**MILMAN LABUDA LAW GROUP PLLC**
**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**
_____

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

Author: Jamie S. Felsen - Member
Direct E-Mail Address: jamiefelsen@mllaborlaw.com
Direct Dial: (516) 303-1391

June 7, 2023

**Via ECF**
Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Re:* **Star Auto Sales of Bayside, Inc.,** *et al.* **v. Voynow, Bayard, Whyte and Co., LLP ("Voynow"),** *et al.*
**Case No.: 1:18-cv-5775 (ERK) (TAM)**

Dear Judge Merkl:

This firm represents the Plaintiffs ("Star") in the above case. The parties have been able to resolve the vast majority of discovery disputes without the need for further judicial intervention, but there are a few disputes that the parties have been unable to resolve. Accordingly, we submit this joint letter with Defendants' counsel, Maureen Fitzgerald, to address the remaining discovery disputes for which the parties request a conference with the Court. Since the last Court conference on March 27, 2023, counsel for the parties met and conferred telephonically on March 30, 2023, April 20, 2023, May 16, 2023, May 18, 2023, and June 1, 2023 (in addition to several e-mail exchanges), but the issues identified herein remain unresolved.

**Star's Position:**

**1)  Expert Discovery**

As is typical in litigation, this "Court contemplated that the expert discovery in this case take place after fact discovery." (Piepes v. Nai Entm't Holdings LLC, 2019 U.S. Dist. LEXIS 246206 (E.D.N.Y. Jan. 29, 2019). In the Court's August 5, 2021 text Order, the Court provided the parties with five (5) additional months to conduct expert discovery following the close of fact discovery. That Order, and no subsequent Order, provided any specific deadlines within the five (5) month period for each party to serve their expert reports. The Court's December 5, 2022 Order extended the end date for fact discovery to March 17, 2023 and the end date for all discovery, including expert discovery, to August 18, 2023. This Court never issued any Order requiring Star to serve their expert report within thirty (30) days after the close of fact discovery as Defendants assert.

In any event, fact discovery has not yet closed. Indeed, the Court's March 28, 2023 Text Order recognized there are "myriad discovery disputes" remaining. Therefore, in the March 28,

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 2 of 18

2023 Order, the Court set various deadlines for the production of documents, for the parties to meet and confer regarding various discovery disputes, and for Voynow's 30(b)(6) deposition to be taken. For example, the parties were directed to meet and confer the week of May 15, 2023 regarding 30(b)(6) deposition topics, Defendants were directed to produce a narrowed subset of documents responsive to Star's Fourth Request for Production of Documents by June 20, 2023, and Star was directed to complete the 30(b)(6) deposition of Voynow by July 20, 2023. (**Annexed hereto as Exhibit "1" is a copy of the Court's March 28, 2023 Text Order**).

The parties have rescheduled the 30(b)(6) deposition for June 22, 2023 and are still meeting and conferring on the topics.[1] Defendants had the opportunity to take Star's 30(b)(6) depositions. Star has not had the opportunity to take Voynow's 30(b)(6) deposition because Voynow failed to appear resulting in motion practice and the directives in the March 28, 2023 Order for the deposition to be concluded by July 20, 2023. Both the documents Voynow is producing by June 20, 2023 and Voynow's 30(b)(6) deposition are necessary for Star's expert to prepare his report just as Star's 30(b)(6) depositions presumably were needed for Defendants' expert to draft his or her expert report.

Accordingly, Star respectfully requests an extension of time to complete expert discovery in line with the five (5) month period following the close of fact discovery contemplated by the Court in its August 15, 2021 and December 5, 2002 Orders. Star proposes the following schedule for expert discovery: (i) the parties' expert reports shall be exchanged by September 15, 2023; (ii) expert rebuttals shall be exchanged by October 27, 2023; and (iii) expert depositions shall be complete by December 15, 2023. Star's request for an extension of time is not on consent.

2) **Star's Second Request for Documents; Demand No. 9: A sample of documents (i.e. different time periods and different services) concerning Defendants' retainers or engagement letter with other automobile dealers involving services other than tax work since January 2010.**

Central to this accounting malpractice litigation is a dispute concerning the scope of work that Star retained Defendants' accounting practice ("Voynow") to perform. No written engagement agreement describing the scope of work Star retained Voynow to perform exists. During discovery, Defendants produced unsigned engagement letters they claim were provided to Star. However, Michael Koufakis ("Koufakis"), one of Star's principals, testified that Star not receive any of these unsigned engagement letters.[2] (See **Exhibit 2 at 4-5**). Moreover, Koufakis, testified that the verbal agreement between Star and Voynow was that the engagement services would fall somewhere between a review and an audit. (See **Exhibit 2 at 2-3**).

---

[1] Plaintiffs request that Defendants be directed to produce all documents under items 2 and 3 herein at least three (3) business days prior to Voynow's 30(b)(6) deposition.

[2] It should be noted that Koufakis testified that he received an engagement letter in December 2016 (after Star discovered the theft) but Star never signed this engagement letter so there is still no written agreement outlining the scope of services between the parties.

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 3 of 18

      Star did not pay Voynow a one-time fee related to the preparation of a tax return as would be typical for a tax preparation engagement. Instead, Voynow invoiced Star and Star paid Voynow a "monthly retainer" for the services Voynow performed for them in addition to a fee for preparation of tax returns. See **Exhibit 7**. Defendants deny that they did anything other than preparing tax returns for Star. Notably, both individuals and corporations generally pay their accountants for the preparation of tax returns after the filing of the tax return and do not pay for same through a monthly retainer over the course of a year.

      Rule 26(b)(1) provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

      Because of the absence of a written engagement letter between Voynow and Star and the factual dispute related to the scope of the engagement, written engagement agreements between Voynow and a sample of other dealerships who retained Voynow to perform solely tax preparation work and also to perform work separate and apart from solely tax preparation, is entirely relevant. The services that Voynow performed for and fees it charged to other dealerships for such services, if similar to Star, will be considered by a jury in making its determination as to Voynow's scope of services provided to Star. If other dealerships paid similar fees to Voynow as Star did, Voynow's scope of services for those dealerships are likely similar to Voynow's scope of services for Star. In the event that the retainer agreements do not contain or accurately reflect the amount that dealerships paid for the services provided to them by Voynow, Defendants should also produce invoices for the other dealerships that reflect this information.

      During counsels' attempts to resolve this dispute, the parties agreed to limit the scope of this demand to the years 2014 and 2015. After limiting it to two years, Star attempted to limit the demand further by requesting that Defendants produce retainer agreements and invoices for (i) three (3) dealerships selected by Star for which Defendants solely prepared tax returns; and (ii) three (3) dealerships selected by Star for which Defendants provided review services in addition to preparation of tax returns (including Thompson Auto Group on whom a subpoena was previously served and quashed by this court on the ground that Star could obtain the information sought in the subpoena from Defendants).

      Defendants have agreed to produce documents responsive to the demand by June 20, 2023 but without clarifying what documents they will be producing and which Defendants (not Star) will choose for three (3) dealerships for which they performed review work. Defendants have not provided any reason why they, rather than Star, should choose the three (3) dealerships other than

stating that the demand gives Defendants the ability to do so. Star only agreed to limit the sample to three (3) dealerships on the condition that Star choose the dealerships because if Defendants choose the dealerships, it will not be a random sampling. Star lacks any knowledge of the specific relationship between Defendants and their clients; thus, if Star chooses it will be a random sampling. Star also specifically asked Defendants if they would be producing documents for Thompson Auto Group (the subject of a prior subpoena which was quashed on the ground that Star could obtain information related to Thompson Auto Group from Defendants) and were told on April 25, 2023 that Defendants need to confer with their clients, but Defendants have not reported back to Star.

Defendants have refused to produce retainer agreements or invoices for any dealerships for whom they perform only tax preparation work because the demand does not explicitly request same. Although this demand seeks retainer agreements only for work other than tax work, during their meet and confers with Defendants Star has modified this demand to include retainers and documents reflecting payments for solely tax work since Defendants assert that they only performed tax work for Star. This information is entirely relevant and Star respectfully requests that the Court direct Defendants to produce same.

3) **Star's Fourth Request for Documents; Demand No. 6: All Documents Concerning checklists Voynow used regarding review engagements for automobile dealership clients as referenced in David Kumor's deposition (**See** Generally p.140-141).**

As discussed *supra*, the scope of Voynow's work for Star is a hotly contested issue in this litigation. David Kumor, a former accountant with Voynow, testified that, when Voynow performed review engagements, it utilized checklists. **(Annexed hereto as Exhibit "3" is the relevant portion of David Kumor's deposition testimony).** Details concerning the contents of these checklists are entirely relevant because they will contain information about the specific tasks associated with Voynow's review engagements.

During depositions, Defendants have attempted to associate work that does not appear to be related to preparation of tax returns with preparation of tax return work. However, if the checklists for review engagements identifies work that Defendants are attempting to classify as preparation of tax return work it would belie Defendants' testimony. This information is relevant with respect to a central issue in this case pertaining to the scope of work Voynow performed for Star and should be ordered to be produced.

During a meet and confer, and in Star's email dated March 30, 2023, Star offered to limit this demand to the specific review engagement checklist about which Mr. Kumor testified. **(Annexed hereto as Exhibit "4" is Star's March 30, 2023 email)**. However, Defendants maintain their objections and take the preposterous position that because Defendants claim they did not perform a review for Star, the audit about which Mr. Kumor testified is not relevant. Despite reminding Defendants during the meet and confer that Koufakis testified that the engagement was somewhere between a review and an audit, Defendants have chosen to ignore Mr. Koufakis' testimony. **(Annexed hereto as Exhibit "5" are Star's emails dated April 24, 2023**

**and April 28, 2023)**. Defendants also ignore the reference in Rule 26 that parties may obtain discovery that is relevant to any "party's claim."  A mere denial of a claim or allegation by a defendant naturally does not prohibit a party from obtaining the discovery.  If that were the case, Star would never obtain any discovery.

Notably, Voynow uses its own internal checklists.  After the thefts at Star were uncovered, Voynow trained Star's new office manager during which time it utilized a checklist (that it produced during discovery) which does not contain any confidential client information.  See **Exhibit 8**. In addition, there are other standard form checklists used for various accounting services. See **Exhibit 9**. The blank "form" checklist is what Star is seeking, not any checklist with client information on it. Like the checklists in **Ex. 8 and 9**, the review engagement checklist is an internal Voynow "form" prepared by and used by Voynow for review engagements and is not a confidential work paper document belonging to Voynow's clients.  To the extent the review engagement checklist about which Mr. Kumor testified contains information identifying the names of any of Voynow's clients, Star agrees that Defendants can redact any such identifying information.

**4)  A Protective Order is Necessary for Reynolds Emails for the Period November 16, 2016 Through December 31, 2017, Requiring Defendants to Pay for the Cost of Production.**

Defendants should be required to pay the costs of production for Reynolds emails for the period of November 16, 2016 through December 31, 2017 as the emails are not readily available and would require Star to retain an IT professional to retrieve the entire Reynolds database (not just emails) from seven (7) backup tapes at an estimated cost of $14,750.[3] **(A copy of a quote from North East Data Protection Service is annexed hereto as Exhibit "6")**.  Prior to 2015, Reynolds retained all emails indefinitely.  However, in or around 2015 (prior to Star learning about the thefts related to the instant lawsuit) Reynolds changed its storage policy to delete all emails on its server older than approximately six (6) months. Therefore, the only way to access emails on Star's Reynolds database from November 16, 2016 through December 31, 2017 is by recovering them from Star's seven (7) backup tapes.  During the parties' meet and confer, Star notified Defendants that Star will produce emails that are responsive to Defendants' proposed search terms for which Star previously produced documents for the period January 1, 2010 through November 15, 2016 if Defendants bear the cost, but Defendants refuse to do so.[4]

Fed. R. Civ. Proc. 26(b)(2)(B) states:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because

---

[3] It should be noted that on April 28, 2023 and May 30, 2023, Plaintiffs produced all emails from January 1, 2010 through November 15, 2016 that were requested by Defendants during mutual meet and confers. See **Ex. 5 at 5-6**.

[4] The Court did not direct Star to produce all Reynolds e-mails for the entire period; it directed Star to produce Reynolds' e-mails after the parties meet and confer and come to an agreement related to which Reynolds' e-mails to produce.  **See Exhibit 1**.

of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Fed. R. Civ. Proc. 26(c)(1)(B) states "[t]he court may, for good cause, issue an order to protect a party or person from … undue burden or expense, including one or more of the following: … **(B)** specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery. Fed. R. Civ. Proc. 26(c)(1)(B).

The Court in Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 322 (S.D.N.Y. May 13, 2003) set forth the following relevant factors to aid courts in analyzing which party should bear the cost of electronic discovery:

(1) The extent to which the request is specifically tailored to discover relevant information;
(2) The availability of such information from other sources;
(3) The total cost of production, compared to the amount in controversy;
(4) The total cost of production, compared to the resources available to each party;
(5) The relative ability of each party to control costs and its incentive to do so;
(6) The importance of the issues at stake in the litigation; and
(7) The relative benefits to the parties of obtaining the information.

217 F.R.D. at 322.

Notably, "[w]hen evaluating cost-shifting, the central question must be, does the request impose an 'undue burden or expense' on the responding party." Id. "[W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)." Id. at 318 (emphasis omitted). "'Accessible' data is stored in a readily usable format that 'does not need to be restored or otherwise manipulated to be usable' and 'inaccessible' [data] is not readily usable and must be restored to an accessible state before the data is usable." Estate of Shaw v. Marcus, 2017 U.S. Dist. LEXIS 29760, 2017 WL 825317, at *3 (S.D.N.Y. Mar. 1, 2017) quoting Zubulake, 217 F.R.D. at 320.

With regard to the first factor – the extent to which the request is specifically tailored to discover relevant information – the request to which the emails are responsive are not tailored to discover relevant information. Demand No. 30 from Defendants' Third Request for the Production of Documents dated January 3, 2022, seeks "All documents and/or communications facilitated through the Reynolds & Reynolds System regarding or referencing Voynow, or regarding or referencing suspected theft, fraud, and/or questionable transactions." Star timely objected to the demand on February 11, 2022, stating the demand is "vague, overly broad, unduly burdensome,

and seeks documents that are not relevant to any claim or defense, are not likely to lead to the discovery of relevant admissible information, nor proportional to the needs of the case" – which is accurate. The demand is vague because the term "questionable transactions" is subjective, undefined, and unclear. The demand is overly broad because no time period is specified. The demand is unduly burdensome because it will cost Star $14,750 to produce these emails. The production of all of these emails is also not relevant because, as discussed below under the seventh factor, responsive documents will provide limited value to Defendants' defenses.

With regard to the second factor – the availability of such information from other sources – the Reynolds emails from the period of November 16, 2016 through December 31, 2017 are only available on the Star's seven (7) backup tapes.

With regard to the third factor – the total cost of production, compared to the amount in controversy – the $14,750 cost is not significant in comparison to the 10 million dollars Star seeks in their Complaint.

With regard to the fourth factor – the total cost of production, compared to the resources available to each party – Defendants' insurer, CNA, earned $11.879 billion in revenue in 2022 and its current revenue is $11.90 billion.  https://companiesmarketcap.com/cna-financial/revenue/. Star's combined revenue for 2022 was approximately $260 million (a small fraction of CNA's revenue).

With regard to the fifth factor – the relative ability of each party to control costs and its incentive to do so – this factor is neutral as both parties have spent substantial amounts on e-discovery.

The sixth factor – the importance of the issues at stake in the litigation – is one that is rarely invoked except in cases such as "toxic tort class actions, environmental actions, so-called "impact" or social reform litigation, cases involving criminal conduct, or cases implicating important legal or constitutional questions." Zubulake, 217 F.R.D. at 321.

With regard to the seventh factor – the relative benefits to the parties of obtaining the information – the emails at issue have limited value to Defendants.  For the period January 1, 2010 through November 15, 2016, the documents produced for this seven (7) year period have no bearing on the claims and defenses in this case.  For example, Defendants' search terms have returned emails about birthdays, funerals, Reynolds software updates, and dental insurance (Star can produce examples of these emails under seal if the Court grants Star leave to do so). Defendants have not informed Star of any email contained in the thousands of pages of emails Star produced for that seven (7) year period that assist their defense in this case. Star should not be further burdened with the cost to produce additional emails covering a thirteen (13) month period where emails from the prior seventy-one (71) month period provide no value.

Based on the foregoing, production of the emails is an undue burden for Star and Defendants should bear the cost for production of same if they want them.

**Defendants' Position:**

**This Court Should Reject Yet Another Request for A Discovery Extension From Plaintiffs and Should Preclude Plaintiffs From Expert Testimony Given Their Violation of This Court's Orders**

Given the age of this case, this Court has made clear on numerous occasions that it would not entertain further extensions of the discovery deadlines although Plaintiffs have made repeated requests to do so. In an attempt to get around this directive, Plaintiffs served an egregiously improper 30(b)(6) deposition notice on Voynow just weeks before the March 17, 2023 fact discovery deadline. This 30(b)(6) notice encompassed a 21 year period, included 86 separate topics, was impermissibly vague and overbroad, sought privileged information, failed to specify which of the 86 topics applied to which of the five Plaintiffs, and lacked the "painstaking specificity" required for 30(b)(6) depositions notices. See <u>DDK Hotels v. Williams Sonoma, Inc.</u>, 2022 WL 2702378 *2 (E.D. N.Y. February 11, 2022) ("'Reasonable particularity' means that the noticing party must describe the notices topics with 'painstaking specificity" as to subject areas relevant to the dispute at issue"). It violated the requirements for 30(b)(6) depositions in so many aspects such that this Court noted at the March 28, 2023 in person Pre-Motion Conference that it would be impossible for any witness to testify in response to such a notice. Compounding this improper deposition notice, Plaintiffs then flatly refused to allow Defendants to designate prior testimony as being responsive to the various topics despite the fact that Plaintiffs has already deposed 14 Voynow employees on most of these topics, including its four partners. In short, the fact that Plaintiffs did not complete the 30(b)(6) deposition prior to the March 17, 2023 fact discovery deadline is entirely the result of their disregard of the rules regarding 30(b)(6) depositions.[5] Respectfully, this background should be considered in the context of yet another request by Plaintiffs to extend the discovery deadlines in a case that is already over five years old.

As far as the timing of the production of expert reports, the parties previously agreed that Plaintiffs would produce their expert report thirty days after the close of fact discovery and Voynow would have thirty days thereafter to produce responsive expert reports. There was never a contemplated simultaneous exchange of expert reports, as Plaintiffs now request. Indeed, pursuant to the Court's July 12, 2021 Order, the parties submitted a Joint Case Management plan establishing this timeline for completing fact and expert discovery. This July 27, 2021 Case Management Plan specified that fact discovery was to be completed by 7/29/22; Plaintiffs expert report was due 30 days after fact discovery or by 8/31/22; Defendants' expert

---

[5] Plaintiffs make reference to the fact that defense counsel took 30(b)(6) depositions of the Plaintiffs to somehow justify their argument. The background as to the need for these depositions is critical. Defendants deposed the Plaintiffs' three owners – Michael, John and Steven Koufakis. When specifically asked about the alleged thefts and damage claims being asserted, none of the three owners were able to answer questions and claimed to have no knowledge. Because the owners were unable to answer these questions on behalf of the corporations they owed, Defendants noticed 30(b)(6) depositions. In contrast, the Voynow 14 witnesses already deposed have answered questions *ad nauseum* about the tax engagement services provided and their workpapers.

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 9 of 18

report was due 30 days thereafter by 9/30/22; and that completion of all discovery would be by 12/30/22.  The Case Management Plan provided that the final date to initiate a dispositive motion was 1/31/23.   This Court adopted this Plan by Order dated August 9, 2021, stating as follows:

> As stated on the record, the parties' discovery plan is adopted, in part, as follows. The deadline for joining additional parties and amending the pleadings is 10/15/2021. Fact discovery shall be completed on or before 7/29/2022. The parties are directed to file a joint status report certifying the close of fact discovery by 8/15/2022. All discovery shall be completed by 12/30/2022.

See August 9, 2021 Minute Entry  and Order.

These deadlines were subsequently extended by the Court.  In December of 2022, Plaintiffs made a request to further extend these deadlines which Defendants opposed.  By Order dated December 5, 2022, this Court ordered as follows:

> In light of the ongoing depositions and complexity of the case, the following deadlines are extended. **Fact discovery shall be completed on or before 3/17/2023**. The parties are directed to file a joint status report certifying the close of fact discovery by 3/24/2023. **All discovery shall be completed by 8/18/2023**. The last date to take the first step in dispositive motion practice is 9/18/2023, and should be done in accordance with the Assigned District Judge's Individual Rules and Practices. **As previously stated, the Court is concerned about the age of this case and the length of time for discovery. Additional extensions of time are highly unlikely**. The parties are direct to file a joint status report by 2/17/2023.

See December 5, 2022 Order.

Based upon this Order, the timing of the production of expert reports and expert discovery as set forth in the joint case management plan remained unchanged.  As such, Plaintiffs' expert report was due 30 days after the close of fact discovery – or by April 16, 2023.  Similarly, the timing of dispositive motion practice in relation to the closure of all discovery also remained unchanged as this Court specified that September 18 2023 was the dispositive motion deadline.

 On March 17, 2023, fact discovery closed.  Plaintiffs then made yet another request to reopen fact discovery and extend all deadlines, but this Court denied their request.  In its March 28, 2023 Order, it stated:
> **The Court declines to reopen discovery** *in toto* but directs the parties to continue to meet and confer regarding the myriad discovery disputes highlighted in their recent letters and at the conference. …. **The remaining deadlines as to the close of all discovery ( 8/18/2023) and the last date to take the first step in dispositive motion practice in accordance with the**

### Individual Rules of the assigned District Judge ( 9/18/2023), set on 12/5/2022, remain in effect.

See March 28, 2023 Order.

Thus, the Court has made clear through two separate orders – December 5, 2022 and March 28, 2023 – that the fact discovery deadline was March 17, 2023 and all discovery was to be completed by August 18, 2023. Contrary to Plaintiffs' argument, fact discovery has not remained open. It closed on March 17, 2023. Counsel for the parties thereafter met and conferred on this very topic on March 30, 2023, April 5, 2023 and April 20, 2023. Plaintiffs requested that Defendants agree to extend their expert deadline and Defendants made clear they would not. Thus, Plaintiffs have known for over two months now that (1) this Court had not extended the deadlines for expert discovery; and (2) Defendants would not agree to do so.

Plaintiffs' expert report was due by April 16, 2023. Plaintiffs never produced their report nor filed anything with this Court prior to the April 16, 2023 deadline seeking an extension. Plaintiffs' contention that they somehow need the 30(b)(6) deposition in order to produce an expert report is without merit. They have deposed 14 Voynow employees including all four partners and questioned witnesses on virtually *every* topic listed in the notice. They have been in possession of Voynow's workpapers, invoices and emails for four years. A 15th deposition rehashing the same topics should not be grounds to circumvent this Court's repeated orders regarding deadlines. Indeed, if Plaintiffs felt that a 30(b)(6) deposition was so crucial to their case, they should not have waited five years into discovery to notice it. Almost two months past their expert deadline, Plaintiffs now request an extension despite this Court's repeated stance that it would not entertain further extensions and that all deadlines "remain in effect." Not only should their request be denied given the clear directives made by this Court, but Plaintiffs should now be precluded from introducing any expert report given their violation and disregard of the Court's orders. See e.g., <u>LaMarca v. United States</u>, 31 F.Supp.2d 110, 122 (E.D. N.Y.1999); (the "duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses."); <u>Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.</u>, 769 F.Supp.2d 269, 279 (S.D.N.Y.2011) (courts will not admit expert evidence following the close of discovery as doing so 'would eviscerate the purpose of the expert disclosure rules); <u>Silivanch v. Celebrity Cruises, Inc.</u>, 171 F.Supp.2d 241, 256 (S.D.N.Y.2001) (precluding expert testimony that was not disclosed during expert discovery); <u>Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.</u>, 301 F.R.D. 31, 38 (S.D.N.Y.), objections overruled, 301 F.R.D. 47 (S.D.N.Y. 2014) (AAI's unjustifiable failure to serve its expert disclosures on time justified imposition of a sanction pursuant to court's inherent authority to manage this case); <u>United Magazine Co., Inc. v. Curtis Circulation Co.</u>, 279 Fed.Appx. 14, 18 (2d Cir. 2008) (affirming district court's decision to strike a previously stricken expert report, submitted with plaintiff's opposition papers); <u>Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.</u>, 118 F.3d 955, 961–63 (2d Cir.1997) (affirming magistrate judge and district judge's order to preclude expert reports submitted past discovery cutoff date); <u>Mobileye, Inc. v. Picitup Corp.</u>, 928 F.Supp.2d 759, 766 (S.D.N.Y. 2013) (striking an untimely expert

declaration); *Arnold v. Krause, Inc.,* 232 F.R.D. 58, 67 (W.D. N.Y. 2004) ("preclusion of a proposed expert's testimony and report, disclosed in violation of a scheduling order ... [has been held to be] a proper sanction for tardy expert report).

### **Plaintiffs' Request for A Protective Order As to The Reynolds Emails Should Be Denied**

As stated in prior submissions to this Court, Plaintiffs do not have company email. Routinely, Plaintiffs' employees used their personal email accounts to conduct business on behalf of Plaintiffs. Despite initiating this lawsuit, Plaintiffs never obtained, preserved, nor required their employees to provide these emails. Moreover, two of the three company owners failed to produce any emails, claiming that they were destroyed or otherwise not preserved. However, Plaintiffs did have a limited internal email program through its accounting database known as the Reynolds system. The Reynolds emails reflect internal communications among Plaintiffs' employees and owners, with a significant component relating to accounting and bookkeeping matters. Defendants requested these emails be produced for the period of 2010 through 2017. After several meet and confer sessions dating back to December of 2022, Voynow agreed to narrow the scope of this request to the emails for just 9 custodians even though over 25 employees worked on accounting matters. Voynow then further agreed to provide search terms to be applied. This Court has reviewed the search terms and deemed them to be reasonable. This Court has already heard arguments from Plaintiffs as to their unwillingness to produce the Reynolds emails. Initially, Plaintiffs contended that the 11,000 documents in existence for the period of 2010 through November 2016 was too voluminous and costly to review. Then, when Defendants provided search terms, Plaintiffs argued that the terms were overbroad. Application of these search terms dispelled that argument, yet Plaintiffs continued to refuse to produce the Reynolds emails until this Court issued Orders on April 28, 2023 and May 24, 2023 directing them to do so.

Despite these orders, Plaintiffs refuse to produce any Reynolds emails for the period of November 2016 through December 2017 on the basis that it is too costly to do so because the emails are now housed on back-up tapes. **For the first time**, Plaintiffs now seek a protective order on the basis that $14,750 cost to restore these emails is purportedly too expensive and burdensome for them. This $14,750 cost is apportioned among the five Plaintiff corporations who collectively shared and used the Reynolds email system. As such, this supposed "undue burden" amounts to **a cost of $2,950 for each Plaintiff corporation**. They seek a protective order requiring that Voynow pay the $14,750 for the restoration and production of these emails. Notably, they do not argue that the November 2016-December 2017 time period at issue is not relevant. To the contrary, it is arguably the most critical time period as it is when the alleged thefts were discovered, investigated, and when two controllers and numerous accounting employees were fired or quit. It is when Plaintiffs hired an outside accountant in February of 2017 to investigate and then hired a forensic accounting firm in April of 2017 for purposes of this litigation. It is during this time period when Voynow was terminated and when Plaintiffs put Voynow on notice in December of 2017 of the anticipated litigation and the need for Voynow to preserve documents. Plaintiffs also contend that alleged theft was ongoing during this period. In short, this time period is highly relevant.

At the outset, Plaintiffs' request for a protective order should be denied as they waived this argument by failing to make it months earlier when the parties briefed this Court. During February and March of 2023, various submissions were made to this Court regarding the Reynolds emails and their production was also discussed at the March 28, 2023 Pre-hearing Conference. At no point did Plaintiffs ever raise the need for a protective order or the purported $14,750 cost as being an undue burden. They have done so now only ***after*** this Court issued two orders (April 28, 2023 and May 24, 2023) compelling them to produce the Reynolds emails. As such, they have now waived this argument and their request for a protective order should be denied for this reason alone. See e.g., Chevron Corp. v. Donziger, 325 F. Supp. 3d 371, 386 (S.D.N.Y. 2018) (finding that protective order motion was essentially an attempt to reargue a court ruling on a prior motion to compel and that the new argument now advanced had been waived or forfeited as being untimely).

Second, Plaintiffs' request for a protective order to shift the $14,750 cost to Voynow is not appropriate given that **it was Plaintiffs' own failure to preserve relevant evidence in an accessible format that has created this alleged burden**. Plaintiffs hired forensic accountants in April of 2017 for purposes of litigation consulting services. Plaintiffs terminated Voynow in November of 2017. Plaintiffs retained litigation counsel who presumably advised Plaintiffs of their obligation to preserve documentation. In fact, on December 5, 2017, Plaintiffs' litigation counselsent a letter to Voynow putting it on notice of the anticipated litigation and directing Voynow to preserve documentation. See Ex. A. In short, Plaintiffs knew of the anticipated litigation against Voynow in early 2017 when had the ability to preserve the Reynolds emails. Yet inexplicably they failed to take the requisite steps to do so, instead allowing the Reynolds emails from November of 2016 through 2017 to be placed in an inaccessible format, despite knowing their likely relevance. They plainly disregarded their own obligations to preserve documents in an accessible format and should not now be permitted to pass off this cost to Voynow.

It is well-established that the obligation to preserve evidence arises when a party has notice that evidence is relevant to litigation or when a party should know that evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir.2001), citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998). **If a party creates its own burden or expense by either failing to preserve or by converting evidence into an inaccessible format data that it should have reasonably foreseen would be discoverable, at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data.** Zubulake v. UBS Warburg LLC, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) ("While a litigant is under no duty to keep or retain every document in its possession ... it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonable likely to be requested during discovery and/or is the subject of a pending discovery request."); Houlihan v. Marriott Int'l, Inc., 2003 WL 22271206 at *2 (S.D.N.Y. Sept. 30, 2003) (in determining the scope of duty to preserve evidence in the absence of a discovery order, "the critical question is whether the party knew or should have known that the destroyed evidence was relevant" to the litigation); Quinby v. WestLB AG, 245 F.R.D. 94, 104–05 (S.D.N.Y. 2006) (rejecting cost-shifting as it would prevent

parties who allowed discoverable material to be converted into an inaccessible format from taking unfair advantage of a self-inflicted burden by shifting costs of undoing the burden to adversary).

Here, Plaintiffs inexplicably failed to preserve the Reynolds emails in 2017 when they anticipated litigation, retained counsel and actually put Voynow on notice of its obligation to preserve documents. Clearly, they knew or should have known of the relevance of these emails given the critical time frame. In short, by failing to preserve these emails in an accessible format back in 2017 when they had the ability to do so, Plaintiffs have effectively created their own "burden." Because the "burden" is self-inflicted, their attempt to shift the cost of this burden to Defendant is improper and the protective order should be rejected.

Lastly, Plaintiffs' request for a protective order compelling Voynow to pay $14,750 should be denied as they fail to meet their burden based upon the established factors this Court should consider as cited by Plaintiffs. See *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280, 283 (S.D.N.Y. 2003) At the outset, there is a presumption in the law that the responding party must bear the expense of complying with discovery requests. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Indeed, Voynow has borne the costs of retaining a third party ediscovery vendor to collect, search for and produce documents responsive to Plaintiffs' discovery requests and never sought to shift that cost to Plaintiffs. A cost-shifting protective order is only issued "for good cause shown." *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280 at 283 (S.D.N.Y. 2003). In *Zubulake*, the court listed certain factors to be considered when determining if cost-shifting is appropriate for the restoration of inaccessible data on back-up tapes. *Id.*, 216 F.R.D. at 284. As to the first two factors cited in *Zubulake* regarding relevance and the availability of information from other sources, the court stated that they should be weighted most heavily in the cost-shifting analysis and the more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the responding party search at its own expense. *Id*. Here, as noted above, the period of November 2016 through 2017 is of critical importance given that this was then theft was allegedly discovered, investigated, employees were questioned, and fired or quit. Two other accountants were retained to investigate and allegedly, employee theft still continued. Thus, the potential content of these internal emails is highly relevant and given that Plaintiffs lacked any company-wide email system and otherwise failed to preserve their employees' or owners' personal emails, it is clear that information can only be obtained through the Reynolds emails. Indeed, the *Zubukake* court noted that where other sources of information were no longer available due to deletion of other emails, then the "utility" of emails only available on back-up tapes becomes "potentially high" and weighs against cost-shifting. *Id*. See also *Quinby v. WestLB AG*, 245 F.R.D. 94, 109 (S.D.N.Y. 2006) (the absence of any other source for these e-mails as they are only available on backup tapes weighed against cost-shifting). Thus, consideration of the first two factors – which are the most important – warrant a denial of a protective order in Plaintiffs' favor.

Factors 3-5 relate to the costs of the restoration and consider who can handle this expense. Because Plaintiffs failed to preserve the Reynolds emails back in 2017 (when they were putting Voynow on notice it its obligation to preserve data), it will allegedly cost $14,750 to convert the emails into an accessible format. When analyzing this cost factor, consideration must be given as to why the data is now in a back-up format, as well as the cost of restoration in relation to the

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 14 of 18

amount in controversy, and Plaintiffs' ability to pay. As noted above, this burden of the $14,750 cost is entirely self-inflicted as Plaintiffs failed to preserve the emails in an accessible format despite knowing litigation was forthcoming. Further, Plaintiffs seek $10 million in damages, so the $14,750 is less than .1% of the damages claims asserted. Plaintiffs clearly have the ability to pay this cost. As between the five Plaintiffs, this amounts to $2,950 apiece. Collectively, Plaintiffs generate at least $300 million in annual revenue and are therefore hard pressed to argue that each cannot pay $2,950 when their own actions are the cause of this self-inflicted burden. Consideration of these cost factors warrants denial of any protective order. See e.g., *Zubukake*, *supra*, 216 F.R.D. at 284 (a cost of $165,955 to restore back up tapes in a case seeking $15 million in damages did not justify a cost-shifting as "the cost of restoration is surely not "significantly disproportionate" to the projected value of this case); *Quinby v. WestLB AG*, 245 F.R.D. 94, 109 (S.D.N.Y. 2006) (finding that plaintiffs' potential to receive a "multi-million dollar recovery" weighed against cost-shifting where the cost for restoring and searching emails on backup tapes was $226,266); *Semsroth v. City of Wichita*, 239 F.R.D. 630, 638 (D. Kan. 2006) (rejecting protective order sought by four individual plaintiffs in a discrimination case seeking to shift the $3,375 cost for restoring a back up tape with discoverable e-mails).

As to factors 6, Plaintiffs concede that it is not relevant and does not support their request for a protective order. As to factor 7 regarding relative benefit, Plaintiffs argue that the Reynolds emails from 2016 through 2017 will "have limited value." Yet, it is somewhat incredulous as to how Plaintiffs can even make this argument given their representation that the emails are in an inaccessible format. Because Plaintiffs do not know the content, they cannot credibly rely upon this factor to meet their burden. In short, Plaintiffs' late request for a protective order should be denied as it is untimely, stems from Plaintiffs' own disregard of its obligation to preserve evidence when litigation was anticipated back in 2017, and they cannot meet their burden as to any of the seven factors outlined in *Zubulake*.

### Plaintiffs Are Not Entitled to The Checklist Workpaper for A Review Attestation Engagement Performed by Voynow for Another Client As Referenced by David Kumor.

Voynow's engagement with Plaintiffs was a tax engagement as set forth in annual engagement letters. See Ex. B. Beginning in the late 1990's, Voynow issued annual engagement letters to Plaintiffs. These tax engagement letters coincided with the recommendations made at the time by the AICPA that tax accountants issue annual engagement letters for tax engagements. The AICPA did not – and still does not – mandate that a taxpayer sign these tax engagement letters before a tax accountant can issue their tax return. Thus, there has never been any requirement for Plaintiffs to sign the engagement letters issued by Voynow in order to receive their annual tax returns. In contrast, for other types of engagements such as a review or audit engagement, the AICPA's professional standards have always mandated that an accountant obtain both a signed engagement letter and a signed management representation letter from a client before the accountant can issue the reviewed or audited financial statement.

In this case, Voynow has produced the annual engagement letters issued to Plaintiffs since 1998 as well as the annual "work product" it issued to Plaintiffs: corporate tax returns. That is

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 15 of 18

the only work product ever issued by Voynow. Although Plaintiffs' owner Michael Koufakis testified that he hired Voynow to provide services "higher than a review and lower than an audit" and to "detect fraud," there is no dispute between the parties that Voynow never prepared Plaintiffs' financial statements and never performed any attestation engagement for Plaintiffs, such as a review or audit. It is undisputed that Plaintiffs prepared their own financial statements.

Against this backdrop, Plaintiffs deposed a former Voynow employee David Kumor, and questioned him about engagements he worked on for other Voynow clients wholly unrelated to Plaintiffs or this case. He testified that for tax engagements, Voynow would conduct interim tax visits and that these interim tax visits were totally unrelated to a review engagement wherein Voynow would actually prepare and issue a dealership's financial statements. For those types of review engagements, Mr. Kumor explained that it was mandatory for a client to sign the engagement letter before the financial statements could be issued and mandatory for the client to also provide a signed management representation letter. He stated that certain checklist workpapers were used on these review engagements that were tailored to the particular client's financial records and were in excess of 40-60 pages. However, Mr. Kumor made clear in his deposition that these "checklist workpapers" did not pertain to tax engagements (See Ex. C at 146:22-25) and had nothing to do with Voynow's tax engagement with Plaintiffs which did not involve the use of checklists:

> Q.: Okay. And when you mentioned that there – you testified, at some point you were asked questions about checklists.
> A.: Um-hum.
> Q.: And a subscription for checklists.
> A.: Yes.
> Q.: That checklist that you referred to, that pertained to a review type engagement, correct?
> A.: Yes.
> Q.: It does not pertain to a tax engagement?
> A.: It does not.
>
> Q.: Did you understand that those interim visits that you participated in at Star, did you understand that that was part of Voynow's tax engagement with Star?
> A.: That was my understanding.
> Q. And did you understand that Voynow's engagement with Star was a tax engagement?
> A.: Yes.

Ex. C at 261:5-15; 265:24-266:9.

Despite this explicit testimony whereby Mr. Kumor made clear that his reference to a "workpaper checklist" pertained to a financial statement review engagement for other clients – and not Plaintiffs – they now seek an order compelling Voynow to produce the workpaper checklist for

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 16 of 18

the review engagement that Mr. Kumor had worked on for another Voynow client. Voynow has produced its workpapers for Plaintiffs' engagement, but there is no basis to allow discovery of Voynow's workpaper checklist for another client's financial statement engagement as it has no relevance to Plaintiffs or the claims asserted in this case. Voynow did not use formal checklists for Plaintiff's tax engagement. While Plaintiffs has offered an incomplete portion of a 2021 blank tax checklist – Ex. 9 – in support of its argument, the fact remains that there were no such checklists used for Plaintiffs' tax engagement. Voynow's workpapers have been produced and there are no checklists. All 14 Voynow witnesses confirmed this fact as there is no requirement to use such a checklist in a tax engagement. Similarly, Plaintiffs' reference to a list of "internal control" recommendations Voynow provided to Plaintiffs' newly hired and inexperienced controller in 2017 – Ex. 8 - is another mischaracterization. This is not a Voynow workpaper checklist used in an engagement. A simple reading of the document makes clear that it is a list of steps for management – not Voynow – to consider when monitoring internal controls.

Notably, Plaintiffs do not cite to *any* authority or case law supporting their position. They never obtained consent from Voynow's client to authorize the release of any workpaper checklist. Pursuant to Pennsylvania's CPA Law, an accountant's workpaper cannot be shared without the consent of the client. See 63 Pa.Stat. ¶ 9.11(a) (2008)("no such statement, record, schedule, working paper or memorandum shall be sold, transferred or bequeathed, without the consent of the client or his personal representative, successor or assignee, to anyone…"). Further, the content of this workpaper checklist referenced by Mr. Kumor contains confidential information regarding Voynow's client who is entitled to protection of this information regarding its financial records. <u>Young v. Kaye</u>, 443 Pa. 335, 279 A.2d 759 (Pa. 1971) (the relationship between a Pennsylvania accountant and his client has been held to be one of confidentiality). Plaintiffs have wholly ignored these issues in seeking the production of workpaper checklist for another Voynow client. The only argument offered in support of this request is the testimony of Michael Koufakis who claims that he hired Voynow to conduct something "higher than a review and less than an audit" and to "detect fraud." A judge or jury deciding this issue will consider the credibility of Mr. Koufakis, as well as evidence regarding Voynow's engagement with Plaintiffs in the form of its workpapers, the engagement letters sent to Plaintiffs, Voynow's invoices sent to Plaintiffs, and Voynow's annual work product issued to Plaintiffs. To suggest that a judge or jury should also consider the confidential workpaper checklist that Mr. Kumor used during a financial statement review engagement for another Voynow client located in a different state, with a completely different set of books and records, and who is wholly unrelated to Plaintiffs or this case, is plainly a perversion of the discovery process.

To the extent Plaintiffs now seek to modify their initial discovery request regarding the checklist referenced by Mr. Kumor, and seek an order compelling Voynow to produce a "blank" review engagement checklist, Plaintiffs do not need Voynow to do so nor this Court to order Voynow to produce such a document. Plaintiffs can obtain "blank" checklists used for review or audit engagements from the internet as they are publicly accessible. Indeed, Plaintiffs have already demonstrated they they can obtain these "blank" checklists – See Ex. 9. There is no need for this Court to order production of a blank or redacted checklist.

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 17 of 18

### The Dispute Regarding Plaintiffs' Request For Production of Sample Non-Tax Engagement Letters Is Moot

During discovery, Plaintiffs requested: "A sample of document (i.e., different time periods and different services) concerning Defendants' retainers or engagement letters with other automobile dealers involving services other than tax work." After several meet and confer sessions, by email dated April 5, 2023, Defendants agreed to produce three sample engagement letters for non-tax clients wherein Voynow performed services for 2014-2015. This production will be made pursuant to the June 20, 2023 deadline set by the Court. This issue is now moot.

Plaintiffs now argue that they should be permitted to decide which Voynow clients and which Voynow engagement letters should be produced. Yet, that was never their request which simply seeks a "sample." Plaintiffs now also argue that they are entitled to invoices Voynow issued to its other clients – even though that was never part of the document request at issue. In making these arguments, Plaintiffs make several blatant misrepresentations to this Court. First, they state that "nowritten engagement letter" exists. This is plainly untrue as annual engagement letters were issued beginning in 2008 once AICPA guidance began recommending that tax accountants issue them and they were sent to Plaintiffs each year through 2016. See e.g., Ex. B. Second, Plaintiffs misrepresent the facts when they state that they paid a "monthly fee" which was purportedly not typical for a tax preparation engagement. Plaintiffs claim that corporations pay for tax services only after the tax returns are prepared. Not only is this statement directly refuted by the evidence in this case, it also makes no sense from a cash flow perspective. Tax accounting firms would never be able to financially function if funds owed by corporate tax clients were only paid at the end of a tax year. Voynow's managing partner explicitly testified regarding retainers and stated that ALL of Voynow's dealership clients are billed on a monthly retainer.

> Q.: Are all Voynow dealership clients that have a tax engagement billed on a monthly basis?
> A.: All the dealership clients are billed on a monthly retainer.

Hugh Whyte Deposition, Ex. D at 158:16-20.

He explained that the "retainer" is "strictly just to get some money in advance so [Voynow] has something in the firm before we start the work." Ex. D at 159:24-160:4. As work is performed, he explained that progress billings and a final bill were issued with the monthly retainers deducted before these bills are issued. Ex. D at 160:5-8. Thus, Plaintiffs' attempt to argue that the monthly retainer invoices were atypical for Voynow or that they were for services unrelated to the tax engagement is plainly false and a misrepresentation to this Court. Moreover, this argument fails to set forth any basis by which Plaintiffs should now be entitled to discovery of invoices or amounts paid by other Voynow clients for their tax returns or for issuance of reviewed financial statements. In short, this issue is moot as Voynow has agreed to produce three sample engagement letters. Plaintiffs are not in position to dictate which clients should agree to the release their engagement letters, absent consent from them. Nor should Plaintiffs be permitted to expand the scope of this request to include invoices issued to other clients as this information has no relevance to this case.

Honorable Taryn A. Merkl, U.S.M.J.
United States District Court Eastern District of New York
June 7, 2023
Page 18 of 18

                                                  Respectfully submitted,

                                                  **MILMAN LABUDA LAW GROUP PLLC**

                                                  <u>/s/ Jamie S. Felsen</u>

cc: All counsel of record