David Kumor
October 18, 2022

Page 146

1  Q.       -- to do this work?
2  A.       Yes.
3  Q.       Okay.
4  A.       But if we were doing anything beyond the
5  scope, like a review or an audit, we would need an
6  engagement letter for that.
7  Q.       Okay.  Was that -- as far as needing an
8  engagement letter, was that something that you were
9  told by, you know, Randy or Hughie, or someone else,
10 that this was required?
11 A.       Originally I was told it, and then I read it
12 somewhere that you had to -- these are the things that
13 you need too.  Because that's one of our checklist
14 things.  Do you have an engagement letter?  I would
15 have to physically sign off and say, yes, I have an
16 engagement letter.
17 Q.       Oh, okay.
18         MS. FITZGERALD:  Is this for review?
19         THE WITNESS:  This is for review.  Yes.
20         Review and audit.
21 BY MR. MULE:
22 Q.       So were you provided a checklist of what was
23 necessary for particular engagements?
24 A.       So the check -- so nothing -- not that I can
25 think of for tax.  But review and audit, we subscribed

Page 147

1  to something that told us what needed to be in the
2  engagements.
3  Q.       What do you mean you subscribed to something?
4  A.       It was some accounting.  I know it's called
5  Smart.  Something like that.  I don't know.  I haven't
6  used it in a while.  But it basically -- you had to
7  check, physically sign off, saying that I did this
8  step.  I did this step.
9  Q.       Do you know if this -- Smart, was it a
10 software?
11 A.       It was a software program.
12 Q.       This software, do you know if it existed from
13 the time that you started at Voynow?  Or sometime
14 after?
15 A.       I think it was there before me.
16 Q.       And was it there for the entire time of your
17 tenure at Voynow?
18 A.       Yes.
19 Q.       As far as clients of Voynow, then, you didn't
20 -- weren't personally responsible for the engagement,
21 such as Star.  You don't know what conversations Randy,
22 for instance, or whoever the managing partner in
23 charge, you don't know the conversations that they had
24 with the clients, right?
25 A.       No.

Page 148

1  Q.       Were there continuing professional education
2  courses that you were required to take while working at
3  Voynow?
4  A.       I was not required to, but they did let me go
5  to CPEs so I could be better in what I was doing.
6  Q.       Okay.  How often would you go to CPEs?
7  A.       I would not go as often as the people that
8  had CPAs.  But I would go whenever they would allow me
9  to.  So it was at least twice a year.
10 Q.       And what -- do you recall any particular
11 courses that you -- that you took?
12 A.       When the new tax law came out I know we did
13 something with that.  And then I would go for
14 refreshers for 401Ks.
15 Q.       Did you do any CPEs related particularly to
16 the auto industry?
17 A.       I don't even know if they have those.
18 Q.       Okay.
19 A.       So no.
20 Q.       Any as to fraud detection?
21 A.       Probably was included with the 401K.
22 Q.       Okay.  Did you have any guidance, on the job,
23 as to how to detect irregularities in the -- when doing
24 reviews, or reviewing records at these dealerships?
25         MS. FITZGERALD:  Objection to form.

Page 149

1         THE WITNESS:  It would be if an answer
2         that someone gave me didn't make sense, I
3         would go to the person in charge and ask
4         them.  And if it didn't make sense to them,
5         then something was probably off.  But I don't
6         think that ever happened.
7  BY MR. MULE:
8  Q.       Okay.  Did you receive any written
9  guidelines, or policies, as far as checklists of what
10 you should look at as an accountant going to auto
11 dealerships?
12 A.       Going to the dealerships.
13 Q.       Yeah.
14 A.       I don't believe so.
15 Q.       Okay.  So we saw earlier, it was a checklist,
16 and it was recommendations with respect to internal
17 controls for dealerships that Voynow recommended
18 controllers should take.
19 A.       Yep.
20 Q.       So I want to know, did you receive anything
21 -- anything similar in your whole tenure at Voynow, as
22 to what you should look at as an accountant?
23         MS. FITZGERALD:  Objection.
24         THE WITNESS:  I don't remember, so.
25 BY MR. MULE:

David Kumor
October 18, 2022

Page 258

1  31st, 2016 schedules.
2  Q.      So going back to Exhibit-40, we cannot look
3  at your time records, because they're not there for
4  that time period, correct?
5  A.      Correct.
6          MS. FITZGERALD:  In this exhibit.
7  BY MR. MULE:
8  Q.      In that exhibit, right.
9  A.      Okay.
10 Q.      Do you know who was working at Subaru in the
11 summer of 2016?
12 A.      I do not.
13 Q.      Do you know who was working at Subaru year
14 end 2016?
15 A.      I do not.
16 Q.      Okay.  I have no further questions at this
17 time.  Thank you.
18              *   *   *
19          EXAMINATION
20              *   *   *
21 BY MS. FITZGERALD:
22 Q.      I just have a few.
23 A.      Okay.
24 Q.      Promise.  First off, you said that you wanted
25 to review your transcript.

Page 259

1  A.      Yes.
2  Q.      Okay.  So it's the court reporter who will be
3  sending that to you.  Which e-mail would you like her
4  to send that to?
5  A.      My personal, please.
6  Q.      I think that's in the transcript.  The g-mail
7  account, right?
8  A.      Yes.
9  Q.      You were asked, at several points today,
10 about a review engagement?
11 A.      Um-hum.
12 Q.      And you testified that that was something,
13 while you were employed at Voynow, that you worked on
14 for Thompson.
15 A.      Yes.
16 Q.      And for Paruzzi?
17 A.      Um-hum.
18 Q.      Okay.  And as part of a review engagement,
19 when that term was being used, did you understand that
20 to mean an engagement where reviewed financial
21 statements were issued by Voynow?
22 A.      Yes.
23 Q.      Okay.  Is it fair to say that the product, or
24 the end product of a review engagement, is financial
25 statements that are issued by Voynow to the client?

Page 260

1  A.      It's financial statements issued to the
2  client that can be distributed with our names on it.
3  Q.      Correct.  Okay.  And those financial
4  statements, those reviewed financial statements, you
5  mentioned, would have footnotes?
6  A.      It would have footnotes.  It would have our
7  -- it would be on our company letterhead.  There would
8  be a lot of difference.  Usually, if they didn't want a
9  pdf, we'd have nicely bound copies.  A lot more
10 detailed than our stapled together interim letters.
11 Q.      Okay.  And you mentioned that for review
12 engagements, which we've established is a reviewed
13 financial statement engagement?
14 A.      Yes.
15 Q.      There is a separate engagement letter, is
16 that correct?
17          MR. MULE:  Object to the form, but go
18          ahead.
19          THE WITNESS:  I'm sorry, what was your
20          question?
21 BY MS. FITZGERALD:
22 Q.      Sure.  Is there a separate engagement letter
23 that exists when Voynow does such a review engagement?
24 A.      Yes.  It's required.
25 Q.      Okay.  And is it also required that the

Page 261

1  client, who hired Voynow for this review engagement,
2  signed that engagement letter before Voynow could issue
3  the financial statements to the client?
4  A.      Yes.
5  Q.      Okay.  And when you mentioned that there --
6  you testified, at some point, you were asked questions
7  about checklists.
8  A.      Um-hum.
9  Q.      And a subscription for checklists?
10 A.      Yes.
11 Q.      That checklist that you referred to, that
12 pertained to a review type engagement, correct?
13 A.      Yes.
14 Q.      It does not pertain to a tax engagement?
15 A.      It does not.
16 Q.      Okay.  As far as you are aware, when Star
17 issued, or prepared, financial statements that are
18 provided to the dealers, the dealerships, were those
19 financial statements prepared by their controllers?
20 Their monthly financial statements.
21          MR. MULE:  Objection.
22          THE WITNESS:  Their monthly financials
23          are prepared by, yes, their controllers.
24 BY MS. FITZGERALD:
25 Q.      Okay.  Voynow did not do that?

David Kumor
October 18, 2022

Page 262

1  A.      No, we did not.
2  Q.      Are you familiar with the term, an attest, or
3  an attestation function?
4  A.      No.
5  Q.      Do you know what that means?
6  A.      No.
7  Q.      What about the term assurance function?
8  A.      I've heard assurance a lot.  I just -- I
9  don't know what it means, off the top of my head.
10 Q.      Okay.  Do you know -- I know you said that
11 you have done 401K audits?
12 A.      Yes.
13 Q.      Okay.  Did you understand whether that is an
14 assurance function or an attestation unction?
15         MR. MULE:  I'm going to object.
16         THE WITNESS:  I don't know.
17 BY MS. FITZGERALD:
18 Q.      Okay.  Did you understand that that was an
19 engagement that required verification --
20 A.      Yes.
21 Q.      -- of information that the client had?
22 A.      Yes.  That definitely required verification
23 for at least the 401K audit.
24 Q.      Okay.  And you were asked about the term,
25 professional skepticism, do you recall that?

Page 263

1  A.      Vaguely.
2  Q.      Okay.  Do you recall -- do you know if that
3  term applies to an attestation function, or an
4  assurance function, or a function where you were asked
5  to verify information?
6          MR. MULE:  Objection.
7          THE WITNESS:  If we were asked to verify
8          the information, then I do believe there is
9          professional skepticism.  But for a tax
10         return, I don't think there was any.
11 BY MS. FITZGERALD:
12 Q.      Did you understand that for a tax engagement
13 an accountant is entitled to rely on the information
14 that a client gives them?
15 A.      Yes.
16 Q.      Okay.  And if for some reason the information
17 that a client does not -- gives them does not
18 necessarily make sense, the accountant is required to
19 ask questions?
20 A.      Can you say that again?
21 Q.      Yeah.  If, for example, the information that
22 a client gives to an accountant in a tax engagement may
23 not make sense, did you understand that the accountant
24 is then required to ask a question about them?
25         MR. MULE:  I'm sorry, did you say is

Page 264

1          not required?
2          MS. FITZGERALD:  Is required.
3          MR. MULE:  Okay.
4          THE WITNESS:  I don't know.
5  BY MS. FITZGERALD:
6  Q.      You don't know.  Okay.  You asked -- you also
7  -- when you were questioned about the fraud that
8  occurred at the Thompson dealership.
9  A.      Yes.
10 Q.      And you were asked about your reaction to
11 that.  Or your impression of it.  And I think you gave
12 the answer.  Let me find my notes.
13 A.      Are you pertaining to the ask but verify?
14 Q.      Yes.  You had testified, I believe, that, in
15 response to counsel's questions, you said that you
16 can't really trust anyone and always trust but verify.
17 A.      Um-hum.
18 Q.      Okay.  When you gave that answer, were you
19 giving that answer with your controller hat on?  Or
20 with your tax accounting hat on?
21         MR. MULE:  Object to that question.
22         THE WITNESS:  That was with my
23         controller hat.  Because I know for a tax
24         engagement you're not supposed to -- or you
25         can rely on the controller's word for it.

Page 265

1  BY MS. FITZGERALD:
2  Q.      Okay.  For the Star engagement, you had
3  testified that you recall Voynow would go out there for
4  tax planning.
5  A.      Um-hum.
6  Q.      Year end, and interim visits?
7  A.      Yes.
8  Q.      Okay.  At any point, during those visits, did
9  Voynow look at, or dig into, Star's journal entries?
10 A.      No.
11 Q.      So when you were asked about what was done
12 specifically at interim visits, I believe you stated
13 that Voynow would review books and records?
14 A.      Yes.
15 Q.      So when you said books and records, I just
16 want to be clear, you do not mean journals or journal
17 entries?
18 A.      I meant the schedules, plus bank
19 reconciliation, floor plan recs, finance reserve recs,
20 and parts statements recs.
21 Q.      Okay.  Nothing beyond that?
22 A.      And then the parts and service repair orders.
23 We did that as well.
24 Q.      Okay.  Did you understand that those interim
25 visits that you participated in at Star, did you

David Kumor
October 18, 2022

Page 266

1  understand that that was part of Voynow's tax
2  engagement with Star?
3          MR. MULE:  I'll just object to that
4          question.
5          THE WITNESS:  That was my understanding.
6  BY MS. FITZGERALD:
7  Q.      Okay.  And did you understand that Voynow's
8  engagement with Star was a tax engagement?
9  A.      Yes.
10 Q.      Okay.  What does Voynow do for your current
11 employer for Barlet?
12 A.      Barlow.  It's tax --
13 Q.      Barlow.
14 A.      -- tax work.
15 Q.      Okay.  So for purposes of that tax work, does
16 Voynow come out for a tax planning visit?
17 A.      Yes.
18 Q.      Do they come out for a year end visit?
19 A.      Yes.
20 Q.      And do they also come out for an interim
21 visit?
22 A.      Yes.
23 Q.      And is it your impression, as the controller
24 for Barlow, that all of that falls under the umbrella
25 of tax work?

Page 267

1  A.      Yes.
2  Q.      You also were asked about what Mr. Lombardo
3  had stated, as far as these interim visits.  And I just
4  want to make sure I have your understanding accurate.
5  As far as internal controls, Voynow was not doing an
6  audit of those internal controls for Star?
7  A.      No.
8  Q.      Was Voynow doing any testing of Star's
9  internal controls?
10 A.      No.
11 Q.      And it wasn't reviewing all of the internal
12 controls that Star had in place or did not have in
13 place --
14         MR. MULE:  Object to form.
15         THE WITNESS:  No.
16 BY MS. FITZGERALD:
17 Q.      -- correct?  Okay.  Was management at Star
18 responsible for establishing internal controls?
19         MR. MULE:  Objection.
20         THE WITNESS:  Yes.
21 BY MS. FITZGERALD:
22 Q.      And was management an Star responsible for
23 reviewing whether internal controls are being followed?
24         MR. MULE:  Objection.
25         THE WITNESS:  Yes.

Page 268

1  BY MS. FITZGERALD:
2  Q.      And was management at Star responsible for
3  rectifying any deficiencies in internal control?
4  A.      Yes.
5  Q.      And when --
6          MR. MULE:  I want to pause for a
7          second.  I'm just objecting.  I've been
8          putting objections, but this whole line,
9          although they're phrased as direct questions,
10         they're really leading questions.  So I'm
11         just objecting on that, to the form of the
12         question.  So to the extent of that, I just
13         want it on the record I'm objecting to form,
14         rather than going through each one.
15 BY MS. FITZGERALD:
16 Q.      When you were asked about the difference, in
17 your mind, between the tax planning work that Voynow
18 did and the interim visit, I believe you testified
19 that, from your perspective, it didn't differ.
20 A.      It did not.  It was keeping the books
21 accurate.
22 Q.      Okay.  And when you say keeping the books
23 accurate, do you mean for purposes of whether income is
24 picked up and expenses are recorded?  What do you mean
25 by that?

Page 269

1          MR. MULE:  Objection.
2          THE WITNESS:  I mean, so you want to
3          make sure that they're -- basically the
4          proper income is being reported, so that when
5          we look at their second quarter, their third
6          quarter, and their fourth quarter estimated
7          tax payments, if we need to adjust them, we
8          would be able to adjust them.
9  BY MS. FITZGERALD:
10 Q.      Would interim visits give the client an
11 opportunity to start looking at things that they need
12 to clean up, or fix, for purposes of year end?
13         MR. MULE:  Objection.
14         THE WITNESS:  Yes.
15 BY MS. FITZGERALD:
16 Q.      When I asked you about management's
17 responsibility for internal controls, was management
18 also responsible to ensure that there was proper
19 segregation of duties among its staff, in performing
20 various functions?
21 A.      Yeah, that's management's responsibility.
22 Q.      Okay.  When Voynow would go out, or you would
23 go out for interim visits, and whatever schedules that
24 you looked at that were printed out for you, would
25 those -- would those schedules make its way into year