# EXHIBIT 2

Page 50

J. CUTILLO

2  A.  Can I defer that to the -- I would
3  like to defer that question to the expert.
4  Q.  So the corporation, as it sits here
5  today, is unable to give an answer to that
6  question?
7  A.  I can you give an answer on my
8  personal --
9  Q.  No, I want your answer on behalf of
10 the corporation, if you're able to.
11      MR. LABUDA: Do you want the
12      corporation's opinion as to how they
13      determined?
14      MS. FITZGERALD: The corporation
15      is a plaintiff making a claim
16      against my client for this scheme.
17      So, I want to know on what basis the
18      corporation is contending that my
19      client, Voynow, is liable for the
20      $68,000 associated with the scheme.
21      MR. LABUDA: Objection to form.
22      But you can answer the question.
23      THE WITNESS: On behalf of the
24      corporation?
25      MS. FITZGERALD: Yes.

Page 51

J. CUTILLO

2      MR. LABUDA: Yes.
3  A.  There were two Staples vendors in
4  the system, which you can identify on the
5  checks. And having duplicate vendor numbers is
6  a red flag for accountants to determine that
7  there is a possible scheme going on.
8  Q.  Anything else?
9  A.  No.
10 Q.  Okay. Moving on. The next scheme
11 listed in the chart, as Exhibit 2, is what's
12 called the AmEx scheme. And according to the
13 corporation, this scheme occurred from
14 October 16, 2010 through September 25th, 2014;
15 is that correct?
16 A.  Correct.
17 Q.  And the company is claiming an
18 amount of theft of 365,034.04, correct?
19 A.  Correct.
20 Q.  And the company is contending that
21 Ms. Jones stole bonus money paid by NMAC to Star
22 Nissan, that was issued via a quarterly credit
23 on its monthly parts statement invoice, by
24 creating fraudulent journal entries in Star
25 Nissan's dealer management system, to allow

Page 52

J. CUTILLO

2  replacement of cash stolen by her with diverted
3  stolen checks from American Express. And then
4  replaced the amount represented by those stolen
5  checks with the bonus money or credit from
6  NMAC --
7  A.  Correct.
8  Q.  -- is that accurate?
9  So am I correct that the company is
10 contending that the actual theft is a theft of
11 cash?
12 A.  Correct.
13 Q.  And that Ms. Jones allegedly made
14 various accounting entries and whatnot to cover
15 up from that theft of cash?
16 A.  Correct.
17 Q.  Who discovered this scheme?
18 A.  I discovered the scheme.
19 Q.  When?
20 A.  The information that led me to the
21 discovery of the scheme was initially presented
22 in May or June of 2017. Research was then
23 further taken, thereafter.
24 Q.  If you could pull up the Amended
25 Complaint against Ms. Jones, which is Exhibit 3.

Page 53

J. CUTILLO

2  And drawing your attention to paragraph 42 of
3  that complaint.
4  A.  Page 5?
5  Q.  Correct.
6  A.  Okay.
7  Q.  According to the company's Amended
8  Complaint against Ms. Jones, it says: During
9  the investigation of the schemes, plaintiffs
10 recently discovered another scheme in May of
11 2020.
12 A.  Correct.
13 Q.  So did the corporation uncover this
14 AmEx scheme in May of 2020?
15 A.  Complete -- officially completed,
16 yes.
17 Q.  And you said that you had
18 information in 2017?
19 A.  We had received NMAC bonus funds
20 when I took over as a controller, that I did not
21 know what they were in 2017; presented it to the
22 owner, Michael Koufakis. We then informed
23 Rosenfield to do some research regarding this
24 moneys that we were getting, that we didn't know
25 what they were for.

14 (Pages 50 - 53)

Page 38

1  MS. FITZGERALD: And I'm going to show you
2  what we've previously marked as Toyota-5.
3  BY MS. FITZGERALD:
4  Q. Okay. Why don't you make your clarification and
5  then --
6  A. Just so you're aware, I don't know exactly which
7  dollar amount pertains to which because I have to see all
8  the documentation. But when Debbie was doing her self
9  loans, I guess you would call them, extracting dollars
10 from the deposits, she wasn't only utilizing the employee
11 advance account; she was utilizing the service and parts
12 receivables account in Star Chrysler for her own customer
13 number.
14     So she was using two accounts back and
15 forth and so on and so forth. So I would have to see the
16 documentation to be able to specify which went to where.
17 I just want you to know it's not everything is hitting
18 employee advances.
19 Q. Okay. So you're referring to Toyota-5, and if
20 you look at the last page, second to the last page of the
21 exhibit.
22 A. Okay.
23 Q. There's a section at the bottom that talks about
24 employee advances.
25     Do you see that?

Page 39

1  A. Yes.
2  Q. So as part of its forensic analysis, Rosenfield
3  was looking at the issue of employee advances on behalf
4  of the company; is that correct?
5  A. I see that.
6  Q. And then if you look at the last page, there's a
7  reference to Debbie, and it says, "an employee advance of
8  $30,000 was made to her in Chrysler store and there's no
9  record of payment," correct?
10 A. That's what it says.
11 Q. Okay. I'm sorry, go ahead.
12 A. That's what it says.
13 Q. Okay. So in the course of its forensic analysis
14 as of November of 2018, Rosenfield's forensic accounting
15 had been going on now for about a year and a half, right?
16 A. That's correct.
17 Q. And it did not detect the other $68,000 that the
18 company is alleging in the damage chart?
19     MR. LABUDA: Objection. You can answer.
20     THE WITNESS: And it also stated, "it not
21 only affected employee advances. Her
22 manipulation of the records, retrieving the cash
23 also affect services and parts receivables in the
24 Star Chrysler store."
25 BY MS. FITZGERALD:

Page 40

1  Q. Does the company contend that Rosenfield should
2  have been able to detect that additional $68,000?
3     MR. LABUDA: Objection, but you can
4  answer.
5     THE WITNESS: I believe their work is
6  incomplete, and that's why they were no longer
7  doing work for our companies.
8  BY MS. FITZGERALD:
9  Q. Okay. But you had indicated that you had
10 investigated this scheme by, I think, May of 2017, April
11 of 2017.
12 A. Correct.
13 Q. And did you provide what you had discovered to
14 any of the Rosenfield accountants between then and
15 between the time they issued their report to Detective
16 Razzo in November of 2018?
17    MR. LABUDA: Objection, but you can
18 answer.
19    THE WITNESS: I wasn't involved in the
20 report to Detective Razzo in 2018. I provided
21 Rosenfield with the information that $7,500 was
22 manipulated in the Reynolds system.
23 BY MS. FITZGERALD:
24 Q. Did you provide the information that you found
25 about the $68,000 roughly to Michael Koufakis?

Page 41

1  A. The remainder after the $7,500 that I discovered
2  after Rosenfield was no longer part of the investigation
3  and I did my own individual investigation in the end of
4  2020, beginning of 2021, that is when the rest of this
5  was discovered.
6  Q. Okay. Why did you do an investigation in April
7  of 2017, and then not go back and look back further until
8  late 2020, early 2021?
9     MR. LABUDA: Objection, but you can
10 answer.
11    THE WITNESS: I didn't do a full-fledged
12 investigation in April of 2017. I brought to
13 Michael's attention the $7,500 that was
14 manipulated. We gave it to Rosenfield.
15 Rosenfield did their investigation. When
16 Rosenfield was no longer part of the
17 investigation process Michael asked me to look
18 further because Rosenfield was no longer
19 involved, and I did my own investigation
20 thoroughly.
21 BY MS. FITZGERALD:
22 Q. All right. You can put that one aside.
23    Has the company amended its Complaint
24 against Debbie to reflect the additional investigation
25 that you did in 2020 or 2021 to come up with the roughly

JACQUELINE CUTILLO

Page 62

1 can defer to the expert.
2 BY MS. FITZGERALD:
3   Q. So you said that there would be a reference on a
4 customer deposit schedule, and then there would be a
5 journal entry, correct?
6   A. There's a journal entry giving credit to
7 herself, a journal entry by herself, and a check issued
8 to herself by herself.
9   Q. Well, the check's signed by the owner.
10   A. But issued to herself, and she's the one that
11 generates the check, and she's the one that generated her
12 credit through a journal entry on her own customer
13 number.
14   Q. And it was signed by the owner.
15   A. Correct.
16   Q. What is the account that was credited in the
17 journal entry?
18   A. Customer deposits.
19   Q. Do you know what that number is?
20   A. It's 3020 or 3040. I don't know off the top of
21 my head. It's one of the two.
22   Q. Was this check or this alleged theft part of the
23 company's civil lawsuit against Vivian?
24   A. I'm not an attorney. I don't know what's on the
25 civil lawsuit. If you could present me with

Page 63

1 documentation I could attest to it.
2   Q. I'll show you the Complaint, but I'm just
3 wondering if you know on behalf of the corporation
4 whether it is pursuing --
5     MR. LABUDA: 19.
6     MS. FITZGERALD: -- 19 -- this damage
7   claim against the person who actually stole the
8   money.
9     MR. LABUDA: Objection, but you can
10   answer.
11 BY MS. FITZGERALD:
12   Q. And I'm showing you Exhibit Nissan-19, which is
13 the company's Complaint against Vivian.
14     MR. LABUDA: You can answer the question.
15     THE WITNESS: Not that it appears.
16 BY MS. FITZGERALD:
17   Q. Did the company make a claim under its fidelity
18 or employee theft policy with regards to this $9,000
19 allegedly stolen by Vivian in 2015?
20   A. Not that I'm aware of.
21   Q. All right. Drawing your attention to the
22 damages part again. Let's move onto the scheme involving
23 Vitaliano, Vivian's stolen Avalon scheme.
24   A. Yes.
25   Q. According to the company, there was an alleged

Page 64

1 theft of $20,000 on or about February 2016, that
2 purportedly involved a Toyota Avalon sold to Vitaliano
3 with a $20,000 deposit that was never actually paid for
4 or accounted for and that Vivian purportedly created the
5 fraudulent journal entry to offset the missing money.
6     Is that accurate?
7   A. That is accurate.
8   Q. Okay. Who is Mr. Vitaliano?
9   A. Ms. Vitaliano.
10   Q. Ms. Vitaliano.
11     Who is that?
12   A. I'm under the impression it's an associate of
13 Vivian, under the impression it is an acquaintance of
14 Vivian.
15   Q. What is her first name?
16   A. I want to say Roseann. That's what comes to
17 mind.
18   Q. And is the spelling of her last name accurately
19 reflected on this chart?
20   A. I believe so.
21   Q. Does the company have the -- well, let me back
22 up.
23     Who discovered this scheme?
24   A. I did.
25   Q. And when did you discover it?

Page 65

1   A. 2021, 2020, around there.
2   Q. So after Rosenfield was no longer engaged?
3   A. Absolutely.
4   Q. And how did you discover it?
5   A. Looking through the books and records I came
6 across an entry created by Vivian in regards to this
7 customer's deal, and the cash was never deposited;
8 therefore, the money was stolen.
9   Q. So you said you came across an entry.
10     Is that a journal entry?
11   A. Correct.
12   Q. And what was the components of the journal
13 entry?
14     MR. LABUDA: Do you understand the
15   question?
16     THE WITNESS: I understand the question.
17     From what I remember, it was a credit
18   given to the customer, and it was expensed to a
19   random account that had no relation to customer
20   deposits.
21 BY MS. FITZGERALD:
22   Q. What was the account?
23   A. I want to -- off the top of my head I believe it
24 was 3225, but I'm not sure of that. If you could show me
25 the document it would help me rehash my memory if

17 (Pages 62 - 65)

JACQUELINE CUTILLO

Page 74

1  deposit schedule that they would review.
2  BY MS. FITZGERALD:
3     Q. So how would it be apparent from a customer
4  deposit schedule that would just list a customer and the
5  customer number and the amount, $20,000? What would be
6  apparent based on review of that schedule that this
7  $20,000 was never deposited?
8     A. Because the recap page would reflect the journal
9  entry for $20,000.
10    Q. Okay. So based upon your understanding, the
11 corporation's claim is based upon what may or may not
12 have been in a recap page associated with this schedule?
13        MR. LABUDA: Objection. You can answer.
14        THE WITNESS: Correct. That's my opinion.
15 You could defer to the expert and his opinion.
16        - - -
17        (Exhibit Toyota-5 was marked
18 for identification.)
19        - - -
20        MS. FITZGERALD: I'm showing you what's
21 been marked as Toyota-5, and take a look at it
22 and let me know when you're done.
23        MR. LABUDA: I do note mine has highlight
24 to it. I'm assuming yours does as well. They're
25 all like highlighted.

Page 75

1         MS. FITZGERALD: I might have given you
2  the wrong one.
3         THE WITNESS: This one does too.
4         MS. FITZGERALD: Oh, they all have
5  highlighting?
6         MR. LABUDA: Yeah, Jackie, does yours?
7  Yeah, yours does too. I'm assuming that that's
8  your highlight and not Rosenfield's highlight?
9         MS. FITZGERALD: It's mine or somebody in
10 my office. It's not Rosenfield's.
11        MR. LABUDA: Okay.
12 BY MS. FITZGERALD:
13    Q. Okay. So I'm showing you Toyota-5, and this is
14 a November 21st, 2018 report by Rosenfield sent to
15 Detective Razzo. And I'm drawing your attention to page 7
16 of the report, the last page.
17        So as of the time this report was issued
18 Rosenfield had been engaged by the company for about a
19 year and a half?
20    A. April 17th to November of -- yeah.
21    Q. And according to its report it had analyzed what
22 it called suspect vehicle deals.
23        Do you see that?
24    A. Correct.
25    Q. Okay. And it does not list this deal involving

Page 76

1  Ms. Vitaliano, correct?
2     A. Correct, which is why we no longer had him.
3  That's why he's no longer the investigator. We had to do
4  further investigation after his work.
5     Q. Okay. And for purposes of investigating this
6  particular deal, that was just you who did it?
7     A. That is correct.
8     Q. Okay. And is the failure by Rosenfield
9  allegedly to find this theft by Vitaliano part of the
10 company's malpractice claim against Rosenfield?
11        MR. LABUDA: Objection to scope, but you
12 can answer.
13        THE WITNESS: Not that I'm aware of.
14 BY MS. FITZGERALD:
15    Q. And why do you say that?
16    A. Because I'm not aware of the scope of the claim.
17    Q. So you don't know one way or the other?
18    A. Right.
19    Q. All right. You can put that aside.
20        I want to go back to the $9,147 that was
21 allegedly stolen by Vivian.
22    A. Okay.
23    Q. And I can show you the indictment again if you
24 want to look at it.
25    A. Yes, please.

Page 77

1     Q. Okay. So I'm showing you what's been previously
2  marked as Nissan-16.
3     A. Thank you.
4     Q. And I'm going to represent to you that I don't
5  believe that that $9,114.70 check is part of the
6  indictment. Feel free to look through that and confirm.
7     A. No. It was found after the fact possibly. It
8  was probably found after the fact.
9     Q. And I'm not sure if you told me when it was
10 discovered.
11    A. I wasn't certain on the time frame, but it's
12 after -- I believe it was after Rosenfield was no longer
13 a part of the investigation.
14    Q. Okay. So sometime in 2021?
15    A. Give or take.
16    Q. All right. Looking at the chart, let's move
17 onto the Ange Raptis Highlander scheme.
18    A. Okay.
19    Q. Who was Ange Raptis?
20    A. That is Vivian Karouzakis' sister.
21    Q. Was she an employee of any of the Star entities?
22    A. I believe she was an employee of Star Chrysler's
23 payroll.
24    Q. Okay. And for what period of time, if you know?
25    A. I don't know all that information off the top of

20 (Pages 74 - 77)

JACQUELINE CUTILLO

Page 18

1  Q. So as part of the investigation of this claim,
2  did the company look to see what was filed away for the
3  backup associated with this check dated May 4th, 2013?
4  A. There was no discovery of the backup for that
5  check. I would presume that Vivian tossed it to not
6  discover that she had committed fraud.
7  Q. So the company has no backup, and the company,
8  as you sit here today, doesn't have the check?
9  A. That is correct.
10     MR. LABUDA: Just note, I think you asked
11  for production of both checks. The other check,
12  the Capital One, you have. That's the one that I
13  was mentioning before. It's Bates Stamped
14  Capital One 588.
15     MS. FITZGERALD: Does it have a Star Bates
16  number on it?
17     MR. LABUDA: No. It's from Capital One.
18     MS. FITZGERALD: I don't have documents
19  from Capital One.
20     MR. LABUDA: You should have them.
21     MS. FITZGERALD: Did you reBates stamp
22  those documents as a Star production?
23     MR. LABUDA: No.
24     MR. KOUFAKIS: No. I made them a Capital
25  One.

Page 19

1     MS. FITZGERALD: Oh, all right. I'll go
2  back and look.
3     MR. LABUDA: Okay. But just put that 588
4  for your records.
5     MS. FITZGERALD: Okay.
6     MR. LABUDA: And we can send you a copy of
7  this.
8  BY MS. FITZGERALD:
9  Q. I take it from the company's perspective there's
10 no assertion that the signatures on the check were
11 forged?
12 A. That is correct.
13 Q. So they were signed by authorized check signers
14 on behalf of the company?
15 A. That is correct.
16 Q. And when I asked you about the backup, you gave
17 me the answer that Vivian may have removed it, the backup
18 that was filed away.
19 A. The backup to the check that she created to
20 commit fraud.
21 Q. The backup to the check that supposedly would
22 have gone with the copy of the unsigned check.
23 A. That she would have presented to the owners.
24 Q. Okay. So is it speculation on your part that
25 she would have thrown away backup, or did somebody

Page 20

1  actually go and search and find the unsigned copy of the
2  check with no backup to it?
3  A. We searched and couldn't find either copy.
4  Q. Would there be a reason why the company would be
5  paying Vivian these amounts, 22,000 or 26,000, outside of
6  the normal payroll process?
7  A. The 22,000 was payable to her personal credit
8  card.
9  Q. Okay. The 26,000. Thank you.
10    Would there be a reason that the company
11 would be paying Vivian $26,000 outside of the normal
12 payroll process?
13 A. Her description in the system is that that is a
14 refund for a deposit.
15 Q. Okay.
16 A. That could be a reason.
17 Q. Okay. And if that was the case, should the
18 check signer have been presented with the documentation
19 supporting the refund of the deposit?
20 A. Yeah.
21 Q. On what basis does the company contend that
22 Voynow is liable for the $34,500?
23 A. Plus the 22,000.
24 Q. Plus the 22,000.
25    MR. LABUDA: Objection, but you can

Page 21

1  answer.
2     THE WITNESS: I'd like to defer that to
3  the expert, but I'll give you my opinion. They
4  looked at the customer deposit schedules every
5  time that they came in. They reviewed our books
6  and records, and they reviewed bank
7  reconciliations. So that would be my -- off the
8  top of my head.
9  BY MS. FITZGERALD:
10 Q. What about either of any of these three checks
11 would show up on a customer deposit schedule?
12 A. The check was issued from her customer -- she
13 issued the check to herself from her customer number on
14 customer deposits of Star Hyundai.
15 Q. And I can show you the indictment if you want to
16 see it again, but I'll represent to you that neither of
17 those checks are listed in the indictment.
18    Is the company aware of that?
19 A. They were discovered after the indictment.
20 Q. Okay. And when were they discovered?
21 A. The $22,000 check was discovered when we
22 obtained the subpoena from Capital One, and the $26,000
23 check was discovered between 2020 and 2021 when she was
24 dead.
25 Q. I'm showing you Nissan-18.

6 (Pages 18 - 21)