**From:** ecf_bounces@nyed.uscourts.gov
**Sent:**                                      Wednesday, December 13, 2023 6:49 PM
**To:** nobody@nyed.uscourts.gov
**Subject:**                                   Activity in Case 1:18-cv-05775-ERK-TAM Star Auto Sales of
                                               Bayside, Inc. et al v. Voynow, Bayard, Whyte and Company, LLP
                                               et al Order on Motion for Discovery

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 12/13/2023 at 6:49 PM EST and filed on 12/13/2023
**Case Name:**         Star Auto Sales of Bayside, Inc. et al v. Voynow, Bayard, Whyte and Company, LLP et al
**Case Number:**       1:18-cv-05775-ERK-TAM <https://ecf.nyed.uscourts.gov/ ...>
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry and Order: A telephonic status conference was held on 12/13/2023 before Magistrate Judge Taryn A. Merkl. Appearances by Jamie Scott Felsen, Joseph M. Labuda, and Jeremy Michael Koufakis for Plaintiffs, and Maureen Fitzgerald for Defendants. Discussion held regarding case status and open discovery issues from the 6/7/2023 Motion for Discovery (ECF No. [102]) and the 8/21/2023 Motion to Quash and Motion for Protective Order (ECF No. [108]), as reported by the parties in their 9/7/2023 joint status report (ECF No. [109]). As stated on the record, Plaintiffs' four requests and two motions are denied, in part.**

**Plaintiff's demand number nine (ECF No. 102, at 2-3) for additional samples of engagement letters for tax and review engagements is denied for the reasons stated on the record, including the finding that, in light of the discovery already produced by Defendants, further discovery on this issue is not proportional to the needs of the case. Denial of the motion is also warranted because the motion fails to include a certification that the parties conferredappropriately in an attempt to resolve this issue without judicial intervention. Indeed, Plaintiffs' counsel confirmed on the record that they had not previously discussed with defense counsel their request for the provision of records related to Defendants' engagements with the two specific entities discussed today (Kerdeck and Peruzzi Auto Groups). EDNY Local Rule 37.3(a) requires parties to "attempt to confer in good faith in person or by telephone in an effort to resolve the dispute, in conformity with Fed. R. Civ. P. 37(a)(1)." For these two reasons, Plaintiffs'**

request for further discovery on this issue is denied.

Plaintiffs' demand number six (ECF No. 102, at 4-5) for a blank checklist for a review engagement is denied in part. Despite extensive discussion, the record is not completely clear whether Defendant Voynow uses a publicly available review engagement checklist or a custom review engagement checklist. The parties are directed to meet and confer to get a definitive answer to this question and resolve the dispute, either with a limited verified interrogatory, a declaration, or some other means, no later than 1/5/2024, the deadline for all discovery.

Plaintiffs' motion to quash subpoena (ECF No. 108, at 1-4) is denied. As discussed on the record, on August 2, 2023, the Court granted Plaintiffs' motion for an extension of all discovery, and unequivocally extended the fact discovery deadline specifically to August 31, 2023, in light of myriad discovery disputes in the case and in the absence of a certification of the close of fact discovery from the parties. Defendants' subpoena was issued before that date and Defendants have demonstrated that the requested documents could bear on their defenses as further explicated on the record.

Plaintiffs' motion to preclude (ECF No. 108, at 4-6) is denied, without prejudice to raise argument regarding the challenged documents in a motion in limine. As noted, fact discovery was open through 8/31/2023 (*see* 8/2/2023 ECF Order), and the parties did not certify the close of fact discovery until 9/7/2023 (*see* ECF No. 109 at 1). Accordingly, Defendants' document production of June 30, 2023, was timely and Plaintiffs had more than enough time to make additional discovery requests related to this production prior to the close of fact discovery.

The remaining deadlines for the completion of discovery remain in effect. Expert depositions shall be completed by 12/15/2023. All discovery shall be completed by 1/5/2024, and the parties shall submit a joint status report certifying the close of all discovery by 1/12/2024. The last date to take the first step in dispositive motion practice, in accordance with the Individual Rules of the assigned District Judge, shall be 2/12/2024. In the absence of dispositive motions, the Joint Pretrial Order shall be filed by 3/12/2024; the JPTO must be prepared in strict compliance with the rules of the assigned District Judge. Ordered by Magistrate Judge Taryn A. Merkl on 12/13/2023. (AT&T Log #11:30-12:50.) (ALG)

**1:18-cv-05775-ERK-TAM Notice has been electronically mailed to:**

Joseph M. Labuda     joe@mllaborlaw.com, info@mllaborlaw.com

Russell J. Shanks     Rshanks@cszlaw.com, jruderman@cszlaw.com, sshanks@cszlaw.com

Nicholas Peter Chrysanthem     npchrysanthem@mdwcg.com

Michael Charles Mule     michaelmule@mllaborlaw.com

Richard Milman     rich@mmmlaborlaw.com

Jeffrey C. Ruderman     jruderman@cszlaw.com, rshanks@cszlaw.com

Jeff J. Imeri     jjimeri@mdwcg.com, dwlevin@mdwcg.com, mbbrownell@mdwcg.com

Christopher D Hansen     cdhansen@mdwcg.com, nchrysanthem@gmail.com

Jamie Scott Felsen     jamiefelsen@mmmlaborlaw.com

Emanuel Kataev     emanuel@mllaborlaw.com, 4119461420@filings.docketbird.com, mail@emanuelkataev.com

Jeremy Michael Koufakis     jeremy@mllaborlaw.com, jkoufakis@recap.email

Maureen Fitzgerald     mpfitzgerald@mdwcg.com, efile@mdwcg.com, lhsmith@mdwcg.com

John Louis Slimm     jlslimm@mdwcg.com, lmevans@mdwcg.com, sdmitchell@mdwcg.com

Jonathan David Weiss     jdweiss@mdwcg.com, efile@mdwcg.com, lhsmith@mdwcg.com

Alesia Suzanne Sulock     assulock@mdwcg.com, dmgalas@mdwcg.com, efile@mdwcg.com

**1:18-cv-05775-ERK-TAM Notice will not be electronically mailed to:**

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

------------------------------X  Docket#
STAR AUTO SALES OF              : 18-cv-05775-ERK-TAM
BAYSIDE, INC., et al.,          :
                                :
                Plaintiffs,     :
                                :
       - versus -              : U.S. Courthouse
                                : Brooklyn, New York
VOYNOW, BAYARD, WHYTE AND        :
COMPANY, LLP, et al.,           :
                                : December 13, 2023
                Defendants      : 11:30 a.m.
------------------------------X
```

         TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
             BEFORE THE HONORABLE TARYN A. MERKL
                UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**
**(VIA VIDEO/AUDIO)**


**For the Plaintiff:**        **Jamie S. Felsen, Esq.**
                              **Joseph M. Labuda, Esq.**
                              **Jeremy M. Koufakis, Esq.**
                              Milman Labuda Law Group, PLLC
                              3000 Marcus Ave., Suite 3w8
                              New Hyde Park, NY 11042


**For the Defendant:**        **Maureen Fitzgerald, Esq.**
                              Marshall Dennehey Warner
                               Coleman & Goggin
                              620 Freedom Business Center
                              Suite 300
                              King of Prussia, PA 19406


**Transcription Service:**    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                    Proceedings

1          THE CLERK:  ...Cause for a Status Conference,

2   docket 18-cv-5775, *Star Auto Sales of Bayside, Inc., et*

3   *al. v. Voynow, Bayard, Whyte and Company, LLP, et al.*

4          Before asking the parties to state their

5   appearance, I would like to note the following.

6          Persons granted remote access to proceedings

7   are reminded of the general prohibition against

8   photographing, recording, and re-broadcasting of court

9   proceedings.  Violation of these prohibitions may result

10  in sanctions including removal of court-issued media

11  credentials, restricted entry to future hearings, denial

12  of entry to future hearings, or any other sanctions

13  deemed necessary by the Court.

14         Will the parties please state their appearances

15  for the record starting with the plaintiff?

16         MR. FELSEN:  Good morning, your Honor.  This is

17  Jamie Felsen.  I'm joined here with Joseph Labuda and

18  Jeremy Koufakis.

19         MS.  FITZGERALD:  Good morning, your Honor.

20  This is Maureen Fitzgerald on behalf of the defendants.

21         THE COURT:  All right.  So good morning,

22  everybody.  We are here at long last hopefully on a final

23  last-ditch effort to resolve some of these discovery

24  disputes.

25         So I'm just curious to start, you know, kind of

3

Proceedings

1   where things stand with regard to what remains

2   outstanding in terms of the fact discovery.  And I know

3   you're in the midst of expert practice as well.  Rebuttal

4   expert reports were due November 10th.

5           So would you like to start by providing an

6   overview, Mr. Felsen?

7           MR. FELSEN:  Sure, your Honor.  I'm happy to

8   report that we will be as of Monday finished with the

9   expert depositions.  As far as we're concerned, fact

10  discovery has been closed but for the four issues that

11  we're here to discuss today that are outlined in the

12  letter that we submitted.

13          THE COURT:  Okay.  So the last expert

14  deposition is Monday?

15          MR. FELSEN:  Correct.

16          THE COURT:  Okay.  And so the four matters that

17  were outlined in your letter of September 7th on document

18  109, those are the only four issues that remain in your

19  point of view?

20          MR. FELSEN:  Yes.  It essentially boils down to

21  two issues in document number 108, and then there's two

22  issues in document number 102 on the docket.

23          THE COURT:  Yes, that's what we gleaned from

24  following all of the connections between the documents.

25          Ms. Fitzgerald, can you give me an update from

4

Proceedings

1   defendant's perspective?

2           MS. FITZGERALD:  Well, I mean we largely agree.

3   We have the last expert deposition scheduled for Monday.

4   And there's four open issues between the docket filing

5   102 and docket filing 108 that the parties are prepared

6   to address today with your Honor.

7           THE COURT:  Great.  Just trying to make sure

8   we're all on the same page in terms of the order of the

9   agenda and what we're on deck to discuss.

10           So as Mr. Felsen described, there were two

11   issues raised in the June 7th letter, document 102 in

12   ECF, one related to Star's request for documents

13   pertaining to demand number 9 as I understand it.  And

14   then the other issue pertaining to Star's fourth request

15   for documents pertaining to demand 6.

16           So would you like to start, Mr. Felsen?

17           MR. FELSEN:  Sure.  You want me to address

18   these two issues in document 102 first?  Is that correct,

19   your Honor?

20           THE COURT:  I think we should probably go back

21   and forth on each issue.  It's usually a little bit more

22   easy to follow.  You want to start with demand 9 first

23   and the letter and then we'll turn to Ms. Fitzgerald for

24   her position?

25           MR. FELSEN:  Sure, your Honor.  With respect to

5

Proceedings

1   document demand number 9 in plaintiff's second request

2   for documents, so one of the hotly contested issues in

3   this case is what the scope of work was during the

4   engagement between Voynow -- that Voynow had with respect

5   to the services it performed for Star.  There is no

6   written agreement so there's been a sharp factual dispute

7   as to what exactly the scope of work was.

8           Now, with regard to demand number 9, it's our

9   position that if other Voynow dealership clients had

10  engagements that were for services other than just tax

11  returns and they paid, those clients paid Voynow in the

12  same manner and similar amounts as Star, it would be

13  indicative that Star had the same engagements as those

14  other dealership clients.  And we're not asking for every

15  single engagement.  We've asked for a sample.

16          And we've met and conferred with Ms. Fitzgerald

17  and we initially asked for the years 2013, 2015, a

18  sampling of three.  We then came to a compromise of 2014

19  and 2015.   But then we weren't able to agree on anything

20  further.  We had requested that three dealership clients

21  of Voynow for tax returns to be provided and three

22  dealership clients where it was review services be

23  provided.

24          Ms. Fitzgerald unilaterally just provided us

25  with three engagements but for one auto group, Thompson

Transcriptions Plus II, Inc.

6

Proceedings

1  auto group, who has various automobile dealerships within

2  that group.  And she chose on her own.  We want to be

3  able to a random sampling of ones that we choose.  We're

4  fine with Thompson but we want to receive engagement

5  letters for two other auto groups, Kerbeck Auto Group and

6  Peruzzi Auto Group.

7       THE COURT:  Could you spell those for me?

8       MR. FELSEN:  K-E-R-B-E-C-K, and Peruzzi,

9  P-E-R-U-Z-Z-I.

10       In addition, to the extent that the engagement

11  letters do not provide information about the price was

12  for the engagement, then we'd ask that we receive

13  invoices also to provide us with information about what

14  those dealerships actually paid to Voynow.

15       THE COURT:  How did you arrive at Kerbeck and

16  Peruzzi?

17       MR. FELSEN:  Those were dealerships that there

18  was testimony about during depositions.

19       THE COURT:  But how is it relevant.  I mean we

20  talked about this, you know, at an in-person conference

21  months ago about how every client is different in

22  comparing documents of engagement with regard to one

23  client may be really apples and oranges compared to

24  another client depending on size, scope, need, volume of

25  business.  Who knows which factors, right?  That's why

7

Proceedings

1  accounting contracts and retainers are often very highly

2  customized, in my understanding.

3         So you know, we talked about this literally

4  months ago and so I'm curious, you know, where the

5  breakdown occurred with regard to the parties'

6  discussions because as of the June letter, it had been

7  represented that this issue was largely moot, that the

8  defendant had provide stuff and then now it seems as

9  though you guys just disagree about what should be

10 provided.  And I don't understand why you think you're

11 entitled to these specific clients.

12        MR. FELSEN:  We believe that these dealership

13 groups are similar in size to Star, so therefore, it'll

14 be a good comparator to determine what the retainer says

15 and what was actually paid.

16        THE COURT:  Do you have any sense of what work

17 they were hired to do?

18        MR. FELSEN:  They had a review engagement those

19 two groups.

20        THE COURT:  And how do you know that?

21        MR. FELSEN:  I believe based on the deposition

22 testimony of a Voynow representative.

23        THE COURT:  Okay.  All right.  So Ms.

24 Fitzgerald, would you like to respond?

25        MS. FITZGERALD:  Sure.  So first of all, I

8

Proceedings

1   think we need to start with request number 9, the actual

2   request, and the request asks for a sample of documents

3   concerning Voynow's retainers or engagement letters with

4   other dealerships.  There's never been a request for

5   invoices.  It's been a sample of engagement letters.

6           And your Honor is right in the sense that we've

7   been sort of around the block on this issue multiple

8   times because what the plaintiffs are trying to do is

9   almost create this type of comparator concept which is a

10  concept that exists in employment discrimination cases.

11  It is not a concept that exists in professional liability

12  case law.

13          And I've repeatedly challenged them to come

14  forward with any kind of law that supports the notion

15  that they can get discovery about pulling out other

16  clients located in a different state with different sets

17  of books and records with different types of issues and

18  argue that that is somehow relevant to the services the

19  Voynow provided to star.  And there is no law.  They

20  haven't been able to do that because it doesn't exist.

21          So I think that it's been my position all along

22  that this has been nothing other than a fishing

23  expedition but when we were in front of your Honor the

24  last time, they argued that they needed the sample

25  engagement letters involving Thompson Auto Group and they

9

Proceedings

1    also wanted to depose the Thompson Auto Group controller.

2    And your Honor denied their request for that deposition

3    but then directed to me that to the extent I had

4    engagement letters from Thompson, those be documents that

5    I could produce.  And I've done that.

6          I've given them two different engagement

7    letters involving the Thompson Group that pertains to a

8    review, financial state review engagement.  And then I've

9    given them an engagement letter that involved 21

10   different entities that are affiliated with the Thompson

11   Group which is a large group that reflected the tax

12   engagement.  So I've given that to them and now they're

13   coming back and saying oh, now this is the first time I'm

14   hearing about Kerbeck or Peruzzi and I can represent to

15   you that there's been no deposition testimony in any way

16   saying that Voynow provided services akin to a review or

17   something less than an audit or whatnot, or that there's

18   any similarity between those two entities and the Star

19   Group.

20         So I mean I think we have to go back to what

21   the law says in terms of the fact that there is no

22   concept of comparators in professional liability cases.

23   This case is going to be decided upon the engagement

24   letter and the plaintiffs are wrong when they say there

25   is no engagement letter.  There is engagement letters.

10

Proceedings

1   They never signed them, but there are engagement

2   letters.

3         So the jury is going to look to what's in the

4   engagement letter and then they're going to look at

5   Voynow's work papers as far as that shows what they did.

6   What happened in a different state in a different type of

7   engagement like an attestation engagement such as a

8   financial statement review engagement, has no relevance

9   whatsoever.

10        And even under the broad standard of relevance

11   and Rule 26, you just can't justify allowing this type of

12   discovery that has to do with, you know, Voynow's

13   relationships with its other clients.  Simply, it's so

14   far outside the threshold of relevance.  And I think when

15   they wanted to make the point that there are different

16   engagement letters that Voynow issued that pertain to

17   reviews, and they have that now because I gave that to

18   them in the Thompson documents and I gave them similar

19   other engagement letters that have to do with tax only

20   engagements.  So they have that.  They have that

21   language.  To now expand it to go on a fishing expedition

22   for other Voynow clients is just well outside the scope

23   of what's permissible.

24        And like I said, invoices have never ever --

25   were never even part of request number 9, so that should

11

Proceedings

1    be just discarded, you know, right at the outset.

2              So that's our position, Judge.

3              THE COURT:  Mr. Felsen --

4              MR. FELSEN:  Your Honor, may I respond?

5              THE COURT:  Yes, Mr. Felsen.

6              MR. FELSEN:  May I respond briefly, your Honor?

7              THE COURT:  Yes.  I'm trying to make a record

8    of who's speaking, so please.  Mr. Felsen, would you like

9    to respond?

10             MR. FELSEN:  Yes.  Thank you, your Honor.

11             With respect to invoices, we're not looking for

12   invoices to the extent that the engagement letters

13   identify the price.  The only reason we are asking about

14   invoices is we want to know what the price is.  So we

15   don't need every invoice.  We just need to know how much

16   was paid under these retainers.

17             Scope of work is at the heart of this case

18   here, so comparators are needed.  We need to look at

19   other evidence since there's no written signed engagement

20   letter between the parties.  So other discovery devices

21   are necessary.  This is not a fishing expedition.  We're

22   not asking for every single engagement letter.  We've met

23   and conferred and all we're asking for is two other

24   dealership groups.  We're not asking for every single

25   review engagement.  That's not a fishing expedition.

12

Proceedings

1   We've narrowly tailored this to two dealerships.

2          THE COURT:  So the Thompson documents are

3   sufficient?  I mean first of all, do you take issue, Mr.

4   Felsen, with the representation that this is the first

5   time you're identifying Kerbeck and Peruzzi by name?

6          MR. FELSEN:  Yes.  We have (audio cut out) with

7   Ms. Fitzgerald those specific dealerships.  She just gave

8   us Thompson.  We had talked about giving other names but

9   we didn't specifically identify them previously.

10          THE COURT:  Okay.  And why are the Thompson

11   documents insufficient?

12          MR. FELSEN:  We'd like to have a sampling.

13   It's just one dealership group.

14          THE COURT:  But aren't there like 21

15   affiliates?  Don't you now have the distinction between

16   the tax engagement and the tax and review engagement?

17          MR. FELSEN:  Thompson is just one auto group

18   that she cherry picked.

19          THE COURT:  That0's not responsive to my

20   question.  Do you now have samples of the tax engagement

21   style and the larger style that includes the review

22   engagement?

23          MR. FELSEN:  Yes, through Thompson.

24          THE COURT:  And why do you believe that

25   additional examples will in any way change the analysis?

Transcriptions Plus II, Inc.

13

Proceedings

1          MR. FELSEN:  Because Ms. Fitzgerald cherry

2   picked Thompson and we don't know what the contents will

3   be of these other auto groups' engagement letters.

4          And your Honor, you know, Ms. Fitzgerald by --

5          THE COURT:  But Mr. Felsen, this is like where

6   we were when you guys were performing at the beginning of

7   the summer.  What does it matter if a different client

8   had a relationship with Voynow that provided them with

9   particular services?  What matters to prove malpractice

10  here and the negligence here is what they were hired to

11  do here.

12         MR. FELSEN:  Right.  And your Honor, that's in

13  dispute and --

14         THE COURT:  I know it's in dispute, but what

15  they did to a different client isn't going to change what

16  conversations transpired between the principals of Star

17  and the principals of Voynow.

18         MR. FELSEN:  But the contents of an engagement

19  letter for solely tax preparation work versus the

20  contents of an engagement letter for review work, it

21  would be different.  And to the extent that the

22  engagement letter for review work addresses duties that

23  Voynow performed for Star, it would tend to establish

24  that Star, like Thompson, had more than an engagement

25  that covered more than just tax preparation.

Transcriptions Plus II, Inc.

Proceedings

14

1        THE COURT:  But doesn't there need to be a

2   meeting of the minds here with regard to what the

3   contract should have included?  What you essentially have

4   is a disconnect between the principals of Star and the

5   principals of Voynow, correct?

6        MR. FELSEN:  Yes, your Honor.

7        THE COURT:  I just really --

8        MR. FELSEN:  Your Honor --

9        THE COURT:  As I have struggled with it back in

10  May or June, whenever we were together, I'm still

11  struggling with the concept that a different contract is

12  going to shed any light whatsoever on what these parties

13  agreed to do here.

14       MR. FELSEN:  Your Honor, there's also the

15  circumstances of the Thompson retainer is such that it's

16  dated 2015 but it's signed in 2017.  We would be amenable

17  to one of these others that we pick, Kerbeck or Peruzzi.

18  And if you don't agree to one of those then some of the

19  auto group that we can pick.

20       THE COURT:  Ms. Fitzgerald, would you like to

21  respond?

22       MS. FITZGERALD:  I don't think that that

23  argument has any bearing on when the client actually

24  signed the engagement letter.  They have the difference

25  in the wording of the two types of engagement.  They have

15

Proceedings

1    what's the standard tax engagement which is an entity

2    that, was a letter that has to do with 21 different

3    entities that I produced.  Okay?  So they have that level

4    of service.

5         And then they have two samples of review

6    engagements and two management representation letters

7    that I also provided from the Thompson related entities.

8    So they have the wording to the extent they even want to

9    try to argue.

10        But the issue as far as what Voynow's

11   engagement with Star is, that's going to be determined by

12   the following.  The actual letters that were issued

13   between Star and Voynow irrespective of whether Star

14   signed them.  By the testimony of Michael Koufakis on one

15   hand and Randy Franzen and his colleague who was present

16   when the engagement was actually agreed to.  Okay?  So

17   that's verbal testimony.

18        There's metadata that supports the existence of

19   engagement letters issued every year by Voynow.  There's

20   references in bills and there's references in emails that

21   support the existence of engagement letters being issued

22   every year by Voynow.  There's a change in format to

23   those letters and the reason why.  That's all in the

24   testimony.

25        And then there's the fact that Star's owner,

16

Proceedings

1   John Koufakis, admitted under oath that they don't sign

2   contracts as a matter of course.

3          So the jury is going to hear all of that

4   evidence.  And that's the evidence, that's important

5   evidence for the jury to decide whether or not this was a

6   tax engagement and whether or not that -- because it

7   doesn't, the letter doesn't have to be signed in the tax

8   engagement.  There is no requirement for it to be signed

9   in order for the tax returns to be issued.  But that's

10  the evidence that the jury is going to hear and that's

11  what the jury is going to decide.  It has nothing to do

12  with what Voynow issued to a different client in a

13  different state for a different time period for a client

14  that has different books and records.  None of that has

15  any bearing on what the scope of the engagement is

16  between Star and Voynow.

17         THE COURT:  Mr. Felsen?

18         MR. FELSEN:  Your Honor, Ms. Fitzgerald gave us

19  Thompson.  So by doing that she acknowledged that it's

20  relevant.  And she doesn't get to pick and choose --

21         THE COURT:  No, she did not, Mr. Felsen.  She

22  has never acknowledged it's relevant.  I was there at the

23  oral argument.  Go ahead.

24         MR. FELSEN:  I don't believe you directed her

25  to produce Thompson.  That was something that she agreed

17

Proceedings

1   to during a meet and confer.

2          MS. FITZGERALD:  Yes.  That was the one that

3   you requested specifically so I agreed to give you

4   Thompson.

5          THE COURT:  The fact that she gave you

6   documents through a negotiated discovery process is not

7   evidence of her views on relevance.  Do not make that

8   mistake.

9          MR. FELSEN:  Understood, your Honor.  Just with

10  respect to Ms. Fitzgerald's belief as to what evidence

11  the jury will consider, I mean that doesn't exclude us

12  from getting other relevant information.  She doesn't get

13  to just choose what's relevant and what's not relevant.

14  I mean we're entitled to relevant documents and we

15  believe that this other engagement letter from another

16  dealership is relevant.

17         THE COURT:  What's the payment arrangement that

18  Thompson utilizes, Mr. Felsen?

19         MR. FELSEN:  The engagement doesn't contain

20  information about the payments.

21         THE COURT:  You don't know whether it's a

22  monthly retainer or a particular set fees depending on

23  the level of service?

24         MR. FELSEN:  No, your Honor.

25         MS. FITZGERALD:  So there was testimony on this

18

Proceedings

1   issue, Judge, by Voynow's managing partner and he said

2   that all Voynow clients, regardless of the level of

3   engagement, are billed on a retainer as the work is done

4   and billed, it's offset against that retainer.  So all

5   clients are billed in that manner.  And that's just

6   because, you know, accountants' work is typically

7   seasonal so that's how they stay afloat.

8           THE COURT:  And one follow-up for Mr. Felsen,

9   do you take issue with the representation by Ms.

10  Fitzgerald that engagement letters need not be signed

11  under the AICPA guidelines for tax engagement?

12          MR. FELSEN:  We don't agree with Ms.

13  Fitzgerald's conclusion on that.

14          THE COURT:  You don't.

15          MS. FITZGERALD:  Well, their expert just

16  testified that he agreed.

17          THE COURT:  I mean the AICP guidelines I assume

18  are in plain English.  I can pull them up right now.  So

19  what is your view on what the AICPA guidelines require

20  with respect to tax engagement specifically, Mr. Felsen?

21          MR. FELSEN:  Our understanding is that once an

22  engagement letter is issued it's signed by the client.

23          THE COURT:  On page 14 of document ECF 102, I

24  assume the defendant's position on this issue, the

25  defendants posit that the AICPA did not and still does

Transcriptions Plus II, Inc.

19

Proceedings

1  not mandate that a taxpayer sign tax engagement letters

2  before tax accountants can issue their tax return.  And

3  so Voynow never chased after them essentially is how I

4  reading this for the signed engagement letter.  Is that a

5  fair read of your argument, Ms. Fitzgerald?

6          MS. FITZGERALD:  That's correct.  I mean the

7  AICPA recommends but does not require.  And that's

8  different from financial statement engagements such as a

9  review or an audit.  And there, the AICPA mandates that

10  you have both a signed engagement letter and a signed

11  management representation letter from the client.

12          THE COURT:  Mr. Felsen, would you like to be

13  heard on this?

14          MR. FELSEN:  Our position is that this wasn't

15  just a tax engagement and it was a review engagement and

16  therefore it had to be signed.

17          THE COURT:  I understand that but that's not

18  what this letter says, correct?

19          MS. FITZGERALD:  The letter says it's only a

20  tax engagement, yes.

21          THE COURT:  I mean you take issue with the

22  letter.  You're saying they never signed the letter, they

23  didn't agree to it.  They understood the scope of work to

24  be something different.  I understand that is your

25  argument.  But under the Rules of Professional

20

Proceedings

1    Responsibility governing accountants, they were not

2    required to chase after your client for a signature if

3    they understood it to be a tax engagement.  Correct, Mr.

4    Felsen?

5             MR. FELSEN:  If it was a tax engagement,

6    correct.  But again, your Honor, our clients didn't

7    receive -- the testimony from our clients is they never

8    received these letters and there's no evidence that our

9    clients received them.

10            MS. FITZGERALD:  We would disagree with that.

11   Initially the letters were sent to the three brothers

12   individually for each of their companies that they own.

13   And one of the brothers, John Koufakis, told our clients

14   hey, instead of doing it this way, put them all, after

15   getting the letter, put them all on a single letter.  So

16   put all the Star companies on a single letter and then

17   address it to Michael Koufakis.  So that was done.  The

18   paper trail reflects a change in the format which was

19   done at the request of John Koufakis.  Michael Koufakis

20   admitted that he got at least the 2016 letter and he does

21   not know or does not recall whether or not he got the

22   other letters.  You know, we can get into what the

23   evidence is going to show as far as the documents that

24   Star definitely got from Voynow and the fact that they

25   haven't produced those in discovery in this case.  But I

Proceedings

1    mean I think that's getting a little bit far off what

2    we're talking about today.  But there's going to be

3    substantial evidence introduced showing that Star did in

4    fact get these letters.  But I think for purposes of our

5    discussion today, the point is that they have the sample

6    format of what a review engagement letter looks like and

7    they have the sample format of what a tax engagement

8    looks like because I gave that to them through the

9    Thompson entity which is the entity that they definitely

10   requested they wanted.  I don't think it's relevant but I

11   gave it to them.

12          We don't need to go any further on that.  We

13   don't need to now bring in other entities that I'm

14   hearing about for the very first time that are unrelated

15   to Star.

16          THE COURT:  Ms. Fitzgerald, Ms. Fitzgerald, I

17   didn't ask you a question and I'm really not even sure

18   what you're talking about.  I was about to make a ruling

19   and I was speaking when you started speaking and I truly

20   am not clear on what you're trying to say.

21          MS. FITZGERALD:  Sorry, I'm sorry, your Honor.

22   I didn't realize.  I thought you had wanted to hear from

23   me but I apologize if not.

24          THE COURT:  So as I was starting to say, this

25   issue has been pending now for many months and we've been

22

Proceedings

1  going around, the parties have been going around in

2  circles trying to find some solution with little success.

3  In the June 7, 2023 motion, the plaintiffs requested that

4  the Court direct defendants to produce, and I quote,

5  "written engagement agreements between Voynow and a

6  sample of other dealerships who retained Voynow to

7  perform solely tax preparation work and also to perform

8  work separate and apart from solely tax preparation."

9       That is on page 3 of ECF number 102.  That

10  motion stated that the parties agree that the defendants

11  would produce three sample tax only agreements and three

12  sample agreements for tax and review services.

13       As of September 7, 2023, plaintiffs contended

14  that the defendants produced only engagement letters from

15  the Thompson Auto Group and no other automotive groups

16  and claimed that the defendants provided no rationale for

17  limiting their production to Thompson Auto Group.

18       We've now discussed the history of this for a

19  length of time today and the distinction between the

20  types of engagements that are represented in the Thompson

21  Auto Group documents.  And I frankly do not think any

22  further discovery on this issue is warranted.  The

23  question of engagement letters with respect to other

24  entities is not proportional to the needs of this case

25  where the issues pertain to the agreement that was in

23

Proceedings

1   place between Star and Voynow.  The fact that you now

2   have some samples seems more than sufficient given the

3   very, very minimal relevance of this particular class of

4   documents.

5          So the court is not inclined to order that the

6   defendants have to produce any further written

7   engagements between Voynow and a sample of other

8   dealerships.

9          I also note that the parties did not even meet

10  and confer on the specific request that the plaintiff is

11  now positing as the documents they're seeking.  You

12  acknowledged just moments ago, Mr. Felsen, that you had

13  never requested specifically in a meet and confer the

14  documents for Kerbeck and Peruzzi and I deny the request

15  on that grounds as well.  So we're done with this

16  particular issue.

17         Turning now to demand number 6, Mr. Felsen,

18  would you like to start?

19         MR. FELSEN:  Yes.  Thank you, your Honor.  So

20  demand number 6, in demand number 6 we're looking for

21  documents concerning checklists Voynow used regarding

22  review engagements for auto dealer clients as referenced

23  in David Kumar's deposition.  Mr. Kumar is an employee

24  for Voynow.

25         Michael Koufakis testified on behalf of the

24

Proceedings

1  plaintiff that his understanding of the engagement as

2  explained to him by the principals of Voynow was that the

3  engagement would be more than an audit, I'm sorry, more

4  than a review and less than an audit.

5          Mr. Kumar testified at Exhibit 3, pages 140 to

6  141 of the deposition that when Voynow performed review

7  engagements, it used checklists.  Voynow's argument

8  principally is that Star isn't entitled to this because

9  Voynow's position is that it only prepared tax returns.

10 Obviously, that's not the case.  There's been no ruling

11 on that particular issue and that's one of the primary

12 issues in this case.

13         So Voynow, throughout the litigation and at the

14 deposition, has tried to relate all tasks that it

15 performed for Star to preparation of tax returns.  But if

16 there are certain tasks that are contained on these

17 checklists that Voynow used for review clients, if on

18 those checklists it identifies tasks that are being done

19 by Star, it would tend to establish that Voynow was

20 actually doing that work for Star.

21         So it's entirely relevant.  It's critical to

22 the central issue in this case related to what the scope

23 of work was.

24         Also, I just want to note for the Court that

25 they produced another type of checklist in discovery.  It

25

Proceedings

1   was a checklist related to the tasks for controllers.

2   We're not looking for confidential client information.

3   All we're looking for is the checklist.  They can redact

4   any information related to the identity of any Voynow

5   client.  But this is entirely relevant and we'd ask that

6   the Court direct Voynow to produce this checklist.

7          THE COURT:  So this checklist question really

8   is someone ephemeral to me, right?  Because it seems as

9   though, you know, the production of checklists for a

10  separate client could be somewhat problematic.  And I

11  wonder, the question about a blank checklist, whether

12  that actually provides me much insight.

13          So would you be satisfied with a blank

14  checklist?  That's what you say on page 5 of ECF 102.

15  Star --

16          MR. FELSEN:  Yes.

17          THE COURT:  The blank form checklist is what

18  Star is seeking, not any checklist for client

19  information.

20          MR. FELSEN:  Correct, your Honor.

21          THE COURT:  So Ms. Fitzgerald, does such a

22  document exist?  Is there like a template that Voynow

23  uses to prepare checklists for when they go out on an

24  engagement?

25          MS. FITZGERALD:  So those types of blank

26

Proceedings

1   documents can be pulled right off the AICPA website.  And

2   I think, I mean the plaintiffs actually did that when

3   they submitted I think it's Exhibit 9 to one of their --

4   I think it's two docket 102.  Exhibit 9 is a blank AICPA

5   checklist for a tax engagement.  So they're looking for a

6   blank --

7            THE COURT:  I understand that there are

8   publicly available checklists but that is not my

9   question, Ms. Fitzgerald.

10           MS. FITZGERALD:  Yeah.  I don't know that

11  Voynow has any checklists that are not already with

12  client's specific information on them.

13           THE COURT:  I find that hard to believe, Ms.

14  Fitzgerald because --

15           MS. FITZGERALD:  I'm sorry?

16           THE COURT:  I find that really hard to believe

17  because I have yet to meet a company or office or, you

18  know, division that doesn't create their own internal

19  templates.

20           MS. FITZGERALD:  So I guess what I was trying

21  to say is whether or not they could get that, like

22  download it from the AICPA website as a blank document,

23  probably, yeah.  But as I understood the question, the

24  request that they were looking for, they were looking for

25  the checklists that were actually used in actual review

Transcriptions Plus II, Inc.

27

Proceedings

1   engagements for other clients.

2           THE COURT:  You're telling me that the Voynow

3   accountants literally pull of the AICPA website when they

4   go out for an engagement?  I don't buy it.

5           MS. FITZGERALD:  So they are --

6           THE COURT:  They don't maintain a blank

7   checklist?

8           MS. FITZGERALD:  It's a publication.  I want to

9   say it's Pearson that publicizes these checklists that

10  accountants use.

11          THE COURT:  I'm asking you whether or not

12  Voynow has a template for their own internal checklists.

13          MS. FITZGERALD:  They have this published

14  document that's put out by another entity.  It's not an

15  internal Voynow template.

16          THE COURT:  I reviewed a fair amount of

17  accounting records back when I was a white-collar

18  prosecutor and I have not seen most accountants utilize

19  like publicly available published forms, Ms. Fitzgerald,

20  and I'm really struggling to credit -- I'm not saying

21  that you are representing anything.  I'm just wondering

22  if you know the answer.  Are you sure that Voynow doesn't

23  have an internal template?

24          MS. FITZGERALD:  The templates are -- and

25  there's been testimony about this, Judge.  So it's a

28

Proceedings

1    company, and I believe it's Pearson, that publishes these

2    documents.  So that's the template that -- it's a

3    publication by the company that lists the template.

4              And I think if you look at the template that

5    the plaintiff attached as a blank one, you can see that

6    it's a publication that's put out by another entity.  So

7    there's not a Voynow specific oh this is what we do in a

8    review engagement.  It's a publication that, you know, it

9    has a checklist and accountants go through it and they

10   decide okay, is this a relevant step for this particular

11   client for this particular engagement?  And if so, you

12   know, they would follow that step.  But it's not a Voynow

13   specific generated template.  It's something that's

14   published by another party used by accountants.

15             THE COURT:  Mr. Felsen, do you have any

16   evidence to suggest that they don't just use the standard

17   public form?

18             MR. FELSEN:  Yes, your Honor.  Mr. Kumar's

19   testimony, Exhibit 3 on page 141, he testified --

20             THE COURT:  Exhibit 3 to what?  Exhibit 3 to

21   ECF number?

22             MR. FELSEN:  I'm sorry, it's document 102-3.

23             THE COURT:  Okay.  Thank you.

24             MR. FELSEN:  On page 141.

25             THE COURT:  Let me just get there.  My computer

29

Proceedings

1   is being very, very slow to open this PDF here.  Hold on.

2   Give me one second.  You said page 141?

3          MR. FELSEN:  Page 141 at the top on line 1

4   starting.  It says, "We would follow checklists.  The

5   checklists change from year to year."  So based on his

6   testimony, there's a different checklist each year.

7          And in addition, your Honor, the checklist --

8          THE COURT:  What about that suggests that's not

9   the AICPA checklist?

10         MR. FELSEN:  Your Honor, that doesn't

11  specifically say whether it's the AICPA checklist or not.

12  But the point is that they had a different checklist each

13  year that they used.

14         And when you also look at the fact that the

15  controller checklist has Voynow's name at the top and

16  bottom of it, it would show that Voynow, when they use

17  checklists, they put their name on it.

18         So we would ask that they produce the

19  checklists that they use that their name is on.  And if

20  their name is not on it and they use the AICPA checklist,

21  then they should confirm that.  It doesn't seem like Ms.

22  Fitzgerald is fully aware as you can hear today.

23         THE COURT:  I'm looking at Exhibit 8 and 9.

24  Give me one second.

25         MR. FELSEN:  Your Honor, the checklist for the

30

Proceedings

1    controller says at the top dealership internal control

2    checklist and it's got Voynow's name at the bottom.

3            THE COURT:  I know.  That's what I'm looking

4    at, documents 8 and 9.

5            So how do these checklists interrelate with the

6    checklists that we're talking about, Ms. Fitzgerald, if

7    you know?

8            MS. FITZGERALD:  So Exhibit 9 is a 2021 tax

9    return S Corporation checklist.  Okay?  What Mr. Kumar

10   was asked about at his deposition was, you know, what

11   types of engagement he worked on when he was at Voynow

12   and he said, you know, he had done tax engagements and he

13   had also done review engagements.  He made very clear

14   that for Star it was only a tax engagement.  But to the

15   extent that he did work on review engagements for other

16   clients, he talked about the fact that there were

17   checklists that were used for those types of engagements

18   that were 40 to 60 pages.

19           And you know, to the extent Mr. Felsen is

20   arguing that those checklist changed every year, well,

21   those checklists would have the year of the financial

22   statement engagement.  So whether it was 2015 or 2016,

23   that would be reflected on the year of the checklist.

24           I believe that -- I think that answers your

25   question.

31

Proceedings

1          THE COURT:  Not exactly, no.  So you know,

2    Exhibit 8 is a different type of checklist than Exhibit 9

3    and it does have Voynow's name at the top and the

4    bottom --

5          MS. FITZGERALD:  Yes.

6          THE COURT:  -- of the first page.  And my

7    question was how do these checklists interrelate with the

8    checklists that you understand plaintiff to be seeking?

9          MS. FITZGERALD:  Yes.

10          THE COURT:  So you know, the Exhibit 9

11    checklist in fact does appear to be an AICPA checklist

12    for income tax return preparation.  Fine.

13          MS. FITZGERALD:  Right.

14          THE COURT:  You get this online.

15          MS. FITZGERALD:  So okay --

16          THE COURT:  The question is with regard to

17    Exhibit 8, I mean to me if Voynow has a blank checklist,

18    you should just produce it and we should be done with

19    this.  I think we just need an answer to the question of

20    whether or not Voynow was in the practice of preparing

21    their own internal checklist or literally just went to

22    AICPA and printed out a form each time.

23          MS. FITZGERALD:  Yes.  So for the review

24    engagement, that would be a similar type of publication,

25    whether it's the Pearson company that I believe is what

32

Proceedings

1  the testimony said similar to what is on Exhibit 9.

2  Exhibit 8, so that document came about after Star fired

3  their two controllers.  In 2017, they asked Voynow to

4  assist the new controller that they hired because she had

5  no experience.  So this was a document -- this is not an

6  accountant, procedures that accountants do.  This was a

7  document that is in your capacity as a dealer, as a

8  controller, these are things you should be doing as part

9  of your job.  So that's the difference between the two

10 documents.

11        THE COURT:  Right.  But I still don't have an

12 answer as to whether Voynow created any internal

13 checklist or literally just used the AICPA forms each

14 time.

15        MS. FITZGERALD:  Yes.  So it is the form that

16 they used.  And they would tailor it as needed to the

17 particular type of review engagement that they were on,

18 but it's not --

19        THE COURT:  What do you mean they would tailor

20 it?  It's a standard form.  How do they tailor it?

21        MS. FITZGERALD:  So like for instance, let's

22 just say, you know, there is a -- and I'm just

23 hypothetically thinking, but just say on a checklist

24 there's petty cash.  If a client doesn't have petty cash,

25 then that would be something that you would just mark N/A

33

Proceedings

1  as you're completing the checklist as an accountant.  You

2  know, or if an accountant, you know, if the company

3  doesn't have like a certain type of inventory, you know,

4  you would skip over something like that.  You tailor it

5  as needed to your client, but that's how it's tailored to

6  a client's specific engagement.

7        THE COURT:  What you're saying is internally

8  inconsistent to some extent, Ms. Fitzgerald.  By saying

9  they're tailoring the checklist, you're suggesting that

10  they're editing it.

11        MS. FITZGERALD:  No, I'm just saying you skip

12  over it.  Like you don't complete it.

13        THE COURT:  No, but that's what you are

14  literally saying, ma'am, with all respect.  When you just

15  say N/A, you're not tailoring the checklist.  You're

16  filling it out as not applicable.  There's a very

17  different meaning.

18        And so what I'm trying to get at is whether or

19  not there is evidence in this case that the AICPA

20  checklists were the ones utilized for both potential

21  types of review here, the tax engagement and/or the

22  review engagement.

23        MS. FITZGERALD:  So the testimony and the work

24  papers make clear that there were no checklists used for

25  the tax engagement.  They're not required to --

34

Proceedings

1        THE COURT:  Totally not responsive to my

2  question.  My question is is there evidence in this case

3  about Voynow's practices with regard to checklist

4  utilization with regard to tax engagement and the review

5  engagement?  Where did the checklist come from?

6        MS. FITZGERALD:  So the evidence is they were

7  asked do you use checklists for tax engagements?  The

8  answer is no.

9        THE COURT:  Okay.

10        MS. FITZGERALD:  Do you use checklists for

11  review engagements?  The answer was yes.  And that was

12  what Mr. Kumar's testimony had to do it.

13        THE COURT:  Right.  Mr. Kumar's testimony is

14  ambiguous as to where the checklists originate.  Is there

15  evidence in the case with regard to where they get their

16  checklists?

17        MS. FITZGERALD:  Yes.  And that's what I'm

18  trying to pull up.  And it was a publication and that's

19  where the name Pearson is coming up.  And I can't recall

20  specifically which deposition it was, but one of the

21  Voynow folks explained that that's where they get the

22  checklists that they use.  It's published by a third

23  party.

24        THE COURT:  Mr. Felsen, do you recall which

25  deposition that was?

35

Proceedings

1          MR. FELSEN:  Not off the top of our heads, your

2     Honor.

3          THE COURT:  Okay.  I can't order Ms. Fitzgerald

4     to produce something that doesn't exist, Mr. Felsen.  If

5     it is true that Voynow utilized the AICPA checklist for

6     their review engagement consistently and that was their

7     standard practice, which actually makes sense to some

8     degree for a small firm not to reinvent the wheel, but I

9     can't possibly weigh in on what their actual business

10    practice was.

11         All of that being said, I can't order her to

12    produce something that doesn't exist.  If there's

13    testimony and evidence in the case that they did not use

14    checklists for tax engagements, there will be no

15    checklists to produce in that regard.  If the evidence in

16    the case indicates that they used the AICPA form for

17    their review engagements, they don't have an internal

18    document to produce that wouldn't have client information

19    on it.

20         So you have Exhibit 9.  It appears to be one of

21    the AICPA forms.  What I'm going to direct the parties to

22    do once again is to meet and confer on this issue and

23    please drill down with your client, Ms. Fitzgerald, and

24    if you need to put it in a declaration or an

25    interrogatory or something to close out this issue,

36

Proceedings

1   please do so.  But we need a definitive answer about

2   whether or not Voynow had their own internal blank

3   checklists that the accountants would use for review

4   engagements or whether or not they were simply using the

5   AICPA form.  Is that clear to you, Ms. Fitzgerald?  Do

6   you understand what I'm saying?

7           MS. FITZGERALD:  Yes.

8           THE COURT:  Okay.  So on this issue, the

9   plaintiff's request for the documents in the motion that

10   I ordered defendants to provide them is denied without

11   prejudice because I don't have sufficient evidence before

12   me to establish that the documents exist.  But I am

13   directing the parties to meet and confer to confirm

14   whether or not -- to confirm what Voynow's business

15   practice was.  If there was a checklist, Ms. Fitzgerald,

16   please provide it.  If there was no checklists, please

17   come up with some sort of a workaround to have that fact

18   documented in the discovery record whether it is one

19   quick interrogatory or declaration.  We have to close

20   this issue out.  Ms. Fitzgerald, does that work for you?

21           MS. FITZGERALD:  Yes.

22           THE COURT:  All right.  So the next two issues

23   that were raised pertain to the filing that was made in

24   August, document 108.

25           First was a motion to quash a subpoena to

37

Proceedings

1  Withum, plaintiff's current accounting firm.  So again,

2  Mr. Felsen, this is your motion.  Would you like to

3  start?

4          MR. FELSEN:  Yes.  Thank you, your Honor.  So I

5  just want to go through some quick procedural history

6  relating to discovery.

7          On December 5, 2022, the Court ordered fact

8  discovery closed as of March 17, 2023 and all discovery

9  closed on August 18, 2023.

10          A few months later, March 28, 2023, the Court

11  entered an order reiterating that the March 17, 2023

12  deadline remains and ordered the parties to meet and

13  confer and try to resolve some pending discovery

14  disputes.

15          Then we fast forward to July 25, 2023.  Star

16  submitted a letter asking for more time to complete

17  expert discovery only and proposed dates for expert

18  disclosures as well as expert depositions.  Star didn't

19  ask to extend fact discovery.  Voynow certainly didn't.

20  Voynow has adamantly and strenuously opposed every

21  attempt by Star to extend the discovery deadline, the

22  fact discovery deadline.

23          The Court entered an order on August 2, '23

24  stating that fact discovery must be completed by August

25  31, 2023 and set a schedule for expert discovery.  In

38

Proceedings

1   that order, the Court did not reopen fact discovery.

2   There was merely some miscellaneous discovery items that

3   needed to be done.  There was nothing before the Court

4   asking any party, including Voynow, asking for the Court

5   to allow new discovery to take place such as the issuance

6   of subpoenas.  The spirit of the order was that no new

7   discovery would take place, that August 31st was the

8   deadline to finish up whatever was outstanding.

9           Ms. Fitzgerald, on April, I'm sorry, August

10  4th, four and a half months after the March 17, 2023

11  close of discovery, served a subpoena on Withum, who is

12  Star's current accountant, and by doing so Ms. Fitzgerald

13  circumvented the August 2, 2023 order.

14          Now, the substance of the subpoena, so we

15  believe that the subpoena should be quashed based solely

16  on the fact that it was served after the close of

17  discovery.  But even if the Court were to entertain that

18  subpoena, which we don't think it should, the subpoena

19  should be quashed because it seeks information that's not

20  relevant.

21          So Withum came up at a deposition of Michael

22  Koufakis back in August of 2022, a year before (audio cut

23  out) on August 4, 2023.  So it's clear that Voynow could

24  have served that subpoena and didn't, for whatever reason

25  did not, and forgot to, and then took the opportunity

39

Proceedings

1    based on its August 2nd order to now engage in new

2    discovery.  They had plenty of time to serve that

3    subpoena during discovery and they failed to do so.

4            Now, the substance of that subpoena is for

5    engagement letters, invoices, and bills for the period of

6    2020 through 2021.  That information that they sought has

7    nothing to do with the claims in this case.  Withum

8    became Star's accountant in 2020, years after the alleged

9    acts in the complaint.  The complaint alleges malpractice

10   up through November 2017.  Withum didn't become the

11   accountant for three years.

12           Withum (audio cut out) after Voynow was

13   terminated simply has no connection to Voynow's retainer.

14   What Star did subsequently with respect to the accounting

15   services that it received from accountants has no bearing

16   whatsoever on this case.  Also --

17           THE COURT:  Isn't it somewhat analogous to your

18   argument that what your relationship was with your

19   subsequent accountant is perhaps reflective of your

20   relationship with your prior accountant?  Isn't that

21   somewhat analogous to comparing the practices that Voynow

22   undertook with other clients, what we started the day

23   with?

24           MR. FELSEN:  And your Honor ruled in favor of

25   Ms. Fitzgerald on that.  So if you believe it's

40

                              Proceedings

 1   comparable then --

 2           THE COURT:  After you got some discovery, sir.

 3           MR. FELSEN:  So, if you believe it's

 4   comparable, then --

 5           THE COURT:  After you got some discovery, sir.

 6           MR. FELSEN:  But your Honor, we're looking for

 7   engagements during the time that -- we were looking for

 8   engagements during the time that Star was being serviced

 9   by Voynow.  They are now looking for engagements three

10   years after the malpractice took place with respect to a

11   totally different accounting firm.

12           THE COURT:  I understand.  All right.  Ms.

13   Fitzgerald?

14           MR. FELSEN:  Just one more comment, your Honor.

15   Ms. Fitzgerald is looking for information related to

16   pricing and we just don't think that you can compare

17   Withum, a large international accounting firm with

18   Voynow, who's a regional accounting firm based in

19   Pennsylvania with less than ten employees.  You just

20   can't compare.  That's like comparing, you know, my firm

21   to one of these huge national law firms.  It's just

22   not -- our rates aren't comparable to a huge law firm

23   like that.

24           THE COURT:  I understand the argument.  Ms.

25   Fitzgerald?

41

Proceedings

1          MS. FITZGERALD:  So first, let me address the

2    argument as to the discovery deadline.  Plaintiffs had

3    made numerous requests to extend that deadline and we did

4    object, and the Court ruled in plaintiff's favor

5    extending that deadline.  So the Court's order issued on

6    August 2nd extends the fact discovery deadline to August

7    31st.  There's no limitations, restrictions, or

8    qualifications in that order as far as fact discovery.

9          And to the extent the plaintiff is trying to

10   argue that only certain limited discovery was permitted

11   after March, well that argument doesn't hold because the

12   plaintiffs disclosed a brand new witness for the first

13   time at the end of June.  The plaintiffs produced almost

14   5,000 documents in mid to late August.  So both parties

15   have engaged in fact discovery after that March deadline

16   and that's consistent with the Court's order allowing

17   discovery to take place up through August 31st.

18          So as to the second part of Mr. Felsen's

19   argument, which is essentially that the subpoena seeks

20   information that's not relevant, we disagree.  First of

21   all, the subpoena is very narrowly tailored.  It only

22   asks for two years of engagement letters and invoices.

23          And the reason why it's relevant is because, as

24   has been alluded to throughout today, that there's a

25   dispute between Michael Koufakis's version as to what he

42

Proceedings

1    hired outside accountants for versus Voynow's version.

2            So I took his deposition and the deposition was

3    taken in August of 2022.  So at that point, Withum was

4    already engaged for over two years.  And Mr. Koufakis

5    testified that with regard to Voynow, he had hired them

6    to conduct services just shy of an actual audited

7    financial statement.  He hired them to actually detect

8    fraud and to actually verify every balance in every

9    account on the balance sheet.  And he said that that was

10   what he hired Voynow to do for a 21-year period and that

11   he had also hired Voynow's predecessor to provide that

12   same level of service.

13           So basically, you have Mr. Koufakis testifying

14   that for 30 years his outside accountant provided this

15   significant level of service.  And when I asked him what

16   he was engaged -- what Withum was engaged to provide, his

17   testimony was that oh, it's a fluid situation.  I really

18   don't recall.  But he was the one who would have hired

19   them.

20           And I think that we should be able to challenge

21   his credibility because when you look at the fact that

22   he's claiming that between 2017 and 2021 he discovered

23   allegedly $10 million worth of theft or fraud that was

24   committed that supposedly wasn't detected by Voynow, and

25   that on top of it there was an investigation by the New

43

Proceedings

1    York Attorney General against Star for Star employees

2    defrauding customers, Chinese customers -- so you have

3    that that occurred, that also occurred around 2018

4    through 2020.  So you have these two big alleging fraud

5    activities and now you're going to claim that you only

6    hired Withum to do something that is so far below the

7    level of an audit engagement?

8              I mean it's our belief, and I'm 99 percent

9    sure, that if the Court allows this subpoena, I'm going

10   to get those engagement letters and they're going to show

11   that it's a tax only engagement.  So that, given the

12   context of what's happened with this fraud, that

13   undercuts Michael Koufakis's credibility because why

14   would you go from such a high level of outside accountant

15   services for 30 plus years and now you have supposedly

16   all this massive fraud and you now scale it back to where

17   you just have a tax engagement that is not intended to

18   detect fraud?

19             So it's relevant to address his credibility,

20   first of all.  And then it's also relevant because the

21   fraud, some of the fraud that is at issue actually is

22   alleged to have occurred up through 2020 and was not

23   discovered until either 2020 or 2021 which falls in the

24   scope of Withum's engagement.  So if Withum, I mean if

25   Star is to believe that they hired Withum to do the same

44

Proceedings

1  type of level of attestation engagement that it did hire

2  Voynow and the prior accountant, then there's an issue as

3  to why Withum couldn't discover that type of fraud

4  because it was only discovered by, you know, their

5  current office manager who isn't even an accountant and

6  who doesn't even have, you know, any education beyond

7  high school.

8          So you have accountants who are professionals

9  who supposedly aren't discovering this so-called fraud.

10  It's relevant to the extent that how discoverable was

11  this fraud or even is there a fraud?  So again, the

12  subpoena is very narrowly tailored.

13          And then the third piece as to why it's

14  relevant, as to why we've asked for the invoices, is that

15  the plaintiff's theory is that because of Voynow's bills

16  that supposedly reflects that they did more than tax

17  work.

18          And their expert made that plain.  And when I

19  took his deposition, I asked him what support he had to

20  back up that opinion and he basically said well, you

21  know, my own accounting firm would issue the tax work for

22  dealerships back in 2015.  And when I tried to ask him,

23  you know, what was the type of clients, what was the size

24  of the dealership, you know, where was the dealership

25  located so that we could actually make some type of

45

Proceedings

1   comparison, he wouldn't disclose any of that information.

2          So if the Court allows me to get Withum's bills

3   and if Withum's bills reflect that it was only a tax

4   engagement, as I suspect that they will, and if those

5   bills are comparable to what Voynow's bills were, then

6   that supports our defense and it rebuts the plaintiff's

7   claim that Voynow's bills suggest something more than a

8   tax engagement.

9          THE COURT:  So then the question of the

10  monetary compensation, I mean didn't we discuss this at

11  length in the context of the other engagement that the

12  price may or may not have any relevance depending upon

13  their pay structure?  I mean I don't know that the money

14  matters.  I understand your argument with regards to the

15  scope of the engagement, but I'm not completely sold on

16  the invoices at all, Ms. Fitzgerald.  How is it not Mr.

17  Felsen's argument that a regional accounting firm may

18  have very different rates than the national?  They could

19  be less, they could be more depending upon whether the

20  larger firm has economy to scale.  Paul Weiss is not

21  comparable to a law firm in rural Pennsylvania.

22         MS. FITZGERALD:  Right.  So what the invoices

23  would show, and I agree that there's variation in rates,

24  but what the invoices would show is if this was a tax

25  engagement, then you would have invoices that reflect a

46

Proceedings

1   tax claiming visit at one point of the year.  You would

2   have invoices that reflect a tax preparation visit at one

3   point of the year.  And then you would have invoices that

4   reflect an interim year tax visit.  So the invoices would

5   reflect and support when it was that Withum was actually

6   out there.  And to the extent it matches up with the same

7   type of three visits per year that Voynow was out there,

8   then it does support, you know, irrespective if let's

9   just say Withum bills at a higher hourly rate than Voynow

10  did, the invoices are going to be relevant to support the

11  scope of the engagement being those three types of on

12  site visits.

13          THE COURT:  Okay.  Mr. Felsen?

14          MR. FELSEN:  Yes, your Honor.  So Voynow has in

15  their possession (indiscernible) and invoices from

16  another accounting firm, Rosenfield, that Star used

17  subsequent to Voynow.  So just like your Honor ruled with

18  respect to demand number 9 where it was sufficient for

19  Star to just have Thompson engagement, I respectfully

20  submit that that should be the ruling here, that they

21  already have Rosenfield and they shouldn't be entitled to

22  anything else.

23          With respect to Mr. Koufakis's testimony, he

24  testified that he uses other accounting firms and not

25  exclusively Withum.

47

Proceedings

1          Also, Ms. Fitzgerald made a statement about a

2    new witness that Star subsequently identified after

3    discovery.  We only learned about that witness at a

4    30(b)(6) deposition that took place after the initial

5    deadline for discovery.  So that's the reason why that

6    individual was identified.

7               THE COURT:  Ms. Fitzgerald, anything final?

8               MS. FITZGERALD:  So just as to the Rosenfield

9    piece, so Rosenfield was hired to conduct a forensic

10   accounting analysis.  So that's different.  They were

11   hired, you know, after the alleged discovery of the

12   alleged theft and they were also hired for purposes of

13   being an expert in this case.  So those types of bills

14   aren't really comparable or reflective of what your

15   prototypical tax engagement would have looked like.

16              THE COURT:  Mr. Felsen, anything in response?

17              MR. FELSEN:  Your Honor, Rosenfield did tax

18   work also.  And your Honor, to the extent that they're

19   allowed this, it's going to prejudice us because, you

20   know, there's no -- discovery is closed and, you know,

21   they're going to get this and that's the end of it?

22   There's no further discovery on this issue?  Their time

23   to get this has well passed.  They should have asked for

24   this a long time ago.  We would have objected back then.

25   But due to the fact that they requested this after

48

Proceedings

1   discovery closed, it should be rejected based on that

2   ground alone.

3         THE COURT:  I understand both sides' arguments.

4   So starting first with the argument as to timing, I would

5   just like to note that in the August 21, 2023 motion by

6   plaintiff, plaintiff's sought to quash the subpoena

7   served on Withum, plaintiff's current accounting firm, as

8   both untimely and irrelevant.  That's in the motion to

9   quash the subpoena at ECF 108.

10        Plaintiffs seem to argue that the Court

11  unintentionally extended the deadline to close fact

12  discovery when the Court was only requested to extend the

13  deadline for expert discovery.  That's suggested in the

14  motion at ECF 108 at page 2.

15        Plaintiffs further argue that the subpoena

16  seeks the relevant documents because the documents

17  requested are outside the time frame of the relationship

18  between plaintiff and defendants.

19        In response, defendants point to the Court's

20  August 2, 2023 order stating that the close of fact

21  discovery would be August 31, 2023 and note that the

22  defendants issued the subpoena with a return date of

23  August 21, 2023 and the defendants explained why the

24  requested documents are relevant supplemented by Ms.

25  Fitzgerald's arguments made here today.

49

Proceedings

1          As a timing matter, I would first note that

2     plaintiff is incorrect that the Court erred in some

3     fashion in extending the close of fact discovery.  The

4     Court's extension of the schedule was specific and based

5     on an expressed request for an extension made by the

6     plaintiff in document 104.  And I quote from ECF 104,

7     "This letter is written as a follow up to a portion of

8     the June 7th letter regarding inter alia plaintiff's

9     request for an extension of time for the completion of

10    all discovery."

11          One prior request for an extension was made on

12    December 2, 2022 and was granted.  The December 2, 2022

13    extension was made in the filing made by plaintiff's

14    counsel docketed at ECF number 78 in which the plaintiffs

15    requested an extension of fact discovery.

16          I did at one point note on the record while we

17    were together that I was not extending the fact discovery

18    schedule in toto at that point in time.  But given all of

19    the events that transpired over the summer and given

20    plaintiff's request, express request that I extend the

21    deadline for the close of all discovery, we entered a

22    responsive scheduling order over defendant's objection.

23          After that time, the parties had ample

24    opportunity all throughout the summer to certify the

25    close of fact discovery notwithstanding discreet open

50

Proceedings

1    issues and continuously declined to do so.  Whether or

2    not the plaintiffs intended to request an extension of

3    the close of fact discovery in their letter, the Court

4    nonetheless ordered it on the basis of the fact that

5    there were so many messy issues that I was aware of that

6    were percolating over the summer.  My order clearly and

7    unequivocally extended the close of fact discovery to

8    August 31, 2023.  No party objected to it.  Had anybody

9    wanted a clarification, it could have been requested.

10   Nothing was made in that regard.  I do find that the

11   defendant's subpoena was issued prior to the close of

12   fact discovery.

13           In addition, I find the defendants have carried

14   their burden to demonstrate that the requested documents

15   could bear on their defenses including, but not limited

16   to, challenging the credibility of an important witness,

17   specifically Michael Koufakis.

18           Accordingly, plaintiff's motion to quash the

19   subpoena is denied.

20           The next issue that we had was the defendant's

21   motion to preclude.  And my question to you, Ms.

22   Fitzgerald, is isn't this really a proper motion for

23   later on in the case as a motion in limine?  Why is this

24   before me now?

25           MS. FITZGERALD:  It's actually the plaintiff's

51

Proceedings

1   motion and I agree with your Honor.

2          THE COURT:  Oh, I'm sorry.  I'm sorry.  Go

3   ahead, Mr. Felsen.

4          MR. FELSEN:  Your Honor, the problem is is that

5   there's documents that Ms. Fitzgerald is attempting to

6   rely on and we're significantly prejudiced because if

7   they're allowed, we haven't had the opportunity to engage

8   in discovery on any of this.  Ms. Fitzgerald snuck in

9   four categories of documents with a 6,000 page document

10  production of documents for the most part where we had

11  agreed upon during the meet and confer that they would be

12  produced.

13         So to allow this to go forward without

14  plaintiffs having the opportunity to engage in further

15  discovery with respect to these four categories of

16  documents would be significantly prejudicial to the

17  plaintiffs.

18         THE COURT:  You got them in June, right?

19         MR. FELSEN:  June, yeah, we got them in June

20  and we filed a motion shortly thereafter, after we

21  believed discovery was over.

22         THE COURT:  Your firm is the firm that

23  requested the extension of the discovery schedule which I

24  granted unequivocally in plain English on the docket.

25         MR. FELSEN:  Your Honor, I respectfully

52

Proceedings

1  disagree with your interpretation of our letter but I

2  understand your ruling.

3          THE COURT:  You also have to understand the

4  docket order.  It says unequivocally fact discovery is

5  extended until August 31st.  And I don't understand why

6  that wasn't read literally in black and white, black and

7  yellow as the case may be.

8          MR. FELSEN:  Your Honor, the Court's orders

9  were making a distinction between fact discovery and all

10 discovery, and we referred to all discovery in our

11 letter.

12         THE COURT:  Fact discovery shall be completed

13 by August 31, 2023.  It is on the docket.  You had a full

14 month after August 2nd to the close of fact discovery to

15 conduct any discovery you would have liked to do with

16 regard to documents you received at the end of June.

17         MR. FELSEN:  But that's not what we asked for

18 in our letter.  We asked for an extension on all

19 discovery, not fact discovery.

20         THE COURT:  Fact is encompassed within all

21 discovery, sir.  And I distinguished in my order what was

22 being extended unequivocally.  So I'm failing to

23 understand how you did not have an opportunity to address

24 these issues during discovery.  You had the documents as

25 of June 30th, correct?

53

Proceedings

1          (Pause in proceedings)

2          THE COURT:  Mr. Felsen, are you there?

3          MR. FELSEN:  I think I was on mute.  The prior

4    orders that the Court issued made a distinction between

5    fact discovery and all discovery.  And so in our letters,

6    we used the same terminology that the Court was using.

7    When we referred to all discovery, we were referring to

8    all discovery which the Court was referring to as expert

9    discovery.

10          THE COURT:  Your letter and what you intended

11   to request specifically made reference to a prior

12   extension of fact discovery that was requested in

13   December.  I extended the schedule clearly and

14   unequivocally again breaking them down by categories.

15   You didn't read my scheduling order.  You didn't

16   understand my scheduling order.  That is frankly not the

17   Court's responsibility to ensure.  It is clear and

18   unequivocal that fact discovery was extended until August

19   31st.  Did you or did you not receive these documents on

20   June 30th, sir?

21          MR. FELSEN:  We received them on June 30th,

22   your Honor.

23          THE COURT:  Okay.  So you had two months from

24   the extension of the discovery schedule that was

25   predicated on receipt of your letter during which you

54

Proceedings

1  could have explored the discovery issues that you think

2  are necessary to follow up on this production.  Whether

3  you misunderstood because you had a different intention

4  in writing the letter than what I ultimately ruled

5  doesn't matter, sir.  The discovery schedule was clear.

6  And your interpretation of my discovery schedule is not

7  binding on the -- what you intended to request is not

8  binding on me.

9          MR. FELSEN:  Your Honor, we did not have an

10 opportunity -- if you were to allow these documents to

11 proceed at trial and wait for a motion in limine, we

12 would be deprived of the opportunity to do depositions

13 related to these documents.

14         THE COURT:  Did you seek to take any

15 depositions related to the documents after you received

16 them in June?

17         MR. FELSEN:  Your Honor, discovery was closed

18 in June.  We couldn't do anything.

19         THE COURT:  Did you seek to take any discovery

20 steps with regard to documents after I extended the fact

21 discovery schedule on August 2nd?

22         MR. FELSEN:  We didn't believe that -- we

23 didn't understand the discovery deadline to be extended.

24 We thought the expert discovery deadline was extended.

25 That was the main argument we made with respect to the

55

Proceedings

1   Withum subpoena.  It's not like I'm just making this up,

2   your Honor.  That was our understanding and we identified

3   that understanding in our motion with respect to the

4   Withum subpoena on August 21st.

5          THE COURT:  We had many, many letters and

6   correspondence over the summer regarding the pendency of

7   various fact discovery disputes in this case.  And my

8   order from August 2nd is unequivocal.  Plaintiff's letter

9   motion for extension of time to complete discovery is

10  granted in part in light of the lengthy history of

11  discovery disputes in this case.  That discovery shall be

12  completed by August 31, 2023.  The parties shall file a

13  joint status report certifying the close of fact

14  discovery by September 7, 2023.  I don't understand how

15  anyone could interpret that to mean anything other than

16  the notion that fact discovery was extended.

17          So did you take any steps in August to do any

18  work with regard to these documents?

19          MR. FELSEN:  No, your Honor.  We filed the

20  letter on August 21st stating that we believe these

21  documents were produced after the close of discovery.

22          THE COURT:  And you knew that defendants

23  disagreed with you.  And if you had reviewed the

24  scheduling order you would have plainly seen that they

25  were right.

Proceedings

1          MR. FELSEN:  We didn't agree that they were

2    right, your Honor.  That's why we submitted the letter.

3          THE COURT:  I'm sorry, there is no credible

4    interpretation of that scheduling order other than the

5    notion that fact discovery was extended.  You may reserve

6    your right to seek to preclude any documents later on in

7    this case, but there's no basis to preclude documents

8    during the discovery phase based upon the fact that you

9    did not read my scheduling order.

10          So the motion to preclude the documents that

11   were produced on June 30, 2023 is denied without

12   prejudice to raise these issues as a motion in limine at

13   the appropriate time.

14          If you have a further application with regards

15   to these issues, you may make it but I don't know what

16   that would be.

17          So at this point the four issues that were

18   identified at the outset by the parties as the issues

19   that remain outstanding have been addressed.  Is there

20   anything further that we should do today, Mr. Felsen?

21          MR. FELSEN:  No, your Honor.

22          THE COURT:  Ms. Fitzgerald?

23          MS. FITZGERALD:  No, your Honor.  But I do have

24   a question.  I guess a clarification really.  To the

25   extent that there are issues regarding preclusion of all

57

Proceedings

1  or part of any expert report, am I correct that we should

2  be addressing those to the trial judge and not to you at

3  a later date?

4          THE COURT:  Are you anticipating that as a sort

5  of motion for summary judgment?

6          MS. FITZGERALD:  Yes.

7          THE COURT:  Then yes, it should be directed to

8  the district judge.

9          MS. FITZGERALD:  Okay.  All right.  Thank you.

10          THE COURT:  And with regard to the expert

11  schedule, it sounded as though the parties are on track

12  to complete the expert depositions on Monday.  And from

13  there, what, if anything, remains outstanding with

14  regards to discovery?  Mr. Felsen, starting with you.  I

15  think you're on mute again, sir.

16          MR. FELSEN:  Your Honor, just the one issue

17  with respect to the checklist that you directed us to

18  meet and confer on.

19          THE COURT:  Yes.  So that will be part of the

20  minute entry order.  Ms. Fitzgerald, anything else?

21          MS. FITZGERALD:  No, your Honor.  Thank you.

22          THE COURT:  All right.  We're almost at the

23  finish line here with regard to discovery.  So I know

24  this has been a laborious process.  I'm glad to hear the

25  parties are on track to complete the discovery and the

58

Proceedings

1  expert practice.  So I wish you guys a good holiday

2  season.  Take care.  And stay safe, everyone.

3          MS. FITZGERALD:  Thank you.  You too, Judge.

4          THE COURT:  Thank you so much.

5          MR. FELSEN:  Thank you, your Honor.

6          THE COURT:  Take care.  Bye-bye.

7                  (Matter concluded)

8                        -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **21st** day of **December**, 2023.

*Mary Greco*

Transcriptions Plus II, Inc.