## UNITED STATES DISTRICT COURT FOR THE  EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------

STAR AUTO SALES OF BAYSIDE, INC. (d/b/a
STAR TOYOTA OF BAYSIDE), STAR AUTO
SALES OF QUEENS, LLC (d/b/a STAR SUBARU),
STAR HYUNDAI LLC (d/b/a STAR HYUNDAI),
STAR NISSAN, INC. (d/b/a STAR NISSAN),
METRO CHRYSLER PLYMOUTH INC. (d/b/a          :
STAR CHRYSLER JEEP DODGE), STAR AUTO         :
SALES OF QUEENS COUNTY LLC (d/b/a STAR       :
FIAT), and STAR AUTO SALES OF QUEENS         :       1:18-cv-05775 (ERK) (TAM)
VILLAGE LLC (d/b/a STAR MITSUBISHI),         :

                              Plaintiffs,     :

                                             :

          v.                                 :

VOYNOW, BAYARD, WHYTE AND COMPANY,
LLP, HUGH WHYTE, and RANDALL FRANZEN,

                              Defendants.

-------------------------------------------------------

## DEFENDANTS VOYNOW, BAYARD, WHYTE AND COMPANY, LLP, HUGH WHYTE, RANDALL FRANZEN, AND ROBERT SEIBEL'S STATEMENT OF MATERIAL  FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 of the United States District Courts for the Eastern and Southern

Districts of New York, Defendants, Voynow, Bayard, Whyte and Company, LLP, Hugh Whyte,

Randall Franzen, and Robert Seibel, (hereinafter and collectively as "Voynow"), by and through

their undersigned counsel, hereby submit this Statement of Material Facts in support of their Motion

for Summary Judgment.

## A.  THE PARTIES

1.  Voynow is an accounting firm based in Trevose, PA.  Individual Defendants Randall Franzen, Hugh Whyte and Robert Siebel are principals at Voynow.  Ex. 1, ¶¶ 17

2.  Plaintiffs are a family owned group of seven automobile dealerships based in Queens, NY: Star Nissan, Star Toyota, Star Subaru, Star Hyundai, Star Mitsubishi, Star Fiat and Star Chrysler (hereinafter and collectively as "the Star Dealerships").  Ex. 1, ¶2; ¶¶10-16.

3.  Plaintiffs' automobile dealership business was established and built by John Koufakis, Sr. who passed ownership onto his three sons - Michael Koufakis, John Koufakis, Jr. and Steve Koufakis.  Ex. 2 at 45:8-17.

4.  The three Koufakis brothers have held various ownerships interests in the Star Dealerships. Ex. 4 at 11:16-12:9; 13:19-23; 14:19-15:3; Ex. 3 at 12:6-8; 26:2-4; Ex. 2 at 13:8-17; 14:3-8; 14-22; 20:7-12; 25:6-9.

5.  The three Koufakis brothers have held the positions of Dealer Principal and/or General Manager and/or Executive Manager of the Star Dealerships.   Ex. 3 at 12:11-13; Ex. 2 at 9:5-10:6; 13:8-15:9; 17:4-7; 25:2-5; Ex. 4 at 11:16-12:11; 13:11-16; 14:2-4.


## B.  THE STAR DEALERSHIPS' ACCOUNTING FUNCTION

6.  The Star Dealerships had a centralized accounting office that performed the accounting and bookkeeping functions for all of the Star Dealerships.  Ex. 2 at 25-28:5; Ex. 4 at 19:15-20.

7.  Vivian Karazoukis ("Karazoukis") was hired in 1986 by an entity owned by the Koufakis family that was a predecessor automobile dealership to the Star Dealerships.  She became the Office Manager. Ex. 2 at 26:15-27:2.

2

8.   During 2010-2016, Karazoukis was the Office Manager/Controller for most of the Star Dealerships.   As Office Manager/Controller, she was the most senior level employee at the Star Dealerships in terms of the accounting function.  Ex. 3 at 27:1-6; Ex. 2 at 25:23-26:9; Ex. 5 at 116:13-117:4.

9.   Karazoukis reported directly to Michael Koufakis and John Koufakis who were both responsible for supervising her.  Ex. 2 at 26:10-14; Ex. 3 at 27:7-13.

10. Debbie Theocharis ("Theocharis") was Karazoukis' sister and employed as Office Manager/Controller specifically for the Star Chrysler and Star Hyundai Dealerships.   Theocharis reported to directly Steve Koufakis and worked under his supervision.  Ex. 2 at 27:3-16; Ex. 4 at 21:16-18; Ex. 5 at 116:8-21.

11. Karazoukis and Theocharis were each employed for approximately 30 years by the Star Dealerships or their predecessor entities owned by the Koufakis family.  Ex. 3 at 29:9-11.

12. In their respective roles as Office Managers/Controllers, Karazoukis and Theocharis were in charge of managing and supervising the accounting staff employed by the Star Dealerships.  Ex. 2 at 28:17-21; Ex. 5 at 115:11-117:6.

13. Up until 1991, Plaintiffs used a manual accounting system for the Star Dealerships. In 1991, Star Nissan began using a computerized Dealership Management System ("DMS") developed for automobile dealerships, known as Reynolds & Reynolds. Ex. 2 at 56:24-57:12.

14. Plaintiffs changed to a newer version of the Reynolds & Reynolds DMS in 1994.  Ex. 2 at 124:21-125:6

15. There is a user manual published by Reynolds & Reynolds for the accounting function within the DMS that was provided to the Star Dealerships accounting staff to consult if they had questions regarding the system or to verify information. Ex. 5 at 126:7-22; Ex. 6.

16. Reynold & Reynolds provides a user with the ability to tailor the DMS and provides recommendations to the user as to how to do so.  Ex. 32 at 109:7-20.

17. Reynolds & Reynolds provides a customer service representatives available to dealerships who can contact it with questions or requests.  Star Dealerships' accounting personnel have used this customer service function within Reynold & Reynolds to contact it with questions or with requests for Reynolds & Reynolds to generate reports. Ex. 5 at 119:5-13; 121:13-24; 122:15-123:2.

18. As Office Manager/Controller, Karazoukis was given remote access to the accounting function in the Star Dealership's DMS such that she was able to access Plaintiffs' accounting system while off-site. Ex. 2 at 127:8-10.

19. The Star Dealership's current Controller Jackie Cutillo also has remote access to the accounting system in the DMS.  Ex. 5 at 118:13-19.


C. **THE VOYNOW ENGAGEMENT FROM 1996 TO 2017[1]**

20. Plaintiffs first engaged Voynow in 1996.  Ex.1, ¶30.

21. Prior to engaging Voynow, the Star Dealerships were in the midst of ongoing IRS audit of the Star Dealerships' tax returns that were prepared by another CPA firm.  Michael Koufakis was unhappy with the IRS tax assessment, interest and penalties and sought to hire a new accountant. Ex. 2 at 62:7-63:20; Ex. 7 at 131:16-132:11.

---

[1] For purposes of this Motion for Summary Judgment, Voynow is submitting Michael Koufakis' testimony as to the scope of the engagement.

22. Michael Koufakis contacted Voynow after receiving a recommendation from Reynolds & Reynolds, as Plaintiffs wanted an accountant familiar with the Reynolds & Reynolds DMS it had in place since 1991.  Ex. 2 at 94:13-18; Ex. 7 at 129:6-12; Ex. 8 at 54:7-12.

23. In 1996, Michael Koufakis met in person with Defendants Hugh Whyte and Randall at the Star Dealerships and thereafter hired Voynow on behalf of all the Star Dealerships. Ex. 2 at 107:2-16.

24. At this 1996 meeting, Michael Koufakis hired Voynow to provide services that were "more than [a] review, but less than audited" financial statements and to provide annual corporate tax services.  Ex. 2 at 74:10-75:20; 108: 12-14.

25. Michael Koufakis wanted the "highest level of accuracy" in the financial statements for the Star Dealerships when hiring Voynow.  Ex. 2 at 82:2-10.

26. Michael Koufakis hired Voynow to be "responsible for true and accurate financial statements" and for verifying all of the account balances on the financial statements that were used by Voynow to prepare and issue the annual corporate tax returns.  Ex. 2 at 109:10-22.

27. Michael Koufakis hired Voynow to perform various functions to review and verify all of the Star Dealership accounts such that the financial statements used by Voynow to prepare the tax returns were "just short of an audited statement." Ex. 2 at 82:24-83:19; 109:10-22.

28. It was part of Voynow's job to perform an audit of the Star Dealerships' financial statement accounts.  Ex. 2 at 73:12-74:5.

29. Michael Koufakis initially hired Voynow to conduct quarterly on site visits to the Star Dealerships but it then changed to three on site visits a year.  Ex. 2 at 104:7-10; 105:19-24; Ex. 4 at 9:16-10:15; Ex. 8 at 98:4-7.

30. Michael Koufakis did not hire Voynow to actually issue audited or reviewed financial statements for the Star Dealerships despite performing services that were more than a review but less than an audit.  He did hire Voynow to issue tax returns based upon the financial statements Voynow reviewed/audited. Ex. 2 at 82:2-83:19.

31. Karazoukis and Theocharis internally prepared all of the Star Dealerships' financial statements.  Ex. 4 at 71:14-20.

32. The Koufakis brothers reviewed these financial statements to ensure they were complete and accurate, before sending them to the national dealer corporations. Ex. 3 at 23:16-24:7-15.

33. These internally prepared financial statements were the culmination of the accounts Voynow reviewed when it was onsite.  Ex. 2 at 84:11-17.

34. Voynow never issued or prepared any financial statements for the Star Dealerships, nor ever issued any written opinion, whether as part of an audit or a review engagement, as to the accuracy of the financial statements internally prepared by the Star Dealerships.  Ex. 2 at 82:24-83:9.

35. The Star Dealerships were never required by any lender, bank or national dealership corporation, to have either audited or reviewed financial statements prepared by an outside accountant.  Ex. 2 at 47:10-15; 50:14-19; 60:2-5; 80:8-81:2.

### D.  VOYNOW PREPARED AND ISSUED ANNUAL CORPORATE TAX RETURNS

36. Voynow did prepare and issue annual corporate state, federal and local tax returns to the Star Dealerships.  Ex. 2 at 82:24-83:19.

37. These tax returns were based upon the financial statements that Voynow was hired to review for the highest level of accuracy. Ex. 2 at 109:10-22.

38. The Star Dealerships were "flow thru" entities for tax purposes such that the tax is calculated at the individual ownership level. Voynow also prepared the Koufakis' brothers personal tax returns. Ex. 7 at 40:21-41:3; 119:6-12.

39. Voynow's approximate 3-4 on site visits per year were designated by Voynow as tax planning visits, interim tax visits, or year-end tax preparation visits. Ex. 9 at 25:19-9; Ex. 7 at 119:3-24; Ex. 2 at 105:19-22; Ex. 4 at 9:16-10:15; Ex. 8 at 98:4-7; Ex. 33 at 24:4-22.

40. Voynow always scheduled these visits in advance and coordinated scheduling with Karazoukis or Theocharis. Ex. 8 at 99: 2-23; Ex. 2 at 106:18-22.

41. Voynow's interim visit each year typically lasted one or two days in total for all of the Star Dealerships combined plus their related entities and typically included approximately 4-7 Voynow accountants. Ex. 8 at 148:25-149:20.

42. Aside from the Star Dealerships, Voynow did tax preparation work for other Star-related entities not party to this case, such as Star Auto Body, various real estate companies, the Koufakis family members and their estates. Ex. 8 at 225:20-227:15; 228:17-22; 229:7-21

43. When on site at the Star Dealerships for their visits, Voynow did not have full access to the Star Dealership's DMS. Ex. 10 at 172:14-18; Ex. 8 at 45:21-47:5.

44. During the visits, Voynow reviewed the Star Dealerships' books and records, such as schedules, parts statements, reconciliations, 1099s, journal entries, inventory, and interacted with various Star Dealership employees.   Ex. 11 at 112:16-113:10; Ex. 12 at 46:1-21; 120:6-121:11; 171:22-172:11; 208:5-15; Ex. 13 at 43:25-44:13; Ex. 14 at 20:21-21:8; Ex. 15 at 53:8-54:5; Ex. 2 at 75:10-16.

45. To the extent there were notable items observed during Voynow's visits or that needed to be addressed by the Star Dealerships prior to year-end, Voynow communicated these items either verbally or in writing to the owners and/or the Controllers.  Ex. 2 at 162:5-17; Ex. 4 at 156:4-14.

46. Voynow did not follow up on any items noted or on any findings and left it up to the Stat Dealership management to decide how it would address any item or recommendation.  Ex. 32 at 137:15-138:9; RANDY

47. At year-end, Voynow would propose certain adjusting journal entries. It was up to management to accept any proposed adjusting journal entry and to post it.  Ex. 16 at 146:22-147:12; 203:8-14.

48. Voynow never made entries in the Star Dealership's accounting system.  Ex. 16 at 146:22-147:12; 203:8-14; Ex. 17 at 71:11-24.

49. For certain years, in addition to its tax planning, interim and year-end visits, a Voynow accountant would also visit a Star Dealership entity if there was an ongoing IRS audit or a sales tax audit.  Such services were deemed by Voynow as special projects or accounting services.  Ex. 8 at 98:8-13; 112:5-23; 113:14-22; 149:21-150:5; Ex. 9 at 28:10-24.

50. Voynow did not have remote access to the Star Dealership's DMS or accounting system at any point from 1996 up until 2017. Ex. 2 at 132:24-133:14; Ex. 8 at 47:6-15; Ex. 18 at 260:12-16; Ex. 33 at 126:4-10.

51. Without remote access, Voynow's ability to view Plaintiff's accounting system was limited to the occasions when it was physically on site at the Star Dealerships, approximately three times per year for one to two days at a time. Ex. 2 at 134:24-135:5; Ex. 8 at 47:6-15; 98:4-7; Ex. 9 at 25:19-9;  Ex. 7 at  119:3-24; Ex. 33 at 24:4-22.

52. When physically on site, Voynow was provided with a log in ID whereby it could access certain portions of the Reynolds & Reynolds system through one of the open Star Dealerships' computers physically located at the Star Dealerships' accounting office. Ex. 8 at 47:6-15; 51:5-9; Ex. 32 at 101:22-102:2; Ex. 10 at 171:6-172:13.

53. From 1996 through 2016, Voynow prepared Plaintiffs' annual corporate tax returns. Plaintiffs' year-end was 12/31 and Voynow issued the tax returns to Plaintiffs prior to Plaintiffs' September 15th tax filing deadline. Ex. 33 at 97:16-21.

54. Specifically, for the 2012-2016 tax returns prepared by Voynow, they were issued to the Star Dealerships on the following dates:

| TAX YEAR OF RETURN | DATES OF ISSUANCE BY VOYNOW |
| --- | --- |
| 2012 | June 24-25, 2013; July 8, 2013 |
| 2013 | July 9, 2014; July 29, 2014; July 31, 2014; August 4, 2014 |
| 2014 | August 6, 2015; August 11-12, 2015; September 10, 2015 |
| 2015 | March 14-15, 2016; May 12-13, 2016; July 17, 2017 |
| 2016 | July 25-27, 2017; September 6, 2-17 |

Ex. 19.

55. Plaintiffs have never filed any amendment to any of the Voynow-prepared tax returns after "discovery" the purported fraud at issue in this case. Ex. 2 at 240:10-13.

56. The Star Dealerships' 2016-2018 returns were filed simultaneously. The IRS has never audited these returns following the "discovery" of the purported fraud at issue in this case. Ex. 2 at 125:15-17; 111:21-23.

### E.  **VOYNOW'S ISSUANCE OF ENGAGEMENT LETTERS**

57. Prior to 2008, Voynow did not issue any written engagement letter to Plaintiffs. Ex. 8 at 65:16-66:13.

58. There is no requirement for a written engagement letter to be issued by an accountant or signed by a taxpayer for a tax engagement.   Ex. 7 at 83:6-14; Ex. 8 at 65:20- 66:13.

59. There is a requirement that a written engagement letter be issued annually by an accountant for review or audit engagements, and that these engagement letters be signed by the client.  Individual letters for each dealership are required in review or audit engagements.  Ex. 7 at 83:21-23; 84:6-8; Ex. 8 at 65:20-66:13; Ex. 32 at 86:9-87:12.

60. There are no engagements letters in existence between Voynow and the Star Dealerships that provide for professional services in the form of a review or audit engagement.

61. In approximately 2008, American Institute of Certified Public Accountants ("AICPA") publications began recommending that accountants now issue engagement letters for tax engagements.  Ex. 8 at 65:20-66:13; 70:7-12; Ex. 16 at 66:17-68:3; 70:2-16.

62. Beginning in 2008, Voynow issued annual engagement letters to the Star Dealerships. In both 2008 and 2009, Voynow issued separate engagement letters to each of the three Koufakis brothers for the Star Dealerships which they owned.  Ex. 20; Ex. 8 at 71:22-72:6.

63. In 2009, Star Nissan's owner John Koufakis, Jr. directed Voynow to deal with his brother Michael regarding the engagement letter, and Voynow thereafter revised the format for future letters by listing all of the Star Dealerships on a single engagement letter addressed to Michael Koufakis. Ex. 3 at 99:6-18; Ex. 8 at Seibel 72:7-9; Ex. 16 at 71:8-72:1; Ex. 21.

64. From 2010 through 2016, Voynow issued a single engagement letter each year for all of the Star Dealerships to the attention of Michael Koufakis.  Ex. 21.

65. Plaintiffs never signed any of the annual engagement letters. Ex. 16 at 70:17-25.

66. According to Plaintiffs' owner John Koufakis, Jr., he conducts business based on handshakes and trust and does not enter into written contracts with anyone.  This is the collective view of the owners of the Star Dealerships.  Ex. 3 at 28:25-29:6; 187:11-21.

67. The Koufakis brothers either deny, are "uncertain," or do not specifically recall whether they received Voynow's annual engagement letters, other than Michael Koufakis admits to receiving the 2016 engagement letter in person.  Ex. 2 at 116:15-117:14; Ex. 4 at 159:15-17; Ex. 3 at 89:16-18.

68. Michael Koufakis never asked the Star Dealership employees whether the Star Dealerships received the Voynow issued engagement letters and has no way of knowing whether or not there were received.  Ex. 2 at 119:21-120:23; 165:7-21.

69. Michael Koufakis did receive tax engagement letters from Voynow which were sent to his home address for the preparation of his personal returns.  He also did not sign these engagement letters, with the exception of one.  Ex. 2 at 166:6-21.

70. Voynow's engagement letters issued to Plaintiffs generally stated, in pertinent part:

> We will perform our services in accordance with the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants.  ….
>
> We will prepare your tax returns based upon information and representations provided to us.  We will not audit or otherwise verify the data you submit to us, although we may ask you to clarify some of the information. ….
>
> Client Responsibilities:  You will provide us with a trial balance and other supporting data needed to prepare your tax returns.  It is your obligation to provide us with accurate and complete information, including worldwide income.  You are responsible for maintaining an adequate and efficient accounting system for safeguarding assets and authorizing transactions and for maintaining adequate documentation to substantiate the accuracy and completeness of your tax returns.  …

CPA Firm Responsibilities. Our services will be limited to only those tasks we deem necessary for the preparation of the returns.  We may deem it necessary to provide you with accounting and bookkeeping assistance in that regard.  …. Please note that we will not validate the completeness or accuracy of the information supplied, and the assistance we do provide is not to be construed as an oversight function, in any respect of your accounting system; therefore, there should be no reliance, stated or implied, by management on the accuracy of the assistance we are to provide.  As a result of our assistance, we may propose standard, adjusting, or correcting journal entries to your books and records.   However, management has final responsibility for reviewing the proposed entries and understanding the nature and impact of the proposed entries on the returns.  Furthermore, it is management's responsibility, once these entries have been approved, to post the entries to its accounting system in a timely manner.

Our engagement does not include any procedures designed to discover errors, fraud or theft.  Therefore, our engagement cannot be relied upon to disclose such matters.

Ex. 21.

## F.  VOYNOW BILLED THE STAR DEALERSHIPS THROUGH ANNUAL FORMAT

71. Voynow billed all of its automobile dealership clients on a monthly retainer strictly so it could get money into the firm in advance before starting to perform any work.  Ex. 7 at 158:19-160:8.

72. For the Star Dealerships, each year in approximately March, Voynow issued a progress bill reflecting work done up to that point and which was applied against any retainers paid. Voynow then issued a "final" bill in approximately September after the Star Dealerships' tax returns were completed and issued.  Ex. 8 at 136:16-137:3; Ex. 25.

73. Any retainers paid were deducted from the final bill each year.  Ex. 7 at 160:159:12-160:8; Ex. 25.

74. To the extent there were services provided arising from IRS or other sales tax audits which were deemed by Voynow as special projects or services, Voynow billed for those matters separately as special accounting for the specific year at issue.  Ex. 8 at 136:16-24.

75. Voynow stored and maintained it records regarding the Star Dealership engagement based upon each year of the engagement, with separate files for each year that contained its year-end workpapers and the tax return work product it issued.  Ex. 32 at 32:15-33:12.

### G.  THE ALLEGED ACTS OF THEFT AND PLAINTIFFS' DISCOVERY

76. Plaintiffs allege that from 2001-2017 – over 17 years -- certain employees committed various acts of theft through different schemes in an amount totaling approximately $4.5 million.  Ex. 22.

77. Plaintiffs first discovered some of the purported theft at issue in December of 2016.  Ex. 12 at 212:21-213:9.

78. Since December of 2016, Plaintiffs have sought to have their former employees criminally charged with the various purported theft schemes.  Ex. 1, ¶48; Ex. 12 at 178:2-180:5; 236:18-237:8; Ex. 5 at 141:15-143:6.

79. Four employees were ultimately charged -- Karazoukis, Theocharis, Carmen Jones and Douglas Filardo.  The total amount of all criminal charges filed is $1,312,536 – not $4.5 million.  Ex. 23.[2]

---

[2] Through their current counsel, Plaintiffs have also filed civil lawsuits against these four employees, as well as their respective spouses, children and/or estates.  All of these civil lawsuits are pending.  See *Star Nissan, Inc. v. Carmen Jones, et al.*, New York Supreme Court, Nassau County, Index No. 610541-2018; *Star Auto Sales of Bayside, Inc., et al., v. Despina Theocharis, et al.*, New York Supreme Court, Nassau County, Index No. 613475- 2017; *Star Auto Sales of Bayside, Inc., et al., v. Estate of Vivian Karazoukis*, New York Supreme Court, Nassau County, Index No. 711698/2018; *Star Auto Sales of Bayside, Inc., et al., v. Michael Karazoukis, et al.*, New York Supreme Court, Nassau County, Index No. 718804/2018; *Star Auto Sales of Queens, LLC v. Douglas Filardo*, New York Supreme Court, Queens County, Index No. 717443/2017; *Star Auto Sales of Queens, LLC v. Francine Filardo*, New York Supreme Court, Queens County, Index No. 702350/2018.

80. No employee has been convicted.

81. Of the $1,312,536 for which criminal charges were filed, $1,151,108 relates directly to checks legitimately signed by Plaintiffs' authorized check signers who approved the release of Star Dealerships funds now deemed to be theft.  Ex. 23.

## H.  ALLEGED "THEFT" THROUGH CHECKS SIGNED BY PLAINTIFFS' AUTHORIZED CHECK SIGNERS

82. The only individuals authorized to sign checks for the Star Dealerships were Michael Koufakis, John Koufakis, Sr., John Koufakis, Jr., and Steve Koufakis ("hereinafter  "the Authorized Check Signers"). Ex. 3 at 61:13-20; Ex. 4 at 63:13-15.

83. The Authorized Check Signers were responsible to make sure that all checks presented to them were for legitimate expenses of the Star Dealerships.  They were responsible to review and require necessary back up documents to support the checks, and to ask questions if they were unsure of any expense, before signing a check. Ex. 3 at 38:9-13; 62:20-63:11; Ex. 4 at 63:9-12; 63:16-20-64:8; 66:15-19.

84. The Authorized Check Signers repeatedly signed checks now deemed to be theft either without proper backup documentation or without actually looking at backup provided with the checks.  Ex. 4 at 64:5-65:16; Ex. 3 at 123:17-25; Ex. 2 at 179:23-25; 180:25-181:181:14; 182:6-16.

85. None of the signatures on any check now deemed to be theft was forged.  All were legitimately signed by the Authorized Check Signers who acted in the scope of their authority to approve the release of funds from the Star Dealerships. Ex. 3 at 61:9-24; 65:19-23; Ex. 2 at 189:15-18; Ex. 12 at 40:17-22; Ex. 11 at 106:24-107:9.

86. Cancelled checks were included in monthly bank statements sent to the Star Dealerships.  Michael Koufakis, Managers Karazoukis and Theocharis reviewed the monthly bank statements on behalf of all the Star Dealerships.  Ex. 4 at 69:9-18.

87. Michael Koufakis was the only person with online access and the ability to monitor activity in the Star Dealerships' bank accounts. Ex. 2 at 202:22-203:9.

88. The criminal charges that arise from checks signed by the Authorized Check Signers relate to purported thefts schemes in connection with (a) a Staples account; (2) an advertising vendor; and (c) an employee's personal creditors.  Ex. 23.


1.  **Alleged Theft Fron 2001-2017 In Connection With Staples Purchases**

89. Carmen Jones ("Jones") was an accounts payable clerk employed by Star Nissan. Ex. 12 at 18:16-18.

90. Over the course of 17 years – from 2001- 2017 – Star Nissan contends that Jones stole $68,853 by purchasing items for personal use with a Staples credit card issued on the Star Nissan account.  Ex. 3 at 47:22-48:1; Ex. 12 at 7:9-8:2.

91. Each alleged act of theft by Jones occurred throughout 2001-2017 when she acquired possession of the items – i.e., at the time of purchase.  Ex. 12 at 34:14-23; 35:14-36:7.

92. For 17 years, Star Nissan received billing statements from Staples for purchases made through its Staples account.  The Authorized Check Signers signed checks payable to Staples which included approval of payments for items acquired by Jones and now deemed to be theft. Ex. 12 at 19:14-19; 39:22-40:16.

93. The Authorized Check Signers never questioned any of the Staples charges listed or and of the backup receipts they were provided with when they signed the checks to authorize payment.  Ex. 4 at 179:3-180:4; Ex. 12 at 41:16-20.

94. All payments made to Staples were properly recorded in the Star Dealerships accounting records as supply expenses. Ex. 12 at 41:21-42:12.

95. Upon "discovery" of this purported theft scheme, Michael Koufakis then reviewed 17 years of Staples invoices and concluded that $68,853 of the payments approved by the Authorized Check Signers was theft by Jones.  Following a criminal investigation, she has been charged with alleged theft for only half that amount, $33,175.  Ex. 12 at 8:3-9:12; 35: 4-25; 43:22-24; Ex. 4 at 59:12-20; Ex. 23.


**2. Alleged Theft Regarding An Advertising Vendor From 2008-2016**

96. Douglas Filardo ("Filardo") was a Sales Manager employed by Star Subaru. Ex. 3 at 190:20-191:12.

97. Over the course of nine years -- from November 25, 2008 to November 1, 2016 -- Star Subaru paid $1,419,874.83 to Motorsports Advertising ("Motorsports") for advertising.

98. Filardo, on behalf of Star Subaru, hired Motorsports to provide advertising services in the form of cardboard flyers that were to be printed and then mailed by Motorsports to residential addresses within various zip codes near Star Subaru.  Ex. 11 at 88:14-89:16; 97:14-21; 103:18-25.

99. Michael Koufakis was responsible to investigate the background and qualifications of any advertising vendor hired by Star Subaru and to supervise Filardo.  Ex. 2 at 192:9-21; 193:8-10.

100.    Star Subaru never had a written contract with Motorsports, nor any documentation memorializing the terms or its arrangement with Motorsports.  The management of Star Subaru never set any limit on the amount of authorized advertising, the frequency of services, or the cost or number of flyers being purchased.  Ex. 11 at 89:18-90:90:16; 95:25-96:7.

101.    Star Subaru claims it never actually received any of the advertising it purchased from Motorsports over the course of 8 years, and that unbeknownst to it, Filardo owned Motorsports.  Ex. 11 at 85:12-86:2; 92:5-16.

102.    For over 8 years, the Authorized Check Signers signed checks payable to Motorsports for these advertising services, but never required, requested or received proof of actual mailing of the flyers from Motorsports or the U.S. Postal Office.   The Authorized Check Signers signed checks payable to Motorsports without knowing who they were or without ever questioning any Motorsports invoices before signing the checks.  Ex. 11 at 104:24-105:4; 107:4-108:23; Ex. 3 at  193:22-194:8; 203:1-24; Ex. 4 at 38:15-24.

103.    The alleged acts of "theft" by Filardo occurred each time a check was signed by the Authorized Check Signers during 2008-2016 to authorize payment to Motorsports. Ex. 11 at 93:13-94:4.

104.    All payments to Motorsports were properly recorded as advertising expenses in the Star Dealership's accounting records throughout 2008-2016.  Ex. 11 at 111:23-112:15.

105.    Filardo has been criminally charged in this scheme for $634,228.77 – not $1.4 million.  Ex. 11 at 85:12-24; Ex. 23.

### 3. Alleged Theft Regarding Karouzakis' Personal Creditors From 2013-2016

106.    Plaintiffs Star Nissan, Star Toyota and Star Hyundai allege that Karazoukis stole $553,724.56 over four years from May 14, 2013 to November 18, 2016 through a series of

checks signed by the Authorized Check Signers that were payable to either Karazoukis directly, or to Capital One, HSBC Bank or M&T Bank.  Ex. 12 at 212:3-12; 227:9-21.

107.    The Authorized Check Signers signed these checks without requiring backup documentation and never questioned the payments or asked for backup documentation to support the checks. Ex. 12 at 228:21-229:9; Ex. 3 at 116:17- 117:18-20; Ex. 4 at 173:2-174:21.

108.    For the checks payable directly to Karazoukis whereby the Authorized Check Signers knowingly released funds to her, the Authorized Check Signers have no recollection as to why they signed them. Ex. 2 at 184:25-186:1.

109.    Plaintiffs allege that Karouzakis applied these legitimately signed checks towards her personal debt obligations rather than expenses of the Star Dealerships. Ex. 12 at 212:13-20;227:22-228:12.

110.    The acts of "theft" in connection with each check occurred when the checks were signed and given to Karazoukis.  Ex. 12 at 241:8-17.

111.    In December of 2016, a representative from Capital One Bank contacted Michael Koufakis to alert him that an employee was paying off personal debt with company checks signed by the Authorized Check Signers.  Ex. 12 at 212:21-213:9.

112.    The Star Dealerships terminated Karouzkis' employment in December of 2016. Ex. 2 at 210:16-19.

113.    Plaintiffs allege that Karazoukis stole $590,481.56 through this scheme.  She was charged for $483,704.36.  Ex. 23; Ex. 23.

114.    Karazoukis was never convicted.  The charges were dismissed following her death in June of 2019. Ex. 12 at 237:9-11.

115.     Some of the check payments at issue were recorded erroneously in the Star Dealerships' accounting system through offsets to accounts such as factory or incentive receivables.  Ex. 2 at 206:4-17; Ex. 12 at 243:13-25.

### 4.   **Alleged Remaining Theft Schemes At Issue In Criminal Complaints**

116.     The remaining schemes comprising the $1,312,536.69 for which criminal charges were filed relate to (a) an unpaid employee loan; and (b) purported theft of customer deposits for warranty purchases.

117.     Specifically, Star Chrysler alleges approved various cash loans from 2010 through 2016 to Theocharis and now allege that she never paid them back, and made fraudulent accounting entries to disguise her purported theft.  Ex. 22.

118.     Star Chrysler never created or maintained any documentation as to the existence of any loan, such as a loan agreement, written loan terms, any repayment schedule, nor even any signed acknowledgement by Theocharis as to receipt of cash for any purported loan.  Ex. 4 at 90:7-15; 23-25; Ex. 13 at 10:16-11:2.

119.     Star Chrysler contends that Theocharis "stole" $98,897.98 in purported unpaid cash loans.  She was criminally charged for only $5,000.  Ex. 22; Ex. 23.

120.     On November 23, 2023, Theocharis pled guilty to a single count of petit larceny under NY PL 155.25. Ex. 24.

121.     Plaintiff Star Subaru alleges that between June of 2014 and July of 2017, Filardo stole $378,157.08 in cash from customer deposits and covered up this purported theft by use of fictitious customer claim forms he created.  Ex. 22.

122.     Filardo was criminally charged for $156,428.56.  Ex. 23.

## I.   **PLAINTIFFS ENGAGE ROSENFIELD AND TERMINATE VOYNOW**

123.    Following Karazoukis' termination in December of 2016, the Star Dealerships put Theocharis in charge as Controller for all the Star Dealerships until mid-April 2017.  Ex. 2 at 210:16-22; 211:24-25; 215:7-14; Ex. 5 at 101:14-19; Ex. 8 at 204:17-22.

124.    On April 10, 2017, Plaintiffs suspended Theocharis and thereafter terminated her employment. Ex. 2 at 215:12-14; 216:2-4; Ex. 5 at 102:18-20.

125.    In April of 2017, Plaintiffs retained another accounting firm – Rosenfield & Company ("Rosenfield") – to provide forensic accounting services.  Ex. 2 at  64:6-11; 226:14-19; Ex.1, ¶49, 54

126.    Following the termination of Theocharis, Plaintiffs promoted existing employee Jackie Cutillo to Controller for all of the Star Dealerships.  Cutillo had no prior experience as a controller or manager nor any formal accounting education. Ex. 2 at 216:2-9; 232:24-233:7; Ex. 5 at 10:7-11; 10:25-11:11; 17:8-25; 107:8-14; Ex. 8 at 205:4-10.

127.    In the Spring of 2017, Michael Koufakis requested that Voynow assist Cutillo and provide training for her new role as Controller.  Ex. 2 at 227:12-15; 18-22; 205:4-10; Ex. 5 at 117:21-118:8; Ex. 8 at 193:10-14.

128.    Voynow deemed this request to be a special project outside the scope of its regular engagement and billed Star Dealerships separately for it.  Ex. 7 at 85:13-17; Ex. 8 at 112:5-10; Ex. 31; Ex. 32 at 167:23-168:12.

129.    Voynow was given limited remote access in 2017 to the Star Dealerships' accounting system for the purpose of assisting Cutillo.  Ex. 2 at 132:24-133:14; Ex. 8 at 47:6-15.

130.    Voynow prepared and issued the Star Dealerships' 2016 corporate tax returns in July and September of 2017.  Plaintiffs terminated the engagement with Voynow on November 3, 2017. Ex. 2 at 63:21-24; Ex. 19.

131.    Rosenfield took over preparing the annual corporate tax returns for the Star Dealerships and related entities after Voynow was terminated, while continuing to perform forensic accounting services. Ex. 2 at 64:15-65:5.

132.    Rosenfield issued annual tax engagement letters to Michael Koufakis, however he never signed them.  Ex. 26.

133.    Plaintiffs terminated Rosenfield in approximately April of 2020. Ex. 27, ¶31.

134.    The forensic accounting services that Rosenfield provided is the "independent forensic review" underlying and referenced in the Plaintiffs' Complaint against Voynow.  Ex. 1, ¶¶49, 54.

135.    Rosenfield was unable to provide proof to the District Attorney's office to support any charges for various alleged theft schemes that Plaintiffs claim occurred. Ex. 2 at 224:14-17.

136.    Plaintiffs have since sued Rosenfield in both state and federal court.

137.    In their lawsuits against Rosenfield, Plaintiffs allege that Rosenfield erroneously identified various things in Plaintiffs' records as red flags or indicative of fraud which were not, and had misrepresented to Plaintiffs that certain fraud had occurred when it did not.  Ex. 2 at 65:6-9; Ex. 28, ¶¶44, 84; Ex. 29, ¶¶39, 40, 45, 64, 85.

**MARSHALL DENNEHEY, P.C.**

BY: _____

JOHN L. SLIMM, ESQUIRE
MAUREEN P. FITZGERALD, ESQUIRE
620 Freedom Business Center, Suite 300
King of Prussia, PA 19406
(610) 354-8270 Fax (610) 354-8299
Email:  mpfitzgerald@mdwcg.com
Attorneys for Defendants,
Voynow, Bayard, Whyte and Company, LLC, Hugh
Whyte, Randall Franzen, and Robert Siebel

Dated:  February 12, 2024
**Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property name.**