# EXHIBIT 2

Page 1

1
2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    1:18-CV-05775-ERK-CLP
     ------------------------------------------x
4
     STAR AUTO SALES OF BAYSIDE, INC.
5    (d/b/a STAR TOYOTA OF BAYSIDE), STAR
     AUTO SALES OF QUEENS, LLC (d/b/a STAR
6    SUBARU), STAR HYUNDAI LLC (d/b/a
     STAR HYUNDAI), STAR NISSAN, INC. (d/b/a
7    STAR NISSAN), METRO CHRYSLER
     PLYMOUTH INC. (d/b/a STAR CHRYSLER
8    JEEP DODGE), STAR AUTO SALES OF
     QUEENS COUNTY LLC (d/b/a STAR FIAT)
9    And STAR AUTO SALES OF QUEENS
     VILLAGE LLC (d/b/a STAR MITSUBISHI),
10
               Plaintiffs,
11
         v.
12
     VOYNOW, BAYARD, WHYTE AND COMPANY, LLP,
13   HUGH WHYTE, RANDALL FRANZEN AND ROBERT
     SEIBEL.
14
               Defendants.
15   ------------------------------------------x
16                    2000 Market Street
                      Philadelphia, Pennsylvania
17
                      August 15, 2022
18                    10:09 a.m.
19
20            DEPOSITION of MICHAEL KOUFAKIS, a
21   Plaintiff, held at the above-entitled time and
22   place, taken before Carolyn Crescio, a
23   Professional Shorthand Reporter and Notary
24   Public of the State of Pennsylvania.
25                *      *      *

Page 2

```
1
2     A P P E A R A N C E S:
3
      MILMAN LABUDA LAW GROUP, PLLC
4     Attorneys for Plaintiffs
           3000 Marcus Avenue
5          Suite 3W8
           Lake Success, New York 11042
6     BY: JAMIE FELSEN, ESQ.
7
8
      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
9     Attorneys for Defendants
           620 Freedom Business Center
10         Suite 300
           King of Prussia, Pennsylvania 19406
11    BY: MAUREEN FITZGERALD, ESQ.
12
13    ALSO PRESENT:
14    Hugh Whyte
      Randall Franzen
15    Robert Seibel
      Jeremy Koufakis
16    Steven Rambam (via phone)
17
18
19
20
21
22
23
24
25      Job No. CS5329457
```

```
 1                    M. KOUFAKIS

 2    M I K E   K O U F A K I S , the witness herein,

 3    after having been first duly sworn by a Notary

 4    Public of the State of Pennsylvania, was examined

 5    and testified as follows:

 6    BY THE COURT REPORTER:

 7         Q.    Please state your name for the

 8    record.

 9         A.    Mike Koufakis.

10              MS. FITZGERALD:  Usual

11              stipulations?

12              MR. FELSEN:  Yes.

13    EXAMINATION

14    BY MS. FITZGERALD:

15         Q.    Good morning, Mr. Koufakis.  My name

16    is Maureen Fitzgerald, and I represent the

17    defendants in this lawsuit that's been brought

18    on behalf of the Star entities.  We are here

19    today to take your deposition.  Before we begin,

20    I would like to go over some ground rules and

21    instructions.  Okay?

22         First off, when I ask a question, I need you

23    to keep your responses verbal, so you can't answer

24    by shaking your head.

25         Okay?  is that understood?
```

```
1                      M. KOUFAKIS
2    the major.
3         Q.    How old are you now, sir?
4         A.    62.
5         Q.    In terms of the plaintiff, Star
6    Nissan Incorporated d/b/a Star Nissan, you are
7    the executive manager?
8         A.    Yes.
9         Q.    And that entity was formed in 1991?
10        A.    Yes.
11        Q.    Are you also the general manager?
12        A.    I'm involved in that dealership
13   mostly with office functions and service and
14   parts, not so much in new and used car sales.
15        Q.    So is there a title known as general
16   manager for Nissan, in addition to a title as
17   executive manager?
18        A.    Yes.  At one point in time I was the
19   general manager.  Then I became the executive
20   manager.  Right now, I would not say it
21   specifically applies to any one person
22   currently.
23        Q.    So is it fair to say that at the
24   point you became executive manager, no one else
25   held the position of general manager?
```

```
1                    M. KOUFAKIS
2          A.    It varied over time, but I would say
3     it's pretty safe to say, yes.
4          Q.    And you became executive manager in
5     1995?
6          A.    I believe so, yes.
7          Q.    As part of your preparation, did you
8     review your prior testimony in the Carmen Jones
9     case?
10                    MR. FELSEN:  Objection.  To the
11                    extent it's going to require you to
12                    reveal attorney/client
13                    communications, I instruct you not
14                    to answer.
15         Q.    Did you review your prior
16     deposition?
17                    MS. FITZGERALD:  I don't see how
18                    that's a communication.
19                    MR. FELSEN:  Anything he
20                    communicated was at the direction of
21                    and during meetings with counsel.
22                    So I'm going to direct him not to
23                    answer any question --
24         A.    Repeat the question.
25                    MR. FELSEN:  -- related to
```

```
 1                    M. KOUFAKIS
 2        Q.    -- to your knowledge?
 3        A.    I'm not sure.
 4        Q.    In terms of chain of command with
 5   Nissan, who is higher; a dealer principal, your
 6   brother John or executive manager, you?
 7        A.    Dealer principal.
 8        Q.    So in terms of the plaintiff Star
 9   Auto Sales of Bayside, Inc. d/b/a Star Toyota of
10   Bayside, who's the dealer principal for that?
11        A.    I'm sorry.  Which entity again?
12        Q.    Star Toyota.
13        A.    Myself.
14        Q.    And that entity was formed in 1995?
15        A.    Yes.
16        Q.    And you're the 100-percent owner?
17        A.    Yes.
18        Q.    Is there an executive manager or
19   general manager for that dealership?
20        A.    Myself.
21        Q.    For the entity known as Star Auto
22   Sales of Queens, LLC d/b/a Star Subaru, who is
23   the dealer principal?
24        A.    Myself.
25        Q.    And that entity was formed in 2006?
```

Page 14

1                    M. KOUFAKIS

2        A.    Yes.

3        Q.    And you're the sole owner and

4   officer?

5        A.    Yes.

6        Q.    And are you also the sole officer of

7   Toyota?

8        A.    Yes.

9        Q.    Are you also fulfilling the role as

10  executive manager, general manager for Subaru?

11       A.    Yes.

12       Q.    And that's been since its inception?

13       A.    Yes.

14       Q.    For the plaintiff known as Metro

15  Chrysler Plymouth, Inc. d/b/a Star Chrysler Jeep

16  Dodge, who is the dealer principal?

17       A.    Steven Koufakis.

18       Q.    And that entity was formed in 1990?

19       A.    Yes.

20       Q.    Is that entity owned equally by your

21  brothers John and Steve Koufakis?

22       A.    Yes.

23       Q.    Is there an executive manager or

24  general manager for Metro Chrysler Plymouth?

25       A.    No.   No.

1                        M. KOUFAKIS

2          Q.    So is it fair to say that Steve

3    Koufakis would fulfill that role?

4          A.    Yes.

5          Q.    For the entity known as Star Hyundai

6    LLC d/b/a Star Hyundai, who's the dealer

7    principal?

8          A.    Currently Steven.  Originally I

9    believe it was John.

10         Q.    So when it was formed in 2008, was

11   it originally John?

12         A.    I believe so.

13         Q.    And when did it change?

14         A.    A few years later.

15         Q.    So sometime around 2011 or so?

16         A.    '11, '12, I believe.

17         Q.    So for Toyota, going back, when you

18   executed the franchise agreement as dealer

19   principal, was that done in 1995 only, or have

20   there been amendments?

21         A.    Toyota has term agreements, so

22   depending on the term, you have to sign when

23   that term expires.

24         Q.    Any idea on the frequency of the

25   term?

M. KOUFAKIS

1

2      A.    I believe it's perpetual.  Not 100

3  percent sure, but I believe.

4      Q.    For the entity known as Star Auto

5  Sales of Queens Village, LLC d/b/a Star

6  Mitsubushi, who was the dealer principal?

7      A.    I believe it was Steven.

8      Q.    Is it still Steven?

9      A.    It was terminated.  I believe -- I

10  forget exactly what year.  2005 or 2006,

11  somewhere in that area.

12      Q.    So your understanding is the entity

13  Star Auto sales of Queens Village LLC, d/b/a

14  Star Mitsubushi no longer exists as a corporate

15  entity?

16      A.    Correct.  It did terminate -- I'm a

17  little off on the year.  It terminated when --

18  shortly before we took on -- shorty after we

19  took on Fiat, which was a separate franchise

20  agreement at the time.

21      Q.    Okay.  So am I correct that the Star

22  Mitsubushi franchise was established in 2002?

23      A.    I believe.

24      Q.    And you believe that entity

25  dissolved?

M. KOUFAKIS

Mitsubishi?

     A.    I'm saying that I was not exactly
sure what needed to be done.  After a period of
time had lapsed, I questioned what needed to be
done.  But I don't specifically recall.

     Q.    Who were the owners of Star
Mitsubishi?

     A.    I believe it was my brothers John
Koufakis, Steven Koufakis, myself.  And a small
percentage to Gus Tsolkas, T-S-O-L-K-A-S.  And
Richard Provenzano.

     Q.    Is there any documentation -- well,
there would be the franchise agreement that
Steve Koufakis signed with Mitsubishi, correct,
establishing the franchise?

     A.    Yes.

     Q.    Is there a separate document that
sets forth the ownership that you just referred
to?

     A.    I believe so, yes.

     Q.    What was the breakdown of that
ownership?  Was there a majority owner?

     A.    If I recall, I believe it was myself
and my two brothers, 30 percent; Gus Tsolkas

M. KOUFAKIS

1

2      Q.    So I don't think we got an answer on

3 who the dealer principal was for Fiat.

4      A.    I believe it was my brother Steve.

5 I believe I answered that.

6      Q.    And who were the owners of Fiat?

7      A.    I believe it was my brother Steven.

8      Q.    Hundred percent?

9      A.    I believe that was the end result.

10     Q.    Now, the dealerships have a position

11 that they refer to as an office manager?

12     A.    Yes.

13     Q.    And is that essentially the

14 equivalent of a controller, to your knowledge?

15     A.    I would not say the equivalent, by

16 my definition.

17     Q.    And how would you distinguish the

18 two?

19     A.    Office manager, I think is the head

20 person in the office, where maybe a controller,

21 by my definition, would maybe have an accounting

22 degree, a little bit higher level of expertise.

23     Q.    So the office manager, by your

24 definition, would be the most-senior level

25 employee in the dealerships accounting

Page 26

M. KOUFAKIS

1
2  department, correct?

3       A.    I would say yes.  Correct.

4       Q.    And for purposes of the time period

5  we are talking about, roughly 2010 to 2016, '17

6  period, am I correct that Vivian Karouzakis was

7  the office manager for the Nissan Toyota and

8  Subaru dealerships?

9       A.    Yes.

10      Q.    And in that role she reported

11 directly to you?

12      A.    Yes.

13      Q.    And you supervised her?

14      A.    Yes.

15      Q.    She had been hired in 1986 by a

16 predecessor of the Star entities; is that

17 correct?

18      A.    Yes.

19      Q.    And did she become -- did she move

20 to the position of office manager in the 1990s

21 for an entity known as Island Chrysler?

22      A.    Yes.

23      Q.    And Island Chrysler was one of the

24 predecessors of the Star entities we are here

25 about, correct?

Page 27

M. KOUFAKIS

1

2      A.    Yes.

3      Q.    Her sister Debbie Theocharis, am I

4   correct that she, during that same time period,

5   2010, 2016, '17, she would have been the office

6   manager for the Chrysler and Hyundai franchises?

7      A.    Definitely Chrysler.  Yes, there was

8   maybe some shared responsibility between the two

9   for Hyundai.  But I think it was more Debbie.

10     Q.    Okay.  And did you supervise her?

11     A.    I was the least involved in the

12  Chrysler store.  She fell mostly under the

13  direction of my brother Steven.  So I would say

14  it depends on what the issue was specifically,

15  at hand.  But I'd say mostly it fell under

16  Steven and somewhat under myself.

17     Q.    Okay.  And am I correct that that

18  position of office manager has since been

19  filled, let's say, at some point in 2017 for all

20  of these dealerships, by Jacque Cutillo?

21     A.    Yes.

22     Q.    So she now does the job that both

23  Vivian and Debbie did combined?

24     A.    Correct.

25     Q.    For the dealerships that are named

Page 28

M. KOUFAKIS

1

2    in this lawsuit, is it true that they all shared

3    the same space for purposes of office

4    administration tasks?

5         A.    Yes.

6         Q.    And that was the second floor of the

7    facility located at 206-26 Northern Boulevard?

8         A.    Yes.

9         Q.    Were there any job descriptions for

10   any of the folks that worked in the accounting

11   or office location for any of the franchises?

12        A.    Not that I can specifically recall.

13   No.

14        Q.    Whose responsibility would it have

15   been, to your knowledge, to establish job

16   descriptions?

17        A.    A manager typically is in charge of

18   the people below them, so I guess if it was

19   Vivian, for whatever people that directly

20   reported to her or any other manager, in any

21   other department.

22        Q.    And did you have responsibility to

23   ensure that Vivian had, in fact, done that?

24        A.    Again, it was not necessarily a

25   specific requirement that I would have made.  I

Page 45

1                    M. KOUFAKIS
2    not an owner, or a dealer principal?  He was not
3    an executive manager for any of these, correct?
4         A.    Correct.
5         Q.    So what, if anything, was his formal
6    role?
7         A.    I don't think he had a formal role.
8         Q.    Am I correct to state that he was
9    the one who established the predecessors to the
10   Star entities?
11        A.    Yes.
12        Q.    So this is a family business that he
13   established?
14        A.    Yes.
15        Q.    And he grew it and passed it on to
16   his sons?
17        A.    Yes.
18        Q.    What did he die of?
19        A.    A weak heart.
20        Q.    He had a heart attack?
21        A.    No.  I'll rephrase it.  He died in
22   his sleep.  I don't think there was an official
23   cause.  But the heart was very weak.
24        Q.    Understood.  Was there a period of
25   time when he stopped coming into the dealership

Page 47

```
 1                    M. KOUFAKIS
 2    year-end financial statement for each of the
 3    dealerships, with an accompanying opinion as to
 4    their review; is that your understanding?
 5                    MR. FELSEN:  Objection.
 6         A.    Yes.
 7         Q.    What, if anything, did Voynow do --
 8    I'm sorry.  What, if anything, did any of the
 9    Star entities -- strike that.
10         During the course of their engagement, were
11    any of the Star entities required to have reviewed
12    financial statements?
13         A.    Every manufacturer requires
14    financial statements to be submitted on a
15    monthly basis.
16         Q.    So did you understand that the
17    reviewed financial statements, that you claimed
18    to have engaged Kera, Weiner to do, were they
19    done on an annual basis, or were they done on a
20    monthly basis?
21         A.    The -- again, every manufacturer
22    requires a monthly financial statement.  They
23    would come in quarterly to review the accounts
24    and the accounting procedures that were being
25    done in the office.
```

Page 50

                    M. KOUFAKIS

1

2        A.    Not necessarily.  I was less

3    involved at that time.  And at that point in

4    time, I was on the sales floor and less involved

5    with the office functions.

6        Q.    Do you have any reason to believe

7    that the services for which you -- for which the

8    Star entities or their predecessors hired George

9    Pavledis, were different in any way from the

10   services you hired Kera, Weiner to do?

11              MR. FELSEN:  Objection.  Calls

12              for speculation.

13        A.    I don't know.

14        Q.    Is there anything that was required

15   or mandated by a bank or a franchisor that

16   required a difference in the level of accounting

17   services?

18              MR. FELSEN:  Objection.

19        A.    No.

20        Q.    So going back to Kera, Weiner, you

21   said you hired them to come in and verify the

22   amounts in each account, correct?

23        A.    Correct.  That was my

24   understanding --

25              MR. FELSEN:  I'm going to object

Page 56

1                    M. KOUFAKIS
2          Q.    How was Mr. Weiner's firm paid?  Do
3     you know?
4          A.    I don't recall.
5          Q.    Do you recall if they would send you
6     bills a couple of times a year?
7          A.    Honestly, I don't recall.  See, at
8     that point in time, I was mostly -- my job
9     functions were mostly in sales.  And we had
10    three dealerships with three different offices,
11    and I was not -- I'm more concerned about
12    selling Nissans than getting involved in other
13    things.
14         Q.    Understood.  But also at the point
15    in time, you were the most senior level in the
16    dealerships for Toyota, Nissan --
17         A.    It didn't exist at the time.
18         Q.    Well, Toyota was formed in 1995.
19         A.    Right.  Nissan was in '91.  I was
20    predominantly -- I would say more of a general
21    sales manager at that point in time at Nissan,
22    not involved with the Dodge store we had or
23    another Chrysler store that we had had.
24         Q.    Okay.  Let me ask you this.  So when
25    Mr. Weiner's firm was hired in 1992, at that

Page 57

1                      M. KOUFAKIS

2    point, you used manual accounting system,

3    correct?

4                 MR. FELSEN:  Objection.

5         A.    Yes.  So when we acquired the Nissan

6    store in April of '91, we actually inherited the

7    computer system from the prior dealers.  And

8    that was -- so that was the first one from the

9    inception, was not on a manual system.

10        Q.    What was the name of that system?

11        A.    It was the Rentals and Rentals

12   VIMNet system.

13        Q.    Was Mr. Weiner's firm familiar with

14   the Rentals and Rentals system when they came

15   onboard?

16        A.    Yes.

17        Q.    And that version of the Rentals and

18   Rentals system, was that a system that was used

19   across the entire Nissan dealership or just the

20   accounting function?

21        A.    It was for accounting and parts, but

22   not services.

23        Q.    And did you provide Mr. Weiner's

24   firm with remote access to the Rentals and

25   Rentals system?

1                     M. KOUFAKIS

2          Q.    So during Mr. Weiner's engagement,

3     who prepared -- the office manager prepared the

4     financial statements?

5          A.    Correct.

6          Q.    And did the office manager prepare

7     the trial balance?

8          A.    I believe so because I think that's

9     what needs to be done in order to -- everything

10    has to be -- the financial statement is the end

11    result of a lot of accounting work.

12                    (Whereupon, an off-the-record

13                    discussion was held.)

14         Q.    How many comprised the team of

15    accountants from Larry Weiner's firm, that

16    provided services?  Do you know?

17         A.    How many came and visited?

18         Q.    Yes.

19         A.    I think, typically, to the best of

20    my recollection, it was him and maybe someone

21    else.

22         Q.    So to your recollection, there were

23    two accountants that came in for each visit?

24         A.    I believe so.

25         Q.    And was Mr. Weiner's firm hired to

Page 62

M. KOUFAKIS

1

2    A.    No.

3    Q.    For anything?

4    A.    No.

5    Q.    Why not?

6    A.    I just didn't.

7    Q.    Now, when was Mr. Weiner's firm

8    disengaged?

9            MR. FELSEN:   Objection.

10   A.    I believe it was late 1996.

11   Q.    And did they end the engagement or

12   did Star?

13   A.    Myself.

14   Q.    And why?

15   A.    For a number of years prior, they

16   insisted on doing the LIFO calculation

17   themselves.  Ultimately it was disallowed by the

18   IRS, and we had to capture that money as income,

19   and there was interest and penalties involved.

20   And I was not too happy about that.  And that

21   was the main reason I terminated the

22   relationship.

23   Q.    Was this related to Toyota?

24   A.    All of the stores.

25   Q.    All of them.  Okay.  Was there an

Page 63

```
 1                    M. KOUFAKIS
 2   IRS audit at some point regarding this issue, or
 3   any other tax issue?
 4        A.    I don't know if it was --
 5              MR. FELSEN:  Objection.
 6        A.    -- an IRS audit.  I just know that
 7   the LIFO calculation got disallowed.
 8        Q.    Okay.  So you know there was some
 9   interaction between the IRS and Star?
10        A.    Absolutely.
11        Q.    And that prompted your decision to
12   end the engagement?
13        A.    Yes.
14        Q.    And was that issue in connection
15   with tax returns that Mr. Weiner's firm had
16   prepared on behalf of the Star entities?
17        A.    Yes.
18        Q.    And then in 1996, then Voynow was
19   engaged; is it fair to say?
20        A.    Yes.
21        Q.    And then that engagement for Voynow
22   ended in roughly November of 2017, December
23   of 2017; is that your recollection?
24        A.    November 3rd of 2017.
25        Q.    Since November 3rd of 2017 -- strike
```

Page 64

M. KOUFAKIS

1
2    that.
3              Since 2016, what other accountants has
4    any of the Star entities engaged?
5         A.    Rosenfield & Company and Withum.
6         Q.    And Rosenfield was hired in 2017?
7         A.    Yes.  I believe April 18th of 2017.
8         Q.    And what services was Rosenfield
9    engaged to perform?
10        A.    Forensic accounting regarding the
11   theft that had taken place.
12        Q.    Did that engagement, at any point --
13              (Whereupon, an off-the-record
14              discussion was held.)
15        Q.    At any point, did the scope of the
16   engagement for which Rosenfield was hired, did
17   that expand or change beyond forensic accounting
18   services?
19        A.    Yes.
20        Q.    What did it expand to and when?
21        A.    He took over after we terminated our
22   relationship with Voynow, to do regular
23   accounting and tax returns.
24        Q.    And was he continued to be engaged
25   to provide forensic accounting services?

Page 65

M. KOUFAKIS

1

2      A.    Yes.

3      Q.    And that would be through the

4   duration of his engagement?

5      A.    Yes.

6      Q.    And that engagement ended in April

7   of 2020?

8      A.    Approximately, maybe slightly

9   sooner.

10     Q.    What is your understanding of what a

11  forensic accounting is?

12     A.    Prove how much money was stolen and

13  how it was stolen.

14     Q.    Did you understand that a forensic

15  accounting is designed to detect fraud?

16     A.    Yes.

17     Q.    Has any of the Star entities hired

18  any other forensic accountant other than

19  Rosenfield?

20            MR. FELSEN:  Objection.  Anything

21            related to forensic accounting is

22            protected by the work product,

23            attorney/client privilege.

24            MS. FITZGERALD:  So I'm not

25            asking for the litigation expert.

Page 70

1                      M. KOUFAKIS

2          Q.     Explain.

3          A.     I get a bill, I glanced at it.  I

4    look at the bottom line.  I didn't tear it apart

5    in detail.

6          Q.     Did the Star entities ever hire an

7    accountant by the name of Nick Chester?

8          A.     Yes.

9          Q.     So that would have been another

10   accountant that was hired after 2016?

11         A.     I wouldn't necessarily say he was

12   hired as an accountant.

13         Q.     Okay.  What's your understanding as

14   to what he was hired for?

15         A.     Another person to -- it was a very,

16   very short engagement.  At the time, they were

17   recommended by Voynow, to -- and this was early

18   on.  This was in February of 2017 to maybe just

19   verify some of the theft that had -- were

20   discovered up until that point, but not

21   really...

22         Q.     So you said to verify the theft that

23   had been discovered up until that point.  So --

24         A.     I guess you could say to be a fresh

25   set of eyes to look over the books, so to speak.

Page 71

M. KOUFAKIS

1

2       Q.    Had the thefts that had been

3  discovered up to that date, February of 2017,

4  would that have been the theft involving Vivian

5  and her personal creditors?

6       A.    Yes.

7       Q.    Was it your understanding that

8  Mr. Chester was engaged to look further at any

9  issues involving Vivian?

10      A.    Yes.

11      Q.    And was there an engagement letter

12  between any of the Star entities and

13  Mr. Chester?

14      A.    I don't specifically recall.

15      Q.    Was there an engagement letter

16  between Rosenfield and the Star entities?

17      A.    Just initially.

18      Q.    Okay.  So your testimony is that

19  there was one engagement letter that was

20  prepared around April 18, 2017?

21      A.    Shortly thereafter for a limited

22  amount of time, maybe a couple of months.

23      Q.    Other than that, any other

24  engagement that you had with Rosenfield for any

25  services that they provided, would that have

Page 73

1                     M. KOUFAKIS

2          Q.    Thank you for that clarification.

3          A.    What was the next question?

4          Q.    Has any of Star entities ever hired

5    an accountant or an accounting firm to conduct

6    an audit or prepare audited-financial

7    statements?

8                     MR. FELSEN:  Objection.

9          A.    Audited-financial statements?

10         Q.    Or to conduct an audit.

11         A.    Sorry.  Repeat that question again.

12         Q.    Has any of the Star entities ever

13   hired an accountant to perform an audit or

14   prepare audited-financial statements?

15                    MR. FELSEN:  Objection.

16         A.     By my definition of

17   audited-financial statements, no.  As far as

18   performing an audit, to me, a forensic

19   accountant is -- well, it's our accountant's job

20   to perform the audit.

21         Q.    So is it your contention that you

22   hired accountants in the past to perform audits?

23                    MR. FELSEN:  Objection.

24         A.    That was part of their job

25   responsibility.

Page 74

M. KOUFAKIS

1
2     Q.    And would that be Mr. Weiner's firm?

3     A.    Yes.

4     Q.    And would that be Voynow?

5     A.    Yes.

6     Q.    And would that be Rosenfield?

7     A.    Yes.

8     Q.    What's your understanding -- do you

9  have -- strike that.

10        Do you have any understanding as to the

11 difference between the terms "audit,"  "review" and

12 "compilation"?

13    A.    Yes.

14    Q.    What is your understanding of what a

15 "compilation" is?

16    A.    So I believe it was in the latter

17 half of 1996, when I was interviewing Voynow, it

18 was in my office, at my desk.  Randy Franzen was

19 on my right, Hugh Whyte was on my left, and they

20 explained to me the differences between the

21 three.

22        They told me that compilation was just

23 basically a cursory check of the numbers.  They had

24 explained to me that reviewed was much more

25 in-depth, and that the highest level was audited

Page 75

                    M. KOUFAKIS

1

2    accounting work.  I indicated to them that I wanted

3    the highest level, which was the audited.  They

4    said that that was -- that was really not

5    necessary, that it was very high in cost, and

6    typically only reserved for publicly-traded

7    companies.  But what we ultimately settled on was

8    something -- and Randy specifically told me at that

9    meeting that there was something in between, more

10   than review, but less than audited.  And he said

11   when they would come into the dealerships on a

12   quarterly basis, they would send someone, let's

13   say, to the Toyota parts department and do random

14   VIN checks.  Then on another meeting, they might go

15   to Chrysler used cars and check -- do a physical of

16   the used car inventory.

17        So it was more than review, but not quite

18   fully audited.  That was discussed.  That's what

19   they promised.  That's what I agreed to, and that's

20   what they did.

21        Q.   Okay.  So my question was what your

22   understanding was of those terms.  And you told

23   me that -- you gave me a reference to a meeting

24   you had with Voynow sometime in '96, correct?

25        A.   Yes.

Page 80

                    M. KOUFAKIS

1

2       A.    Yes.

3       Q.    Did each of the dealerships have

4   their own operating account with Investors Bank?

5       A.    Yes.

6       Q.    And there was no requirement by --

7   strike that.

8       Did any of the dealerships have any type of

9   loan relationship other than floor plan and

10  financing?  Was there any other financing or loan

11  obligations with any bank?

12                 MR. FELSEN:  Objection.

13      A.    No.

14      Q.    So there was no requirement by

15  Investors Bank for audited-financial statements

16  or reviewed-financial statements?

17                 MR. FELSEN:  Objection.

18      A.    No, no one required it from us.

19      Q.    And did the national dealers, did

20  they have a requirement for audited- or

21  reviewed-financial statements for any of the

22  dealerships?

23      A.    No.  I don't think they specifically

24  required it.  They just wanted financial

25  statements, but I think it's inherent in the

```
                              M. KOUFAKIS
 1
 2    spirit of the agreement that it's accurate.
 3         Q.    Okay.  So you believe there's
 4    something in that dealer franchise agreement
 5    that would reference what was required as far as
 6    financial statements?  Or what the understanding
 7    was as to financial statements?
 8              MR. FELSEN:  Objection.
 9         A.    I don't think it specifically is
10    spelled out, but...
11         Q.    The spirit of the agreement
12    references it?
13         A.    I believe so.
14         Q.    Okay.  In terms of other financing,
15    there was floor plan financing for the
16    automobile inventory, correct?
17         A.    New vehicles, yes.
18         Q.    And that was with JP Morgan Chase?
19         A.    From approximately 2006.
20         Q.    Do you have any understanding as to
21    why any of the Star entities would pay for audit
22    services, and not require audited financial
23    statements?
24              MR. FELSEN:  Objection.
25         A.    Repeat that again.
```

M. KOUFAKIS

1

2      Q.    Sure.  Do you have any understanding

3  as to why any of the Star entities would pay for

4  audit services, but not require --

5      A.    Yeah, because I wanted it.

6      Q.    -- but not require audited financial

7  statements?

8                MR. FELSEN:  Objection.

9      A.    I wanted the highest level of

10  accuracy, as possible.

11      Q.    And why was it that you didn't ask

12  for audited financial statements then, if you

13  wanted the highest level of accuracy possible?

14      A.    I took Voynow's recommendation, that

15  it was not necessary and overly burdensome and

16  costly.

17      Q.    If you believe that you paid for

18  something higher than a review, but not quite an

19  audit, why wouldn't you have at least wanted

20  reviewed financial statements?

21                MR. FELSEN:  Objection.

22      A.    You're making the assumption it was

23  not.

24      Q.    Did you ever get financial

25  statements prepared by Voynow, with an opinion

Page 83

M. KOUFAKIS

1

2    stating that they reviewed them and what they

3    found?

4         A.    They didn't prepare the financial

5    statements, but they reviewed the accounts that

6    were used to prepare the financial statements.

7         Q.    Did you ever get anything as far as

8    an opinion from them?

9         A.    Not that I can recall.

10        Q.    But yet you believe you paid for it?

11        A.    I believe that the accounting

12   statements we were producing was just short of

13   an audited statement.

14        Q.    And that -- when you say "accounting

15   statement," what is it specifically you're

16   referring to?

17        A.    The one the dealership produces for

18   the manufacturers and what is ultimately

19   utilized to ultimately do the tax returns.

20        Q.    Are you talking about a balance

21   sheet, an income statement?  What are you

22   talking about when you say an "accounting

23   statement"?

24        A.    A financial statement required by

25   all of the manufacturers.

                              M. KOUFAKIS

1

2        Q.    Which is what?

3        A.    It is a -- anywhere from

4    four-to-seven page document.  Page 1 is balance

5    sheet, page 2 is, you know, the total of -- it's

6    typically expenses.  Page 3 and 4 are the income

7    and expenses of the various departments.

8        Q.    And that three-to-four page

9    financial statement --

10       A.    It's at least four-to-seven.

11       Q.    Okay.  This financial statement was

12   prepared by whom?

13             MR. FELSEN:  Objection.

14       A.    It's printed by the office manager

15   and sent by the office manager.  But it's the

16   culmination of the accounts that Voynow

17   reviewed.

18       Q.    Let's go back to the current

19   accountant.  It's Withum, did you say?

20       A.    Yes.

21       Q.    Where are they based?

22       A.    I believe New Jersey is the main

23   headquarters.

24       Q.    Who's your contact there?  Who's the

25   main accountant?

Page 94

M. KOUFAKIS

1

2      A.     Yes.

3      Q.     What is the title of this position?

4      A.     I didn't specifically give it a

5   title.

6      Q.     And you don't know this person's

7   name?

8      A.     I have to look it up on my phone.

9      Q.     Did you advertise the position?

10     A.     No.

11     Q.     How did you hear of this person?

12     A.     From Steve Rambam.

13     Q.     How did you first hear about Voynow?

14     A.     Through John Sharon, my Rentals and

15   Rentals sales rep.

16     Q.     And did you ask him for a reference

17   because you were looking to make a change?

18     A.     Yes.

19     Q.     And what did he tell you about

20   Voynow?

21     A.     He highly recommended them.  He told

22   me that they had attended all of their training

23   sessions, and that they knew the rental system

24   better than anyone that he knew.

25     Q.     When you said they had attended all

Page 104

M. KOUFAKIS

2    the --

3         A.    I would say it was not specifically

4    discussed on the number of people.  But it was

5    the understanding that they would come in with

6    other accountants from the firm to do the work.

7         Q.    And is it your understanding that

8    there was a specific discussion that Voynow

9    would make quarterly visits?

10        A.    Yes.

11        Q.    And was there any discussion that

12   you were, you, specifically were to meet with

13   them each quarter?

14        A.    It was not specifically said, but

15   initially, the accounting offices were

16   in separate offices.  By 2000, it got

17   consolidated to one.  So typically, the office

18   manager would tell me when they would be coming

19   in.

20        Q.    And would you make a point of making

21   sure you met with them each quarter?

22        A.    Yes.  Unless I was out of town, yes.

23        Q.    So if there were no quarterly

24   visits, then is it fair to say that based on

25   your understanding, Voynow was not meeting the

1                    M. KOUFAKIS

2    terms of their agreement?

3         A.    Yes.

4         Q.    And you would have known that

5    because you were supposed to meet with them

6    every quarter?

7         A.    Well, it's not specifically said.

8    It was their job to come in every quarter, and

9    it was just natural that while they were there,

10   I would make it a point of stopping by.  It was

11   not required, but --

12        Q.    But you said you hired them to come

13   out every quarter, correct?

14        A.    That was -- that was the original

15   understanding, yes.

16        Q.    Did that ever change?

17        A.    Well, in 2017, I think they just

18   showed up once.

19        Q.    So prior to 2017 did it ever change?

20        A.    It may have gone to -- again, I

21   didn't keep exact dates.  It may have gone from

22   quarterly to maybe three times a year.

23        Q.    When did that change?

24        A.    I could not tell you.

25        Q.    Okay.  So was it prior to 2010?

Page 106

M. KOUFAKIS

1
2          A.     I'm not sure.
3          Q.     And did you specifically negotiate
4    that change or agree to that change?
5          A.     No.
6          Q.     Did you approve that change?
7          A.     No.
8          Q.     How did you become aware of that
9    change?
10         A.     Again, I didn't keep track of
11   specific dates.  I can't say whether, in fact,
12   it was -- so I'm not completely sure, because I
13   didn't sit there and mark off, okay, they're
14   going to come in on X amount of days or X.  So
15   it was not appointments with me -- were not
16   made.  They were usually done with the office
17   manager, based on, I guess, their workload.
18         Q.     So based on your response, are you
19   testifying that Voynow was to coordinate its
20   visits to the dealership with the office
21   managers, as opposed to you?
22         A.     Yes.
23         Q.     And it was not necessary that you be
24   there when Voynow was there?
25         A.     No.

Page 107

                        M. KOUFAKIS

1

2       Q.    So there was this initial meeting in

3   1996, late 1996, between you and Hugh and Randy.

4   And then at some point, Voynow was hired shortly

5   thereafter.  Was there annual meetings,

6   thereafter, where you met with Voynow and

7   decided this is what I'm hiring you to do for

8   1998 --

9       A.    No.

10      Q.    Or was there just that initial

11  meeting where they were hired?

12      A.    It was the initial meeting that they

13  were hired.

14      Q.    Okay.  And were you authorized to

15  hire them on behalf of the other dealerships?

16      A.    Yes.

17      Q.    Did you have to consult with any of

18  your brothers regarding Voynow?

19      A.    No.

20      Q.    Did you?

21      A.    I mean, I clued them in, but they

22  left it up to me.

23      Q.    So they didn't have to meet Voynow

24  before Voynow was hired?

25      A.    I mean, I did it as a matter of

Page 108

1                    M. KOUFAKIS

2    courtesy.  I don't think I was -- I think just

3    out of common courtesy, before you make a move,

4    you keep them abreast of the situation.  I don't

5    think it was required, but I think it's the

6    right thing to do.

7         Q.    But as far as the discussion about

8    the level of services that were going to be

9    provided, your brothers were not involved in

10   that?  That was you?

11        A.    Yes.

12        Q.    Now, Voynow was hired to prepare the

13   tax returns, correct, the corporate tax returns?

14        A.    Yes.

15        Q.    And you, as the officer of the

16   dealerships, were required to actually sign off

17   on the tax returns before they were filed,

18   correct?

19        A.    Well, the ones that I could --

20   typically, I don't believe I signed for the

21   dealerships that I had no ownership in.

22        Q.    But for the ones that you did, you

23   signed?

24        A.    Yeah, yeah.

25        Q.    In signing those, did you understand

Page 109

M. KOUFAKIS

1
2    that Voynow was not obligated or undertaken to

3    verify the information that was set forth on

4    those tax returns?

5        A.    Say it again.

6        Q.    Sure.  As the taxpayer signing the

7    tax returns --

8        A.    Are we talking corporate or

9    personal?

10       Q.    Corporate.  On behalf of the

11   corporation.  Did you understand that Voynow was

12   not obligated or undertaken to verify the

13   information that the Star dealership set forth

14   on the tax return?

15       A.    They were responsible for true and

16   accurate financial statements.·

17       Q.    I'm asking you about a tax return,

18   not a financial statement.

19       A.    Well, it derives from the financial

20   statement.  So I would say maybe not quite to

21   the level of being audited, but I do believe it

22   was their job to verify it.

23       Q.    Now, Voynow prepared the 2016

24   corporate tax return prior to being disengaged.

25   Do you recall that?

Page 111

```
 1                    M. KOUFAKIS
 2   claimed amount to the roughly 4.5 million, that
 3   you alluded to earlier?
 4                    MR. FELSEN:  Objection.
 5        A.    I don't believe so.
 6        Q.    What is your understanding as to
 7   what the amount of loss claimed --
 8        A.    I don't know, because if the money
 9   never comes in -- it's a lower profit, as
10   opposed to -- it's money you should have
11   received, but didn't, so you're not necessarily
12   paying tax on money you never received in the
13   first place.
14        Q.    So it's a tax savings?
15        A.    It's less income.
16        Q.    Which would ultimately result in a
17   tax savings?
18        A.    Possibly.
19        Q.    Has anybody looked -- well, strike
20   that.
21        You said the '16, '17 and '18 were all filed
22   simultaneously, correct?
23        A.    Yes.
24        Q.    But from what I understand, there
25   was alleged fraud discovered beyond the 2018 tax
```

Page 116

```
                        M. KOUFAKIS
 1
 2      A.    Yes.
 3      Q.    When did you -- how often did you
 4  review their bills?
 5      A.    I mean, if I signed the check, it
 6  would typically be attached to the check.  And
 7  typically at the end of the year, I would just
 8  ask what did we pay them over the last
 9  12 months.
10      Q.    So would you review the bills at the
11  end of each year, or did you just review the
12  number?
13      A.    More the dollar amount.  The bills
14  didn't really say that much.
15      Q.    Did you ever, at any point, receive
16  anything in writing from Voynow, setting forth
17  the terms of their engagement?
18      A.    I said I don't believe so.
19      Q.    I think I asked you specifically
20  right after the meeting in 1996.  So this
21  question was any point thereafter.
22      A.    The only one I can specifically
23  remember I believe was in December of '16, that
24  one was presented to me for the business.  I
25  think there was one or two possibly on my
```

Page 117

                    M. KOUFAKIS

1
2    personal.  Excluding the personal, I believe
3    specifically in December of '16, one was
4    presented to me.
5         Q.    So you said one was presented to you
6    in December of 2016.  Do you have a recollection
7    as to how that was presented and who presented
8    it?
9         A.    I believe Bob Seibel presented it.
10        Q.    In what context?
11        A.    At some point it was sent.  I don't
12   know if it was an email or mail or discussed.  I
13   don't remember specifically.  I think at some
14   point I believe it appeared.
15        Q.    Do you believe he gave it to you?
16        A.    I don't specifically recall.
17        Q.    You just remember at some point --
18        A.    I think at some point it came up.  I
19   don't know if it was at a year-end visit or
20   mailed.
21        Q.    But you remember having an
22   engagement letter in front of you --
23        A.    At some point it came up.  I don't
24   remember exactly how.
25        Q.    And this was in December of 2016 --

Page 119

1                    M. KOUFAKIS
2    to you later that month?
3         A.    I believe so.
4         Q.    And you wouldn't sign it because you
5    said you viewed it as cover-your-ass-type --
6         A.    Yeah.  It was not -- to be honest
7    with you, at that point in time, that was the
8    least of my concerns.
9         Q.    Was anybody else present -- did you
10   convey that view to Bob Seibel, when you told
11   him you were not going to sign it?
12        A.    Yeah, I believe so.
13        Q.    Was anybody else present?
14        A.    I don't know if anyone was present
15   for that.  No, I don't know.
16        Q.    And other than that December of 2016
17   engagement letter, is it your testimony that you
18   had never seen any engagement letters for prior
19   years from Voynow?
20        A.    Yes, that I can recall.
21        Q.    Did you ever ask at any point of any
22   of your current or now former employees, whether
23   they were aware of engagement letters being sent
24   by Voynow?
25        A.    No.

Page 120

M. KOUFAKIS

1

2      Q.    To this day, have you ever asked

3   anybody?

4      A.    Have I asked my employees if they

5   received one?

6      Q.    So you're saying, other than the

7   2016 engagement letter -- I'm only speaking

8   about the corporate side.  You're not aware of

9   any other prior engagement letter being sent or

10  provided by Voynow, correct?

11     A.    Correct.

12     Q.    So my question is:  Have you asked

13  any of your employees, either current employees

14  or employees who no longer work for you, whether

15  they were aware of engagement letters being

16  provided by Voynow?

17     A.    No.  No.  I don't know why I would.

18     Q.    Is it possible that documents were

19  received, that you might not be aware of or

20  might not have seen?

21     A.    Not for Toyota.

22     Q.    For other dealerships?

23     A.    I guess anything is possible.

24     Q.    To your knowledge, was there ever a

25  file kept for Voynow documents?

Page 124

M. KOUFAKIS

1

2    A.    Correct.

3    Q.    So you could not have entered into

4    an agreement for services on their behalf when

5    they did not exist at that time, agreed?

6                MR. FELSEN:  Objection.

7    A.    I mean, not specifically for those

8    dealerships.  But I would say on behalf of the

9    group, as we acquired over time -- as we

10   acquired and -- acquired franchises or sold

11   them, it was the understanding that the scope of

12   the work was the same, regardless of what

13   franchise we might have at any given time.

14   Q.    That was your understanding?  Your

15   impression of what the understanding was?

16   A.    Yes.

17   Q.    But there was no actual meeting once

18   those entities were, thereafter, formed?

19   A.    No actual meeting, no.  But I think

20   it was a given.

21   Q.    I think you said that the Rentals

22   system was acquired around 1992, when you

23   acquired the Nissan dealership?

24   A.    Correct.  That was the VIM Net.

25   Q.    Did the version of the Rentals

Page 125

```
 1                    M. KOUFAKIS
 2   system being used change?
 3        A.    Yes.
 4        Q.    When did it change and to what?
 5        A.    It went to the Era system, which I
 6   believe was late 1994.
 7                    (A lunch break was taken.)
 8        Q.    Back on the record.  Mr. Koufakis, I
 9   just want to touch on some of the topics we
10   talked about earlier.  Are aware specifically of
11   the difference in the Voynow-prepared 2016
12   corporate returns, to what was actually filed?
13              MR. FELSEN:  Objection.
14        A.    No.
15        Q.    Has there been any IRS audit of the
16   '16, '17 or '18 tax returns?
17        A.    No.
18        Q.    When you signed those corporate
19   returns for the dealerships that you were
20   authorized to sign, did you understand that
21   those Star dealerships were responsible for the
22   completeness and accuracy of the information
23   used to prepare the tax return?
24        A.    Yes.
25        Q.    Did you ever meet somebody by the
```

Page 127

```
1                    M. KOUFAKIS
2    retained in the system.
3         Q.    I take it you had the highest level
4    of access?
5         A.    Yes.
6         Q.    Do you also have remote access?
7         A.    Yes.
8         Q.    Did Vivian have remote access?
9         A.    Yes.
10        Q.    Did Debbie?
11        A.    I don't believe so.
12        Q.    Does Jacque?
13        A.    Yes.
14        Q.    Do your brothers have remote access?
15        A.    No.
16        Q.    Have you provided remote access to
17   anybody who was not an employee of Star?
18        A.    I believe Voynow at some point had
19   capability of doing it.  I'm not sure if they
20   utilized it.
21        Q.    So other than Voynow, did anybody
22   else, to your knowledge, have remote access --
23        A.    No.
24        Q.    -- to your Rentals to Rentals
25   system?
```

Page 132

                         M. KOUFAKIS

1

2    exist in the system that would show what level

3    of access was provided?

4         A.    If the user ID still exists, the

5    answer would be yes.

6         Q.    But you keep the user IDs?

7         A.    Yes.  I'm not sure if they were

8    deleted, off the top of my head.  But I can

9    check.

10        Q.    Did you delete the user IDs for

11   Vivian or Debbie?

12        A.    So the way the system works -- the

13   answer is I'm not sure.  But the way the system

14   works, is if you don't log in -- for sure once

15   they were terminated, the password was changed.

16   If the system -- if you don't log in with any

17   user for a 30-day period, it locks you out.  It

18   requires you to change it at least after 30

19   days.  As a general rule, when someone is

20   terminated, their password is immediately

21   changed.  If someone is -- if you forget or, you

22   know, it just renders inactive.  It will lock

23   you out.  You have to unlock it.

24        Q.    Do you have a recollection of

25   providing Voynow with remote access for the

Page 133

```
 1                    M. KOUFAKIS
 2    first time in 2017, in connection with asking
 3    them to help Jacque?
 4         A.    Possibly, but not specifically.  If
 5    there was a need to, and they wanted it, I would
 6    have given it to them.  I don't specifically
 7    remember if they had it or not.  It gets a
 8    little involved.
 9         Q.    Is it possible that the first time
10    Voynow was provided remote access was in 2017,
11    in connection with your request to help Jacque?
12              MR. FELSEN:  Objection.
13         A.    I would say it's possible after the
14    firewall had been installed.  It's possible.
15         Q.    I don't understand.  So are you
16    saying that you believe you gave Voynow remote
17    access at some point after 2015?
18         A.    What I'm saying is once the firewall
19    is installed, you need to have this other
20    software installed in order to accomplish it.
21    Prior to that, you didn't.  You could just use
22    your regular user ID and log in.  It didn't
23    matter if you were inside or outside of the
24    dealership, as long as you knew the phone number
25    to dial in this.
```

Page 134

1                      M. KOUFAKIS

2          After the firewall, it was required.  So it

3     gets a little bit more complicated.  I think there

4     was a period of time where they did get it.

5          Q.    But you can't state when?

6          A.    No.  No.  I'm not sure if they did.

7     I think so.  I'm not a hundred percent sure.

8          Q.    Is there any way that you can check

9     within the system when somebody logs in

10    remotely?

11         A.    It typically tells you the last date

12    and time or the last time someone logged in.  It

13    does maintain a history of the activity, but it

14    might be like a rolling 30 days or something,

15    for every user.

16         Q.    But those records could be archived

17    and accessible?

18         A.    Which specifically, again?

19         Q.    A log showing the history of when

20    someone is accessing the system virtually.

21         A.    I don't think it gets maintained on

22    the system.  I think it's just a rolling 30

23    days, to the best of my knowledge.

24         Q.    Would you agree that without remote

25    access, the only way Voynow would be able to see

M. KOUFAKIS

1

2    what was happening, as far as journal entries,

3    would be when they were actually physically

4    on-site?

5           A.    Yes.

6           Q.    Did any of the Star entities have

7    bonding or fidelity coverage?

8           A.    I'm sorry.  Repeat the question.

9           Q.    Did any of the Star entities have

10   bonding or fidelity coverage?

11          Do you know what that is?

12          A.    For whom?  The employees?

13          Q.    Any shape or form.  Did you have

14   that coverage?

15          A.    I believe it's a requirement in New

16   York for a car dealer to have some sort of bond

17   for a motor vehicle license.  I think it's a

18   state requirement.

19          Q.    So is there -- I'm referring to

20   insurance for employee theft or fidelity issues,

21   sometimes referred to as bonding coverage.

22          A.    Insurance to insure theft?

23          Q.    So if there was employee theft,

24   there are insurance products available to

25   protect employers from that theft.  So my

Page 162

                    M. KOUFAKIS

1

2        A.     Not in one shot.  That was a unique

3   situation where she exploited a loophole that I

4   don't think Rentals and Rentals are aware of.

5        Q.     But you would have expected that

6   Voynow, who you hired to detect fraud and verify

7   every account balance with the highest level of

8   accuracy, would have picked up on that, right?

9               MR. FELSEN:  Objection.

10        A.     They would have picked up and they

11   did pick up -- and they mentioned many times

12   about the number of pending tickets there were.

13   So that was a -- so they did bring that to my

14   attention.  It's something that's maybe a little

15   out of ordinary and could be an opportunity for

16   theft, but not necessarily a theft, if that

17   makes any sense.

18        Q.     But it was, in fact, a theft because

19   Star submitted a claim to their insurance

20   carrier?

21        A.     In fact it was a theft, yes.

22        Q.     And it was not a theft that was

23   detected by Voynow?  It was reported to you by

24   Vivian?  That's what you testified to?

25        A.     Yes.

Page 165

M. KOUFAKIS

1
2    A.    Yes.
3    Q.    So is this the address -- on Exhibit
4  1, is that the address for the Nissan
5  dealership?
6    A.    Technically, *no.*
7    Q.    Is it the address for the office?
8    A.    It's the address of the office and
9  Subaru.  One is on the first floor, one is on
10  the second floor.
11    Q.    Are you able to state today, one way
12  or the other, whether or not these documents
13  were received by anyone in the office or at the
14  Subaru location?
15          MR. FELSEN:  Objection.  Asked
16          and answered.
17    A.    I have no way of knowing.
18    Q.    Did you ever ask any of your current
19  or former employees if they had ever seen any
20  type of engagement letter from Voynow?
21    A.    No.
22    Q.    You can put those aside.
23  *Now you had indicated that you recall*
24  *receiving an engagement letter for purposes of the*
25  *preparation of your personal income tax return,*

Page 166

```
 1                    M. KOUFAKIS
 2    correct?
 3               MR. FELSEN:  Objection.
 4         A.    I think there was one, a couple of
 5    years.
 6         Q.    So it's your recollection, that at
 7    least for a couple of the years, you received
 8    written engagement letters from Voynow for your
 9    personal tax returns?
10         A.    Yes, I believe so.
11         Q.    And where did you receive those
12    documents?  Do you recall?
13         A.    I believe they were mailed to my
14    home.
15         Q.    So on the occasions where you did
16    receive engagement letters for your personal tax
17    returns, did you sign them?
18         A.    I think I signed one.
19         Q.    Was there a reason you didn't sign
20    the others that you received?
21         A.    No particular reason.
22         Q.    So as you sit here today, there was
23    not anything in the engagement letter that you
24    disagreed with?  You just never got around to
25    signing it?
```

Page 179

                        M. KOUFAKIS

1

2    of the time, they had a bin.  And as the bills

3    came in, checks were made.  And whoever may have

4    normally come in the office would have been

5    presented the checks for signature.

6          Q.    And if the records reflect that

7    Senior signed the majority of those checks, then

8    is it fair to say he would have been the one

9    that was present more to sign them?

10               MR. FELSEN:  Objection.

11         Q.    Or available more to sign them?

12         A.    For the most part, yes.  But it's

13   clear that he was targeted for certain checks.

14   And to a lesser extent, my brother Steve was

15   targeted for certain checks.  And I think it's

16   also fair to say that I was avoided for certain

17   checks and John was avoided for certain checks.

18   Target or preyed might be the correct word.

19         Q.    But you never saw any reason to

20   expect that your father would be preyed upon

21   prior to December of 2016?

22         A.    Absolutely not, no.

23         Q.    Did you ever sign a check without

24   backup documentation?

25         A.    I'm sure I have.

Page 180

1                        M. KOUFAKIS

2         Q.    Did you ever sign a blank check?

3         A.    You asked that --

4                    MR. FELSEN:  Objection.

5         Q.    Sorry.

6         A.    -- the one with the DMV account.

7         Q.    If you or any other check signer

8    were to sign a check without backup

9    documentation, or that was incomplete in some

10   fashion, do you believe that was a compromise of

11   the dealership's internal control?

12                   MR. FELSEN:  Objection.

13        A.    In hindsight, yes.

14        Q.    Do you believe that that created the

15   impression or an environment where employees

16   felt that ownership may not be paying attention?

17                   MR. FELSEN:  Objection.

18        A.    Speculation.  I could not say.

19        Q.    In hind site, do you think that it

20   did?

21                   MR. FELSEN:  Objection.

22        A.    I believe my father was preyed upon

23   because he was of a trusting nature, and Vivian

24   and Debbie were trusted like a family member.

25        Q.    Did you ever ask your father after

Page 181

M. KOUFAKIS

1
2    Vivian's personal checks were discovered in
3    2016, whether he had backup documentation before
4    he signed them?
5        A.    I didn't have to ask him.  I knew
6    the answer.  There was not -- it was not -- the
7    details were not on the check.  There couldn't
8    be backup documentation because it was -- it
9    didn't exist.
10       Q.    So is it fair to say that he would
11   have signed those checks without any backup
12   documentation?
13             MR. FELSEN:  Objection.
14       A.    Yes.
15       Q.    Has there been any change or any
16   implementation of written policies as far as the
17   check-signing process?
18             MR. FELSEN:  Objection.
19       A.    I would not say written policies,
20   no.  But I would say in early 2017, I just
21   basically sent the mandate that I'm going to
22   sign the vast majority of the checks.
23       Q.    For all of the dealerships?
24       A.    For all of the dealerships.  In
25   fact, I threatened to fire someone if they

Page 182

                          M. KOUFAKIS

1
2    presented my father with a check, that was not a
3    payroll or swap check.  That was how emphatic I
4    had gotten.  Like, don't even approach him, and
5    if I find out you did, you could be terminated.
6         Q.    Now, did you also ask your brother
7    Steve about the checks that he had signed?
8         A.    Yes.
9         Q.    And did he admit that he signed them
10   without backup documentation?
11        A.    He didn't have to because it was the
12   same situation as my father.
13        Q.    So you know for a fact he signed
14   them without backup.
15        A.    There was none.  There was no
16   detail.  It was evident.
17        Q.    Now, you were notified by a bank
18   around December 1st, 2016 about --
19        A.    November 30th, early morning.
20   Between 10:30 and 11.
21        Q.    About Vivian, correct?
22        A.    No not about Vivian.
23        Q.    About a potential concern?
24        A.    Yes.
25        Q.    So prior to that call from the bank,

Page 184

```
 1                    M. KOUFAKIS
 2           Exhibit M. Koufakis 8 for
 3           identification, as of this date.)
 4      Q.    I'm going to show you what we marked
 5  as Exhibit 8.  And this -- so pages Star 15997
 6  through 16009, these are the checks that are
 7  payable to Capital One, Vivian's personal
 8  account there?
 9      A.    Yes.
10      Q.    And these are issued on Star
11  Nissan's account, correct?
12      A.    Yes.
13      Q.    Am I correct that Star Nissan did
14  not have a credit card account with Capital One
15  at the time these checks were signed?
16      A.    Correct.
17      Q.    And pages 16011 through 16024, are
18  the checks payable to Vivian's account at M&T
19  Bank?
20      A.    Yes.
21      Q.    And the pages designated as 16026
22  through 16036 are the -- I'm sorry, 16034, are
23  the checks payable to HSBC, at Vivian's account?
24      A.    Yes.
25      Q.    And then can you identify what the
```

Page 185

```
                        M. KOUFAKIS
1
2    last two checks purport to represent?  So that's
3    16035 and 36.
4         A.    So 16035 is a check from Star Toyota
5    to Vivian, signed by my brother Steve.  And I
6    guess exhibit 16036 is a Star Hyundai check to
7    Vivian, signed by my dad.
8         Q.    So would there have been a reason
9    why -- did you ever ask Steve why he signed this
10   check payable to Vivian?
11        A.    Yes.
12        Q.    What was his response?
13        A.    He didn't recall.
14        Q.    Did you ever ask your father why he
15   signed the check for 8500, payable to Vivian?
16        A.    Yes.
17        Q.    What was his response?
18        A.    He didn't recall.
19        Q.    So as you sit here today, do you
20   know what these checks were for?
21        A.    It was nothing good; that I can tell
22   you.  They were for nothing good.
23        Q.    These were checks that the company
24   was knowingly releasing funds to Vivian for,
25   correct?
```

Page 186

M. KOUFAKIS

1

2      A.    Yes.

3      Q.    So are you contending that these two

4  checks are part of the fraud scheme conducted by

5  Vivian?

6      A.    What I'm saying is -- yes, these

7  checks -- what I'm saying is, yeah, these are

8  additional thefts by Vivian.

9      Q.    Okay.  But you would agree that at

10  least in the case of the first check for $9,147,

11  Star Toyota is not deceived in knowing that it

12  is paying Vivian, correct?

13      A.    Well, Star Toyota is deceived.  Star

14  Toyota and my brother Steve are deceived.  The

15  Hyundai check, there may be a little bit more to

16  the story.

17      I believe the short story is that they were

18  just simply lied to, they believed the lie, and

19  they signed the checks.  That's what I personally

20  believe.  They don't recall.  That's a reasonable

21  deduction.  I can't say with absolute certainty,

22  but I can say it was -- it was not for any

23  legitimate reason.

24      Q.    But you would agree, unlike the

25  other checks that are paid to banks, this --

Page 189

1                    M. KOUFAKIS

2        Q.    So this specific request relates to

3   Investors Bank.

4        A.    I'm sorry.  What is your question

5   now?

6        Q.    My question was whether you ever got

7   a response to your letter asking that the checks

8   be reversed, whether verbally or in writing?

9        A.    Not that I can recall.

10       Q.    Did Nissan ever have an account with

11   M&T Bank?

12       A.    I don't believe so.

13       Q.    What about HSBC?

14       A.    I don't believe so, no.

15       Q.    And there's no contention that any

16   of the signatures on these checks were forged,

17   correct?

18       A.    Correct.

19       Q.    So to your knowledge, there would be

20   no reason for any check to be made payable to

21   either Capital One, M&T Bank or HSBC without a

22   business reason, for Star Nissan?

23            MR. FELSEN:  Objection.

24       A.    Repeat the question.

25       Q.    Yeah.  Would there have been any

Page 202

M. KOUFAKIS

1
2    days after it was brought to my attention.
3        Q.    Right.  You're referring to the
4    first letter on Exhibit 8.  But the actual
5    Exhibit 8 documents includes all of the checks
6    from --
7        A.    Yeah.  I understand what you're
8    saying.  I'm not a hundred percent sure.  You
9    have to double-check with her.
10       Q.    With Jacque?  She would know that?
11       A.    Yeah, yeah.  When we get into the
12   very, very fine details, she would be the best
13   person to...
14       Q.    Do you have any reason to doubt, as
15   you sit here today, that however many checks
16   there were, that make up the difference between
17   the 486,000 and the 553,000, that those were all
18   signed by either Senior or Steve?
19            MR. FELSEN:  Objection.
20       A.    I would not know.  It would be
21   speculation.
22       Q.    Now, did you have online access to
23   the Investors Bank account?
24       A.    Yes.
25       Q.    Did your brothers as well and

Page 203

                        M. KOUFAKIS

1

2    your father?

3         A.    No.

4         Q.    Only you did?

5         A.    I mean, to this day, I'm pretty much

6    the only one that really has full access.  Only

7    Jacque can view.  If they want to just stop a

8    check in any dealership, they have to go through

9    me.

10        Q.    Did you also receive monthly bank

11   statements from Investors Bank, in addition to

12   whatever online access you had?

13        A.    Not me personally.  Jacque would get

14   them or they would be generally mailed to the

15   accounting office.  I wouldn't normally see

16   them.  I take that -- the Toyota ones, I believe

17   get mailed to Toyota.  Or some of the Toyota

18   ones get mailed to Toyota.  There's quite a few.

19        Q.    So as part of your custom and

20   practice running any of the dealerships that you

21   ran or were dealer principal for, did you look

22   over monthly bank statements --

23        A.    No.

24        Q.    -- or did you just delegate that --

25        A.    Delegate.

Page 205

                         M. KOUFAKIS

1
2    that you were not in the office on the dates
3    that all of these checks were signed?
4                  MR. FELSEN:  Objection.
5         A.    I would say half I was out of the
6    state of New York.
7         Q.    I'm sorry.  I didn't catch the full
8    answer.  Half of those times?
9         A.    I believe half of them I was out of
10   the state of New York.  I believe that was done
11   consciously and deliberately.
12        Q.    Have you actually, like, matched the
13   checks up to your calendars?
14        A.    Yes, yes.
15        Q.    Do you believe your brother John was
16   also not at the dealership on the date that any
17   of those checks in Exhibit 8 were signed?
18                  MR. FELSEN:  Objection.
19        A.    No.  I believe he was.  They just
20   didn't go to him.
21        Q.    As part of your investigation, did
22   you ever look at any of the accounting entries
23   that were made in connection with --
24        A.    Yes.
25        Q.    -- any of those checks listed in

Page 206

M. KOUFAKIS

1
2    Exhibit 8?
3         A.    Yes.
4         Q.    And what did you find as part of
5    that investigation?
6         A.    I immediately found, a couple of
7    hours after I got the call, that it hit the
8    Nissan account 2211, which was the Nissan
9    factory receivables, and that's when I knew we
10   had a problem.  I mean, within an hour or so of
11   getting the phone call.
12        Q.    So is it your testimony that all of
13   the checks that were part of Vivian's fraud
14   scheme were recorded by an entry to cash offset
15   by Nissan instead of receivable?
16        A.    Yes.  To the best of my
17   recollection, yes.
18        Q.    And you said that you knew that
19   right away and you knew it was a problem,
20   correct?
21        A.    Correct.
22        Q.    And are you contending that that's
23   something Voynow should have picked up on?
24        A.    Absolutely.
25        Q.    And you knew that as of early

Page 210

M. KOUFAKIS

1

2          reveal communications that you had

3          with a law firm or anybody hired by

4          the law firm, related to litigation,

5          then you're not to answer the

6          question.

7     Q.    I'm not interested in what you

8  discussed with your lawyer.  I'm interested

9  in -- did you look at, as part of your own

10 investigation, did you look into what you said

11 you saw was an immediate problem when you looked

12 at the accounting entries?

13    A.    Again, I'm not at an accountant, but

14 I know there's a problem, no ifs, ands, or buts.

15 That's it.

16    Q.    So Vivian was fired in early

17 December of 2016, correct?

18    A.    Yeah.  I would say by that following

19 Tuesday.  So it was --

20    Q.    Early December is fine.

21    A.    December 6th, the morning of

22 December 6.

23    Q.    What, if anything, did you tell the

24 employees about Vivian's termination?

25         MR. FELSEN:  Objection.

```
                                              Page 211

 1                    M. KOUFAKIS
 2        A.    Initially I confronted Vivian the
 3   next day.
 4        Q.    I'm asking what, if anything, you
 5   told the employees.
 6        A.    Me, personally, I didn't tell
 7   anything to the employees.
 8        Q.    Did you make the decision on your
 9   own to fire her, or did you consult with
10   your father or brothers?
11        A.    Initially, I suspended her when I
12   thought it was 150,000.  By Monday, it had grown
13   in excess to $500,000, at that point.
14   Originally I suspended her, I said, Listen, you
15   got one week to repay the money; otherwise, I go
16   to the police.  A few days later, it's in excess
17   of 500,000.  I called her sister into my office.
18        Q.    My question was really, Did you make
19   the decision?
20        A.    Yes.
21        Q.    On your own, without consultation
22   with your brothers?
23        A.    Yes.
24        Q.    And then her responsibilities were
25   assigned to Debbie?
```

Page 215

M. KOUFAKIS

1
2      A.    I didn't say it either way.
3      Q.    Did you take any steps?  You said it
4  was not possible?  Why is that?
5      A.    Because we had five dealerships to
6  run.
7      Q.    Did you take any steps to try to
8  find new people at that time?
9      A.    Well, yes.  As people are getting
10 terminated, they needed to be replaced.
11     Q.    No.  In, like, December of 2016.
12     A.    Well, Vivian was gone so her duties
13 were assigned to Debbie, and then she was
14 suspended on Monday, April 10th.
15     Q.    When did you have your conversation
16 with Mr. Whyte?
17     A.    I believe it was in mid-December of
18 2016.
19     Q.    So at that point, after that
20 conversation, prior to when you terminated
21 Debbie, which was in April of 2017, did you do
22 anything to try to find replacements?
23     A.    Yes.  As you --
24     Q.    No, no.  Like, did you put in an ad?
25 Did you try to bring in new people?

Page 216

M. KOUFAKIS

1

2          A.    As -- when Debbie was terminated,

3    Jacque was promoted.  And so the focus was

4    getting her ramped up to speed --

5          Q.    Understood.

6          A.    -- to assume the functions that she

7    currently has.  So that was the focus.  Then as

8    people underneath her got replaced, she would do

9    the interviewing and the hiring.

10         Q.    So before any of that happened, what

11   steps, if any, between December of 2016 and

12   April of 2017, did you take to try to find and

13   hire new people?

14         A.    I was not hiring new people.  I was

15   still focused on the theft schemes that were at

16   hand.  It was only one person, you know, that we

17   knew we had an issue with.  We just didn't

18   know -- so now -- not everyone is guilty.  Not

19   every one is a thief.

20         So now, you know, did they know and not say

21   anything?  Probably, to a certain degree.  That's a

22   little hard to ascertain.  Over time, you're trying

23   to figure out what happened and take the

24   appropriate measures.

25         Q.    Now, you were involved in trying to

Page 224

1                    M. KOUFAKIS

2    will be audited.

3         Did you have a discussion with Mr. Rosenfield

4    about auditing 2017?

5         A.    His job was to uncover any theft

6    that had taken place, up until when he was

7    employed.

8         Q.    Did you ever have any discussion

9    with him at any point that, Hey, you know, this

10   is costing too much?

11        A.    No.  I mean, I didn't mind spending

12   the money, provided that we got results.  He

13   just was not producing results.

14        Q.    So he was not able to provide the

15   proof that you needed to take to the DA, to show

16   actual theft?

17        A.    Yeah. I think that's fair to say.

18        Q.    He writes:  To actually go through

19   each entry, every vendor and every transaction

20   affected would be at too great a cost.

21        Do you see that?

22        A.    I didn't put any limitations on the

23   budget with him.  So, you know, I -- I see what

24   he's saying.

25        Q.    So is it fair to say you never

Page 226

1                    M. KOUFAKIS

2        A.    Yes.

3        Q.    And did you have the opportunity to

4   suggest any changes or make any factual changes?

5        A.    Yes.

6        Q.    Did you authorize the filing of this

7   document on behalf of the dealerships that are

8   listed?

9        A.    Yes.

10        Q.    To your knowledge, did anyone else

11   at any of the dealerships review the complaint

12   for accuracy?

13        A.    No.

14        Q.    If you turn to paragraph 49 of the

15   complaint, it says that:  The plaintiff obtained

16   a forensic accounting firm and initiated a broad

17   investigation of the extent of the thefts.

18        Is that referring to the Rosenfield firm?

19        A.    Yes.

20        Q.    So is it fair to say that the

21   plaintiffs relied, at least in part, upon the

22   Rosenfield forensic accounting to support the

23   allegations that are in this complaint?

24              MR. FELSEN:  Objection.

25        A.    Initially -- well, let me clarify

Page 227

```
 1                    M. KOUFAKIS
 2   that --
 3                    MR. FELSEN:  To the extent the
 4              answer doesn't allow you to reveal
 5              any communications with your
 6              attorney, you can answer the
 7              question.
 8        Q.    There was no other forensic
 9   accountant engaged prior to the time this
10   complaint was filed?
11        A.    Correct.
12        Q.    After Debbie was fired, did you
13   engage Voynow to assist in the training of
14   Jacque Cutillo?
15        A.    Yes.
16        Q.    Was that request made verbally?
17        A.    I believe so.
18        Q.    Did Voynow, in fact, come out to
19   provide services to assist Jacque?
20        A.    Yes.
21        Q.    Did they do so in 2017?
22        A.    Yes.
23        Q.    And we have already discussed the
24   fact that Voynow prepared the 2016 corporate tax
25   returns, correct?
```

Page 232

M. KOUFAKIS

1
2  ultimately this was one of the last emails.
3      Q.   At any point prior to August
4  of 2017, did you ever advise Voynow not to do
5  any work on the 2016 tax return?
6      A.   I didn't specifically advise them
7  not to.  Again, I was more, you know, my focus
8  was getting the business running, trying to get
9  people prosecuted.  Trying to, you know, work
10  with Rosenfield, Jacque, whoever, to clean
11  everything up.
12      Q.   Were you aware that Voynow was
13  working on the 2017 tax return?
14      A.   No.
15      Q.   So you hired Rosenfield in April of
16  2017 to do everything but your tax return,
17  correct?
18      A.   They were hired to -- when
19  Rosenfield was hired initially, his job was to
20  look backwards and figure out what happened.
21      Q.   And not do the tax return?
22      A.   Correct.
23      Q.   So --
24      A.   And the concern was just trying to
25  get Jacque up to speed.  You know, you're taking

Page 233

M. KOUFAKIS

1

2     a bookkeeper who never did a bank

3     reconciliation, never closed out a month and,

4     you know, you're just throwing her into the deep

5     end.  And we are just trying to keep a business

6     running.  And now you're trying to get her to do

7     the job of basically two people.

8          Q.    Yeah, but the IRS doesn't really

9     care.  They have their deadlines, right?  And

10    you're aware of what those deadlines were for

11    the tax return, right?

12         A.    Yes.

13         Q.    So at any point did you instruct

14    Voynow, prior to August of 2016, I'm not going

15    to file my corporate tax return?  I need to you

16    get an extension or file whatever you need to

17    file?

18         A.    Yes.  It was said in that August of

19    '17.

20         Q.    After the tax return was already

21    prepared, that's when you told them?

22         A.    I'm pretty sure it was prepared.  I

23    don't think it was -- I don't know exactly when

24    it was sent to me.  But they knew of the thefts,

25    so why would you do it?

Page 240

M. KOUFAKIS

1
2      A.     I received the bills.  But in my
3  opinion, not only was the work not done, it
4  either wasn't done, shouldn't have been done or
5  whatever was done was done extremely poorly.
6  That's what I'm saying.
7      Q.     Got it.  Did you pay any penalties
8  in connection with the 2016 tax return?
9      A.     I'm not sure.
10     Q.     Have there been any amendments filed
11 to the 2010 through '15 corporate tax returns
12 that Voynow prepared?
13     A.     I don't believe so.
14     Q.     As a result of what you contend to
15 be theft --
16     A.     No, I don't believe they went back.
17 I believe they were trying to take it in '16.
18 And that's still an issue, even until today.  I
19 don't believe there were penalties because the
20 IRS owes us money.  That's why there are no
21 penalties.
22     Q.     For the late filing?  Were there
23 penalties in connection with the late filing of
24 the 2016 return?
25     A.     I think it's only a penalty if you

Page 241

                    M. KOUFAKIS
1
2    owe them money.  If don't think there's a
3    penalty if you don't.  I don't think there's --
4    again, I'm not a hundred percent sure.
5    Certainly there is no interest.  I'm not sure if
6    there's penalties.  I don't think so, but I'm
7    not sure.
8         Q.    Let's talk about Nick Chester.  So
9    when Star entities hired Nick Chester to perform
10   the services in January, February of 2017, was
11   he provided remote access?
12        A.    No.  He came to the dealership.  He
13   lived in Princeton, New Jersey.  He needed to
14   stay in a hotel for a few days, which I believe
15   we paid for.
16        Q.    He came to the dealership on
17   January 26th and January 27?  Does that sound
18   accurate?
19        A.    That sounds about right.
20        Q.    And he provided you with a report as
21   far as what he reviewed and what he concluded?
22        A.    I believe so, yes.
23        Q.    And he offered to look further at
24   certain items and issues, correct?
25        A.    I believe so, yes.

Page 242

M. KOUFAKIS

1

2      Q.    And you never responded to that

3   offer, correct?

4      A.    No, not immediately.  No.  I don't

5   think I responded particularly to his request

6   after that.

7      Q.    He gave you his phone number, to

8   contact him, correct?

9      A.    Yes.  I think he came in one other

10  time in early June, if I'm not mistaken.  But to

11  be perfectly honest with you, you know, there

12  was a lot going on.  There was, you know, in

13  March of '17, Vivian was -- not Vivian.  I'm

14  sorry --

15     Q.    I'm aware of the time line.  I'm

16  asking if you ever responded to his invitation

17  or his request to come back --

18     A.    To be perfectly honest with you, the

19  more I thought about it, we thought there was a

20  potential conflict of interest, and we felt

21  maybe it was best not to go with someone that

22  Voynow recommended.  Maybe somebody that was

23  just a little bit more independent.

24     Q.    So is it fair to say you felt that

25  there was a potential conflict of interest as of