EXHIBIT 3

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
                          - - -
 3   STAR AUTO SALES OF     : Civil Action No.:
     BAYSIDE, INC. (d/b/a   : 1:18-cv-05775-ERK-CLP
 4   STAR TOYOTA OF         :
     BAYSIDE), STAR AUTO    :
 5   SALES OF QUEENS,       :
     LLC (d/b/a STAR        :
 6   SUBARU), STAR HYUNDAI  :
     LLC (d/b/a STAR        :
 7   HYUNDAI), STAR NISSAN, :
     INC.(d/b/a STAR        :
 8   NISSAN), METRO         :
     CHRYSLER PLYMOUTH      :
 9   INC.(d/b/a STAR        :
     CHRYSLER JEEP DODGE),  :
10   STAR AUTO SALES OF     :
     QUEENS COUNTY LLC      :
11   (d/b/a STAR FIAT) and  :
     STAR AUTO SALES OF     :
12   QUEENS VILLAGE LLC     :
     (d/b/a STAR            :
13   MITSUBISHI),           :
                            :
14        Plaintiffs,       :
                            :
15        vs.               :
                            :
16   VOYNOW, BAYARD, WHYTE  :
     AND COMPANY, LLP, HUGH :
17   WHYTE, RANDALL FRANZEN :
     AND ROBERT SEIBEL,     :
18                          :
          Defendants.       :
19                    - - -
20        FRIDAY, SEPTEMBER 23, 2022
21                    - - -
22
23   (Caption continued on page 2.)
24
25   Job No. CS5366866
```

Page 2

1          UNITED STATES DISTRICT COURT

           EASTER DISTRICT OF NEW YORK

2

3                      -  ~  -

4

           FRIDAY, SEPTEMBER 23, 2022

5

                       -  ~  -

6

7

8          Oral Deposition of JOHN KOUFAKIS, taken at

9   Marshall Dennehey, 2000 Market Street, Suite 2300,

10  Philadelphia, Pennsylvania, commencing at 9:24 a.m.,

11  before Lauren Sweeney, a Court Reporter and Notary

12  Public.

13

                       -  ~  -

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S:
 2           MILMAN LABUDA LAW GROUP, PLLC
             BY:   JAMIE S. FELSEN, ESQUIRE
 3           3000 Marcus Avenue
             Suite 3W8
 4           New Hyde Park, New York 11042
             516-328-8899
 5           jamiefelsen@mllaborlaw.com
             Representing the Plaintiffs
 6
 7           MARSHALL DENNEHEY
             BY:   MAUREEN FITZGERALD, ESQUIRE
 8           620 Freedom Business Center
             Suite 400
 9           King of Prussia, Pennsylvania 19406
             610-354-8270
10           mpfitzgerald@mdwcg.com
             Representing the Defendants
11
12
13
                         - - -
14
15   ALSO PRESENT:
16           RANDALL FRANZEN
17           ROBERT SEIBEL
18           JEREMY KOUFAKIS
19
20                       - - -
21
22
23
24
25
```

Page 4

```
 1                    I N D E X

 2                      - - -

 3  TESTIMONY OF:  JOHN KOUFAKIS              PAGE

 4  By MS. FITZGERALD. . . . . . . . . . . . . . 7

 5

 6                      - - -

 7                    EXHIBITS

 8                      - - -

 9  NUMBER           DESCRIPTION              PAGE

10  J-Koufakis-1     Dealer agreement          15

11  J-Koufakis-2     Staples document          35

12  J-Koufakis-3     Fraudulent charges        58

13  J-Koufakis-4     Checks                    61

14  J-Koufakis-5     Forms for signature       81

15  J-Koufakis-6     2016 tax return           83

16  J-Koufakis-7     Draft letters             91

17  J-Koufakis-8     Engagement letter         97

18  J-Koufakis-9     Tax return               101

19  J-Koufakis-10    Voynow bills             106

20  J-Koufakis-11    E-mails                  137

21  J-Koufakis-12    Dealer bonus program document   144

22  J-Koufakis-13    E-mail                       145

23

24  (Exhibits continued on page 5.)

25
```

Page 5

1                    I N D E X

2                       - - -

3                    EXHIBITS

4                       - - -

5    NUMBER              DESCRIPTION                      PAGE

6    J-Koufakis-14   Responses to Interrogatories      153

7    J-Koufakis-15   Tax plan memos                    166

8    J-Koufakis-16   Checks                            201

9    J-Koufakis-17   E-mail and letter                 224

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1              DEPOSITION SUPPORT INDEX

2    DIRECTIONS TO WITNESS NOT TO ANSWER

3    Page    Line

4     (None)

5

6

7

8    REQUEST FOR PRODUCTION OF DOCUMENTS

9    Page    Line    Description

10   21      8       Original agreement

11

12   STIPULATIONS

13   Page    Line

14    (None)

15

16   QUESTIONS MARKED

17   Page    Line

18    (None)

19

20

21

22

23

24

25

Page 7

1                    - - -

2          JOHN KOUFAKIS, after having

3      been first duly sworn, was examined

4      and testified as follows:

5                    - - -

6  BY MS. FITZGERALD:

7      Q.  Good morning, Mr. Koufakis.  My name's Maureen

8  Fitzgerald, and I represent the Defendants in the lawsuit

9  that's been filed by Star Entities, including your

10 company, Star Nissan.

11          Before we begin today I'm going to go over

12 some instructions, which you may have already not

13 reviewed with your attorney.

14          But you're under oath today.  Do you

15 understand that the oath you just took is the same oath

16 as if you were in front of a judge and jury?

17     A.  I do.

18     Q.  Okay.  We need to get your testimony accurately,

19 so please allow me to finish my question before you

20 answer so that we're not speaking at the same time.

21 Fair?

22     A.  Understood.

23     Q.  If you don't understand my question, please let

24 me know and I'll rephrase it or repeat it, but if you do

25 answer, I'm going to assume that you've understood the

JOHN KOUFAKIS

Page 12

1    employment outside of the family business?

2        A.  That's correct.  I started with my father.  It

3    was in the 1960s, him and I owned.

4        Q.  And how old are you today?

5        A.  Seventy years.

6        Q.  Now, you are the sole owner of Star Nissan, one

7    of the Plaintiffs, correct?

8        A.  Yeah.

9        Q.  And that was formed in 1991?

10       A.  Yes.

11       Q.  And you are the dealer principal for Star

12   Nissan?

13       A.  I am.

14       Q.  And in your role as dealer principal you have

15   signed agreements with --

16       A.  Nissan Corp.

17       Q.  -- Nissan Corporation?

18       A.  I have.

19       Q.  Okay.  When is the last agreement that you've

20   signed?

21       A.  Probably in 1991.  My dealer agreement is

22   perpetual, which is rare these days.  There's very few of

23   us left.

24       Q.  So there have been no written documents that

25   you've signed with Nissan Corporation since 1991 in your

JOHN KOUFAKIS

Page 23

1    me try it again, right.

2                Have you ever seen any documents, are you

3    aware of any documents that support your contention that

4    Voynow was reviewing on a quarterly basis the financial

5    statements that were internally prepared by your company

6    and provided to Nissan Corporation?

7                MR. FELSEN:  Objection.  Asked and

8            answered.

9    BY MS. FITZGERALD:

10       Q.   The answer is?

11       A.   No.

12       Q.   Thank you.

13       A.   I would get my information from Michael, my

14   brother, and -- I'm sorry -- and the office manager who

15   at the time was Vivian.

16       Q.   Okay.  And the monthly financial statements that

17   Star provided to Nissan Corporation were what?  What were

18   they?

19       A.   Statements on the condition of the dealership.

20       Q.   Was it a sheet, an income statement?  Do you

21   know what the statement was called?

22       A.   There is a balance sheet.

23       Q.   Okay.  So you believe a balance sheet was

24   provided monthly.  And what else was provided monthly?

25       A.   Well, it's really a detailed condition of the

JOHN KOUFAKIS

Page 24

1    dealership.

2        Q.  Are you aware -- do you know what the title of

3    the statement was called?  Because different financial

4    statements have different names.

5        A.  It's just called a financial statement, a

6    financial statement.

7        Q.  And as part of your role as the dealer

8    principal, did you review these statements before they

9    were sent off to Nissan Corporation?

10       A.  Uh-hum.

11       Q.  And you did that each month?

12       A.  Yes.

13       Q.  And you reviewed them to ensure that they were

14   complete and accurate to the best of your knowledge?

15       A.  Yeah.

16       Q.  Okay.

17       A.  I did have help from the office manager and my

18   brother who are a little bit more astute in numbers and

19   accounting.  My primary duties were in new and used car

20   sales.  Michael's was accounting, computers.  So he has

21   more detailed information than I do.  I relied on him and

22   my office manager.

23       Q.  You mentioned that you believe that Voynow was

24   there quarterly.

25              Was that your testimony?

JOHN KOUFAKIS

Page 26

1    A.   Yes.

2    Q.   And you're partial owner of Chrysler and

3    Hyundai, correct?

4    A.   Yes.

5    Q.   Okay.  How much of your time do you devote to

6    each of those companies?

7    A.   Well, basically, I go where -- most of my time

8    is at Nissan, but if I'm needed elsewhere we do have many

9    locations.  I make the rounds, service, parts, Hyundai,

10   Subaru, Toyota, Chrysler.  I'm an all-around man.

11   Q.   All right.  So it's a family business.  So I

12   understand from that answer that even though you did not

13   have ownership interest in the other dealerships you

14   would also work or provide services or devote your time

15   to those as well when needed?

16   A.   Yes, yes.

17   Q.   All right.  Can you give me an estimate, though,

18   like in a typical week -- and I'm saying, you know, let's

19   say around 2015, 2017 time frame -- how much of your time

20   were you devoting to Nissan?  Would it be more than 50

21   percent?

22   A.   Yes.

23   Q.   More than 75 percent?

24   A.   I would say two-thirds Nissan and one-third

25   every other dealership.

JOHN KOUFAKIS

Page 27

1    Q.   Okay.  And Vivian Karouzakis was the controller

2  for Nissan, correct?

3    A.   I would call her office manager.

4    Q.   Okay.  But she was the most senior level

5  employee of Star Nissan in terms of accounting matters?

6    A.   Yes.

7    Q.   Okay.  Now, as the owner and dealer principal of

8  Nissan, you are responsible for the overall operations of

9  Star Nissan?

10    A.   I am.

11    Q.   And you are responsible for the supervision of

12  employees that report to you?

13    A.   I am.

14    Q.   And Vivian was one such employee, correct?

15    A.   Yes.

16    Q.   And you are responsible for the implementation

17  of internal controls throughout the dealership?

18    A.   Yes.

19    Q.   And one of your responsibilities as the owner

20  and dealer principal is to ensure that there are

21  procedures in place to prevent theft and fraud, correct?

22    A.   Yes.

23    Q.   And one of your responsibilities as the owner

24  and dealer principal is to ensure that the company was

25  properly insured to present itself against theft or

JOHN KOUFAKIS

Page 28

1  fraud?

2      A.  Yes, to the best of my limited accounting

3  knowledge.

4      Q.  Okay.  So is it your belief that insurance is

5  somehow related to accounting?

6      A.  Well, it would be an expense that would be on

7  the financial statement.

8      Q.  Okay.  Do you have -- you have a home, right?

9  You have a personal home?

10     A.  Yes.

11     Q.  Do you have homeowner's insurance?

12     A.  Yes.

13     Q.  Okay.  Do you have life insurance?

14     A.  No.

15     Q.  All right.  Did you understand -- what's the

16  annual sales of Star Nissan?

17     A.  As a group it's a quarter of a billion.

18  Nissan's is maybe 25 percent of that.

19     Q.  Okay.  Were you aware that prior to 2017, that

20  Star Nissan only had insurance coverage to protect itself

21  against employee theft in the amount of a hundred

22  thousand dollars per year?

23     A.  No.  That would have been Michael's area of

24  requirements, his responsibilities.

25     Q.  So even though you're the owner and dealer

JOHN KOUFAKIS

Page 29

1    principal you have no role in determining whether your

2    company is properly insured?

3                     MR. FELSEN:  Objection.  Asked and

4            answered.

5                     THE WITNESS:  Well, I'm an old school guy.

6            I do a lot of business on handshakes, and I

7            trusted all of my people.  That's evident by the

8            length of time.  I believe we had the Voynow

9            company for 21 years.  Debbie -- I'm sorry,

10           Vivian may have been an employee for 30 some odd

11           years, her sister or someone close to that.

12   BY MS. FITZGERALD:

13       Q.  Okay.  Who was Star Nissan's insurance broker?

14       A.  Oh, God.  We flipped back and forth.  Gundermann

15   was one of them.

16       Q.  Did Gundermann ever tell you or advise you that

17   your company was underinsured?

18       A.  No.  Michael would take care of that.

19       Q.  Were you aware that Gundermann was telling

20   Michael that your company was underinsured?

21                    MR. FELSEN:  Objection.

22                    THE WITNESS:  I didn't read the policy.

23   BY MS. FITZGERALD:

24       Q.  Okay.  So are you telling me that -- were you

25   aware during the period of 2010 through 2017 that your

JOHN KOUFAKIS

Page 38

1  statement from Staples, did you understand that that was

2  a credit card statement that you were paying?

3              MR. FELSEN:  Objection.  Asked and

4       answered.

5              THE WITNESS:  I wasn't sure whether it was

6       -- I didn't think I had a credit card.  I thought

7       they were invoices.

8  BY MS. FITZGERALD:

9       Q.  Okay.  And did you have an obligation as the

10 dealer principal and an authorized check signer to ask

11 questions about anything that you were unsure of before

12 you signed it?

13      A.  Oh, I would definitely ask.

14             MR. FELSEN:  Objection.

15             THE WITNESS:  I would ask Vivian and

16      Carmen, and they said, Boss, everything's in

17      order.

18 BY MS. FITZGERALD:

19      Q.  That's what they told you?

20      A.  Uh-hum.

21      Q.  And other than the statement, Boss, everything's

22 in order, you never required any documentation showing

23 what it was you were signing off on?

24             MR. FELSEN:  Objection.

25      Mischaracterization of the testimony. You can

JOHN KOUFAKIS

Page 47

1    learned that there was an actual physical Staples credit

2    card?

3                    MR. FELSEN:  Objection.  Asked and

4          answered.

5                    THE WITNESS:  Yes.

6    BY MS. FITZGERALD:

7          Q.  Okay.  And how did you learn that?

8          A.  At the same time Michael told me she was

9    charging gift cards through Staples.

10         Q.  Okay.  And have you come to learn who had

11   physical possession of the credit card?

12         A.  I've never seen it.  I would have no idea who

13   has it.

14         Q.  Okay.  Does the credit card exist now?

15         A.  I have no idea.

16         Q.  Did you cancel the credit card with Staples?

17         A.  How would I cancel a credit card that I didn't

18   know exists?

19         Q.  Well, once you learned it exists, did you cancel

20   it?

21         A.  You'd have to ask Michael.

22         Q.  Now, the allegation concerning this Staples

23   credit card scheme is that Ms. Jones allegedly made

24   purchases over a 17-year period for personal use.

25                    You're aware of that?

JOHN KOUFAKIS

Page 48

```
 1      A.  Yes.
 2      Q.  Did you have any role in investigating or
 3  determining what purchases may or not have been
 4  legitimate versus what was personal?
 5      A.  No.
 6              MR. FELSEN:  Objection.  Asked and
 7          answered.
 8  BY MS. FITZGERALD:
 9      Q.  Okay.  Did anybody ever ask you about any
10  specific purchases, whether they were, in fact,
11  legitimate or not?
12      A.  No.
13      Q.  But you will agree that there were legitimate
14  purchases made by Star Nissan using the Staples account?
15      A.  After I was told by Michael.
16      Q.  Okay.  Did you ever review the Complaint that's
17  been filed against Carmen Jones?
18      A.  No.
19      Q.  So your company is suing.  Did you authorize
20  your company to file suit against her?
21      A.  I almost always agree with my brother's
22  judgment.
23      Q.  Okay.  But you are the owner and the only person
24  who can authorize your company to file a lawsuit,
25  correct?
```

JOHN KOUFAKIS

Page 61

1          THE WITNESS:  I wouldn't know.  No, I
2      wouldn't know.  I didn't know Staples had their
3      own credit card.
4              - - -
5          (Exhibit J-Koufakis-4 was
6      marked for identification.)
7              - - -
8  BY MS. FITZGERALD:
9      Q.  I'm showing you a series of checks that we've
10  marked as Exhibit-4, and these checks are all issued by
11  Star Nissan, correct?
12      A.  Yes.
13      Q.  And am I correct that the authorized check
14  signers on behalf of Star Nissan included yourself, your
15  father, your brother Michael, and your brother Steve?
16      A.  In this bunch I count three of my signatures.
17      Q.  Okay.  But my question was, the authorized check
18  signers for Star Nissan would have been yourself, your
19  father, your brother Michael, and your brother Steve?
20      A.  Correct.
21      Q.  Okay.  And you've just gone through this
22  exhibit, and do you agree that all of these checks are
23  signed by authorized check signers?
24      A.  Yes.
25      Q.  Okay.  And do you agree that as authorized check

JOHN KOUFAKIS

Page 62

1    signers of the company you and the other three had a

2    responsibility to make sure that the charges were

3    legitimate expenses of the company before you authorized

4    payment by the company?

5         A.   Well, when I see what happened here, the

6    majority was signed by John, Sr., a 90-year-old man who

7    was taken advantage of.

8              MR. FELSEN:   John, just listen to the

9         question and answer the question that's being

10        asked.

11             MS. FITZGERALD:   Can you read the question

12        back?

13                       - - -

14             (The court reporter reads back

15        the previous question.)

16                       - - -

17             MS. FITZGERALD:   Let me restate the

18        question.

19   BY MS. FITZGERALD:

20        Q.   Do you agree that you and the other three

21   authorized check signers had the responsibility to make

22   sure that the expenses that were presented to you were

23   legitimate expenses of the company?

24        A.   Yes.

25        Q.   And you had the duty to ask questions if you

JOHN KOUFAKIS

Page 63

1   were unsure of any check presented to you before signing

2   it?

3        A.  Well, like I said, I didn't see but four of

4   these checks.

5             MS. FITZGERALD:  Read that question back,

6        please.

7                       -  -  -

8             (The court reporter reads back

9        the previous question.)

10                      -  -  -

11            THE WITNESS:  Yes.

12   BY MS. FITZGERALD:

13       Q.  Prior to mid 2017, did you have any reason to be

14   concerned about your father's ability to fulfill his

15   responsibilities as an authorized check signer for Star

16   Nissan?

17       A.  He had, in my opinion, more than an average

18   mental acuity for a 90-year-old.

19       Q.  So then the answer would be you had no concerns

20   about him exercising his check signing authority?

21       A.  Yes.  If Carmen presented him with a check or

22   Vivian presented him with a check, it was based on trust,

23   and he would sign it.

24       Q.  But he also, as you just testified, had the

25   responsibility to review the check to make sure it was a

JOHN KOUFAKIS

Page 65

1  presently and back then Star Nissan.

2     Q.  Well, why -- I mean, you're the dealer principal

3  and you're the owner.  Why would you not be more involved

4  in signing checks for your own company?

5     A.  Well, I just finished saying that I would sign

6  most of them.

7     Q.  Okay.

8     A.  Now, very often Carmen, when I'm right in the

9  next building, would say we can't find your sons, John,

10 Sr., we can't find them.  And I would be right nextdoor.

11 "Would you please sign this for me?"

12    Q.  And there was no prohibition on them doing that

13 because he was an authorized check signer, correct?

14    A.  He could sign checks.

15    Q.  All right.  And there was no requirement that

16 Star Nissan put in place that there would be two

17 signatures required for any check?

18    A.  No two signatures.

19    Q.  And there's no allegation or contention that any

20 of the checks that were signed were forged signatures,

21 correct?

22    A.  I'm not a signature expert, but I can tell you

23 these are John, Sr.'s, and they all look good.

24    Q.  So looking at the first one, is that Michael?

25    A.  Yes.

JOHN KOUFAKIS

Page 83

1                    - - -

2                 (Exhibit J-Koufakis-6 was

3          marked for identification.)

4                    - - -

5    BY MS. FITZGERALD:

6        Q.   Okay.  I'm showing you what we've marked as

7    Exhibit-6, and this is a copy of the 2016 tax return.

8                 Do you see that?

9        A.   Personal.

10       Q.   No.  It's the corporate tax return for Star

11   Nissan.

12       A.   Oh, yeah, I can tell by the figure.  Yes.

13       Q.   Okay.  So, and if you look at the first page of

14   the exhibit, there's a cover letter, and it says, "Dear

15   Client, enclosed are the returns."

16                 And I am correct that Voynow prepared both

17   the state and federal returns for Star Nissan?

18       A.   Yes.

19       Q.   Okay.  And if you look at the first page, sir.

20   So if you look at the second paragraph of this letter it

21   says, "these returns were prepared from information

22   provided by you or your representative.  The preparation

23   of tax returns does not include the independent

24   verification of information used."

25                 Do you see that?

JOHN KOUFAKIS

Page 84

1      A.   Yes.

2      Q.   So does this refresh your recollection or

3   indicate to you that when you signed these returns on

4   behalf of Star Nissan you did so knowing that Voynow was

5   not obligated or undertaking to verify the information on

6   the returns?

7                MR. FELSEN:   Objection.

8                THE WITNESS:   If the accountants put --

9           delivered this to me and said sign here, I would

10          sign there.

11  BY MS. FITZGERALD:

12     Q.   Did you understand as the person signing the tax

13  return that you had certain obligations as far as making

14  sure that the information was true and correct and

15  accurate?

16               MR. FELSEN:   Objection.

17               THE WITNESS:   No.

18  BY MS. FITZGERALD:

19     Q.   No?   Did you review the tax returns before you

20  filed them?

21               MR. FELSEN:   Objection.

22          Mischaracterization of testimony and of the

23          document.

24  BY MS. FITZGERALD:

25     Q.   So the question was did you review the tax

JOHN KOUFAKIS

Page 89

1          speculation.

2                    THE WITNESS:  I don't want to assume, so

3          --

4    BY MS. FITZGERALD:

5          Q.  You said that you don't recall ever receiving

6    any documents from Voynow in terms of services they

7    provided to you in a personal capacity; is that correct?

8          A.  I don't recall.  There may have been.

9          Q.  Okay.  Did they ever provide you with an

10   engagement letter for preparation of your personal tax

11   return?

12                   MR. FELSEN:  Objection.

13                   THE WITNESS:  I don't remember signing any

14         such.

15   BY MS. FITZGERALD:

16         Q.  Did they ever provide you with an engagement

17   letter whether you signed it or not?

18         A.  I'm uncertain.

19         Q.  Okay.  Do you know, have you ever heard the term

20   "compilation"?  Do you know what that is?

21         A.  Could you spell it?

22         Q.  C-O-M-P-I-L-A-T-I-O-N.

23         A.  I don't know the meaning of that.

24         Q.  Have you ever heard the term "review" in the

25   context of an accounting service?

JOHN KOUFAKIS

Page 99

1    prepare Star Nissan's 2008 tax return?

2        A.   Well, I'm not one hundred percent sure.

3        Q.   Okay.

4        A.   They were with us for a long period of time.

5    But if I guess, that's incorrect to do.

6        Q.   So you said that when you would get something

7    like Exhibit-8 you would forward it on to Michael.

8        A.   Absolutely.

9        Q.   Okay.  Do you recall a point in time where you

10   told Voynow or gave Voynow the instruction as far as

11   accounting matters, deal with Michael?

12       A.   Yes.  He's a lot more qualified than I am.

13       Q.   And you would have passed that directive --

14       A.   In accounting matters and legal matters and in

15   computers.  I'm an old school guy who sells cars.

16       Q.   All right.  And you would have passed on that

17   directive then to Voynow, deal with Michael?

18       A.   Yes.

19       Q.   All right.  Do you know what, if anything,

20   Michael would do with any documents or correspondence you

21   forwarded on to him?

22       A.   He has tendencies to save everything.

23       Q.   Okay.  Would you ever give any correspondence or

24   documents or communications that you received from Voynow

25   to Vivian or anybody in the accounting department?

JOHN KOUFAKIS

Page 116

1   to follow up with her to make sure that outstanding loans

2   were, in fact, repaid?

3        A.   The payment schedule was usually 50 or $100.

4   No, I wouldn't check up on that.

5        Q.   Would she be the person who set up the payment

6   schedules?

7        A.   Yes.

8        Q.   And were the loans --

9        A.   But I would ask them how much do you want me to

10   take out of your pay, $50?

11        Q.   So is it your understanding that employee loans

12   were repaid through payroll deductions?

13        A.   Yes.

14        Q.   And was that the case for Star Nissan and for

15   all the other dealerships?

16        A.   It was for Star Nissan.  I'm not quite sure how

17   Michael and Steve handled that.

18        Q.   Okay.  I'm going to show you a document.  It's

19   been previously marked at the other depositions, at both

20   your brother Michael's deposition as Exhibit-8 and your

21   brother Steven's deposition as Exhibit-3.

22             MS. FITZGERALD:  I'm not going to mark

23        them.  I'm just going to show him.

24             THE WITNESS:  Okay.

25   BY MS. FITZGERALD:

JOHN KOUFAKIS

Page 117

1      Q.   So are you aware -- you can actually put that

2   down for a second -- but are you aware that there's --

3   one of the alleged schemes involved checks being signed

4   to pay Vivian's personal creditors?

5      A.   Around the time she was -- yes, around the time

6   she was fired.

7      Q.   Okay.  And these checks were signed on the

8   investor's back account and maintained by Star Nissan.

9              Are you aware of that?

10     A.   All of them?  I don't know.

11     Q.   Okay.  If you want to turn the pages in that

12   exhibit and let me know --

13     A.   Okay.  They say Star Nissan.  Yes, Star Nissan.

14     Q.   Okay.  Do you know if you signed any of the

15   checks involving payment to Vivian's personal creditors?

16     A.   I'll let you know in a minute.  I do not see my

17   signature on any.

18     Q.   But the signatures that you did see, those were

19   all signatures of authorized check signers?

20     A.   Yes.

21     Q.   Okay.  And the payees on the check are

22   legitimate payees, correct?

23     A.   I would call them illegitimate.

24     Q.   Okay.  So let me ask you this.

25              So you're looking at a check payable to

JOHN KOUFAKIS

Page 123

1      A.  No.

2      Q.  Did Vivian ever work for you or a dealership

3   known as Island Chrysler?

4      A.  Yes.

5      Q.  Okay.  Did you ever tell anybody that Vivian had

6   stolen from Island Chrysler in the past?

7      A.  No.

8      Q.  Did you ever sign blank checks?

9      A.  Only to the Department of Motor Vehicle.  The

10  amount would be blank, but it would say New York State

11  Department of Motor Vehicle because every car's annual

12  registration is different.

13     Q.  Are you aware of whether any of the other

14  authorized check signers had signed blank checks other

15  than DMV checks?

16     A.  Other than DMV checks, no.

17     Q.  Did you ever sign checks without backup

18  documentation?

19     A.  Yes.

20     Q.  Okay.  Other than DMV checks?

21     A.  If advised to do so, yes.

22     Q.  Okay.  And were you aware of whether your

23  brothers and father ever signed checks without backup

24  documentation?

25     A.  I am now.

JOHN KOUFAKIS

Page 187

1    Q.   And who set that budget?  Did you?

2    A.   Uh-hum.

3    Q.   Yes?

4    A.   Yes.

5    Q.   Okay.  And you conveyed that budget verbally to

6    Gus?

7    A.   Yes.

8    Q.   And was it up to Gus to decide how that money

9    was going to be spent?

10   A.   Yes.

11   Q.   Okay.  Was Gus authorized to enter into any

12   contract for services with an outside advertiser on

13   behalf of Star Nissan?

14   A.   I do not enter into any written contracts with

15   anyone.  If you don't trust me, let's not do business.

16   Those are my answers.

17   Q.   Is that view held by your brothers and your

18   father as well?

19             MR. FELSEN:  Objection.

20             THE WITNESS:  I should hope so, but I

21        couldn't guarantee it.  My answer is probably.

22   BY MS. FITZGERALD:

23   Q.   All right.  So when Gus -- did Star Nissan use

24   an outside person for advertising?

25   A.   There was -- well, in most years there was an

JOHN KOUFAKIS

Page 190

1    you get to us, anything like that?

2        A.   They would have a flier in their hand, the

3    letter.

4        Q.   Okay.  And was there anything that was recorded

5    or like any report or anything that you could look at as

6    the owner of the dealership to say, you know, this

7    advertiser is working, this method is working, you know,

8    versus what's not?

9        A.   No.

10        Q.   Well, how did you know what to do in terms of

11    your advertising strategy?

12        A.   Gus made that decision.

13        Q.   Okay.  And did he ever discuss it with you?

14        A.   I trusted him.  He knows what he's doing, and he

15    wouldn't spend the money unnecessarily.

16        Q.   Okay.  And you said that when Doug Filardo was

17    -- I think you said at one point he was working for Star

18    Nissan, and then he shifted to Star Subaru.

19        A.   Yeah.

20        Q.   So was he an actual employee of Star Nissan and

21    then became an employee of Star Subaru?

22        A.   Yeah.

23        Q.   Okay.  When did that change take place, do you

24    know?

25        A.   I can't remember.

JOHN KOUFAKIS

Page 191

1    Q.  Okay.  Was it a lateral move for him or was it a

2  promotion?

3                 MR. FELSEN:  Objection.  Asked and

4           answered.  You can answer.

5                 THE WITNESS:  He went from salesperson and

6           was given the opportunity by Gus to be sales

7           manager.

8  BY MS. FITZGERALD:

9    Q.  For Nissan or Subaru?

10   A.  Subaru.  He recommended him to Michael.

11   Q.  And Michael approved the transfer.

12   A.  Yeah.

13   Q.  All right.  Do you have any like approximate

14  year when that occurred?

15   A.  I don't want to guess.

16   Q.  Okay.  When he was a Star Nissan employee, did

17  he ever -- you had referenced earlier that you said that

18  -- well, actually, you said that he did not provide any

19  advertising services; that was all done through Gus,

20  right?

21   A.  Yes.

22   Q.  Okay.

23   A.  Now, Doug kept asking me to do advertising.

24   Q.  When you say he kept asking you to do

25  advertising, does that mean --

JOHN KOUFAKIS

Page 192

1      A.   It doesn't cost a salesperson anything.  He

2   would love it -- a salesperson would love it if I spent a

3   hundred thousand in advertising.  It would affect the

4   bottom line tremendously but put money in their pocket.

5      Q.   Okay.  Did he ever ask you while he was employed

6   by Nissan about using a different third party to do the

7   advertising?

8      A.   Not that I recall.

9      Q.   Okay.  Did you have any involvement or input as

10  far as what Star Subaru did for purposes of outside

11  advertisers?

12     A.   That would be Michael.

13     Q.   So Michael would be responsible for deciding

14  what third party Star Subaru used for advertising

15  services?

16     A.   Yes.

17     Q.   And Michael would be responsible for

18  investigating or looking into the background and

19  qualifications of any third party Star Subaru decided to

20  go with?

21     A.   Yes.

22     Q.   Okay.  Did you know that at some point Star

23  Subaru began using a company called Motor Sports

24  Advertising?

25     A.   No.  I hadn't heard of them.

JOHN KOUFAKIS

Page 193

1       Q.   Okay.   When Filardo was promoted to the sales

2   manager position at Subaru, did he then become in charge

3   of handling outside advertising?

4       A.   You'd have to ask Michael.

5       Q.   Okay.   Who did Filardo replace at Subaru, Star

6   Subaru?

7       A.   Can't recall.

8       Q.   Do you know who he reported to in his role at

9   Star Subaru?

10       A.   Michael.

11       Q.   Now, you said that at some point -- your

12   testimony was after signing two checks from Filardo you

13   asked him to discontinue.   That's what you said before --

14       A.   Discontinue asking me to do print.

15       Q.   I'm sorry, explain your answer. I don't

16   understand.

17       A.   He was trying to convince me to advertise more

18   so that more people would come into the showroom and

19   spend a lot -- well, to spend more money advertising.

20   All the salespeople want maximum in advertising, and they

21   have no regard for its cost.

22       Q.   So your testimony, though, was -- and I wrote it

23   down -- after signing two checks you asked him to

24   discontinue.

25               So what checks were you signing?

JOHN KOUFAKIS

Page 194

1      A.   I'd have to look them up.

2      Q.   Okay.  Were you signing checks that were payable

3  to Motor Sports?

4      A.   Motor Sports -- I hadn't -- I don't know who

5  they were.

6      Q.   Okay.  Did you ever look into or investigate who

7  they were before signing checks?

8      A.   No.

9      Q.   You said that you asked Mr. Filardo to

10 discontinue.  Did that mean --

11     A.   Discontinue asking me.

12     Q.   Okay.  And was that while he was an employee of

13 Star Nissan or Star Subaru?

14     A.   Nissan.

15     Q.   Okay.  And when you had the discussion with him

16 about signing checks, was that while he was an employee

17 of Star Subaru?

18     A.   I'm not sure.

19     Q.   Okay.  You said that Nissan's advertising budget

20 was roughly 40,000 a month.

21     A.   Yes.

22     Q.   Okay.  Is there like a rule of thumb, you know,

23 based on whatever your annual sales are, that this is

24 what you spend on advertising?  Where does that come

25 from?

JOHN KOUFAKIS

Page 203

1    Q.  Okay.  Well, if you look at the check it's made
2    payable to Motor Sports Advertising in Sarasota, Florida.
3    A.  These look like mistakes to me.
4    Q.  What do you mean?
5    A.  Errors.
6    Q.  And what's the error?
7    A.  I don't know who Motor Sports is.
8    Q.  But this is your signature, correct?
9    A.  Yes.
10   Q.  Okay.  So did you ask anybody about Motor Sports
11   before you signed these checks?
12   A.  I may have signed them in haste.
13   Q.  So you don't recall asking anybody about who
14   Motor Sports Advertising was?
15   A.  I don't know.
·16   Q.  But you don't recall asking?
17   A.  No.
18   Q.  You know, looking at all of the checks that are
19   listed in Exhibit-16, do you agree that these are signed
20   by authorized check signers?
21   A.  By my father.  I see one by Michael.
22   Q.  And both your father and Michael were authorized
23   check signers.
24   A.  Yes.
25   Q.  And do you know how these transactions were