EXHIBIT 4

Page 1

1
2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    1:18-CV-05775-ERK-CLP
     -----------------------------------------x
4
     STAR AUTO SALES OF BAYSIDE, INC.
5    (d/b/a STAR TOYOTA OF BAYSIDE), STAR
     AUTO SALES OF QUEENS, LLC (d/b/a STAR
6    SUBARU), STAR HYUNDAI LLC (d/b/a
     STAR HYUNDAI), STAR NISSAN, INC. (d/b/a
7    STAR NISSAN), METRO CHRYSLER
     PLYMOUTH INC. (d/b/a STAR CHRYSLER
8    JEEP DODGE), STAR AUTO SALES OF
     QUEENS COUNTY LLC (d/b/a STAR FIAT)
9    And STAR AUTO SALES OF QUEENS
     VILLAGE LLC (d/b/a STAR MITSUBISHI),
10
                 Plaintiffs,
11
         v.
12
     VOYNOW, BAYARD, WHYTE AND COMPANY, LLP,
13   HUGH WHYTE, RANDALL FRANZEN AND ROBERT
     SEIBEL.
14
                 Defendants.
15   -----------------------------------------x
16                     2000 Market Street
                       Philadelphia, Pennsylvania
17
                       September 13, 2022
18                     10:42 a.m.
19
20           DEPOSITION of STEVEN KOUFAKIS, a
21   Plaintiff, held at the above-entitled time and
22   place, taken before Carolyn Crescio, a
23   Professional Shorthand Reporter and Notary
24   Public of the State of Pennsylvania.
25                   *      *      *

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
      MILMAN LABUDA LAW GROUP, PLLC
 4    Attorneys for Plaintiffs
          3000 Marcus Avenue
 5        Suite 3W8
          Lake Success, New York 11042
 6    BY: JAMIE FELSEN, ESQ.
 7
 8
      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
 9    Attorneys for Defendants
          620 Freedom Business Center
10        Suite 300
          King of Prussia, Pennsylvania 19406
11    BY: MAUREEN FITZGERALD, ESQ.
12
13    ALSO PRESENT:
      Jeremy M. Koufakis, Esq.
14    Hugh Whyte
      Randall Franzen
15    Robert Seibel
      Steven Rambam (via phone)
16
17
18
19
20
21
22
23
24
25    Job No. CS5366859
```

Page 3

```
1                         S. KOUFAKIS
2      S T E V E N   K O U F A K I S , the witness herein,
3      after having been first duly sworn by a Notary
4      Public of the State of Pennsylvania, was examined
5      and testified as follows:
6      BY THE COURT REPORTER:
7           Q.    Please state your name for the
8      record.
9           A.    Steven Koufakis.
10     EXAMINATION
11     BY MS. FITZGERALD:
12          Q.    Good morning, Mr. Koufakis.  My name
13     is Maureen Fitzgerald, and I represent the
14     defendants in a lawsuit that's been filed by the
15     Star entities.
16          Have you ever had your deposition taken
17     before?
18          A.    Yes.
19          Q.    When was that?
20          A.    Many years ago.
21          Q.    In what connection?  What context?
22          A.    It was a thing when my mom passed
23     away.
24          Q.    An estate matter?
25          A.    I'm sorry?
```

```
1                    S. KOUFAKIS
2   accounting.
3        Q.    That was not my question.  My
4   question was:  Should management or ownership
5   have caught some of the schemes that allegedly
6   occurred?
7        A.    I don't know.
8        Q.    You said there were quarterly
9   meetings.  On what basis do you say that?
10            MR. FELSEN:  Objection.
11       A.    Physically seeing them at the
12  dealership.
13       Q.    And is it your testimony that you
14  physically saw Voynow at the dealership four
15  times -- strike that.
16       You physically saw Voynow at the dealership
17  each quarter of every year?
18       A.    No, not each quarter.
19       Q.    How many times do you think in the
20  course of a year, how many quarters do you think
21  you saw Voynow at the dealership?
22       A.    At least half.  Twice.
23       Q.    Twice a year.  Are you able to
24  recall specifically which quarters?
25       A.    No.
```

1                    S. KOUFAKIS

2        Q.    Are you able to say whether it was,

3    you know, January or June?

4        A.    Well, definitely at the end of the

5    year when they would do the year-ends.

6        Q.    So would that be in December or

7    January, when you say "year-ends"?

8        What do you mean?

9        A.    Yes.

10       Q.    Around the December, January time

11   frame?

12       A.    Yes.

13       Q.    And when was the other time you

14   recall seeing Voynow at the dealership?

15       A.    They were different times.  I could

16   not tell you exactly when.

17       Q.    Okay.  And is it your testimony that

18   you believe you were always present when Voynow

19   was at the dealership?

20            MR. FELSEN:  Objection.

21       A.    No.

22       Q.    Can you approximate for me how many

23   times you believe you were present when Voynow

24   would be at the dealership?

25            MR. FELSEN:  Objection.  Asked

Page 11

```
 1                    S. KOUFAKIS
 2            and answered.
 3       A.    I would being guessing.
 4       Q.    Are you aware of situations or
 5  occurrences when Voynow was at the dealership,
 6  and you were not there?
 7       A.    Yes.
 8       Q.    Did you review the complaint in this
 9  lawsuit before it was filed?
10       A.    My brother Mike was handling that.
11       Q.    So my question was:  Did you review
12  the complaint before it was filed?
13       A.    No.
14       Q.    Have you ever reviewed it?
15       A.    No.
16       Q.    I want to ask you about the period,
17  and I'm focusing generally on 2010 through the
18  current date.  Am I correct that you do not have
19  any ownership role in the Toyota Nissan or
20  Subaru franchises during that period of time?
21       A.    That is correct.
22       Q.    And you don't have any management
23  responsibilities for those franchises during
24  that same time frame?
25                 MR. FELSEN:  Objection.
```

Page 12

1                    S. KOUFAKIS

2        A.     That is correct.

3        Q.     But you are involved, during that

4    time period, in the Metro Chrysler Plymouth

5    franchise, correct?

6        A.     Yes.

7        Q.     And am I correct that you're a

8    50 percent owner, along with your brother John?

9        A.     Yes.

10       Q.     And you're the dealer principal?

11       A.     Yes.

12       Q.     In the capacity as a dealer

13   principal, did you sign any franchise agreement

14   or contract with Chrysler?

15       A.     Yes.

16       Q.     And was that agreement something

17   that was signed when the franchise was

18   established, or is it a document that has been

19   renewed periodically?

20       A.     No.  It's perpetual.  It was signed

21   once many years ago.

22       Q.     So was it signed when the Chrysler

23   franchise was formed in 1990?

24       A.     Yes.

25       Q.     And I understand it then merged with

Page 13

```
 1                    S. KOUFAKIS
 2   Metro Dodge in 1995; is that accurate?
 3        A.    Yes.
 4        Q.    And was a new agreement signed at
 5   that time?
 6        A.    No.
 7        Q.    So the only agreement that you
 8   signed would have been the dealer-principal
 9   agreement in 1990?
10        A.    Yes.
11        Q.    Is there somebody that holds the
12   position of executive manager for Chrysler?
13        A.    No.
14        Q.    Do you fulfill that function, as
15   well as dealer principal?
16        A.    Yes.
17        Q.    Are you also involved in the
18   management -- strike that.
19        Did you hold ownership interest in the
20   Hyundai franchise?
21        A.    Yes.
22        Q.    And you're a one-third owner?
23        A.    Yes.
24        Q.    And that was formed in 2008?
25        A.    I believe so.
```

Page 14

1                    S. KOUFAKIS

2        Q.    And you're the dealer principal for

3   the Hyundai franchise?

4        A.    Yes.

5        Q.    Same question again.  Did you sign a

6   single franchise agreement with Hyundai, or have

7   you signed subsequent ones over the years?

8        A.    Subsequent ones.

9        Q.    How frequently have you signed

10  dealer-principal agreements with Hyundai?

11       A.    I think it's every five years.

12       Q.    Is there an executive manager for

13  Hyundai?

14       A.    No.

15       Q.    So is it fair to say you fulfill

16  that role, as well as the dealer principal for

17  Hyundai?

18       A.    Yes.

19       Q.    Let me ask you this:  All of these

20  Star entities, essentially it's a family

21  business, correct?

22       A.    Yes.

23       Q.    And it was, if I understand,

24  established by your father and built by

25  your father over the years?

Page 15

1                   S. KOUFAKIS

2        A.    Well, he's the founder.  We all

3   built it over the years.

4        Q.    How is it divided?  I mean, is it

5   divided that each of the brothers get basically

6   one-third of the total value, or was there a

7   decision made that one brother is going to get a

8   bigger franchise versus another?  Can you

9   explain that to me?

10                  MR. FELSEN:  Objection.

11       A.    It just happened the way it happened

12   here, the way it's stated.

13       Q.    But was there an intent that it

14   would be owned equally?

15       A.    It was not -- it was intended that

16   way, yes, but it did not happen that way.

17       Q.    And do you know why it deviated from

18   the original intent?

19       A.    I have to ask my dad.

20       Q.    Okay.  Who's deceased?

21   You have to say "yes."

22       A.    Yes.

23       Q.    Let me ask you about your father.

24   So as I understand, your father was actively

25   engaged in the business, you know, up until

Page 19

1                    S. KOUFAKIS
2    broken out?
3          A.    It was 60, me.  40, Mr. Raptis.
4    Sixty percent, and he was 40 percent.
5          Q.    So in the course of a typical week,
6    how much time would you apportion between being
7    physically at the Chrysler store versus the
8    Hyundai store versus the body shop?
9          A.    Wherever needed.
10         Q.    Did you have an office in each
11   location?
12         A.    No.
13         Q.    Where did you have an office?
14         A.    At the Chrysler store.
15         Q.    How much time in a typical week
16   would you spend at the sort of accounting
17   location for the dealerships?  I understand
18   there was one central location for all of the
19   dealerships; is that accurate?
20         A.    That is correct.
21              MR. FELSEN:  Objection.
22         Q.    And in the course of a typical week,
23   how much time would you spend at that location?
24              MR. FELSEN:  Objection.
25         A.    Minimal.

Page 21

S. KOUFAKIS

1
2     think it was necessary.

3          Q.    So were you aware that your

4     employees were using their personal emails,

5     personal email accounts to conduct company

6     business on behalf of Chrysler?

7          A.    I was not aware, but not surprised.

8          Q.    So you say you were not aware.  So

9     when you say only managers had corporate email,

10    who would be the managers that would have it?

11         A.    Sales, service.  I guess, parts.

12         Q.    And what about the office manager,

13    the controller?

14         A.    We didn't really have a controller.

15    We had office managers.

16         Q.    And Debbie Theocharis was the office

17    manager for Chrysler?

18         A.    Yes.

19         Q.    So were you aware she did not have a

20    corporate email?

21         A.    Yes, I was aware she did not have.

22         Q.    So you knew, to the extent she was

23    conducting business on behalf of the Chrysler

24    franchise, she was using her personal email?

25              MR. FELSEN:  Objection.

Page 38

1                    S. KOUFAKIS

2        A.    There was an advertising scheme with

3   Subaru.

4        Q.    And who was involved with that

5   scheme?

6        A.    Assuming Vivian and one of the

7   managers, sales managers.

8        Q.    You said you're assuming Vivian and

9   one of the sales managers?

10       A.    Yeah. I think they did together.

11       Q.    And on what basis do you say that?

12       A.    The sales manager gave false bills,

13  and she cut the checks for them without looking

14  into it.

15       Q.    Who signed the checks?

16       A.    Not sure.

17       Q.    Did you ever look into that?

18       A.    Like, who signed checks?

19       Q.    Well --

20       A.    We all signed checks.

21       Q.    -- are you alleging that somebody

22  who was not an authorized check signer, signed

23  these checks relating to advertising?

24       A.    No.

25       Q.    Did you ever find out who signed the

Page 59

S. KOUFAKIS

1

2    only indicted for $489,000?

3          A.    At the time?  When was she indicted?

4          Q.    2017 or '18.  I'm not sure.

5          A.    At that time, that's probably all we

6    found.

7          Q.    So is it your testimony that --

8    well, let me ask you this:  Were you involved in

9    any of the meetings or communications with

10   either the police or district attorney?

11         A.    No.

12         Q.    Were you aware that the Star

13   dealerships have made efforts and attempts to

14   have other employees criminally charged?

15         A.    It's ongoing.

16         Q.    Okay.  And despite the fact that we

17   are now in 2022, and this came to the surface in

18   2016, am I correct that the only employee who's

19   been criminally charged has been Vivian?

20         A.    So far.

21         Q.    Okay.  Do you have reason to believe

22   any other employee is going to be criminally

23   charged?

24               MR. FELSEN:  Objection. Calls for

25               speculation?

Page 63

                              S. KOUFAKIS

1

2          Q.     What is your understanding of

3   management's role or responsibility in

4   preventing fraud?

5          A.     To check things to the best of their

6   ability, to rely on people to do their job

7   properly, to get correct information from

8   management.

9          Q.     In terms of checking things, does

10  management have the responsibility to check

11  things before signing checks?

12         A.     Yes.

13         Q.     And you were one of four authorized

14  check signers for the dealerships, correct?

15         A.     Yes.

16         Q.     So as an authorized check signer,

17  did you have the responsibility to make sure

18  that a check presented to you for signature, was

19  for a legitimate expense of the business?

20         A.     Yes.

21         Q.     Were you responsible, as a check

22  signer, to make sure that there was proper

23  backup documentation before signing a check?

24         A.     Yes.

25         Q.     And were you required as a check

Page 64

                           S. KOUFAKIS

1

2    signer to review that documentation before

3    signing the check?

4         A.    Usually that's what happens.

5         Q.    And were there ever any occasions in

6    your capacity as an authorized check signer of

7    the business, where you did not do that?

8         A.    Yes, on occasion.

9         Q.    And how often on occasion was that

10   where you did not review backup documentation,

11   or make sure that a check was for legitimate

12   expenses?

13        A.    There were times we could literally

14   sign a hundred checks in a day.  And while

15   you're reviewing things with backup, assuming

16   the backup is accurate, they would come over and

17   say, Just here sign this, one more.  And it

18   would be without backup.  And I would say, What

19   is this for?  And they would give an answer.

20        And because the cell phone is ringing,

21   there's three people asking you to do something,

22   sometimes we would not, on occasion, would not

23   check, and trust the employee.

24        Q.    So you would not be paying attention

25   to what it was you were signing.  Fair?

Page 65

S. KOUFAKIS

1

2          MR. FELSEN:  Objection.

3      A.    No, I didn't say that.

4      Q.    So you would sign checks without the

5  documentation backing it up?

6          MR. FELSEN:  Objection.

7      A.    I signed the check, asked, What is

8  it for?  They would tell me.  It sounded

9  feasible.  Yes.

10      Q.    And you would sign it without the

11  backup documentation, that you could --

12      A.    They said they would bring it later.

13      Q.    Did that, in fact, happen?  Did they

14  bring it later after you had signed a check?

15      A.    Sometimes I would forget.  They

16  would not offer.

17      Q.    Did you ever sign blank checks?

18      A.    No.

19      Q.    Did you ever --

20      A.    Yes.  In the motor vehicle account;

21  the only account that that would happen.

22      Q.    When you say the motor vehicle

23  accounts, you're talking about the DMV checks?

24      A.    Correct.

25      Q.    Would there ever be occasion that

1                    S. KOUFAKIS

2    you would sign blank checks while sitting at a

3    desk next to Debbie?

4         A.    No.

5         Q.    If current or former employees were

6    to say that you did, in fact, sign blank checks,

7    would that be accurate?

8              MR. FELSEN:  Objection.

9         A.    Unless it was a motor vehicle, the

10   answer would be no.

11             MR. FELSEN:  Want to take a

12             break?

13             THE WITNESS:  Yeah.

14             (A break was taken.)

15        Q.    As an owner with check-signing

16   authority, did you have the responsibility to

17   ask questions about any checks that raised a

18   concern, before signing?

19        A.    Yes.

20        Q.    As executive manager and owner, did

21   you have responsibility to ensure that there

22   were proper procedures in place to prevent

23   fraud?

24        A.    That's very difficult.

25        Q.    Why is it difficult?

Page 69

1                          S. KOUFAKIS

2          A.    They were all in the main office.

3          Q.    So you could have looked at any of

4    them?

5          A.    I could have, yes.

6          Q.    Did you have a habit or practice of

7    reviewing those monthly bank statements?

8          A.    No.

9          Q.    Did you believe you had any

10   responsibility to review the monthly bank

11   statements?

12         A.    I felt between my brother, that was

13   his responsibility, and the managers, that it

14   was being done properly.

15         Q.    So when you say "brother," you're

16   referring to it being Michael's responsibility

17   to review the monthly bank statements?

18         A.    Yes.

19         Q.    Did ownership have any

20   responsibility for safeguarding the assets of

21   the business?

22         A.    I don't understand.

23         Q.    So you do know what an asset is?

24         A.    Yes.

25         Q.    If you look at a balance sheet, you

Page 71

S. KOUFAKIS

1

2      Q.    Checking to see if the cash was

3  correct?

4      A.    Yes.

5      Q.    And what would you do to check that?

6      A.    I would -- I'd be checking the

7  monthly financial statements for the OEMs.

8      Q.    OEM?

9      A.    OEM are the manufacturers.

10     Q.    Would that be for all of the

11  dealerships?

12     A.    I would not do that on a regular

13  basis.

14     Q.    Would you be checking the monthly

15  financial statements for all of the dealerships

16  or just Chrysler and Hyundai?

17     A.    I would look at all of them.

18     Q.    And who prepared those monthly

19  financial statements?

20     A.    The office managers.

21     Q.    To your knowledge, did any of the

22  dealerships ever pay contractors or vendors in

23  cash?

24     A.    Not to my knowledge.

25     Q.    Did you ever pay any contractor or

Page 90

S. KOUFAKIS

1
2   manager, or did she work her way up?

3       A.     She worked her way up.

4       Q.     Did you have a close relationship
5   with her?

6       A.     Yes.

7       Q.     So what is your best recollection as
8   far as the amount of any loan that was extended
9   by Chrysler to Debbie, during 2012, through her
10  termination in 2017?

11      A.     I could not tell you, off the top of
12  my head.

13      Q.     When you agreed to give her a loan,
14  what, if anything, did you do to document that?

15      A.     There was nothing written.

16      Q.     On the occasion where you made her a
17  loan, again this time period, 2012 to 2017, do
18  you recall if you had to inform your brothers?

19      A.     I'm assuming I did.

20      Q.     Did you have to get their approval,
21  or did you tell them after the fact?

22      A.     I think after the fact.

23      Q.     Why was there not anything written
24  down?

25      A.     We trusted her explicitly.

Page 156

S. KOUFAKIS

2  compared to what Debbie or Vivian was making?

3       A.    I don't remember, honestly.

4       Q.    You had testified before that you

5  remember getting reports periodically from

6  Voynow, and that you said you would get rid of

7  them at the end of the year.  Do you recall that

8  testimony?

9       A.    Yes.

10       Q.    Okay.  Did you ever receive

11  -- strike that.

12       Do you know if any of your brothers ever

13  received reports from Voynow?

14       A.    I think so, yes.

15       Q.    Was there a, for lack of a -- a

16  Voynow file kept in the office?

17       A.    There might have been, but not that

18  I know of.

19       Q.    So is it fair to say, whatever you

20  may have received you never then like forwarded

21  it to filing, for somebody to put in a Voynow

22  file?

23       A.    Some of them, I kept in my office,

24  and after a certain amount of time, we got rid

25  of it.

Page 159

1                    S. KOUFAKIS

2       you received from Voynow, that you tossed end of

3       the year?

4                    MR. FELSEN:  Objection.

5           A.    No.

6           Q.    Why do you say that?

7                    MR. FELSEN:  Objection.

8           A.    First of all, it's not signed.

9       Second of all, how did they send it?  Did they

10      send it certified mail?  This could have been

11      printed at any time.  Is there a certified

12      receipt for this?

13          Q.    So I'm not here to answer questions.

14      That can be a question your lawyer can ask.

15          Did you ever receive any engagement letter

16      from Voynow?

17          A.    No.

18          Q.    Do you know what an engagement

19      letter is?

20          A.    Yes.  What the scope of work is

21      supposed to be.

22          Q.    For the tax returns that you signed,

23      do you know if the corporate tax returns, do you

24      know if you or somebody on your behalf filed

25      those?  Do you know how they got filed?

Page 173

S. KOUFAKIS

1   that's not Bates stamped.

2

3          If you can turn to -- this is the one we

4   previously marked as Michael Koufakis 8.  if you

5   can turn to the sixth page of the exhibit.

6          A.    Okay.  Right there.

7          Q.    So this is the check dated

8   November 23rd, 2015, payable to Capital One.  Is

9   that your signature?

10         A.    Looks like it.

11         Q.    I'm going to ask you about all of

12  these.  Is it fair to say you don't have a

13  recollection as to what, if anything, was

14  provided to you as far as backup, prior to

15  signing these checks?

16         A.    Seven years ago?  Really?

17         Q.    So you don't?

18         A.    No.

19         Q.    All right.  The next page of the

20  exhibit, the check for 15,200, is that your

21  signature?

22         A.    Looks like it, yes.

23         Q.    Then nine pages later, there's a

24  check 8664 -- right there.  You have it.  That's

25  a check for 15,500 again, dated May 26, 2015.

Page 174

1                    S. KOUFAKIS
2        Is that your signature?
3        A.    It looks like it.
4        Q.    Eight pages later in this exhibit,
5   that's check Number 90599.  The check is for
6   $16,550, dated April 1st, 2016.  Is that your
7   signature?
8        A.    Again, it looks like it.
9        Q.    Seven pages later, the check
10  numbered 86642, dated May 26th, 2015, in the
11  amount of $15,644.95, is that your signature?
12       A.    It looks like it.
13       Q.    Three pages later, check 89072,
14  dated 11/23/15 for $8800, is that your
15  signature?
16       A.    Looks like it.
17       Q.    Then six pages later, check 116188,
18  dated November 23rd, 2015, in the amount of
19  $9,147.70 payable directly to Vivian.
20       Is that your signature?
21       A.    Looks like it.
22       Q.    So for what reason -- let me ask
23  you -- would be signing a check, that's not a
24  payroll check, payable to Vivian, on behalf of
25  Star Toyota?

Page 179

```
 1                    S. KOUFAKIS
 2    invoices at any point?
 3         A.    No.
 4         Q.    Did you ever sign checks paying the
 5    Staples invoices?
 6         A.    I don't remember.  Possibly.
 7         Q.    Okay.
 8              (Staples checks from 2014 to 2017
 9              are received and marked as Exhibit
10              S. Koufakis 4 for identification, as
11              of this date.)
12         Q.    I'm showing you what we've mark as
13    Steve Koufakis 4, which is a series of Staples
14    checks from 2014 to 2017.  If you look at --
15    there are numbers at the bottom that are Bates
16    stamped, so if you would turn to P4386.  Is that
17    your signature?
18         A.    Looks like it.
19         Q.    If you look at P4394, is that your
20    signature?
21         A.    It looks like it.
22         Q.    If you look at P4405, is that your
23    signature?
24         A.    It looks like it.
25         Q.    P4416?
```

Page 180

S. KOUFAKIS

1
2     A.    Looks like it.
3     Q.    And P4430?
4     A.    Looks like it.
5     Q.    And I think you answered this, but
6  you did not carry a Staples card yourself,
7  correct?
8     A.    No.
9     Q.    And never used a card to make
10  purchases yourself?
11     A.    No.
12     Q.    And you just said you did not look
13  at the invoices when you would sign the checks;
14  is that correct?
15     A.    I don't remember.
16     Q.    I asked you before about your
17  discussion with Debbie right around the time she
18  was terminated, and I think you said she called
19  about COBRA, right?
20     A.    Yes.
21     Q.    Was that the last contact you had
22  with her, that phone call?
23     A.    No.
24     Q.    What was the last contact you had
25  with her?