# EXHIBIT 5

Page 1

1                IN THE COURT OF COMMON PLEAS

2                 OF PHILADELPHIA COUNTY, PA

3                      CIVIL DIVISION

4              * * * * * * * * *

5                             *

6    STAR AUTO SALES OF        *

7    BAYSIDE, INC., et al.,    *

8        Plaintiffs            *   Case No.

9        vs.                   *   1:18cv05775ERKCLP

10   VOYNOW, BAYARD, WHYTE and *

11   COMPANY, LLP, et al.,      *

12       Defendants            *

13                             *

14             * * * * * * * * *

15

16                      DEPOSITION

17                         OF

18                   JACKIE CUTILLO

19                 February 28, 2023

20

21

22

23       Any reproduction of this transcript

24       is prohibited without authorization

25          by the certifying agency.

Page 2

```
 1                        DEPOSITION

 2                           OF

 3    JACKIE CUTILLO, taken on behalf of the Defendants

 4    herein, pursuant to the Rules of Civil Procedure,

 5    taken before me, the undersigned, Kate Formichelli, a

 6    Court Reporter and Notary Public in and for the

 7    Commonwealth of Pennsylvania, at the law offices of

 8    Marshall Dennehey, 2000 Market Street, Suite 2300,

 9    Philadelphia, Pennsylvania, on Tuesday, February 28th,

10    2023, beginning at 10:21 a.m.

11

12    Job No. CS5778615

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1              A P P E A R A N C E S
2
3    JOSEPH M. LABUDA, ESQUIRE
4    JEREMY M. KOUFAKIS, ESQUIRE
5    Milman Labuda Law Group, PLLC
6    3000 Marcus Avenue, Suite 3W8
7    Lake Success, NY  11042
8        COUNSEL FOR PLAINTIFFS
9
10   MAUREEN P. FITZGERALD, ESQUIRE
11   Marshall Dennehey Warner Coleman & Goggin, PC
12   620 Freedom Business Center, Suite 300
13   King of Prussia, PA  19406-1330
14       COUNSEL FOR DEFENDANTS
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                        I N D E X

2

3    WITNESS: JACKIE CUTILLO

4    DISCUSSION AMONG PARTIES                    7 - 8

5    EXAMINATION

6        By Attorney Fitzgerald                8 - 314

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                       E X H I B I T S

2                                                    PAGE

3      NUMBER           DESCRIPTION              IDENTIFIED

4      Cutillo

5      Exhibit  1    Email                          154

6      Exhibit  2    Email                          159

7      Exhibit  3    Email                          163

8      Exhibit  4    Email                          177

9      Exhibit  5    Email                          200

10     Exhibit  6    Timeline                       221

11     Exhibit  7    Statement                      249

12     Exhibit  8    Checklist                      261

13     Exhibit  9    Email                          265

14     Exhibit 10    Email                          267

15     Exhibit 11    Email                          271

16     Exhibit 12    Picture                        275

17     Exhibit 13    Report                         298

18     Exhibit 14                            313

19

20

21

22

23

24

25

Page 6

1                    O B J E C T I O N S

2

3     ATTORNEY                                          PAGE

4     Labuda        17, 18, 34, 44, 47, 53, 54, 54, 56, 58, 59,

5     62,   64, 64, 65, 66, 68, 71, 105, 110, 111, 112, 121,

6     123, 133, 133, 134, 134, 156, 157, 158, 158, 169, 169,

7     172, 172, 173, 173, 174, 175, 175, 181, 187, 192, 192,

8     193, 194, 195, 197, 197, 198, 198, 200, 201, 205, 205,

9     206, 207, 211, 211, 212, 213, 216, 216, 217, 225, 230,

10    241, 242, 244, 245, 251, 269, 269, 270, 280, 281, 282,

11    284, 288, 289, 290,2 92, 293, 293, 294, 301, 303, 306,

12    312, 312

13

14

15    MARKED QUESTIONS:  197, 198, 198, 198, 218

16

17

18

19

20

21

22

23

24

25

Page 7

```
 1              S T I P U L A T I O N
 2     ---------------------------------------------------
 3     (It is hereby stipulated and agreed by and between
 4     counsel for the respective parties that reading,
 5     signing, sealing, certification and filing are not
 6     waived.)
 7     ---------------------------------------------------
 8              P R O C E E D I N G S
 9     ---------------------------------------------------
10                  JACKIE CUTILLO,
11     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
12     HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
13     FOLLOWS:
14                      ---
15          COURT REPORTER:
16          And just before we start, when you start
17     your questioning, can you just say your names?
18          ATTORNEY FITZGERALD:
19          I'm Maureen Fitzgerald, Counsel for the
20     Defendant.
21          ATTORNEY LABUDA:
22          Good morning, Joe Labuda and Jeremy
23     Koufakis for the Plaintiffs.  Plaintiffs are also
24     requesting a copy of the transcript be provided to
25     them for their review and execution as part of the
```

1    companies.

2    Q.    Who do you receive your paycheck ---?

3    A.    Toyota and Subaru.

4    Q.    Do you receive one check?

5    A.    Two checks.   A check for Toyota, a check for

6    Subaru.

7    Q.    And has that been the case since you've become a

8    controller?

9    A.    Yes.

10    Q.    And that has been since April 2017?

11    A.    Mid-April 2017.

12    Q.    And are you saying that your entire salary ---

13    even though you receive a compensation from two of the

14    entities, Toyota and Subaru, it's your understanding

15    that your salary as a controller is shared by how many

16    of the Star entities?

17    A.    All five.

18    Q.    And is it shared equally among all five?

19    A.    Yeah, divided by five.

20    Q.    When did you begin working for any of the Star

21    entities.

22    A.    September 1st, 2005.

23    Q.    And which entity was that?

24    A.    Star Toyota.

25    Q.    What is your highest level of education?

Page 11

1    A.    One year of college.

2    Q.    And when did you complete that year?

3    A.    2007.

4    Q.    Where did you go?

5    A.    ITT Tech online.

6    Q.    Is that a community college?

7    A.    It's an online college.  It's --- on the

8    commercial it's ITT Tech.

9    Q.    Were you pursuing any formal program or any

10   degree?

11   A.    Criminal justice.

12   Q.    Was that an Associate's degree or a Bachelor's

13   degree?

14   A.    If I would have continued, Associate's degree.

15   Q.    And did you attend that at night?

16   A.    Yeah, virtually at night.  You could like log

17   into your classes at any point in time and take your

18   tests and submit your reports.

19   Q.    When did you graduate high school?

20   A.    2005.

21   Q.    Was your job with Star Toyota the first job that

22   you had following high school?

23   A.    No.

24   Q.    Where did you work before?

25   A.    I worked during high school.

```
 1    to comprehend mathematical calculations.
 2    Q.    Okay.
 3          Math computation?.
 4    A.    Yeah.
 5    Q.    All right.
 6          Anything else?
 7    A.    Off the top of my head.
 8    Q.    Aside from whatever you learned in your high
 9    school math courses, have you taken any other
10    accounting courses anywhere else?
11              ATTORNEY LABUDA:
12              Objection, but you can answer.
13              THE WITNESS:
14              Not that I remember.
15    BY ATTORNEY FITZGERALD:
16    Q.    So is it fair to say, as you sit here today,
17    you've never taken any formal instruction or any
18    classes in forensic accounting?
19    A.    No.
20    Q.    Tax accounting?
21    A.    No.
22    Q.    Cost accounting?
23    A.    No.
24    Q.    Banking?
25    A.    No.
```

Page 101

1    Debbie.

2    Q.    So your next position was assistant controller?

3    A.    Should have been, yes.

4    Q.    What do you mean?

5    A.    I was supposed to assist Debbie.

6    Q.    Okay.

7          Did you actually function in that capacity?

8    A.    No.

9    Q.    What did you understand that your role or

10   responsibility was going to be as assistant

11   controller?

12   A.    She was supposed to teach me what I needed to

13   know.

14   Q.    So this would have been after Vivian was

15   terminated?

16   A.    Correct.

17   Q.    And Debbie was the controller for, at that time,

18   all five dealerships?

19   A.    That is correct.

20   Q.    And did you understand that your role was going

21   to be her assistant?

22   A.    Correct.

23   Q.    And was it the assistant for all five dealerships

24   or just certain dealerships?

25   A.    All five.

1    Q.    And did you actually assume that role?  Did that

2    actually happen where you, for whatever period of

3    time, worked as her assistant controller?

4    A.    She was instructed to train me and teach me

5    everything that I needed to know.

6    Q.    At what point did you then step into the

7    assistant controller role?

8    A.    She didn't teach me.

9    Q.    I know.  At what point did you step into the

10   role?  Like, when did you stop doing your deal posting

11   and commission function?

12   A.    After she was terminated.

13   Q.    Okay.

14       So when you were going to become the assistant

15   controller, were you still going to do the deal

16   posting and commission function?

17   A.    It hadn't been worked out.

18   Q.    So she was terminated, I believe, in, like, mid-

19   April of 2017?

20   A.    That is correct.

21   Q.    So when do you recall being told that you were

22   going to be the assistant controller in relation to

23   that date?

24   A.    January, February maybe.

25   Q.    I think you told me when you were the deal poster

Page 107

1    A.    But it's also probable.

2    Q.    It's also what?

3    A.    She was not the best-looking individual.

4    Q.    Okay.

5          So you believe she was jealous of you?

6    A.    My looks and maybe --- sure, maybe intimidated

7    maybe, I don't know, threatened.  Who knows?

8    Q.    When Debbie was terminated in April of 2017, fair

9    say that then you became the controller?

10   A.    That's correct.

11   Q.    Okay.

12         And was that the first time in your career that

13   you've ever supervised anyone?

14   A.    That's correct.

15   Q.    And you were the controller for five Star

16   dealerships or six?

17   A.    Well, five.

18   Q.    Okay.

19         Mitsubishi was not in existence?

20   A.    No.

21   Q.    And you've functioned as the controller since

22   mid-April 2017?

23   A.    Yes.

24   Q.    Okay.

25         And who do you report to?

Page 115

1    A.    A while.

2    Q.    Huh?

3    A.    A long time.

4    Q.    So that's something you've had in place before

5    you became a ---?

6    A.    Uh-huh (yes).  But Vivian was a notary, so I only

7    notarized once in a while.

8    Q.    And then you said you verbally handled deals when

9    your employees have questions?

10   A.    I'll intervene, yes.

11   Q.    And you said that you supervised 16 to 17

12   employees?

13   A.    Uh-huh (yes).

14   Q.    Would those be the employees that worked in the

15   office?

16   A.    That work in my office.

17   Q.    Okay.

18      And that would be the accounting office?

19   A.    That is correct.

20   Q.    And do those employees report directly to you?

21   A.    Yes.

22   Q.    Okay.

23      Do they report to anybody else?

24   A.    They can report --- they can talk to any of the

25   owners.

Page 116

1    Q.    Okay.

2         Other than the owners and you, do they report to

3    anybody else?

4    A.    No.

5    Q.    Are they supervised by anyone else other than you

6    and the owners?

7    A.    No.

8    Q.    Did you understand that that same hierarchy was

9    in place when Vivian and Debbie were controllers?  In

10   other words, the office staff reported to them, and

11   they reported to the owners?

12   A.    Huh?

13   Q.    When Vivian and Debbie were the controllers

14   before you, ---

15   A.    Okay.

16   Q.    --- did you understand that that same system was

17   in place where Vivian and Debbie supervised the office

18   staff?

19   A.    Okay.

20   Q.    And Vivian and Debbie reported to the owners?

21   A.    That is correct.

22   Q.    Okay.

23        So it's the same as what exists under you?

24   A.    No, because my staff can go to my owners and

25   people can go to the owners.

```
                                              Page 117
 1    Q.     Okay.
 2          Were the staff not permitted to go to the owners
 3    when Vivian and Debbie were the controllers?
 4    A.     No.
 5    Q.     So it's the same system?
 6    A.     Yeah, sure.  Yes..
 7               ATTORNEY LABUDA:
 8               And Maureen, just whenever it's good for
 9    a break --- it's 1:15.  I think downstairs closes at
10    2:00, my recollection, ---
11               ATTORNEY FITZGERALD:
12               Okay.
13               ATTORNEY LABUDA:
14               --- so whenever is a good time.
15               ATTORNEY FITZGERALD:
16               Yeah, maybe like another five minutes
17    and then we can go.
18               ATTORNEY LABUDA:
19               Okay.
20    BY ATTORNEY FITZGERALD:
21    Q.     As part of becoming a controller, you received
22    training by Voynow?
23    A.     That is correct.
24    Q.     Okay.
25          And do you remember who specifically from Voynow
```

Page 118

1    was involved in training you?

2    A.    Yes.

3    Q.    Who was that?

4    A.    Bobby.

5    Q.    Bob Seibel?

6    A.    Yes.  David Kumar, Tim Kravitz.

7    Q.    Anybody else?

8    A.    No.  They're the ones that trained me.

9    Q.    Other than those three gentlemen from Voynow, did

10   you receive training from anybody else about the

11   controller function?

12   A.    No.

13   Q.    What access do you have as a controller in the

14   Reynolds system?

15   A.    I'd say --- I don't know.  I don't know.  I don't

16   have full access.

17   Q.    Okay.

18       Do you have remote access?

19   A.    Yes.

20   Q.    Did you have remote access when you became a

21   controller?

22   A.    No.

23   Q.    When did you get remote access?

24   A.    COVID.

25   Q.    Did other employees get remote access as a result

Page 119

1    of COVID?

2    A.    No.  Not that I'm aware of.  I don't know.  I

3    don't know who he gave remote access to.  It's not my

4    job.

5    Q.    Have you had any contact or communications with

6    anyone from Reynolds and Reynolds as far as your role

7    as a controller or understanding your duties as a

8    controller?

9    A.    Like, if I have a question, I can call them.

10   Q.    So is there like a point person that you have at

11   Reynolds and Reynolds, or do you just call a generic

12   line and whoever is there answers?

13   A.    1-800, yeah.

14   Q.    Do you know what version of Reynolds and Reynolds

15   Star has?

16   A.    I don't understand the question.  What do you

17   mean?

18   Q.    Are you aware of different versions or types of

19   dealer management systems for dealerships that are

20   provided for Reynolds and Reynolds?

21   A.    There's two, to my knowledge.

22   Q.    And what are the two?

23   A.    Blue Screen and Ignite.

24   Q.    And which one does Star have?

25   A.    I have Blue screen and I have Ignite.

Page 121

1    A.    I don't know.  I'm not in charge of that.

2    Q.    Did you use --- as part of your investigation

3    into any of the things at issue in this case, did you

4    use that Ignite program?

5    A.    No.  I don't know.  Not that I'm aware.  I don't

6    remember.

7    Q.    Is it possible?

8          ATTORNEY LABUDA:

9          Objection.  You can answer.

10         THE WITNESS:

11         I don't know.

12   BY ATTORNEY FITZGERALD:

13   Q.    How did you become aware --- you said two years

14   ago you had access to it.  How did you become aware of

15   it?

16   A.    Because I called Reynolds to ask them a question

17   and they said, do you have Blue Screen or Ignite?  And

18   I said Blue Screen.  They're like, if you have Ignite,

19   we can assist you in fixing the routing that's being

20   confused.

21   Q.    And as part of your investigation into the

22   schemes, did you at any point time call up Reynolds

23   for assistance?

24   A.    Yeah, for them to generate reports.

25   Q.    Okay.

Page 122

1    And do you remember how many times that happened?

2    A.    I don't know.  I don't remember off the top of my

3    head.

4    Q.    Did it happen more than five times?

5    A.    No.  Maybe a couple.  I don't know.

6    Q.    And why did you have to call Reynolds to generate

7    reports?  Why were you unable to do it on your own?

8    A.    Because Reynolds needs to generate and create ---

9    create and generate that --- a report.

10    Q.    Do you have a recollection of the specific

11    reports you asked Reynolds to generate that you were

12    unable to generate?

13    A.    I don't know how to generate a report.  Reynolds

14    does it.

15    Q.    As the controller, you don't know how to generate

16    a report in Reynolds?

17    A.    Reynolds --- I don't know if you understand the

18    context of generating a report.

19    Q.    Why don't you tell me what you mean when you use

20    the word generating a report?

21    A.    If I call Reynolds and I ask them to make a

22    report with certain --- with specific parameters, they

23    create it.

24    Q.    Okay.

25        And it's not something you are able to do on your

Page 123

1  own?

2  A.    No.

3  Q.    Are you able to recall any specific parameters

4  that you gave to Reynolds and Reynolds when you

5  requested that they generate a report for you?

6         ATTORNEY LABUDA:

7         Objection, but you can answer.

8         THE WITNESS:

9         I don't know.  I don't know.  I don't

10  remember.

11  BY ATTORNEY FITZGERALD:

12  Q.    How many reports did Reynolds and Reynolds

13  generate for purposes of your investigation in this

14  case?

15  A.    I don't know.  Maybe two, maybe three.

16  Q.    And do you know which schemes they were

17  applicable to that you were investigating that you

18  asked for those two to three reports?

19  A.    I don't remember.  You'd have to show me

20  documents, then I could tell you.

21  Q.    Well, I'll just rattle off the names of the

22  schemes --- the customer claims.  With Filardo and

23  Subaru?

24  A.    I believe so, but I don't remember off the --- I

25  don't want to give you an answer that I'm not a

Page 126

1    A.    It's possible, but I'm not sure.  They might have

2    just been able to generate it based on what I was

3    asking.  I don't think I had to give specific

4    parameters.  They might have just did it themselves.

5    Q.    Do you know one way or the other?

6    A.    I don't ---.

7    Q.    Is there a manual onsite that Star has regarding

8    the Reynolds system?

9    A.    There's a digital manual for Reynolds and

10   Reynolds.

11   Q.    Okay.

12       And is that something you've referred to?

13   A.    I have.

14   Q.    And have you referred to it since you've become a

15   controller or had you referred to it before?

16   A.    No, since I became a controller.

17   Q.    Do all office employees have access to that

18   manual or just you as a controller?

19   A.    No.  If they have a question and I want --- we

20   would look it up in the book, in the manual.  If I

21   don't know the answer, and even if I do know the

22   answer, we would verify it in the book.

23   Q.    And as best as you recall, is the version of the

24   Reynolds and Reynolds system that Star has, is it the

25   same version since you've been employed or has it been

Page 141

1   Q.    Is there anybody specific you recall meeting

2   with?

3   A.    We made a police report for a fraudulent check

4   with the name of an employee of Star Toyota.

5   Q.    And who was that?

6   A.    Gabriel Zambrana.

7   Q.    When you say we made a police report, is that a

8   report that you completed?

9   A.    Me and Mike --- I went with Michael Koufakis.

10  Q.    Okay.

11        Do you remember who at the NYPD you met with?

12  A.    A cop that was there.  I don't remember who it

13  was.

14  Q.    Okay.

15        Other than that policeman regarding Gabriel

16  Zambrana, was there any other law enforcement person

17  that you recall meeting with regarding employee theft

18  or fraud?

19  A.    I went with Mike K. to meet Mrs. Wright, a

20  District Attorney.

21  Q.    Regarding what?

22  A.    Regarding --- which scheme was that, which fraud?

23  I want to say Subaru.

24  Q.    So would that be regarded regarding Doug Filardo?

25  A.    I believe so.

Page 142

1    Q.    Would it also be regarding Vivian?

2    A.    I don't believe so.  I don't remember.

3    Q.    Did you say you went with Michael Koufakis?

4    A.    Yes.

5    Q.    Do you remember when?

6    A.    I want to say 2018.

7    Q.    Any other meetings that you recall?

8    A.    I met with the Assistant District Attorney

9    recently, like within the last year.

10   Q.    And who was that?

11   A.    Aharon Diaz.

12   Q.    Is this the Queens ---

13   A.    Yes.

14   Q.    --- Assistant D.A.?  And Ms. Wright was also from

15   Queens?

16   A.    Yes.

17   Q.    And you said that was I think within the last

18   year?

19   A.    Within the last year.

20   Q.    And did you go alone?

21   A.    On some occasions.

22   Q.    How many times did you meet with Mr. Diaz?

23   A.     Maybe five times.

24   Q.    So five times in 2022, is that your recollection?

25   A.    2022, maybe the end of '21, but 2022.

Page 143

```
 1    Q.    And regarding which employees?
 2    A.    That one is Carmen Jones, Debbie, ---.
 3    Q.    Carmen and Debbie?
 4    A.    Right.
 5    Q.    And nobody else that you recall?
 6    A.    Yeah, I believe those.
 7    Q.    Okay.
 8          Any other meetings that you recall with any other
 9    law enforcement representative?
10    A.    Off the top of my head, besides those three, no,
11    not off --- no, not off the top of my head.
12    Q.    So I asked about meetings.  Would your answers be
13    the same if I said any communications that you've had?
14    So, for instance, email or telephonic communications?
15    A.    Yeah.
16    Q.    Do you recall ---?
17    A.    I wouldn't --- yeah, I would say so.
18    Q.    Okay.
19          And it would be the police officer regarding
20    Gabriel Zambrana, who's a police officer name you
21    didn't remember, Ms. Wright regarding Doug Filardo and
22    Mr. Diaz regarding Carmen and Debbie?
23    A.    Correct.
24    Q.    You don't believe you ever communicated with
25    anybody else in law enforcement?
```