# EXHIBIT 8

# In the Matter of

Case No. 18-cv-05775 (ERK)(TAM)

STAR AUTO SALES OF BAYSIDE, INC., et al.

v.

VOYNOW, BAYARD, WHYTE AND COMPANY LLP, et al.

---

## Deposition of Robert Seibel

*Wednesday, February 8, 2023*

---



The Little
Reporting
Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
STAR AUTO SALES OF BAYSIDE, INC.
(d/b/a STAR TOYOTA OF BAYSIDE),
STAR AUTO SALES OF QUEENS, LLC
(d/b/a STAR SUBARU), STAR HYUNDAI
LLC (d/b/a STAR HYUNDAI), STAR
NISSAN, INC. (d/b/a STAR NISSAN),
METRO CHRYSLER PLYMOUTH INC. (d/b/a
STAR CHRYSLER JEEP DODGE) STAR AUTO
SALES OF QUEENS COUNTY LLC (d/b/a
STAR FIAT) and STAR AUTO SALES OF
QUEENS VILLAGE LLC (d/b/a STAR
MITSUBISHI),

                         Plaintiffs,

            -against-                    Case No.
                                         18-cv-05775
VOYNOW, BAYARD, WHYTE and COMPANY        (ERK)(TAM)
LLP, HUGH WHYTE, and RANDALL
FRANZEN,

                         Defendants.
----------------------------------------x

                         February 8, 2023
                         10:35 a.m.


        Deposition of ROBERT SEIBEL, taken by

Plaintiffs, held at the offices of Milman

Labuda Law Group PLLC, 3000 Marcus Avenue,

Suite 3W8, Lake Success, New York, before

Lisa Hiesiger, a Shorthand Reporter and Notary

Public within and for the State of New York.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

2

1

2    A P P E A R A N C E S :

3

4        MILMAN LABUDA LAW GROUP PLLC
         Attorneys for Plaintiffs
5            3000 Marcus Avenue, Suite 3W8
             Lake Success, New York 11042

6

7        By:   MICHAEL MULÈ, ESQ.
               JEREMY M. KOUFAKIS, ESQ.
               jeremy@mllaborlaw.com

8

9

10       MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN P.C.
         Attorneys for Defendants
             620 Freedom Business Center, Suite 405

11           King of Prussia, Pennsylvania 19406

12       By:   MAUREEN P. FITZGERALD, ESQ.
               mpfitzgerald@mdwcg.com

13

14

     Also Present:

15

         JACQUELINE CUTILLO

16

         RANDY FRANZEN

17

         HUGH WHYTE

18

         STEVE RAMBAM (Via videoconference)

19

         MICHAEL KOUFAKIS

20

         ANDREW GEDACHT, Videographer

21                    ~oOo~

22

23

24

25

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

3

1

2          IT IS HEREBY STIPULATED AND AGREED, by and

3     among counsel for the respective parties hereto, that

4     the filing, sealing and certification of the within

5     deposition shall be and the same are hereby waived;

6          IT IS FURTHER STIPULATED AND AGREED that all

7     objections, except as to form of the question, shall

8     be reserved to the time of the trial;

9          IT IS FURTHER STIPULATED AND AGREED that the

10    within deposition may be signed before any Notary

11    Public with the same force and effect as if signed and

12    sworn to before the Court.

13                    ~oOo~

14

15

16

17

18

19

20

21

22

23

24

25

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

4

1               Seibel

2          THE VIDEOGRAPHER:   The date is

3     February 8th, 2023.   The time is 10:35

4     a.m.   We are located at the offices of

5     Milman Labuda Law Group PLLC, 3000 Marcus

6     Avenue, Lake Success, New York.

7          We are taking the deposition of Bob

8     Seibel in the matter of Star Auto Sales of

9     Bayside, Inc. et al. v Voynow, Bayard,

10    Whyte and Company LLP, et al. pending in

11    the U.S. District Court, Eastern District

12    of New York, case number 18-cv-05775 (ERK)

13    (TAM).

14          My name is Andrew Gedacht, I'm the

15    video specialist with the Little Reporting

16    Company.   The court reporter is Lisa

17    Hiesiger, also with the Little Reporting

18    Company.

19          At this time I would ask the

20    attorneys to please introduce themselves

21    for the record and to state your name, the

22    firm with which you are affiliated and who

23    you represent, after which time the court

24    reporter will swear in the witness.

25          MR. MULÈ:   Good morning.   My name is

5

```
 1                        Seibel
 2           Michael Mulè with the firm Milman Labuda
 3           Law Group PLLC.  We represent the various
 4           Star entities in this lawsuit, the
 5           plaintiff.
 6                    MS. FITZGERALD:  Maureen Fitzgerald
 7           on behalf of Marshall Dennehey
 8           representing all of the defendants.
 9                    THE VIDEOGRAPHER:  Will the court
10           reporter please swear in the witness.
11     R O B E R T    S E I B E L, having been first duly
12     sworn by Lisa Hiesiger, a Notary Public, was called
13     as a witness and testified as follows:
14     EXAMINATION BY MR. MULÈ:
15           Q.   Good morning, Mr. Seibel.
16           A.   Good morning.
17           Q.   My name is Michael Mulè, as you know,
18     I represent the various Star entities, I'll refer
19     to collectively as Star in this lawsuit commenced
20     against the defendants Voynow, Bayard, Whyte and
21     Company, Hugh Whyte and Randall Franzen, okay?
22           A.   Yes, I understand.
23           Q.   You are represented by counsel,
24     correct?
25           A.   I am.
```

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

45

1                          Seibel

2          Q.    Generally, yes.

3          A.    Some we do, some we don't.

4          Q.    So for those that you would not have

5     access even when you were physically present,

6     would that again just be a matter of what the

7     dealer and controller were comfortable with?

8          A.    Correct.

9          Q.    Any other reason?

10         A.    Not that I'm aware of.

11         Q.    Would it depend on the type of

12    engagement?

13         A.    It could, I suppose, but I don't know

14    that I would make that distinction.

15         Q.    Did you ever ask a dealership for

16    access to its dealership management system?

17         A.    We certainly have, you know, had

18    conversations with dealers about that, you know,

19    giving us access to their system could expedite

20    the engagement somewhat.

21         Q.    Are you aware whether or not Voynow

22    had access to Star's dealership management

23    system?

24         A.    Limited access.

25         Q.    When you say limited access, what do

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

46

1                       Seibel
2      you mean?
3              A.    Again it depends on the period of
4      time that we're talking about.  Prior to 2017,
5      since the beginning of when I was involved with
6      them up until let's say the end of 2016, we only
7      had access to the Reynolds and Reynolds, when we
8      were physically there and if someone was away
9      from their desk.  Because we didn't have an
10     actual terminal to use, we had to wait until
11     someone was away from their desk to be able to
12     use their computer.  And as well, even once we
13     were able to access the system, when we got a
14     computer, there are certain functions that we
15     wouldn't have access to.
16             Q.    What functions would you not have
17     access to?
18             A.    The only one that I can think of
19     specifically was I think it's called the name
20     file access, I don't remember the numbers of the
21     executable.  I don't think we had access to that.
22     And there were probably others but I don't
23     remember.
24             Q.    What is the name file?
25             A.    So if you wanted to look up either a

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

47

1                        Seibel

2       customer or a vendor, you could go into that name

3       file screen and type in a name and search for a

4       name.  But from my recollection, I don't think we

5       had access to that.

6              Q.   Are you saying that there was no

7       remote access to Star's DMS system through the

8       end of 2016?

9              A.   That is correct.  From when I got

10      involved with them in 1998 up until the end of

11      2016, we never had any remote access where we

12      could access their system from anywhere other

13      than Star's office.  And again, it was only when

14      someone in Star's office was away from their

15      desk.

16             Q.   Did Star ever advise Voynow that they

17      could not bring their own laptop to visit?

18             A.   Not that I'm aware of.

19             Q.   Could Voynow have brought a laptop

20      rather than use someone's computer while at Star

21      and obtain access while physically present

22      through the laptop?

23             A.   I don't think we could.

24             Q.   Why don't you think you could?

25             A.   Because it was generally our policy,

51

                        Seibel

1
2      not occupied by an employee of Star.  Do you
3      understand the question?
4              A.   No.
5              Q.   So you said that you would have to
6      wait for an employee to not be at their desk and
7      not be at their computer to access the DFS
8      system, correct?
9              A.   Yes.
10             Q.   Was there ever any conversation with
11     anyone at Star that you needed to have a desk
12     with a computer that was available without an
13     employee sitting there?
14             A.   Yes.
15             Q.   And you had that conversation?
16             A.   I think we all did.
17             Q.   And who did you have that
18     conversation with?
19             A.   Vivian and Debbie.
20             Q.   And just Vivian and Debbie?
21             A.   Probably other people in the office
22     as well.
23             Q.   Do you know who else?
24             A.   I mean every visit we would go there,
25     it's easier if I explain it, I think.  Every

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

54

Seibel

1

2      A.    I didn't work here at the time.

3      Q.    Although you didn't work there at the

4   time, do you have any knowledge?

5      A.    Not direct knowledge, but people have

6   told me how it unfolded.

7      Q.    And what is your understanding?

8      A.    My understanding is someone from

9   Reynolds and Reynolds had referred Star to us,

10   and Hugh Whyte and Bob Bayard went up to meet

11   with Star, with Michael, and I don't know if

12   there were others that they were meeting with.

13          And they met with them, talked mostly

14   about their IRS problems, and then my

15   understanding is Michael understood from that

16   visit that Hugh Whyte and Bob Bayard would not be

17   the ones doing the actual legwork for the account

18   so he wanted to meet the people that would be

19   involved in the account.  So then Randy with, you

20   know, another manager went up to meet with them.

21      Q.    And when did you get this

22   information?

23      A.    I think I've heard the story many,

24   many times over the past 20 some years.

25      Q.    Did you have an understanding that

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

65

1          Seibel
2          MR. MULÈ:  No.  Everything is the
3     time period between August 1998 until
4     November 2017 unless I state otherwise.
5          A.   I mean in 1998 and, you know, the
6     years, a few years after that, I would have had
7     no idea whatsoever what it was the partners were
8     doing as far as new clients. At that time they
9     said go here and I went there.  They said you're
10    going to do this and that's what I did.
11         Q.   When would you say you first got any
12    type of awareness as to what the partners did as
13    far as new clients?
14         A.   Maybe, you know, you're probably
15    talking 2001, '2, '3, somewhere around there.
16         Q.   So to get back in the time period say
17    from 2001 until November 2017, would an
18    engagement letter typically be sent by Voynow
19    regardless of the type of engagement?
20         A.   Well, we generally follow the AICPA
21    recommendations for engagement letters.  My
22    understanding is that up until roughly 2008
23    engagement letters were not required, they're
24    still not required, but around that time the
25    AICPA, you know, issued guidance recommending

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

66

Seibel

1    that you have written engagement letters for all

2    of your business engagements, and so around that

3    time we started doing engagement letters for all

4    engagements.  For tax engagements I'm referring

5    to.  For review engagements, you know, we always

6    had to have signed engagement letters, but for

7    tax engagements prior to the 2008 roughly time

8    period, you didn't have to have engagement

9    letters.  At some point around then the AICPA

10    starts recommending that you have written

11    engagement letters for these engagements, and we

12    started doing engagement letters at that point.

13        Q.    Directly related to Star from 2001 or

14    even going back to 1998, although that's before

15    the 2008 guidance, have you ever seen an

16    engagement letter that was signed by Star?

17        A.    Only for the personal returns.

18        Q.    Were you individually responsible in

19    any way for sending out business engagements to

20    Star at any time?

21        A.    I was involved to the extent that,

22    you know, for the clients that I was involved

23    with, including Star, they would show the

24    engagement letters to me before they would go out

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

70

Seibel

1
2      Q.    So you don't know if it was Star, if
3   it was Thomson, if it was whatever other clients
4   Voynow had?
5      A.    Correct, but I remember seeing her
6   sign at least some of these.
7      Q.    And the reason Voynow started having
8   engagement letters for tax engagements was really
9   as a result of the AICPA recommendation, is that
10  correct?
11     A.    Correct.  At least that's my
12  understanding.
13     Q.    And as you sit here today, you have
14  no personal knowledge as to whether Dot actually
15  signed a business engagement with respect to
16  Star, is that correct?
17     A.    Well, I saw her sign some of the
18  business engagement letters at some point in
19  time.  I don't know specifically what client it
20  was on these occasions when I saw her signing.
21     Q.    So that's what I'm getting at, which
22  just to clarify, you're not -- you can't sit here
23  and say absolutely she signed Star, it could have
24  been Star, it could have been some other client,
25  is that correct?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

71

1                          Seibel

2          A.    The one that she saw, though I think

3     we've seen some engagement letters through the

4     course of this that have a signature at the

5     bottom that to me appears to be Dot's.  So

6     clearly it had to get on there somehow.  So I may

7     or may not have watched her sign that one, but I

8     know her signature got onto it.

9                Just to clarify too, you know, the

10    engagement letters were mailed, but there were

11    occasions when we in addition to the mailed copy,

12    we brought the engagement letter with us to go

13    over with the client and to, you know, attempt to

14    get it signed with the client.

15         Q.    With respect to Star in particular,

16    do you have any personal knowledge of any time

17    you brought or someone in Voynow brought an

18    engagement letter and presented it to someone at

19    Star?

20         A.    Yes.

21         Q.    When did that occur?

22         A.    There's two instances that I know

23    about, though I think there were others.  There

24    was one early on around 2008 or '9, we brought

25    them up and Randy had gone over it with John and

72

1                        Seibel
2        John said basically at that time, we had separate
3        ones between, we had John's companies on one, we
4        had Steve's companies on one nand we had
5        Michael's companies on one.  So there were three
6        engagement letters.
7                  John says no, don't do three separate
8        ones, put them all on one and have Michael sign
9        it.  So that's one example that I could think of.
10                 The other example is around in 2017
11       for the 2016 tax returns, we had brought the
12       engagement letter up and Randy and I gave it to
13       Michael.
14            Q.   For the 2008/2009 instance that you
15       referred to, who was it that actually presented
16       the engagement letters to, I think you said to
17       John, is that correct?
18            A.   Yeah.
19            Q.   So who was present for that?
20            A.   Randy.
21            Q.   And were you present as well?
22            A.   I was present when we got the
23       engagement letters ready and brought them up, I
24       was not there for the conversation with John.
25            Q.   So the conversation with John, you

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

98

Seibel

1    statements as well.  For Star it was always tax

2

3    returns.

4          Q.    And Voynow came to Star, it was

5    approximately three times a year?

6          A.    Yeah.  I mean it varied from year to

7    year, but yeah, around three times a year.

8          Q.    Three, sometimes four?

9          A.    It depends on what was going on.  I

10   mean there was I think one year when there was

11   some IRS audits and sales tax audits that, you

12   know, I was up there more often, but for the most

13   part I think that's probably pretty accurate.

14         Q.    Would there be any preparation before

15   each visit to Star?

16         A.    Well, we'd schedule a visit and we'd

17   figure out who's going to be going with the team

18   on that visit and generally who's going to work

19   on which company or on which thing that had to be

20   done.

21         Q.    So the first thing you'd do is you'd

22   schedule the visit?

23         A.    Uh-huh.

24         Q.    Who would schedule the visit?

25         A.    Either me or Randy.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

99

                          Seibel
1
2         Q.    And how would you schedule the visit?
3         A.    Well, it depends, you know, either a
4  phone call with Vivian or Randy may have gotten a
5  call from Michael or somebody asking for certain
6  dates.
7         Q.    You said Randy might have gotten a
8  call from who?
9         A.    I'm sorry, Michael Koufakis.
10        Q.    Did you make calls yourself to Star
11 as far as scheduling visits?
12        A.    At times.
13        Q.    When you called, who did you speak
14 with?
15        A.    Probably Vivian or Debbie.
16        Q.    Would you ask them -- provide them
17 with dates that were good for you, ask them for
18 dates that were good for them?
19        A.    Yeah, that's kind of the idea.
20        Q.    How far in advance would you schedule
21 a visit?
22        A.    I would say anywhere from a week to a
23 month and a half.
24        Q.    Did you ever schedule a visit by
25 calling Michael Koufakis or either of his

112

1                       Seibel

2        do a separate engagement letter but it certainly

3        is what I would consider more of a special

4        project type thing.

5             Q.    Special project is something that's

6        come up in this litigation.  What is your

7        understanding of a special project?

8             A.    Well, something that's requested to

9        be done or that needs to be done that's outside

10       of the normal engagement.

11            Q.    When you say outside of the normal

12       engagement --

13            A.    Uh-huh.

14            Q.    -- what do you mean by that?

15            A.    Well, so for instance, for Star, you

16       know, we have a tax engagement, but it's, you

17       know, like if they, let's say they get a letter

18       that they're being audited by the IRS.  Well,

19       that's something outside of the normal yearly

20       engagement that I would consider to be a special

21       project.  Even though it's still part of your tax

22       engagement but it's outside of the sort of

23       routine yearly work.

24            Q.    You say it's -- so you mention like

25       an IRS audit, you would consider that part of the

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

113

1                          Seibel
2        tax engagement, would you consider it part of the
3        tax engagement because it's an IRS audit?
4              A.    Because it's taxes.
5              Q.    Taxes, okay.  If you have a 401(k)
6        audit or something like that, would that be
7        considered a special project?
8              A.    Well, no, I wouldn't consider a
9        401(k) audit to be a special project.  That's a
10       completely separate audit engagement that would
11       have a separate engagement letter and
12       representation letter and all the different
13       things that go with a 401(k) audit.
14             Q.    What about a sales tax audit, what do
15       you consider that?
16             A.    That would be part of your tax
17       engagement.  Because that's still part of your
18       taxes.
19             Q.    That would be a special project
20       particularly?
21             A.    Yeah, I would consider it to be a
22       special project.
23             Q.    We talked about there is an instance
24       that you could recall at Barlow Chevrolet where
25       only the controller was signing the check and you

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ----  February 8, 2023

136

Seibel

1

2    Q.    Can you tell me what type of time
3    software Voynow used, I'm going to say the last
4    five years of its relationship with Star?
5         A.    Yeah, at some point we switched to
6    using a program, what is it called, Practice CS,
7    I believe is the name of it.
8         Q.    What was used before that?
9         A.    Track Time.
10        Q.    During the entire time of the
11   relationship between Voynow and Star, were those
12   two time softwares the only ones used or were
13   there other ones?
14        A.    That's the only ones that I'm aware
15   of.
16        Q.    Can you tell me how the billing for
17   Star worked?
18        A.    We would send them a monthly retainer
19   bill that would be applied against the year-end
20   fees, then usually in March or so we would do a
21   progress billing.  Then in September we would do
22   the final bill for the tax work.  Then if there
23   were any special projects, those would be billed
24   at some point during the year.
25        Q.    The monthly retainer, you said it was

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

137

                              Seibel
1
2       you'd have a monthly retainer that would be, what
3       did you say, against the year-end fees?
4              A.    Yeah, that would be part of the or it
5       would be applied into the yearly tax work.
6              Q.    Was there a set yearly fee for the
7       year-end tax work?
8              A.    No, it varied from year to year.
9              Q.    And what was the usual yearly fee for
10      the entire group dealership for tax work?
11             MS. FITZGERALD:  During the 19-year
12             period you're asking?
13             Q.    Let's just say for the last five
14      years approximately.
15             A.    My recollection is it was somewhere
16      around 100,000, maybe between a hundred and 125
17      is my recollection, but I don't have exact
18      figures on it.
19             Q.    And that was just for the tax work?
20             A.    Correct.
21             Q.    And then do you have any type of
22      estimate as to special projects with that?
23             A.    It would vary year to year depending
24      on what projects were involved.
25             Q.    As far as tax work for similarly

148

1                          Seibel

2      it may not be practical to run that way.

3                  So we would look at most things

4      through the 0350 because that gives you a more --

5      gives you the information we need for our tax

6      engagement at that point.

7                  MS. FITZGERALD:  I just want to make

8                  sure I'm clear because I thought you said

9                  at one point 0150 and then another point

10                 0350.

11                 THE WITNESS:  I'm sorry, it's 0350

12                 and 0355.  I'm sorry, I may have

13                 transposed the numbers.

14                 MS. FITZGERALD:  Or I may have

15                 written them down wrong.

16         Q.   When you would arrive for an interim

17      visit at Star, who would print these schedules?

18         A.   It depends.

19         Q.   Generally?

20         A.   Sometimes I would do it, sometimes

21      Shawn might do it, sometimes we'd have one of the

22      other guys do it.  It depends on who's there and

23      it depends on how many computers we have

24      available to use.

25         Q.   How long would you be at Star

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

149

Seibel

2    typically for an interim visit?

3         A.    Either one day or two days.  I think

4    it was more commonly, if you're talking about

5    like 2010 through '17, I think more commonly we

6    were doing two day visits.

7         Q.    So on the first day, as soon as you

8    get there, the first thing you do is print out

9    the schedules?

10        A.    Well, the first thing you do is say

11   hello to everyone, but then, yeah, we would find

12   out once we put our stuff down and all of that,

13   find out where we can work and what computer that

14   we can use.  Then you print the trial balance and

15   the schedules and the different things that we're

16   going to print out.

17        Q.    Approximately how many accountants

18   would be with you?

19        A.    It would vary from visit to visit.

20   Probably between four and seven.

21        Q.    And there would be generally

22   yourself, Randy, who else?

23        A.    Shawn most of the time, Rob Kirkhope

24   would be there with us sometimes and different

25   staff members.  Just to clarify one thing though,

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

150

                              Seibel
1
2    when you say how many people on the visits.  On
3    the visits when I was coming up working on IRS
4    audits and sales tax audits and stuff, it was
5    just me or maybe me and Randy.
6              Q.   But on interim visits it would be
7    between four and seven?
8              A.   Yeah.
9              Q.   Once the schedules were printed up,
10   what was done next?
11             A.   We would get the bank recs, floor
12   plan recs, factory parts, statement of factory
13   open account statement, some of that stuff, and
14   then, you know, try to go through the trial
15   balance to go through each account to see if
16   there's any sort of adjustments that would be
17   needed to have the numbers accurate for the tax
18   reporting.
19             Q.   How would the schedules be divvied
20   out if they would be?
21             A.   Well, they would be -- I don't know
22   if you'd call it divvied out, but whoever is
23   working on each particular company would look
24   through the schedules for that company.
25             Q.   How would you determine if something

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel --- February 8, 2023

193

                              Seibel
1
2          Q.    Yes, other than --
3          A.    I mean I saw the schedule.
4          Q.    You saw the schedule?
5          A.    I don't recall seeing any other
6     documents relating to that.
7          Q.    Do you recall when you were training
8     Jackie that she came to you specifically
9     regarding PTSN?
10         A.    After Debbie had been let go, we came
11    up to help Jackie however we could with whatever
12    she needed for that new role any way we can help.
13    But no, I don't specifically remember her asking
14    about the PTSN.
15         Q.    If I told you that she came up to you
16    and asked you after Vivian was no longer at Star
17    and asked you why PTSN was no longer on the
18    accrued commissions and you advised her that it
19    should be done as an intercompany payable, not as
20    PTSN, do you recall that?
21         A.    I don't specifically recall that
22    conversation.
23         Q.    So you did train Jackie on how to
24    post commissions?
25         A.    No.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel --- February 8, 2023

204

1                        Seibel
2       this list to try and assess who was doing what in
3       the office because after Vivian and Debbie had
4       left and about half of the office had been cut
5       out of the office, there were some struggles on
6       that they were having with figuring out how to
7       get everything done because you got half the
8       number of people and the same amount of work.
9                    So we had tried to figure out who was
10      doing what to see just to get an idea of how it
11      was all flowing and who was doing what.
12                   And so I think the readjust was just
13      Randy saying, you know, hey, look at this, and if
14      you have any changes based on what you know of
15      the people are doing, adjust the schedule to
16      reflect that.
17          Q.   So for the time period after Vivian
18      was terminated until this date, actually until a
19      little before this date, so mid-April when Debbie
20      was terminated, Debbie basically was in the
21      position of controller, correct?
22          A.   As far as I know, yes.
23          Q.   And there was no itemization or
24      schedule of how to divvy up the work in that time
25      period, right?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

205

1              Seibel

2         MS. FITZGERALD:  Object to form.

3         Go ahead.

4         A.    Well, at this point in time here we

5    were asked to come up and help Jackie and assist

6    her if there was anything she needed help with or

7    anything to get her acclimated to her new

8    position because she had never been in a position

9    of a controller and now she's a controller for

10   six dealerships.

11             When Debbie took over after Vivian

12   left, Debbie had something like 30 years of

13   experience being a controller and we were not

14   asked to come up and assist her with any of that

15   part of it.  We came up in February to work on

16   the tax year-end and get all that pulled

17   together, but we weren't requested to do any sort

18   of work like this at that point in time.

19        Q.    You came in February to do the tax

20   work?

21        A.    Well, to do, to look at the year-end

22   December 31st books.

23        Q.    When you came in in December -- I'm

24   sorry, in February of 2017 to look at the

25   December 31, 2016 books, who would have come on

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

225

1                          Seibel

2           existing.

3                     MS. FITZGERALD:  What's the existing

4           one?

5                     MR. MULÈ:  The existing is 52.

6           Q.    Mr. Seibel, I show you what has been

7     marked as Exhibit 52 for identification, it's a

8     March 11, 2013 e-mail from Randy Franzen to you,

9     Vincent Bucolo, cc Hugh Whyte.  It says "I have a

10    few questions.  Number one, do sales tax return

11    agree with tax and non-taxable sales on tax

12    return."  Focusing on number 3, "Were 1099's sent

13    out?"  Do you see that?

14          A.    I see it.

15          Q.    Was there a process regarding 1099's?

16                    MS. FITZGERALD:  Object to form.

17          A.    There's lots of processes relating to

18    1099's, I'm not specifically sure what you're

19    referring to.

20          Q.    With respect to Star, the

21    dealerships, did you review 1099's?

22                    MS. FITZGERALD:  I just want to note

23          for the record that this e-mail was Star

24          Auto Body, which was not a plaintiff, but

25          go ahead.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel  ---  February 8, 2023

226

1                           Seibel
2           A.    No, we did not review 1099's except
3     to the extent that where there was 1099's from
4     the dealerships going to individuals who we
5     prepared their tax returns, we would have to get
6     copies of those in order to complete those
7     personal tax returns.  But there's on each of the
8     business returns or in each of the business tax
9     returns there's a question that must be answered
10    that asks did you make any payments that would
11    require you to issue and file a 1099, and if so,
12    did you file them.  So we would inquire as to did
13    you file your 1099's.
14          Q.    So you would inquire of who in
15    particular if Star filed the 1099's?
16          A.    We would inquire of management, but
17    generally it was Vivian and Debbie who would be
18    filing those or someone under their direction.
19    So we would be asking them to make sure they
20    filed their 1099's for the companies.
21          Q.    As far as review of 1099's, your
22    testimony is that you would only review 1099's
23    when?
24          A.    We don't review 1099's.
25          Q.    I thought you said if there was some

227

                              Seibel

1
2       individual --                               .
3              A.   Well, we would get a copy of any
4       1099's that went to individuals, for instance,
5       Mike Koufakis, Steve Koufakis, John Koufakis
6       Senior, Junior or the Third who were doing their
7       tax returns, their personal individual tax
8       returns.  So we would need that 1099 in order to
9       complete their individual tax returns.
10             Q.   So what is this a reference to, "Were
11      1099's sent out," is this a reference to what?
12             A.   That's a reference to when doing the
13      tax return for Star Auto Body did we ask them if
14      they filed their 1099's so that we can accurately
15      answer the question on the business tax return.
16             Q.   Let me show you the next one.
17             MR. MULÈ:  Can you mark this as
18             Exhibit 86, please.
19             (Exhibit 86, Printout from
20             timekeeping system regarding Star Toyota,
21             was so marked for identification, as of
22             this date.)
23             Q.   I show you what's been marked as
24      Exhibit 86.
25             A.   Can I review it for a minute?

228

1                          Seibel
2          Q.   Yes.  I ask you to take a look at it,
3     review it.  Tell me what that is when you've had
4     an opportunity to review it.
5               (Pause)
6          Q.   What is this document?
7          A.   It appears to be a printout from our
8     timekeeping system.
9          Q.   This is regards Star Toyota, correct?
10         A.   It is.
11         Q.   And it has entries from 2011 and
12    2012, correct?
13         A.   Yes.
14         Q.   Whose handwriting is on the second
15    page, do you know?
16         A.   That's mine.
17         Q.   TP stands for tax planning?
18         A.   It does.
19         Q.   What does the estate reference?
20         A.   That is a reference to work related
21    to either the estate of Georgia Koufakis or to
22    John Koufakis Senior's estate planning.
23         Q.   YE is related to year-end, right?
24         A.   Yes, that's our year-end visit when
25    we were physically there.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Robert Seibel   ---   February 8, 2023

229

Seibel

1
2      Q.    There's an entry for the date of

3   March 30, 2012, it says "Go through 1099's from

4   Carmen."  Do you see that?

5      A.    I see it.

6      Q.    This would indicate that you went

7   over 1099's with her?

8      A.    No.  This would indicate that I

9   got -- I received some 1099's from Carmen, most

10  likely for, could be, you know, either Mike, John

11  or Steve Koufakis or John Koufakis Senior's tax

12  return, and I was sorting through to separate

13  those and get them into the proper individual tax

14  files.

15            It could also be she was sending me

16  1099's that related to the real estate companies

17  because she also would have issued 1099's or the

18  dealership would have issued 1099's to the real

19  estate companies that we did the tax returns for,

20  so we would have wanted to see that as well in

21  doing the tax returns for those entities.

22            But most likely, if I spent an hour,

23  she probably sent me a package that had all those

24  1099's for those related people and entities.

25      Q.    How long would it take you to review