# EXHIBIT 11

Page 1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

                         - - -
3     STAR AUTO SALES OF    : Civil Action No.:
      BAYSIDE, INC. (d/b/a  : 1:18-cv-05775-ERK-CLP
4     STAR TOYOTA OF        :
      BAYSIDE), STAR AUTO   :
5     SALES OF QUEENS,      :
      LLC (d/b/a STAR       :
6     SUBARU), STAR HYUNDAI :
      LLC (d/b/a STAR       :
7     HYUNDAI), STAR NISSAN, :
      INC.(d/b/a STAR       :
8     NISSAN), METRO        :
      CHRYSLER PLYMOUTH     :
9     INC.(d/b/a STAR       :
      CHRYSLER JEEP DODGE), :
10    STAR AUTO SALES OF    :
      QUEENS COUNTY LLC     :
11    (d/b/a STAR FIAT) and :
      STAR AUTO SALES OF    :
12    QUEENS VILLAGE LLC    :
      (d/b/a STAR           :
13    MITSUBISHI),          :
                            :
14           Plaintiffs,    :
                            :
15           vs.            :
                            :
16    VOYNOW, BAYARD, WHYTE :
      AND COMPANY, LLP, HUGH :
17    WHYTE, RANDALL FRANZEN :
      AND ROBERT SEIBEL,    :
18                          :
             Defendants.    :
19                        - - -
20           FRIDAY, FEBRUARY 3, 2023
21                        - - -
22
23    (Caption continued on page 2.)
24
25    Job No. CS5701935
```

Page 2

1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

3                          - - -

4

                      FRIDAY, FEBRUARY 3, 2023

5

                           - - -

6

7

8          Oral Deposition of JACQUELINE CUTILLO, as
9   corporate designee for Star Auto Sales of Queens, LLC
10  d/b/a Star Subaru, taken at Marshall Dennehey, 2000
11  Market Street, Suite 2300, Philadelphia, Pennsylvania,
12  commencing at 9:05 a.m., before Lauren Sweeney, a Court
13  Reporter and Notary Public.

14                         - - -

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    A P P E A R A N C E S:

2            MILMAN LABUDA LAW GROUP, PLLC
             BY:  JOSEPH M. LABUDA, ESQUIRE
3            3000 Marcus Avenue
             Suite 3W8
4            Lake Success, New York 11042
             516-328-8899
5            joe@@mllaborlaw.com
             Representing the Plaintiffs
6
7            MARSHALL DENNEHEY
             BY:  MAUREEN FITZGERALD, ESQUIRE
8            620 Freedom Business Center
             Suite 400
9            King of Prussia, Pennsylvania 19406
             610-354-8270
10           mpfitzgerald@mdwcg.com
             Representing the Defendants
11
12
13
                         -  -  -
14
15   ALSO PRESENT:
16           RANDALL FRANZEN, VIA TELEPHONE
17           JEREMY KOUFAKIS
18           MICHAEL KOUFAKIS, VIA TELEPHONE
19           STEVE RAMBAM, VIA TELEPHONE
20
21                       -  -  -
22
23
24
25

Page 4

1                          I N D E X

2                            - - -

3    TESTIMONY OF:  JACQUELINE CUTILLO              PAGE

4    By MS. FITZGERALD. . . . . . . . . . . . . . . 6

5

6                            - - -

7                          EXHIBITS

8                            - - -

9    NUMBER          DESCRIPTION                    PAGE

10   Subaru-1        Notice                         6

11   Subaru-2        Amended Complaint              6

12   Subaru-3        "Exhibit-15" to affidavit      26

13   Subaru-4        Claim forms                    39

14   Subaru-5        Affidavit                      71

15   Subaru-6        Declaration                    71

16   Subaru-7        Complaint                      93

17   Subaru-8        Advertising invoices           104

18   Subaru-9        Checks                         106

19   Subaru-10       Check document                 108

20   Subaru-11       Document/Star 00028323         110

21   Subaru-12       Exhibit to affidavit           110

22

23

24

25

Page 5

1                  DEPOSITION SUPPORT INDEX

2       DIRECTIONS TO WITNESS NOT TO ANSWER

3       Page    Line

4       (None)

5

6

7

8       REQUEST FOR PRODUCTION OF DOCUMENTS

9       Page    Line    Description

10      (None)

11

12      STIPULATIONS

13      Page    Line

14      (None)

15

16      QUESTIONS MARKED

17      Page    Line

18      (None)

19

20

21

22

23

24

25

JACQUELINE CUTILLO

Page 6

```
 1                    - - -

 2              JACQUELINE CUTILLO, after

 3         having been first duly sworn, was

 4         examined and testified as follows:

 5                    - - -

 6    BY MS. FITZGERALD:

 7         Q.   Okay.  Good morning, Jackie.  Round three.  This

 8    is the third deposition that you've taken as a corporate

 9    designee.  I'm not going to go over the deposition

10    instructions.  I know you understand those.

11         A.   Yes.

12         Q.   You are here today as the representative

13    starting off today for the Plaintiff, Star Auto Sales of

14    Queens, LLC d/b/a Star Subaru; is that correct?

15         A.   That is correct.

16              MS. FITZGERALD:   I'm going to mark as

17         Subaru-1 the notice.

18                    - - -

19         (Exhibit Subaru-1 was marked

20         for identification.)

21                    - - -

22              MR. LABUDA:   Okay.

23                    - - -

24         (Exhibit Subaru-2 was marked

25         for identification.)
```

JACQUELINE CUTILLO

Page 23

1    individual customer transactions?

2        A.  As well as Voynow.

3        Q.  On what basis does the company contend that

4    Voynow was aware of the alleged concealment of this fraud

5    for each of the 67 customers?

6        A.  Aside from being told by Gladys, they also

7    reviewed all our books and records every single time they

8    came to the dealership and reviewed the service and parts

9    receivables schedules.

10       Q.  So, now, the company is contending that Gladys

11   told Voynow what specifically?  Because you've already

12   testified she asked them about the advance payment.

13       A.  Applying to the accounts receivable schedule.

14       Q.  Did she tell them something else above and

15   beyond that?

16       A.  She told them that the Subaru money was going

17   towards the Subaru service and parts accounts receivable

18   that were claims for customer CODs and deposits.

19       Q.  Okay.  And is that the conversation that you're

20   contending occurred on or about March of 2013, when the

21   first advance payment came in, or is it a second

22   conversation that Gladys had with Voynow?

23       A.  I don't know if it was 2013 or 2014, but it's a

24   conversation that she had with Voynow.

25       Q.  So it's one conversation, correct?

JACQUELINE CUTILLO

Page 85

1           THE WITNESS:  I wouldn't say they're a
2       supervisor, but if you have a question in regards
3       to something that they're affiliated with, you
4       would ask them a question.
5   BY MS. FITZGERALD:
6       Q.  All right.  We can move on from that scheme.
7               Before we do, has the company made any
8   claim under its employee theft policy regarding either
9   the conduct of Vivian, Filardo, or anyone else in
10  connection with that scheme?
11      A.  Not that I'm aware.
12      Q.  Okay.  So going back to the damage chart, there
13  is a scheme labeled the Motor Sports Advertising scheme
14  that allegedly occurred from November 25th, 2008, to
15  November 1st, 2016, in the amount of $1,419,874.83?
16      A.  That is correct.
17      Q.  Okay.  And the company alleges according to this
18  chart that Mr. Filardo unbeknownst to Subaru operated a
19  sole proprietorship, Motor Sports Advertising d/b/a
20  Subaru Motor Sports under the alias name Filatdo,
21  F-I-L-A-T-D-O, solely for the purpose of receiving
22  ill-obtained payments from Subaru for advertising work
23  that was never done.
24      A.  From Star Subaru.
25      Q.  From Star Subaru for advertising work that was

JACQUELINE CUTILLO

Page 86

1    never done.

2         A.   That is correct.

3         Q.   All right.  When was this scheme discovered?

4         A.   Early 2018.

5         Q.   By whom?

6         A.   A phone call came into the accounting office

7    asking for a payment, and we had no knowledge of that

8    person that was on the phone, who they were.  Michael

9    Koufakis overheard the conversation and instructed the

10   office to put that call on hold, and he then spoke with

11   the individual.

12        Q.   Okay.  And is that individual you're referring

13   to John Alexander?

14        A.   That is correct.

15        Q.   And you said this was discovered in early of

16   2018?

17        A.   Yeah.

18        Q.   So at that point Rosenfield had been engaged to

19   provide forensic accounting services for close to a year?

20        A.   Yep.

21        Q.   Was this scheme in any way investigated by

22   Rosenfield?

23        A.   I don't believe so.

24        Q.   So who investigated it?

25        A.   Michael Koufakis spoke with Mr. Alexander, and

JACQUELINE CUTILLO

Page 88

1    conversation and then had me put it on hold and took the
2    call.
3         Q.  Okay.  If you could look at Subaru-2, please.
4         A.  Okay.
5         Q.  This is the Amended Complaint that the company
6    has filed against Mr. Filardo and Motor Sports d/b/a
7    Motor Sports Advertising.
8         A.  Okay.
9         Q.  Does paragraph 33 through 44 represent the
10   company's allegations with regards to this scheme?
11        A.  Through what number, 40-what?
12        Q.  4.
13        A.  Yes.
14        Q.  Okay.  According to paragraph 55, Filardo was
15   responsible for hiring the advertiser; is that correct?
16        A.  That is correct.
17        Q.  Okay.  And that's part of his role as sales
18   manager?
19        A.  That is correct.
20        Q.  And is that the responsibility for all of the
21   dealership sales managers or is Subaru unique?
22        A.  No.  That is correct.
23        Q.  And do the sales managers have authority to
24   enter into contractual agreements on behalf of the
25   company?

JACQUELINE CUTILLO

Page 89

```
 1                MR. LABUDA:  Objection to scope, but you
 2         can answer.
 3                THE WITNESS:  During that period of time,
 4         yes.
 5    BY MS. FITZGERALD:
 6         Q.  Did the company have a policy or practice in
 7    place whereby advertising vendors or outside vendors had
 8    to be approved by ownership?
 9         A.  One more time.
10                THE WITNESS:   Repeat that.
11                    - - -
12                (The court reporter reads back
13         the previous question.)
14                    - - -
15                THE WITNESS:  They had the authority to
16         hire advertising vendors.
17    BY MS. FITZGERALD:
18         Q.  And enter into a contractual arrangement with
19    these vendors for purposes of advertising services?
20                MR. LABUDA:  Objection, but you can
21         answer.
22                THE WITNESS:  I don't believe there was a
23         contract in regards to this vendor.
24    BY MS. FITZGERALD:
25         Q.  So on that point, the company never had a
```

JACQUELINE CUTILLO

Page 90

1   written contract with the advertising vendor associated

2   with this particular scheme.

3       A.   That is correct.

4       Q.   Did the company have any type of written

5   document whatsoever, not necessarily a formal contract,

6   that memorialized the terms of the advertising

7   arrangement?

8       A.   Not that I'm aware.

9       Q.   Did the company have a policy or practice in

10  place that required some form of written document from a

11  vendor that set forth the terms regarding services that

12  were being provided?

13      A.   Not necessarily, no.

14      Q.   Okay.  Did the company have a budget for

15  advertising expenses?

16      A.   No.

17      Q.   Did the company have a practice in place where

18  it reviewed its advertising expenditures on an annual

19  basis or quarterly basis or any other periodic basis?

20      A.   Did you say owners?  What did you say?  Manager?

21      Q.   I said the company.

22      A.   The company.  Can you be more specific?

23      Q.   Anyone acting on behalf of the company.

24      A.   I don't know.

25      Q.   Did the company coordinate its advertising

JACQUELINE CUTILLO

Page 92

1           MR. LABUDA:  For advertising?

2           MS. FITZGERALD:  Yes.

3           THE WITNESS:  I believe so.

4    BY MS. FITZGERALD:

5       Q.  And as I understand your answer, it was

6    Mr. Filardo who made the decision to hire Motor Sports?

7       A.  That is correct.

8       Q.  And was he the sales manager for the company

9    during the entire period of November 2008, through

10   November 2016?

11      A.  That is correct.

12      Q.  Do you know at what point he actually became the

13   sales manager for the corporation?

14      A.  When the company opened.

15      Q.  Which would be?

16      A.  I believe February of 2005.

17      Q.  Who preceded him?

18      A.  No one.  The company opened in 2005.  He was the

19   manager.  Oh, who preceded -- after the fact.

20      Q.  The company opened in 2005, and he became the

21   sales manager in 2005?

22      A.  Yes.

23      Q.  All right.  Who was the prior advertising vendor

24   that Subaru used before retaining Motor Sports in 2008?

25          MR. LABUDA:  Objection, but you can

JACQUELINE CUTILLO

Page 93

1          answer.

2                    THE WITNESS:  I don't know.

3     BY MS. FITZGERALD:

4          Q.  So the corporation has sued Mr. Filardo civilly,

5     correct?

6          A.  Correct.

7          Q.  And the corporation has also sued Mr. Alexander

8     and his wife?

9          A.  Can you read the names?

10                    -  -  -

11                    (Exhibit Subaru-7 was marked

12          for identification.)

13                    -  -  -

14    BY MS. FITZGERALD:

15         Q.  I'm showing you Subaru-7.  Is this a copy of the

16    Complaint that the company filed in federal court against

17    Mr. Alexander and someone who I believe is his wife?

18         A.  That is correct.

19         Q.  Okay.  And is it the company's contention that

20    it did not receive any of the advertising services that

21    it purchased or --

22         A.  From Motor Sports?

23         Q.  Yes.

24         A.  Okay.  Yes.

25         Q.  Okay.  So the company's position is that between

JACQUELINE CUTILLO

Page 94

1    November of 2008, and November of 2016, it paid

2    1.4 million dollars roughly for advertising and never

3    received any of those advertising services.

4         A.   That is correct.

5         Q.   The initial Complaint that was filed by the

6    company against Mr. Filardo and Subaru too happens to be

7    the Amended Complaint, but --

8                   MR. LABUDA:  Let's just take a quick break

9              for one second.

10                  MS. FITZGERALD:  Can I just finish this

11             question?

12                  MR. LABUDA:  I don't think there's a

13             question pending.  I just wanted to clarify one

14             thing.

15                  MS. FITZGERALD:  I started it though.

16                  MR. LABUDA:  I know, but you didn't finish

17             the question.

18                  MS. FITZGERALD:  Well, it's a pending

19             question.

20                  MR. LABUDA:  Okay.  You can ask the

21             question, and then we're going to take a break.

22   BY MS. FITZGERALD:

23        Q.   So in paragraph 36 of Exhibit-2, it states that

24   Subaru was aware that it was receiving advertising

25   services from New Vision Advertising but never actually

JACQUELINE CUTILLO

Page 95

1    paid them directly.

2        A.   Yes.

3        Q.   As you sit here today, is that accurate?  Is

4    that the company's position?

5                MR. LABUDA:  Objection, but you can

6            answer.

7                THE WITNESS:  I don't know.

8                MR. LABUDA:  Let's take a break for a

9            second.

10                    - - -

11            (There was a brief recess in

12        the proceeding.)

13                    - - -

14                THE WITNESS:  Can I make some

15        clarifications?

16                MS. FITZGERALD:  Go ahead.

17                THE WITNESS:  Okay.  In regards to

18        advertising vendors and contracts, I stated Motor

19        Sports had no contract. Sales managers are not --

20        the procedures are sales managers are not to sign

21        contracts.  Owners are to sign a binding

22        contract, which is why I stated this one had no

23        contract.

24    BY MS. FITZGERALD:

25        Q.   Okay.  Did the company have a requirement that

JACQUELINE CUTILLO

Page 96

1    there be contracts with its vendors?

2         A.   It's not necessary to have a contract that binds

3    you in.

4         Q.   Did the company have a requirement that there be

5    some sort of writing memorializing the services that it

6    was receiving from the vendor?

7         A.   No.   And I have one more clarification.

8         Q.   Go ahead.

9         A.   In regards to Exhibit-2, line 36.

10        Q.   Yes.

11        A.   It says Star Subaru was aware that they were

12   receiving advertising services from New Vision Industries

13   but never actually paid them.   That was your question

14   before, and that is an incorrect statement.   We did not

15   receive services from New Vision Advertising.

16        Q.   It's the company's position as it sits here

17   today that it didn't receive advertising services from

18   New Vision or from Motor Sports?

19        A.   That is correct.

20        Q.   Okay.   At what point -- you've already told me

21   about the phone call that came in in early 2018.

22             At what point did the company make a

23   determination that not only did it not know who was the

24   accurate vendor but that it had not received any of the

25   advertising it had paid for?

JACQUELINE CUTILLO

1      A.   What date, year, time period?   In or around the

2   time of the investigations and discussions with John

3   Alexander and Michael Koufakis.   John Alexander was not

4   able to provide documentation showing actual advertising

5   being distributed.

6      Q.   Did the company have any records on its own to

7   show one way or the other whether it received any of the

8   advertising services it paid for?

9      A.   What Star was presented was an invoice and a

10  sample that we know now was a sample flyer generated by

11  New Vision to Subaru Motor Sports for advertising.   But

12  those fliers never actually were sent out.

13     Q.   Okay.   Let me back up.

14          Did the company believe it was purchasing

15  -- when it was purchasing advertising services, was the

16  advertising in the form of those mailing cards, the

17  cardboard mailers?

18     A.   That is correct.   That was the impression.

19     Q.   Okay.   Was that the majority of what the company

20  believed it was purchasing?

21     A.   That is the impression.

22     Q.   And there were also, I believe, a couple of

23  purchases where the company believed it was buying

24  television ads that were being run.

25     A.   That is correct.

JACQUELINE CUTILLO

Page 103

1    mailing of the cards, did the company believe that Motor

2    Sports was designing the cards and also mailing them, or

3    did the company understand that there was another entity

4    that was actually going to mail them?

5                MR. LABUDA:  Objection, but you can

6           answer.

7                THE WITNESS:  I don't think it was

8           something that they were privy to.  I think they

9           were under the impression that Motor Sports

10          Advertising was producing advertising.  How they

11          produced that advertising is based off of the

12          bill that they provided us.

13               So if they provide us with a bill and they

14          provide us with a flyer, mailer, whatever you

15          want to call it, a card, that's our backup like

16          for us to issue a check.

17   BY MS. FITZGERALD:

18       Q.  Okay.  Did the company have any role in

19   providing either zip codes or a customer list or

20   demographics of anybody who was being targeted with the

21   advertising services?

22       A.  The company did not.

23       Q.  Was that left up to Motor Sports to decide who

24   would receive mailings?

25       A.  And the sales manager.

JACQUELINE CUTILLO

Page 104

1      Q.   The sales manager on behalf of the company?

2      A.   Right.

3      Q.   So it was left -- so it was the company's

4  understanding that Filardo working with the advertising

5  vendor would decide who would receive mailings?

6      A.   The demographic.

7      Q.   Yeah.

8      A.   Yes.

9      Q.   Did the company purchase mailing lists?

10      A.   I don't know.

11               - - -

12           (Exhibit Subaru-8 was marked

13        for identification.)

14               - - -

15  BY MS. FITZGERALD:

16      Q.   Okay.  I'm showing you what we've marked as

17  Subaru-8, which are a sampling of advertising invoices

18  that was produced by Star in this lawsuit.

19      A.   Okay.

20      Q.   Is it fair to say that the company received

21  invoices for all of the check payments that it thereafter

22  issued?

23      A.   Can you rephrase that?

24      Q.   Sure.  So there are check payments, checks

25  payable, to Motor Sports that we'll identify soon.

JACQUELINE CUTILLO

Page 105

1          But is it fair to say that before that

2    check was ever prepared the company would had to have

3    received an invoice?

4          A.   That is correct.

5          Q.   Okay.  And does it appear that, you know, the

6    documents that are in Subaru-8 are the types of invoices

7    that the company would receive with regard to the checks

8    that were ultimately made payable to Motor Sports?

9          A.   This is a sampling.

10         Q.   Okay.  Would there be any requirement that

11   somebody at the company had to review the invoices that

12   Motor Sports sent and say, yes, this was a legitimate

13   service that I purchased and okay to pay?

14         A.   If the manager is handing the invoice to the

15   accounting office for it to be paid with a mailer or such

16   documentation, it's presumed that the advertising is

17   done.

18         Q.   Okay.  So is it the company's position that when

19   it would receive invoices such as what are in Subaru-8,

20   it would also receive a mailer?

21         A.   That's correct.

22         Q.   And when you say mailer, in my mind that's sort

23   of like a cardboard --

24         A.   Flyer.

25         Q.   Flyer.

JACQUELINE CUTILLO

Page 106

1      A.   Something along those lines. Something should

2   and could be attached with the invoice, yes.

3      Q.   Does the company -- because obviously the

4   invoices have been produced, but there are not actual

5   cardboard mailers that at least have been produced to me

6   with each of these invoices.

7              Does the company have those mailers?

8      A.   Whatever mailers the company actually had were

9   produced.  If they didn't have them, then they weren't

10   produced, but whatever was produced is what the company

11   has.

12      Q.   If they weren't produced, then is it fair to say

13   that the invoice was sent, at least for the ones that

14   don't have it, without the mailer, without the cardboard

15   mailer?

16      A.   Not sent.  Handed.

17      Q.   Handed.

18      A.   Correct.

19              - - -

20              (Exhibit Subaru-9 was marked

21         for identification.)

22              - - -

23   BY MS. FITZGERALD:

24      Q.   Okay.  I'm showing you what we've marked as

25   Subaru-9, which are a series of checks that were produced

JACQUELINE CUTILLO

Page 107

1    by Star in this lawsuit that begin in April of 2011, and

2    end in November 1st, 2016.

3         A.   That's what it appears.

4         Q.   Okay.  Does the company acknowledge that all of

5    these checks were signed by authorized check signers?

6         A.   That is correct.

7         Q.   And there's no contention by the company that

8    any of the signatures were forged?

9         A.   That is correct.

10        Q.   What is the company's understanding as far as

11   whether there was any backup presented at the time these

12   checks were signed?

13        A.   They would have attached the copy of the

14   invoice.

15        Q.   Was there anything attached showing, for

16   instance, postal, the U.S. postal receipt, showing that X

17   number of items were mailed?

18        A.   Not that I'm aware.

19        Q.   Did the company have a policy in place for the

20   requirement of a receipt from the U.S. postal office when

21   it was buying advertising in the form of mailers that

22   were being mailed out?

23        A.   Not that I'm aware.

24        Q.   And Subaru-9 shows that the corporation was

25   making payments to Motor Sports from its operating

JACQUELINE CUTILLO

Page 108

1    account?

2        A.  That is correct.

3        Q.  Should backup that was provided to the company

4    have included documentation showing proof of actual

5    mailing?

6              MR. LABUDA:  Objection, but you can

7          answer.

8              THE WITNESS:  I don't know.  Not

9          necessarily.  You have an invoice.

10   BY MS. FITZGERALD:

11       Q.  Did the corporation at any point question any of

12   the invoices from Motor Sports during 2011 to 2017 --

13   '18, I'm sorry -- I'm sorry, 2008 to 2016?

14       A.  Not that I'm aware of, no.

15                  - - -

16              (Exhibit Subaru-10 was marked

17          for identification.)

18                  - - -

19   BY MS. FITZGERALD:

20       Q.  I'm showing you what we've marked as Subaru-10.

21       A.  Okay.

22       Q.  Do you recognize this document?

23       A.  Yes.

24       Q.  What is it?

25       A.  This document represents the checks that you

JACQUELINE CUTILLO

Page 111

1           Is this what you were referring to?

2      A.  That is correct.

3      Q.  So if you look through the other pages in the

4  exhibit, it appears that the company was able to break

5  down certain amounts by year, with the breakdown

6  beginning with the year 2010.

7           So if you look at the third page of the

8  exhibit, do you see the breakdown and then the year that

9  is most remote is 2010?

10     A.  I see it.

11     Q.  Was the company unable to generate a breakdown

12 for 2008 or 2009?

13     A.  That is correct.

14     Q.  So then --

15     A.  The system does not hold all of that data, but

16 it always retains the initial date of issuance and the

17 overall payment made, which is why the first page is so

18 important.

19     Q.  Does the company know how the payments that were

20 made by it to Motor Sports were recorded in its books and

21 records?

22     A.  Can you --

23     Q.  Sure.  Does the company have an advertising

24 expense account?

25     A.  Yes.

JACQUELINE CUTILLO

Page 112

1      Q.  Did the company record those payments which were

2  the checks that were issued to Motor Sports, did they

3  record them as advertising expenses?

4      A.  Yes.

5      Q.  And they were recorded then in -- is that

6  account 6544 or no?

7      A.  No.

8      Q.  That is account -- what is the account for

9  advertising expense?

10     A.  You'd have to show me a document.  I don't know

11  it by heart.

12     Q.  Okay.  But there's no contention from the

13  company that the recording of those expenditures were

14  somehow improper in its books and records?

15     A.  No.

16     Q.  On what basis does the company contend Voynow is

17  responsible for the 1.4 million approximately that's

18  listed in the damage chart relating to this scheme?

19              MR. LABUDA:  Objection, but you can

20         answer.

21              THE WITNESS:  I'd like to defer that to

22         the expert, but in my opinion it's because they

23         reviewed the 1099s.

24  BY MS. FITZGERALD:

25     Q.  When you say review, what do you mean by that?

JACQUELINE CUTILLO

Page 113

1     A.   They reviewed the 1099s.

2     Q.   What do you mean by that?

3     A.   Voynow would come in four times a year, review

4  our books and records, and reviewed the 1099s when they

5  were generated.  And since we received the letter from

6  the IRS stating that the tax ID number did not match the

7  1099 that was supplied for 2016, but the letter we

8  received in 2018, Voynow should have noticed that 1099s

9  were not accurately being done when they reviewed the

10  1099s.

11     Q.   Is there a paper file of 1099s that the company

12  keeps?

13     A.   What do you mean?

14     Q.   You said that Voynow was receiving the 1099s

15  allegedly.

16          MR. LABUDA:   Objection.

17  BY MS. FITZGERALD:

18     Q.   Is there a file of 1099s that the company keeps?

19     A.   When Voynow would come in for their year-end

20  work, they would review the 1099s.

21     Q.   Again, is there a file of 1099s that the company

22  keeps?

23     A.   They keep it for a period of time.

24     Q.   So for each tax year, does the company keep some

25  sort of file for 1099s?