EXHIBIT 12

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

3   1:18-CV-05775-ERK-CLP
    -----------------------------------------x

4

    STAR AUTO SALES OF BAYSIDE, INC.

5   (d/b/a STAR TOYOTA OF BAYSIDE), STAR
    AUTO SALES OF QUEENS, LLC (d/b/a STAR

6   SUBARU), STAR HYUNDAI LLC (d/b/a
    STAR HYUNDAI), STAR NISSAN, INC. (d/b/a

7   STAR NISSAN), METRO CHRYSLER
    PLYMOUTH INC. (d/b/a STAR CHRYSLER

8   JEEP DODGE), STAR AUTO SALES OF
    QUEENS COUNTY LLC (d/b/a STAR FIAT)

9   And STAR AUTO SALES OF QUEENS
    VILLAGE LLC (d/b/a STAR MITSUBISHI),

10

             Plaintiffs,

11

     v.             DAY 1

12

    VOYNOW, BAYARD, WHYTE AND COMPANY, LLP,

13  HUGH WHYTE, RANDALL FRANZEN AND ROBERT
    SEIBEL.

14

             Defendants.

15  -----------------------------------------x

16                 2000 Market Street
                 Philadelphia, Pennsylvania

17

                 February 1, 2023

18                10:38 a.m.

19

20        DEPOSITION of JACQUELINE CUTILLO, a

21  30(b)(6) witness of Star Nissan, held at the

22  above-entitled time and place, taken before

23  Carolyn Crescio, a Professional Shorthand

24  Reporter and Notary Public of the State of

25  Pennsylvania.
    Job No. CS5681760

```
1                    J. CUTILLO
2  A P P E A R A N C E S:
3

   MILMAN LABUDA LAW GROUP, PLLC
4  Attorneys for Plaintiffs
        3000 Marcus Avenue
5       Suite 3W8
        Lake Success, New York 11042
6  BY: JOSEPH LABUDA, ESQ.
7

8
   MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
9  Attorneys for Defendants
        620 Freedom Business Center
10      Suite 300
        King of Prussia, Pennsylvania 19406
11 BY: MAUREEN FITZGERALD, ESQ.
12

13 ALSO PRESENT:
   Jeremy M. Koufakis, Esq.
14 Randall Franzen
   Robert Seibel
15 Michael Koufakis (via telephone)
16 Steve Rambam (via telephone)
17
18
19
20
21
22
23
24
25
```

1          J. CUTILLO

2    J A C Q U E L I N E   C U T I L L O, the witness

3    herein, after having been first duly sworn by a

4    Notary Public of the State of Pennsylvania, was

5    examined and testified as follows:

6    BY THE COURT REPORTER:

7          Q.    Please state your name for the

8    record.                           .

9          A.    Jacqueline Cutillo.

10   EXAMINATION

11   BY MS. FITZGERALD:

12         Q.    Good morning, Jacque.

13         A.    Good morning.

14         Q.    I'm Maureen Fitzgerald.  We have met

15   before.

16         We are here today to take the deposition

17   of a corporate representative.  Today we are

18   going to start initially with a corporate

19   representative on behalf of the plaintiff, Star

20   Nissan, Inc., d/b/a Star Nissan.

21         A.    Correct.

22         Q.    Okay.  So we have marked as

23   Exhibit 1 the deposition notice, Nissan 1.

24               (Deposition Notice is received

25               and marked as Exhibit Nissan 1 for

Page 7

```
 1                    J. CUTILLO

 2        A.    Yes, this is what I reviewed.

 3        Q.    Okay.  If you would, go to the last

 4   page of the chart.

 5        A.    Okay.

 6        Q.    And you probably want to keep that

 7   handy throughout the deposition.

 8        A.    Okay.

 9        Q.    Under Star Nissan, in this chart,

10   there is a scheme referenced as the Staples

11   scheme?

12        A.    Correct.

13        Q.    And according to the chart, the

14   corporation is contending that Carmen Jones

15   bought various items, mainly gift cards, from

16   Staples, Incorporated, using a Star Nissan

17   Staples credit card for her own personal use.

18   Is that correct?

19        A.    Correct.

20        Q.    And the corporation is contending

21   that this scheme allegedly took place between

22   August of 2001 through May of 2017?

23        A.    Correct.

24        Q.    And the corporation is claiming that

25   the amount of alleged damages is $68,852.67?
```

Page 8

1                    J. CUTILLO

2        A.    Yes.

3        Q.    Okay.  When was this scheme
4   discovered?

5        A.    The scheme was discovered, I want to
6   say, 2018.

7        Q.    Do you know when in 2018?

8        A.    Not exactly.

9        Q.    Who discovered it?

10       A.    So that scheme was discovered when a
11  Staples invoice came into the accounting office.
12  And John Koufakis III, saw it, and didn't know
13  what it was, and immediately forwarded it to
14  Michael Koufakis's attention.

15       Q.    Who determined the amount of $68,000
16  that's listed in this chart?

17       A.    Michael Koufakis.

18       Q.    Now, the company had hired
19  Rosenfield as a forensic accountant in April
20  of 2017?

21       A.    Correct.

22       Q.    Was Rosenfield involved in any way
23  in investigating the scheme?

24       A.    Not that I'm aware of, no.

25       Q.    And Rosenfield did not uncover the

```
 1                    J. CUTILLO
 2    scheme at any point between when it was hired,
 3    up until the point that Michael Koufakis became
 4    aware of it in 2018?
 5         A.    I think Michael handled this
 6    particular scheme and then explained to them the
 7    situation.  And then they further did -- they
 8    allowed him to do his research and everything
 9    that went along with it.
10         Q.    Okay.  But Rosenfield did not
11    discover it?
12         A.    No.
13         Q.    The company is suing Carmen Jones
14    individually in state court, correct?
15         A.    Correct.
16                (Amended Verified Complaint is
17                received and marked as Exhibit
18                Nissan 3 for identification, as of
19                this date.)
20         Q.    I'm showing you what has been marked
21    as Nissan 3, which is the amended complaint that
22    the company has filed against Ms. Jones and --
23    is that her husband, Dmitrius?
24         A.    Dmitrius, yes.
25         Q.    And is the Staples scheme part of
```

Page 18

1                    J. CUTILLO

2      place as far as monitoring purchases through the

3      Staples account?

4            A.    No.

5                        MR. LABUDA:  I'm just going to

6                  put in an objection, just a standing

7                  objection.  To the extent that this

8                  line of questioning with respect to

9                  the account and the creation of the

10                  account is beyond the scope of the

11                  30(b)(6), we are objecting.  I'm not

12                  going to preclude the witness from

13                  answering the question, so just

14                  proceed, but I just want to put that

15                  on the record.

16            Q.    Was Carmen Jones's position with the

17      company an accounts payable clerk?

18            A.    Correct.

19            Q.    So her job would be to -- one aspect

20      of her job would be to pay vendor invoices?

21            A.    Correct.

22            Q.    If you could turn to the complaint,

23      please, which was Exhibit 3.  And paragraph 28

24      of the amended complaint states:  Upon

25      information and belief, Carmen would intercept

Page 19

J. CUTILLO

1

2      the Staples bills sent to Nissan every month.

3              A.      Correct.

4              Q.      Part of her job was to pay those

5      bills, correct?

6              A.      Correct.

7              Q.      And on what basis does the company

8      contend that she intercepted these bills?

9              A.      Because the bills that would have

10     came in would have given a detailed explanation

11     of what was purchased, instead of just a check.

12     And we have no copies of those bills that would

13     have been given in the mail.

14             Q.      Okay.  So is it accurate that during

15     the period of 2001 through 2017, when Staples

16     would send monthly bills to the company, those

17     bills would have an itemized list of the

18     purchases that were made using that account?

19             A.      It's possible.

20             Q.      What do you mean, "it's possible"?

21     Were the bills itemized, or were they not?

22             A.      The bills would say office supplies

23     were purchased.  But you wouldn't have the

24     receipt for the purchases that she would have

25     obtained when she went to Staples and used the

Page 34

1                       J. CUTILLO

2     [sic]?

3           A.    Yes.

4           Q.    So is it the corporation's

5     contention that Ms. Jones committed theft on or

6     about November 6th, or prior to that date when

7     she actually went to the Staples store and used

8     the account to purchase an item such as a gift

9     card for her personal use?

10                    MR. LABUDA:   November 4th.  You

11                said 6th.

12                    MS. FITZGERALD:   November 4.

13          A.    We are contending that she -- yes.

14          Q.    So the theft occurred when she

15    purchased the item, acquired the item?

16          A.    Correct.

17          Q.    Okay.  And that would be the case

18    for each purchase that she made.  It's the

19    corporation's contention that the theft occurred

20    at the time Ms. Jones acquired possession of the

21    physical item?

22          A.    Yes, because the transaction is a

23    fraudulent transaction.

24                    (Four-page document of data entry

25                is received and marked as Exhibit

Page 35

1                    J. CUTILLO

2              Nissan 6 for identification, as of

3              this date.)

4         Q.    I'm sorry.  Showing you what we have

5    marked as Nissan 6.  Have you seen this document

6    before?

7         A.    Yes.

8         Q.    And what is it?

9         A.    It is a calculation done by Michael

10   Koufakis, detailing what transactions were

11   considered non-business-related purchases with

12   the Staples credit card, going to 2001, because

13   we couldn't obtain any data prior to that.

14        Q.    Okay.  So this exhibit, Nissan 6,

15   represents the individual purchases made by

16   Ms. Jones between 2001 through 2017, the alleged

17   purchases made by Ms. Jones between 2001 through

18   2017, which the corporation is contending were

19   fraudulent purchases?

20        A.    The portion of the transactions that

21   were fraudulent, correct.

22        Q.    Okay.  And the amount on this

23   exhibit of the 68,000 corresponds with the

24   amount in the chart on Exhibit 2?

25        A.    Correct.

Page 36

J. CUTILLO

1

2      Q.    And for each of these alleged

3   purchases, it's the company's contention that

4   the theft occurred on the date listed in the

5   first column of this exhibit?

6      A.    That's the date that we contend is

7   the theft, yes.

8      Q.    Has the corporation ever located the

9   physical Staples credit card account?

10                MR. LABUDA:  Objection.

11                You can answer.

12     Q.    Credit card?

13     A.    No.

14     Q.    But it's the contention -- it's the

15  corporation's contention that there was an

16  actual physical credit card?

17     A.    Correct.

18     Q.    Okay.  In one of the documents,

19  Exhibit 4, the corporation made a request of

20  Staples to provide a photo image of the card,

21  front and back.  Do you see that?

22     A.    Yes.

23     Q.    Was that ever provided?

24     A.    No.

25     Q.    Was any explanation given by Staples

Page 39

J. CUTILLO

1
2     or her own funds, that employee was then
3     reimbursed after providing a receipt?
4          A.    Correct.
5          Q.    Did the corporation ever determine
6     whether there was just one credit card or more
7     than one associated with the Staples account?
8          A.    Not that I'm aware of.
9          Q.    It never found out whether there was
10    one or more than one?
11         A.    No.
12         Q.    Other than Ms. Jones' alleged use of
13    the Staples account with a credit card, is the
14    company aware of any other employee that used
15    the Staples account with a credit card?
16         A.    With their own personal credit card?
17         Q.    No.   With the corporation's card.
18         A.    Not that I'm aware of, no.
19               (Copies of checks is received and
20               marked as Exhibit Nissan 7 for
21               identification, as of this date.)
22         Q.    I'm showing you what we have marked
23    as Nissan 7, which is copies of copies on the
24    corporation's operating account from 2014
25    through 2017, making payment to Staples.

Page 40

```
 1                      J. CUTILLO
 2          Do you see that?
 3          A.     I see that.
 4          Q.     And do these checks show that the
 5     company is making payments of Staples' bills
 6     from its operating account?
 7          A.     The checks associated with the
 8     operating account.
 9          Q.     Does the corporation acknowledge
10     that these checks are all signed by authorized
11     check signers?
12          A.     Yes.
13          Q.     So there's no contention by the
14     corporation that any of these signatures were
15     forged?
16          A.     No.
17          Q.     Did the corporation have a policy in
18     place that only one particular owner or dealer
19     principal could sign checks on behalf of Nissan,
20     or could any of the authorized check signers
21     sign on behalf of Nissan?
22          A.     Any authorized signer can sign.
23          Q.     Did the corporation have a policy in
24     place during 2001 through 2017, that required
25     backup documents with regard to these Staples
```

Page 41

J. CUTILLO

1

2 payments be provided to the check signer, before

3 he signed the check?

4      A.    Repeat that?

5      Q.    Did the corporation have a policy

6 with regard to paying these Staples invoices

7 that backup documentation be provided to the

8 check signer before he would sign these checks?

9      A.    Are you referring to, like, full

10 backup?  I'm not understanding the question.

11      Q.    Did the corporation have a policy,

12 as far as any backup being provided to the check

13 signers, with regard to signing these Staples

14 checks that are listed in Exhibit 7?

15      A.    Not that I'm aware of.

16      Q.    Did the corporation ever question

17 any of the Staples charges at any point between

18 2001 through 2017, before signing any of these

19 checks to authorize payment?

20      A.    No.

21      Q.    Were the amounts listed in these

22 checks recorded in the company's dealer

23 management system, as an office supply expense?

24      A.    Do you mean if the bill was expensed

25 to office supplies?

Page 42

1                      J. CUTILLO

2          Q.    However it was charged.  Yes.

3          A.    Yes.

4          Q.    So as far as the corporation is

5     aware, all of these payments to Staples were

6     expensed as an office supply?

7          A.    Correct.

8          Q.    So there's no contention by the

9     corporation that any of these amounts that were

10    paid to Staples were improperly recorded in any

11    way in its dealer management system?

12         A.    No.

13         Q.    Other than Ms. Jones, is the

14    corporation -- other than Ms. Jones and my

15    client, is the corporation pursuing anybody else

16    for its alleged loss in connection with the

17    Staples scheme?

18         A.    No.

19         Q.    Is this scheme -- the corporation is

20    presently suing Rosenfield.  Are you aware of

21    that?

22         A.    Yes.

23         Q.    Is this scheme in any way part of

24    the corporation's claim against Rosenfield?

25                   MR. LABUDA:  Objection in terms

Page 43

J. CUTILLO

2 of the scope, but you can answer.

3 A. I don't know.

4 Q. Has there been any recovery by the

5 corporation against Ms. Jones?

6 A. In regards to this --

7 Q. In regards to this scheme.

8 A. No.

9 Q. Has there been any settlement offer

10 by Ms. Jones with regard to this scheme?

11 A. No.

12 Q. The corporation had a bonding or

13 fidelity policy in place with regard to employee

14 theft during the period at issue, with regard to

15 this scheme.  Has the corporation filed any

16 claim with its insurance carrier with regard to

17 this scheme?

18   MR. LABUDA:  Objection.  Beyond

19  the scope.

20   You can answer.

21 A. I don't know.

22 Q. Has Ms. Jones been criminally

23 charged as a result of this scheme?

24 A. No, not yet.

25 Q. Has there been any -- is the

Page 46

```
 1                        J. CUTILLO
 2   documentation.
 3                  MR. LABUDA:  Is this a good time
 4            for a bathroom break?
 5                  MS. FITZGERALD:  Sure.  We can
 6            take a break.
 7                  (A break was taken.)
 8                  THE WITNESS:  One more
 9            clarification.  When you asked me if
10            we were pursuing anyone in the
11            Carmen Jones case, I didn't mention
12            Dmitrius Jones, her husband.
13                  MS. FITZGERALD:  Okay.  And I
14            think I understood that.
15                  THE WITNESS:  That's what I
16            thought, but I just wanted to
17            clarify it.
18                  MS. FITZGERALD:  Okay.
19       Q.    You mentioned that you have been --
20   the corporation has been communicating with
21   Aaron Diaz, who is the Queens assistant DA?
22       A.    ADA, yes.
23       Q.    Did he replace Alison Wright as far
24   as the corporation's contact person?
25       A.    He's just the one that is handling
```

Page 120

1                          J. CUTILLO

2     statement always matched, if I'm using the right

3     terminology?

4          A.     Okay.  Dollar amount-wise, yes, it

5     matched.  Not the information based on that.

6          Q.     And on this AmEx scheme, on what

7     basis is the corporation contending that Voynow

8     is responsible for this 365,000 plus $2,600

9     that's alleged to be part of the scheme?

10                    MR. LABUDA:  Objection, but you

11                    can answer the question.

12          A.     I mean, I can defer that to the

13     expert, but if you would like my personal

14     opinion...

15          Q.     I would like your position as the

16     company representative, as far as the basis for

17     the corporation's claims against my client as

18     part of this scheme.

19          A.     So you want my opinion on behalf of

20     the corporation?

21          Q.     Whether it's your opinion, or

22     whether it's your facts, whatever the answer is.

23          A.     All right.  So it's my opinion that

24     Voynow would have been able to identify it based

25     off of the accounts receivable to the credit

Page 121

1                       J. CUTILLO

2     cards, as well as being responsible to look at

3     and review the parts statement every time they

4     came.

5          Q.     Say the first part of that answer

6     again?

7          A.     They would review the credit card

8     receivable schedules when they'd come, as well

9     as reviewing the parts statements.

10         Q.     Anything else?

11         A.     No.

12         Q.     All right.  Moving on.

13    .      The next scheme that's part of this chart

14    is what's labeled as the "reversed-deposit

15    scheme."  And the company alleges that took

16    place from February 20th of 2013 to April 19th

17    of 2016.  Correct?

18         A.     Correct.

19         Q.     And the company alleges that

20    Ms. Jones stole allegedly $319,150.98.

21         A.     Correct.

22         Q.     And according to the company,

23    Ms. Jones stole bonus money paid by NMAC to Star

24    Nissan, that was issued via a quarterly credit

25    on its monthly parts statement invoice, by first

Page 171

1                        J. CUTILLO

2    I'm sorry -- January 14th, 2015.  And the

3    $225,859.45 reflects amounts that were stolen on

4    or before January 14, 2015, correct?

5         A.    I believe so, yes.

6         Q.    On what basis does the company

7    contend that Voynow is liable for the $319,150

8    as part of the reversed-deposit scheme?

9              MR. LABUDA:  Objection, but you

10             can answer.

11        A.    Can I differ that to the expert?

12        Q.    Well, I want to know -- the

13   corporation has made claims, so I want to know

14   what facts or information the corporation has in

15   support of its claims.  I'm not looking for

16   opinion.  I'm looking for what facts or

17   information the corporation has that supports

18   the basis for its claims against Voynow.

19        A.    But as a representative of the

20   corporation, I'm not a factual -- I don't -- I'm

21   not an expert.

22        Q.    You're here on behalf of the

23   corporation, so on what basis is the corporation

24   claiming that Voynow is responsible for this?

25             MR. LABUDA:  Same objection, but

Page 172

                        J. CUTILLO

1

2          you can answer.

3      A.    It's my opinion that they would have

4  known about this, based off of the parts

5  statement and the credit card receivables

6  schedules.  That's what I can come up with right

7  now off the top of my head.

8      Q.    When you say "parts statement,"

9  you're referring to the monthly Nissan North

10 America parts statement?

11     A.    Yes.

12     Q.    That the company no longer has?

13     A.    Right.  But they had when they came.

14     Q.    And you said the credit card

15 receivable.  Are you referring to the American

16 Express credit card receivable or something

17 else?

18     A.    The American Express is on the

19 credit card receivable schedule.  That schedule

20 is consistent of AmEx, Visa, Discover, and

21 MasterCard.

22     Q.    What is it about the parts statement

23 that the company contends should have alerted

24 Voynow to what Ms. Jones was allegedly doing?

25              MR. LABUDA:  Objection, but you

Page 178

1                    J. CUTILLO

2    corporation or anyone on its behalf, against

3    Carmen Jones, other than Exhibit 14?

4         A.    Yes.

5         Q.    And what are you aware of?

6         A.    We have presented to the district --

7    assistant district attorney, the American

8    Express scheme and the reversed-deposit scheme.

9         Q.    And it was presented in the context

10   of a criminal complaint being filed?

11        A.    Correct.

12             MS. FITZGERALD:  I'm going to ask

13             for a copy of that because we don't

14             have that.

15             MR. LABUDA:  Okay.

16        Q.    Do you know when that was submitted?

17        A.    Not off the top of my head.

18        Q.    So this is December of 2018.  Can

19   you give me an estimate in relation to that

20   date?  Well, actually, you discovered it in May

21   of 2020.

22        A.    2020.

23        Q.    So in relation to that discovery,

24   when was the criminal complaint submitted?

25        A.    I can guess but I couldn't be

Page 179

```
 1                    J. CUTILLO
 2   definitively sure which -- if it was 2020 or
 3   2021.
 4        Q.    Okay.
 5             MR. LABUDA:  Let's take a break
 6             for a second.
 7             (A break was taken.)
 8        A.    Can I make a thing?
 9             MR. LABUDA:  A clarification?
10             THE WITNESS:  Clarification.
11        A.    There's no criminal complaint that
12   was created for the AmEx or reversed-deposit
13   scheme.  It was just -- the information was just
14   presented to the district attorney, assistant
15   district attorney.
16        Q.    Okay.
17        A.    So we didn't have to file a criminal
18   complaint.
19        Q.    Okay.  And when you say
20   "information," was the information presented in,
21   like, a summary form or a report form, or was it
22   just --
23        A.    It was a bunch of documentation, all
24   like the exhibits and stuff that you have, and
25   then it was explained to them the process of
```

1                        J. CUTILLO

2    what had happened, verbally, in person.

3         Q.    Okay.  Have there been any charges

4    filed against Ms. Jones?

5         A.    Not yet.

6         Q.    Did the company have a policy in

7    place as far as when somebody in the accounting

8    office made a reversing journal entry, whether

9    that had to have approval?

10        A.    A reversing journal entry?

11        Q.    Yes.

12        A.    We are not talking about reversing

13   journal entries.

14        Q.    I'm just asking whether there was a

15   policy in place that the company had that

16   approval was needed for any type of reversing

17   journal entry.

18        A.    Do you mean, deposit entry or a

19   journal entry?

20        Q.    Journal entry.

21        A.    No, because you don't reverse -- you

22   really don't reverse a journal entry.  You

23   create a journal entry, and that's the journal

24   entry.

25        Q.    If somebody made a mistake in a

Page 208

J. CUTILLO

1

2    year of the car, if it's a 2022 or a 2023, if

3    it's sold in 2022, it's getting filed under

4    2022.

5         Q.    On what basis is the company

6    contending that Voynow is responsible for this

7    $3,000 as part of the Carmen Jones Highlander

8    scheme?

9         A.    Based off of the customer deposits,

10   I would assume.  That's my opinion.  I'm not an

11   expert.

12        Q.    And what do you mean by that?

13        A.    Voynow would look at the customer

14   deposit schedules every time they came.  So

15   that's what I would think.

16        Q.    And a customer deposit schedule is

17   just going to have customer and the deposit

18   amount, right?  Like, I mean, what's on a

19   customer deposit schedule?

20        A.    It's going a show a customer number,

21   customer name, the dollar amount.  But at the

22   end of that schedule, it's going to show a recap

23   page with all of the sources that are affecting

24   that schedule.

25        Q.    So how would looking at the customer

Page 212

1                        J. CUTILLO

2    that printed.

3         Q.    Looking at our chart, under Nissan,

4    it is alleged that Vivian stole from the company

5    during the period of May 14th, 2013 through

6    November 18th, 2016, in the amount of

7    $510,076.86, from Nissan?

8         A.    Yes.

9         Q.    And, in total, under that scheme,

10   it's alleged that she stole from Toyota Nissan

11   and Hyundai collectively for 553,724.56?

12        A.    Yes.

13        Q.    And the company contends that she

14   did so by allegedly causing numerous checks to

15   be drawn upon Star Nissan, Star Toyota, and Star

16   Hyundai's checking accounts, by primarily

17   deceiving John Koufakis, Sr., which were payable

18   to credit card companies or other creditors to

19   whom she was indebted?

20        A.    Correct.

21        Q.    And who discovered this scheme?

22        A.    Michael Koufakis.

23        Q.    And when?

24        A.    December 20, 2016, or the end of

25   November 2016.

J. CUTILLO

1

2      Q.     And how was it discovered?

3      A.     He received a phone call from

4   Capital One telling him that an employee was

5   paying their personal account with company

6   funds.  He responded by saying, Hold on, let me

7   get my controller on the phone.  And they

8   instructed him, Do not do that.  You need to

9   research it yourself.

10      Q.     Who came up with the amounts that

11   are listed in the chart?

12      A.     Mike Koufakis had Reynolds run a

13   report based on the checks that Vivian had cut.

14      Q.     So when you say he ran a report

15   based on checks that she cut, those were checks

16   that she prepared?

17      A.     Correct.  He had Reynolds run a

18   report.

19      Q.     And when was that done?

20      A.     That same day.  Right away.  When he

21   got the phone call from Capital One.

22      Q.     Okay.  And then what did he do with

23   that report?

24      A.     He ran the report for -- and I

25   believe he immediately went to the police

Page 227

J. CUTILLO

1

2      the scope, for sure.  But you can

3      still answer the question.

4   A.      Not to my knowledge, I don't know.

5          (Star Nissan documents is

6          received and marked as Exhibit

7          Nissan 18 for identification, as of

8          this date.)

9   Q.      Have you seen Exhibit 18 before?

10  A.      Let me look at the whole thing.

11  Okay.

12  Q.      Okay.  Have you seen this before?

13  A.      Yes.

14  Q.      Okay.  And does this document

15  represent the checks that the company contends

16  are part of the paying personal creditors

17  scheme?

18  A.      Yes.  But I would have to sit here

19  and calculate every single one to see what the

20  total dollar amount is that you're presenting to

21  me.

22  Q.      Okay.  Is the scheme essentially

23  that these checks were prepared and presented to

24  authorized check signers of the company, and the

25  company check signers then signed those checks,

Page 228

1                          J. CUTILLO

2      and then they ultimately were used to pay

3      Vivian's personal debt?

4           A.    Yes.

5           Q.    Does the corporation acknowledge

6      that the signatures on the checks are legitimate

7      signatures of authorized check signers on behalf

8      of its operating account?

9           A.    Yes.

10          Q.    So there's no suggestions that any

11     signature is forged?

12          A.    No.

13          Q.    Would there be business reasons for

14     the company to be making payments to Capital

15     One, M&T Bank, or HSBC Bank?

16          A.    Can you rephrase the question?

17          Q.    Sure.  Would there be legitimate

18     business reasons for the company to be making

19     payments to those three entities?

20          A.    Absolutely.

21          Q.    What backup was provided to the

22     check signers prior to signing any of the checks

23     that are listed in Exhibit 18?

24                    MR. LABUDA:  Objection, but you

25                can answer.

```
 1                    J. CUTILLO
 2        A.    To my knowledge -- none to my
 3   knowledge.  I don't know.
 4        Q.    So, as far as the corporation's
 5   concerned, the checks were signed without
 6   backup?
 7              MR. LABUDA:  Objection, but you
 8              can answer.
 9        A.    Yes.
10        Q.    Is there anything about the amounts
11   that are listed in these checks that would have
12   been a red flag to any of the check signers when
13   they were signing these checks?
14              MR. LABUDA:  Objection, but you
15              can answer.
16        A.    It's speculatory.  But for a
17   90-year-old man, no, I don't think so.
18        Q.    A 90-year-old man who none of his
19   sons saw any reason to remove his check-signing
20   authority, correct?
21              MR. LABUDA:  Objection.  You can
22              answer.
23        A.    I guess.
24        Q.    Did the company file a complaint
25   against Vivian civilly regarding the scheme?
```

```
1                    J. CUTILLO
2          can answer.
3     A.    What was the date of the amendment?
4               (Motion to Amend the Indictment
5               is received and marked as Exhibit
6               Nissan 21 for identification, as of
7               this date.)
8               MS. FITZGERALD:  Let's mark this.
9     Q.    So if you look at -- towards the
10    middle part of this exhibit, a motion to amend
11    the indictment was filed on August 29th of 2018.
12              MR. LABUDA:  Again, this is the
13              first time I think we are seeing
14              these documents.  We are not
15              contesting the veracity, but we have
16              just never seen these documents
17              before.  So...
18    Q.    Was it the company's intent to
19    charge -- have Vivian criminally charged to the
20    fullest extent to which she was responsible for
21    the theft?
22              MR. LABUDA:  Objection, but you
23              can answer.
24    A.    Yeah.  Absolutely.
25    Q.    And if you look at the basis for law
```

1                    J. CUTILLO

2  enforcement's amendment, do you agree that it is

3  not adding any new alleged episodes of theft to

4  this amended indictment?

5                    MR. LABUDA:  Objection.  You can

6                    answer it.

7       A.    I would presume it had not been

8  discovered yet, so sure.

9       Q.    And if you look at the last page of

10  this exhibit, Vivian died on June 28th of 2019?

11       A.    That is correct.

12       Q.    Okay.  So between the initial

13  discovery in late 2016, and the date of her

14  passing, is it fair to say that there was not

15  any additional information provided by the

16  company to law enforcement, to justify any new

17  charges above and beyond what was in the

18  indictment?

19                    MR. LABUDA:  Objection, but you

20                    can answer.

21       A.    Yes.

22                    MR. LABUDA:  We might as well

23                    take a break.

24                    MS. FITZGERALD:  Can I just

25                    finish this line?

Page 241

1                        J. CUTILLO

2          Q.    So I'm going to ask for copies of

3     the checks that represent payments made to

4     either Capital One, M&T Bank, HSBC that comprise

5     the 510,000 that are not part of either the

6     indictment or part of Exhibit 18, or part of

7     Rosenfield's report which was Exhibit 17.

8          Does the company contend that this theft

9     occurred when Vivian took each of these checks that

10    were signed, and used them and sent them to her

11    personal creditors?

12         A.    Yes, along with the fact that it was

13    paid to her creditors.

14         Q.    Okay.  So the theft occurred on or

15    about the time that the creditor cashed that

16    check?

17         A.    Correct.

18         Q.    Is the company making any contention

19    that somebody within the office tipped off

20    Capital One about this alleged scheme?

21         A.    Can you repeat that?  I'm sorry.  I

22    was coughing.

23         Q.    Is the company making any allegation

24    or contention that somebody within the office

25    tipped off Capital One about this scheme?

Page 243

1                        J. CUTILLO

2    that lawsuit against her estate?

3         A.    Not to my knowledge at this point.

4         Q.    Have there been any offers?

5         A.    Not to my knowledge.

6         Q.    On what basis does the company

7    contend that Voynow is responsible for the

8    $510,076?

9              MR. LABUDA:  Objection, but you

10             can answer.

11        A.    I'd like to defer that to the

12   expert.

13        Q.    So the expert is going to give his

14   opinion.  I'm asking you, as the representative

15   on behalf of the corporation, that has made a

16   claim in a lawsuit alleging that my client is

17   responsible.  So what facts or information does

18   the corporation have that supports it's claim

19   that Voynow is responsible for this?

20             MR. LABUDA:  Same objection, but

21             you can answer.

22        A.    My opinion, they should have caught

23   this based off of the account these checks were

24   being written out of, which is the Star Nissan

25   incentives account.