# EXHIBIT 32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\* \* \*

STAR AUTO SALES OF BAYSIDE, INC.,:
d/b/a STAR TOYOTA OF BAYSIDE),    :
STAR AUTO SALES OF QUEENS, LLC,   :
d/b/a STAR SUBARU, STAR HYUNDAI,  : NO:  18-CV-05775
LLC, d/b/a STAR HYUNDAI, STAR     :      (ERK)(TAM)
NISSAN, INC., d/b/a STAR NISSAN,  :
METRO CHRYSLER PLYMOUTH, INC.,    :
d/b/a STAR CHRYSLER JEEP DODGE,   :
STAR AUTO SALES OF QUEENS COUNTY, :
LLC, d/b/a STAR FIAT and STAR     :
AUTO SALES OF QUEENS VILLAGE,     :
d/b/a STAR MITSUBISHI,            :
             Plaintiffs,          :
           - vs -                 :
VOYNOW, BAYARD, WHYTE AND         :
COMPANY, LLC, HUGH WHYTE and      :
RANDALL FRANZEN,                  :
             Defendants.          :

\* \* \*

Oral deposition of DAVID KUMOR, taken at U.S. LEGAL SUPPORT, 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, 19103, on Tuesday, October , 2022, beginning at approximately 11:00 a.m., before Lisa M. Cooper, Court Reporter.

\* \* \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

U.S. Legal Support | www.uslegalsupport.com

```
 1   A P P E A R A N C E S :

 2
             MILMAN LABUDA LAW GROUP, PLLC
 3           BY:  MICHAEL C. MULE, ESQUIRE
             BY:  JEREMY M. KOUFAKIS, ESQUIRE
 4           3000 Marcus Avenue, Suite 3W8
             Lake Success, New York  11042
 5           michaelmule@mllaborlaw.com
             -- Representing the Plaintiffs
 6

 7           MARSHALL DENNEHEY WARNER COLEMAN
             & GOGGIN, P.C.
 8           BY:  MAUREEN P. FITZGERALD, ESQUIRE
             620 Freedom Business Center, Suite 300
 9           King of Prussia, Pennsylvania  19406
             mpfitzgerald@mdwcg.com
10           -- Representing the Defendants

11                     *   *   *

12   ALSO PRESENT:
             Robert Seibel
13           Jacqueline Cutillo
             Steve Rambam (via telephone)
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2
 3   WITNESS                                    PAGE
 4
 5   DAVID KUMOR
 6
 7         By:   Mr. Mule                  4, 272, 275
 8         By:   Ms. Fitzgerald               258, 274
 9
10                     *    *    *
11
12                    E X H I B I T S
13
14   NUMBER           DESCRIPTION          PAGE MARKED
15   Exhibit-38       E-Mail/Document          200
16   Exhibit-40       Document                 210
17   Exhibit-41       E-Mail                   184
18   Exhibit-42       E-Mail/Document          154
19   Exhibit-43       E-Mail                   203
20   Exhibit-44       E-Mail                   169
21   Exhibit-45       Invoice                  175
22   Exhibit-46       Document                 175
23
24
25
```

```
 1                  (It is hereby stipulated by and
 2          among counsel for the respective parties
 3          that sealing, certification, and filing are
 4          waived, and that all objections, except as to
 5          the form of the question, are reserved until
 6          the time of trial.)
 7                          *   *   *
 8                       DAVID KUMOR,
 9          after having been first duly sworn, was
10          examined and testified as follows:
11                          *   *   *
12                       EXAMINATION
13                          *   *   *
14   BY MR. MULE:
15   Q.         Good morning, Mr. Kumor, how are you?
16   A.         Good.  How about yourself?
17   Q.         All right.  Very good.  My name is Michael
18   Mule.  And I'm an attorney for the various Star
19   entities that are in this lawsuit.  They're the
20   plaintiffs in this lawsuit.  For the sake of
21   convenience, I'm just going to refer to them as Star,
22   okay?
23   A.         Um-hum.
24   Q.         This lawsuit is against the defendants,
25   Voynow, Bayard, Whyte and Company, LLP, Hugh Whyte and
```

1  Q.         Yes.
2              MS. FITZGERALD:  Accordion files.
3  BY MR. MULE:
4  Q.         Accordion files.  Got it.  So they'd be
5  stored in those accordion files and -- somewhere in the
6  office by a particular client?
7  A.         Yes.
8  Q.         And did -- was Star identified by a
9  particular client number or anything like that?
10 A.         They were.  But I think their filing cabinet
11 just had "Star" on it.
12 Q.         Okay.
13 A.         And then it would be broken into the Redwelds
14 by store.
15 Q.         And were the client files organized in a
16 particular way?  Were they by number?  Or
17 alphabetically?  Or -- you said by Star.  Was that
18 identified?
19 A.         So there was a Star filing cabinet.  In the
20 Star filing cabinet, let's say it was a four thing file
21 cabinet, the top drawer would be one year of all the
22 Star things.  The second drawer would be another year.
23 There might have been permanent files too.
24 Q.         Okay.  And as far as hard copy paper files,
25 were there any other hard copy paper files that you

1   recall at Voynow?
2   A.      Like the tax return?
3   Q.      Yeah, whatever else.
4   A.      The tax return.
5   Q.      The tax return.
6   A.      The tax return was the main hard copy we
7   kept.  As well as the year end files.
8   Q.      Okay.  And -- but they also kept the binded
9   work papers?
10  A.      Yeah.  So it would be the tax return and then
11  the binded year end work papers, which were the
12  clients' produced schedules.
13  Q.      And do you know how long the hard copies
14  would be maintained?
15  A.      By the time I left I believe that we were
16  keeping them for five years.
17  Q.      And you were saying Star had its own cabinet?
18  A.      Its own file cabinet.
19  Q.      When you became manager, did you get involved
20  with basically compiling any interim reports yourself
21  from work --
22              MS. FITZGERALD:  Object to form.
23  BY MR. MULE:
24  Q.      -- that was provided by associates?  Or staff
25  accountants?

1  A.        It was for their -- it was for their tax
2  work, because the way the reviewed financial statements
3  were listed, you would have to have them individually
4  per dealership, or per engagement, because each of the
5  reviewed financial statements were separate
6  engagements.  The tax returns, we had them all -- all
7  the tax returns we would be doing, listed at the top of
8  the page by themselves.
9  Q.        All right.  So you'll have to repeat that
10 again, because I don't understand what you just said.
11 A.        Okay.  So the reviewed financial statements,
12 like we did for Paruzzi each -- each one of those had
13 to have its own engagement letter.
14 Q.        Okay.
15 A.        So it -- and then for the tax return
16 purposes, for Paruzzi, it would list all the Paruzzi
17 dealerships and say the scope of the tax work we were
18 doing.  Star, I remember seeing them all listed,
19 because there were a lot.
20 Q.        What was all listed?
21 A.        All the tax returns we were going to do.
22 Because they had a lot of real estate, from what I
23 remember too, plus a lot of the dealerships.  So I
24 don't remember if the dealerships were listed
25 separately than the real estate.  But they were all on

```
 1   the one engagement letter.
 2   Q.        The dealerships were all on one engagement
 3   letter.  So are you saying that if there was a reviewed
 4   financial that each dealership would be separate?  A
 5   separate engagement letter?
 6   A.        They would have to have their own separate
 7   engagement letter, because there is going to be backup
 8   as well that we have to do for the reviewed financial
 9   statements.  We have to do check lists at that point
10   that tell us, did you review this particular account.
11   Like does the inventory account make sense.  And we
12   have to physically sign off that we looked at that.
13   Q.        Right.  Do you -- as you sit here, do you
14   know if you actually saw a signed engagement letter for
15   Star?
16   A.        I don't know.
17   Q.        Okay.  We can put that aside.  I'll take
18   that.  Thank you.  All right.  I'll show you what has
19   been marked as Exhibit 4 for identification.  If you
20   can take a look at that.
21   A.        Um-hum.
22   Q.        All right.  Have you reviewed that document?
23   A.        Quickly.
24   Q.        Okay.  Do you know what it is?
25   A.        Just looks like a check list.  Maybe a month
```

```
 1            If it's over five days, why haven't you
 2            collected it.  Do you need to go get the car
 3            back?  Because it's tough to be out, you
 4            know, $40,000 when you have a floor plan
 5            payoff coming up.
 6   BY MR. MULE:
 7   Q.       Right.  So you have like a -- presently you
 8   have a rule of thumb.  If it's over five days --
 9   A.       If it's over five days I'm asking my
10   department why it hasn't been collected.  If there's a
11   funding noted problem or something.
12   Q.       Okay.  Then under it, in parenthesis it has,
13   it looks like see schedule.
14   A.       Yes.
15   Q.       Are we just looking at a schedule in the
16   Reynolds System?
17                 MS. FITZGERALD:  Objection.
18                 THE WITNESS:  Randy liked paper.  So he
19            probably had someone print it out.  Or he
20            printed it out himself.
21   BY MR. MULE:
22   Q.       Okay.  When you would go to Star, would you
23   typically print out the schedules or have them printed
24   out?
25   A.       We -- they gave us a login, and then they had
```

```
 1  us sit at whoever's open desk it was, and then we just
 2  printed out all the schedules ourselves.
 3  Q.          Okay.  Looking at the item number 4, it says
 4  C -- AC, I think that's account.
 5  A.          Um-hum.
 6  Q.          227A on aged rebates, any -- it looks like an
 7  abbreviation for writeoff.
 8  A.          Um-hum.
 9  Q.          So what -- what does that mean to you?
10              MS. FITZGERALD:  Objection.
11              THE WITNESS:  It means, let's say they
12          set up a rebate, which is what you get when
13          you purchase a car for $1,000, but sales set
14          the rebate up wrong.  It should only be $750,
15          you're out $250.
16  BY MR. MULE:
17  Q.          Okay.  And why would sales set it up wrong?
18  A.          It could be something as simple as they
19  needed a -- like we have it happen once in a while
20  where it's -- it could go the other way too.  So they
21  can just say they tried a teacher's education rebate,
22  but whatever institution they thought was that they
23  worked at didn't actually qualify as a teacher's
24  education, because it has to be public school, not
25  Catholic school, or something like that.
```

```
 1   it printed out.  So the service and parts receivable
 2   would actually -- like, if it's that type of a
 3   schedule, it says Schedule 2, it would actually break
 4   it out between the current, 30 to 60 days.  60 and
 5   over.  So it would break it out a little differently by
 6   aging.
 7   Q.         Okay.  All right.  So this is -- these are
 8   the schedules that are within the Reynolds System?
 9   A.         Yes.
10   Q.         And this --
11   A.         These would have been set up by the client,
12   though.
13   Q.         By the client.  Okay.  Are these -- these
14   schedules are -- are they uniform in the Reynolds
15   System?  Or are they different per client?
16   A.         They're different per client.  Like I said,
17   the client has to set them up themselves.
18   Q.         Okay.
19   A.         I'm sure Reynolds has some recommendations of
20   what to do.
21   Q.         All right.  So looking at the first -- the
22   first page.
23   A.         Um-hum.
24   Q.         Are there certain of these schedules that
25   are, you know, more significant than others?
```

```
 1   worked on, right?
 2   A.      Yes.
 3   Q.      Okay.  And did you have someone who was then
 4   reporting to you, with respect to the service and
 5   repair orders?
 6   A.      If they came back and they had any questions,
 7   then, yeah, I would -- we would all try to help out
 8   whenever they came back, because it's one of those
 9   things, it's tough to call the client to clarify
10   something for parts and service after the fact.
11   Q.      Okay.  So this summer visit where you were
12   doing this type of work, how did it differ from, like,
13   the pretax planning work?
14   A.      It didn't really differ that much.
15   Q.      Okay.  So did it differ in any respect?
16   A.      We wrote a letter.
17   Q.      Okay.  And the letter was to summarize your
18   findings, right?
19   A.      Correct, something that they could follow up
20   on.
21   Q.      Okay.  When -- after the summer was done and
22   you came for the pretax planning, would there be any
23   followup to see if they actually did follow up on what
24   was written in the letter?
25   A.      I don't believe so.
```

```
 1   Q.         So it was, a letter was sent with findings,
 2   and with items for them to follow up on.  But whether
 3   they followed up on it or not was not --
 4   A.         It was -- it was not our responsibility.
 5   That was management's responsibility.
 6   Q.         Management, being management of Star?
 7   A.         Of Star, yes.  Management of Star.  So if the
 8   letter got sent to Michael, John or Steven, then they
 9   were the people that should have followed up on it.
10   Q.         Did there -- was there ever an occasion where
11   you know that certain things were pointed out that
12   should have been followed up on, and they weren't, and
13   you asked a question to -- to management as to why?
14   A.         No.
15   Q.         Why not?
16   A.         Why not, nothing has been followed up on?
17   Q.         Yeah.  Well, let me ask it another way.
18   Strike that question.
19   A.         Okay.
20   Q.         Is the reason that you never asked why
21   weren't these items followed up on, if you saw it,
22   because you never had an occasion of -- of experiencing
23   something where you -- you know that you wrote them --
24   you had findings for them to follow up on something and
25   they didn't do it, or --
```

```
 1  Q.      Okay.  Going back to this Exhibit-42.  You
 2  don't recall receiving it?
 3  A.      No.
 4  Q.      But you're sure you did?
 5  A.      Well, yeah, I'm sure I did.
 6  Q.      Okay.  And as you sit here today, do you have
 7  any understanding as to why you would have received
 8  this?
 9  A.      Probably because I was going up to help Bobby
10  with the Star, after the fact.  Because we were trying
11  to help Jackie as much as we could, with the financial
12  statements.  And making sure, you know, the factory
13  statements weren't super out of whack.
14  Q.      That the what statements were not super out
15  of whack?
16  A.      The factory financial statements.
17  Q.      Okay.  Were -- were you charged with
18  assisting Jackie as far as, you know, making sure those
19  factory financial statements were not out of whack, as
20  you say?
21  A.      I wasn't charged with it, but, I mean, that's
22  what we did.
23  Q.      Okay.  Do you know if there was a separate
24  engagement for doing that work and assisting in helping
25  Jackie?
```

| | |
|---|---|
| 1 | A.        That I don't know.  That probably would have |
| 2 | been billed under what we said was "Special".  I think |
| 3 | we were just trying to help Jackie so that none of the |
| 4 | factory statements were late.  And trying to keep them |
| 5 | -- making sure the factories didn't get mad at Star. |
| 6 | Because you went from two controllers to one |
| 7 | inexperienced controller at the time. |
| 8 | Q.        When you say two controllers, who are you |
| 9 | referring to? |
| 10 | A.        Vivian and Debbie. |
| 11 | Q.        They were both controllers? |
| 12 | A.        Both controllers at Star. |
| 13 | Q.        Okay.  And what -- what dealerships was |
| 14 | Debbie the controller for? |
| 15 | A.        I remember Chrysler.  Chrysler's the one I |
| 16 | remember.  I want to say I went to Debbie for Subaru |
| 17 | too, but I could be mistaken. |
| 18 | Q.        Okay.  And Vivian was controller for the |
| 19 | rest? |
| 20 | A.        I don't think for the rest.  I'm pretty sure |
| 21 | they split them.  I just don't remember who was in |
| 22 | charge of which one. |
| 23 | Q.        Okay.  I would like to show you what we had |
| 24 | marked as Exhibit-44.  Will be marked as Exhibit-44. |
| 25 | *   *   * |