UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
STAR AUTO SALES OF BAYSIDE, INC.            :
(d/b/a STAR TOYOTA OF BAYSIDE),             :        Case No.: 1:18-cv-5775 (ERK) (TAM)
STAR AUTO SALES OF QUEENS, LLC              :
(d/b/a STAR SUBARU), STAR HYUNDAI LLC       :
(d/b/a STAR HYUNDAI), STAR NISSAN, INC.     :
(d/b/a STAR NISSAN), METRO CHRYSLER         :
PLYMOUTH. (d/b/a STAR CHRYSLER              :
JEEP DODGE), STAR AUTO SALES OF             :
QUEENS COUNTY LLC (d/b/a STAR FIAT)         :
and STAR AUTO SALES OF QUEENS               :
VILLAGE LLC (d/b/a STAR MITSUBISHI),        :
                                            :
                         Plaintiffs,        :
                                            :
            v.                              :
                                            :
VOYNOW, BAYARD, WHYTE                       :
AND COMPANY, LLP, HUGH WHYTE,               :
RANDALL FRANZEN and ROBERT SEIBEL,          :
                                            :
                         Defendants.        :
------------------------------------------------------------x

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1 of the United States District Courts for the Eastern and Southern

Districts of New York, Plaintiffs submit this opposition to Defendants' Statement of Material Facts

and hereby submits Plaintiffs' Counter-Statement of Material Facts.

### A.  THE PARTIES

1.  Voynow is an accounting firm based in Trevose, PA.  Individual Defendants

Randall Franzen, Hugh Whyte and Robert Seibel are principals at Voynow.  Ex. 1, ¶¶ 17.

**Response: Admitted.**

2.  Plaintiffs are a family owned group of seven automobile dealerships based in

Queens, NY: Star Nissan, Star Toyota, Star Subaru, Star Hyundai, Star Mitsubishi, Star Fiat

1

and Star Chrysler (hereinafter and collectively as "the Star Dealerships").  Ex. 1, ¶2; ¶¶10-16.

**Response: Admitted.**

3.   Plaintiffs' automobile dealership business was established and built by John Koufakis, Sr. who passed ownership onto his three sons - Michael Koufakis, John Koufakis, Jr. and Steve Koufakis.  Ex. 2 at 45:8-17.

**Response: Disputed.  The cited evidence does not establish that John Koufakis, Sr. had any ownership interest in any of the plaintiff entities.**

4.   The three Koufakis brothers have held various ownerships interests in the Star Dealerships. Ex. 4 at 11:16-12:9; 13:19-23; 14:19-15:3; Ex. 3 at 12:6-8; 26:2-4; Ex. 2 at 13:8-17; 14:3-8; 14-22; 20:7-12; 25:6-9.

**Response: Admitted.**

5.   The three Koufakis brothers have held the positions of Dealer Principal and/or General Manager and/or Executive Manager of the Star Dealerships.  Ex. 3 at 12:11-13; Ex. 2 at 9:5-10:6; 13:8-15:9; 17:4-7; 25:2-5; Ex. 4 at 11:16-12:11; 13:11-16; 14:2-4.

**Response: Admitted.**

**B.  THE STAR DEALERSHIPS' ACCOUNTING FUNCTION**

6.   The Star Dealerships had a centralized accounting office that performed the accounting and bookkeeping functions for all of the Star Dealerships.  Ex. 2 at 25-28:5; Ex. 4 at 19:15-20.

**Response: Disputed.  Voynow was retained by Star to, *inter alia*, perform controllership functions.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report Ex. 1 ¶¶ 1, 6 7, pages 5-7.**

7.   Vivian Karazoukis ("Karazoukis") was hired in 1986 by an entity owned by the Koufakis family that was a predecessor automobile dealership to the Star Dealerships. She became the Office Manager. Ex. 2 at 26:15-27:2.

**Response: Admitted.**

8.   During 2010-2016, Karazoukis was the Office Manager/Controller for most of the Star Dealerships.  As Office Manager/Controller, she was the most senior level employee at the Star Dealerships in terms of the accounting function. Ex. 3 at 27:1-6; Ex. 2 at 25:23-26:9; Ex. 5 at 116:13-117:4.

**Response: Disputed.  Karouzakis was the Office Manager, not the Controller.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 25:10-26:9.**

9.   Karazoukis reported directly to Michael Koufakis and John Koufakis who were both responsible for supervising her. Ex. 2 at 26:10-14; Ex. 3 at 27:7-13.

**Response: Admitted and add that Voynow, who performed controllership functions for Star, also supervised her.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report ¶¶ 1, 6 7, pages 5-7.**

10. Debbie Theocharis ("Theocharis") was Karazoukis' sister and employed as Office Manager/Controller specifically for the Star Chrysler and Star Hyundai Dealerships. Theocharis reported to directly Steve Koufakis and worked under his supervision. Ex. 2 at 27:3-16; Ex. 4 at 21:16-18; Ex. 5 at 116:8-21.

**Response: Disputed.  Theocharis was the Office Manager, not the Controller.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 25:10-26:2; 27:3-10.  Voynow, who performed controllership functions for Star, also supervised her.  Felsen Decl. Exhibit 1, Sosnowski**

**Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21;**

**Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Ex. 1 ¶¶ 1, 6 7, pages 5-7.**

11. Karazoukis and Theocharis were each employed for approximately 30 years by the Star Dealerships or their predecessor entities owned by the Koufakis family.  Ex. 3 at 29:9-11.

**Response: Admitted.**

12. In their respective roles as Office Managers/Controllers, Karazoukis and Theocharis were in charge of managing and supervising the accounting staff employed by the Star Dealerships.  Ex. 2 at 28:17-21; Ex. 5 at 115:11-117:6.

**Response: Disputed inasmuch as Karouzakis and Theocharis were Office Managers, not Controllers.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 25:10-26:9; 27:3-10.  Moreover, Voynow, who performed controllership functions for Star, also oversaw Star's accounting office which did not have any CPAs or accountants on staff.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Ex. 1 ¶¶ 1, 6 7, pages 5-7.**

13. Up until 1991, Plaintiffs used a manual accounting system for the Star Dealerships.  In 1991, Star Nissan began using a computerized Dealership Management System ("DMS") developed for automobile dealerships, known as Reynolds & Reynolds. Ex. 2 at 56:24-57:12.

**Response: Admitted.**

14. Plaintiffs changed to a newer version of the Reynolds & Reynolds DMS in 1994.  Ex. 2 at 124:21-125:6

**Response: Admitted.**

15. There is a user manual published by Reynolds & Reynolds for the accounting function within the DMS that was provided to the Star Dealerships accounting staff to consult if they had questions regarding the system or to verify information. Ex. 5 at 126:7-22; Ex. 6.

**Response: Plaintiffs object and dispute as no particular time period is provided and the cited deposition testimony relates to the present time rather than when Voynow was Plaintiffs' accountants. Therefore, the material fact is irrelevant.**

16. Reynold & Reynolds provides a user with the ability to tailor the DMS and provides recommendations to the user as to how to do so. Ex. 32 at 109:7-20.

**Response: Plaintiffs object and dispute as no particular time period is provided and that the citation in support of defendants' assertion references a question about Plaintiffs' present situation asked during a deposition taken on October 18, 2022. Therefore, the material fact is irrelevant.**

17. Reynolds & Reynolds provides a customer service representatives [sic] available to dealerships who can contact it with questions or requests. Star Dealerships' accounting personnel have used this customer service function within Reynold & Reynolds to contact it with questions or with requests for Reynolds & Reynolds to generate reports. Ex. 5 at 119:5-13; 121:13-24; 122:15-123:2.

18. **Response: Disputed except admit that the evidence relied upon for this statement establishes that this is true only during Jacqueline Cutillo's tenure replacing Despina Theocharis in 2017 shortly before Voynow was terminated by Plaintiffs and that the citation in support of defendants' assertion references a question about Plaintiffs' present situation asked during a deposition taken on February 28, 2023. Therefore, the material fact is irrelevant.**

5

19. As Office Manager/Controller, Karazoukis was given remote access to the accounting function in the Star Dealership's DMS such that she was able to access Plaintiffs' accounting system while off-site. Ex. 2 at 127:8-10.

**Response: Plaintiffs object as this is not a material fact related to the limited basis for which they seek summary judgment and must be excluded based on lack of relevance. Subject to and without waiving said objection, disputed inasmuch as Karouzakis was the Office Manager, not the Controller.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 25:10-26:2; 27:3-10.**

20. The Star Dealership's current Controller Jackie Cutillo also has remote access to the accounting system in the DMS.  Ex. 5 at 118:13-19.

**Response: Plaintiffs object as this is not a material fact related to the limited basis for which they seek summary judgment.  Subject to and without waiving said objection, Plaintiffs admit this statement to the extent that Ms. Cutillo, who became the office manager, not controller, started having remote access during Covid.  Felsen Decl. Exhibit 72, Declaration of Jacqueline Cutillo ¶ 1. Moreover, the citation in support of defendants' assertion references a question about Plaintiffs' present situation asked during a deposition taken on February 28, 2023. Therefore, the material fact is irrelevant.**

## C.  THE VOYNOW ENGAGEMENT FROM 1996 TO 2017

21. Plaintiffs first engaged Voynow in 1996.  Ex.1, ¶30.

**Response: Admitted.**

22. Prior to engaging Voynow, the Star Dealerships were in the midst of ongoing IRS audit of the Star Dealerships' tax returns that were prepared by another CPA firm. Michael Koufakis was unhappy with the IRS tax assessment, interest and penalties and

sought to hire a new accountant. Ex. 2 at 62:7-63:20; Ex. 7 at 131:16-132:11.

**Response: Objection as to Defendants' mischaracterization of the evidence. The deposition testimony of Michael Koufakis, cited by Defendants in support of this purported fact, establishes that Mr. Koufakis did not know if an IRS audit was being conducted at that time. Id.**

23. Michael Koufakis contacted Voynow after receiving a recommendation from Reynolds & Reynolds, as Plaintiffs wanted an accountant familiar with the Reynolds & Reynolds DMS it had in place since 1991. Ex. 2 at 94:13-18; Ex. 7 at 129:6-12; Ex. 8 at 54:7-12.

**Response: Admitted. (DMS refers to "Dealer Management System").**

24. In 1996, Michael Koufakis met in person with Defendants Hugh Whyte and Randall at the Star Dealerships and thereafter hired Voynow on behalf of all the Star Dealerships. Ex. 2 at 107:2-16.

**Response: Admitted.**

25. At this 1996 meeting, Michael Koufakis hired Voynow to provide services that were "more than [a] review, but less than audited" financial statements and to provide annual corporate tax services. Ex. 2 at 74:10-75:20; 108: 12-14.

**Response: Disputed as it is incomplete and out of context. The cited testimony establishes that Michael Koufakis told Voynow that he wanted the highest level of services, which was audit services. In response, Voynow told him that audit services were not necessary as it is reserved for publicly traded companies and expensive. As a result of their discussion, Voynow and Star ultimately agreed that Voynow's services would be at a level somewhere in between – more than a review but less than an audit. At the meeting, Randall Franzen**

**told Michael Koufakis that "they would come into the dealerships on a quarterly basis, they would send someone, let's say, to the Toyota parts department and do random VIN checks. Then on another meeting, they might go to Chrysler used cars and check -- do a physical of the used car inventory.  So it was more than review, but not quite fully audited.  That was discussed. That's what they promised.  That's what I agreed to, and that's what they did." Id.**

26. Michael Koufakis wanted the "highest level of accuracy" in the financial statements for the Star Dealerships when hiring Voynow.  Ex. 2 at 82:2-10.

**Response: Disputed to the extent that this was only one of many reasons why Plaintiffs hired Voynow.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:10-75:20; 108: 12-14; see also Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

27. Michael Koufakis hired Voynow to be "responsible for true and accurate financial statements" and for verifying all of the account balances on the financial statements that were used by Voynow to prepare and issue the annual corporate tax returns.  Ex. 2 at 109:10-22.

**Response: Disputed to the extent that these were only some of many reasons why Plaintiffs hired Voynow.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:10-75:20; 108: 12-14; see also Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

28. Michael Koufakis hired Voynow to perform various functions to review and verify all of the Star Dealership accounts such that the financial statements used by Voynow to prepare the tax returns were "just short of an audited statement." Ex. 2 at 82:24-83:19; 109:10-22.

**Response: Disputed to the extent that these were only one of many reasons why Plaintiffs**

hired Voynow.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:10-75:20; 82:24-83:19; 108: 12-14; 109:10-22; see also Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.

29. It was part of Voynow's job to perform an audit of the Star Dealerships' financial statement accounts.  Ex. 2 at 73:12-74:5.

**Response: Admitted.**

30. Michael Koufakis initially hired Voynow to conduct quarterly on site visits to the Star Dealerships but it then changed to three on site visits a year.  Ex. 2 at 104:7-10; 105:19-24; Ex. 4 at 9:16-10:15; Ex. 8 at 98:4-7.

**Response: Disputed.  The cited evidence does not establish that the quarterly visits were reduced to three annual visits; it merely establishes that it may have been reduced to three visits.  Id.**

31. Michael Koufakis did not hire Voynow to actually issue audited or reviewed financial statements for the Star Dealerships despite performing services that were more than a review but less than an audit.  He did hire Voynow to issue tax returns based upon the financial statements Voynow reviewed/audited. Ex. 2 at 82:2-83:19.

**Response: Disputed.  The cited evidence establishes that Voynow performed ongoing consulting services that included its review of the accounts that were used to prepare the financial statements.  Id.  As stated above, Voynow's ongoing consulting services that were to be "more than a review but less than an audit" was one type of accounting service that Voynow provided to the Star Dealerships.  Moreover, disputed to the extent that the issuance of tax returns was one of many reasons why Plaintiffs hired Voynow. See Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:10-75:20; 82:24-83:19; 108: 12-14;**

**109:10-22; see also Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

32. Karazoukis and Theocharis internally prepared all of the Star Dealerships' financial statements.  Ex. 4 at 71:14-20.

**Response: Admitted and state that this was done under the direction and supervision of Voynow.  Felsen Decl. Exhibit 23, Voynow 30(b)(6) Dep. at 217:12-218:20; Felsen Decl. Exhibit 69.**

33. The Koufakis brothers reviewed these financial statements to ensure they were complete and accurate, before sending them to the national dealer corporations. Ex. 3 at 23:16- 24:7-15.

**Response: Disputed.  The cited evidence concerns Star Nissan, and not any of the other Star dealerships.  Id.  Moreover, Voynow reviewed Star's financial statements.  Felsen Decl. Exhibit 4, J. Koufakis Dep. at 18:21-19:1.  Star relied upon the expertise that Voynow provided to Plaintiffs during its consulting engagement with Star to ensure Star's accounting was accurate.  This service was directly related to ensuring the accuracy of Plaintiffs' financial statements.  Felsen Decl. Exhibit 72, J. Cutillo Decl. ¶ 3.**

34. These internally prepared financial statements were the culmination of the accounts Voynow reviewed when it was onsite.  Ex. 2 at 84:11-17.

**Response: Disputed inasmuch as the cited evidence does not establish that Voynow solely reviewed accounts on site.  Id.  In fact, Voynow copied documents from the Star dealerships and took them back to Voynow's offices for further review.  Felsen Decl. Exhibit 12, Breslin Dep. at 16:10-17:3; 75:9-76:9; Felsen Decl. Exhibit 11, Lombardo Dep. at 39:25-40:12; 46:23-47:13; 105:4-13; Felsen Decl. Exhibit 19, Bucolo Dep. at**

**19:25-20:18; 115:13-116:14; Felsen Decl. Exhibit 21, Corrigan Dep. at 21:9-22:9; 52:8-54:2; 62:8-21; 119:17-23.**

35. Voynow never issued or prepared any financial statements for the Star Dealerships, nor ever issued any written opinion, whether as part of an audit or a review engagement, as to the accuracy of the financial statements internally prepared by the Star Dealerships. Ex. 2 at 82:24- 83:9.

**Response: Disputed.  The cited evidence establishes that Michael Koufakis did not recall if Voynow provided an opinion regarding the financial statements.  Id.**

36. The Star Dealerships were never required by any lender, bank or national dealership corporation, to have either audited or reviewed financial statements prepared by an outside accountant. Ex. 2 at 47:10-15; 50:14-19; 60:2-5; 80:8-81:2.

**Response: Admitted.**

### D.  VOYNOW PREPARED AND ISSUED ANNUAL CORPORATE TAX RETURNS

37. Voynow did prepare and issue annual corporate state, federal and local tax returns to the Star Dealerships. Ex. 2 at 82:24-83:19.

**Response: Admitted.**

38. These tax returns were based upon the financial statements that Voynow was hired to review for the highest level of accuracy. Ex. 2 at 109:10-22.

**Response: Admitted.**

39. The Star Dealerships were "flow thru" entities for tax purposes such that the tax is calculated at the individual ownership level.  Voynow also prepared the Koufakis' brothers personal tax returns. Ex. 7 at 40:21-41:3; 119:6-12.

**Response: Disputed.  The cited testimony refers to Voynow's clients in general and does**

11

not relate to Star.  **Id.**

40. Voynow's approximate 3-4 on site visits per year were designated by Voynow as tax planning visits, interim tax visits, or year-end tax preparation visits.  Ex. 9 at 25:19-9;  Ex. 7 at 119:3-24; Ex. 2 at 105:19-22; Ex. 4 at 9:16-10:15; Ex. 8 at 98:4-7; Ex. 33 at 24:4-22.

**Response: Disputed.  See Felsen Decl. Exhibit 74; Plaintiff's Counter-Statement of Facts ¶¶ 56-60, 62. Moreover, the Star dealerships did not view or designate these visits as tax visits.  See Plaintiff's Counter-Statement of Facts ¶¶ 25-26, 30, 40, 50.**

41. Voynow always scheduled these visits in advance and coordinated scheduling with Karazoukis or Theocharis.  Ex. 8 at 99: 2-23; Ex. 2 at 106:18-22.

**Response: Disputed inasmuch as the visits were not designated by Voynow as tax planning visits, tax visits, or year-end tax preparation visits.  Id.**

42. Voynow's interim visit each year typically lasted one or two days in total for all of the Star Dealerships combined plus their related entities and typically included approximately 4- 7 Voynow accountants.  Ex. 8 at 148:25-149:20.

**Response: Disputed.  Voynow visited Star three (3) to four (4) times each year, for one (1) to (2) days each visit.  See SOF ¶ 51 (contradicting the instant SOF by stating Voynow was "physically on site at the Star Dealerships, approximately three times per year for one to two days at a time").  Also, Voynow sent approximately six (6) accountants on each visit. Felsen Decl. Exhibit 21, Corrigan Dep. at 23:15-18; 55:13-23; 178:13-179:2; Felsen Decl. Exhibit 13, Kumor Dep. at 26:16-17.**

43. Aside from the Star Dealerships, Voynow did tax preparation work for other Star-related entities not party to this case, such as Star Auto Body, various real estate companies, the Koufakis family members and their estates. Ex. 8 at 225:20-227:15; 228:17-22; 229:7-21.

**Response:  Plaintiffs object to this statement as irrelevant.**

44. When on site at the Star Dealerships for their visits, Voynow did not have full access to the Star Dealership's DMS.  Ex. 10 at 172:14-18; Ex. 8 at 45:21-47:5.

**Response: Disputed.  The cited testimony establishes that Robert Kirkhope did not know whether he had full access or not.  <u>Id</u>. Moreover, Robert Seibel "doesn't think" (but was not sure) whether Voynow had access to the name file.  <u>Id</u>.  Voynow had the same access to Star's DMS as Star's office managers, Theocharis and Karouzakis.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 130:17-131:17; Felsen Decl., Exhibits 39-43; 62.**

45. During the visits, Voynow reviewed the Star Dealerships' books and records, such as schedules, parts statements, reconciliations, 1099s, journal entries, inventory, and interacted with various Star Dealership employees.   Ex. 11 at 112:16-113:10; Ex. 12 at 46:1-21; 120:6-121:11; 171:22-172:11; 208:5-15; Ex. 13 at 43:25-44:13; Ex. 14 at 20:21-21:8; Ex. 15 at 53:8-54:5; Ex. 2 at 75:10-16.

**Response: Admitted and state that these were among the many duties Voynow performed at Star.  See Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

46. To the extent there were notable items observed during Voynow's visits or that needed to be addressed by the Star Dealerships prior to year-end, Voynow communicated these items either verbally or in writing to the owners and/or the Controllers.  Ex. 2 at 162:5-17; Ex. 4 at 156:4-14.

**Response: Disputed.  Communications regarding notable items observed during Voynow's visits occurred each time Voynow visited and in future visits, not solely at "year-end." Defendants' Ex. 32 137:11-137:20.**

47. Voynow did not follow up on any items noted or on any findings and left it up to the Stat [sic] Dealership management to decide how it would address any item or recommendation. Ex. 32 at 137:15-138:9; RANDY

**Response: Disputed. Voynow's review and ongoing consulting services were continuous in nature and were not segmented by year or project as evinced by the lack of a written accountant's report as required by AICPA standards. September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 1-2. Moreover, Voynow would discuss its findings, concerns, and recommendations with Star during visits and on future visits. Felsen Decl. Exhibit 13, Kumor Dep. at 220:16-222:5; Felsen Decl. Exhibit 15, Franzen Dep. at 57:5-16; 61:18-62:11; 114:15-115:10; 120:3-135:25; Felsen Decl. Exhibit 2, Felsen Decl. Exhibit 21, Corrigan Dep. at 89:1-18. Additionally, Voynow prepared analytical review work papers comparing multiple years, including trend analyses. Felsen Decl. Exhibit 1, Sosnowski Dep. at 98:22-99:9.**

48. At year-end, Voynow would propose certain adjusting journal entries. It was up to management to accept any proposed adjusting journal entry and to post it. Ex. 16 at 146:22- 147:12; 203:8-14.

**Response: Object inasmuch as the term "management" is vague. Moreover, Voynow did not propose adjusting journal entries to ownership of Star and never reviewed them with ownership of Star. Felsen Decl. Exhibit 16, Seibel Dep. at 42:2-8; Felsen Decl. Exhibit 22, Voynow 30(b)(6) Dep. at 224:8-22.**

49. Voynow never made entries in the Star Dealership's accounting system. Ex. 16 at 146:22-147:12; 203:8-14; Ex. 17 at 71:11-24.

**Response: Denied except admit that Voynow did not physically input entries that it**

14

prepared but Voynow's accountants sat with Star's accounting personnel while they physically input adjusting journal entries recommended by Voynow.  Felsen Decl. Exhibit 23, Voynow 30(b)(6) Dep. at 135:3-12; 151:16-152:18.

50. For certain years, in addition to its tax planning, interim and year-end visits, a Voynow accountant would also visit a Star Dealership entity if there was an ongoing IRS audit or a sales tax audit.  Such services were deemed by Voynow as special projects or accounting services.  Ex. 8 at 98:8-13; 112:5-23; 113:14-22; 149:21-150:5; Ex. 9 at 28:10-24.

Response: Deny except admit these tasks were in addition to the many tasks Voynow performed, including its ongoing consulting services.  See Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.

51. Voynow did not have remote access to the Star Dealership's DMS or accounting system at any point from 1996 up until 2017. Ex. 2 at 132:24-133:14; Ex. 8 at 47:6-15; Ex. 18 at 260:12-16; Ex. 33 at 126:4-10.

Response: Disputed.  Voynow had remote access to Reynolds & Reynolds.  See Michael Koufakis Dep. at 126: 13-127:20).  Indeed, Michael Koufakis requested Voynow to perform work that required Voynow to remotely access Reynolds & Reynolds, including researching vehicle purchases by Vivian Karouzakis.  See Felsen Decl. Exhibit 59.

52. Without remote access, Voynow's ability to view Plaintiff's accounting system was limited to the occasions when it was physically on site at the Star Dealerships, approximately three times per year for one to two days at a time. Ex. 2 at 134:24-135:5; Ex. 8 at 47:6-15; 98:4- 7; Ex. 9 at 25:19-9;  Ex. 7 at  119:3-24; Ex. 33 at 24:4-22.

Response: Deny.  See response to SOF ¶ 50.

53. When physically on site, Voynow was provided with a log in ID whereby it could access certain portions of the Reynolds & Reynolds system through one of the open Star Dealerships' computers physically located at the Star Dealerships' accounting office. Ex. 8 at 47:6-15; 51:5-9; Ex. 32 at 101:22-102:2; Ex. 10 at 171:6-172:13.

**Response: Disputed inasmuch as Voynow was provided with log-in credentials at the beginning of the engagement and the credentials never changed.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 3.**

54.  From 1996 through 2016, Voynow prepared Plaintiffs' annual corporate tax returns. Plaintiffs' year-end was 12/31 and Voynow issued the tax returns to Plaintiffs prior to Plaintiffs' September 15th tax filing deadline.  Ex. 33 at 97:16-21.

**Response: Denied inasmuch as the deadline was March 15 and to the extent they were extended until September 15.   Moreover, these were among the many duties Voynow performed at Star. See Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

55. Specifically, for the 2012-2016 tax returns prepared by Voynow, they were issued to the Star Dealerships on the following dates:

| TAX YEAR OF RETURN | DATES OF ISSUANCE BY VOYNOW |
| --- | --- |
| 2012 | June 24-25, 2013; July 8, 2013 |
| 2013 | July 9, 2014; July 29, 2014; July 31, 2014; August 4, 2014 |
| 2014 | August 6, 2015; August 11-12, 2015; September 10, 2015 |
| 2015 | March 14-15, 2016; May 12-13, 2016; July 17, 2017 |
| 2016 | July 25-27, 2017; September 6, 2-17 |

Ex. 19.

**Response: Admitted.**

16

56. Plaintiffs have never filed any amendment to any of the Voynow-prepared tax returns after "discovery" the purported fraud at issue in this case.  Ex. 2 at 240:10-13.

**Response: Disputed.  Plaintiffs are unable to fully respond to this statement as it is unintelligible, but state that the cited testimony refers to the period 2010-2015.**

57. The Star Dealerships' 2016-2018 returns were filed simultaneously.  The IRS has never audited these returns following the "discovery" of the purported fraud at issue in this case. Ex. 2 at 125:15-17; 111:21-23.

**Response: Admitted.**

### E.   VOYNOW'S ISSUANCE OF ENGAGEMENT LETTERS

58. Prior to 2008, Voynow did not issue any written engagement letter to Plaintiffs. Ex. 8 at 65:16-66:13.

**Response: Admitted and state that the only written engagement letter ("form letter") issued by Voynow was in 2016.  Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

59. There is no requirement for a written engagement letter to be issued by an accountant or signed by a taxpayer for a tax engagement.   Ex. 7 at 83:6-14; Ex. 8 at 65:20-66:13.

**Response: Disputed insofar as this is as an opinion or legal conclusion, not a statement of material fact and the statement fails to address that Voynow's engagement included ongoing consulting services.**

60. There is a requirement that a written engagement letter be issued annually by an accountant for review or audit engagements, and that these engagement letters be signed by

the client.  Individual letters for each dealership are required in review or audit engagements. Ex. 7 at 83:21-23; 84:6-8; Ex. 8 at 65:20-66:13; Ex. 32 at 86:9-87:12.

**Response: Disputed insofar as this is as an opinion or legal conclusion, not a statement of material fact and the statement fails to address that Voynow's engagement included ongoing consulting services.**

61. There are no engagements letters in existence between Voynow and the Star Dealerships that provide for professional services in the form of a review or audit engagement.

**Response: Admitted and state that there were no engagement letters between Voynow and the Star Dealerships at all and that the only written engagement letter that Voynow provided to the Star Dealerships was in 2016.  Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

62. In approximately 2008, American Institute of Certified Public Accountants ("AICPA") publications began recommending that accountants now issue engagement letters for tax engagements. Ex. 8 at 65:20-66:13; 70:7-12; Ex. 16 at 66:17-68:3; 70:2-16.

**Response: Disputed insofar as this is as an opinion or legal conclusion, not a statement of material fact.**

63. Beginning in 2008, Voynow issued annual engagement letters to the Star Dealerships.

In both 2008 and 2009, Voynow issued separate engagement letters to each of the three Koufakis brothers for the Star Dealerships which they owned.  Ex. 20; Ex. 8 at 71:22-72:6.

**Response: Disputed.  There was no written engagement agreement between the parties.  The**

18

**first form letter that Voynow ever sent to Star was in December 2016 after Star learned that Vivian Karouzakis stole from it.  Star did not sign it because it did not represent the scope of the services and Star felt that Voynow sent the December 2016 letter to cover its tracks because it knew it should have uncovered the theft by Vivian.  Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

64. In 2009, Star Nissan's owner John Koufakis, Jr. directed Voynow to deal with his brother Michael regarding the engagement letter, and Voynow thereafter revised the format for future letters by listing all of the Star Dealerships on a single engagement letter addressed to Michael Koufakis. Ex. 3 at 99:6-18; Ex. 8 at Seibel 72:7-9; Ex. 16 at 71:8-72:1; Ex. 21.

**Response: Disputed.  John Koufakis testified that he did not receive form letters, but that if he did, he would send them to Michael Koufakis.  John Koufakis Dep. at 97:7-98:23.  There was no written engagement agreement between the parties.  The first form letter that Voynow ever sent to Star was in December 2016 after Star learned that Vivian Karouzakis stole from it.  Star did not sign it because it did not represent the scope of the services and Star felt that Voynow sent the December 2016 letter to cover its tracks because it knew it should have uncovered the theft by Vivian.  Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

65. From 2010 through 2016, Voynow issued a single engagement letter each year for all of the Star Dealerships to the attention of Michael Koufakis.  Ex. 21.

**Response: Disputed.  There was no written engagement agreement between the parties.  The**

first form letter that Voynow ever sent to Star was in December 2016 after Star learned that Vivian Karouzakis stole from it.  Star did not sign it because it did not represent the scope of the services and Star felt that Voynow sent the December 2016 letter to cover its tracks because it knew it should have uncovered the theft by Vivian.  **Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20**; **Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

66. Plaintiffs never signed any of the annual engagement letters. Ex. 16 at 70:17-25.

**Response: Disputed insofar as no form letters were provided to Star by Voynow until 2016. Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20**; **Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

67. According to Plaintiffs' owner John Koufakis, Jr., he conducts business based on handshakes and trust and does not enter into written contracts with anyone.  This is the collective view of the owners of the Star Dealerships.  Ex. 3 at 28:25-29:6; 187:11-21.

**Response: Disputed.  John Koufakis Jr. did not testify that the Star Dealerships never enter into written contracts.   Felsen Decl. Exhibit 4, John Koufakis Dep. at 187:11-21.  Notably, the Star Dealerships could not sell vehicles without written contracts.  See N.Y. Gen. Bus. Law § 396-P.**

68. The Koufakis brothers either deny, are "uncertain," or do not specifically recall whether they received Voynow's annual engagement letters, other than Michael Koufakis admits to receiving the 2016 engagement letter in person.  Ex. 2 at 116:15-117:14; Ex. 4 at 159:15-17; Ex. 3 at 89:16-18.

**Response: Denied.  No form letters were provided to Star by Voynow until 2016 at which time**

**Voynow sent a form letter to cover Voynow's tracks because it knew it should have uncovered the theft by Vivian.   Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

69. Michael Koufakis never asked the Star Dealership employees whether the Star Dealerships received the Voynow issued engagement letters and has no way of knowing whether or not there were received.  Ex. 2 at 119:21-120:23; 165:7-21.

**Response: Admitted and state that any mail addressed to Michael Koufakis would have been delivered to Michael Koufakis.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 12.**

70. Michael Koufakis did receive tax engagement letters from Voynow which were sent to his home address for the preparation of his personal returns.  He also did not sign these engagement letters, with the exception of one.  Ex. 2 at 166:6-21.

**Response: Disputed and this is as not a statement of material fact.  Moreover, Michael Koufakis testified that, in his personal capacity, he received merely a couple of tax form letters, one of which he signed, and they were for his personal tax returns, not for the Star Dealerships.  Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 166:6-18. Plaintiffs object to this statement as irrelevant.**

71. Voynow's engagement letters issued to Plaintiffs generally stated, in pertinent part:

We will perform our services in accordance with the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants.  ….

We will prepare your tax returns based upon information and representations provided to us.  We will not audit or otherwise verify the data you submit to us, although we may ask you to clarify some of the information. ….

Client Responsibilities:  You will provide us with a trial balance and

other supporting data needed to prepare your tax returns.  It is your obligation to provide us with accurate and complete information, including worldwide income.  You are responsible for maintaining an adequate and efficient accounting system for safeguarding assets and authorizing transactions and for maintaining adequate documentation to substantiate the accuracy and completeness of your tax returns. …

CPA Firm Responsibilities. Our services will be limited to only those tasks we deem necessary for the preparation of the returns.  We may deem it necessary to provide you with accounting and bookkeeping assistance in that regard.  …. Please note that we will not validate the completeness or accuracy of the information supplied, and the assistance we do provide is not to be construed as an oversight function, in any respect of your accounting system; therefore, there should be no reliance, stated or implied, by management on the accuracy of the assistance we are to provide.  As a result of our assistance, we may propose standard, adjusting, or correcting journal entries to your books and records.  However, management has final responsibility for reviewing the proposed entries and understanding the nature and impact of the proposed entries on the returns.  Furthermore, it is management's responsibility, once these entries have been approved, to post the entries to its accounting system in a timely manner.

Our engagement does not include any procedures designed to discover errors, fraud or theft.  Therefore, our engagement cannot be relied upon to disclose such matters.

Ex. 21.

**Response: Disputed.  There was no written engagement agreement between the parties.  The first form letter that Voynow ever sent to Star was in December 2016 after Star learned that Vivian Karouzakis stole from it.  Star did not sign it because it did not represent the scope of the services and Star felt that Voynow sent the December 2016 letter to cover its tracks because it knew it should have uncovered the theft by Vivian. Star never signed the December 2016 letter.   Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24; Felsen Decl. Exhibit 3, Michael Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.**

## F.  <u>VOYNOW BILLED THE STAR DEALERSHIPS THROUGH</u>

### ANNUAL FORMAT

72. Voynow billed all of its automobile dealership clients on a monthly retainer strictly so it could get money into the firm in advance before starting to perform any work.  Ex. 7 at 158:19-160:8.

73. **Response: Disputed because the cited testimony refers to clients for whom Voynow performed only tax services and Star's engagement with Voynow was not limited to tax services.  Moreover, Voynow performed work throughout the year.  See Plaintiff's Counter-Statement of Facts ¶¶ 1-6, 12-18, 23-27, 29-39, 43-44, 51-55, 63.**

74. For the Star Dealerships, each year in approximately March, Voynow issued a progress bill reflecting work done up to that point and which was applied against any retainers paid. Voynow then issued a "final" bill in approximately September after the Star Dealerships' tax returns were completed and issued.  Ex. 8 at 136:16-137:3; Ex. 25.

**Response: Disputed.  See Felsen Decl. Exhibits 63-67.**

75. Any retainers paid were deducted from the final bill each year.  Ex. 7 at 160:159:12- 160:8; Ex. 25.

**Response: Disputed inasmuch as the cited evidence does not establish that all retainers paid were deducted from the final bill each year.**

76. To the extent there were services provided arising from IRS or other sales tax audits which were deemed by Voynow as special projects or services, Voynow billed for those matters separately as special accounting for the specific year at issue.  Ex. 8 at 136:16-24.

**Response: Denied to the extent it suggests that Voynow's ongoing consulting services had a discrete beginning and end.  It did not.  Felsen Decl. Exhibit 75, D. Sosnowski Decl. ¶ 6.**

23

However, admit that Voynow provided bills on a monthly basis.  Moreover, Voynow's accounting services provided to Star went well beyond tax services.  Voynow acted as Star's controller and oversaw it's accounting services in its entirety.  Felsen Decl. Exhibit 2, Sosnowski November 20, 2023 Expert Report at 2, 4-7.

77. Voynow stored and maintained it [sic] records regarding the Star Dealership engagement based upon each year of the engagement, with separate files for each year that contained its year- end workpapers and the tax return work product it issued.  Ex. 32 at 32:15-33:12.

**Response: Disputed in that how Voynow stored and maintained its records is not a material fact.  Also dispute that Voynow's work product was "tax return work product."  Voynow did not have any annual engagements with Star.  In addition, Voynow had one continuous consulting engagement with Star.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 5.  Voynow would discuss its findings, concerns, and recommendations with Star during visits and on future visits.  Felsen Decl. Exhibit 13, Kumor Dep. at 220:16-222:5; Felsen Decl. Exhibit 15, Franzen Dep. at 57:5-16; 61:18-62:11; 114:15-115:10; 120:3-135:25; Felsen Decl. Exhibit 21, Corrigan Dep. at 89:1-18.  Voynow prepared analytical review work papers comparing multiple years, including trend analyses.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 98:22-99:9.**

## G. <u>THE ALLEGED ACTS OF THEFT AND PLAINTIFFS' DISCOVERY</u>

78. Plaintiffs allege that from 2001-2017 – over 17 years -- certain employees committed various acts of theft through different schemes in an amount totaling approximately $4.5 million.  Ex. 22.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

79. Plaintiffs first discovered some of the purported theft at issue in December of 2016.  Ex. 12 at 212:21-213:9.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as the cited testimony is that Star discovered theft in November or December 2016.**

80. Since December of 2016, Plaintiffs have sought to have their former employees criminally charged with the various purported theft schemes.  Ex. 1, ¶48; Ex. 12 at 178:2-180:5; 236:18-237:8; Ex. 5 at 141:15-143:6.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

81. Four employees were ultimately charged -- Karazoukis, Theocharis, Carmen Jones and Douglas Filardo.  The total amount of all criminal charges filed is $1,312,536 – not $4.5 million.  Ex. 23.

**Response:** **Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to**

which Defendants contend there is no genuine issue to be tried.  Notwithstanding the

objection, disputed.  Filardo was indicted for $1,855,039.70.  Also, Theocharis pled guilty

to theft.  Felsen Decl. Exhibit 26.  Moreover, Vivian Karouzakis passed away on the eve of

her criminal trial and the criminal proceedings against Carmen Jones and Douglas Filardo

remain pending.  See Felsen Decl. Exhibit 73, M. Koufakis Decl.¶ 6.

 82. No employee has been convicted.

Response: Plaintiffs object as this statement is not relevant to any claim or defense raised

in Defendants' motion for summary judgment and is not a material fact as to which

Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,

disputed.  Theocharis pled guilty.  See Felsen Decl. Exhibit 26.  Moreover, Vivian Karouzakis

passed away on the eve of her criminal trial and the criminal proceedings against Carmen

Jones and Douglas Filardo remain pending.  See Felsen Decl. Exhibit 73, M. Koufakis Decl.¶

6.

 83. Of the $1,312,536 for which criminal charges were filed, $1,151,108 relates

directly to checks legitimately signed by Plaintiffs' authorized check signers who approved the

release of Star Dealerships funds now deemed to be theft.  Ex. 23.

Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in

Defendants' motion for summary judgment and is not a material fact as to which

Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,

disputed.  Exhibit 23 does not establish same.

## H. ALLEGED "THEFT" THROUGH CHECKS SIGNED BY PLAINTIFFS' AUTHORIZED CHECK SIGNERS

 84. The only individuals authorized to sign checks for the Star Dealerships were

Michael Koufakis, John Koufakis, Sr., John Koufakis, Jr., and Steve Koufakis ("hereinafter

"the Authorized Check Signers"). Ex. 3 at 61:13-20; Ex. 4 at 63:13-15.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised
in Defendants' motion for summary judgment and is not a material fact as to which
Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,
admitted.**

85. The Authorized Check Signers were responsible to make sure that all checks
presented to them were for legitimate expenses of the Star Dealerships.   They were
responsible to review and require necessary back up documents to support the checks, and to
ask questions if they were unsure of any expense, before signing a check. Ex. 3 at 38:9-13;
62:20-63:11; Ex. 4 at 63:9-12; 63:16-20-64:8; 66:15-19.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised
in Defendants' motion for summary judgment and is not a material fact as to which
Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,
admitted.**

86. The Authorized Check Signers repeatedly signed checks now deemed to be theft
either without proper backup documentation or without actually looking at backup provided
with the checks.  Ex. 4 at 64:5-65:16; Ex. 3 at 123:17-25; Ex. 2 at 179:23-25; 180:25-
181:181:14; 182:6-16.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in
Defendants' motion for summary judgment and is not a material fact as to which
Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, the
cited evidence does not establish how many checks were signed by each signer, when the
checks were signed, or the total amount of the checks.  Although some checks were signed,**

at times, without backup, there is no evidence about incidents as the check signers do not recall which checks they signed that had backup and which did not.  **Felsen Decl. Exhibit 5, S. Koufakis Dep. at 64:5-65:16; 173:11-18.**

87. None of the signatures on any check now deemed to be theft was forged.  All were legitimately signed by the Authorized Check Signers who acted in the scope of their authority to approve the release of funds from the Star Dealerships. Ex. 3 at 61:9-24; 65:19-23; Ex. 2 at 189:15-18; Ex. 12 at 40:17-22; Ex. 11 at 106:24-107:9.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

88. Cancelled checks were included in monthly bank statements sent to the Star Dealerships.  Michael Koufakis, Managers Karazoukis and Theocharis reviewed the monthly bank statements on behalf of all the Star Dealerships.  Ex. 4 at 69:9-18.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, the cited testimony does not establish that Michael Koufakis, and Managers Karazoukis and Theocharis reviewed the monthly bank statements on behalf of all the Star Dealerships; the testimony is merely that Michael Koufakis was responsible for reviewing bank statements.**

89. Michael Koufakis was the only person with online access and the ability to monitor activity in the Star Dealerships' bank accounts. Ex. 2 at 202:22-203:9.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried and there is no specified time period.  Notwithstanding the objection, disputed.  The cited testimony only refers to Plaintiffs' Investors Bank online access (for an unspecified time period).  Michael Koufakis and Plaintiffs' office managers had online access to Plaintiffs' Investors Bank account, which could also be monitored in Reynolds and Reynolds to which Voynow had access.  See Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 4.**

90. The criminal charges that arise from checks signed by the Authorized Check Signers relate to purported thefts schemes in connection with (a) a Staples account; (2) an advertising vendor; and (c) an employee's personal creditors.  Ex. 23.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as there are also charges against Douglas Filardo for a customer claim scheme that does not arise from checks signed by the Authorized Check Signers and charges against Carmen Jones for stolen funds in connection with her purchase of a vehicle.  See Defendants' Exhibit 23.**

1. **Alleged Theft Fron 2001-2017 In Connection With Staples Purchases**

91. Carmen Jones ("Jones") was an accounts payable clerk employed by Star Nissan. Ex. 12 at 18:16-18.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which**

**Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

92. Over the course of 17 years – from 2001- 2017 – Star Nissan contends that Jones stole $68,853 by purchasing items for personal use with a Staples credit card issued on the Star Nissan account.  Ex. 3 at 47:22-48:1; Ex. 12 at 7:9-8:2.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as this was only one scheme by Jones wherein she stole from Plaintiffs and a civil jury concluded that Jones stole $555,000 from Star.  Felsen Decl. Exhibit 25, Plaintiffs' Response to Defendants' Second Set of Interrogatories, Exhibit A; Felsen Decl., Exhibit 27.**

93. Each alleged act of theft by Jones occurred throughout 2001-2017 when she acquired possession of the items – i.e., at the time of purchase.  Ex. 12 at 34:14-23; 35:14-36:7.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as this was only one scheme by Jones wherein she stole from Plaintiffs. See Felsen Decl., Exhibit 25.**

94. For 17 years, Star Nissan received billing statements from Staples for purchases made through its Staples account.  The Authorized Check Signers signed checks payable to Staples which included approval of payments for items acquired by Jones and now deemed to

be theft. Ex. 12 at 19:14-19; 39:22-40:16.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed.  The statements contained general charges for office supplies.  <u>See</u> Felsen Decl. Exhibit 4, J. Koufakis Dep. at 36:14-23.**

95. The Authorized Check Signers never questioned any of the Staples charges listed or and of the backup receipts they were provided with when they signed the checks to authorize payment.  Ex. 4 at 179:3-180:4; Ex. 12 at 41:16-20.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed. John Koufakis did not see any statements with itemized charges.  Instead, he saw Staples statements which contained general charges for office supplies.  <u>See</u> Felsen Decl. Exhibit 4, J. Koufakis Dep. at 36:14-23.  Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 11.**

96. All payments made to Staples were properly recorded in the Star Dealerships accounting records as supply expenses. Ex. 12 at 41:21-42:12.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as many of these payments were for improper non-business items purchased by Jones.  Moreover,**

this improper act of theft should have been uncovered by Voynow as Star's acting Controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 11.

97. Upon "discovery" of this purported theft scheme, Michael Koufakis then reviewed 17 years of Staples invoices and concluded that $68,853 of the payments approved by the Authorized Check Signers was theft by Jones. Following a criminal investigation, she has been charged with alleged theft for only half that amount, $33,175. Ex. 12 at 8:3-9:12; 35: 4-25; 43:22-24; Ex. 4 at 59:12-20; Ex. 23.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, Jones was indicted only for an amount that was covered in the statutory period and only for acts that occurred in Queens. In April 2024, Jones was found liable by a civil jury for stealing $555,000.00 from Star during the period of 2001 to 2017 – all of which was during the time that Voynow was acting as Star's Controller. Felsen Decl., Exhibit 27.**

**2. Alleged Theft Regarding An Advertising Vendor From 2008-2016**

98. Douglas Filardo ("Filardo") was a Sales Manager employed by Star Subaru. Ex. 3 at 190:20-191:12.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, admitted.**

99. Over the course of nine years -- from November 25, 2008 to November 1, 2016 -- Star Subaru paid $1,419,874.83 to Motorsports Advertising ("Motorsports") for

advertising.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried and there is no citation to evidence.  Notwithstanding the objection, admitted.**

100.   Filardo, on behalf of Star Subaru, hired Motorsports to provide advertising services in the form of cardboard flyers that were to be printed and then mailed by Motorsports to residential addresses within various zip codes near Star Subaru.  Ex. 11 at 88:14-89:16; 97:14-21; 103:18- 25.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

101.   Michael Koufakis was responsible to investigate the background and qualifications of any advertising vendor hired by Star Subaru and to supervise Filardo.  Ex. 2 at 192:9-21; 193:8- 10.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried and the cited testimony does not support the purported fact.  Moreover, advertising at Star Subaru was delegated to Filardo, Star Subaru's Sales manager.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 8.**

102.   Star Subaru never had a written contract with Motorsports, nor any documentation memorializing the terms or its arrangement with Motorsports.  The

33

management of Star Subaru never set any limit on the amount of authorized advertising, the frequency of services, or the cost or number of flyers being purchased.  Ex. 11 at 89:18-90:90:16; 95:25-96:7.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

103.    Star Subaru claims it never actually received any of the advertising it purchased from Motorsports over the course of 8 years, and that unbeknownst to it, Filardo owned Motorsports.  Ex. 11 at 85:12-86:2; 92:5-16.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

104.    For over 8 years, the Authorized Check Signers signed checks payable to Motorsports for these advertising services, but never required, requested or received proof of actual mailing of the flyers from Motorsports or the U.S. Postal Office.  The Authorized Check Signers signed checks payable to Motorsports without knowing who they were or without ever questioning any Motorsports invoices before signing the checks.  Ex. 11 at 104:24-105:4; 107:4- 108:23; Ex. 3 at  193:22-194:8; 203:1-24; Ex. 4 at 38:15-24.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, Star**

Subaru was provided with mailing and postage receipts that it believed to be real, but has now learned that they were fake.  <u>See</u> **Felsen Decl. Exhibit 17, STAR00151829-00151832**; **STAR00151833-00151836.  Star Subaru was also provided with a sample mailer which it believed had been mailed but has now learned that it was not mailed.  <u>Id.</u> at STAR00151869.  Moreover, advertising at Star Subaru was delegated to Filardo, Star Subaru's Sales manager.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 8.**

105.    The alleged acts of "theft" by Filardo occurred each time a check was signed by the Authorized Check Signers during 2008-2016 to authorize payment to Motorsports. Ex. 11 at 93:13-94:4.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, Filardo was also involved in a customer claims scheme that did not involve checks.  <u>See</u> Defendants' Exhibit 23.**

106.    All payments to Motorsports were properly recorded as advertising expenses in the Star Dealership's accounting records throughout 2008-2016. Ex. 11 at 111:23-112:15.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, denied.  These payments were improper acts of theft that Voynow should have uncovered as Star's acting Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 8.**

107.    Filardo has been criminally charged in this scheme for $634,228.77 – not

$1.4 million.  Ex. 11 at 85:12-24; Ex. 23.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed.  The total amount for which Filardo has been criminally charged is $1,855,039.70. See Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 7.**

### 3. Alleged Theft Regarding Karouzakis' Personal Creditors From 2013-2016

108.   Plaintiffs Star Nissan, Star Toyota and Star Hyundai allege that Karazoukis stole $553,724.56 over four years from May 14, 2013 to November 18, 2016 through a series of checks signed by the Authorized Check Signers that were payable to either Karazoukis directly, or to Capital One, HSBC Bank or M&T Bank.  Ex. 12 at 212:3-12; 227:9-21.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted with regard to this scheme and state that Karouzakis was involved in other schemes. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 9.  Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

109.   The Authorized Check Signers signed these checks without requiring backup documentation and never questioned the payments or asked for backup documentation to support the checks. Ex. 12 at 228:21-229:9; Ex. 3 at 116:17- 117:18-20; Ex. 4 at 173:2-174:21.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, the cited evidence does not establish how many checks were signed by each signer, when the checks were signed, or the total amount of the checks. Although some checks were signed, at times, without backup, there is no evidence about incidents as the check signers do not recall which checks they signed that had backup and which did not. Felsen Decl. Exhibit 5, S. Koufakis Dep. at 64:5-65:16; 173:11-18. Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

110.    For the checks payable directly to Karazoukis whereby the Authorized Check Signers knowingly released funds to her, the Authorized Check Signers have no recollection as to why they signed them. Ex. 2 at 184:25-186:1.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, disputed inasmuch as the testimony relates only to two checks, not every check payable directly to Karazoukis. Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

111.    Plaintiffs allege that Karouzakis applied these legitimately signed checks towards her personal debt obligations rather than expenses of the Star Dealerships. Ex. 12 at 212:13- 20; 227:22-228:12.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, denied. There was no "legitimate" basis for the issuance of these checks and Voynow as Star's controller should have uncovered this scheme. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

112.     The acts of "theft" in connection with each check occurred when the checks were signed and given to Karazoukis. Ex. 12 at 241:8-17.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, denied. The theft occurred when Karazoukis generated the check and the theft should have been uncovered by Voynow as Star's controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17. Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller. Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

113.     In December of 2016, a representative from Capital One Bank contacted Michael Koufakis to alert him that an employee was paying off personal debt with company checks signed by the Authorized Check Signers. Ex. 12 at 212:21-213:9.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, admitted.**

38

114.    The Star Dealerships terminated Karouzkis' employment in December of 2016. Ex. 2 at 210:16-19.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

115.    Plaintiffs allege that Karazoukis stole $590,481.56 through this scheme.  She was charged for $483,704.36.  Ex. 23; Ex. 23.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, disputed inasmuch as the cited evidence does not identify a specific amount for which Karouzakis was charged and states that it is more than $300,000.**

116.    Karazoukis was never convicted.  The charges were dismissed following her death in June of 2019.  Ex. 12 at 237:9-11.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted and further state that in the civil action against Karouzakis' estate, a judgment in the amount of $16,588,928.87 was entered against Karouzakis' estate in connection with her theft from Plaintiffs.  See Star Auto Sales of Bayside, Inc. v. Michael Karouzakis as Executor of the State of Vivian Karouzakis, Nassau County index no. 711698/2018, NYSCEF Doc. No. 65.**

117.    Some of the check payments at issue were recorded erroneously in the Star Dealerships' accounting system through offsets to accounts such as factory or incentive receivables.  Ex. 2 at 206:4-17; Ex. 12 at 243:13-25.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.  Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 16-17.**

### 4.    Alleged Remaining Theft Schemes At Issue In Criminal Complaints

118.    The remaining schemes comprising the $1,312,536.69 for which criminal charges were filed relate to (a) an unpaid employee loan; and (b) purported theft of customer deposits for warranty purchases.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried and Defendants have not cited any evidence in support of this purported statement of fact.**

119.    Specifically, Star Chrysler alleges approved various cash loans from 2010 through 2016 to Theocharis and now allege that she never paid them back, and made fraudulent accounting entries to disguise her purported theft.  Ex. 22.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,**

admitted that this is one of the schemes for which Theocharis was criminally charged.

Moreover, this improper act of theft should have been uncovered by Voynow as Star's acting

Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at 11.

120.    Star Chrysler never created or maintained any documentation as to the

existence of any loan, such as a loan agreement, written loan terms, any repayment schedule,

nor even any signed acknowledgement by Theocharis as to receipt of cash for any purported

loan.  Ex. 4 at 90:7-15; 23-25; Ex. 13 at 10:16-11:2.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised**

**in Defendants' motion for summary judgment and is not a material fact as to which**

**Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,**

**Star states that this type of documentation should have, but was never recommended to, Star**

**by Voynow who was acting as Star's Controller.  See Felsen Decl. Exhibit 75, Sosnowski**

**Decl. ¶ 8.  Moreover, this improper act of theft should have been uncovered by Voynow as**

**Star's acting Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at**

**11.**

121.    Star Chrysler contends that Theocharis "stole" $98,897.98 in purported

unpaid cash loans.  She was criminally charged for only $5,000.  Ex. 22; Ex. 23.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense**

**raised in Defendants' motion for summary judgment and is not a material fact as to**

**which Defendants contend there is no genuine issue to be tried.  Notwithstanding the**

**objection, Plaintiffs state Theocharis was only charged for the period covered under the**

**statute of limitations.  Moreover, as part of her guilty plea to petit larceny for the period**

**limited to July 21, 2016 through November 30, 2016, she is required to pay $5,000 in**

restitution.  See Felsen Decl., Exhibit 26.

122.    On November 23, 2023, Theocharis pled guilty to a single count of petit

larceny under NY PL 155.25. Ex. 24.

Response: Admitted and state that the guilty plea was limited to the period July 21, 2016

through November 30, 2016.  Id.

123.    Plaintiff Star Subaru alleges that between June of 2014 and July of 2017,

Filardo stole $378,157.08 in cash from customer deposits and covered up this purported theft

by use of fictitious customer claim forms he created.  Ex. 22.

Response: Plaintiffs object as this statement is not relevant to any claim or defense raised

in Defendants' motion for summary judgment and is not a material fact as to which

Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,

admitted.  Moreover, this improper act of theft should have been uncovered by Voynow as

Star's acting Controller.  Felsen Decl. Exhibit 2, November 20, 2023 Sosnowski Report at

8-9.

124.    Filardo was criminally charged for $156,428.56.  Ex. 23.

Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in

Defendants' motion for summary judgment and is not a material fact as to which

Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection,

disputed.  The total amount for which Filardo has been criminally charged is $1,855,039.70.

See Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 7.

## I.    PLAINTIFFS ENGAGE ROSENFIELD AND TERMINATE VOYNOW

125.    Following Karazoukis' termination in December of 2016, the Star Dealerships

put Theocharis in charge as Controller for all the Star Dealerships until mid-April 2017.  Ex. 2

at 210:16-22; 211:24-25; 215:7-14; Ex. 5 at 101:14-19; Ex. 8 at 204:17-22.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, denied inasmuch as Theocharis was put in charge as office manger, not controller, for all of the Star dealerships.**

126.    On April 10, 2017, Plaintiffs suspended Theocharis and thereafter terminated her employment. Ex. 2 at 215:12-14; 216:2-4; Ex. 5 at 102:18-20.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

127.    In April of 2017, Plaintiffs retained another accounting firm – Rosenfield & Company ("Rosenfield") – to provide forensic accounting services.  Ex. 2 at  64:6-11; 226:14- 19; Ex.1, ¶49, 54

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

128.    Following the termination of Theocharis, Plaintiffs promoted existing employee Jackie Cutillo to Controller for all of the Star Dealerships.  Cutillo had no prior experience as a controller or manager nor any formal accounting education. Ex. 2 at 216:2-9; 232:24-233:7; Ex. 5 at 10:7-11; 10:25-11:11; 17:8-25; 107:8-14; Ex. 8 at 205:4-10.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, denied.  Felsen Declaration Exhibit 72, Jacquleine Cutillo Decl. ¶ 1.  In fact, Voynow provided formal accounting training to Cutillo.   Defendants' Ex. 2 at 227:12-15; 18-22; Defendants' Ex. 5 at 117:21-118:8.**

129.    In the Spring of 2017, Michael Koufakis requested that Voynow assist Cutillo and provide training for her new role as Controller.  Ex. 2 at 227:12-15; 18-22; 205:4-10; Ex. 5 at 117:21-118:8; Ex. 8 at 193:10-14.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, denied inasmuch as Cutillo was hired as office manager, which is the position Karouzakis and Theocharis held.**

130.    Voynow deemed this request to be a special project outside the scope of its regular engagement and billed Star Dealerships separately for it.  Ex. 7 at 85:13-17; Ex. 8 at 112:5-10; Ex. 31; Ex. 32 at 167:23-168:12.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Moreover, how Voynow "deemed" these services is inadmissible opinion testimony.   Notwithstanding the objection, admitted.**

131.    Voynow was given limited remote access in 2017 to the Star Dealerships' accounting system for the purpose of assisting Cutillo.  Ex. 2 at 132:24-133:14; Ex. 8 at 47:6-

44

15.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, disputed. See response to SOF ¶ 50.**

132.    Voynow prepared and issued the Star Dealerships' 2016 corporate tax returns in July and September of 2017. Plaintiffs terminated the engagement with Voynow on November 3, 2017. Ex. 2 at 63:21-24; Ex. 19.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, admitted.**

133.    Rosenfield took over preparing the annual corporate tax returns for the Star Dealerships and related entities after Voynow was terminated, while continuing to perform forensic accounting services. Ex. 2 at 64:15-65:5.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried. Notwithstanding the objection, admitted.**

134.    Rosenfield issued annual tax engagement letters to Michael Koufakis, however he never signed them. Ex. 26.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which**

**Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted that the documents in Exhibit 26 were not signed.**

135.    Plaintiffs terminated Rosenfield in approximately April of 2020. Ex. 27, ¶31.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

136.    The forensic accounting services that Rosenfield provided is the "independent forensic review" underlying and referenced in the Plaintiffs' Complaint against Voynow.  Ex. 1, ¶¶49, 54.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

137.    Rosenfield was unable to provide proof to the District Attorney's office to support any charges for various alleged theft schemes that Plaintiffs claim occurred. Ex. 2 at 224:14-17.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted and state that, notwithstanding, Vivian Karouzakis, Depina Theocharis, Carmen Jones, and Douglas Filardo were charged criminally.  See Defendants' Exhibit 23.**

138.    Plaintiffs have since sued Rosenfield in both state and federal court.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

139.     In their lawsuits against Rosenfield, Plaintiffs allege that Rosenfield erroneously identified various things in Plaintiffs' records as red flags or indicative of fraud which were not, and had misrepresented to Plaintiffs that certain fraud had occurred when it did not.  Ex. 2 at 65:6-9; Ex. 28, ¶¶44, 84; Ex. 29, ¶¶39, 40, 45, 64, 85.

**Response: Plaintiffs object as this statement is not relevant to any claim or defense raised in Defendants' motion for summary judgment and is not a material fact as to which Defendants contend there is no genuine issue to be tried.  Notwithstanding the objection, admitted.**

## PLAINTIFFS' COUNTERSTATEMENT OF FACTS

1.     Voynow was recommended to Star by Reynolds & Reynolds because Voynow was considered experts on the Reynolds & Reynolds system, which has no connection to preparation of tax returns.  Felsen Decl. Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 2.

2.     Voynow held itself out as an accounting specialist in the auto industry and auto dealerships were its primary client type.  Felsen Decl. Exhibit 11, Lombardo Dep. at 23:3-18; Felsen Decl. Exhibit 13, Kumor Dep. at 36:16-20; 42-13-18.

3.     Voynow offers its dealership clients a variety of services including preparation of tax returns, financial statements, and consulting work, and interim visits/management visits.  Felsen Decl. Exhibit 11, Lombardo Dep.17:18-18:5; 23:20-24:6; Felsen Decl., Exhibit 35.

4.      When Voynow performed only tax services for auto dealerships, it would only include a maximum of one tax planning visit at the end of the year.  Felsen Decl. Exhibit 11, Lombardo Dep. at 25:21-26:14.

5.      In the latter half of 1996, Michael Koufakis interviewed Randy Franzen and Hugh Whyte in Mr. Koufakis' office at Star. Mr. Franzen was to the right of Mr. Koufakis and Mr. Whyte was to Mr. Koufakis' left.  Mr. Franzen and Mr. Whyte explained the differences between compilation, audit, and review. Mr. Koufakis explained that he wanted the highest level, which was an audit. Mr. Franzen and Mr. Whyte said that an audit was not necessary, it would be very high in cost and typically is only reserved for publicly traded companies.  Mr. Franzen explained that there was something in between – "more than review but less than an audit" – and that Voynow would come into the dealerships on a quarterly basis.  That is ultimately what Mr. Koufakis agreed to.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:14-75:20.

6.      Franzen was assigned to the Star account because Star wanted an accountant fluent in Reynolds and Reynolds because Star wanted to streamline its accounting system and because Franzen has a very good relationship with Reynolds and Reynolds and he could direct Star in issues related to Reynolds and Reynolds.  Felsen Decl. Exhibit 10, Whyte Dep. at 38:8-23.

7.      Reynolds & Reynolds has no connection to, nor is it used in any manner for, the preparation of income tax returns except to generate a trial balance which summarizes assets, liabilities income and expenses; a tax preparer does not require access to the accounting system.   Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 6; November 20, 2023 Sosnowski Report at 6.

8.      Star only recalls seeing one form letter from Voynow – and it was presented in December 2016 right after one of the thefts was first uncovered.   Felsen Decl. Exhibit 3, M.

Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.

9.      Voynow is unaware of the existence of signed retainer agreements with Star.  Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24.

10.     That is because Voynow did not describe in writing the proposed scope of services, including the terms of Voynow's engagement to provide professional accounting and tax services to Star until December 2016 after Star notified Voynow of the theft by Vivian Karouzakis. Felsen Decl. Exhibit 1, September 15, 2023 Sosnowski Report at 5; Felsen Decl. Exhibit 75.

11.     Kumor has been tasked with drafting form letters for Voynow, but he never drafted one for Star, and he does not know if form letters include visits.  Felsen Decl. Exhibit 13, Kumor Dep. at 115:25-116:6; 142:16-22.

12.     Voynow was Star's accountant of record from 1996 through 2017 during which time Voynow performed ongoing consulting services and a review and oversight function and assessed and analyzed the internal control systems and performed controllership functions for Star on an ongoing, continuous basis until Star terminated the relationship in 2017.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 5. Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; September 15, 2023 Sosnowski Report Ex. 1 ¶¶ 1, 6, 7, pages 5-7.

13.     These controllership functions included inspection of Star Auto's financial schedules, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing continuous basis.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at

5; Felsen Decl., Exhibit 25.

14.     Voynow's duties also included detecting fraud, overseeing all accounting processes, accounting entries (including reviewing and verifying the propriety of accounting transactions), and internal procedures.  See Felsen Decl., Exhibit 25.

15.     Voynow also counseled Star on whether to terminate employees in its accounting office. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 214:6-18.

16.     Voynow also recommended that Star hire a specific forensic accountant.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 70:6-21.

17.     Voynow had, and was given, "free reign" to review everything and anything whenever and however it deemed fit to ensure no fraud or irregularities existed and was expected to do so. See Felsen Decl., Exhibit 25.

18.     Voynow also trained Star's accounting staff.  See Felsen Decl., Exhibit 31.

19.     Star usually did not direct Voynow to look at any specific items because they understood that Voynow was an expert in the automotive field and trusted its judgment to review areas most susceptible to fraud.  See Felsen Decl., Exhibit 25.

20.     Voynow's review and consulting services were continuous in nature and were not segmented by year or project as evinced by the lack of a written accountant's report as required by AICPA standards.  Felsen Decl. Exhibit 1, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 1-2.

21.     Voynow's expert admitted that a consultative engagement could be ongoing. Felsen Decl. Exhibit 22, Scherf Dep. at 245:10-18; Felsen Decl. Exhibit 75, Sosnowski Decl. ¶ 5.

22.     A consultative engagement can be oral.  November 20, 2023 Sosnowski Report at 5.

23.     On a quarterly basis, Voynow made visits to Star during which time it provided review

and controllership services, including inspection of Star's financial schedules, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing basis; there were no annual or final reports provided by Voynow to Star that related to any specific project.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7; November 20, 2023 Sosnowski Report at 1-2, 4; Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

24.     Among the duties Voynow performed under its ongoing consulting engagement were reviews of Star's schedules, financial statement review, controllership services, including reviewing bank statements, developing general journal entries that were not for tax purposes, and overseeing and supervising Star's accounting employees.  Felsen Decl. Exhibit 4, J. Koufakis Dep. at 18:21-19:1; Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; September 15, 2023 Sosnowski Ex. 1 ¶¶ 1, 6 7, pages 5-7; Felsen Decl. Exhibit 22, Scherf Dep. at 100:2-22.

25.     As part of Voynow's consulting engagement with Star, Voynow made visits during the slower months, typically during the summer months and into the fall; visits for tax engagements were not made during this period.  Felsen Decl. Exhibit 11, Lombardo Dep. at 28:1-9; 38:24-39:5; 88:3-13; 145:23-146:11; Felsen Decl. Exhibit 12, Breslin 19:3-21:12; 28:11-14; Felsen Decl. Exhibit 18, McCabe 28:8-17; Felsen Decl. Exhibit 19, Bucolo Dep. at 27:8-28:7-30:17.

26.     Voynow had accountants dedicated to performing visits for Star during which visits the accountants reviewed various schedules and reconciliations to assess internal controls associated with the schedules which could reveal fraud or misstatements.  Felsen Decl. Exhibit 11, Lombardo Dep. at 74:13-77:3; 94:9-95:9; 104:24-105:2.

27.     Voynow's visits gave clients a level of comfort that their books and records were accurate.  Felsen Decl. Exhibit 11, Lombardo Dep. at 44:11-20.

28.     In general, Voynow's visits to clients ranged from one to four times a year, depending on the client.  Felsen Decl. Exhibit 11, Lombardo Dep. at 35:20-36:8.

29.     Voynow conducted three to four visits at Star each year.  Felsen Decl. Exhibit 4, J. Koufakis Dep. at 75:22-76:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 91:5-93-2.

30.     Voynow's visits to Star's offices to review its books and records were unrelated to tax preparation services.  Felsen Decl. Exhibit 20, Sidor Dep. at 22:4-7; Felsen Decl. Exhibit 21, Corrigan Dep. at 55:13-20; 126:5-9.

31.     Voynow sent approximately six (6) employees to Star's offices during the summer; Voynow's employees conducted audits for Star and referred to these visits as "audits".  Felsen Decl. Exhibit 21, Corrigan Dep. at 23:15-18; 55:13-23; 178:13-179:2; Felsen Decl. Exhibit 13, Kumor Dep. at 26:16-17.  Voynow never issued Star a certified financial statement which would be required to close out an audit.  Felsen Decl. Exhibit 75, D. Sosnowski Decl. ¶ 9.

32.     In accordance with its oral agreement to perform ongoing consulting services, during Voynow's review of Star's books and records, Voynow would review Star's books and records, including all of its schedules, such as accounts receivables, accounts payables, prepaids, previewed bank reconciliations, reviewed 1099s, reviewed all sales tax payments, asked questions of Star's accounting employees, ensured various reconciliations were completed, reviewed internal controls, and were supposed to notify Star about its findings and any issues they identified.  Felsen Decl. Exhibit 17, Lombardo Dep. at 34:6-35:5; Felsen Decl. Exhibit 12, Breslin Dep. at 11:11-13:7; 21:13-19; Felsen Decl. Exhibit 20, Sidor Dep. at 133:7-135:12; Felsen Decl. Exhibit 13, Kumor Dep. at 62:23-63:10; 119:3-120:23; 131:5-133:7; 133:10-136:20; Felsen Decl. Exhibit 6,

Star Nissan 30(b)(6) Dep. at 120:6-121:9; Felsen Decl. Exhibit 7, Star Chrysler 30(b)(6) Dep. at 43:25-44:13; Felsen Decl. Exhibit 8, Star Subaru 30(b)(6) Dep. at 21:6-14; 113:1-10; Felsen Decl. Exhibit 9, Star Toyota 30(b)(6) Dep. at 40:3-40:19; 53:8-54:5; 61:16-62:1; 94:14-23; 138:12-139:1.

33.     As part of its consulting services and controllership role at Star, Voynow also looked for anomalies which could identify potential fraud.  Felsen Decl. Exhibit 11, Lombardo Dep. at 44:21-45:6; See Felsen Decl., Exhibits 39-43, 62.

34.     Voynow would review in excess of sixty (60) schedules per dealership during its visits to Star, including, but not limited to, Accounts Receivable, Employee Advances, Car Deals, Financial Reserves, Service and Parts Receivables, We-Owe Deliveries, Accrued Commissions, Accounts Payable, Rebates and Incentives, Credit card Receivable, Inventory, and New/Used. Felsen Decl. Exhibit 13, Kumor Dep. at 107:3-22; 114:9-17; Felsen Decl. Exhibit 21, Corrigan Dep. at 46:1-47:21; Felsen Decl. Exhibit 11, Lombardo Dep. at 81:13-83:13; 84:6-24; Felsen Decl. Exhibit 12, Breslin Dep. at 51:8-53:9; Felsen Decl., Exhibit 44.

35.     The purpose of reviewing bank reconciliations and schedules as part of Voynow's ongoing services to Star was to test the internal controls to ensure completeness of accounts and to prevent theft or financial misstatement.  Voynow would review this information to confirm accuracy and identify inaccuracies, anomalies, and irregularities and was supposed to ask questions for items that seemed unusual. Voynow would also look for aged deposits in transit and outstanding checks to determine if there was any unusual activity.  Also, as part of its services, if Voynow identified abnormal activity or irregularities, it was supposed to be further investigated by asking questions, asking for support and further documentation, and following up.  There was no final report that Voynow issued to Star when it completed these various tasks.  Felsen Decl.

Exhibit 73, M. Koufakis Decl. ¶ 9; Felsen Decl. Exhibit 11, Lombardo Dep. at 40:13-41:25; 42:18-43:20; 52:13-20; 67:17:68:13; 83:15-84:1; 88:14-89:14; 91:15-92:2; 92:25-93:5; Felsen Decl. Exhibit 21, Corrigan Dep. at 35:8-16; 60:7-25; 95:9-96:11; Felsen Decl. Exhibit 12, Breslin Dep. at 11:11-12:7; 13:1-15:8; 89:5-15; Felsen Decl. Exhibit 19, Bucolo Dep. at 27:8-28:7-30:17; 46:4-25; Felsen Decl. Exhibit 13, Kumor Dep. at 26:18-21; 135:20-136:7; 240:13-249:23; Felsen Decl. Exhibit 14, McCormack Dep. at 110:12-111:24; Felsen Decl. Exhibits 35, 38, 44.

36.     Voynow reviewed service open repair orders at Star, and then collected VIN numbers, had the service department look up customers' names, and performed a physical check on Star's service lots to ensure the customers' vehicles were still present to confirm the repair remained in process, and if not, reported such irregularities to Franzen.  There was no final report that Voynow issued to Star when it completed these various tasks.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9; Corrigan Dep. at 21:9-25; 37:10-38:3; 47:24-50:25; Bucolo Dep. at 50:16-24; 55:18-56:7; 99:19-100:17.  This was done to make sure no employees were stealing and to identify fraud. Felsen Decl. Exhibit 21, Corrigan Dep. at 37:23-38:3.

37.     Voynow performed a review of aged receivables at Star to ensure that employees were not stealing and to identify fraud.  Felsen Decl. Exhibit 21, Corrigan Dep. at 75:2-76:17; 36-37; Felsen Decl. Exhibits 36-37. There was no final report that Voynow issued to Star when it completed these various tasks.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

38.     Voynow was responsible for finding irregularities and determining why there were irregularities.  Felsen Decl. Exhibit 21, Corrigan Dep. at 62:1-5.  There was no final report that Voynow issued to Star when it completed these various tasks.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

39.     Voynow assigned its accountants to review the schedules at Star.  Felsen Decl. Exhibit

11, Lombardo Dep. at 78:16-79:3; Felsen Decl. Exhibit 16, Seibel Dep. 140:23-143:12.

40.     The review of Star's schedules conducted by Voynow was not tax work.  Felsen Decl. Exhibit 11, Lombardo Dep. at 116:20-25; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7; November 20, 2023 Sosnowski Report at 7.

41.     Voynow's review of these schedules establishes that Voynow performed procedures consistent with a financial statement review but without issuing a final accountant's written report. Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15.

42.     Voynow's performance of reviewing the financial statements and audit-type procedures is consistent with a consulting engagement.   Felsen Decl. Exhibit 75, Sosnowski Decl. ¶ 7.

43.     During Voynow's review of Star's schedules, Voynow would ask Star's office employees questions regarding the schedules they ran and reviewed, then Voynow would make notes on the schedules which included notes related to unusual activity (such as control numbers on commission schedules with the name "Extra" instead of the names of employees or with Star's office manager's initials), and notes indicating Voynow purportedly inquired with Vivian Karouzakis, one of the employees who stole from Star, about unusual activity, such as by writing on the schedules "OK by Viv" and "OK"; Voynow's employees also raised concerns with Voynow management about lack of internal controls.  Felsen Decl. Exhibit 12, Breslin Dep. at 11:11-12:22; 102:1-104:19; 112:1-11; Felsen Decl. Exhibit 11, Lombardo Dep. at 95:10-97:18; Felsen Decl. Exhibit 1, Sosnowski Dep. at 97:16-98:4; Felsen Decl. Exhibit 14, McCormack Dep. at 166:24-167:10; 168:18-181:19; 186:19-189:2; Felsen Decl. Exhibit 33, 39, 70; Felsen Decl. Exhibit 22, Scherf Dep. at 245:19-251:10; Exhibits 39-43, 62.

44.     After reviewing and extracting all of the data from the documents, Voynow would

generate questions to ask employees if Voynow discovered any errors, red flags, anything aged outstanding at time of the visit, and/or any other issues.  Felsen Decl. Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 2.

45.     Voynow had complete control of the amounts included in the final trial balances each year for Star; for example, for the year ended December 31, 2014 a general entry was made in the amount of $283,985.56 which entry reduced inventory and net income.  Supporting documentation for the general journal entry was contained in the Voynow workpaper file demonstrating Voynow's control. This level of review and analysis would not be required for a tax-only engagement. Reviewing year-end general journal entries is a controllership function.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7; November 20, 2023 Sosnowski Report at 7.

46.     With regard to the shortfall of $283,985.56 in inventory parts for Star Nissan for which Voynow made an enormous accounting adjustment, increasing cost of sales, which in essence, was a write-off of that amount – without having any physical inventory in place to justify the adjustment and without ever apprising the owner of this large and unusual adjustment.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 14; November 20, 2023 Sosnowski Report at 14.

47.     Voynow had the adjustment "baked in" with the bottom-line figure, instead of separating it out, so as to hide the basis for the Star Nissan's poor performance that year.  See Felsen Decl., Exhibit 68.

48.     Voynow was required to answer all of Star's questions covering the broad scope of Voynow's work.  Voynow was on call for and answered practically all of Star's questions.  See Felsen Decl., Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of

Interrogatories, no. 2.

49.     The owners of Star would ask virtually every time at the end of every review of its books and records by Voynow whether there were any issues with the accounting records and Voynow's response always led them to believe that there was never any theft going on.  See Felsen Decl., Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 7.

50.     At Star, Voynow also performed cashier audits, checked the petty cash drawer in the service department of dealerships and performing an accounting of it, and provided recommendations related to internal controls; this is not related to tax preparation work.  Felsen Decl. Exhibit 10, Whyte Dep. at 172:18-173:12; Felsen Decl. Exhibit 13, Kumor Dep. at 217:5-218:22; Felsen Decl., Exhibit 34.

51.     Following some visits to Star, Voynow's accountants provided Star's owners with letters identifying and summarizing their findings, including unusual activity or anomalies, and making recommendations for internal controls.  Felsen Decl. Exhibit 11, Lombardo Dep. at 48:2-14; 110:6-12; 114:1-116:19; 117:3-8; Felsen Decl. Exhibit 12, Breslin Dep. at 11:12-17:3; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 182:23-183:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 64:6-11; Felsen Decl. Exhibit 19, Bucolo Dep. at 53:6-16; Felsen Decl. Exhibit 13, Kumor Dep. at 141:19-142:11; Felsen Decl. Exhibit 15, Franzen Dep. at 52:15-18; Felsen Decl. Exhibit 16, Seibel Dep. at 156:4-157:2; 163:10-166:15; Felsen Decl., Exhibits 28-30, 35-37, 57.

52.     Voynow would discuss its findings, concerns, and recommendations with Star during visits and on future visits.  Felsen Decl. Exhibit 13, Kumor Dep. at 220:16-222:5; Felsen Decl. Exhibit 15, Franzen Dep. at 57:5-16; 61:18-62:11; 114:15-115:10; 120:3-135:25; Felsen Decl. Exhibit 21, Corrigan Dep. at 89:1-18.  In addition to speaking with Voynow when they came to

Star's offices, Michael Koufalkis and Star's accounting personnel spoke with Voynow on the phone on a monthly basis.   The conversations on the phone included questions about prior visits and questions about daily accounting operations.  Felsen Decl. Exhibits 72-73, Declarations of J. Cutillo ¶ 4 and M. Koufakis ¶ 11.

53.     Voynow had "various meetings" with Star's owners about the parts department because it was a "serious problem" (which ultimately was not proven to be a problem at all) Felsen Decl. Exhibit 15, Franzen Dep. at 152:13-154:2.

54.     Voynow prepared analytical review work papers comparing multiple years, including trend analyses.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 98:22-99:9.

55.     Voynow counseled Star about fraud.  Felsen Decl. Exhibit 15, Franzen Dep. at 246:15-17; 250:11-252:9; Felsen Decl., Exhibit 61.

56.     Voynow billed based on the category of services; the different categories included tax preparation services, review engagement services, interim services and audited financial statement services.  Felsen Decl. Exhibit 24, Kaplan Dep. at 55:14-56:11; 59:3-6; 65:6-11; Felsen Decl. Exhibit 13, Kumor Dep. at 150:1-152:24; 210:13; 214:9-11.

57.     On their invoices for services rendered, Voynow indicated the performance of various controllership functions. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 6; November 20, 2023 Sosnowski Report at 6.

58.     Voynow would bill visits to Star and the drafting of letters as "INTSER" (interim services) and under "Accounting and Reporting" rather than under preparation of tax returns. Felsen Decl. Exhibit 11, Lombardo Dep. 143:7:144:12; 146:23-147:22; Felsen Decl. Exhibit 12, Breslin Dep. at 45:4-10; Felsen Decl. Exhibit 19, Bucolo Dep. at 112:4-7; 116:15-118:5; 121:7-122:7; Felsen Decl. Exhibit 14, McCormack Dep. at 83:16-85:18; 89:23-93:10; 97:22-98:15.

59.     Voynow's time sheets reflect the ongoing consulting services they performed.  See Felsen Decl., Exhibits 32, 45-56, 58.

60.     On some occasions, Voynow performed more than one (1) visit to Star in the same month.  See Felsen Decl., Exhibit 60.

61.     The last interim report that Voynow issued to Star was in 2013.  Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 13.; Felsen Decl. Exhibit 38.

62.     Voynow's own expert concedes that, with regard to Star, there are "e-mails or billing records that describe the scope of certain other services that were provided", and those would have been consulting services by definition.  Felsen Decl. Exhibit 22, Scherf Dep. at 100:2-22.

63.     Each time Voynow visited Star, the accountants from Voynow sat down all of Star's accounting office employees and the accountants from Voynow looked in detail into what exactly they were doing, going through schedules and the dollar amounts of each of the accounts.  Felsen Decl. Exhibit 3, M. Koufakis Dep. at 48:8-12.

64.     In total, Voynow charged Star $1,561,300.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2

65.     Voynow billed Star annually as follows:

| Year | NISSAN | TOYOTA | CHRYSLER | SUBARU | TOTAL |
|------|--------|--------|----------|--------|-------|
| 1999 | $19,425.00 | $27,290.00 | $14,625.00 | | $63,339.00 |
| 2000 | $26,000.00 | $22,870.00 | $12,860.00 | | $63,730.00 |
| 2001 | $37,525.00 | $22,125.00 | $13,225.00 | | $74,876.00 |
| 2002 | $22,925.00 | $22,175.00 | $11,375.00 | | $58,477.00 |
| 2003 | $23,250.00 | $31,825.00 | $16,250.00 | | $73,328.00 |
| 2004 | $26,850.00 | $22,525.00 | $12,935.00 | | $64,314.00 |
| 2005 | $22,500.00 | $24,200.00 | $20,225.00 | | $68,930.00 |
| 2006 | $27,700.00 | $24,200.00 | $18,700.00 | $960.00 | $73,566.00 |
| 2007 | $24,750.00 | $25,250.00 | $14,000.00 | $5,890.00 | $71,897.00 |
| 2008 | $37,215.00 | $23,500.00 | $23,750.00 | $5,950.00 | $92,423.00 |
| 2009 | $18,000.00 | $20,000.00 | $12,000.00 | $6,000.00 | $58,009.00 |
| 2010 | $19,825.00 | $34,685.00 | $27,750.00 | $15,240.00 | $99,510.00 |

| **2011** | $43,635.00 | $30,950.00 | $26,570.00 | $12,520.00 | $115,686.00 |
| **2012** | $49,440.00 | $34,825.00 | $24,085.00 | $11,325.00 | $121,687.00 |
| **2013** | $29,490.00 | $36,865.00 | $24,360.00 | $16,315.00 | $109,043.00 |
| **2014** | $27,230.00 | $27,380.00 | $26,820.00 | $12,725.00 | $96,169.00 |
| **2015** | $31,475.00 | $35,230.00 | $32,315.00 | $14,270.00 | $115,305.00 |
| **2016** | $38,085.00 | $29,615.00 | $32,985.00 | $12,700.00 | $115,401.00 |
| **2017** | $19,875.00 | $19,875.00 | $20,300.00 | $10,100.00 | $72,167.00 |

See Felsen Decl., Exhibit 71.

66.     The customary fee charged for preparation of a corporate tax return in the New York Metro area in 2015 was $9,700 in a year.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 152:13-17.

67.     During the relevant period, the cost for the preparation of a tax return by Voynow did not exceed $10,000 in a year.  Felsen Decl. Exhibit 20, Sidor Dep. at 78:12-25.

68.     Review engagements were double the price of tax-only engagements, *i.e.*, less than $20,000 in a year.  Felsen Decl. Exhibit 14, McCormack Dep. at 49:12-17; 50:5-12.

69.     In 2015, Star paid Voynow an average of $28,673 per dealership.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 152:9-12.

70.     Thus, the professional fees Star paid Voynow were well in excess of the customary fees charged for the preparation of corporate income tax returns and were in line with (or exceeded) the customary fee for providing financial statement review and controllership functions, along with other ongoing consulting services in addition to tax return preparation.  Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7.

71.     In addition to analyzing Star's schedules, the amount of time Voynow spent performing services for Star, the time of year that they billed for services, and their own billing entries (*e.g.*, stating "accounting services" or "special accounting services"), all establish that Voynow performed financial statement review and controllership functions as part of a consulting engagement on an on-going basis.  Felsen Decl. Exhibit 1, Sosnowski Dep. at 103:7-105:25; Felsen

Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7 November 20, 2023 Sosnowski Report at 7.

72.     Voynow did not visit clients who had only tax engagements three or four times a year. Felsen Decl. Exhibit 11, Lombardo Dep. at 27:21-25.

73.     The only required visit for tax purposes is in December.  Felsen Decl. Exhibit 10, Whyte Dep. at 122:20-22; Felsen Decl. Exhibit 12, Breslin Dep. at 17:19-23.

74.     For tax preparation work, some Voynow partners do not meet with clients and merely walk through year end over the phone with the clients.  Felsen Decl. Exhibit 10, Whyte Dep. at 90:24-91:21.

75.     At most, two visits per year were made to clients for whom Voynow provided solely tax preparation work; any additional visits were for interim visits.  Felsen Decl. Exhibit 13, Kumor Dep. at 119:3-120:23; Felsen Decl. Exhibit 11, Lombardo Dep. at 26:15-27:20.

76.     Tax work does not involve any analysis.  Felsen Decl. Exhibit 13, Kumor Dep. at 62:16-18.

77.     Typically, Voynow did not provide separate form letters for interim visits covering consulting and controllership services.  Felsen Decl. Exhibit 11, Lombardo Dep. at 57:1-23.

78.     Voynow repeatedly, each time it reviewed Star's schedules, saw abnormal entries on schedules and said nothing to Star's owners.  Felsen Decl., Exhibits 39-43; 62.

79.     At the end of 2014 or early 2015, Voynow was informed by Cutillo, who at the time had just started the job function of posting commissions for Star, that the commission schedules contained unusual information and Voynow told her "that's Vivian's [Karouzakis], don't worry about it."  Felsen Decl. Exhibit 6, Star Nissan 30(b)(6) deposition.  The commission schedule contained a list of the names of employees but also contained the names of employees beginning

with the term "PTSN" and TOY" followed by a series of numbers, which was later revealed as a scheme by Karouzakis to steal money.  Felsen Decl., Exhibits 39-40.

80.     Voynow's own employees concede that Voynow did not exercise professional skepticism with respect to work it performed at Star.  Felsen Decl. Exhibit 11, Lombardo Dep. at 101:11-103:10.

Dated: Lake Success, New York
        May 15, 2024

                              **MILMAN LABUDA LAW GROUP PLLC**


                              By: /s/_____
                              Joseph M. Labuda, Esq.
                              Jamie S. Felsen, Esq.
                              Michael C. Mulè, Esq.
                              3000 Marcus Avenue, Suite 3W8
                              Lake Success, NY 11042-1073
                              (516) 328-8899 (office)
                              (516) 328-0082 (facsimile)
                              joe@mllaborlaw.com
                              jamie@mllaborlaw.com
                              michaelmule@mllaborlaw.com

                              *Attorneys for Plaintiffs*