# EXHIBIT 1

Page 1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------X
     STAR AUTO SALES OF BAYSIDE,
3    INC., ET AL.,
4          Plaintiffs,
5
      Civ. No. 18-CV-5775 (ERK) (CLP)
6
7        -against-
8    VOYNOW, BAYARD, WHYTE AND COMPANY,
     LLP, ET AL.,
9
                     Defendants.
10   --------------------------------X
                 November 28, 2023
11               10:00 a.m.
12               Virtual Deposition
13
14
               THE EXAMINATION BEFORE TRIAL of
15
         DOUGLAS SOSNOWSKI, a Witness, held remotely,
16
         before a shorthand reporter and Notary
17
         Public within and for the State of New York.
18
19
20
21
22
23
24
25   Job No. CS6326406

1     Q.   When did they do that?

2     A.   I don't remember.

3     Q.   Do you acknowledge that as of the time Voynow

4    provided services to the plaintiffs, there was no

5    mandate by any accounting standard or governing body

6    that there would be engagement letters for tax

7    engagements?

8     A.   Yes.

9     Q.   Do you also agree that there is no requirement

10   in scenarios where an engagement letter is issued

11   for a tax engagement that the letter actually be

12   signed before the tax return can be issued?

13    A.   That's correct.

14    Q.   Now, page 2, September 15th of your report now.

15   Page 10, you stated scope of accounting and tax work

16   performed for Star Auto by Voynow was not defined in

17   a written document prior to December of 2016.  Do

18   you see that?

19    A.   Yes.

20    Q.   What facts, testimony, or documents did you

21   rely upon when you made that statement in your

22   report?

23    A.   I reviewed all documents and I didn't see any

24   engagement letters that were ever provided, and I

25   also spoke with Michael Koufakis and Jackie Cutillo

Page 52

1    who told me that they did not exit.

2    Q.    Anything else?

3    A.    No.

4    Q.    So let's look now at your appendix, number 11

5    and engagement letters not signed by Star.  Do you

6    see that?

7    A.    Yes.

8    Q.    There is a whole slew of documents that are

9    Bates stamped by Voynow you listed and you have

10   reviewed; is that correct?

11   A.    Correct.

12   Q.    And those documents, are in fact, engagement

13   letters; is that correct?

14   A.    Yes, unsigned.

15         MS. FITGERALD:  Sorry, what was

16     his answer?

17       (Whereupon, the answer was read back by the

18   stenographer.)

19   EXAMINATION BY

20   MS. FITGERALD:

21   Q.    And your statement states that there is no

22   documentation of the services that Voynow was

23   providing, and you acknowledge that there is, in

24   fact, engagement letters that are issued by Voynow

25   and you reviewed them in your appendix?

1     related to 2016, that was provided and issued by

2     Voynow that Star has produced in this case?

3     A.    Yes.

4     Q.    And you believed it wasn't provided to you?

5     A.    Yes.

6     Q.    Were you provided with interim letters that

7     Voynow issued to Star?

8     A.    Yes.

9     Q.    How many interim letters were there?

10    A.    My understanding is three or four went out per

11    year.

12    Q.    What is your understanding as to the number of

13    interim letters that you believe Voynow issued to

14    Star?

15    A.    I don't know how many were actually issued, but

16    based on those numbers, 40 to 50.

17    Q.    As part of your review were you provided with

18    40 to 50 letters Star printed out in this case?

19    A.    No.

20    Q.    Were you provided with any?

21    A.    I don't remember the source of them, but I was

22    provided with interim letters.

23          MR. LABUDA: Objection.

24          To the form of the question.

25    EXAMINATION BY

Page 18

1                    Douglas Sosnowski                91

2          Q      You made the statement that Voynow is

3    the accountant of record, okay?

4          A      Right.

5          Q      I have to know.  I'm the attorney on

6    record with the court for the purposes of this

7    case.

8          A      Right.

9          Q      I asked you when you referenced

10   accountant of record, who is Voynow on record

11   with?

12                MR. LA BUDA:  Objection.

13                He can answer.

14         A      With the IRS.

15         Q      Was Rosenfield the accountant of

16   record after Voynow's services were terminated?

17         A      I believe so.

18         Q      Is Withum Star's current accountant

19   of record?

20         A      I have no idea.

21         Q      You state on page 2 of your report,

22   number 7, that on an interim\quarterly basis

23   Voynow made periodic visits to Star.  Do you see

24   that?

25         A      Yes.

Page 19

1                    Douglas Sosnowski                92

2          Q      Quarterly we can agree is four times

3    a year?

4          A      Yes.

5          Q      Is it your opinion that Voynow

6    visited Star four times a year during the course

7    of its engagement?

8          A      I believe I previously answered this

9    question that it was three or four times a year.

10   It may not have always been four times.

11         Q      You used the word "interim".

12         A      Yes.

13         Q      What does interim versus quarterly

14   mean?

15         A      Well, interim is a more broad term.

16   So, interim would refer to any time you went out

17   prior to year end.  It doesn't necessarily mean

18   it's done at a specific calendar quarter.

19                If it were quarterly and under normal

20   circumstances, you would go out in April, because

21   that would be the month after the first quarter

22   and you would go out in July, the month after the

23   second quarter.

24                I don't think Voynow did that.  They

25   would show up in June or August.  They were before

Page 20

1                    Douglas Sosnowski                  93

2    year end, but not necessarily on the quarter.

3         Q     You don't cite any date in the

4    documents or report that showed you tabulated the

5    specific dates when Voynow was actually on-site,

6    is that correct?

7                    MR. LA BUDA:  Objection.

8                    He can answer.

9         A     Well, the time sheets I reviewed on

10   Appendix A.

11        Q     Nothing in your report lists a

12   specific date that Voynow was on-site, correct?

13        A     Well, accept for the one that one

14   year.

15        Q     To be clear, that is the January 19,

16   2015 date you reference in page 13 of your report?

17        A     Yes.

18        Q     Other than that date there is nothing

19   in your report showing when Voynow was actually

20   on-site?

21        A     Correct.

22        Q     Did you understand that Voynow did

23   not have remote access to Star's records prior to

24   2017?

25                    MR. LA BUDA:  Objection.

Page 24

1                    Douglas Sosnowski                    97

2          A       That's correct.

3          Q       In the case of a review engagement

4    have you seen any of those checklists for the

5    review engagement?

6          A       Yes, I have.

7          Q       That would be something that an

8    accountant would bring when it was going on-site

9    for purposes of review engagement, correct?

10         A       He may, yes.

11         Q       When you reviewed Voynow's work

12   papers in this case, did you see any preprinted

13   checklists?

14         A       No, I don't believe they used

15   checklists.

16         Q       Did you see any inquiry work papers?

17         A       No, I saw documentation that

18   inquiries were made, but never properly

19   documented, inquiry work papers.

20         Q       When you say you saw documentation

21   inquires were made, is there any document you're

22   able to identify as you sit here today?

23         A       I don't remember what the specific

24   bate stamp was on the document, but I remember

25   that it had something to do with the PTSM scheme

Page 25

1                        Douglas Sosnowski                    98

2      where some anomolies were discovered by Voynow and

3      there was a notation on it that they had spoken

4      about it with Vivian, the office manager.

5              Q       You recall the testimony of Bob

6      Seibel as part of your review on this case?

7              A       Yes.

8              Q       He testified that he inquired, for

9      purposes of his tax engagement, about that PTSM

10     entry and was told it was accrual.  Do you recall

11     that?

12             A       Yes.

13             Q       Other than that document is there any

14     other document you are categorizing as an inquiry

15     work paper?

16             A       I know there were more, but none that

17     come to mind specifically.

18             Q       Did you see any documents that were

19     specifically labeled or designated "PBC" or as

20     prepared by client in going out work papers?

21             A       No.

22             Q       Did you see any documents analytical

23     review work papers in Voynow's documents?

24             A       Yes.

25             Q       Which document are you referring to?

Page 26

1                    Douglas Sosnowski                    99
2          A       I do remember a trend analysis they
3     were performing on inventory where they were
4     comparing inventory trends to statements to prior
5     product statements from the dealer.
6          Q       That's the report you have referenced
7     dated January 19, 2015?
8          A       Yes.
9          Q       Other than that document is there any
10    other analytical review work papers contained in
11    the documents you reviewed?
12         A       No.
13         Q       Did you see any engagement
14    agreements?
15         A       No.  I'm sorry?
16         Q       Did you see any engagement agreement
17    in these work papers for Voynow?
18         A       No.
19         Q       Do you agree that for a review you
20    would expect to see the signed engagement letter
21    in an accountant's work papers?
22         A       Yes.
23         Q       Did you see any management
24    representation letter in Voynow's work papers
25    signed by Star?

Page 28

1                    Douglas Sosnowski                    101

2          Q      Were you provided with the tax

3    returns that Voynow prepared as part of the

4    year-end statement?

5          A      Yes.

6          Q      Did you look at those tax returns?

7          A      Yes, I did.

8          Q      Do you recall there were control

9    sheets with those tax returns?

10         A      I don't remember specifically.

11         Q      Did you see any control sheet in

12   Voynow's records reflecting or suggesting its

13   engagement was a review engagement?

14         A      No.

15         Q      Were you provided with the sample

16   control sheet that Voynow uses for review

17   engagements for other clients?

18         A      Yes.

19         Q      You acknowledge you didn't see any

20   type of control sheet in Voynow's records

21   regarding Star?

22         A      Correct.

23         Q      At page 1 of your report you state

24   that, "Voynow performed procedures consistent with

25   a financial statement review but without issuing

Page 29

1                    Douglas Sosnowski              102
2    an accountant's report."
3                    What are the specific documents that
4    are contained in Voynow's work papers that support
5    that statement?
6         A    Well, the time sheets on what they
7    did that document the review procedures and the
8    work papers that are copies of the Schedules from
9    the Reynolds and Reynolds system.
10        Q    Is it your opinion that the Schedules
11   that are printed out and contained in Voynow's
12   work papers are indicative of performing
13   procedures consistent with the financial statement
14   review?
15        A    Yes.
16        Q    Did you consider the testimony from
17   Voynow's accountant as to why they printed out or
18   had those Schedules in their work papers?
19        A    I did.
20        Q    Did that testimony cause you to alter
21   your opinion that Voynow was performing procedures
22   consistent with the financial statement review?
23        A    No.
24        Q    You last prepared any tax returns in
25   any capacity in 2001, is that correct?

1              Douglas Sosnowski              103

2      A      No, that's incorrect.

3      Q      You last prepared a tax return for an

4  automobile dealership in 2001, is that correct?

5      A      Yes.

6              (Discussion off the record.)

7      Q      You stated that the timesheets

8  support your opinion that Voynow performed

9  procedures consistent with the financial statement

10  review?

11      A      Yes.

12      Q      What specifically is it about the

13  time sheets that you are relying upon?

14      A      Well, first of all, just the volume

15  of time that they spent on these engagements and,

16  secondly, the time of the year that they would go

17  out.

18              If you were doing only tax work,

19  there would be no need to go out and perform

20  procedures at interim dates like Voynow did.

21      Q      When you say, "timesheets," you're

22  relying upon the number of hours billed and the

23  timing of the on-site visits by Voynow?

24      A      And the descriptions.

25      Q      What specific description are you

Douglas Sosnowski                    104

1  relying upon when you make the statement that

2  Voynow performed procedures consistent with the

3  financial statement review?

4          A       They were very vague in their

5  descriptions, but they would say accounting

6  services or special accounting services.

7          Q       Those are billing records?

8          A       Those are billing records.

9          Q       All right.

10                 Let me draw a distinction.  There is

11  timesheets and there is the bills.  I thought you

12  answered as to timesheets.

13         A       I answered as to timesheets, yes.

14         Q       All right.

15                 What specific entry in the timesheets

16  support your opinion that Voynow performed

17  procedures consistent with the financial statement

18  review but without issuing an accountant's report?

19         A       I believe I've answered the question.

20         Q       You told me they were vague.

21         A       Where it says accounting services or

22  special accounting services I believe that's how

23  they would describe the work that was done.

24         Q       All right.

```
                                                    Page 32
 1                   Douglas Sosnowski              105
 2              So where there are time entries or
 3      bills that do not reflect special accounting
 4      services that Voynow was not performing services
 5      that are consistent with the financial statement
 6      review?
 7                   MR. LA BUDA:  Objection.
 8                   He can answer.
 9         A      No, I didn't say that.
10         Q      Well, other than the reference to
11      special accounting services that you indicated
12      that are contained in bills on the timesheets what
13      else is out there in bills or timesheets that
14      support your statement that Voynow performed
15      services consistent with the financial statement
16      review?
17         A      The work papers and the volume of
18      time that they spent.
19         Q      You already talked about the volume
20      of time.  What specifically in the work papers
21      that you are relying upon when you make that
22      statement that Voynow performed procedures
23      consistent with the financial statement review?
24         A      The analysis they performed on every
25      schedule every time they went out there.
```

```
 1                    Douglas Sosnowski              107
 2          A      No.
 3          Q      Were there any Schedules that you
 4   believe support the statement that Voynow
 5   performed procedures consistent with the financial
 6   statement review?  Did you see any accompanying
 7   analytical review work papers?
 8          A      Yes.
 9          Q      For which schedule?
10          A      I can't recall sitting here.
11          Q      Where do you recall seeing an
12   analytical review work paper other than the trend
13   analysis report?
14          A      The trend analysis for sure, yes.
15          Q      Anything else beyond that?
16          A      Not that I can recall.
17          Q      Is it your opinion Voynow provided
18   internal audit services?
19          A      I don't know if I said that.
20          Q      I'm asking you.  Do you have that
21   opinion?
22          A      No.
23          Q      So page 26 of your report, number 7,
24   you state that, "Voynow made periodic visits to
25   Star during which time it provided review and
```

```
 1                  Douglas Sosnowski              108
 2    controllership services."
 3         A      Yes.
 4         Q      Do you agree there is nothing in
 5    writing in any of the engagement letters that I
 6    showed you or in the engagement letter that Star
 7    acknowledges receiving wherein Voynow states it
 8    was providing controllership services?
 9                  MR. LA BUDA:  Objection.
10                  He can answer.
11         A      Not in any of the documents you
12    showed me, no.
13         Q      Where in Voynow's records did you see
14    any evidence they provided controllership
15    services?
16         A      Just, again, timesheets, billing
17    records and their work papers.
18         Q      Identify for me any specific work
19    paper you believe is indicative of a
20    controllership service.
21         A      Anything that would show they
22    reviewed bank statements and when they prepared
23    general journal entries or reviewed general
24    journal entries.  Those were all controllership
25    references.
```

Page 37

<table>
<tr><td></td><td>Douglas Sosnowski</td><td>110</td></tr>
</table>

1

2    Q    Did you see any evidence where Voynow

3  was actually in a position to supervise Star's

4  employees?

5    A    Yes.

6    Q    In what capacity?  Would it be when

7  they were physically on-site?

8    A    No, they could also do it remotely.

9    Q    Did you see any evidence that Voynow

10  was supervising Star's employees while it was

11  based in Trevose, Pennsylvania and the employees

12  were based in Long Island?

13    A    Just in the billing records.

14    Q    Is there anything in the billing

15  records that suggest that Voynow, based in

16  Pennsylvania, is supervising employees working in

17  Long Island?

18    A    Yes.

19    Q    What?

20    A    I can't remember specifically as

21  we're sitting here.

22    Q    There is nothing that you cite to in

23  your report, either a document or a deposition,

24  that supports your opinion or your statement that

25  Voynow was supervising Star's employees, is that

Page 42

1                   Douglas Sosnowski                 115

2          Q      So when you made the statement they

3    were making general journal entries, that's not

4    accurate, correct?  They did not do that?

5                   MR. LA BUDA:  Objection.

6          A      No, they developed the general

7    entries and had somebody else input that.

8          Q      When you say, "general journal

9    entries," you're referring to adjusting general

10   journal entries, correct?

11         A      Adjusting journal entries, correct.

12                 (Recess taken.)

13                 (After recess, the following ensued.)

14   EXAMINATION

15   CONT'D BY MS. FITZGERALD:

16         Q      Sir, at page 6 of your report you

17   state, under the section entitled "controllership

18   function" that in Voynow's invoices for services

19   rendered Voynow indicated the performance of

20   various controllership functions.  This

21   fundamentally changed the relationship between

22   dealership and Voynow." Do you see that?

23         A      Yes.

24         Q      If I understand your statement, when

25   Voynow issued invoices referencing what you

Page 49

1               Douglas Sosnowski               122

2      entries that went into the financial statements.

3              Q      So the adjusting journal entries that

4      are referenced in Voynow's work papers is what

5      you're referring to, correct?

6              A      Correct.

7              Q      Those entries were in fact recorded

8      by Star personnel to its own books and records,

9      correct?

10             A      Correct.

11             Q      You agree that other than preparing

12     adjusting journal entries, which my client's

13     contend were for tax purposes, Voynow did not do

14     anything in terms of preparing Star's financial

15     statements?

16                    MR. LA BUDA:  Objection.

17                    You can answer.

18             A      I'm unclear what your question is.

19     They made adjusting journal entries I find other

20     than at year end.  So, they weren't for tax

21     purposes.  They were for reconciling the books and

22     records of the company.

23             Q      All right.

24                    On what occasion do you recall Voynow

25     proposing journal entries outside of the year end

Page 79

```
 1                  Douglas Sosnowski              152
 2      portion of that $143,365 related to dealerships
 3      other than Toyota, Nissan, Chrysler, Subaru, and
 4      Hyundai?
 5           A     No, I just get a total.
 6           Q     There are facts figures analysis in
 7      your report breaking down that total, right?
 8           A     Correct.
 9           Q     When you state the average per
10      dealership is $28,673, did you just divide
11      $143,365 by 5?
12           A     Yes.
13           Q     You state in your report that the
14      customary fee charged for preparation of a
15      corporate tax return in New York City in 2015 was
16      approximately $9,700, correct?
17           A     Yes.
18           Q     You don't cite to any publication,
19      journal, treatise, or survey in your report that
20      supports that statement, correct?
21           A     No, it's based on my personal
22      knowledge.
23           Q     You don't append anything in your
24      report to support that statement?
25           A     No.
```

Page 222

1              Douglas Sosnowski                295

2         Q      Assuming you're doing an

3    investigation as opposed to preparing a tax

4    return, correct?

5         A      Well, they were looking at the

6    schedules to try to verify numbers and the most

7    efficient way to do that would be to look at the

8    summary.  They would know that.  They're familiar

9    with the Reynolds and Reynolds system.

10        Q      Is it your opinion that Voynow was

11   engaged to verify numbers on a schedule?

12        A      They were engaged to perform various

13   consulting procedures.

14        Q      That wasn't my question.

15             MR. LA BUDA:  Objection.  I don't

16        know he's finished.

17        A      They were never documented in a

18   written engagement letter.

19        Q      Is it your opinion that Voynow was

20   engaged to verify numbers on a schedule?

21        A      They looked at the schedules to make

22   sure that the schedules were properly reflecting

23   the amounts that were going onto the tax return,

24   but they were out there on an interim basis

25   looking for adjustments that could be made to the

Page 224

1                Douglas Sosnowski                297

2        Q      Do you acknowledge that those letters

3   explicitly state that they are not verifying the

4   numbers that are on the tax returns?

5        A      That's not what they actually did.

6        Q      My question to you:  Is it your

7   position in this case that Voynow was actually

8   engaged to verify the numbers on the schedule, yes

9   or no?

10               MR. LA BUDA:  Objection.

11        A      They were engaged to verify numbers

12   but not on the schedules.  For purposes of looking

13   at the financial statements, the monthly dealer

14   financial statements and the income tax returns.

15        Q      When an accountant is engaged to

16   verify numbers on a financial statement, that's an

17   audit engagement, isn't it, sir?

18               MR. LA BUDA:  Objection.

19               You can answer.

20        A      They didn't perform an audit.  They

21   performed consulting services.

22               There are no restrictions on

23   procedures for consulting services.  An accountant

24   can be asked to do anything.

25        Q      Where in any of the testimony or any