# EXHIBIT 3

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   1:18-CV-05775-ERK-CLP
     ----------------------------------------x
 4
     STAR AUTO SALES OF BAYSIDE, INC.
 5   (d/b/a STAR TOYOTA OF BAYSIDE), STAR
     AUTO SALES OF QUEENS, LLC (d/b/a STAR
 6   SUBARU), STAR HYUNDAI LLC (d/b/a
     STAR HYUNDAI), STAR NISSAN, INC. (d/b/a
 7   STAR NISSAN), METRO CHRYSLER
     PLYMOUTH INC. (d/b/a STAR CHRYSLER
 8   JEEP DODGE), STAR AUTO SALES OF
     QUEENS COUNTY LLC (d/b/a STAR FIAT)
 9   And STAR AUTO SALES OF QUEENS
     VILLAGE LLC (d/b/a STAR MITSUBISHI),
10
              Plaintiffs,
11
         v.
12
     VOYNOW, BAYARD, WHYTE AND COMPANY, LLP,
13   HUGH WHYTE, RANDALL FRANZEN AND ROBERT
     SEIBEL.
14
              Defendants.
15   ----------------------------------------x
16                     2000 Market Street
                       Philadelphia, Pennsylvania
17
                       August 15, 2022
18                     10:09 a.m.
19
20          DEPOSITION of MICHAEL KOUFAKIS, a
21   Plaintiff, held at the above-entitled time and
22   place, taken before Carolyn Crescio, a
23   Professional Shorthand Reporter and Notary
24   Public of the State of Pennsylvania.
25                *      *      *
```

Page 25

1                    M. KOUFAKIS

2        Q.    So I don't think we got an answer on

3   who the dealer principal was for Fiat.

4        A.    I believe it was my brother Steve.

5   I believe I answered that.

6        Q.    And who were the owners of Fiat?

7        A.    I believe it was my brother Steven.

8        Q.    Hundred percent?

9        A.    I believe that was the end result.

10       Q.    Now, the dealerships have a position

11   that they refer to as an office manager?

12       A.    Yes.

13       Q.    And is that essentially the

14   equivalent of a controller, to your knowledge?

15       A.    I would not say the equivalent, by

16   my definition.

17       Q.    And how would you distinguish the

18   two?

19       A.    Office manager, I think is the head

20   person in the office, where maybe a controller,

21   by my definition, would maybe have an accounting

22   degree, a little bit higher level of expertise.

23       Q.    So the office manager, by your

24   definition, would be the most-senior level

25   employee in the dealerships accounting

1                   M. KOUFAKIS

2    department, correct?

3         A.    I would say yes.  Correct.

4         Q.    And for purposes of the time period

5    we are talking about, roughly 2010 to 2016, '17

6    period, am I correct that Vivian Karouzakis was

7    the office manager for the Nissan Toyota and

8    Subaru dealerships?

9         A.    Yes.

10        Q.    And in that role she reported

11   directly to you?

12        A.    Yes.

13        Q.    And you supervised her?

14        A.    Yes.

15        Q.    She had been hired in 1986 by a

16   predecessor of the Star entities; is that

17   correct?

18        A.    Yes.

19        Q.    And did she become -- did she move

20   to the position of office manager in the 1990s

21   for an entity known as Island Chrysler?

22        A.    Yes.

23        Q.    And Island Chrysler was one of the

24   predecessors of the Star entities we are here

25   about, correct?

Page 27

1                    M. KOUFAKIS

2          A.    Yes.

3          Q.    Her sister Debbie Theocharis, am I

4    correct that she, during that same time period,

5    2010, 2016, '17, she would have been the office

6    manager for the Chrysler and Hyundai franchises?

7          A.    Definitely Chrysler.  Yes, there was

8    maybe some shared responsibility between the two

9    for Hyundai.  But I think it was more Debbie.

10         Q.    Okay.  And did you supervise her?

11         A.    I was the least involved in the

12   Chrysler store.  She fell mostly under the

13   direction of my brother Steven.  So I would say

14   it depends on what the issue was specifically,

15   at hand.  But I'd say mostly it fell under

16   Steven and somewhat under myself.

17         Q.    Okay.  And am I correct that that

18   position of office manager has since been

19   filled, let's say, at some point in 2017 for all

20   of these dealerships, by Jacque Cutillo?

21         A.    Yes.

22         Q.    So she now does the job that both

23   Vivian and Debbie did combined?

24         A.    Correct.

25         Q.    For the dealerships that are named

Page 48

                    M. KOUFAKIS

1

2          Q.    So do you have -- when you're using

3     the term "review," do you have any understanding

4     as to -- and you're using that in the context of

5     financial statements.  Do you have any

6     understanding as to what that means?

7                    MR. FELSEN:  Objection.

8          A.    My understanding is they come in.

9     They sit down with everyone in my office, and

10    they look in detail into what exactly they are

11    doing, going through schedules and verifying the

12    dollar amounts of each of the accounts.

13         Q.    And that's what you believe you

14    hired Kera, Weiner to do?

15         A.    That's what I know they were hired

16    to do.  And that's what I know they did.

17         Q.    So who hired them?

18         A.    I did.

19         Q.    So you would have hired them around

20    1987, '86?

21         A.    Let me rephrase that.  I think it

22    was closer to '90.  I think it was 1990 to 1996.

23         Q.    Who was your point of contact there?

24         A.    Larry Weiner.

25         Q.    Prior to Kera, Weiner, who was the

1                    M. KOUFAKIS

2        Q.    Explain.

3        A.    I get a bill, I glanced at it.  I

4   look at the bottom line.  I didn't tear it apart

5   in detail.

6        Q.    Did the Star entities ever hire an

7   accountant by the name of Nick Chester?

8        A.    Yes.

9        Q.    So that would have been another

10  accountant that was hired after 2016?

11       A.    I wouldn't necessarily say he was

12  hired as an accountant.

13       Q.    Okay.  What's your understanding as

14  to what he was hired for?

15       A.    Another person to -- it was a very,

16  very short engagement.  At the time, they were

17  recommended by Voynow, to -- and this was early

18  on.  This was in February of 2017 to maybe just

19  verify some of the theft that had -- were

20  discovered up until that point, but not

21  really...

22       Q.    So you said to verify the theft that

23  had been discovered up until that point.  So --

24       A.    I guess you could say to be a fresh

25  set of eyes to look over the books, so to speak.

1                    M. KOUFAKIS

2        Q.    And would that be Mr. Weiner's firm?

3        A.    Yes.

4        Q.    And would that be Voynow?

5        A.    Yes.

6        Q.    And would that be Rosenfield?

7        A.    Yes.

8        Q.    What's your understanding -- do you

9    have -- strike that.

10        Do you have any understanding as to the

11   difference between the terms "audit,"  "review" and

12   "compilation"?

13        A.    Yes.

14        Q.    What is your understanding of what a

15   "compilation" is?

16        A.    So I believe it was in the latter

17   half of 1996, when I was interviewing Voynow, it

18   was in my office, at my desk.  Randy Franzen was

19   on my right, Hugh Whyte was on my left, and they

20   explained to me the differences between the

21   three.

22        They told me that compilation was just

23   basically a cursory check of the numbers.  They had

24   explained to me that reviewed was much more

25   in-depth, and that the highest level was audited

```
1                    M. KOUFAKIS
2    accounting work.  I indicated to them that I wanted
3    the highest level, which was the audited.  They
4    said that that was -- that was really not
5    necessary, that it was very high in cost, and
6    typically only reserved for publicly-traded
7    companies.  But what we ultimately settled on was
8    something -- and Randy specifically told me at that
9    meeting that there was something in between, more
10   than review, but less than audited.  And he said
11   when they would come into the dealerships on a
12   quarterly basis, they would send someone, let's
13   say, to the Toyota parts department and do random
14   VIN checks.  Then on another meeting, they might go
15   to Chrysler used cars and check -- do a physical of
16   the used car inventory.
17        So it was more than review, but not quite
18   fully audited.  That was discussed.  That's what
19   they promised.  That's what I agreed to, and that's
20   what they did.
21        Q.   Okay.  So my question was what your
22   understanding was of those terms.  And you told
23   me that -- you gave me a reference to a meeting
24   you had with Voynow sometime in '96, correct?
25        A.   Yes.
```

Page 82

1                    M. KOUFAKIS

2        Q.    Sure.  Do you have any understanding

3    as to why any of the Star entities would pay for

4    audit services, but not require --

5        A.    Yeah, because I wanted it.

6        Q.    -- but not require audited financial

7    statements?

8              MR. FELSEN:  Objection.

9        A.    I wanted the highest level of

10   accuracy, as possible.

11       Q.    And why was it that you didn't ask

12   for audited financial statements then, if you

13   wanted the highest level of accuracy possible?

14       A.    I took Voynow's recommendation, that

15   it was not necessary and overly burdensome and

16   costly.

17       Q.    If you believe that you paid for

18   something higher than a review, but not quite an

19   audit, why wouldn't you have at least wanted

20   reviewed financial statements?

21             MR. FELSEN:  Objection.

22       A.    You're making the assumption it was

23   not.

24       Q.    Did you ever get financial

25   statements prepared by Voynow, with an opinion

1                    M. KOUFAKIS

2       stating that they reviewed them and what they

3       found?

4            A.    They didn't prepare the financial

5       statements, but they reviewed the accounts that

6       were used to prepare the financial statements.

7            Q.    Did you ever get anything as far as

8       an opinion from them?

9            A.    Not that I can recall.

10           Q.    But yet you believe you paid for it?

11           A.    I believe that the accounting

12      statements we were producing was just short of

13      an audited statement.

14           Q.    And that -- when you say "accounting

15      statement," what is it specifically you're

16      referring to?

17           A.    The one the dealership produces for

18      the manufacturers and what is ultimately

19      utilized to ultimately do the tax returns.

20           Q.    Are you talking about a balance

21      sheet, an income statement?  What are you

22      talking about when you say an "accounting

23      statement"?

24           A.    A financial statement required by

25      all of the manufacturers.

1           M. KOUFAKIS

2    courtesy.  I don't think I was -- I think just

3    out of common courtesy, before you make a move,

4    you keep them abreast of the situation.  I don't

5    think it was required, but I think it's the

6    right thing to do.

7           Q.    But as far as the discussion about

8    the level of services that were going to be

9    provided, your brothers were not involved in

10   that?  That was you?

11          A.    Yes.

12          Q.    Now, Voynow was hired to prepare the

13   tax returns, correct, the corporate tax returns?

14          A.    Yes.

15          Q.    And you, as the officer of the

16   dealerships, were required to actually sign off

17   on the tax returns before they were filed,

18   correct?

19          A.    Well, the ones that I could --

20   typically, I don't believe I signed for the

21   dealerships that I had no ownership in.

22          Q.    But for the ones that you did, you

23   signed?

24          A.    Yeah, yeah.

25          Q.    In signing those, did you understand

1                    M. KOUFAKIS

2    that Voynow was not obligated or undertaken to

3    verify the information that was set forth on

4    those tax returns?

5         A.    Say it again.

6         Q.    Sure.  As the taxpayer signing the

7    tax returns --

8         A.    Are we talking corporate or

9    personal?

10        Q.    Corporate.  On behalf of the

11   corporation.  Did you understand that Voynow was

12   not obligated or undertaken to verify the

13   information that the Star dealership set forth

14   on the tax return?

15        A.    They were responsible for true and

16   accurate financial statements.

17        Q.    I'm asking you about a tax return,

18   not a financial statement.

19        A.    Well, it derives from the financial

20   statement.  So I would say maybe not quite to

21   the level of being audited, but I do believe it

22   was their job to verify it.

23        Q.    Now, Voynow prepared the 2016

24   corporate tax return prior to being disengaged.

25   Do you recall that?

1           M. KOUFAKIS

2      A.    Yes.

3      Q.    When did you -- how often did you

4  review their bills?

5      A.    I mean, if I signed the check, it

6  would typically be attached to the check.  And

7  typically at the end of the year, I would just

8  ask what did we pay them over the last

9  12 months.

10     Q.    So would you review the bills at the

11 end of each year, or did you just review the

12 number?

13     A.    More the dollar amount.  The bills

14 didn't really say that much.

15     Q.    Did you ever, at any point, receive

16 anything in writing from Voynow, setting forth

17 the terms of their engagement?

18     A.    I said I don't believe so.

19     Q.    I think I asked you specifically

20 right after the meeting in 1996.  So this

21 question was any point thereafter.

22     A.    The only one I can specifically

23 remember I believe was in December of '16, that

24 one was presented to me for the business.  I

25 think there was one or two possibly on my

1              M. KOUFAKIS

2    personal.  Excluding the personal, I believe

3    specifically in December of '16, one was

4    presented to me.

5          Q.   So you said one was presented to you

6    in December of 2016.  Do you have a recollection

7    as to how that was presented and who presented

8    it?

9          A.   I believe Bob Seibel presented it.

10         Q.   In what context?

11         A.   At some point it was sent.  I don't

12   know if it was an email or mail or discussed.  I

13   don't remember specifically.  I think at some

14   point I believe it appeared.

15         Q.   Do you believe he gave it to you?

16         A.   I don't specifically recall.

17         Q.   You just remember at some point --

18         A.   I think at some point it came up.  I

19   don't know if it was at a year-end visit or

20   mailed.

21         Q.   But you remember having an

22   engagement letter in front of you --

23         A.   At some point it came up.  I don't

24   remember exactly how.

25         Q.   And this was in December of 2016 --

Page 118

1                    M. KOUFAKIS

2          A.    I believe so.

3          Q.    -- in connection with a discussion

4    or a meeting with Bob Seibel?

5          A.    I believe he brought it up to me.

6          Q.    Was the document in front of you?

7    Did he give it to you?

8          A.    I don't specifically remember.

9          Q.    What do you remember about any

10   discussion or meeting regarding the 2016

11   engagement letter?

12         A.    They wanted me to sign it, and I

13   said no.

14         Q.    And why did you not want to sign the

15   engagement letter?

16         A.    Because the theft with Vivian had

17   already occurred.  And quite honestly, I viewed

18   it as revisionist history, cover-your-ass-type

19   move.

20         Q.    So the theft of Vivian was

21   discovered at the beginning of December of 2016,

22   right?

23         A.    December 1st of 2016.  It was

24   brought to my attention the day before.

25         Q.    And then this letter was presented

1              M. KOUFAKIS

2    to you later that month?

3         A.    I believe so.

4         Q.    And you wouldn't sign it because you

5    said you viewed it as cover-your-ass-type --

6         A.    Yeah.  It was not -- to be honest

7    with you, at that point in time, that was the

8    least of my concerns.

9         Q.    Was anybody else present -- did you

10   convey that view to Bob Seibel, when you told

11   him you were not going to sign it?

12        A.    Yeah, I believe so.

13        Q.    Was anybody else present?

14        A.    I don't know if anyone was present

15   for that.  No, I don't know.

16        Q.    And other than that December of 2016

17   engagement letter, is it your testimony that you

18   had never seen any engagement letters for prior

19   years from Voynow?

20        A.    Yes, that I can recall.

21        Q.    Did you ever ask at any point of any

22   of your current or now former employees, whether

23   they were aware of engagement letters being sent

24   by Voynow?

25        A.    No.

1              M. KOUFAKIS

2    ability.  Whether they utilized it or not, I'm

3    not sure.

4         Q.   On what basis do you say that they

5    had the ability?

6         A.   Because if you have a user ID and

7    password and knew the phone number, you could do

8    it.  Afterwards with the VPM, that got more

9    complicated.

10        Q.   What did you need after the VPM?

11        A.   You needed special software to

12   download on a PC, in order to get past the

13   firewall.

14        Q.   Did you decide what level of access

15   somebody has within the system?

16        A.   Yes.

17        Q.   And what level of access do you

18   believe you provided to Voynow?  And if it

19   changed at any point, let me know.

20        A.   I believe it was comparable to the

21   office managers.

22        Q.   Are you sure about that?

23        A.   Pretty sure, because it was a very

24   high-level of access.

25        Q.   Were there occasions when Voynow was

```
 1                    M. KOUFAKIS
 2   on-site and unable to access --
 3        A.   I don't believe so.  And if they
 4   did, they may not utilize their own password and
 5   log-in.  They might ask one of the office
 6   managers to do it for them.
 7        Q.   So does that indicate to you that
 8   the office managers had a higher level of access
 9   than Voynow, if they had to use an office
10   manager's credentials?
11        A.   No.  It's just the supposition,
12   which I'm not sure.  But there's no reason why I
13   would give them less.
14        Q.   So it's your testimony that they had
15   the same --
16        A.   Most likely.  Most likely.  I'm not
17   a hundred percent sure.
18        Q.   And is there anything that you have,
19   as far as documentation-wise in your records,
20   that show what level of access you've given to
21   various users for the system?
22        A.   It's maintained in the system.  It's
23   not something that I printed out and have
24   available.
25        Q.   So there would be records that still
```

1                     M. KOUFAKIS

2      correct?

3                     MR. FELSEN:   Objection.

4           A.    I think there was one, a couple of

5      years.

6           Q.    So it's your recollection, that at

7      least for a couple of the years, you received

8      written engagement letters from Voynow for your

9      personal tax returns?

10          A.    Yes, I believe so.

11          Q.    And where did you receive those

12     documents?  Do you recall?

13          A.    I believe they were mailed to my

14     home.

15          Q.    So on the occasions where you did

16     receive engagement letters for your personal tax

17     returns, did you sign them?

18          A.    I think I signed one.

19          Q.    Was there a reason you didn't sign

20     the others that you received?

21          A.    No particular reason.

22          Q.    So as you sit here today, there was

23     not anything in the engagement letter that you

24     disagreed with?  You just never got around to

25     signing it?

Page 214

1                    M. KOUFAKIS

2        A.    I think so.

3        Q.    How much?

4        A.    A monetary reward.  Maybe a thousand

5   dollars.

6        Q.    Did anyone advise you around this

7   time that you should clean house in your

8   accounting department?

9        A.    Yes.

10       Q.    Who?

11       A.    Hugh Whyte.

12       Q.    And in what context?  Was this a

13   phone conversation?

14       A.    Yes.

15       Q.    When did you have a phone call with

16   Mr. Whyte?

17       A.    Shortly after this incident was

18   discovered with Vivian.

19       Q.    And you did not follow that advice;

20   is that fair to say?

21       A.    Not immediately.  It was not

22   possible.

23       Q.    Well, did you advise him that you

24   would follow that advice, or did you say, No, I

25   think this is just Vivian?