# EXHIBIT 9

Page 1

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
 2
                        - - -
 3   STAR AUTO SALES OF       : Civil Action No.:
     BAYSIDE, INC. (d/b/a     : 1:18-cv-05775-ERK-CLP
 4   STAR TOYOTA OF           :
     BAYSIDE), STAR AUTO      :
 5   SALES OF QUEENS,         :
     LLC (d/b/a STAR          :
 6   SUBARU), STAR HYUNDAI    :
     LLC (d/b/a STAR          :
 7   HYUNDAI), STAR NISSAN,   :
     INC.(d/b/a STAR          :
 8   NISSAN), METRO           :
     CHRYSLER PLYMOUTH        :
 9   INC.(d/b/a STAR          :
     CHRYSLER JEEP DODGE),    :
10   STAR AUTO SALES OF       :
     QUEENS COUNTY LLC        :
11   (d/b/a STAR FIAT) and    :
     STAR AUTO SALES OF       :
12   QUEENS VILLAGE LLC       :
     (d/b/a STAR              :
13   MITSUBISHI),             :
                              :
14           Plaintiffs,      :
                              :
15           vs.              :
                              :
16   VOYNOW, BAYARD, WHYTE    :
     AND COMPANY, LLP, HUGH   :
17   WHYTE, RANDALL FRANZEN   :
     AND ROBERT SEIBEL,       :
18                            :
             Defendants.      :
19                      - - -
20          THURSDAY, FEBRUARY 2, 2023
21                      - - -
22
23   (Caption continued on page 2.)
24
25   Job No. CS5681791
```

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Page 2

UNITED STATES DISTRICT COURT

EASTER DISTRICT OF NEW YORK

- - -

THURSDAY, FEBRUARY 2, 2023

- - -

Oral Deposition of JACQUELINE CUTILLO, as corporate designee for Star Auto Sales of Bayside, Inc., d/b/a Star Toyota of Bayside taken at Marshall Dennehey, 2000 Market Street, Suite 2300, Philadelphia, Pennsylvania, commencing at 10:39 a.m., before Lauren Sweeney, a Court Reporter and Notary Public.

- - -

1   further investigation. In the connection to all those
2   checks, yes, those were all connected to fraud.
3       Q.  Is it the company's contention that any time the
4   references to TOY, extra, bonus, or incentive appear in
5   its records that there is a connection with a check to
6   those references?
7               MR. LABUDA:  Objection, but you can
8           answer.
9               THE WITNESS:  The ones that are connected
10          to the checks, yes, one hundred percent they are
11          fraud.  If there is any other ones, it was
12          required to have further investigation done on
13          the part of Voynow due to them looking at the
14          books and records and them not being normal,
15          realistic control numbers.
16              Anything that's not connected to those
17          checks was the responsibility of Voynow to keep
18          an eye and identify if there's any fraud going
19          on.
20  BY MS. FITZGERALD:
21      Q.  So that wasn't my question.
22              My question was, as part of the company's
23  investigation of this scheme and claims being asserted
24  related to this scheme, is it the company's determination
25  that any time there was a reference in its records,

1    A.   No.  Vice versa.
2    Q.   Okay.  So it's entered into the Reynolds system
3  first, and then the deposit ticket is prepared.
4    A.   Right, which is why your Reynolds information is
5  supposed to match your deposit slip.
6    Q.   Okay.  Does it matter which is done first?
7    A.   Yes.
8    Q.   On what basis does the company contend that
9  Voynow is liable for the $463,000 alleged to be part of
10 this scheme?
11           MR. LABUDA:  Objection, but you can
12        answer.
13           THE WITNESS:  I'd like to defer that to
14        the expert.
15 BY MS. FITZGERALD:
16   Q.   Understood, but here you are the designee on
17 behalf of the corporation who has asserted claims against
18 Voynow with regard to this scheme, so in that capacity,
19 what is your understanding as to the basis that the
20 company contends Voynow is liable?
21           MR. LABUDA:  Same objection, but you can
22        answer.
23           THE WITNESS:  It's my opinion that Voynow
24        should have off the top of my head been able to
25        identify this based off of reviewing the

1         schedules for incentives, reviewing the schedules
2         for commissions.  In review of all those
3         schedules they would have been able to identify
4         that checks were being distributed off the recap
5         page.
6    BY MS. FITZGERALD:
7         Q.  So it's the company's contention that the
8    schedules that were reviewed included a recap page?
9         A.  Absolutely, along with the fact that I then told
10   Randy about the Toyota side, that I had given the
11   question in regards to the Toyota side that's these
12   entries made no sense to me previously.
13        Q.  And going back to that, when you questioned
14   Randy, where did this conversation take place?
15        A.  In the office.
16        Q.  Where in the office?
17        A.  At my desk.
18        Q.  Okay.  And was anybody else present?
19        A.  Randy.
20        Q.  Other than you and Randy?
21        A.  No.  I turned to him, and I said I have a
22   question in regards to this entry, I am not the one
23   putting this entry on here, and I don't understand why
24   it's here.  And he looked at it and he said, don't worry
25   about that, it's Vivian, it's okay, and walked away.

```
 1              this check I want to say I was the one that found
 2              this check, but I'm not a hundred percent
 3              certain.
 4     BY MS. FITZGERALD:
 5        Q.  Well, the reason that I ask is I don't believe
 6     this check is included in the indictment, nor is it
 7     included in Rosenfield's listing of checks.
 8                 So do you know when you would have run
 9     whatever report or found this particular check?
10        A.  I want to say during my research and
11     investigation in or around the time that I was
12     researching the PTSN scheme.
13        Q.  So that would be some point after Rosenfield's
14     engagement ended?
15        A.  Correct.
16        Q.  On what basis does the company contend that
17     Voynow is responsible for this $9,147?
18              MR. LABUDA:  Objection, but you can
19          answer.
20              THE WITNESS:  Voynow reviewed the customer
21          deposit schedules, and it's in my opinion that
22          they would have came across a journal entry
23          utilizing a credit to an employee on a customer
24          deposit schedule and then a check being generated
25          to themselves. Off the top of my head, but you
```

JACQUELINE CUTILLO

Page 62

1  can defer to the expert.
2  BY MS. FITZGERALD:
3      Q.  So you said that there would be a reference on a
4  customer deposit schedule, and then there would be a
5  journal entry, correct?
6      A.  There's a journal entry giving credit to
7  herself, a journal entry by herself, and a check issued
8  to herself by herself.
9      Q.  Well, the check's signed by the owner.
10     A.  But issued to herself, and she's the one that
11 generates the check, and she's the one that generated her
12 credit through a journal entry on her own customer
13 number.
14     Q.  And it was signed by the owner.
15     A.  Correct.
16     Q.  What is the account that was credited in the
17 journal entry?
18     A.  Customer deposits.
19     Q.  Do you know what that number is?
20     A.  It's 3020 or 3040.  I don't know off the top of
21 my head.  It's one of the two.
22     Q.  Was this check or this alleged theft part of the
23 company's civil lawsuit against Vivian?
24     A.  I'm not an attorney.  I don't know what's on the
25 civil lawsuit.  If you could present me with

1  not take any steps to pursue recovery of this amount from
2  her, correct?
3      A.  Not to my knowledge, no.  There was a lot going
4  on, so, no, and then she died.
5      Q.  Was Mr. Fenton or Nicholas P. or Mr. Tam, were
6  any of them disciplined as a result of this deal by the
7  company?
8      A.  Not to my knowledge.
9      Q.  Did the company have any specific policy in
10 place where an employee was purchasing or leasing a
11 vehicle that in that scenario an owner had to review the
12 terms of the deal?
13     A.  No.
14     Q.  And on what basis does the company contend that
15 Voynow is responsible for the alleged $3,000?
16          MR. LABUDA:  Objection, but you can
17      answer.
18          THE WITNESS:  Based on the fact that in my
19      opinion they looked at the customer deposit
20      schedules, and they looked at the we owe
21      schedules, and the source 11s would be in the
22      recap that they could identify something wasn't
23      right.  Off the top of my head.
24 BY MS. FITZGERALD:
25     Q.  Does the company contend that it provided Voynow

1    THE WITNESS: Yes, as well as Voynow.
2    BY MS. FITZGERALD:
3        Q. And on what basis does the corporation contend
4    that Voynow should be liable for the $40,000 associated
5    -- well, let me -- be liable for the $30,000 associated
6    with the Toyota Avalon purchase?
7               MR. LABUDA: Objection, but you can
8         answer.
9               THE WITNESS: I'd like to defer that to
10        the expert.
11   BY MS. FITZGERALD:
12       Q. In your role as the designee on behalf of the
13   corporation, what facts or information does the
14   corporation have that supported its claims in the lawsuit
15   against Voynow with regard to this scheme?
16              MR. LABUDA: Objection, but you can
17        answer.
18              THE WITNESS: The fact that they utilized
19        the customer deposit schedules when they would
20        review all of our books and records and see
21        journal entries in large amounts of money. Off
22        the top of my head that's one of the things I can
23        come up with at this moment, and the fact that
24        there's an employee, Michael Karouzakis, on a
25        schedule twice with journal entries. Off the top

JACQUELINE CUTILLO

Page 139

1       of my head, but I'm not an expert.
2  BY MS. FITZGERALD:
3       Q.  And by the schedule, are you referring to car
4  deals as of this 7/31/13 schedule?
5       A.  I would say May of '13, July of '13, June of
6  '13, sure.
7       Q.  Anything else?
8       A.  Not off the top of my head.
9            MS. FITZGERALD:  All right.  Why don't we
10       take a five-minute break.
11            MR. LABUDA:  Sure.
12                - - -
13            (There was a brief recess in
14       the proceeding.)
15                - - -
16  BY MS. FITZGERALD:
17       Q.  Just a few more.
18            On the 2013 deal involving the Avalon
19  where Michael Karouzakis took possession of the vehicle
20  simply by trading in his existing vehicle, okay, were the
21  company's owners made aware of that when you discovered
22  this deal for this scheme?
23       A.  Can you rephrase?  I'm not understanding the
24  context.
25       Q.  So you told me that you were the person who