# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
*   *   *

| | |
|---|---|
| STAR AUTO SALES OF BAYSIDE : | |
| INC., (d/b/a STAR TOYOTA    : | CASE NO. |
| OF BAYSIDE), STAR AUTO SALES: | 18-cv-05775(ERK)(TAM) |
| OF QUEENS, LLC, (d/b/a      : | |
| STAR SUBARU) STAR HYUNDAI,  : | |
| LLC, (d/b/a STAR HYUNDAI    : | |
| LLC), STAR NISSAN, INC.,    : | |
| (d/b/a STAR NISSAN)), METRO : | |
| CHRYSLER PLYMOUTH, INC.     : | |
| (d/b/a STAR CHRYSLER JEEP   : | |
| DODGE), STAR AUTO SALES OF  : | |
| QUEENS COUNTY, LLC, (d/b/a  : | |
| STAR FIAT) and STAR AUTO    : | |
| SALES OF QUEENS VILLAGE, LLC: | |
| (d/b/a STAR MITSUBISHI),    : | |
| Plaintiffs : | |
| : | |
| : | |
| : | |
| vs.               : | |
| : | |
| VOYNOW, BAYARD, WHYTE AND   : | |
| COMPANY, LLP, HUGH WHYTE    : | |
| and RANDALL FRANZEN,        : | |
| : | |
| Defendants : | |

*   *   *

        Videotape deposition of DAVID LOMBARDO, held

at the offices of U.S. LEGAL SUPPORT, 1818 Market

Street, 14th Floor, Philadelphia, Pennsylvania 19103,

beginning at 10:54 a.m., on Monday, October 3, 2022,

before Alice T. Mattes, Court Reporter and Notary

Public, there being present:

                    *   *   *

                U.S. LEGAL SUPPORT
            Northeast Processing Center
             1818 Market Street, Suite 1400
            Philadelphia, Pennsylvania 19103
                  (877)  479-2484

David Lombardo
October 03, 2022

```
1    Q       90 percent, you'd say, during your time?

2            A       Um-hmm.

3    Q       Okay.   Generally did Voynow hold itself out

4    as an accounting specialist in the auto industry?

5                    MS. FITZGERALD:   Objection.

6    BY MR. LABUDA:

7    Q       You can answer.

8            A       Yes.

9    Q       And how would you -- how would you say that

10   Voynow held themselves out as accounting specialists

11   in the auto industry?

12                   Like was that through conversations

13   that supervisors had with clients?  Would that be

14   through advertising?   Anything else?

15           A       Yeah, I would say conversations.   I

16   think our website even acknowledged that.

17                   When I say "our website" Voynow's

18   website.

19   Q       Voynow, right.

20                   And when you worked at various auto

21   dealers, let's specifically talk about auto

22   dealerships, at -- when you worked at Voynow, what

23   would be the types of things that you would be doing

24   there at auto dealerships in general?

25           A       It would depend on the engagement.
```

David Lombardo
October 03, 2022

1            Would that be from a supervisor

2  saying, hey, look, we're here to do tax work or

3  we're here to do X, you know, type of work?

4        A     Yeah.  I mean, it would be talked

5  about.

6  Q      Okay.

7        A     Sometimes I was involved in like

8  preparing the engagement letter, but not all the

9  time.

10  Q      Okay.

11            All right.  So let me ask you

12  generally, 'cause I think you kind of talked about

13  three buckets of services; tax services, financial

14  statements, and interim reviews.  Is that accurate?

15            MS. FITZGERALD:  Objection.

16  BY MR. LABUDA:

17  Q      You can answer.  Sorry.

18        A      Interim visits.

19  Q      Interim visits, okay.

20        A      That's what we called them.

21  Q      All right.  So with respect to let's say tax

22  services, and let's talk specifically about

23  dealerships.  What is the scope of work that's

24  involved and the type of work that's done with

25  respect to a client who has engaged Voynow to

David Lombardo
October 03, 2022

1    perform tax services?

2           A       Towards the end of the year, I would

3    say starting in November and December, we'd go out

4    for tax planning visits.  And then shortly after the

5    beginning of the year I guess we'd finish up a lot

6    of the tax work.

7    Q       All right.  And what would that -- what

8    would that entail in terms of the actual work that

9    you would be performing with respect to tax services

10   for an auto client?

11          A       Just going through the trial balance,

12   reviewing account balances.  Writing off any

13   uncollectible receivables.  Adjusting prepaids.  You

14   kind of primarily focus on the balance sheet.

15   Q       All right.  And approximately how many times

16   would you visit a client who was requesting tax

17   services?  How many times a year would you go?

18          A       Times a year, I would say twice.

19   Q       Okay.  You said --

20          A       Yeah, tax planning before the end of

21   the year and then after the year to wrap up

22   everything.

23   Q       Okay.  So right.  Once before the tax year

24   ends, assuming I guess fiscal year ending on

25   December 31st of the year.

David Lombardo
October 03, 2022

```
 1            A       Correct.

 2    Q       All right.  And then once --

 3            A       Most of our clients were calendar.

 4    Q       Right.  Okay.  And then once after the year

 5    is over to finalize the returns?

 6            A       Correct.

 7    Q       Okay.

 8            A       And each of those time periods could

 9    have been a couple days, depending on the size of

10    the client.

11    Q       Okay.

12            A       You know, a smaller dealership might

13    just be one day for each.  Largers could be two or

14    three days.

15    Q       Okay.  But, generally, your understanding is

16    that and experience at Voynow was that a client who

17    had requested tax services Voynow would go there

18    twice, twice per year, once before the year ends,

19    and then once before the taxes are actually filed.

20            A       Correct.

21    Q       Okay.  Would there be any -- do you have any

22    recollection of a client who was requesting just tax

23    services where that you would go to three or four

24    times a year?

25            A       Not for tax services, no.
```

David Lombardo
October 03, 2022

1   Q        And what about in -- what about visits in

2   let's say the summer, or anything like that, would

3   that -- do you have any recollection of going to a

4   Voynow client for tax services in the middle of the

5   summer?

6           A        No.

7                    Yeah, summer is kind of like our

8   down season.  So we typically did a lot of interim

9   or management visits then.

10  Q        Okay.  And what is -- I just want to get

11  into some of these items that you had mentioned with

12  respect to the tax services.

13                   Trial balance, can you explain what

14  you would do with respect to I guess reviewing the

15  trial balance.  Is that the right term?

16          A        Yeah.  We would take balance sheet

17  accounts and their primary focus was on the balance

18  sheet accounts and just cleaning things up and

19  occasionally some income statement accounts you

20  would tie out.

21  Q        Okay.  And what type of work would be

22  involved in the account balances that you had

23  referenced?

24          A        Could you rephrase that.

25  Q        So I believe that in your earlier testimony

David Lombardo
October 03, 2022

```
 1   have followup work in the later months after tax
 2   season.
 3   Q       Okay.
 4           A       Other times it would be completed,
 5   you know, before the end of tax season as well.
 6   Q       Okay.  And then you had also said that
 7   Voynow provided interim visits or management visits
 8   to customers as well?
 9           A       Correct.
10   Q       Okay.  And so what does an interim or
11   management visit entail?
12           A       We would go out there and review the
13   books and records, their internal controls, and we
14   would issue a letter, you know, stating what we had
15   found.
16   Q       And when you said reviewing the books and
17   records, what would that actually entail?
18           A       Looking at bank recs, receivables,
19   payables, prepaids, making sure various
20   reconciliations were completed.
21   Q       All right.  When you did interim visits
22   would you look at all the schedules for the
23   particular dealership?
24           A       Yes.  Or at least most of 'em.
25   Q       Okay.  And you had said you also did
```

David Lombardo
October 03, 2022

```
1    internal controls.  What would that be?

2          A      The various reconciliations, bank

3    reconciliations, the parts statement rec.  Prepaid

4    calculations.  Insure that they're reviewing the

5    aged receivables and payables regularly.

6    Q      And then you had said that Voynow would then

7    issue a letter to the client?

8          A      Correct.

9    Q      Okay.  And what would -- what would that

10   letter entail?  What was in that letter?

11         A      Um.  It would be a letter addressed

12   to the client just stating what we had found.

13   Q      Okay.  So it's the findings --

14         A      Completed and reviewed.  Yeah.

15   Q      Okay.  The findings from the interim visit

16   or management visit.  Right?

17         A      Correct.

18   Q      Now, with respect to the -- oh.  Let me ask

19   you one other question.

20               So and if Voynow was engaged in

21   providing interim visits how often would Voynow go

22   to the client site on an annual basis?

23         A      Well, it would be every time we did

24   an interim visit or management visit.  And it would

25   vary on client.  You know, some clients wanted us to
```

David Lombardo
October 03, 2022

1    come out more, some less.

2    Q       Okay.  What would the range be in terms of

3    times?

4            A       I would say up to four times per

5    year.  That would probably be the max.

6    Q       Okay.  And the minimum?

7            A       Once.

8    Q       One time, okay.

9                    And just so I understand, would

10   there be clients that would request all three of

11   these types of services from Voynow, the tax

12   services, the financial statements, and the interim

13   visits?

14           A       Yes.

15   Q       Okay.

16           A       And, you know, like sometimes it was

17   also used as like negotiations.  Like if you were

18   just preparing tax returns for a particular client,

19   you know, sometimes they'd throw in like an added

20   service as part of the negotiations.

21   Q       Okay.

22                   And would there be times where a

23   client would engage Voynow to provide two out of the

24   three services, engagements?

25                   MS. FITZGERALD:  Object to form.

David Lombardo
October 03, 2022

1   Q      Correct?  Okay.

2                  You wouldn't make special trips for

3   tax services vis-a-vis financial statements.

4   Correct?

5          A      Could you repeat that.

6   Q      Well, so you said that for the tax services

7   Voynow would generally go twice a year.  Correct?

8          A      Correct.

9   Q      Okay.  With the financial statements it was

10  also twice a year.  Correct?

11         A      Correct.

12  Q      If a client asked Voynow to go -- to perform

13  tax services and financial statements they wouldn't

14  necessarily go four times a year.

15         A      No.

16  Q      Right?  Okay.

17                 They would double up, do the tax

18  services and the financial statements --

19         A      Yeah, we do --

20  Q      -- all at once?

21         A      -- a lot of the same work at the same

22  time.  Yeah.

23  Q      Right.  Okay.

24                 And in terms of timing of the

25  interim visits, was there any specific time that

David Lombardo
October 03, 2022

```
 1  those would generally take place at Voynow?

 2         A       During our slower months.

 3  Q       And when is that?

 4         A       Typically your summer months.  Maybe

 5  into the fall.

 6                      *   *   *

 7                    (Pause.)

 8                      *   *   *

 9  BY MR. LABUDA:

10  Q       Bear with me one second.

11                      *   *   *

12                    (Pause.)

13                      *   *   *

14              THE WITNESS:  Would it be okay to take

15         a break for coffee?

16              MR. LABUDA:  Sure.  Sure, absolutely.

17              THE VIDEOGRAPHER:  Going off the

18         record at 11:35.

19                      *   *   *

20              (Whereupon, a short break was taken.)

21                      *   *   *

22              THE VIDEOGRAPHER:  And we're back on

23         the record at 11:40.

24  BY MR. LABUDA:

25  Q       All right.  With respect to financial
```

David Lombardo
October 03, 2022

1   controls.

2   Q      Okay.  Would you be reviewing let's say the

3   bank statement for the accuracy of it?

4              MS. FITZGERALD:  Objection.

5              THE WITNESS:  Correct.

6   BY MR. LABUDA:

7   Q      Okay.  And as part of looking for the

8   accuracy would you also look for like inaccuracies

9   or anomalies or things that were just what you

10  thought were not...

11         A      Yeah, occasionally something would

12  pop up and, you know, we would ask more questions

13  about it.  Anything that seemed unusual.

14  Q      Okay.  And that was true with the schedules

15  that you would review as part of the interim visits?

16         A      Yeah.  It really depends on what type

17  of account you're looking at.  Like if you're

18  looking at bank reconciliations, you would, number

19  one, verify it's being done on a regular basis, look

20  for like aged deposits in transit, outstanding

21  checks, if anything seems abnormal there.

22  Q      Okay.  And then as part of the interim visit

23  if you saw that something was abnormal, that would

24  be something that would be further investigated?

25         A      Yeah.

David Lombardo
October 03, 2022

1    Q       Correct?  Okay.

2                    And how was that -- how was that

3    investigation done like at Voynow when you were --

4    when you were there?  Like would there be things

5    that did pop up that were out of the ordinary?

6                    MS. FITZGERALD:  We're talking just

7            general.  Right?

8                    MR. LABUDA:  General.  Yeah.  Not at

9            Star.

10                   MS. FITZGERALD:  Got it.

11                   MR. LABUDA:  Yeah.

12                   MS. FITZGERALD:  Just to make sure

13           it's clear.

14                   MR. LABUDA:  Right.

15                   THE WITNESS:  I'm sorry, could you

16           repeat the question.

17   BY MR. LABUDA:

18   Q       So, yes.  So how was it that these anomalies

19   or things that, you know, just didn't seem normal to

20   you get further investigated at Voynow when you were

21   there?

22                   Like what was the process?  Would

23   you --

24           A       You would ask for -- ask different

25   questions, ask for support, follow up with somebody

David Lombardo
October 03, 2022

 1    else, if necessary.

 2    Q       Okay.

 3                        *   *   *

 4                        (Pause.)

 5                        *   *   *

 6              MR. LABUDA:   Could you just repeat

 7          that last answer.   Sorry.

 8                        *   *   *

 9                   (Whereupon, the Court Reporter

10           read from the record.)

11                        *   *   *

12    BY MR. LABUDA:

13    Q       Okay.  And when you say "support" you would

14    mean like documentation, like backup to establish

15    that this is an accurate transaction.

16                   Is that right?

17          A       Correct.

18    Q       Okay.

19          A       And, you know, you might use

20    different procedures based on the account.

21    Q       Okay.

22                   And with respect to tax services,

23    what would be the purpose for providing tax services

24    to a customer?  Is that to provide the actual tax

25    returns for --

David Lombardo
October 03, 2022

```
 1          A      Yeah.

 2   Q      -- for the client?

 3          A      Yeah, the clients with IRS.

 4   Q      And what was the purpose behind providing

 5   financial statements?  What was the goal there, the

 6   reason for providing financial statements?

 7          A      You know, sometimes it was required

 8   by the bank for floor plan financing or a particular

 9   loan.  Occasionally some clients requested it for

10   their own internal purposes.

11   Q      And then what was the purpose for providing

12   interim visits?

13          A      By client request.  Give 'em a level

14   of comfort that everything's being reconciled and

15   handled appropriately during the year.

16                Even when we do our tax work, you

17   know, that's primarily, yeah, November through

18   March.  You know, you kind of want to see what's

19   being done throughout the year.  Some clients are

20   interested in that.

21   Q      Okay.  As an accountant providing interim

22   visits was one of your jobs to look for anomalies

23   during these interim visits?

24          A      Yeah.

25   Q      And the anomalies could be as innocuous as
```

David Lombardo
October 03, 2022

```
 1   professional competence.  Correct?

 2           A      Yes.

 3   Q       Okay.  Due professional care as well.

 4   Correct?

 5           A      Correct.

 6   Q       Planning and supervision.  Correct?

 7           A      Correct.

 8   Q       And obtaining sufficient relevant data to

 9   provide its services?

10           A      Yes.

11                          *   *   *

12                      (Pause.)

13                          *   *   *

14   BY MR. LABUDA:

15   Q       And did...

16                  Were there ever times that in your

17   opinion Voynow failed to meet those standards?

18               MS. FITZGERALD:  Objection.

19               THE WITNESS:  I'd have to think about

20       that one.

21   BY MR. LABUDA:

22   Q       Okay.  All right, we can table it for now.

23                  With respect to the interim visits,

24   in terms of issuing a letter, would you actually be

25   involved in the drafting of the letters to clients?
```

David Lombardo
October 03, 2022

```
1          A       Yes.

2     Q        Okay.  And what was your role with respect

3     to that aspect?

4          A       It would depend on the client.  But,

5     you know, typically we would go out there.  They

6     would divvy up the different balance sheet accounts.

7     Everybody was kind of responsible for their own

8     section.  And then at the end of the -- at the end

9     of the visit you would go back to the office and

10    type everything up for your own individual section.

11    And then everybody would provide their -- their own

12    pieces to the secretary, who would then combine them

13    into a letter.

14    Q        Okay.  And in terms of providing the pieces

15    to the secretary, how was that done?  Was that done

16    by e-mail?  Was that through a typed report, a

17    handwritten report, something else?

18         A       I don't specifically recall.  But I

19    would imagine it was done either by saving it on a

20    specific place on the network or by e-mail.

21    Q        All right.  And, again, as part of the

22    interim visits when you talked about reviewing bank

23    recs, that was to check for outstanding deposits.

24                   Is that correct?

25         A       Just really completeness.  But, you
```

David Lombardo
October 03, 2022

1   know, that would be an example of completeness.

2   Q     Okay.  And when you would put in your

3   portion of the interim letter for the client, what

4   is it that you would include in your report?

5         A     I guess you would just state what you

6   had found.  You know, anything that you thought was

7   unusual you would note in there.

8   Q     Okay.  And what if there was nothing

9   unusual, would that also be noted that it all

10  checked out and that the balances seemed accurate

11  and there didn't seem to be any --

12        A     I would note if I didn't find

13  anything odd or unusual.

14  Q     Okay.

15                    *   *   *

16                  (Pause.)

17                    *   *   *

18            MR. LABUDA:  All right.  I should have

19        done this earlier.  I'm sorry.

20            Let's have this marked as Exhibit 16.

21                  *   *   *

22          (Whereupon, the above-mentioned

23        document was marked for identification

24        as Exhibit 16.)

25                    *   *   *

David Lombardo
October 03, 2022

1    talks about the fact that the threat of theft and

2    financial misstatements is especially high if a

3    store lacks formal regularly reviewed internal

4    controls.

5                    Do you see that?

6         A    Yeah.

7    Q    Okay.  And that's what you were referring to

8    again before in terms of interim visits, that one of

9    the functions of performing interim visits is to

10   provide these internal controls.  Correct?

11        A    I wouldn't say that's our primary

12   goal when we do the interim visits.

13   Q    Okay.  And it seems from this -- from this

14   paragraph here that the primary purpose of doing the

15   interim controls is to prevent any type of theft or

16   financial misstatement.

17                   Would you agree with that?

18                   MS. FITZGERALD:  Objection.

19                   THE WITNESS:  Yeah.  That would be the

20        purpose of internal controls.

21   BY MR. LABUDA:

22   Q    Okay.

23                   MR. LABUDA:  Steve, if you can mute,

24        that would be helpful.

25                   MR. RAMBAM:  It was muted, I thought.

David Lombardo
October 03, 2022

```
1                    As part of your -- with respect to

2     the different services, would those be listed in an

3     engagement letter that Voynow provided to the

4     client?

5           A     Yeah.  Each of those types of

6     services should have an engagement letter.

7     Q     Okay.  And to your understanding did the

8     engagement letters specify what level or what type

9     of service Voynow was providing to a client?

10          A     Yes.

11    Q     Did you have any internal discussions at

12    Voynow about engagement letters in general?

13          A     We didn't put too much of an emphasis

14    on those.

15    Q     Okay.  Were there any conversations about

16    engagement letters with respect to interim visits?

17          A     I do remember shortly before I had

18    left our quality control person Ken Mann suggested

19    engagement letters for everything, including interim

20    visits.  And, you know, a lot of people -- a lot of

21    the partners just didn't want to do that.  They

22    didn't want to issue a separate engagement letter

23    just for interim visits.

24    Q     Okay.  So if I'm understanding correctly,

25    there would be an engagement letter with respect to
```

David Lombardo
October 03, 2022

 1          A       No formal training for Voynow.  When

 2     I had started it was in the middle of tax season,

 3     you know, a lot of my training kind of came from the

 4     clients.

 5     Q       Okay.

 6                  What about taking continuing like

 7     accounting education courses?  Did you have to do

 8     that when you were at Voynow?

 9          A       Yes, we did.  A lot of times we did

10     that as a firm as well.

11     Q       Okay.  You'd have like a webinar or

12     something like that?  Somebody would come in and

13     provide some type of training on a particular

14     accounting issue?

15          A       Yes.  Or we would go out to, you

16     know, some sort of seminar.

17     Q       Did Voynow ever provide any type of written

18     guides to you in terms of how to conduct or perform

19     these interim visits for clients?

20          A       No.

21     Q       During your time at Voynow do you believe

22     you developed a good understanding of how to review

23     the books and records of a dealership?

24          A       I would agree with that, yes.

25     Q       And how is it that you would identify any

David Lombardo
October 03, 2022

```
 1   type of anomaly or irregularity that you saw?  Like
 2   what would be some of the things that you would be
 3   looking for in terms of schedules or bank recs or
 4   anything like that?
 5              MS. FITZGERALD:  Object to form.
 6              THE WITNESS:  I guess from experience
 7         you kind of know what to look for.  You
 8         know, maybe materiality based on how much a
 9         certain figure was --
10   BY MR. LABUDA:
11   Q      Okay.
12         A      -- you know, might determine how much
13   you look into it.
14   Q      Okay.  Now, in the Exhibit 16 that we had
15   looked at before, there was a term, we didn't talk
16   about it, but they used the term "red flag".
17              Have you ever heard that term
18   before?
19         A      Yes.
20   Q      Okay.  And is a red flag some type of
21   anomaly or irregularity to the books and records?
22         A      Correct.
23   Q      Okay.  And so can you just list some things
24   that you would at least consider to be red flags
25   when you're reviewing books and records with respect
```

David Lombardo
October 03, 2022

```
 1  supervisor or an owner for their review and editing

 2  before it was sent out to the client?

 3          A       I would say it would go to the

 4  partner for review and editing.

 5  Q       Okay.  And with respect to the reports that

 6  you provided and included in your reports, would you

 7  also include recommendations, if necessary?

 8          A       Sometimes, yeah.

 9                          *   *   *

10                      (Pause.)

11                          *   *   *

12  BY MR. LABUDA:

13  Q       All right.  Now, you had mentioned that one

14  of the dealerships that you worked on at Voynow was

15  Star.  Correct?

16          A       Correct.

17  Q       Okay.  And do you have any recollection of

18  when it was that you worked on the -- on the Star

19  dealerships?

20          A       I couldn't give you specifics on

21  that.

22  Q       And do you remember doing any particular

23  work -- well, withdrawn.

24                      What type of engagement did Voynow

25  have with respect to Star?
```

David Lombardo
October 03, 2022

1   Kerbeck?

2          A      The Kerbeck Group.  Yeah, all three

3   types of services.

4   Q      And with respect to other coworkers, did you

5   ever work with John Breslin on Star?

6          A      I'm debating whether I was out there

7   with him or not.

8   Q      Do you know whether or not he performed any

9   services for Star?

10         A      I know he did at some point, yes.

11  Q      Okay.  You just may not have overlapped with

12  him.

13         A      Correct.

14  Q      Okay.  And what about Mike Corrigan?

15         A      I don't recall.

16  Q      Okay.  And do you have any recollection in

17  terms of which specific dealerships you worked on

18  for Star?  So, for example, Star Toyota, Star

19  Chrysler, Star Nissan.

20         A      I wouldn't know, no.

21                Oh, it was all of 'em.

22  Q      All of 'em?

23         A      (Witness nods head.)

24  Q      Okay.  So if you did -- if you were looking

25  at schedules you would look at the same schedule for

David Lombardo
October 03, 2022

```
 1   each --
 2          A       Correct.
 3   Q      Okay.
 4                  All right.  I'm going to show you
 5   what's been marked as --
 6                  MR. LABUDA:  Or let's have this marked
 7           as Exhibit 28.
 8                          *   *   *
 9           (Whereupon, the above-mentioned
10       document was marked for identification
11       as Exhibit 28.)
12                          *   *   *
13                  MS. FITZGERALD:  Off the record.
14                          *   *   *
15           (Whereupon, a brief off-the-record
16           discussion was held.)
17                          *   *   *
18   BY MR. LABUDA:
19   Q      I'm going to show you what's been marked as
20   Exhibit 28.  If you could take a look at this and
21   let me know when you've had a chance to review.
22          A       (Witness reading.)
23                  Okay.
24   Q      Okay.  So, now, this is a document.  The
25   first page states Star Chrysler Jeep Dodge Schedule
```

David Lombardo
October 03, 2022

1   File Report.  Correct?

2          A       Correct.

3   Q       Okay.  And have you seen documents like this

4   before in terms of doing interim reports?  Or

5   interim --

6          A       Yes.

7   Q       -- reviews.  I'm sorry.

8          A       Yes.

9   Q       Interim visits.

10          A       I call it the schedule of schedules.

11   Q       Okay.  Right.  So this is a schedule of all

12   of the different schedules at Star.

13          A       (Witness nods head.)

14   Q       And this was printed out by Voynow in the

15   upper left-hand corner on January 26th, 2012.

16                  Is that correct?

17          A       That's what it says.

18   Q       Okay.  Voynow had access to the Reynolds

19   System.  Correct?

20          A       Yes.

21   Q       Okay.  And --

22          A       Some dealerships would set us up with

23   a username.

24   Q       Right.  And Reynolds generally would

25   identify who was actually printing out a particular

David Lombardo
October 03, 2022

1          MR. LABUDA:  Yeah.

2          MS. FITZGERALD:  All right.

3          THE WITNESS:  I mean, I wouldn't be

4      assigned all these accounts.

5  BY MR. LABUDA:

6  Q      Correct.  But these would be ones that you

7  and the other -- and your coworkers from Voynow

8  would review.

9          A      Correct.

10 Q      Okay.

11         A      Some of those, though, like we

12 wouldn't necessarily take a look at.

13 Q      Okay.  So there are some schedules that are

14 more significant or more important than others.

15              Is that fair to say?

16         A      Yeah.

17 Q      Okay.  So with respect to some of the more

18 significant schedules, would those include the

19 number five, Accounts Receivable?

20         A      Definitely.

21 Q      Number six, Employee Advances?

22         A      Definitely.

23 Q      Number seven, Car Deals?

24         A      Yep.  Yes.

25 Q      Number 13, Finance Reserves?

David Lombardo
October 03, 2022

1   dealership.

2   Q       Okay.  So those would be -- do you have any

3   recollection of pulling any of these specific

4   schedules at Star?

5           A       I don't recall that, no.

6   Q       Okay.  But these would be ones that you

7   would generally look at -- the ones that we

8   highlighted, those would be the main ones that would

9   be looked at at any car dealership?

10          A       Yeah.

11  Q       Okay.

12          A       I mean, I would say typically we

13  would look at the inventory schedules as well.

14  Q       Okay, inventory schedule.

15          A       New/used.

16  Q       Where is that one?

17          A       On the first page.  It would be nine

18  and eleven.  It looks like the eleven got cut off

19  there.

20  Q       Okay.  Right.  Yeah, nine and eleven.

21                  Okay.  Any other ones in your mind

22  that would be looked at?

23          A       I would say the ones that we both had

24  mentioned would be the main ones.

25  Q       Okay.  And on the second page it's got some

David Lombardo
October 03, 2022

1    Voynow had with Star?

2            A      No.

3    Q       When you were at Voynow do you have any

4    understanding directly or indirectly of how many

5    times Voynow would go to Star's offices to conduct

6    these interim visits?

7            A      It was multiple times a year.  But I

8    couldn't give you a specific number.

9    Q       Okay.  And do you have any recollection

10   personally in terms of what time of year you would

11   go up there?

12           A      I remember a number of times it was

13   in the summer, because it'd be hot out.

14   Q       Okay.  And do you have any understanding,

15   again, directly or indirectly, of Voynow employees

16   doing any inventory checks, like counting cars or

17   parts or things like that?

18           A      Never with parts.  You know, we

19   wouldn't count parts.  But, you know, we would

20   review service repair orders, and we'd also verify

21   that the vehicle is still there.  As long as there

22   was an amount owed.

23   Q       That's with respect to a service repair

24   order.  So if there was an amount owed that it

25   shouldn't be leaving the shop until it gets paid?

David Lombardo
October 03, 2022

1           A       Correct.

2    Q       Okay.

3           A       And sometimes that would happen.  But

4    there was -- that would require that, you know, a

5    specific reason.

6    Q       Okay.  And that was part of the internal

7    controls, just making sure that if you do the

8    service you'd better get paid before you actually

9    provide --

10          A       Yeah.

11   Q       -- the vehicle back to the customer.

12          A       Yeah, you don't want to release the

13   vehicle before it's been paid for.

14   Q       Right.

15          A       But you had asked if we had counted

16   like inventory.  Like, no, I don't believe we ever

17   really counted all the vehicles or anything.

18   Q       Okay.

19          A       You know, a lot of times that's

20   covered by your floor plan audits done by the bank.

21   Q       Right.  So the bank might do that directly.

22          A       Yeah.

23   Q       Okay.  But you have no recollection of doing

24   the like car inventories yourself?

25          A       Not specifically, no.

David Lombardo
October 03, 2022

1  Q    All right.

2            At Star did you perform any type of

3  factory part reconciliations?

4       A    Well, we wouldn't perform the

5  reconciliations.

6  Q    Okay.

7       A    But that's one of the reconciliations

8  we would check on.

9  Q    Okay.  That you would look at the schedule

10 involving the reconciliation or the report?

11      A    Yeah.

12 Q    Okay.

13      A    We would commonly refer to it as a

14 parts rec.

15 Q    Okay.  Would you involve Star in reviewing

16 credit card receivables?

17      A    No.  Was that a separate account?

18 Q    I would think so, yes.

19      A    Yeah.

20 Q    What about reviewing service and parts

21 receivables?

22      A    Definitely, yep.

23 Q    Cash sales and journal entries?

24      A    No.  I don't recall doing it

25 personally, but I could see somebody else doing it.

David Lombardo
October 03, 2022

1    Q      Okay.  Bank reconciliations?

2           A      Absolutely.

3    Q      Okay.  Was there a process that Voynow

4    recommended that dealerships follow in terms of how

5    often to reconcile the bank statements?

6           A      Monthly.

7    Q      And if a client was not reconciling on a

8    monthly basis, would that be a red flag --

9           A      That would be an --

10   Q      -- that would be identified?

11          A      -- internal control deficiency, yes.

12   Q      Okay.  And then that would get -- you would

13   raise that with -- let's say with respect to a bank

14   reconciliation not being done on monthly basis.

15   What would be the process to identify that anomaly

16   that, you know, I guess, breakdown in the internal

17   controls?

18                 Like, again, would you raise that

19   with the dealership directly, or would that be

20   something that you'd raise with Voynow internally?

21          A      Both.  And, you know, I would also

22   note it inside the interim letter so the owners

23   would be aware as well.

24   Q      Okay.

25                 Now, one of your purposes for

David Lombardo
October 03, 2022

1   reviewing these schedules for Star was to detect

2   fraud or theft.  Is that fair?

3               MS. FITZGERALD:  Objection.

4               THE WITNESS:  I would say it's to test

5          internal controls.

6   BY MR. LABUDA:

7   Q     Okay.  Well and --

8               MS. FITZGERALD:  My only objection is

9          I think he's testified that he didn't look

10         at all of these schedules.  And I think your

11         question had that -- inferred that he was.

12         So I would just like to --

13              MR. LABUDA:  Yeah, I'm not -- yeah,

14         I'm not suggesting -- I mean, I think the

15         witness has said he didn't necessarily look

16         at the schedules, all of the schedules.  But

17         I'm talking about the ones that you would

18         review, for starters.

19              MS. FITZGERALD:  Have we established

20         that?

21              MR. LABUDA:  I think he's

22         identified -- he's indicated that there were

23         schedules that he did review at Star.  I

24         mean, let's ask him.

25   BY MR. LABUDA:

David Lombardo
October 03, 2022

1    Q      You did review schedules when you worked at

2    Star.  Correct?

3           A      Yes.

4    Q      Yeah.  Okay.

5                  MS. FITZGERALD:  Do you remember which

6           ones you reviewed?

7                  THE WITNESS:  I know parts and

8           service, I know I looked at that.  I mean,

9           there were others.

10                 Most of our work is like looking at

11          schedules, and that's how you do the

12          interim visit.  It's not limited to

13          schedules.  You know, like a bank

14          reconciliation wouldn't be a schedule, but

15          you would have to look at schedules for

16          different things.

17   BY MR. LABUDA:

18   Q      Right.  And so you're saying -- let's say,

19   for example, looking at parts and service schedules,

20   you would look at those for proper internal controls

21   within that particular schedule.  Correct?

22          A      Yeah.  And, you know, internal

23   control deficiencies could lead to, you know, fraud

24   or misstatement.

25   Q      Right.  Right.

David Lombardo
October 03, 2022

```
 1                     And that was -- that was your role
 2   in terms of reviewing the parts and service
 3   schedule, was to look for these type of --
 4          A       Internal controls.
 5   Q       -- type of anomalies.  Right?
 6          A       Yeah.
 7   Q       Something that deviated from proper internal
 8   controls.  Correct?
 9          A       Correct.
10   Q       Do you have any recollection of raising any
11   concerns about Star not having proper internal
12   controls to anyone at Voynow?
13          A       Yes.
14   Q       Okay.  And do you remember the context, like
15   what schedule you were looking at or the particular
16   issue?
17          A       It was a service and parts
18   receivable.  And it was Vivian's husband that was
19   the service manager.  And I noticed that they were
20   related.  And the dollar amount wasn't a whole lot.
21   It was under $10,000.  But it was just the fact that
22   he had this receivable -- you know, I assume he made
23   a decent salary and, you know, like why would this
24   receivable be on there aged over 90 days and it
25   still wasn't paid for?  I specifically remember that
```

David Lombardo
October 03, 2022

```
 1    instance.

 2    Q       Okay.

 3            A       And I remember questioning him about

 4    why it wasn't paid.  And I remember him replying

 5    that, well, he could have just written it off, which

 6    I thought was extremely strange to say.

 7    Q       Who said that to you?

 8            A       Vivian's husband.

 9    Q       Oh, no.  I'm saying, who said he could have

10    written it off?

11            A       Vivian's husband.

12    Q       Oh, Vivian's husband.  Okay.

13            A       That was an item of -- you know, I

14    was concerned with.

15    Q       So if I'm --

16            A       And I addressed that directly with

17    Randy as well.

18    Q       Okay.  Right.  That was my next question.

19                    With respect to this service and

20    parts receivable involving Vivian's husband, did

21    you -- is it fair to say based on what you just said

22    that you identified this as a potential issue with

23    the internal controls?  Correct?

24            A       Yes.

25    Q       Okay.  And then is it also fair to say that
```

David Lombardo
October 03, 2022

1   you spoke with the client in terms of speaking with

2   Vivian's husband about why he had this aged

3   receivable?

4          A       Yes.

5   Q       Right?  Okay.

6                  And his response was he could have

7   written it off?

8          A       Yeah.

9   Q       Okay.  Well, this is -- if I'm understanding

10  correctly, this is money that was listed on the

11  service parts receivable that he owed to Star.

12  Correct?

13         A       Correct.

14  Q       Okay.  When he said he could have written it

15  off, did that raise any further issues with you?

16         A       Yeah.  I mean, you know, alarms were

17  going off in my head.  I mean, it's not a big dollar

18  amount, but still, you know, it's a...

19                 And then after that I learned that

20  there was other family members that worked there,

21  too, which that's extremely odd.  You know, that's

22  not something you really see.  Normally, when you

23  see family members working at a dealership like

24  they're family members of the owners.  Not family

25  members of just employees.

David Lombardo
October 03, 2022

1          A      Not specifically.

2    Q      Okay.  Were there any issues that you

3    remember generally in terms of Star?

4          A      Nothing specific to Star, no.

5    Q      Okay.  Do you know whether or not there was

6    any -- any further investigation done by Voynow on

7    this particular issue you were raising with the

8    parts and service receivable?

9          A      I don't believe so.  But I don't

10   know.

11   Q      Okay.  Have you ever heard the term

12   professional skepticism?

13         A      Yes.

14   Q      Okay.  And what does that mean to you?

15         A      Kind of trust but verify.

16   Q      Okay.  And do you believe that Voynow at all

17   times exercised professional skepticism with respect

18   to its interim visits at Star?

19              MS. FITZGERALD:  Object to form.

20              THE WITNESS:  I would not say all the

21         time, no.

22   BY MR. LABUDA:

23   Q      Okay.  And why do you say no?  Why would

24   you --

25         A      An example of the -- Vivian's husband

David Lombardo
October 03, 2022

1    I kind of felt like it was kind of like dismissed

2    and...  I kind of feel like Randy didn't take that

3    seriously.

4    Q       Okay.

5            A       Randy Franzen.

6    Q       Okay.  Now, in terms of like this trust and

7    verify, did you believe it was Voynow's

8    responsibility as their accountants to get an

9    adequate answer and get proper backup for why there

10   was this aged receivable by the controller's

11   husband?

12           A       Yeah.  And I would also, you know,

13   make the owners aware as well.

14   Q       Okay.

15           A       I feel that's important.

16   Q       Do you have any other instances, generally

17   speaking, of Mr. Franzen not exercising professional

18   skepticism at Star or at other dealerships?

19                   MS. FITZGERALD:  Object to form.

20                   THE WITNESS:  I couldn't give you

21           specific examples.  But I would say over --

22           over the period of my career there, yeah,

23           there was a number of times where I felt

24           like Randy didn't exercise that.

25   BY MR. LABUDA:

David Lombardo
October 03, 2022

1   Q      Okay.  And can you give me one or two other

2   examples.  And if you know the dealership associated

3   with it, that's fine.  If not, that's fine as well.

4          A      I can't think of anything

5   specifically offhand.

6   Q      Okay.  We'll table that.  And maybe at a

7   break if you have time to think about it.  But I'd

8   be curious to see other examples that you think of

9   that kind of form that conclusion.

10         A      Okay.

11  Q      Do you have any recollection about raising

12  some type of concern about a lack of internal

13  controls with anyone else, other than let's say

14  Randy, with respect to the Star dealerships?  So,

15  for instance, Shawn McCormack or Bob Seibel.

16         A      I'm sure we've casually brought it

17  up.

18  Q      Okay.  You don't have any specific

19  recollections with respect to Star and either with

20  respect to conversations you had with Shawn or with

21  Bob?

22         A      Not specifically, no.

23  Q      Okay.

24                Now, with respect to Exhibit 28

25  here, would -- in terms of the schedule of schedules

David Lombardo
October 03, 2022

1    that are listed here, would Voynow have access to

2    all those different schedules as part of its interim

3    visit?

4            A       Access?  Yeah.  I believe so.

5    Q       Okay.

6            A       It's on here.  I don't see why they

7    wouldn't be able to print it.

8    Q       Right.  And then I think you said generally

9    speaking what you and other Voynow employees would

10   do would be to ask that a schedule be printed by

11   someone at Star.  Is that correct?

12           A       Or I guess we could print it

13   ourselves.

14   Q       Okay.

15           A       I don't recall the -- I don't recall

16   that specifically at Star.  But just that the -- you

17   know, the username is Voynow.  That was typically a

18   username that was provided to us to print the

19   schedules.

20   Q       And do you have a recollection of how many

21   times you went to Star when you worked at Voynow?

22           A       I don't recall how many times.  I

23   would say it was three times or less.

24   Q       And each time was to provide interim visits

25   to review books and records and review internal

David Lombardo
October 03, 2022

1    controls?

2           A      Yes.

3    Q      Any of the work that -- withdrawn.

4                  Did you do any of the work that you

5    performed for Star outside of Star's offices?  So,

6    for example, did you do -- take schedules and go

7    back to Voynow, or anything like that?

8           A      Yes.

9    Q      Okay.

10          A      Yeah, when we were out there we would

11   kind of go through the schedules and the

12   reconciliations.  We would take a lot of notes, and

13   then we'd go back to the office and formalize it.

14   Q      Okay.  And when you would go to Star how

15   long would you be there for?

16          A      All day.

17   Q      Okay.  Would it just be one day?  Would it

18   be multiple days that you were there?

19          A      I believe it was just one day, but it

20   could have been multiple days.

21   Q      Okay.

22          A      I specifically don't remember.  I've

23   never stayed overnight there, so.  I was only there

24   for one day.

25   Q      Okay.  And, generally speaking, when you

David Lombardo
October 03, 2022

1            A       I'm sure multiple people at Star.  I

2   just -- the specifics I'm just not sure of.

3   Q       Okay.  Any of the owners?

4            A       I think briefly for like a short

5   discussion.  But not really, no.

6   Q       Okay.  With respect to the interim letters

7   that got issued by Voynow to a client, would there

8   be an interim letter that was sent out after every

9   interim visit?

10           A       Yes.  Yeah, that was kind of like

11  your completed product.

12  Q       Right.  Okay.

13                   When you were at Star did you ever

14  interact with an employee by the name of Debbie

15  Diacaris (ph)?

16           A       It sounds familiar.  But I don't

17  recall the specifics.

18  Q       Okay.  Do you remember if Vivian had a

19  sister that worked there?

20           A       I do recall that, yeah.

21  Q       Okay.  And, again, with the fact that you

22  have related parties there, would that be something

23  that you would have raised internally with one of

24  your supervisors as to the fact that you have --

25           A       Yeah.

David Lombardo
October 03, 2022

```
 1              MR. LABUDA:  All right.  Let's mark
 2         this as Exhibit 1.
 3              And, Maureen, actually, we have --
 4         these are some from Randy that are -- not
 5         Randy's.  Shawn's.  So I'm just going to
 6         use the same one.  That's kind of one of
 7         the reasons why we're doing it, so.
 8              MS. FITZGERALD:  Do you have copies?
 9              MR. LABUDA:  I have copies, yeah.
10         Yeah.
11              MS. FITZGERALD:  So it's been
12         previously marked at Shawn McCormack's
13         deposition.
14              MR. LABUDA:  Yeah, this is previously
15         marked.  I didn't have copies with the
16         actual like sticky on it.  But this is one
17         that was previously marked in this case as
18         Exhibit 1.
19              MS. FITZGERALD:  At Shawn McCormack's
20         dep?
21              MR. LABUDA:  Yeah.  I don't know -- I
22         don't think -- yeah, we'll just leave it --
23         yeah, we'll just leave it the way it is.
24              And that was on March 22nd, 2022.
25    BY MR. LABUDA:
```

David Lombardo
October 03, 2022

```
 1          service.

 2   BY MR. LABUDA:

 3   Q        Okay.  And these would all be identified and

 4   sent to the client as items that were reviewed by

 5   Voynow and if there were particular anomalies or

 6   issues to raise those particular issues.  Correct?

 7          A        Yeah.  You would highlight those in

 8   the letter, yeah.

 9   Q        Okay.  So, for example, with respect to...

10                   There's a section of Service and

11   Parts Accounts Receivable on the second into the

12   third page.  Correct?

13          A        From page two going onto page three,

14   yeah.

15   Q        Yes.  Yeah.

16                   And with respect to this it has

17   various customers that owe money to Star and then

18   how long they've owed money to Star.  Correct?

19          A        Yeah, it gives an aging.  Yeah.

20   Q        Yeah, the 61 to 90 days, 91 to 120, and 121

21   plus.  Correct?

22          A        Correct.

23   Q        Okay.  And I know you had mentioned that

24   before with respect to Vivian's husband.  This would

25   be something where you would have noted the fact
```

David Lombardo
October 03, 2022

```
 1              MS. FITZGERALD:  Objection.

 2              THE WITNESS:  (Witness reading.)

 3              Yeah, I would say the vast majority

 4       of those are things you would typically

 5       look at.

 6  BY MR. LABUDA:

 7  Q      Okay.  Let's put that one down.  Let's look

 8  at Exhibit 5, what's been previously marked as

 9  Exhibit 5 from McCormack's deposition.

10              I'm going to show you what's been

11  marked as Exhibit 5, and just take a look at that

12  briefly.  And I'll kind of focus your attention on a

13  couple particular items.

14       A      (Witness complies.)

15              Oh, this is like a billing

16  work-in-process report.

17  Q      Yes.

18       A      Okay.

19  Q      So like at the bottom -- this would be a

20  typical billing summary from Voynow.  Correct?

21       A      It appears to be, yes.

22  Q      Right.  And at the top of it it has Group,

23  Star.  And it says Star Hyundai.

24              Do you see that at the top?

25       A      Yes.
```

David Lombardo
October 03, 2022

1    Q       Okay.  And let's say, for instance, with
2    respect to at the bottom of it it has a Shawn
3    McCormack.  And then it says "INTSER Letters to
4    Client, Prep".
5                    Do you see that?
6            A       Um-hmm.
7    Q       Would that be with respect to these interim
8    letters that would be sent to clients?  Is that what
9    it's referencing?
10           A       I would assume so.
11   Q       Yes.  Okay.
12           A       Interim services.
13   Q       Okay.  And then on the third page I think I
14   see something as well.  At the bottom of it it has
15   the same thing, "INTSER Interim Visit Planning".
16                   Do you see that?
17           A       Um-hmm.  I see it.
18   Q       Let's see.
19                   On the next page, which is 24607,
20   there's a few references from David Kumor.
21                   Do you see that in the middle of the
22   page?
23           A       Okay.
24   Q       Do you know who David Kumor was?
25           A       I'm familiar with him, yes.

David Lombardo
October 03, 2022

1    Q      Okay.  He worked at Voynow?

2           A      He did.

3    Q      Okay.  And the -- actually, I take that

4    back.

5                  Below David Kumor there's a couple

6    specific entries for Mike Corrigan.

7                  Do you see those?  In the middle of

8    the page.  There's one that says "Business Trip to

9    Queens".

10          A      Yeah.

11   Q      Okay.  Those are -- those appear to be

12   duties associated with performing an interim visit.

13   Is that accurate?

14                 MS. FITZGERALD:  Objection.

15                 THE WITNESS:  Yes.

16   BY MR. LABUDA:

17   Q      Okay.

18          A      Yeah, where you see "RO's", that's

19   for repair orders.

20   Q      Okay.

21          A      We never reviewed repair orders for

22   tax work.  That was something we did at interims.

23   Q      Okay.  Now, I see also, as you mentioned

24   before, a lot of this, the interim reports were done

25   over the summer.  These two entries are July 24th,

David Lombardo
October 03, 2022

1    2013 and August 5th, 2013.  Correct?

2           A       Um-hmm.

3    Q       Okay.  And that would typically be the time,

4    one of the times that you would be doing interim

5    reports.  Correct?

6           A       Correct.

7    Q       Interim visits.  I'm sorry.  Correct?

8           A       Correct.

9    Q       Okay.  And not associated with any type of

10   tax work.  Correct?

11          A       I don't believe so.

12   Q       Okay.  If you flip a few more pages.

13          A       Yeah, even on like -- you know,

14   looking at Mike Corrigan on August 5th, you know,

15   letter editing the mistakes, evaluating the letter,

16   like, you know, you could tell right there that's

17   interim letters.

18   Q       Okay.  Right.

19                          *   *   *

20                        (Pause.)

21                          *   *   *

22   BY MR. LABUDA:

23   Q       Okay.  Yeah, so if you flip a few other

24   pages in there's -- it's actually towards the end,

25   second-to-last page, 24690.  There's a couple

David Lombardo
October 03, 2022

1    entries for you.  And it has Dave Lombardo in the

2    middle of the page.  Like October it looks like

3    2010.  October 31st, 2010.  It says engagement

4    planning.  Do you see that?

5            A       Um-hmm.

6    Q       And the client visit, interim letter,

7    interim letter.  I guess the interim letter, that's

8    referring to, you know -- is it fair to say that

9    that is referring to time that you spent preparing

10   your portion of what was to be an interim letter to

11   the client?

12           A       Yes.  But I'd just like to note like

13   due to the time, like I only put one hour there, I

14   would imagine that had something to do with like

15   corrections or.

16   Q       Okay.  Right.  That wouldn't be the time

17   that you would actually spend doing your portion of

18   a report.  You wouldn't be able to do it in an hour.

19   Correct?

20           A       Correct.

21   Q       Right.

22           A       Yeah.  Much more time than that.

23   Q       Right.  And then it says, client visit.

24   That would be the time that you were actually at the

25   client site?