# EXHIBIT 12

John Breslin
November 17, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\*   \*   \*

STAR AUTO SALES OF BAYSIDE, INC.,:
d/b/a STAR TOYOTA OF BAYSIDE,  :
STAR AUTO SALES OF QUEENS, LLC, :
d/b/a STAR SUBARU, STAR HYUNDAI, : NO:  18-CV-05775
LLC, d/b/a STAR HYUNDAI, STAR   :      (ERK)(TAM)
NISSAN, INC., d/b/a STAR NISSAN, :
METRO CHRYSLER PLYMOUTH, INC.,  :
d/b/a STAR CHRYSLER JEEP DODGE, :
STAR AUTO SALES OF QUEENS COUNTY,:
LLC, d/b/a STAR FIAT, and STAR  :
AUTO SALES OF QUEENS VILLAGE,   :
d/b/a STAR MITSUBISHI,          :
                Plaintiffs,     :
            - vs -              :
VOYNOW, BAYARD, WHYTE AND       :
COMPANY, LLC, HUGH WHYTE and    :
RANDALL FRANZEN,                :
                Defendants.     :

\*   \*   \*

Video recorded deposition of JOHN

BRESLIN, taken at U.S. LEGAL SUPPORT, 1818 Market

Street, Suite 1400, Philadelphia, Pennsylvania, 19103,

on Thursday, November 17, 2022, beginning at

approximately 10:36 a.m., before Lisa M. Cooper, Court

Reporter.

\*   \*   \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

John Breslin
November 17, 2022

1    you --

2    A.        Either.

3    Q.        -- provided services for?

4    A.        New York.  Obviously.  Local.  Maybe a couple

5    in Jersey.  But, I mean, that I've been to.

6    Q.        Okay.  So mainly in the Philadelphia area.

7    Some in New Jersey, as well as some in New York?

8    A.        Yes.

9    Q.        And none outside of that area?

10   A.        Not for me.

11   Q.        The services that you perform -- what type of

12   services did you perform for car dealerships in

13   general?  For Voynow?

14   A.        Well, when I went out it was mostly -- well,

15   I would check the auto repair orders.

16   Q.        So those are also called the ROs?

17   A.        Yes.

18   Q.        Okay.

19   A.        And then some -- at some clients, I'd check

20   their receivables or payables.  That's about what I

21   remember doing.

22   Q.        And when you say check, what do you mean by

23   that?

24   A.        So if the receivables are old, you just ask

25   the controller, or whoever's in charge, if they're

John Breslin
November 17, 2022

1   going to be collected.  Or if they're a payable, are

2   you going to pay them?  What's the deal with it?  And

3   that's basically what the whole thing consisted of.

4   Q.       Okay.  So you would look at the receivables

5   schedule or the payables schedule and inquire from the

6   client as to what the status was?

7   A.       Yes.

8   Q.       Okay.  And when you got an answer, would you

9   ask the client directly?

10  A.       Yes.

11  Q.       Okay.  And when you got an answer, what did

12  you do with that information?

13  A.       Write a note next to that particular one,

14  whatever she said.  Or he said.

15  Q.       Okay.  So on the actual physical receivable

16  schedule?

17  A.       Either the schedule or the work paper.  Well,

18  yeah, I would usually write it on the schedule and then

19  put it like -- on the work paper on the computer.

20  Q.       Okay.  And when you're talking about work

21  paper, those are the internal work papers of Voynow?

22  A.       Yes.

23  Q.       Okay.  And were those used to generate a

24  report or a letter for the client?

25  A.       I believe they did that.  Yes.

John Breslin
November 17, 2022

1   Q.        Okay.  And with respect to the ROs, what is

2   it that you would do there?  You would look at the RO

3   schedule?

4   A.        Yeah.  I guess there was a schedule.  But

5   just see what the open ones are.  If there are 15 of

6   them, go check with the service shop to see if the car

7   was there.  Or what the deal with it was.

8   Q.        Right.  Because the repair orders, those are

9   cars that came into the dealership for service, right?

10  A.        Yes.

11  Q.        And then the repair, you're supposed to --

12  the dealership is supposed to be paid for that, right?

13  A.        Correct.

14  Q.        And then you would look to see if there were

15  outstanding receivables that were owed to the

16  dealership, correct?

17  A.        You mean in the ROs?

18  Q.        In the ROs.

19  A.        Well, I was checking to see if the car was

20  there.

21  Q.        Okay.

22  A.        I wasn't checking to see if it was paid.  I

23  was just checking to see if it was there.

24  Q.        Okay.  And in terms of looking -- checking to

25  see if the car was there, would you actually like

John Breslin
November 17, 2022

```
1    physically go onto the premises of --

2    A.          Yes.  To look at the VIN number.  Awful.  For

3    real.

4    Q.          Why do you say awful?

5    A.          Because if there was three of the same car,

6    you have to see if that's the VIN number.

7    Q.          Okay.  So you'd --

8    A.          I remember that.

9    Q.          You'd have to squat down?

10   A.          No.  You have to go like this into the damn

11   windshield.  (Indicating.)

12   Q.          Okay.

13   A.          And look at it.

14   Q.          Okay.

15   A.          So, yes.

16   Q.          And what was the purpose of that?  To verify

17   that the car was actually on premises?

18   A.          To -- just to make sure that it was -- they

19   were accounted for.  That there was -- I don't know.

20   That they were there.  There was no -- there wasn't

21   like a fake RO.

22   Q.          Okay.  It was to, I guess, check the veracity

23   of the books and records of the particular dealership?

24               MS. FITZGERALD:  Objection.

25               THE WITNESS:  I would say just to check
```

John Breslin
November 17, 2022

```
 1              to make sure that -- we did it everywhere.
 2              To see if the car was there.  Yeah, I guess.
 3   BY MR. LABUDA:
 4   Q.       Okay.  And with -- when you would check to
 5   make sure that the car was actually there that was
 6   listed on the RO schedule, what did you do with that
 7   information?
 8   A.       Just check it.  Check mark.
 9   Q.       Okay.  That would be it?  So if -- did you
10   ever run into an occasion where there were -- there was
11   not a car that was on the RO schedule?
12   A.       Well, it would be on the schedule.  You mean
13   that the car wasn't there?
14   Q.       Yeah, I'm sorry.  That the car wasn't
15   actually there.
16   A.       I'm sure there was.  I don't really remember
17   what exactly we did.  Made a note of it.  But I don't
18   really remember.
19   Q.       Okay.
20              MS. FITZGERALD:  You're just asking
21   generally, right?
22              MR. LABUDA:  Yeah.  Just general about
23              dealerships.  Right.
24   BY MR. LABUDA:
25   Q.       And do you have any recollection of doing
```

John Breslin
November 17, 2022

```
 1   anything else at the -- at car dealerships when you
 2   were at Voynow?  We mentioned --
 3   A.         Not that I remember.
 4   Q.         -- ROs and receivables and payables.
 5   A.         Not -- no.
 6   Q.         Okay.  This would be -- this would be work
 7   that you would actually do when you were physically at
 8   the car dealership, correct?
 9   A.         Yes.
10   Q.         Okay.  Would there be work that you performed
11   for dealerships off premises?  Like back at Voynow's
12   offices?
13   A.         I put the trial balance in, math the tax
14   return.  I didn't really do anything with the tax
15   return in regards to like preparing it.
16   Q.         Back at Voynow's offices, would you also
17   provide your supervisors with reports, or like a
18   summary of the work that you did at a particular
19   dealership?  Whether or not it was ROs or receivables
20   or payables?
21   A.         I believe we would do that if -- unless if we
22   left, then it would be done and be checked the next
23   day.  And if -- if we had time that day then we would
24   just do it there.
25   Q.         Okay.  And would you give that information to
```

John Breslin
November 17, 2022

```
 1   your supervisor?

 2   A.          I would give it to Randall Franzen.  If he

 3   was the guy there that was doing that.

 4   Q.          Okay.  And do you have any recollection of

 5   how many dealerships you visited when you were at

 6   Voynow?

 7   A.          A dozen.  I don't know.  It's a guess.

 8   Q.          Okay.  And do you have a recollection of the

 9   names of any one of them?  For instance, you went to

10   Star, correct?

11   A.          Yeah.  Peruzzi.  I think I was at Kerbeck.

12   Runnemede.  Toyota.  Mike AT & T or something.  I don't

13   know.  That's the wrong name probably.  Sloane.  I

14   don't know.  There's probably more.  Thompson.

15   Q.          And do you have any recollection of what time

16   of year you would do that?  Go to these dealerships?

17   Was there any particular time that you would go?

18   A.          Depends on what it was for.

19   Q.          Okay.  So let's say, for instance, if it was

20   for some type of a -- a tax service that Voynow was

21   providing, was there a certain period of time that you

22   would go to the dealership?

23   A.          Near the end of the year and then after.

24   Q.          Okay.

25   A.          Like a month later.
```

John Breslin
November 17, 2022

1    Q.        Okay.  And with respect to the ROs, what is

2    it that you would do there?  You would look at the RO

3    schedule?

4    A.        Yeah.  I guess there was a schedule.  But

5    just see what the open ones are.  If there are 15 of

6    them, go check with the service shop to see if the car

7    was there.  Or what the deal with it was.

8    Q.        Right.  Because the repair orders, those are

9    cars that came into the dealership for service, right?

10   A.        Yes.

11   Q.        And then the repair, you're supposed to --

12   the dealership is supposed to be paid for that, right?

13   A.        Correct.

14   Q.        And then you would look to see if there were

15   outstanding receivables that were owed to the

16   dealership, correct?

17   A.        You mean in the ROs?

18   Q.        In the ROs.

19   A.        Well, I was checking to see if the car was

20   there.

21   Q.        Okay.

22   A.        I wasn't checking to see if it was paid.  I

23   was just checking to see if it was there.

24   Q.        Okay.  And in terms of looking -- checking to

25   see if the car was there, would you actually like

John Breslin
November 17, 2022

 1  physically go onto the premises of --

 2  A.         Yes.  To look at the VIN number.  Awful.  For

 3  real.

 4  Q.         Why do you say awful?

 5  A.         Because if there was three of the same car,

 6  you have to see if that's the VIN number.

 7  Q.         Okay.  So you'd --

 8  A.         I remember that.

 9  Q.         You'd have to squat down?

10  A.         No.  You have to go like this into the damn

11  windshield.  (Indicating.)

12  Q.         Okay.

13  A.         And look at it.

14  Q.         Okay.

15  A.         So, yes.

16  Q.         And what was the purpose of that?  To verify

17  that the car was actually on premises?

18  A.         To -- just to make sure that it was -- they

19  were accounted for.  That there was -- I don't know.

20  That they were there.  There was no -- there wasn't

21  like a fake RO.

22  Q.         Okay.  It was to, I guess, check the veracity

23  of the books and records of the particular dealership?

24                 MS. FITZGERALD:  Objection.

25                 THE WITNESS:  I would say just to check

John Breslin
November 17, 2022

```
 1              to make sure that -- we did it everywhere.
 2              To see if the car was there.  Yeah, I guess.
 3   BY MR. LABUDA:
 4   Q.       Okay.  And with -- when you would check to
 5   make sure that the car was actually there that was
 6   listed on the RO schedule, what did you do with that
 7   information?
 8   A.       Just check it.  Check mark.
 9   Q.       Okay.  That would be it?  So if -- did you
10   ever run into an occasion where there were -- there was
11   not a car that was on the RO schedule?
12   A.       Well, it would be on the schedule.  You mean
13   that the car wasn't there?
14   Q.       Yeah, I'm sorry.  That the car wasn't
15   actually there.
16   A.       I'm sure there was.  I don't really remember
17   what exactly we did.  Made a note of it.  But I don't
18   really remember.
19   Q.       Okay.
20              MS. FITZGERALD:  You're just asking
21   generally, right?
22              MR. LABUDA:  Yeah.  Just general about
23              dealerships.  Right.
24   BY MR. LABUDA:
25   Q.       And do you have any recollection of doing
```

John Breslin
November 17, 2022

```
1    anything else at the -- at car dealerships when you
2    were at Voynow?  We mentioned --
3    A.          Not that I remember.
4    Q.          -- ROs and receivables and payables.
5    A.          Not -- no.
6    Q.          Okay.  This would be -- this would be work
7    that you would actually do when you were physically at
8    the car dealership, correct?
9    A.          Yes.
10   Q.          Okay.  Would there be work that you performed
11   for dealerships off premises?  Like back at Voynow's
12   offices?
13   A.          I put the trial balance in, math the tax
14   return.  I didn't really do anything with the tax
15   return in regards to like preparing it.
16   Q.          Back at Voynow's offices, would you also
17   provide your supervisors with reports, or like a
18   summary of the work that you did at a particular
19   dealership?  Whether or not it was ROs or receivables
20   or payables?
21   A.          I believe we would do that if -- unless if we
22   left, then it would be done and be checked the next
23   day.  And if -- if we had time that day then we would
24   just do it there.
25   Q.          Okay.  And would you give that information to
```

John Breslin
November 17, 2022

 1   your supervisor?

 2   A.        I would give it to Randall Franzen.  If he

 3   was the guy there that was doing that.

 4   Q.        Okay.  And do you have any recollection of

 5   how many dealerships you visited when you were at

 6   Voynow?

 7   A.        A dozen.  I don't know.  It's a guess.

 8   Q.        Okay.  And do you have a recollection of the

 9   names of any one of them?  For instance, you went to

10   Star, correct?

11   A.        Yeah.  Peruzzi.  I think I was at Kerbeck.

12   Runnemede.  Toyota.  Mike AT & T or something.  I don't

13   know.  That's the wrong name probably.  Sloane.  I

14   don't know.  There's probably more.  Thompson.

15   Q.        And do you have any recollection of what time

16   of year you would do that?  Go to these dealerships?

17   Was there any particular time that you would go?

18   A.        Depends on what it was for.

19   Q.        Okay.  So let's say, for instance, if it was

20   for some type of a -- a tax service that Voynow was

21   providing, was there a certain period of time that you

22   would go to the dealership?

23   A.        Near the end of the year and then after.

24   Q.        Okay.

25   A.        Like a month later.

John Breslin
November 17, 2022

1    schedules?

2    A.        Yes.

3    Q.        Okay.  Is there anything that you did in

4    particular when you would look at these schedules?  In

5    terms of like tax returns for the -- for tax services?

6    A.        Yeah.  The same thing we would do -- look to

7    see how old they were, if they're going to be

8    collected.  Or paid.

9    Q.        Okay.  Would you also look at ROs as well?

10   A.        I don't remember doing that there.  Or at

11   that time.  Maybe.  I don't know.

12   Q.        Okay.  You have a recollection of doing

13   payables and receivables.  So let me ask you this, with

14   the ROs, my understanding is that that's when you would

15   have to go out and physically go onto the lot to make

16   sure that the car was there, correct?

17   A.        Yes.

18   Q.        Okay.  Do you have any recollection of doing

19   that in the colder months?  Like in that November,

20   December, January, February, time period?

21   A.        Not really.

22   Q.        Okay.  Do you have a recollection of looking

23   at -- doing this RO work during the, like, summer

24   months?

25   A.        Yes.

John Breslin
November 17, 2022

```
1    Q.        Okay.

2    A.        I mean maybe -- maybe we did.  I don't

3    remember.

4    Q.        Okay.

5    A.        I just don't remember freezing doing it.

6    That's what I don't remember.  I just remember

7    sweating.

8    Q.        Right.

9    A.        So.

10   Q.        Right.  And generally you're going to sweat

11   in the summertime, not in the wintertime, correct?

12   A.        I would think.

13   Q.        Okay.  Did anyone at Voynow explain to you

14   why you were looking at these ROs in the summertime

15   verifying that the cars were actually on the lot?

16             MS. FITZGERALD:  Object to form.

17             THE WITNESS:  Just to make sure they

18        were there.  Just so it wasn't just like

19        they -- a fake RO.

20   BY MR. LABUDA:

21   Q.        Okay.  And if there was a fake RO, what would

22   that kind of mean?  What would that mean to you?

23             MS. FITZGERALD:  Objection.

24        Hypothetical.

25             THE WITNESS:  What would that mean to
```

John Breslin
November 17, 2022

```
1   Q.         All right.  And when you went to -- if you

2   know there were a couple, did you physically go to each

3   one of those stores?

4   A.         Each service department.

5   Q.         Each service department.  And that was for

6   the RO work, correct?

7   A.         Yes.

8   Q.         Okay.  Do you have any understanding of what

9   your colleagues did at Star?

10  A.         I don't know.  Checked the books.

11  Q.         Do you have any understanding of what the

12  purpose was to make this visit like in the summertime?

13                 MS. FITZGERALD:  Object to form.

14                 THE WITNESS:  It was an interim visit.

15             I don't know.

16  BY MR. LABUDA:

17  Q.         Did you have an understanding that interim

18  visits were separate and apart from tax visits?

19                 MS. FITZGERALD:  Object to form.

20                 THE WITNESS:  Well, I would assume.

21             Because if they're in the summer.  I mean,

22             wouldn't that be normal?  Common sense.  I

23             don't know.

24  BY MR. LABUDA:

25  Q.         Well, not to a non accountant like me.
```

John Breslin
November 17, 2022

1          MS. FITZGERALD:  Objection.

2          THE WITNESS:  I don't see it.

3    BY MR. LABUDA:

4    Q.        Okay.  And where -- where would you

5    characterize the interim visit services out of these

6    one, two, three -- five different services that are

7    listed here?

8    A.        Where would I?

9    Q.        Yeah, where would you put them?

10   A.        Accounting and reporting.

11   Q.        So the first one?

12   A.        I guess I would.

13   Q.        Okay.

14   A.        Why does that matter, What I care, or what I

15   would say?

16   Q.        You worked there, you know.  You're entitled

17   to your view.  So let's look at Exhibit-1.

18   A.        You want this back?

19   Q.        Sure.  Thanks.  I'm going to show you what

20   has been marked as Exhibit-1.  Ask if you've ever seen

21   this document before.

22   A.        Have I seen this document?  No.

23   Q.        Okay.  Have you seen --

24   A.        Something similar, yes.

25   Q.        Yes.  Okay.  And are these the letters that

```
 1              the record.

 2                         *    *    *

 3              (Whereupon, a short break was taken.)

 4                         *    *    *

 5              THE VIDEOGRAPHER:  11:50 a.m., we're

 6       back on the record.

 7  BY MR. LABUDA:

 8  Q.        I'm showing you what's been marked as

 9  Exhibit-28.  Have you ever seen this document before?

10  A.        Looks familiar.

11  Q.        This is a list of schedules from Star

12  Chrysler Jeep Dodge and other dealerships at Star,

13  correct?

14  A.        It looks like a schedule file report.

15  Q.        Okay.  That's what it says, right?

16  A.        Yes.

17  Q.        Schedule file report.  For each of the

18  different dealerships, correct?

19  A.        Yes.

20  Q.        Would these generally get printed out at the

21  beginning of a visit in order to know what schedules

22  existed at a particular dealership?

23  A.        I know schedules were printed.  I don't know

24  if this was used.

25  Q.        Okay.  And in terms of looking at these
```

John Breslin
November 17, 2022

1    particular, you know, schedule file reports for the

2    different dealerships, in reviewing it, does it refresh

3    your recollection, in terms of various schedules that

4    you may have looked at at Star?

5    A.       I don't know what I looked at at Star.

6    Q.       Yeah, what I'm asking is, now that you see

7    that there's a -- let's say a list of 18 different

8    schedules on the first page of this exhibit, does that

9    help refresh your recollection in terms of looking at

10   any other exhibits other than the -- or schedules other

11   than the ones that you've already testified to?

12   A.       Maybe.  Maybe.  Maybe like service and parts.

13   Maybe.  Maybe payables.

14   Q.       Service and parts, that would be Schedule 5

15   here, right?  And payables is Schedule 18, correct?

16   A.       Correct.

17   Q.       And do you have an understanding of, in terms

18   of reviewing a service and parts schedule, what it --

19   what it is that you would do with respect to that

20   review?

21   A.       Service and parts, it would be the same thing

22   as the regular receivables.  So I -- I think for

23   service and parts, there's a service and parts manager,

24   though.  So if I did do that there, I think I would

25   have talked to the service and parts manager.

John Breslin
November 17, 2022

1  Q.        And that's in terms of looking at aged

2  receivables?

3  A.        Yeah.

4  Q.        Okay.  And then the accounts payable, that's

5  who you -- I think you were testifying to earlier, it's

6  an -- it's an aged payable and you wanted to identify

7  whether or not that payable was actually going to get

8  paid to a particular vendor, correct?

9  A.        Yes.

10  Q.        Let's look at Exhibit-34.

11                           *    *    *

12               (Whereupon, the above-mentioned document

13               was marked for identification as Exhibit-34.)

14                           *    *    *

15  BY MR. LABUDA:

16  Q.        I'm going to show you what's been marked as

17  Exhibit-34.  Take a moment to look at this and let me

18  know when you've had a chance to review?

19  A.        Raphael Vargas, huh?

20  Q.        Blast from the past?

21  A.        Var is a legend.  All right.

22  Q.        Okay.  And I'll make a representation that

23  these were billing records that we received from

24  Voynow.  You see their Bates stamp number on the bottom

25  right-hand corner, it says Voynow?

John Breslin
November 17, 2022

1   notes on the -- on the schedule that -- in terms of

2   that, they were all current as per Vivian?  Or any

3   notes on the actual schedule?

4   A.        On the actual schedule?

5   Q.        Yeah.

6   A.        I don't know.  I might have just took the

7   schedule to her and said what's the deal with them and

8   then she said they're current.

9   Q.        Would this be a document that you would

10  create at Star's offices, or would this be a schedule

11  that you would make at -- or --

12  A.        This?

13  Q.        These work papers --

14  A.        I would probably make it at the office.

15  Q.        Okay.  So --

16  A.        I would -- I think.  I think some places it

17  depended on the time.

18  Q.        Right.  But -- and if -- if you made these

19  work papers at Voynow, you had to rely on notes or

20  papers that you obtained while you were at Star in this

21  particular instance, correct?

22                  MS. FITZGERALD:  Objection.

23                  THE WITNESS:  Well, I would have notes,

24          yeah, on the paper.  Or if I did it there,

25          then.

John Breslin
November 17, 2022

1   BY MR. LABUDA:

2   Q.        Would you -- do you have a recollection of

3   calling Vivian or Debbie?

4   A.        No.  Never.

5   Q.        Okay.  So any of the information obtained

6   here would be information that you obtained when you

7   were at Star, and then you would make these work papers

8   at --- at Voynow's offices, correct?

9   A.        If we didn't have time to do it there.

10  Q.        Okay.  And with the schedules that you

11  reviewed, that are attended with these work papers,

12  what did you do with them?  Like would you give them to

13  Randy?  Would you put them in storage?

14  A.        I would give them to somebody.  Whoever --

15  Randy or whoever.  And then they would take them back.

16  Like earlier you asked, I don't -- I never took them

17  back.  So I guess they took them.

18  Q.        Okay.  And then let's look at the last page.

19  Sheet name 294.  Again, this is another work paper of

20  yours, correct?

21  A.        Yep.

22  Q.        And it's for "Advance to employee", do you

23  see that?

24  A.        Yep.

25  Q.        Do you have any understanding what that

John Breslin
November 17, 2022

```
1              MS. FITZGERALD:  Object to form.

2              THE WITNESS:  Yeah.  I guess I would

3         write this up.

4    BY MR. LABUDA:

5    Q.        Okay.  And in terms of performing that RO

6    task, would you also speak with the service manager?

7    In this case Toyota.

8              MS. FITZGERALD:  Objection to form.

9              THE WITNESS:  It's either the service

10        manager or the service, like, person that was

11        in charge of that vehicle.  If there was more

12        than one.  There were some places that had a

13        manager, but then they also had four service

14        writers.  So like, oh, no, he's in charge of

15        that person.  So I would ask.

16   BY MR. LABUDA:

17   Q.        Okay.  And your -- one of the tasks, in terms

18   of the RO list, was to determine the status of

19   particular repair orders that hadn't been paid,

20   correct?

21   A.        Well, yeah.

22   Q.        And I know -- note in here that, it says,

23   "ROs aged five place days with the service advisors",

24   do you see that?

25   A.        Yep.
```

John Breslin
November 17, 2022

1    Q.        All right.  I'm going to show you Exhibit-21.

2    I'll ask you to take a look at this.  And if you just

3    look at the first, let's say three pages, I'd say.  I

4    take it back.

5    A.        Second page?

6    Q.        Yeah.  Well, we can go page by page.  If you

7    look at the second page.  So this is Voynow Bates stamp

8    8783.  And this is in reference to an accrued

9    commission schedule at Star Toyota.  Correct?

10   A.        Yep.

11   Q.        Okay.  And there's a column, probably like

12   five columns over.  It says employee name?

13   A.        Yep.

14   Q.        Do you see that?  At the bottom of this, you

15   see three entries that all begin with PTSN?

16   A.        Yep.

17   Q.        Does that look unusual to you?

18   A.        I never looked at one of these schedules in

19   my life.

20   Q.        Okay.

21   A.        So I would not know.

22   Q.        Okay.

23   A.        But it's not a name.  That I do know.

24   Q.        Okay.  Right.  You don't remember looking at

25   accrued commission schedules at any dealership --

John Breslin
November 17, 2022

```
 1   A.         No.

 2   Q.         -- is that fair?  Okay.  But does it stand

 3   out to you as something unusual, the PTSN entries?

 4                   MS. FITZGERALD:  Objection.

 5                   THE WITNESS:  Well, it's not a name.

 6   BY MR. LABUDA:

 7   Q.         Right.  Would it be something that you would

 8   inquire further over, since it's not names that --

 9   A.         Probably not.  I wasn't there.

10   Q.         If you -- if you did see this schedule.

11                   MS. FITZGERALD:  Objection.

12               Hypothetical.  He wasn't there.  He says he

13               didn't see it.

14                   MR. LABUDA:  Yeah.  That's okay.  He can

15               still answer.

16                   MS. FITZGERALD:  Object to form.

17   BY MR. LABUDA:

18   Q.         That's fine.

19   A.         The end of 2012.  I didn't really give a shit

20   in '11, so I definitely didn't care in '12.  So, yes,

21   it's not a name.

22   Q.         Right.  And my question is, just like with

23   the extras, would this be something that you would ask

24   questions about?

25                   MS. FITZGERALD:  Objection.
```

John Breslin
November 17, 2022

```
 1              Hypothetical.
 2   BY MR. LABUDA:
 3   Q.        You can answer.
 4   A.        Me?  No.  I wouldn't care.  So how's that
 5   answer?
 6   Q.        Okay.  Is it fair to say that it does look
 7   unusual to you, but you wouldn't have raised these
 8   issues, because you didn't care?
 9              MS. FITZGERALD:  Objection.  You're
10              totally mischaracterizing his testimony.  He
11              said he never looked at accrued commissions,
12              first off.  And then he said he was never
13              there in 2012.
14              MR. LABUDA:  I'm not asking that
15              question now.
16              MS. FITZGERALD:  Yeah, you are.
17              MR. LABUDA:  I am not.
18              THE WITNESS:  I said there is no name on
19              there.
20   BY MR. LABUDA:
21   Q.        Right.  But I'm saying --
22   A.        So if Billy Blank is getting paid this, that
23   would be pretty weird.  That's all -- whatever.  Would
24   I look into it?  Depends on how I felt that day.
25   Q.        Okay.  The next page after that has those
```

John Breslin
November 17, 2022

1   Q.        Okay.  A few pages after that, about four

2   pages, there is a sheet name 1500, dash, 1571, do you

3   see that?

4   A.        Yep.

5   Q.        Okay.  And this one has a WIP Mechanic Labor.

6   Do you have any understanding what that is?

7   A.        It's work in progress.  In process.

8   Whatever.

9   Q.        Okay.  Work in progress, right.  And it says

10  "Balance correct per Debbie", do you see that?

11  A.        Yep.

12  Q.        Do you know what the process would be to --

13  to -- you know, for you to make that particular entry?

14  Would it just be as simple as looking at the balance,

15  asking Debbie, and her saying it's correct?

16            MS. FITZGERALD:  Object --

17  BY MR. LABUDA:

18  Q.        And that would be it?

19            MS. FITZGERALD:  Object to form.

20            THE WITNESS:  Going by this I asked her

21            and she said it's correct.

22  BY MR. LABUDA:

23  Q.        Okay.  And is it fair to say that you would

24  have had to review, in detail, each one of these

25  particular schedules in order to create these work