# EXHIBIT 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x
STAR AUTO SALES OF BAYSIDE, INC.
(d/b/a STAR TOYOTA OF BAYSIDE), STAR
AUTO SALES OF QUEENS, LLC (d/b/a
STAR SUBARU), STAR HYUNDAI LLC
(d/b/a STAR HYUNDAI), STAR NISSAN,
INC. (d/b/a STAR NISSAN), METRO
CHRYSLER PLYMOUTH INC. (d/b/a STAR
CHRYSLER JEEP DODGE), STAR AUTO SALES
OF QUEENS COUNTY LLC (d/b/a STAR
FIAT) and STAR AUTO SALES OF QUEENS
VILLAGE LLC (d/b/a STAR MITSUBISHI),

                         Plaintiffs,

           -against-                    Case No.
                                        18-cv-05775
VOYNOW, BAYARD, WHYTE and COMPANY,      (ERK)(TAM)
LLP, HUGH WHYTE, and RANDALL FRANZEN,

                         Defendants.
--------------------------------------x

                         March 22, 2022
                         10:24 a.m.


        Deposition of SHAWN McCORMACK, taken by

Plaintiffs, held at the offices of Milman Labuda

Law Group PLLC, 3000 Marcus Avenue, Suite 3W8,

Lake Success, New York, before Joseph Danyo V,

a Shorthand Reporter and Notary Public within

and for the State of New York.



Job No: 4430

Page 49

```
 1                        McCORMACK
 2      correct?
 3                   MS. FITZGERALD:  Object to form.
 4                   Go ahead.
 5            A.    The only reason that those customers
 6      were receiving review engagements were due to
 7      bank agreements where they were required to
 8      provide accountant-reviewed financial statements
 9      to banking partners.  Clients that did not have
10      those requirements from their banking partners
11      would opt for tax almost exclusively.
12            Q.    What is the difference in price
13      between a tax engagement versus a review
14      engagement?
15            A.    I don't know exactly, but the ones
16      that I worked on, it was generally about double
17      the price for the review engagement.
18            Q.    Did you exclusively do review
19      engagements in person or did you ever do them
20      remotely?
21            A.    I didn't, I never did any engagement
22      remotely.
23            Q.    So all the work you did for the
24      dealership clients was at the dealership?
25            A.    We would do work back in the office
```

Page 50

1                                    McCORMACK

2       after we had gathered everything at the

3       dealership, but all the fieldwork was conducted

4       at the dealership locations.

5              Q.   So a review engagement which entailed

6       one or two more visits per year was double the

7       price of a tax engagement?

8              A.   It wasn't because of the visits per

9       year, it was because of the additional time that

10      had to be spent on analytical reviews, review

11      specific checklists and putting together

12      financial statements and an accountant opinion.

13             Q.   How long would the visits be each

14      time that you performed a visit related to a

15      review engagement?

16                  MS. FITZGERALD:   Object to form.

17             A.   It would depend on the client.

18             Q.   What was, in your experience, the

19      average amount of days that you spent each visit

20      for a review engagement?

21                  MS. FITZGERALD:   Object to form.

22             A.   My experience was that generally it

23      would be approximately, let's call it one and a

24      half man-days for a tax engagement and three to

25      three and a half man-days for a review

Page 83

1                           McCORMACK

2           A.    -- specifically.

3           Q.    For Voynow clients that the review

4    engagement was being performed for, how would the

5    customers know what was being done for each

6    visit?

7           A.    How would they know?

8           Q.    Yes.

9           A.    You would communicate with them

10   probably verbally, and you would -- they would

11   know at the end when they got a financial

12   statement, bound financial statement packet for

13   them to present to their banks or whoever

14   their -- needed, it would be banks, creditors.

15   Other places like that.

16               MR. FELSEN:  Mark this Exhibit 5.

17               (Plaintiffs' Exhibit 5, Time report,

18                was so marked for identification, as of

19                this date.)

20          Q.    Okay, Mr. McCormack, so I'm showing

21   you what we've marked as Plaintiffs' Exhibit 5.

22          A.    Um-hum.

23          Q.    These are documents that have various

24   Bates stamp numbers at the bottom that begin with

25   Voynow, indicating that these are documents that

Page 84

1                         McCORMACK

2       were produced by Voynow in this litigation.

3               A.    Um-hum.

4               Q.    Are you familiar with this sort of

5       document?

6               A.    Yes.  This is a time report.

7               Q.    This is related to what you testified

8       about previously where you would input your time

9       for all your tasks performed at customers, is

10      that correct?

11              A.    Um-hum.

12                    MS. FITZGERALD:  You have to say yes.

13              A.    Yes.

14              Q.    I just want to direct your attention

15      to towards the bottom of the page where it has

16      your name, and we've highlighted your name there.

17              A.    Um-hum.

18              Q.    A little bit above your name it says

19      "INT SER other services use memo."

20              A.    Um-hum.

21              Q.    Do you know what that refers to?

22              A.    That would be interim services.

23              Q.    What does interim services mean?

24              A.    It means in between your year-end.

25              Q.    That doesn't reflect tax work being

Page 85

1                          McCORMACK

2       performed, correct?

3              A.   Interim services is actually just an

4       internal code that we would use.  It would not

5       reflect any specific sort of work.  It would

6       reflect an in between in the middle of the year

7       type work that would be indicative of whatever

8       the overall engagement was.

9              Q.   What does other services reflect?

10             A.   Well, that's not where I bill my

11      time.  My time was billed to letters of --

12      letters to client prep.

13             Q.   Okay, so you're saying the other

14      services is for Raphael Vargas on this page?

15             A.   Um-hum.

16             Q.   Your time is for interim services,

17      letters to client prep?

18             A.   Yes.

19             Q.   Okay, and in the course of performing

20      tax work, what kind of letters would you send to

21      clients?

22             A.   It would be during our interim time.

23      It would basically be a summary of their

24      schedules and their other things and things that

25      were on there that they needed to look at and

Page 89

1                              McCORMACK

2              A.    We bring food for ourselves and the

3       client, and yes, it's not necessarily every day.

4       It might be one time in a visit.

5              Q.    Your name is highlighted here, so

6       what does this represent?  The 40 that's entered

7       there, what is that?

8              A.    That's my employee number.

9              Q.    Okay.  What's 666?  Do you know what

10      that represents?

11             A.    Mileage.

12             Q.    Okay.

13             A.    It was the mileage reimbursement for

14      driving.

15             Q.    Going down a little bit further,

16      there is a reference for Randy for Hotel Andrew.

17             A.    That was the overnight stay for the

18      whole staff.

19             Q.    How many staff members would go?

20             A.    I don't know how many were on this

21      job specifically.  It could be six.  It could be

22      four.  It could have been eight.  I don't know.

23             Q.    Okay.  Let's turn the page to Voynow

24      24606.

25             A.    Um-hum.

Page 90

1                          McCORMACK

2          Q.   Right above where your name is

3     highlighted here, there is ten hours for Mr.

4     Seibel, and it looks like for interim services,

5     and then it says interim visit planning.  Do you

6     see that?

7          A.   Yes.  I believe it's two hours for

8     Mr. Seibel and eight hours for Mr. Kirkhope.

9          Q.   Okay, and what is that referencing,

10    interim visit planning?

11         A.   Generally it would be gathering

12    together all the information we need to bring

13    with us, making sure that we had all the prior

14    year tax returns and work papers and everything

15    else so that we were ready to go out into the

16    field.  Probably the next day, possibly the next

17    week, depending on how tightly we were scheduled.

18         Q.   Shouldn't that have been billed to

19    business tax work?

20         A.   Probably, because that was probably

21    to prepare for the tax planning visit, but I

22    don't know, I don't know this situation behind

23    all of it.

24         Q.   Do you think that Mr. Seibel made the

25    same mistake that Mr. Vargas made?

Page 91

```
 1                         McCORMACK

 2              A.   I don't know.

 3                   MS. FITZGERALD:  Object to form.

 4                   Go ahead.

 5              A.   I don't know why that billing was

 6         there or whether it should have been there or

 7         not.

 8              Q.   Okay.  Let's turn to the next page,

 9         Voynow 24607.

10              A.   Um-hum.

11              Q.   There is an entry right under your

12         name by Randy for, it says "Go to New York and do

13         an interim visit.  Meet with Mike, John, Steve

14         and Senior."  Did you generally all meet with all

15         four of them when you went to Star?

16                   MS. FITZGERALD:  Is that -- wait.  Is

17              that his entry?

18              A.   That's not my time entry.

19              Q.   I'm just asking you.  Do you know if

20         you were there for that visit?

21              A.   Yes.  I was there for that visit.  I

22         don't know exactly who Randy would meet with.  He

23         met with generally some or all of the Koufakises

24         every single time we were up there.  I couldn't

25         tell you, I don't know if in 2013 who he met with
```

Page 92

1                              McCORMACK

2        on that visit.

3               Q.    A little bit below that right under

4        Randy's name, it says INT SER REV. ledger and

5        schedules?

6               A.    Um-hum.

7               Q.    What is that referring to?

8               A.    That means interim services.  We

9        looked at the schedules and the trial balances,

10       which if you look at the total hours, it's really

11       a combination of all the people that billed to

12       that time code, which is a lot of me.

13              Q.    If that was tax work, wouldn't it

14       have been billed to business tax?

15              A.    No.  We would not have billed that to

16       business tax.  Just because it was an interim

17       visit.  It was how we segregate it, what time of

18       year we were there.  It doesn't make it any

19       different from the tax work.  It's just the time

20       of year we would go.

21              Q.    Towards the bottom right above your

22       name of this page, it says INT SER income tax

23       project end EX.

24              A.    Um-hum.

25              Q.    So that reflects time for actual tax

Page 93

1                        McCORMACK

2    work, correct?

3           A.   Yes, so this was an -- there was a

4    code that we used.  It was -- yes, it was

5    interim/tax planning, but it was the tax-related

6    code, but it was also an interim code.

7           Q.   Why was this code, this income tax

8    project end EX not used for these other entries

9    that you say were tax work?

10          A.   I couldn't tell you.

11          Q.   Okay.  Let's turn to the next page,

12   Voynow 024640.

13          A.   Um-hum.

14          Q.   There are some entries here for you

15   that are highlighted, and under one of the

16   entries it says "Spoke with Vivian on the phone

17   and followed up on questions she had regarding

18   year-end."  Do you see that?

19          A.   Um-hum.

20          Q.   Who is Vivian?

21          A.   Vivian was the controller at Star.

22          Q.   Vivian Karouzakis, correct?

23          A.   Yes.

24          Q.   Do you know what you spoke with her

25   about for two hours?

1                           McCORMACK

2              A.   It's not mine.  I don't know whose it

3    is.

4              Q.   Do you know under what circumstances

5    these time records would be marked up like this?

6              A.   Yes.  We would routinely go through

7    the time records to classify what all the time --

8    where it needed to be applied bill-wise, and

9    you're asking about people billing stuff to the

10   wrong places.  It was common, and you would have

11   to correct where their stuff was billed.  Like

12   you couldn't change it.  You just had to change

13   where it was supposed to go.  My guess is

14   somebody used this to put together a spreadsheet

15   to figure out how the time really got divided up.

16             Q.   When do tax returns need to be filed

17   for Star, what time of year?

18             A.   Generally tax returns were not filed.

19   They were generally extended and filed either

20   September 15th or October 15th, but it would be a

21   December 31st year-end.

22             Q.   On this document that we're looking

23   at, there is time here for, I'm looking right

24   above your name, for INT SER interim visit

25   planning, and it's for -- in May of 2011.

Page 98

1                              McCORMACK

2              A.    Um-hum.

3              Q.    What would be the purpose of having

4       an interim visit solely related to tax work when

5       the tax return wasn't due for many months later?

6              A.    You'd be looking at actually not

7       2010's books.  You'd be looking at 2011's books.

8       This would be our first look at 2011.  We would

9       have been looking at 2010 all prior to that up to

10      extending the tax return on April 15th or

11      March 15th.  Whatever the due date was.  The May

12      would be the first time you go out to see what

13      has gone on since the end of the year to get

14      people back together for the coming year.  This

15      is a never-ending cycle.

16             Q.    That went for all of Voynow's

17      customers that were dealerships that exclusively

18      used Voynow for tax work, where you'd have

19      multiple visits, approximately three to four

20      visits per year?

21             A.    Not necessarily.  Many of them would

22      not want us out for those extra interim visits.

23      They would just want the tax planning year-end

24      visit.  They would specifically request that.

25             Q.    Was Star the only Voynow auto

Page 110

1                         McCORMACK

2      bank recs since February.

3              Q.   But for customers that you only went

4      once a year --

5              A.   We could run into that.  It's very

6      possible.

7              Q.   But for customers that Voynow only

8      visited once a year, Voynow only reviewed the

9      bank reconciliations once a year, correct?

10             A.   Because that's how -- we were only

11     there once a year, so yes.

12             Q.   You said that somebody would go to

13     the service department, so what did that entail?

14             A.   You would print out a list of open

15     ROs, repair orders, or parts tickets or both.

16     Then you would go into the Reynolds system, and

17     any of -- any open ROs that would be older than a

18     certain time frame, it might be a week, it might

19     be ten days, you would look to see if there was

20     any money charged on the RO.

21                  Then you would go down to the service

22     department to see if the cars were still on the

23     lot and that's why the ROs were open, and if the

24     cars were still here you really didn't have to go

25     much further than that.  It was just incomplete

Page 111

1                              McCORMACK

2      service work.  If the cars -- if they couldn't

3      account for the cars or there was a story behind

4      them, you would get the story behind them as to

5      why the RO wasn't closed yet, and you would just

6      report that.  The idea was that all the ROs for

7      all the work that they had done should be closed,

8      because otherwise they would never hit their

9      general ledger.

10             Q.   Who would you speak to --

11             A.   I never went.

12             Q.   Who would Voynow speak to regarding

13     that issue?

14             A.   Generally they would speak to a

15     service manager.  It's possible they would speak

16     to a service writer.

17             Q.   Do you recall, was there a specific

18     employee that was assigned at Voynow to the

19     service department review?

20                  MS. FITZGERALD:  Object to form.

21             A.   There was no specific employee that I

22     can think of throughout all the time I was there.

23     It was generally one of the people in the one to

24     three-year range of employment of Voynow.

25             Q.   Who was assigned at Voynow to review

Page 166

1                          McCORMACK

2          Q.   What about the fact that these

3    entries contain large amounts in comparison to

4    some of the other ones that have employee names

5    and normal control numbers, does that raise a red

6    flag to you?

7               MS. FITZGERALD:  Objection.

8          A.   No.

9          Q.   In your current job at the

10   dealership, do you make entries like these last

11   few on this document?

12         A.   100 percent.  Every month.

13         Q.   Entries that have no employee name on

14   accrued commissions?

15         A.   Um-hum.

16              MS. FITZGERALD:  You have to say yes.

17         A.   Yes.

18         Q.   How do you get those entries to go

19   away?

20              MS. FITZGERALD:  Objection.

21         A.   At Sloane I reverse them in the

22   subsequent month when the actual payroll that

23   they relate to is paid.

24         Q.   On this document at the bottom

25   somebody wrote "All okay per Viv."  That's not

Page 167

1                              McCORMACK

2          your handwriting, is it?

3                    A.    It's not my handwriting.

4                    Q.    Do you know whose handwriting that

5          is?

6                    A.    I do not know.

7                    Q.    Do you have any knowledge about what

8          Vivian's explanation was with respect to these

9          entries?

10                   A.    No.

11                   Q.    In your experience in the auto

12         industry, would these sort of entries show that

13         somebody may be stealing money?

14                   A.    No.

15                   MS. FITZGERALD:   Objection.

16                   Q.    Let's turn the page.

17                   A.    Um-hum.

18                   Q.    Voynow 000807.

19                   A.    Um-hum.

20                   Q.    Is there anything on here that would

21         raise a concern for you?

22                   MS. FITZGERALD:   Objection.

23                   You can answer.

24                   A.    No.

25                   Q.    What about the last entry on this

Page 168

1                          McCORMACK

2       page?

3              A.   It's a zero-day entry for 3755 Toyota

4       12/31.  I can't guess at what exactly this is.

5       However, it would be standard for a month-end

6       accrual entry.

7              Q.   Is it normal to have an even dollar

8       amount for a monthly accrual?

9              MS. FITZGERALD:  Objection.

10             A.   It's possible.  Accrual is an

11      estimate.

12             Q.   Is that a red flag if it's an even

13      number like that?

14             MS. FITZGERALD:  Objection.

15             A.   No.

16             Q.   Do you know whether Voynow discussed

17      this with anybody at Star?

18             A.   I can't tell from this document.

19             Q.   All right.  Let's turn the page to

20      Voynow 006670.

21             A.   Um-hum.

22             Q.   Is there anything on this page that

23      would raise an issue for you if you saw it?

24             MS. FITZGERALD:  Objection.

25             A.   No.

Page 169

1                          McCORMACK

2          Q.   Somebody wrote something on the top

3     next to number 1.  Do you know what that says?

4          A.   "Are accruals correct."

5          Q.   Is that your handwriting?

6          A.   No.

7          Q.   Do you know who wrote that?

8          A.   I don't know for sure.

9          Q.   Do you know whose handwriting that is

10    where it says "Okay"?

11         A.   No.

12         Q.   The control number TOI1015, that

13    doesn't raise an issue for you?

14              MS. FITZGERALD:  Objection.

15         A.   It would be something that I would

16    look into one step further.  Whoever did this,

17    the okay and the circle around it would indicate

18    that they took that extra step to check the

19    accrual.

20         Q.   Now, this report was ran, according

21    to the top, on November 23rd, 2015, correct?

22         A.   Yes.

23         Q.   Do you see any issue with having

24    commissions on a November 23rd, 2015 report from

25    October 1st, 2015?

Page 170

1                          McCORMACK

2              MS. FITZGERALD:  Objection.

3         A.    No.  There is -- no.

4         Q.    There is no issue with that?

5         A.    No.  It might not have been reversed.

6    I don't see an 11/15 yet, so they may not reverse

7    their October commission accrual until they do

8    their November commission accrual.  It might have

9    been standard practice.  You're in between

10   months.

11            Q.    This wasn't reversed.  Is that what

12   you're saying?

13            A.    At this point in time it wasn't

14   reversed.  Their standard of practice might be to

15   do the November, I don't know, the November

16   commission accrual and reverse the October

17   commission accrual on the same day, and they

18   might have dated that entry on 11/1, but they

19   probably wouldn't have posted that until the end

20   of the month.

21            Q.    You don't know that that --

22            A.    I don't know for sure.

23            Q.    -- was Star's practice, correct?

24            A.    I don't know.

25            Q.    If that wasn't their practice, would

Page 171

1                        McCORMACK

2       there be an issue here?

3                    MS. FITZGERALD:  Objection.

4              A.    I don't think so.

5              Q.    Why not?

6              A.    I would have asked about the accrual,

7       which looks like somebody did, and it wouldn't be

8       necessarily an issue.

9              Q.    Would it be Voynow's practice to just

10      take the word of whoever it is that provided the

11      explanation when inquired about it?

12             A.    For something like this, 100 percent,

13      yes.

14             Q.    Let's turn the page to Voynow 008844.

15             A.    Um-hum.

16             Q.    Are there any issues on this page

17      that you see?

18                    MS. FITZGERALD:  Objection.

19             A.    I don't -- this looks like just a

20      page out of a general journal entry.  I don't

21      know what it refers to or anything like that.

22      There is nothing that I would have -- I don't

23      know what it is.

24             Q.    Let's turn the page to Voynow 008805.

25      This is a list of the various account numbers and

Page 172

1                    McCORMACK
2        a description.  Toward the bottom is 247 and 301,
3        which are contained on the prior page.  247 is
4        Work in Process Labor.  Do you see that?
5             A.    Um-hum.
6             Q.    301 is We Owe?
7             A.    Um-hum.
8             Q.    Do you see that?
9             A.    Um-hum.
10            Q.    Okay.  Now, let's go back to the
11       prior page, 8804.
12            A.    Okay.
13            Q.    It's a standard month-end statistical
14       entry, correct?
15                 MS. FITZGERALD:  I'd just like a
16                 continuing line of objection, so I don't
17                 have to keep objecting to questions on 844
18                 and 845, these two documents.
19                 MR. FELSEN:  What's that?
20                 MS. FITZGERALD:  Continuing
21                 objection.  I mean these are -- you
22                 don't -- you haven't established that
23                 Voynow even looked at any of these, so
24                 rather than my objecting to every single
25                 question, I'm just going to ask for a

Page 173

1                          McCORMACK

2          continuing objection on the record.

3                    MR. FELSEN:  Well, Voynow produced

4          these records, didn't they?  I mean you

5          guys produced them in discovery.

6          A.    This is printed out of Star's system,

7     so these are just Reynolds' reports.  Because

8     they were in the work papers, nobody produced

9     these.  They just printed them.

10         Q.    All right.  The document reflects

11    that these were produced by Voynow in discovery.

12    We'll leave it at that.

13         A.    Okay.

14         Q.    Are you familiar with this page?

15         A.    I have no idea what this is.  I don't

16    know what this entry is.  I've never seen it

17    before.  I don't know what it is.

18         Q.    It's a standard month-end entry.

19         A.    Okay.  If you say so.  I don't know

20    what this entry specifically is about.

21         Q.    Would you ever offset using the We

22    Owe account?

23         A.    The We Owe and the Work in Process

24    account?

25         Q.    Yes.

Page 174

1                        McCORMACK

2           A.   Definitely.  Work in Process is done

3      in the shop to do work for something that you owe

4      on a vehicle.  That's exactly where I would do

5      it.  Especially if it was somebody, a customer

6      returning to get something done that was owed on

7      a vehicle that we sold.

8           Q.   Do you see the control number Extra

9      next to 301?

10          A.   Yes.

11          Q.   That's an extra on a We Owe account.

12     Does that look suspicious to you?

13          A.   It doesn't.  I mean I'll be honest

14     with you, it looks lazy.

15          Q.   Why do you say that?

16          A.   It looks like they offset Work in

17     Process to the We Owe account and didn't identify

18     the specific We Owes on this schedule and used a

19     bulk account and then figured that they would

20     offset it later.

21          Q.   If you saw something like that, would

22     you bring it to the attention of your superior at

23     Voynow?

24          A.   I don't know that I would have ever

25     seen this.

Page 175

1                              McCORMACK

2            Q.   If anybody at Voynow saw this, would

3      it be their duty to report it higher up at

4      Voynow?

5                 MS. FITZGERALD:  Objection.

6            A.   I don't think so.

7            Q.   Why do you say that?

8                 MS. FITZGERALD:  I mean I think we're

9                 getting -- you're asking him about a

10                document that he's never even seen, and

11                now you're asking him for opinions on it.

12                Note my continuing objection to this whole

13                line of questioning, but --

14                MR. FELSEN:  Well, he's raised an

15                issue with the reference to Extra, so

16                he --

17                MS. FITZGERALD:  He's answering your

18                questions, because I'm not instructing him

19                not to answer.  It doesn't mean they are

20                proper questions.

21                MR. FELSEN:  But he's --

22                MS. FITZGERALD:  He's a fact witness.

23                MR. FELSEN:  He's identified an issue

24                here with the word "Extra" on a document,

25                on an accounting document.

Page 176

1              McCORMACK

2              MS. FITZGERALD:  No.  You asked him

3              the question.  I did not instruct him to

4              answer.  It doesn't mean the question is

5              proper.

6         Q.   Do you know whether anybody at Voynow

7    made a conclusion that this document represents a

8    red flag?

9         A.   I do not know.

10        Q.   Would you at your current job make an

11   entry like this with the control number Extra?

12        A.   I don't necessarily have an answer

13   for that.  I don't know.

14        Q.   Have you ever done an entry at your

15   current job using Extra?

16        A.   I've never used the control number

17   Extra.

18        Q.   Have you ever seen any other Voynow

19   dealerships' documents that use this type of

20   term, "Extra," on a control number?

21        A.   I don't even know exactly what the

22   term refers to, but I can't say for sure.  People

23   use different control numbers for different

24   stuff.

25        Q.   Let's turn two pages to 8828.

Page 177

1                            McCORMACK

2              MS. FITZGERALD:  Just mark on the

3         record that's the end of my standing

4         objection.

5         Q.    Have you ever seen this page before?

6         A.    No.  This is not my writing.  It's

7    not a company I looked at.

8         Q.    On the top left it says 11/24/2014

9    Voynow.  Does that reflect that this was run by

10   Voynow on that date?

11        A.    Yes.

12        Q.    This goes along with the next page,

13   Voynow 8830, correct?

14        A.    Okay.

15        Q.    This is Star Toyota of Bayside We

16   Owes as of November 24th, 2014, correct?

17        A.    Um-hum.

18        Q.    On the second page of this 8830, the

19   report shows a control number entitled REC0314

20   for $26,918.66, correct?

21        A.    Um-hum.

22        Q.    Then on the prior page it shows a

23   control number for BC0114 in the amount of

24   $6,669.10, correct?

25        A.    Um-hum.

Page 178

1                          McCORMACK

2          Q.   Somebody from Voynow documented on

3     this page that these amounts were for bank recs,

4     correct?

5               MS. FITZGERALD:  Objection.

6               You can answer.

7          A.   Yes.  They marked bank rec next to

8     it.

9          Q.   Do you know who wrote that, by the

10    way?

11         A.   No.

12         Q.   Do you know why Voynow concluded that

13    this was in fact part of the bank rec?

14              MS. FITZGERALD:  Objection.

15         A.   I have no idea.

16         Q.   Do you know why this is on a We Owe?

17         A.   I have no idea.

18         Q.   Do you know whether anybody at Voynow

19    questioned why these weren't given a profit?

20         A.   I don't know.

21         Q.   Does anything on this document raise

22    an issue from your review?

23              MS. FITZGERALD:  Objection.

24         A.   These are things I would have looked

25    at, but it's not an issue, and the notes here

Page 179

1                                    McCORMACK

2       would indicate that somebody did do something,

3       but I can't tell what they did or if they did

4       anything.

5                Q.   Have you ever seen anything like this

6       at any other of the other dealerships that you

7       provided services for when you were at Voynow?

8                     MS. FITZGERALD:  Objection.

9                A.   I've seen all sorts of things.  I

10      don't know specifically this stuff.

11               Q.   Have you ever seen this type of thing

12      at your current job?

13                    MS. FITZGERALD:  Objection.

14               A.   No.

15               Q.   You don't know what a bank rec has to

16      do with the We Owe here, correct?

17               A.   No.

18                    MS. FITZGERALD:  Objection.

19               Q.   It says cleanup schedules.  Do you

20      know what that means?

21                    MS. FITZGERALD:  Objection.

22               A.   No, I don't.  I'd have to look at the

23      details of these control numbers to see what it

24      even referred to.

25               Q.   This document, the first page of this

Page 180

1                              McCORMACK

2       document has a few entries with Extra as a

3       control number again.  Do you see that?

4              A.    Um-hum.

5              Q.    Do you know why there is a control

6       number with Extra in there again?

7              A.    Well, I don't know.  It says cleanup

8       schedules.  My guess is that it's a result of the

9       cleaning up schedules, but I don't know.

10             Q.    Okay.  Let's turn the page to 8830.

11      The last part of the handwriting here says "Viv

12      deposit on car."  Do you see that?

13             A.    I see it.

14             Q.    Do you know who concluded that --

15                   MS. FITZGERALD:  Objection.

16             Q.    -- that was a valid deposit for

17      Vivian's car?

18                   MS. FITZGERALD:  Objection.

19             A.    No.  I don't know.

20             Q.    Is it normal to have a stock number

21      with the initials of an employee, VK?

22                   MS. FITZGERALD:  Objection.

23             A.    No, but it's not a stock number.

24      It's basically saying this is from Vivian.

25             Q.    Why isn't this on the customer

Page 181

1                      McCORMACK

2    deposit?

3              A.   I don't know.  I can't answer that

4    question.

5              Q.   Do you know whether Voynow did any

6    research to determine if this was in fact a true

7    deposit for Vivian's car?

8              A.   I have no idea.

9              Q.   Now, with respect to the entry REC

10   0314, why is a March 2014 bank rec on a November

11   report?

12             MS. FITZGERALD:  Objection.

13             A.   Again, I don't know.  I didn't look

14   at it.  I don't know what this is.

15             Q.   If cleaning up schedules is the We

16   Owe, what would that have to do with Work in

17   Process from the prior page?

18             MS. FITZGERALD:  Objection.

19             A.   I have no idea.

20             Q.   All right.  Let's turn the page to

21   010729.

22             A.   Um-hum.

23             Q.   This is a Nissan Rebate and Incentive

24   report as of December 31st, 2010, run by Voynow

25   on January 28, 2011, correct?

Page 186

```
 1                          McCORMACK
 2     the last one, where it's over amounts of on
 3     incentives that are either income or waiting for
 4     chargeback.
 5          Q.   If you did in fact review this and
 6     you saw Extra Extra, you would have spoken with
 7     somebody at Star?
 8               MS. FITZGERALD:  Objection.
 9          A.   In theory, yes.
10          Q.   Do you remember having any
11     conversations with anybody at Star about any
12     suspicious entries with serial numbers or control
13     numbers using the word "Extra"?
14          A.   Not specifically.
15          Q.   Do you recall anybody at Voynow ever
16     discussing a serial number or a control number
17     with the term "Extra" being used in it?
18          A.   Not specifically.
19          Q.   All right.  Let's turn to the next
20     page, 7864.
21          A.   Um-hum.
22          Q.   This is another Nissan rebate and
23     incentive, and it's as of December 31st, 2013,
24     correct?
25          A.   Um-hum.
```

Page 187

```
 1                              McCORMACK
 2                Q.   This was run by Voynow, correct?
 3                A.   Um-hum.
 4                Q.   Do you know whose handwriting that is
 5           where it says --
 6                A.   That's my writing.
 7                Q.   You wrote "Extra money waiting for
 8           chargeback"?
 9                A.   And that would have been the answer
10           that I would have gotten from Vivian.
11                Q.   So you inquired about it and that was
12           her answer?
13                A.   And that was her answer that I wrote
14           on here.
15                Q.   You just took her word for it?
16                A.   That's what a tax engagement is.  It
17           seemed reasonable, and I had seen it in a
18           million -- at a lot of dealerships otherwise.
19           Control number is a control number that they
20           chose to use.  Different dealers use different
21           control numbers.
22                Q.   Would you question this page
23           differently if Star had a review engagement?
24                     MS. FITZGERALD:  Objection.
25                Q.   Or would you treat it the same way?
```

Page 188

```
1                          McCORMACK
2             A.   Again, I don't remember the
3       additional steps involved in a review engagement.
4       We would have started off this way.
5             Q.   There are documents reflecting Extra
6       control numbers, and now you see a control number
7       with Vivian's initials.  That didn't raise a red
8       flag at all?
9                  MS. FITZGERALD:  Objection.
10            A.   No.
11            Q.   This entry represents a large sum of
12      money, $74,693, correct?
13            A.   Um-hum.
14            Q.   You have to answer in words.
15            A.   Yes.
16            Q.   You didn't see a reason to go further
17      than just discussing it with Vivian?
18            A.   No.
19            Q.   Is it unusual to have a chargeback
20      55 days after the fact?
21            A.   I've seen chargebacks a year after
22      the fact.
23            Q.   Were any documents reviewed to
24      confirm that this was in fact a chargeback?
25            A.   No.  This was a tax engagement, so we
```

Page 189

1                              McCORMACK

2       just inquire and ask.

3              Q.   In all the years you worked at Voynow

4       did you see entries where control numbers

5       included the initials of the controller?

6                   MS. FITZGERALD:  Objection.

7              A.   I can't -- I don't know on anybody

8       else's.  I don't know.

9              Q.   At your current dealership are the

10      controller's initials used?

11             A.   I don't generally use my initials,

12      but, however, I do use my initials in my entries

13      so that I can identify that they are my entries.

14             Q.   Why wouldn't they post the payment to

15      the corresponding VIN numbers and leave it there

16      until a chargeback happens?

17                  MS. FITZGERALD:  Objection.

18             Q.   Rather than lump it to an Extra

19      control group?

20             A.   Why wouldn't they?  I don't know why

21      they wouldn't.  Generally what would happen with

22      us at Sloane is as things began to age out, so

23      that we weren't carrying aged items all over our

24      thing, we would reclass them to a lump, waiting

25      to hear back from the factory if we ever got a