# EXHIBIT 15

# In the Matter of

Case No. 18-cv-05775 (ERK)(TAM)

STAR AUTO SALES OF BAYSIDE, INC., et al.

v.

VOYNOW, BAYARD, WHYTE AND COMPANY LLP, et al.

---

## Deposition of Randall Franzen

*Wednesday, February 15, 2023*

---

The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x
STAR AUTO SALES OF BAYSIDE, INC.
(d/b/a STAR TOYOTA OF BAYSIDE),
STAR AUTO SALES OF QUEENS, LLC
(d/b/a STAR SUBARU), STAR HYUNDAI
LLC (d/b/a STAR HYUNDAI), STAR
NISSAN, INC. (d/b/a STAR NISSAN),
METRO CHRYSLER PLYMOUTH INC. (d/b/a
STAR CHRYSLER JEEP DODGE) STAR AUTO
SALES OF QUEENS COUNTY LLC (d/b/a
STAR FIAT) and STAR AUTO SALES OF
QUEENS VILLAGE LLC (d/b/a STAR
MITSUBISHI),

                         Plaintiffs,

            -against-                    Case No.
                                         18-cv-05775
VOYNOW, BAYARD, WHYTE AND COMPANY        (ERK)(TAM)
LLP, HUGH WHYTE, and RANDALL
FRANZEN,

                         Defendants.
------------------------------------x

                         February 15, 2023
                         10:37 a.m.

        Videotaped Deposition of RANDALL

FRANZEN, taken by Plaintiffs, held at the

offices of Milman Labuda Law Group PLLC,

3000 Marcus Avenue, Suite 3W8, Lake Success,

New York, before Lisa Hiesiger, a Shorthand

Reporter and Notary Public within and for the

State of New York.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

52

Franzen

2    product out of Voynow, excluding audits,

3    et cetera?

4         A.   Again I don't understand your

5    question but I'll try to answer what I think

6    you're asking me.  You asked me if I was always a

7    hundred percent there and I said probably

8    90 percent of the time.  That has nothing to do

9    with work product.  Again the work product could

10   have been handled by one of the other guys and I

11   would have been there.  So the 90 percent and the

12   work product are unrelated as to who did what

13   when.  I can't answer that as to percentages on

14   who did what when.

15        Q.   There was something called interim

16   reports or interim letters that were sent to Star

17   during the relationship, correct?

18        A.   Correct.

19        Q.   Ultimately you signed whatever

20   interim letters there were, you were the one who

21   signed them, right?

22        A.   Incorrect.

23        Q.   Someone else signed them?

24        A.   Different people had signed them.  I

25   definitely signed some but I did not sign them

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen --- February 15, 2023

57

Franzen

1

2 different issues on the letters.  So when it was

3 written up it was a follow-up of what we spoke to

4 them about.

5          Q.   Was there any time where you would go

6 over the entirety of what is contained in the

7 interim report with particular owners of the

8 dealership at Star?

9          A.   Repeat your question.

10          MR. MULÈ:  Can you read it back,

11 please.

12          (Record read)

13          A.   There were times that we discussed

14 everything in the letter that was going to with

15 the dealers.  When we could find them and when

16 they had enough time to sit with us.

17          Q.   What happened when they didn't have

18 enough time to speak with you?

19          A.   We would try to raise them on the

20 telephone, call them, hey, can I speak to, for

21 example, I would call and get Vivian to call

22 Michael.  Michael, I have some stuff to go over

23 with you.  He would tell me, I'm too busy, I

24 can't, go over everything with Vivian.  He goes,

25 I trust her with my life, tell Vivian and I'll

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

61

1                          Franzen

2          Q.    So you said you would hear the story

3     first from someone other than Michael, correct?

4          A.    Correct.

5          Q.    Who would that be?

6          A.    Either Debbie or Vivian.

7          Q.    And then when Michael came back, you

8     would have a discussion with Michael?

9          A.    He would tell me the story of what

10    happened.

11         Q.    And if you visited Star approximately

12    three times a year, would he tell you that in

13    person the next time you came or would there be

14    some other way you communicated when he would

15    tell you the story?

16         A.    He would tell me the story probably

17    the next time I saw him, whenever that was.

18         Q.    When Michael was back and the next

19    time you saw him, did you go over the report with

20    him then when he was back?

21         A.    Depends.

22         Q.    Depends on what?

23         A.    The mood Michael was in.

24         Q.    What about other owners, did you talk

25    to any of the other owners about the contents of

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

62

1                      Franzen

2      interim reports?

3            A.    Yes.

4            Q.    Who did you speak with?

5            A.    Steve Koufakis and John Koufakis.

6            Q.    Would you discuss the entirety of the

7      contents of the interim report with Steve?

8            A.    Depends.

9            Q.    Depends on what?

10           A.    How long I could get him to sit

11     there.

12           Q.    Was there ever an occasion where you

13     were able to discuss the entirety of the interim

14     report with Steve in person?

15           A.    Probably over a two-day span that we

16     were there, bits and pieces.

17           Q.    Over the time period that you were

18     there, you're talking about while you were there

19     during an interim visit?

20           A.    Correct.

21           Q.    So you would be providing him with

22     information while the visit was going on,

23     correct?

24           A.    Correct.

25           Q.    So on an interim visit would you

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

114

1                          Franzen

2         that you signed a document that states that

3         you're going to keep your records intact and

4         you're going to be able to find your records and

5         have your records.  Now that they're destroyed

6         you have no records.  So please get a backup

7         system.  Save the system, do something.

8                  Again that went on for years and

9         nothing ever happened.  I understand maybe in '16

10        Vivian sends me an e-mail back in '16, they

11        finally, finally agreed to a document management

12        system.

13                Q.    Anything else?

14                A.    That's all I can think of right now.

15                Q.    On these topics did you personally

16        review any documents or did you just rely on what

17        Vivian told you in confronting Mike, Steve,

18        Junior or taking any steps with respect to these

19        items?

20                A.    Vivian showed me on the cashier, the

21        cashier theft Vivian showed us the report what

22        totaled amount on the deposit, she showed me a

23        deal and where the missing money had come up.  On

24        the hoopty cars she showed me a car too that

25        happened.  I just looked at it, she held it, I

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

115

Franzen

1
2    just looked at it and that was it.

3        Q.   With respect to taking money out of

4    sales deposits, what was shown to you?

5        A.   She showed me a receipt, money had

6    come up and here's the receipt and there's no

7    money to match it.

8        Q.   As far as document retention, are you

9    aware of any documents that were actually

10   destroyed?

11       A.   The books and the records, the

12   schedules, the journals, the basement was full of

13   them.

14       Q.   Any records destroyed that were

15   pertinent to IRS audit?

16       A.   Books and the records, the journals.

17       Q.   And those were destroyed, to your

18   knowledge?

19       A.   To my knowledge they were all

20   destroyed.

21       Q.   And how did you learn that?

22       A.   I was told that.

23       Q.   By whom?

24       A.   By Debbie, Vivian, different people

25   in the office.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

120

                        Franzen

1
2      wanted, and they in turn said come these dates or
3      don't come these dates, whatever it was under
4      their control as to when we came.
5           Q.   Now once you got to the jobsite at
6      Star, you said that sometimes depending on what
7      the client wanted, that might dictate who did
8      what, correct?
9           A.   Correct.
10          Q.   So when you said depending upon what
11     the client wanted, did you have any discussions
12     or typically have discussions with Michael or any
13     of his brothers as to what they wanted done?
14          A.   We could have if available.  For
15     example, Michael could immediately get ahold of
16     me for estate tax issue, his mom's, you know,
17     death issues that we had to handle, setting up
18     the kids' trust, he could do that immediately
19     when I came in.  Junior could call me or
20     immediately get ahold of me, he's trying to buy
21     an apartment for his daughter.  And Steve would
22     get ahold of me at different times about he needs
23     a personal financial statement for him trying to
24     get an apartment in the city.  So different
25     things could change when we got up there.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

121

Franzen

1

2      Q.   And if you were asked to do something

3  else, would you assign someone else to basically

4  field questions from staff accountants while you

5  were handling those issues?

6      A.   I didn't understand your question.

7      Q.   Did you have someone who was like a

8  second in command with respect to the interim

9  visit that you came to Star if you were occupied

10  answering questions concerning an estate, an

11  apartment, some other issue?

12      A.   Yes, Bob would be there, Rob would be

13  there, Shawn would be there.

14      Q.   Typically would all three of those

15  persons, or at least until Shawn left Voynow,

16  would all three of them be present at an interim

17  visit at Star?

18      A.   Most all the time they were present.

19      Q.   Would you assign individual staff

20  accountants to work at particular dealerships or

21  to do particular jobs at several dealerships at

22  Star?

23      A.   It depends.

24      Q.   It depends on what?

25      A.   It depends on, for example, if you

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen --- February 15, 2023

122

Franzen

1

2      were doing the year-end we might have one guy,

3      one staff accountant do all the fixed assets for

4      all the dealerships.  So it depends on what made

5      the best use and sense.

6              Q.    Now an interim visit, how did it

7      typically work?

8              A.    It could happen that way, one guy

9      could go through the whole job or one guy could

10     do a part of the job and the other person help

11     out and do parts and service receivable schedule

12     across the board, it depended.  Or one person, a

13     guy did all the contracts in transit for the

14     dealerships.  It depended on the situation in the

15     day and the staffing.

16             Q.    Did you typically make -- have a

17     preference as far as how you assigned staff?

18             A.    Me personally?

19             Q.    Yes.

20             A.    No.  We made sure that the staffing

21     was done correctly between Bob, myself, Rob and

22     Shawn.

23             Q.    Did you personally assign staff to

24     do, you know, particular jobs that covered all

25     the dealerships at Star?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

123

Franzen

1

2          A.    Repeat your question.

3          Q.    Did you individually assign any staff

4    at any time to do a particular job such as

5    looking at contracts in transit for all the

6    dealerships at Star?

7          A.    I don't recall.

8          Q.    How was the interim reports, how were

9    they drafted?

10          A.    In a word processor.

11          Q.    Not the device used to draft them.

12    What was the process that was used in drafting an

13    interim report, would you draft the entire thing

14    yourself?

15          A.    Possibly.

16          Q.    Did you get any information from

17    anyone?

18          A.    I got it from the client.

19          Q.    Besides getting information --

20          A.    Let's go back a step.  It's the

21    client's books and records.  I didn't generate

22    anything, I took their books and records,

23    inquired with the client as to any tax

24    adjustments, anything that needs to be written

25    off, is there any reserves we have to pick up,

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

124

1                     Franzen

2      and we, you know, checked our estimates, we

3      checked to find out where we are tax-wise and

4      where the income was.

5                     On those schedules, if we had

6      schedules we'd sit down with the client

7      periodically throughout the day and ask

8      questions, follow up on this.  Many times we

9      handed the schedules back to the client and said,

10     hey, follow up on these handful of things.  We

11     already made our notes so we gave them back the

12     schedules on a lot of occasions.  So we put our

13     notes on it and gave it to them.  We said here,

14     here's your own schedules, follow up on them, so

15     we handed everything back to them and they worked

16     on it.

17          Q.   So as far as drafting the interim

18     reports, you would take the books and records

19     from the client, and by books and records, you're

20     talking about schedules?

21          A.   That's one part of it.  There's other

22     books and records.

23          Q.   You would take also bank statements?

24          MS. FITZGERALD:  Object to form.

25          A.   Not in the context you're talking

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

125

1                        Franzen

2      about, I don't know what you mean by taking bank

3      statements.

4              Q.   You would take possession of, look

5      at?

6              A.   I take the client's books and

7      records, whatever they would be at that point in

8      time, whatever the situation was.  Whatever they

9      were.  Books and records could be many different

10     things.

11             Q.   It's the words you used?

12             A.   What?

13             Q.   So what would you use?

14             A.   Books and records, there are many

15     different things.

16             Q.   Identify them.

17             A.   Car deals.

18             Q.   What else?

19             A.   Sales tax returns, books and records.

20     Many different things.

21             Q.   So I'm asking you in particular, you

22     ultimately drafted or signed interim reports, how

23     were those interim reports drafted?  Not a word

24     processor, what was the process done to draft

25     those reports?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

126

                          Franzen

1

2          A.    We look at those clients' books and

3    records.

4          Q.    And?

5          A.    Mostly schedules and whatever type of

6    items that came off the schedule.

7          Q.    Would particular employees of Voynow

8    draft parts of the interim report?

9          A.    Possibly.

10         Q.    You don't know?

11         A.    It depends on the time and the

12   period.

13         Q.    So at any time period during Voynow's

14   relationship with Star -- do you understand the

15   question?

16         A.    No, I'm lost.

17         Q.    At any time period during the

18   relationship between Voynow and Star, did any

19   Voynow employee participate in writing parts of

20   the interim statement?

21         A.    And the answer is possible.

22         Q.    You don't know whether they did or

23   they didn't, is that your testimony?

24         A.    So one person could have written the

25   parts and service side and another person -- one

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen --- February 15, 2023

127

Franzen

1

2      person could have worked on parts, one person

3      could have worked on service, one person could

4      have worked on the part of the interim tax

5      letter.

6           Q.   What is the interim tax letter, is

7      that the interim report, is that what you're

8      referring to?

9           A.   The interim reports, the interim tax

10     letter that's between the two tax periods, that's

11     the interim period.  It gives the letter to the

12     client to figure out what needs to be written

13     off, picked up, adjusted and determine where

14     we're at before the end of the year.

15          Q.   What was the purpose of that interim

16     report or what you call an interim tax letter?

17          A.   I just -- do you want to read back

18     what I just said.  I just said that's what it

19     was.

20               MS. FITZGERALD:  Just read back his

21          answer.

22               (Record read)

23               MS. FITZGERALD:  I think he also said

24          written off.

25          Q.   Do you want to amend your testimony?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

128

1                        Franzen

2       You're saying it was given to determine what was

3       picked up, adjusted and what else?

4              A.   We're alerting the client in an

5       interim period, we have tax payments to be made,

6       we have 6/15 and a 9/15 payment, those payments

7       are quarterly payments so we need to understand

8       where the income is at that period of time.  So

9       we're looking at the income.

10             Then we go through the books and the

11      schedules to see if there's items to be adjusted

12      off so we could possibly lower the coupons, lower

13      the tax payments or is there reserves and there's

14      bigger income on the books that hasn't been

15      picked up and we need to raise them higher.

16             So the idea of that letter was for

17      the client to say, hey, here's some stuff that we

18      spotted, maybe you want to take a look at it, and

19      these end up will be write-offs by the end of the

20      year, or they might be income by the end of the

21      year for the tax return.

22             It's your decision what you want to

23      do with them.  They're your books and records.

24      We have no control, you do what you want, but

25      we're just bringing this to your attention and

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

129

Franzen

1

2      you decide how you want to handle it.

3              Q.   And you had multiple dealerships that

4      were clients of Voynow where no interim visits

5      occurred, is that correct?

6              A.   I don't understand your question.

7              Q.   It seems like a simple question.

8              A.   Ask it again then because I didn't

9      understand it.

10             Q.   Were there a number of clients of

11     Voynow that were dealerships that were part --

12     that Voynow had a tax engagement with where there

13     were no interim visits?

14             A.   I can think of maybe possibly one.

15             Q.   Possibly one, who?

16             A.   Restaurant.

17             Q.   I'm talking about a dealership, can

18     you think of any dealership where there were no

19     interim visits?

20             A.   Most dealerships that I've been

21     involved in, I definitely make it there for tax

22     planning issues to understand where we're at

23     before the end of the year.  And every dealership

24     is different, every dealership has their own

25     scenario, every dealership has their own tax

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

130

1                          Franzen

2       rates, every dealership has their own tax areas.

3       Different states are different, you have to look

4       at the different rules differently with every

5       dealership.  So you can't sit here and pinhole

6       one dealership and the other and say they're all

7       the same, it doesn't work.  Just like your kids,

8       not one kid is the same as your other kid,

9       everyone is different.  So it depends on the

10      scenario and the relationship and the dealership.

11           Q.   I don't know if that answers my

12      question.  Can you identify any dealership that

13      was a client of Voynow for whom you did not have

14      interim visits although they were a tax

15      engagement client?

16           A.   I thought I said to you that every

17      client that I know of that I dealt with, I always

18      had an interim tax planning visit, on a minimum I

19      always had one.  Because I didn't know where to

20      go unless I had that visit without understanding

21      bonuses, year-end numbers and what has to happen

22      and projections.

23           Q.   So for dealerships that were a Voynow

24      client of which you were a participating

25      accountant, you always had at least one interim

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

131

1                           Franzen

2     visit, is that correct?

3              A.    That's correct.

4              Q.    What month would the visit be, the

5     same time period, between June and September?

6              A.    No, if you're telling me I only did

7     one, that time period had to be October,

8     November, December, somewheres in that period.

9              Q.    What could you tell me about your

10    first time meeting Michael Koufakis?

11             A.    The first time I met Michael Koufakis

12    was in December of 1996.  I had heard about the

13    Star group prior to that because Hugh Whyte and

14    Bob Bayard had gone up to meet Michael on a nasty

15    tax audit that Michael had a problem with.

16                  So they had gone up somewheres in

17    June of '96.  Michael explained the situation.

18    Hugh said he could handle it.  Immediately had

19    Michael sign a power of attorney, and Hugh in

20    turn worked on a LIFO situation and met with the

21    auditor from I think it was Carol Weiner's firm

22    now that I hear later that had screwed up the

23    LIFO in the audit process, Hugh got it dropped

24    down some.  So after that got handled, Michael's

25    called Hugh and asked, I'd like to meet the

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

132

1                              Franzen

2      people that are going to do my work, my tax work.

3                    So myself and Rob Szpanka came up and

4      met Michael in his office for a brief time, and

5      from there we went down to 162nd Street, I think

6      that's the right street, or is it 64th, and met

7      Vivian and asked us a few questions about

8      Reynolds.  Explained to us that there's all kind

9      of, you still got all kind of tax issues with New

10     York that's got to get handled.  And very not a

11     whole lot said and that was about it.  It was

12     more everything was about the tax -- the LIFO

13     finally got fixed, quizzed us on if we understood

14     the computer system, told us about John Sharon

15     calling, John Sharon had recommended us because

16     we knew enough about the system and told us about

17     various other tax issues that he's got that's got

18     to get handled.

19                    We left.  Then I believe --

20                    MS. FITZGERALD:  I think you've

21              answered the question, your first meeting

22              with Michael.

23                    Right, that was the question?

24                    MR. MULÈ:  Yes.

25              Q.   So you met Michael you said in

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

133

1                      Franzen

2        December of 1996?

3              A.    Correct.

4              Q.    With the name I didn't get, Bob?

5              A.    Rob Szpanka.

6              Q.    How do you spell that?

7              A.    S-z-p-a-n-k-a.

8              Q.    You said you met Michael for a brief

9        time, was that at his office?

10             A.    At his office.

11             Q.    What location?

12             A.    Toyota store.

13             Q.    Was he seated by his desk when you

14       met?

15             A.    I don't think we even sat in his

16       office.

17             Q.    You were standing?

18             A.    Have you been in his office?

19             Q.    I'm going to ask the questions.  So

20       were you standing in his office?

21             A.    I believe so, yes.

22             Q.    Was Rob Szpanka standing?

23             A.    Yes.

24             Q.    What was Michael doing?

25             A.    Walking around and talking.

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen --- February 15, 2023

134

Franzen

1

2      Q.    How long did you meet for
3  approximately?

4      A.    In his office?

5      Q.    Yes.

6      A.    Could be an hour.  It took us a
7  little while for him to get focused in on us.

8      Q.    Then you said you then met Vivian, is
9  that correct?

10     A.    We went down to meet Vivian.

11     Q.    You went down where precisely, did
12 you go to meet Vivian, was she in the same
13 location or a different location?

14     A.    I said 162nd Street.

15     Q.    How far away is that from where the
16 Toyota store was?

17     A.    40 blocks if I do the math.

18     Q.    You drove there?

19     A.    Correct.

20     Q.    Did you drive with --

21     A.    No.

22     Q.    -- Michael?  You drove with Rob
23 Szpanka?

24     A.    Yes.

25     Q.    In your own car?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

135

                            Franzen

1

2          A.    Yes.

3          Q.    When you got to 162nd Street, where

4    did you go from there?

5          A.    Down in the basement.

6          Q.    Why did you go to the basement?

7          A.    Where the office was.

8          Q.    Who was located there?

9          A.    The staff of Nissan.

10         Q.    The Nissan staff?

11         A.    Correct.

12         Q.    You said you met with Vivian?

13         A.    We were introduced to Vivian and

14   spoke to her.

15         Q.    And who introduced you to Vivian?

16         A.    Michael.

17         Q.    So Michael met you at 62nd Street?

18         A.    Correct.

19         Q.    And he brought you down to the

20   basement to meet Vivian?

21         A.    Correct.

22         Q.    Did you meet anyone else while there?

23         A.    We met staff to say hello, not

24   knowing who anybody was.

25         Q.    And did you have -- you had

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

152

1                      Franzen

2    2014, correct?

3          A.    Where was it again?

4          Q.    In Exhibit 133.

5          A.    Okay, go ahead, what about it?

6          Q.    Exhibit 133 pertained to the month of

7    November 2014, the accounts payable schedule,

8    correct?

9          A.    Correct.

10          Q.    And looking back at 134, this trend

11   analysis also covers the year 2014, correct?

12          A.    Covers 2014, '13 and '12.

13          Q.    So the lines that we were looking at

14   and the handwriting that goes from November and

15   says $35,000, that is referenced or relates to

16   November, correct?

17               MS. FITZGERALD:  Object to form.

18          A.    Again I don't understand your

19   question.  The 35, it looks like it relates the

20   way I read it relating, it looks like from

21   October to November the inventory has jumped up

22   approximately $35,000, and when I look at from

23   September to October it looks like there's

24   $50,000 between somewheres in there, that's what

25   it looks like to me.  There's some comparison

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

153

1                          Franzen

2       between these numbers here.

3                    The same thing, I go down at the

4       bottom, when I look down at 2013 between the

5       October/November, it looks like it's 119,000, so

6       there's some comparison on this sheet that

7       they're trying to understand on the trend

8       analysis why inventory is all over the place in

9       the Star parts department.

10                   Now with that being said, the Star

11      parts department is a serious problem which was

12      brought up to the Koufakises, we had various

13      meetings on the parts department and we tried to

14      get our hands around how parts would be sold.

15      Then they would come back into the parts

16      department on the books, they would write them

17      off and still get the parts back.  The

18      inventories were out of control in the parts

19      department.  We don't know where, who was taking

20      money, but again we saw crazy receivables.

21                   So the Nissan parts department has a

22      problem and it was brought up to the Koufakises,

23      we had meetings, we had meetings with Alkarim and

24      never got anywheres on this.  So I can't tell you

25      what you're looking at, what you're trying to

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

154

1                         Franzen

2      suggest or the numbers because I don't know.

3             Q.   That 35,000 that is above the, for

4      lack of a better, typed November, do you have any

5      understanding as to what that number represents?

6             A.   It's a comparison between different

7      inventory levels on the sheet.

8             Q.   Do you know which inventory levels

9      that's a comparison from?

10            A.   It looks like you're going from

11     October to November, some kind of comparison.

12            Q.   If you looked at October, it looks

13     like the October numbers are 677,573 and the

14     November number is 789,097, is that correct?

15            A.   Repeat your question, or repeat your

16     comment.

17            Q.   The number for November 2014 on this

18     trend analysis is 789,097, correct?

19            A.   789,097, correct.

20            Q.   The number for October as you read

21     this is 677,573, correct?

22            A.   Correct.

23            Q.   That is far larger than 35,000,

24     correct?

25            A.   Correct.  And look at the 50.  The 50

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen --- February 15, 2023

246

1                    Franzen

2     you've got to safeguard your records, and saying

3     that you had a flood twice is not safeguarding

4     your records.  You would be in violation of the

5     tax code and you could be under penalty.  So I

6     said you've got to get some kind of system in

7     here to save your records, and this is tax work.

8          Q.   You're not aware of any documents

9     that were necessary for any IRS audit that were

10    lost, are you?

11         A.   I don't even understand your

12    question.

13              MR. MULÈ:  If you could mark this

14         131, please.

15              (Exhibit 131, Document containing

16         July 15, 2014 e-mail, was so marked for

17         identification, as of this date.)

18              MS. FITZGERALD:  Could we take a

19         quick break?

20              MR. MULÈ:  Can we take it after I

21         question him about it?

22              MS. FITZGERALD:  There's no question

23         pending, I'd like to take a break.

24              MR. MULÈ:  Can we keep the exhibits

25         here?

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

250

Franzen

1

2          MR. MULÈ:  That's usually not how

3          depositions occur.  When you have an

4          exhibit that you hand to a witness where

5          all of a sudden the counsel takes a break

6          as soon as you hand an exhibit.

7          MS. FITZGERALD:  You should tell your

8          partner because that's what happened

9          repeatedly when Jackie was deposed last

10         week.

11     Q.   Mr. Franzen, did you take a look at

12 this July 15, 2014 e-mail?

13     A.   Yes.

14     Q.   This is, there's an e-mail from your

15 personal e-mail account to you with a link to a

16 particular website location, correct?

17     A.   Correct.

18     Q.   And that link is still alive, it's

19 not on the produced document, but we were able to

20 get the link which is the attachment.

21          Do you recall this article and

22 sending this article to Vivian and Michael?

23     A.   After looking at it, yes.

24     Q.   And why did you send this?

25     A.   Because Star had fraud, had done a

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

251

                              Franzen

1
2    bunch of fraud deals and Michael had explained to
3    us.
4         Q.   What do you mean Star had done a
5    bunch of fraud deals, what does that mean?
6         A.   Michael came to us and told us that
7    Toyota was buying a bunch of deals, the good, the
8    bad and the ugly.  Michael, to his credit, called
9    Toyota up and said, hey, we're doing some bad
10   deals, and Toyota said, well, take the good, the
11   bad, the ugly.
12             Anyway, make a long story short, I
13   believe Michael told us that the F&I or one of
14   the finance people at Toyota got fired and Toyota
15   was very mad at him and they pulled his floor
16   plan line.  So Michael had to turn around and get
17   a new floor plan line, and he lost the Toyota
18   floor plan line, and I believe the fraud deals
19   that they were doing was at the Chrysler
20   dealership, which in turn cost his fraud line.
21             So I in turn sent this article
22   saying, hey, it's still happening, there's still
23   fraud deals happening out there for business
24   practices.  And when it said New Jersey, New York
25   dealers, it was more of a reminder, and hopefully

STAR AUTO SALES, et al. v. VOYNOW, BAYARD, et al.
Randall Franzen  ---  February 15, 2023

252

1                        Franzen

2      somebody is paying attention to that as a

3      friendly reminder, just a thought process to

4      those two.  That's what this was about.

5              Q.   This was not related to taxes, right?

6              A.   I said it was a friendly reminder for

7      the fraud deals that had to get expensed off the

8      books at one point in time.  It was just a

9      friendly reminder is what I said.

10             Q.   As a friendly reminder it didn't have

11     to do with taxes, correct?

12                  MS. FITZGERALD:  Object to form.

13             A.   In the past it did do with taxes.

14             Q.   In the past?

15             A.   In the past, and hopefully if I send

16     this friendly reminder out that we don't have

17     write-offs for taxes currently, so in a

18     roundabout way it has to do with taxes.

19             Q.   Are you referring to Toyota, the

20     bank?

21             A.   TMCC.

22             Q.   And that TMCC stands for?

23             A.   Toyota Motor Credit Corporation.

24                  MR. MULÈ:  Can you mark this 121,

25             please.