UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

STAR AUTO SALES OF BAYSIDE, INC.   :
(d/b/a STAR TOYOTA OF BAYSIDE),   :   Case No.: 1:18-cv-5775 (ERK) (TAM)
STAR AUTO SALES OF QUEENS, LLC   :
(d/b/a STAR SUBARU), STAR HYUNDAI LLC   :
(d/b/a STAR HYUNDAI), STAR NISSAN, INC.   :
(d/b/a STAR NISSAN), METRO CHRYSLER   :
PLYMOUTH INC. (d/b/a STAR CHRYSLER   :
JEEP DODGE), STAR AUTO SALES OF   :
QUEENS COUNTY LLC (d/b/a STAR FIAT)   :
and STAR AUTO SALES OF QUEENS   :
VILLAGE LLC (d/b/a STAR MITSUBISHI),   :
   :
          Plaintiffs,   :
   :
          v.   :
   :
VOYNOW, BAYARD, WHYTE   :
AND COMPANY, LLP, HUGH WHYTE,   :
RANDALL FRANZEN and ROBERT SEIBEL,   :
   :
          Defendants.   :

-------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Jamie Felsen, Esq.
Michael Mulè
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
*Attorneys for Plaintiffs*

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND ............................................................................ 5

STANDARD ON SUMMARY JUDGMENT ...................................................... 10

ARGUMENT ................................................................................................11

DEFENDANTS' CONTINUING MALPRACTICE PROPERLY  INCLUDES THE PERIOD FROM 2001 THROUGH 2014 ...................................................................11

CONCLUSION ........................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................................11

Apple Bank v. Sav. v. PricewaterhouseCoopers LLP, 895 N.Y.S.2d 361 A.D.3d 438 (N.Y. App. Div. 1st Dep't 2010).................................................................................................................. 21

Bart v. Golub Corp., 96 F.4th 566 (2d Cir. 2024) ..................................................................... 20

Berger v. United States, 87 F.3d 60 (2d Cir. 1996)..................................................................... 20

Bill Kolb, Jr., Subaru, Inc. v. LJ Rabinowitz, CPA, 117 A.D.3d 978 N.Y.S.2d 523 (N.Y. 2d Dep't 2014) ........................................................................................................................................ 12

Bookman v. Lynch, 2009 U.S. Dist. LEXIS 40766 (S.D.N.Y. May 14, 2009)............................ 20

Booth v. Kriegel, 36 A.D.3d 312 N.Y.S.2d 193 (1st Dept. 2006)................................................ 19

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)...........................................................................11

Consorcio Prodipe, S.A. de. C.V. v. Vinci, S.A., 544 F. Supp. 2d 178 (S.D.N.Y. 2008) ............. 20

Ford v. Reynolds, 316 F.3d 351 (2d Cir. 2003)...........................................................................11

Ghiz v. Schreck & Co., 2013 N.Y. Misc. LEXIS 3559 2013 NY Slip Op 31869[U] (Sup. Ct. N.Y. Cnty. Aug. 9, 2013) .................................................................................................................. 12

Giarratano v. Silver, 847 N.Y.S.2d 698 A.D.3d 1053 (N.Y. App. Div. 3d Dep't 2007)............... 21

Kessler v Westchester County Dept. of Social Services, 461 F.3d 199 (2d Cir 2006) ..................11

Lexington Furniture Indus. v. Lexington Co., No. 19-cv-6239 U.S. Dist. LEXIS 55775 (S.D.N.Y. Mar. 23, 2021).......................................................................................................................... 20

Lobel Chem. Corp. v Petitto, 2016 N.Y. Misc. LEXIS 492 2016 NY Slip Op 30273(U) (Sup. Ct. N.Y. Cnty. Feb. 16, 2016) ......................................................................................................... 12

Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113 (2d Cir. 1998) ..................................... 9

Mitschele v. Shultz, 36 A.D.3d 249 N.Y.S.2d 14 (1st Dep't 2006) ..............................................11

Rodeo Family Enters., LLC v. Matte, 952 N.Y.S.2d 581 A.D.3d 781 (N.Y. App. Div. 2d Dep't 2012) ........................................................................................................................................ 21

Shumsky v. Eisenstein, 96 N.Y.2d 164 750 N.E.2d 67 N.Y.S.2d 365 (2001)............................... 22

Star Nissan, Inc. et al v. Carmen Jones and Demetrius Jones, Supreme Court of the State of New York, Nassau County, Index No. 610541/2018................................................................................ 3

United States v. Hyman, No. 16-cv-5363, 2022 U.S. Dist. LEXIS 164237 (E.D.N.Y. Sep. 9, 2022) .................................................................................................................................................. 21

Williams v. NY City Hous. Auth., 816 F. App'x 532 (2d Cir. 2020) ............................................ 13

Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1 N.E.2d 842 N.Y.S.2d 730 (2007) ....... 12

**Statutes**

Fed. R. Civ. P. 37(a)(3)(B) ........................................................................................................ 20

## PRELIMINARY STATEMENT

Plaintiffs, STAR AUTO SALES OF BAYSIDE, INC., (d/b/a STAR TOYOTA OF BAYSIDE), STAR AUTO SALES OF QUEENS, LLC (d/b/a STAR SUBARU), STAR HYUNDAI, LLC (d/b/a STAR HYUNDAI), STAR NISSAN, INC. (d/b/a  STAR  NISSAN), METRO CHRYSLER PLYMOUTH INC. (d/b/a STAR CHRYSLER JEEP DODGE), STAR AUTO SALES OF QUEENS COUNTY LLC (d/b/a STAR FIAT), and STAR AUTO SALES OF QUEENS VILLAGE LLC (d/b/a STAR MITSUBISHI) (collectively "Star") respectfully submit this memorandum of law in opposition to the motion of defendants, Voynow, Bayard, Whyte and Company, LLP, Hugh Whyte, Randall Franzen and Robert Seibel (collectively, "Voynow") for partial summary judgment based on the statute of limitations applicable to accounting malpractice actions. Star submits that Voynow's motion is meritless because the facts establish that the continuous representation doctrine applies in this case, or in the very least, that issues of fact exist as to its application.

Critically, in this regard, this accounting malpractice action concerns an ongoing pattern of misconduct and dereliction of duty by Voynow, unrelated to specific transactions or treatment of items in financial statements and tax returns for any given year. Voynow held itself out as an accounting firm specializing in automobile dealerships. Its engagement by Star ran from 1996 through 2017. The malpractice alleged consists of negligent conduct in its consulting and controllership services from 2001 through November 2017.  The evidence supports Star's position that from 1996 until Voynow's termination in November 2017, Voynow orally agreed to provide ongoing consulting services for Star, services that went well-beyond the preparation of tax returns. Voynow charged significant fees, largely related to its ongoing consulting engagement, which would be utterly unjustifiable if the engagement had been limited to the preparation of tax returns.

1

Voynow would send a cadre of accountants (approximately six) to Star's facility for days at a time on a (roughly) quarterly basis. Voynow would review each of Star's accounts. Voynow's services included, among other duties: (i) meeting with and overseeing the work of personnel in Star's accounting department (none of which had accounting training), including its bookkeepers, (ii) reviewing Star's books and records throughout the year, and (iii) identifying issues with operations and fixing those problems and/or reporting them to the owners (or at least that is what Voynow was charged to do). Star had no in-house CPA or even an accountant on its staff. So, Star relied heavily on Voynow's expertise to validate the work of its staff. As stated in Star's responses to interrogatories, "Voynow had, and was given, free reign to review everything whenever and however it deemed fit to ensure no fraud or irregularities were found and was expected to do so." The wide breadth and continuous nature of Voynow's work is supported by the evidence.

The evidence also establishes that Star was the victim of egregious multi-million dollar embezzlement schemes from 2001 through 2017 (the "Schemes"), by its former office managers, Vivian Karouzakis ("Vivian," "Viv" or "Karouzakis," deceased) and her sister, Debbie Theocharis ("Debbie" or "Theocharis," convicted of larceny); a former accounts payable clerk, Carmen Jones ("Jones," indicted grand larceny felony pending); and a former sales manager, Douglas Filardo ("Filardo," indicted grand larceny felony pending), (collectively, the "Embezzlers"). Contrary to Voynow's suggestion that the impact of these schemes was "only approximately $1.3 million" (Moving Br. at 2), Star sustained losses, due to Voynow's malpractice, of over $4 million. Also, contrary to Voynow's narrative, Star, currently, has civil verdicts or judgments in excess of $17 million, plus a conviction and pending felony charges against the Embezzlers and/or their estate or family members.[1]

---

[1] By judgment entered on February 9, 2024 in the matter entitled, *Star Auto Sales of Bayside, Inc. et al v. Michael Karouzakis as Executor of the Estate of Vivian Karouzakis*, Supreme Court of the State of New York, Queens County,

These Schemes started to unravel in December 2016 when a representative from a bank contacted Michael Koufakis ("Koufakis") of Star to alert him that Karouzakis was paying off a personal mortgage debt with company funds (Response SOF, ¶¶ 111-12). Voynow continued to service Star until November 2017.[2]

Based on Voynow's own work papers, Voynow saw numerous accounting entries directly related to various Schemes by the Embezzlers. (*See, e.g.* Felsen Decl. Exhibits 39-43). Voynow's claim that "[t]he overwhelming majority" of the theft "stem[s] directly from checks signed by Authorized Check Signers" is false and misleading – and it entirely misses the point. Voynow's malpractice stems from its actions (or lack thereof) in the face of questionable accounting entries, accounting practices and internal controls that it saw on a regular basis, was alerted to, and that it, in fact, questioned on occasion. (*See, e.g.*, COF, ¶¶ 32-47, 49-54, 78-79). Voynow's work papers are damning in this regard because Voynow "inquired" of Star's accounting staff as to the related schedules and entries pertaining to those schedules.[3] *Id.* Voynow said nothing to Star and never issued any type of final report concerning its review of Star's books and records. *See, e.g.*, COF, ¶¶ 23, 35-38. Voynow had a professional continuing obligation to make reasonable inquiries and rely on "sufficient relevant data" before accepting the explanations offered by Star's staff, including the explanation of the Embezzlers, but they failed to satisfy those obligations. (Felsen Decl., Ex. "2"). Indeed, after extensive discovery, Voynow has failed to identify <u>any</u> data they

---

Index No. 711698/2018, Star has a judgment against the estate of the ringleader, Karouzakis, in an amount exceeding $16,588,927.00. (Response SOF, ¶114). By jury verdict, dated April 10, 2024 (judgment pending), in the matter of *Star Nissan, Inc. et al v. Carmen Jones and Demetrius Jones*, Supreme Court of the State of New York, Nassau County, Index No. 610541/2018, Star anticipates the entry of a judgment in an amount exceeding $555,000.00. (Response SOF, ¶¶ 90 and 95).

[2] Star commenced this lawsuit in October 2018 once its March 2018 tolling agreement, which was only four months after Voynow's discharge, expired.

[3] Indeed, when Ms. Jacqueline Cutillo ("Cutillo") was just beginning in her job function in 2014 or 2015 to post commissions and directly inquired of Voynow's Franzen as to the odd entries of "PTSN" on the accrued commission schedule, Franzen, in essence, "brushed it off," stating "that's Vivian's, don't worry about it." (COF, ¶79; Felsen Decl., Ex. "2"). So, the fraud continued for another two years.

supposedly relied upon to satisfy their questions. *Id.* Contrary to the concept of "professional skepticism," whereby a CPA would "trust but verify," Voynow apparently acted as if the standard were to "trust blindly," as they, inexplicably, relied on the wrongdoer's word, alone, noting in its workpapers, for example, "OK per Viv," without no explanation. *See* Felsen Decl, Exhibit 39-43. However, it was not "OK." As explained further below and in the accompanying opposition papers, Star's relationship with Voynow was continuous and ongoing, rather than project-based.

In their motion, Voynow attempts to overcome the continuous representation doctrine by setting up a "straw man" argument and relying on the irrelevant distinctions between tax engagements, audit engagements and review. Critically, Star's claim is that Star's relationship with Voynow was an ongoing consulting engagement – but Voynow conveniently ignores this claim.

Although all facts must be construed in favor of the non-moving party in a summary judgment motion to determine whether there are any material questions of fact requiring a trial, Voynow relies upon their own self-serving "spin" of <u>disputed</u> facts. Thus, Voynow argues that they were solely engaged to prepare yearly tax returns in a series of discrete, yearly engagements. (Even the unsigned, computer-generated form tax engagement letter upon which Voynow relies fails to support its claim that its engagement was <u>solely</u> for the preparation of tax returns for numerous reasons). From these premises, Voynow argues that since the last tax return it prepared for Star was in 2017, all claims prior to 2014 are time-barred. The obvious and fatal flaw to this argument is that it fails to consider the mountain of evidence supporting Star's claim that its relationship with Voynow was an ongoing consulting/controllership engagement. Indeed, the scope of Voynow's engagement is the core factual issue in this case.

In addition, every case upon which Voynow relies upon involved an accounting firm taking a position, on a specific tax return, or otherwise, and the client suing based on the accountant,

4

essentially, giving "bad advice" as to a discrete work product, such as a specific tax return. The consulting engagement involved here, on the other hand, was different. Voynow was negligent based on the things it failed to do.  There was no end-of-engagement work product. Rather, this was an ongoing relationship whereby Voynow was to scour Star's accounts, identify issues with books and records and present them to the owners – not the wrongdoers. It is submitted that Voynow's position is simply belied by the evidence, and Voynow's own experts.

The accounting malpractice alleged here may be compared to medical malpractice for the treatment of an ongoing disease for more than three years. In this case, Voynow's negligence, visit after visit, enabled the cancer of embezzlement by Star's office managers, accounting personnel and sales manager to metastasize into a multi-million dollar loss (found to exceed $17 million). If Voynow acted in accordance with professional standards and demanded "sufficient relevant data," just once during the 16-year span of the Schemes, the cancer of theft and embezzlement would have been caught early – before it metastasized.

At the very least, the evidence raises factual issues that must be resolved by a jury. Voynow's motion should be denied in its entirety.

## **Factual Background**[4]

Star employed no one with accounting experience. Star sought to engage Voynow for purposes of providing Star with assurance that its books and records were accurate, and could be relied upon, and to implement and maintain reasonable accounting practices, policies and procedures.[5] Star sought an accounting firm with familiarity with the Reynolds & Reynolds

---

[4] For a full statement of material facts, the Court is respectfully referred to Star's responses to Voynow's statement of material facts and to Star's Counterstatement of material facts. The facts contained herein are in summary for the Court's convenience.

[5] There is no question that Voynow also agreed to prepare Star's tax returns. The ongoing consultative/controllership engagement at issue in this litigation was in addition to Voynow's role in preparing Star's tax returns. Star makes absolutely no claim that it sustained any damages as a result of Voynow's role in preparing taxes. Star's claims have nothing to do with that.

Dealership Management System ("R&R") that it used, including the schedules or every account contained therein and the reports that may be generated. Before being engaged, Voynow assured Star that it had the requisite R&R expertise. It also represented that its consulting/controllership engagement would include its performance of services that were "more than a review but less than an audit," but without the formal requirements (and additional costs) associated with a formal review or audit engagement, *i.e.*, no formal checklists, no management representation letter. Based on this representation, Star agreed to engage Voynow. Voynow acted like an in-house Chief Financial Officer, or a controller with accounting experience. (Counterstatement of Facts ("COF"), ¶12). Voynow looked at every account on R&R every time it came to Star.

The fundamental premise of Star's claim is that Star and Voynow had an oral, consulting engagement with Star, starting in 1996, pursuant to which Voynow would act as Star's watchdog, Voynow was given "free reign" to look at Star's entire books and records and speak with anyone employed by Star whenever Voynow deemed it appropriate. Voynow performed the controllership functions and reviewed the work of Star's accounting staff. Voynow identified issues, and both recommended and implemented solutions. The engagement was not a discrete and severable transaction, but rather it was an engagement that continued until terminated by either party – which occurred in 2017 when Star terminated the engagement. All issues of material inaccuracies in Star's books and records and deficient accounting practices, policies and procedures were to be addressed by Voynow throughout the engagement – whether Year 1 or Year 21 of the engagement.

By way of example, Voynow sold its services to Star on the basis of providing services of a level that was "more than review but less than an audit" (COF, ¶5). Voynow had "free reign" to review everything and anything whenever and however it deemed fit to ensure no fraud or

irregularities existed and was expected to do so. (COF, ¶17). Voynow trained Star's accounting staff. (COF, ¶18). Star usually did not direct Voynow to look at any specific items because they understood that Voynow was an expert in the automotive field and trusted its judgment to review areas most susceptible to fraud.  (COF, ¶19).   Voynow's review and consulting services were continuous in nature and were not segmented by year or project as evinced by the lack of a written accountant's report as would have been  required by AICPA standards unless the engagement was a consulting engagement. (COF, ¶20). Indeed, Voynow's expert admitted that a consultative engagement could be ongoing. (COF, ¶21). Star was in regular communications with Voynow, not only when Voynow visited three to four times per year for multiple days at a time with approximately six accountants, but also on a monthly basis. (COF, ¶¶ 23-31, 43-44, 49, 51-54; Cutillo Decl., ¶4; Koufakis Decl., ¶11). Star's telephone conversations were part of a continuing dialogue with Voynow as those communications included questions about prior visits and questions about daily accounting operations. (Koufakis Decl., ¶11).

The evidence is clear that Voynow's work went well beyond tax preparation. Voynow's expert, in fact, even conceded that Voynow's work went beyond a tax engagement and included consultative services. (COF, ¶67). Not surprisingly, Voynow's fees to Star dwarfed the typical fees for the preparation of corporate income tax returns. So, for example, in 2015, typical fees for the preparation of corporate income tax returns in the New York City area was $9,700. (COF, ¶62).  In that same year, Voynow charged Star an average of $28,673 per dealership for five dealerships. This amount was, approximately, 300% more than would be expected for a tax engagement.[6] Voynow charged Star $1,561,300, during their long two-decade relationship.

---

[6] Voynow claimed that anywhere between $5,000 and $50,000 is a typical range for preparing corporate tax returns, but, a former Voynow employee testified that, at most, the fees would be $10,000. (COF, ¶63).

Voynow's billing entries also confirm that they performed consulting services.  (COF ¶ ¶¶ 56-59).

While Voynow, certainly, prepared Star's tax returns, that work was merely a small part of Voynow's engagement. Rather, consulting/controllership services is where Voynow performed the bulk of its work – and charged the bulk of its fees. Indeed, Voynow cannot, seriously, argue that its engagement was purely a tax engagement because, in addition to the evidence as to the fees it charged, Voynow, admittedly, performed work that would not typically be done in a tax engagement. For example, Voynow sent approximately six accountants to Star, generally, three or four times per year to review every Star account on the R&R system – that work is something that would be totally unnecessary if Voynow's engagement were merely the preparation of taxes. (COF, ¶¶ 72-76). Thus, Voynow reviewed the very same schedules of accounts on the R&R system every time it visited. (COF, ¶29). It would encounter the same types of entries, again and again. It was supposed to make reasonable inquiries and rely on sufficient relevant data to accept the explanation. It was supposed to recommend adjustments, and those, typically, would be made in its presence. Yet, for its on-going consulting and controllership services, Voynow never issued a final year-end or project-based work product (like a tax return or a certified financial statement) to Star about its findings.  (COF, ¶¶ 23, 35-38).

Since the bulk of Voynow's work involved consulting services, there was no discrete transaction, no separate, or final, work product.  *Id*.  Rather, the Star-Voynow relationship was an ongoing arrangement – and Voynow gladly accepted Star's money to perform that role. Voynow's expert conceded that a consultative engagement may be ongoing. (COF, ¶21).

As supposed support for its argument that its engagement by Star was limited to the preparation of tax returns, Voynow refers to unsigned, unexecuted engagement letters contained

on its own computer system and cannot provide any proof that any engagement letter was delivered to Star for the relevant time period ("Form Letters").[7] Star has testified they never saw the Form Letters. (Fitzgerald Decl., Exs. 20 and 21). Thus, the Form Letters are meaningless for this reason alone. But, in addition, the Form Letters do not foreclose a separate oral consulting agreement. In this regard, even if the Form Letters were considered, they are entirely consistent with the oral consulting arrangement alleged because they contemplate orally discussing any services that are not covered.[8]

Every act by Voynow in this case that failed to meet professional standards relates to Voynow's consulting/controllership engagement where they orally agreed to take measures to assure Star that its books and records were accurate, and could be relied upon, and to assure that Star had reasonable policies and procedures in place and to implement measures if necessary. Throughout the engagement, Star was assured by Voynow that it was looking at the books and

---

[7] Voynow did not even produce these documents in native format, but in PDF format. Thus, there is no way to verify when the Form Letters were created or whether the dates that appear on the Form Letters are accurate.

[8] By and large, the Form Letters did not contain any merger clause and expressly contemplated "additional services" beyond what was expressed in the form letters. (*See, e.g.*, Ex. 21, Voynow_035717, Voynow_035721, Voynow_035725, Voynow_035730, Voynow_019140, Voynow_019135, Voynow_019129, Voynow_019124; Ex. 20, Voynow_035694, Voynow_035697, Voynow_035701, Voynow_035704, Voynow_035707, Voynow_035710, Voynow_035713, Voynow_028330, Voynow_028326, Voynow_028322, Voynow_028338, Voynow_028334, Voynow_028318, Voynow_019119). All of those Form Letters state: "Any additional services not referenced above will be considered 'out of scope' of this engagement letter. <u>Prior to the commencement of 'out of scope' services, we will discuss the nature and extent of the work that clarifies these services.</u>" *Id.* (emphasis added). Indeed, it was not until purportedly 2015 that Voynow's Form Letters even included a merger clause, but even so, many of those letters also expressly contemplated additional work. (*See* Ex. 21, Voynow_035602, Voynow_035613, Voynow_024974, Voynow_010915 (stating, "You may request that we perform additional services not contemplated by this engagement letter. If this occurs, we will communicate with you regarding the scope and estimated cost of these additional services. Engagements for additional services <u>may necessitate that we amend this letter</u> or issue a separate engagement letter to reflect the obligations of both parties. In the absence of any other written communications from us documenting additional services, our services will be limited to and governed by the terms of this engagement letter"). Even as to Form Letters with a merger clause, <u>no Form Letter prohibits oral modification or modification by performance</u>. (*Id.; see also, e.g.*, Ex. 21, Voynow_035592, Voynow_024984). Thus, the Form Letters are ineffective as a matter of law to support Voynow's conclusion that its engagement solely related to the preparation of tax returns. *See e.g.*, *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 (2d Cir. 1998) ("parties may waive a no-oral modification clause, and an oral modification may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement") (internal quotation marks and citations omitted).

procedures, and Star implicitly trusted Voynow's counsel. Star was shocked to find out in November 2016 that its primary office manager, Vivian Karouzakas, someone whose work Voynow was charged to review, had been manipulating the accounting records, and Star soon learned that she had been doing so for approximately 15 years.

As set forth in the reports of Star's expert, Mr. Douglas Sosnowski, at numerous times during their relationship, Voynow should have detected these falsifications, which would have stopped the fraud, if it had performed its work in compliance with professional standards. We know that Voynow questioned numerous accounting transactions relating to the Schemes. They were required to make reasonable inquiries, relying on "sufficient relevant data," under professional standards. Instead, among other inexcusable actions, they:

- Took the wrongdoer's word at face value, writing without any explanation whatsoever, "Ok per Viv." (COF, ¶40). Voynow's expert agreed that there is no explanation in Voynow's work papers as to what the explanation was for it to conclude that the explanation was sufficient. (Scherf Dep. at 250). Instead, he suggested that "we have to take Voynow's word for it that … the explanation was reasonable" (*id.*).

- When presented with a shortfall of $283,000 in inventory parts for Star Nissan, Voynow had the office manager, who was under Voynow's direction and supervision (Response SOF, ¶31), make an accounting adjustment, basically increasing cost of sales, in essence, writing off that amount – without having any physical inventory in place to justify the adjustment and without ever apprising the owner of this large and unusual adjustment. And, to make matters worse, they had the adjustment "baked in" with the bottom-line figure, instead of separating it out, so as to cover up the basis for the Star Nissan's poor performance that year. (Indeed, Voynow's failures, here, may go beyond mere negligence, as its cover-up suggests complicity. Moreover, Voynow has concocted a nonsensical tale as to what this shortfall represents – that the testimony of its own expert debunks).

### STANDARD ON SUMMARY JUDGMENT

To dismiss claims on summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact," and, thus, that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard imposes the initial burden on the defendant to

10

show the absence of a "genuine" dispute over facts relevant to the plaintiff's claim, or any element thereof, which would allow a "reasonable jury" to "return a verdict for" the plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White, J.). If the moving party meets its initial burden, the non-moving party must identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted).

In ruling on a motion for summary judgment, the district court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Kessler v Westchester County Dept. of Social Services*, 461 F.3d 199, 206 (2d Cir 2006) (internal citation omitted). "The judge's function is not . . .to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* To the contrary, "[s]ummary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).

## ARGUMENT

### DEFENDANTS' CONTINUING MALPRACTICE PROPERLY <u>INCLUDES THE PERIOD FROM 2001 THROUGH 2014</u>

It is fundamental that tolling of the statute of limitations "may occur where the parties engaged in a continuous professional relationship, such as where same accounting firm provided ongoing services ...." *Mitschele v. Shultz*, 36 A.D.3d 249, 253, 826 N.Y.S.2d 14, 18 (1st Dep't 2006). As held by the New York Court of Appeals in *Williamson*:

> The continuous representation . . . doctrine[] recognize[s] that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered ....

*Id.*, 9 N.Y.3d at 9 (internal citation and quotation marks omitted); *see also*, *Lobel Chem. Corp. v Petitto*, 2016 N.Y. Misc. LEXIS 492, at *6, 2016 NY Slip Op 30273(U) (Sup. Ct. N.Y. Cnty. Feb. 16, 2016).

Under the facts in this case, Voynow's continuing malpractice properly includes the period from 2001 through 2014 because here, in addition to preparing tax returns, the parties mutually contemplated, through an oral agreement, that Voynow's work would be ongoing, until terminated, and included ongoing consulting services. By way of example, Voynow had "free reign" to perform whatever procedures it deemed necessary for Star, such as supervising the office manager and accounting department, reviewing entries of each account, overseeing reconciliations, and correcting errors, so as to assure Star that its books and records were accurate, and could be relied upon, and that it had reasonable policies and procedures in place. Under these circumstances, the case law firmly establishes that the statute of limitations is tolled because Star had full confidence in Voynow until November 2017 and was entitled to a "right to repose confidence" in Voynow's professional's ability and good faith. *Williamson v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 9, 872 N.E.2d 842, 840 N.Y.S.2d 730 (2007).

Three accounting malpractice cases are particularly instructive here: *Bill Kolb, Jr., Subaru, Inc. v. LJ Rabinowitz, CPA*, 117 A.D.3d 978, 980, 986 N.Y.S.2d 523 (N.Y. 2d Dep't 2014); *Lobel Chem.*; and *Ghiz v. Schreck & Co.*, 2013 N.Y. Misc. LEXIS 3559, at *6, 11-12, 2013 NY Slip Op 31869[U], *7 (Sup. Ct. N.Y. Cnty. Aug. 9, 2013).

*Bill Kolb, Jr., Subaru* was an accounting malpractice action brought by an automobile dealership against a certified public accountant, Leonard J. Rabinowitz ("CPA"). In *Bill Kolb, Jr., Subaru*, the automobile dealership engaged the defendant CPA in 1998. *Id.*, 986 N.Y.S.2d at 525. The CPA's "services" included "review of the books and records of the dealership, as well as

overseeing the work of the dealership's in-house controller." *Id.* The dealership hired Ms. Carol Grabbe as its in-house controller in October 2003.[9]  In March 2009, the dealership "suspected that there were financial discrepancies in its books and records." *Id.* From December 31, 2004 through June 30, 2009, over $800,000 in funds were recorded as deposit on the general ledger but not deposited in the dealership bank account. *Id.* The dealership sued the CPA on February 28, 2012 for that amount plus the amount expended for the forensic audit. *See* fn.3. Thereafter, the dealership's in-house controller pleaded guilty to grand larceny and admitted to stealing $209,475.27. *Id.*, 986 N.Y.S.2d at 525.

In *Bill Kolb, Jr., Subaru*, the defendant CPA, like Voynow here, moved to dismiss based on the statute of limitations, arguing that claims accruing before March 1, 2009 were time-barred. *Id.* The Second Department reversed the lower court's order which had granted the defendant CPA's motion. *Id.* First, the Court observed that the plaintiff dealership noted that the CPA "negligently performed work for the dealership on March 16, 2009, a date that falls within three years of the … commencement of the action." *Id.*  The Court then noted:

> [E]ven if the Rabinowitz defendants had met their prima facie burden, in opposition to the motion, the plaintiff raised a triable issue of fact as to whether the statute of limitations was tolled by the "continuous representation" doctrine, which would suspend the limitations period until the completion of the professional services rendered by the Rabinowitz defendants.

*Id.* (citations omitted). Thus, the Second Department found that the CPA's continuous services for the dealership tolled the statute of limitations with respect to claims accruing more than seven (7) years before the commencement of the action, *i.e.*, from December 31, 2004. The claims in this action are strikingly similar to those asserted in *Bill Kolb, Jr., Subaru*.

---

[9] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=ODcDzZ34ae2gPYvbfg8Eig==. The Court may take judicial notice of the complaint filed in that action, which is a matter of public record. *See, e.g., Williams v. NY City Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020) (observing that it was appropriate for the district court to consider "Williams's Article 78 petition and state court decision because they were public records") (citations omitted).

*Lobel Chem.* is also helpful. In that case, plaintiff sued its individual accountant, Frank A. Petitto ("Petitto") and the accounting firm, RSSMC. Like here, "there was no written agreement that outlined the services to be provided. Rather, the parties appear to have contemplated an ongoing relationship that was based on trust and good faith." *Id.*, 2016 N.Y. Misc. LEXIS 492, at *9.

In *Lobel Chem.*, the plaintiff asserted that it had retained the accountants in 1991 to "1) supervise Lobel's bookkeeper; 2) oversee the bookkeeping and accounting issues concerning its business and finances; and 3) prepare Lobel's tax returns and represent the Company at tax audits." *Id.* at *1. In 2004, Lobel Chemical's "longtime bookkeeper retired" and a non-party, Meredith Conyers, who had been the assistant bookkeeper, filled the position. *Id.* at *1-2. The accountant "recommended that the Company install specialized accounting software (Peachtree) to assist Conyers in the preparation of reports for general accounting and tax preparation purposes". *Id.* at *2.

"In 2011, Steven Lobel, the Company president, began questioning discrepancies between his own estimates of the Company's gross profits and documents that Petitto was reviewing to determine operating expenses." *Id.* at *3. Then, the company's vice-president, Rhona Lobel, Steven's sister, 'began to monitor the Company's cash flow more closely" and "discovered Conyers's embezzlement" in January 2014. *Id.* at *3-4. The lawsuit was commenced on October 22, 2014. *Id.* at *4. "The Complaint allege[d] that from 2004 through 2013, Petitto advised Lobel regarding hiring a bookkeeper and installing the Peachtree software, and that the parties contemplated that Petitto would supervise the bookkeeper, perform monthly reconciliations and internal audits, and advise Steven Lobel on ongoing financial concerns and decisions facing the business enterprise." *Id.* at *9.

14

The defendant accountants in *Lobel Chem.*, like Voynow here, moved to dismiss based on the statute of limitations. Since Lobel was asserting claims going back to 2004 but did not commence the lawsuit until 2014, the accountants argued that "all of plaintiff's claims sounding in accounting malpractice that accrued before October 22, 2011, are time-barred." *Id.* at *5. The defendants also argued that "plaintiff used RSSMC's services for annual tax preparation and auditing services, which constitute separate and discrete services for each year …." *Id.* at *8. Defendants argued that this precluded the application of the continuous representation doctrine. *Id.* These are the same arguments Voynow makes here.

*Lobel Chem.*, however, rejected the defendants' arguments. It concluded that the submissions were "sufficient to establish that the parties mutually contemplated that RSSMC's work would continue on a monthly basis and that Petitto's work was not limited to annual tax preparation and audit review." *Id.* at *8-9. *Lobel Chem.* based its holding on the following:

> The complaint alleges that from 2004 through 2013, Petitto advised Lobel regarding hiring a bookkeeper and installing the Peachtree software, and that the parties contemplated that Petitto would supervise the bookkeeper, perform monthly reconciliations and internal audits, and advise Steven Lobel on ongoing financial concerns and decisions facing the business enterprise ….

*Id.* at *9. The court emphasized the lack of written engagement letter (just like the present case). It, therefore, concluded that "the continuous representation doctrine applies and plaintiff's accounting malpractice claims for the years 2004 through October 11, 2011 are not time-barred." *Id.*

Finally, *Ghiz* is equally instructive. The plaintiff in *Ghiz* was a dental practice. *Id.*, 2013 N.Y. Misc. LEXIS 3559, at *1. It brought a lawsuit against its accounting firm, Schreck and

Company, CPA's, P.C. ("Schreck") in December 2012.[10] Ghiz had engaged Schreck since the formation of its dental practice in 2000.[11]

In *Ghiz*, like this case, the plaintiff claimed that the accounting firm was engaged by it "'to examine, verify and advise with respect to the accounting and bookkeeping methods and records of plaintiffs in accordance with generally accepted auditing and accounting standards' and had <u>'full and unfettered discretion to perform whatever services it deemed necessary for plaintiffs</u>.'" *Id.*, 2013 N.Y. Misc. LEXIS 3559, at *1 (emphasis added). Like here, there was "[n]o written scope of work" that "was ever created or executed by Plaintiffs …." *Id.* Instead, "Schreck 'verbally represented to plaintiffs that they would do everything that plaintiffs needed accounting-wise and that plaintiff just needed to trust them, to sit back and relax knowing Schreck would take care of everything.'" *Id.* at *1-2.

In *Ghiz*, the plaintiff claimed as follows:

> Schreck balanced Plaintiffs' check registers, reconciled Plaintiffs' bank statements, prepared and filed Plaintiffs' tax returns, and represented Plaintiffs regarding tax issues, reviewed and filed Plaintiffs' quarterly payroll returns, drafted Plaintiffs' profit and loss statements, reviewed and verified Plaintiffs' payroll expenses, and prepared and certified the accuracy and fairness of the Plaintiffs' consolidated financial statements. Plaintiffs allege that they "wholly and completely relied upon Schreck's professional judgment, acumen and integrity in the matters Schreck undertook" and that Schreck was "fully aware. . .that plaintiffs would wholly and exclusively rely upon Schreck's services, professional acumen and experience...."

*Id.* at *2. Between March 2007 and August 2009, Ms. Carolina Vallario was employed to run the dental practice, including "drafting but not signing checks, paying bills, balancing banking accounts and recording various financial transactions in Plaintiffs' books." *Id.* at *2-3. In 2011, she was convicted for theft/embezzlement of $400,000 from Plaintiffs. *Id.* The plaintiffs claimed that the accounting firm discovered the embezzlement at some point but failed to disclose it, causing

---

[10] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=Kzg6ICSkchi9/QUN_PLUS_ETfvA==
[11] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=9geldjhpbT0T7GoYEXg79Q==

further damages. *Id.* at \*3. The accounting firm was engaged by the plaintiff until September 2012 (*id.*)

The accountants in *Ghiz* argued that the statute of limitations barred claims relating to theft/embezzlement that occurred more than three years prior to the commencement of the action, *i.e.*, to December 2009 (which was after the theft occurred). The Court rejected the defendants' argument and found the statute of limitations was tolled by the continuous representation doctrine. *Id.* at \*6-7. The Court noted the plaintiffs' claims that "'Defendant Schreck continuously represented plaintiffs regarding claims by various government bodies as to said tax penalties and liabilities up and until September 2012 as well as rendered its usual and customary services to plaintiffs and attempted to restate and correct the mistakes made during the period of defendant Schreck's malfeasance.'" *Id.* at \*7.

Here, as in *Bill Kolb, Jr., Subaru*, *Lobel Chem.* and *Ghiz*, this Court should reject Voynow's argument and find that the continuous representation doctrine applies, or alternatively, that there are issues of fact as to whether the doctrine applies. The facts, here, are substantially similar to the above cases. For example, as in *Lobel Chem.*, here, Voynow had an "ongoing relationship" with Star that "was based on trust and good faith." *Id.*, 2016 N.Y. Misc. LEXIS 492, at \*9. Similarly, Voynow supervised the accounting department, and oversaw bookkeeping and accounting issues. *Id.* at \*1. In *Lobel Chem.*, the accounting firm recommended the accounting software.  Here, Voynow was hired, in large part, based on its proficiency in the Reynolds & Reynolds accounting software. In *Ghiz*, the accounting firm had "full and unfettered discretion." *Id.*, 2013 N.Y. Misc. LEXIS 3559, at \*1. Likewise, here, Voynow had "free reign to review everything whenever and however it deemed fit to ensure no fraud or irregularities were found."

Indeed, here the facts are much more compelling in that:

- Voynow's consulting engagement including the performance of procedures consistent with assurance services (although no one claims that Voynow's engagement was an assurance engagement). (Felsen Decl., Ex. "2").[12]

- The engagement between Voynow and Star Auto was primarily a consulting/controllership engagement. Tax return preparation was a minor service performed within the 21-year consulting period. The majority of time spent and fees charged were for ongoing consulting/controllership functions. (COF, ¶71; Sosnowski Decl., ¶4).

- Voynow's own expert concedes that there are "e-mails or billing records that describe the scope of certain other services that were provided, those would have been consulting services by definition. (COF, ¶62)

- Voynow performed a review and oversight function and assessed and analyzed the internal control systems of Star Auto on an ongoing, continuous basis that continued until Star Auto terminated the relationship in 2017. (Felsen Decl., Ex. "2," p. 5).

- According to former Star Auto employee Despina "Debbie" Theocharis, Voynow would close the books for Star Auto and oversaw the accounting in the office. In addition, Voynow would review various schedules during their visits. These activities constitute controllership functions and would not be performed on a tax-only engagement. (Felsen Decl., Ex. "2," p.7).

- Voynow was not given any specific instructions. They were engaged to inspect the books and records of Star and meet with personnel in the accounting department. Both parties understood that Voynow's job was to identify any issues with operations and fix the problems and/or report to the owners. (COF, ¶¶ 12-20, 23-57, 63).

Voynow was tasked with continuously reviewing Star's books and records for its sales, parts, and services departments to detect any irregularities and discrepancies.  For these services, Voynow was paid on a monthly basis.  As explained in *Lobel Chem.*, Star "ha[d] a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services [we]re rendered." *Id.*, 2016 N.Y. Misc. LEXIS 492, at *6.

---

[12] If that were the case, Voynow would be negligent for not issuing an engagement letter or accountant's report for any year during the 21-year engagement period.

None of the cases cited by Voynow support their argument that the continuous representation doctrine does not apply here. Not a single one of those cases involved the unique consulting/controllership engagement that was involved here. None of those cases involved an accounting firm sending approximately six accountants for days at a time to visit Star's premises three to four times per year. None of those cases involved such extensive accounting billing by multiple accountants each year. None of those cases involved an accounting firm that was charged with reviewing the very functioning of the accounting department, the accuracy of its books and records and propriety of its processes and procedures.

For example, *Booth v. Kriegel*, 36 A.D.3d 312, 825 N.Y.S.2d 193 (1st Dept. 2006) involved tax return preparation. Each engagement ended with a finalized tax return. The accountant in *Booth* failed to advise the client that it was not responsible for paying United States' income taxes while residing in the United Kingdom. The erroneous advice was contained in a final product that was produced to the client, *i.e.*, the tax returns. *Booth* did not involve the type of entwined relationship that Star and Voynow had which involved far more than taxes, and critically, included an oversight function. In fact, the *Booth* Court was careful to hold that "the continuous representation doctrine does not apply under these facts because, regardless of the common mistake affecting the tax returns, each return was a separate and discrete transaction." *Booth* at 313. Not so here where Voynow's consulting/controllership services was ongoing, and Voynow was expected to advise the owners and take corrective action.

Another case cited by Voynow, *Williamson*, also is not helpful because it did not involve ongoing consulting services that include controllership functions and supervision of the accounting department, as well as internal controls. Rather, *Williamson* involved audited financial statements that resulted in a discrete work product, *i.e.*, annual opinions, each year for six consecutive years.

*Id.*, 9 N.Y.3d at 6. Thus, the New York Court of Appeals concluded that since "the Funds entered into annual engagements with defendant for the provision of separate and discrete audit services for the Funds' year-end financial statements, and once defendant performed the services for a particular year, no further work as to that year was undertaken[,]" the plaintiff, there, "fail[ed] to allege that defendant and the Funds explicitly contemplated further representation regarding the audits." *Id.* at 10-11.

In this motion, Voynow argues that its engagement by Star was an annual tax engagement.[13] However, there is voluminous evidence to the contrary. Accordingly, Voynow's summary judgment motion must be denied because the scope of Voynow's engagement is the "ultimate issue" of fact that should be left to the fact finder.[14] *See, e.g.*, *Bart v. Golub Corp.*, 96 F.4th 566, 578-579 (2d Cir. 2024) (in discrimination case, plaintiff "adduced sufficient evidence of discriminatory intent by a supervisor … to defeat Golub's motion for summary judgment and submit the ultimate issue of intentional discrimination to a fact finder"); *Lexington Furniture Indus. v. Lexington Co.*, No. 19-cv-6239, 2021 U.S. Dist. LEXIS 55775, at *27-28 (S.D.N.Y. Mar. 23, 2021) (denying summary judgment because "reasonable juries could reach different

---

[13] It is unclear why Voynow relies on Star's response to Interrogatory #6, which sought information regarding Star's "internal controls or accounting policies and procedures," for their argument that the continuous representation doctrine does not apply. (Moving Br. at 11-14). Their reliance is misguided. First, Star, in limiting its response to the 2010-17 time period, was not responding to an interrogatory concerning Voynow's services. In any event, if Voynow had an issue with the response, it should have brought a motion to compel but never did. *See* Fed. R. Civ. P. 37(a)(3)(B) ('party seeking discovery may move for an order compelling an answer, designation, production, or inspection" when "a party fails to produce documents"). By certifying the close of discovery (ECF Dkt. Entry118), Voynow has "forfeited their ability to complain at this juncture." *Consorcio Prodipe, S.A. de. C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 188 (S.D.N.Y. 2008) (citations omitted). *See also, e.g.*, Fed. R. Civ. P. 56(f); Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (Rule 56(f) request for discovery will be denied when there has been a meaningful opportunity to conduct discovery).

[14] Here, the intent of the parties as to the scope of their relationship is the crux of this dispute. In this regard, the fact finder's role in determining what was the agreement of the parties is similar to the fact finder's role in discrimination cases where it must determine intent. *See also, e.g.*, *Bookman v. Lynch*, 2009 U.S. Dist. LEXIS 40766, at *26-28 (S.D.N.Y. May 14, 2009) ("summary judgment is inappropriate because of disputed issues of material fact regarding the 'ultimate issue': whether a fact finder could reasonably conclude that Defendant unlawfully discriminated against him").

conclusions on 'the ultimate issue'"); *United States v. Hyman*, No. 16-cv-5363, 2022 U.S. Dist. LEXIS 164237, at *19 (E.D.N.Y. Sep. 9, 2022) ("ultimate factual issues [are] reserved for the finder of fact").

The other cases cited by Voynow are also inapplicable and not helpful because in those cases, the complained-of conduct, upon which the continuous representation argument was based, was not related to the engagement. *See, e.g.*, *Giarratano v. Silver*, 847 N.Y.S.2d 698, 46 A.D.3d 1053 (N.Y. App. Div. 3d Dep't 2007) (where defendant accountant prepared annual tax returns from the 1980s, plaintiff's 2004 lawsuit was time-barred because the complained of conduct concerned discrete advice by the accountant in 1995 about an investment opportunity that plaintiff, ultimately, claimed was bad advice); *Mitschele*, 826 N.Y.S.2d at 17-18 (plaintiff could not rely on the continuous representation doctrine to save her 2003 lawsuit which complained about discrete errors in the 1997 through 1999 annual tax returns where defendant accountant expressly told plaintiff in March 2001 that they "could no longer represent her" to prepare her year 2000 tax return or otherwise); *Rodeo Family Enters., LLC v. Matte*, 952 N.Y.S.2d 581, 585, 99 A.D.3d 781 (N.Y. App. Div. 2d Dep't 2012) (holding that the accountant's "alleged negligent advice regarding the drafting of the 2004 Buy/Sell Agreement was a subject distinct and separate from [the accountant's] subsequent work conducting audits of RJM's financial statements"); *Apple Bank v. Sav. v. PricewaterhouseCoopers LLP*, 895 N.Y.S.2d 361, 70 A.D.3d 438 (N.Y. App. Div. 1st Dep't 2010) (claim based on the original advice as to the "effect of the stock buy back" not tolled by subsequent accounting work where there was no "mutual agreement to advise plaintiff on the effect of the stock buy back" at any time subsequent to the original advice).

Here, in contrast to the cases cited by Voynow, and like *Kolb, Lobel Chem.* and *Ghiz*, the complained-of conduct was directly related to Voynow's engagement by Star – which concerned

ongoing consulting services that include controllership functions and supervision of the accounting department, as well as internal controls.[15]

## CONCLUSION

For all the foregoing reasons, it is respectfully requested that the Court deny defendants' motion for summary judgment in its entirety and grant such other relief as the Court may deem just and proper.

Dated: Lake Success, New York
     May 15, 2024

**MILMAN LABUDA LAW GROUP PLLC**

By: /s/ _____

Joseph M. Labuda, Esq.
Jamie S. Felsen, Esq.
Michael C. Mulè, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
jamie@mllaborlaw.com
michaelmule@mllaborlaw.com
*Attorneys for Plaintiffs*

---

[15] Based on the evidence, Star was "left with the reasonable impression that defendant was, in fact, actively addressing" these ongoing consulting needs and did not lose confidence in Voynow until it terminated Voynow in November 2017. *Shumsky v. Eisenstein*, 96 N.Y.2d 164, 169-70, 750 N.E.2d 67, 726 N.Y.S.2d 365 (2001) (attorney malpractice). This lawsuit was commenced immediately after the expiration of the March 2018 tolling agreement.