## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STAR AUTO SALES OF BAYSIDE, INC. (d/b/a STAR TOYOTA OF BAYSIDE), et al. | Civil Action No.: 1:18-cv-05775-ERK-TAM |
| Plaintiffs, -against- | |
| VOYNOW, BAYARD, WhyTE AND COMPANY, LLP, HUGH WHYTE, RANDALL FRANZEN and ROBERT SEIBEL, | |
| Defendants. | |

## REPLY OF DEFENDANTS VOYNOW, BAYARD, WHYTE AND COMPANY, LLP, HUGH WHYTE, RANDALL FRANZEN, AND ROBERT SEIBEL IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Voynow, Bayard, Whyte and Company, LLP ("Voynow"), Hugh Whyte ("Whyte"), Randall Franzen ("Franzen"), and Robert Seibel ("Seibel"), (collectively as "Voynow"), hereby submit this Reply in support of their Motion for Summary Judgment.

## PREFATORY STATEMENT

The statute of limitations applicable to an accounting malpractice claim is three years and accrues when a client receives the accountant's work product "since this is the point that a client reasonably relies on the accountant's skill and advice; not the date that a plaintiff claims to have discovered the alleged professional malpractice." *Ackerman v. Price Waterhouse,* 84 N.Y.2d 535, 541 (1994). In this case, the work product issued each year by Voynow were corporate tax returns. These corporate tax returns contained line item amounts for balance sheet and income statement accounts as of the end of each fiscal year.[1]   According to Michael Koufakis, he hired

---

[1] See e.g., Voynow Ex. 34, Plaintiff Star Nissan's 2014 Tax Return.  Note that Voynow is filing the redacted first page only of Form 1120S but is supplying the Court with the full unredacted tax return that reflects the income statement and balance sheet accounts.  That document is bates stamped as VOYNOW 004094.0000-004094.0085.

Voynow to perform procedures that were "more than a review and less than an audit" of every account balance on the financial statements.  He did not want Voynow to actually prepare or issue annual audited or reviewed financial statements, but did require that it "verify" the financial statement account balances that then flowed into the annual corporate tax returns. Plaintiffs contend that various purported theft was committed by several former employees over the course of 17 years, such that certain account balances were therefore erroneous and Voynow was negligent in not detecting the alleged theft or erroneous balances through the "review/audit" procedures it performed each year during annual site visits.

Voynow's work product was issued each year approximately seven months after the close of Plaintiffs' fiscal year with a cover letter enclosing these corporate tax returns.  For the last five years of Voynow's engagement, this work product was issued on the following dates:

| TAX YEAR OF RETURN | DATES VOYNOW ISSUED ITS WORK PRODUCT |
|---|---|
| 2012 | June 24-25, 2013; July 8, 2013 |
| 2013 | July 9, 2014; July 29, 2014; July 31, 2014; August 4, 2014 |
| 2014 | August 6, 2015; August 11-12, 2015; September 10, 2015 |
| 2015 | March 14-15, 2016; May 12-13, 2016; July 17, 2015 |
| 2016 | July 25-27, 2017; September 6, 2-17 |

Given the October 16, 2018 filing date of this action and the three year statute of limitations, all claims arising from Voynow's alleged failure to detect purported theft through the "review/audit"  or "verification" procedures it performed during Plaintiffs 2001 through 2014 fiscal years are now time-barred.  All Voynow's work product arising from these "review/audit" and "verification" procedures performed as to account balances for the 2001-2014 fiscal years

was issued prior to October 16, 2015.  Hence, the sole claims not time-barred at this juncture are those predicated upon purported theft that allegedly occurred in the 2015 and 2016 fiscal years that was not detected as part of Voynow's "review/audit" procedures, since Voynow's work product for those years was not issued until 2016 and 2017, respectively.

In their opposition, Plaintiffs argue that the continuous representation exception applies such that the "relevant" period should extend back 17 years to 2001.  The continuous representation exception has a narrow scope commensurate with the policy interests underlying the purpose of a statute of limitations. *Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.*, 713 F. Supp. 2d 96, 104 (N.D.N.Y. 2010); *Duffy v. Horton Mem. Hosp.*, 66 N.Y.2d 473, 476–477, 497 N.Y.S.2d 890 (1985) (purpose of the statute of limitations is to protect a defendant from stale claims).  Plaintiffs bear the burden to prove this exception applies.  *Booth v. Kriegel*, 36 A.D.3d 312, 825 N.Y.S.2d 193 (1st Dept. 2006).  At the outset, Plaintiffs cannot meet their burden as they cannot overcome the contradictory position they took throughout discovery in response to requests for their pre-2010 financial records and theft prevention policies.  Plaintiffs objected to the "temporal scope" of these requests as being overbroad and explicitly proclaimed that "**the relevant time period**" for discovery purposes was "**2010 to 2017 based upon the statute of limitations in this case**" or was "**from January 1, 2012 forward.**"  This repeated stance effectively undermines any attempt to now change the "relevant time period" to a 17 year window dating back to 2001.

Further, to invoke the continuous representation exception, Plaintiffs must establish that there was a "mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim" as opposed to a mere "continuation of a professional relationship." *Williamson v. PricewaterhouseCoopers LLP,* 9 N.Y.3d at 9–10, 840 N.Y.S.2d

3

730, 872 N.E.2d 842 (2007).  The parties must explicitly contemplate that the professional relationship continue and that the continued representation occur "in connection with the particular transaction which is the subject of the action." *Arnold v. KPMG LLP*, 543 F. Supp. 2d 230, 236 (S.D.N.Y. 2008), *aff'd*, 334 F. App'x 349 (2d Cir. 2009) *citing*, *Mitschele v. Schultz*, 36 A.D.3d 249, 253, 826 N.Y.S.2d 14, 18 (1st Dep't 2006).  Voynow has put forth substantial evidence that belies any "mutual understanding" of continued representation on any specific matter.  That evidence includes (1) discrete sets of "year-ending" annual workpapers maintained for each separate engagement; (2) "final" bills issued by Voynow in September of each year at the end of every engagement; (3) annual engagement letters issued each year from 2008 through 2016; (4) issuance of its work product each year; and (5) testimony from both Voynow and Plaintiffs' owners that they discarded or filed away documentation for past years once the fiscal year ended.  This evidence refutes any "mutual understanding" as to an ongoing open-ended and continuous representation of any specific subject matter.  To the contrary, it indicates a series of discrete and severable engagements performed in successive years.

Plaintiffs also cannot meet their burden to establish a continuous representation or any disputed issue of material fact through their extensive reliance upon the reports of their expert Douglas Sosnowski, CPA.  Not only are Mr. Sosnowski's reports unsworn, they are devoid of any evidentiary support from the record which renders them inadmissible and unreliable.  Further, they are also inconsistent with Michael Koufakis' deposition testimony.  Most notably, Mr. Sosnowski attempts to recast the Voynow engagement as one of a "controllership" service or a never-ending, vast "consulting" engagement.  But Mr. Koufakis never testified that he had hired Voynow to be the "controller" nor as part of any open-ended "consulting" engagement on

any specific matter.  Mr. Sosnowski's reports are even contradicted by the many concessions he later made in his own deposition and cannot be used simply to try to defeat summary judgment.

Lastly, the three cases Plaintiffs rely upon are distinguishable as all were decided at the pleadings stage in the context of a motion to dismiss.  Hence, unlike this case, those courts had to accept, without question, the plaintiffs' factual averments in their complaints that there was a mutual understanding as to a continuous representation on a specific matter.  None involved a fully developed record, or was decided pursuant to Fed.R.Civ.P. 56(e).  Plaintiffs also notably omit critical facts when describing these cases, further dispelling their pertinence to this matter.

In short, Voynow is entitled to summary judgment based upon the three-year statute of limitations.  Plaintiffs have not met their burden to invoke the continuous representation exception or establish a disputed issue of material fact based upon the fully developed record in this case.  Accordingly, all claims relating to purported theft or erroneous account balances existing or occurring prior to 2015 are now time-barred and should be dismissed.

## LEGAL ARGUMENT

**I.  PLAINTIFFS HAVE NOT MET THEIR BURDEN TO WARRANT TOLLING THE STATUTE OF LIMITATIONS FOR SEVENTEEN YEARS PURSUANT TO THE CONTINUOUS REPRESENTATION EXCEPTION.**

**A. Plaintiffs' Contradictory Position Taken In Discovery As To "The Relevant Time Period" And As To The Applicable Statute Of Limitations Undermines Their Attempt To Now Invoke The Continuous Representation Exception.**

When Voynow served discovery requests seeking financial records such as Plaintiffs' bank statements, canceled checks, accounting journals, monthly parts statements, monthly reconciliations, invoices, or information as to their theft prevention policies or internal controls in place for years prior to 2010, Plaintiffs objected.  They claimed that such discovery was

"**overly broad in temporal scope and therefore not relevant to the claims and defenses**."[2] Citing to "**the relevant time period**" for discovery as being from **2010 to 2017 based upon the statute of limitations in this case**" or to being "**from January 1, 2012 forward,**" Plaintiffs provided responsive information or documents in discovery only for the period post-2010 or post-2012. *Id*. At no point throughout the six year discovery phase in this case, did Plaintiffs ever amend their responses or provide the requested discovery dating back to 2001. Voynow has argued in its Motion for Summary Judgment that Plaintiffs' discovery responses stating -- that the "relevant time period is 2010 to 2017 based upon the statute of limitations in this case" -- cannot now be ignored when this Court is being asked to decide the applicable statute of limitations. Yet, that is essentially what Plaintiffs have tried to do in their Response.

Conspicuously, Plaintiffs largely ignore the direct contradiction between their discovery responses and their attempt to expand the statute of limitations back 17 years to 2001. Voynow compared their actions to improper attempts by a party who tries to use the attorney client privilege as both a sword and a shield, and cited case law precluding such tactics. But Plaintiffs failed to even address this argument or analogy. They offer no reason as to why this Court can or should ignore the glaring inconsistency between their discovery position and their current attempt to invoke the continuous representation exception. By failing to even address or oppose Voynow's argument on this point, Plaintiffs have effectively waived any opposition to it. See e.g., *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.) *aff'd*, 130 F.3d 1101 (2d Cir.1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue ... which provides an independent basis for dismissal"); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, 2018 WL 4625768, at *3 (S.D.N.Y. Sept.

---

[2] See Voynow Ex. 29, Plaintiffs' Answers to Interrogatories, #6; Voynow Ex. 30, Plaintiffs' Answers to Document Requests.

26, 2018) ("where defendants moved for summary judgment on particular claims, arguments, or theories of liability, and where plaintiff failed to address them in her memoranda of law, the court has deemed those claims, arguments, and theories abandoned").

By way of a passing footnote, Plaintiffs actually try to shift blame to Voynow and suggest that it should have recognized that they were lodging purportedly baseless discovery objections in violation of the discovery rules, and should have filed a motion to compel to obtain pre-2010 documents and information.  Response at 20, fn.11.  This argument is essentially an admission of their bad faith discovery tactics.  The whole point of discovery is to "expeditiously narrow the scope of the litigation, reduce the element of surprise, serve as admissions for trial, and in a significant matter avoid unnecessary discovery and minimize expense." _Trueman v. New York State Canal Corp._, 2010 WL 681341, at *2 (N.D.N.Y. Feb. 24, 2010).  Such bad faith tactics by Plaintiffs are an egregious violation of the the purpose of discovery.  If the limitations period were to be extended back 17 years, Voynow would be severely prejudiced given Plaintiffs' failure to provide pre-2012 or pre-2010 discovery and their assertion that this period of time was not relevant to their claims.  Because Plaintiffs' repeated stance that the "relevant time period" for discovery was confined to post-2012 or post-2010 "based upon the statute of limitations in this case," they are now bound by that position.  See e.g., _Feuer v. Cornerstone Hotels Corp._, 2017 WL 3841841, at *10 (E.D.N.Y. Aug. 4, 2017), adopted, 2017 WL 3842350 (E.D.N.Y. Aug. 31, 2017) (a party cannot create a genuine question of material fact to avoid summary judgment where there are contradictory prior admissions or discovery responses); _287 Franklin Avenue Residents' Assn._, 2012 WL 189922, at *9 (E.D.N.Y. May 24, 2012) (discovery rules explicitly require responding party to "provide the best answer they can based upon information within their possession").

Voynow respectfully submits that this Court's analysis of Plaintiffs' attempt to invoke the continuous representation exception can be decided on this issue alone.  Plaintiffs' clear and explicit discovery responses as to the applicable statute of limitations in this case, coupled with their refusal to produce pre-2010 or pre-2012 discovery, effectively resolves the question at hand.  They simply cannot meet their burden to establish the continuous representation exception applies, having clearly stated otherwise throughout discovery.

**B.  Plaintiffs Have Failed To Meet Their Burden To Prove A Continuous Representation As Voynow's Undisputed Evidence Reflects A Series of Discrete And Separate Engagements Over the Course Of A Professional Relationship.**

It is Plaintiff's burden to prove that there was a "mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim" as opposed to the "continuation of a professional relationship."  *Williamson v. Pricewaterhouse Coopers LLP,* 9 N.Y.3d at 9–10, 840 N.Y.S.2d 730, 872 N.E.2d 842 (2007).  Where the evidence does not establish any such "mutual understanding," nor support any disputed material issue of fact, the continuous representation exception does not apply.

**1.  Voynow's Documentation Is Indicative Of Discrete And Separate Engagements Over The Course of A Professional Relationship.**

The evidence of record makes clear that Voynow had a series of discrete and separate engagements with Plaintiffs over the course of a professional relationship.  First, the existence of annual engagement letters issued by Voynow is paramount.  As stated in *Williamson v. PricewaterhouseCoopers LLP*, *supra*., 9 N.Y.3d 1, 9–10, 840 N.Y.S.2d 730, the existence of any retainer agreement plays a key role in determining whether a continuous representation was contemplated by the parties. *Id*.  Here, Voynow issued annual engagement letters beginning in 2008 once guidance from the AICPA suggested accounting firms do so.  These engagement

8

letters were issued on or about December 30, 2008, December 30, 2009, December 15, 2010, December 15, 2011, December 28, 2012, January 2, 2014, January 30, 2015, January 18, 2016 and January 3, 2017.[3]   The fact that these annual engagement letters even exist and were issued each year, make clear that from Voynow's perspective, its engagements were discrete and separate matters.  If there was a "mutual" agreement for an engagement that was an open-ended and ongoing as Plaintiffs now argue, there would be no need for Voynow's annual engagements letters to even exist or be issued.  Yet, they do and they flatly refute Plaintiffs' argument.

Nonetheless, Plaintiffs seek to create an issue of fact as to these annual engagement letters by offering testimony that Michael Koufakis does not recall receiving them, or that the letters were never signed.  This argument misses the point because there was no requirement that the letters issued by Voynow actually be signed.[4]  Further, Mr. Koufakis' mere lack of recollection is insufficient to create a disputed issue of material fact to avoid summary judgment. As Plaintiffs must establish a "**mutual** understanding" of a continuous representation on the specific subject matter underlying their claims, they must show that Voynow did not contemplate separate and discrete engagements.  Mr. Koufakis' lack of recollection as to whether he received the annual engagement letters has no bearing on Voynow's understanding of the engagement.[5] The letters explicitly state that the engagement would be concluded upon delivery of Voynow's work product. This language, reiterated annually, negates the existence of any "mutual" understanding from Voynow's perspective that there was an open-ended, ongoing and continuous representation on any specific matter.  In fact, it makes clear that from Voynow's

---

[3] See Voynow Ex. 20, 2008-2009 Engagement Letters; Voynow Ex. 21, 2010-2016 Engagement Letters.
[4] Even Plaintiffs' expert agreed that the AICPA did not require that engagement letters, such as those issued by Voynow, be signed.  See Plaintiffs' Ex. 2, Sosnowski 9/15/23 Report at p. 5. Further Mr. Koufakis never signed the annual engagement letters issued by Rosenfield & Company hired after Voynow. Voynow Ex. 26, Unsigned Rosenfield Engagement Letters.
[5] Plaintiffs' expert concedes that Plaintiffs' owners discarded many communications received from Voynow and Plaintiffs' owners specifically admitted to doing so at the end of each year.  CITE

perspective, its engagements were "discrete and separate." *Contrast* <u>Anwar v. Fairfield Greenwich Ltd</u>., 728 F. Supp. 2d 372, 461 (S.D.N.Y. 2010) (declining to grant motion to dismiss where accountant's engagement letter dated February 7, 2006 stated "this engagement letter is also effective for years subsequent to 2005, until it is replaced by a new engagement letter, unless the engagement is terminated" as sufficient to invoke a continuous representation at the pleadings stage).

Just as the existence of Voynow's annual engagement letters undercuts Plaintiffs' argument as to the continuous representation exception, so too does the content and organization of Voynow's workpapers. These workpapers reflect a compilation of Voynow's work rendered over the course of each year and corresponded to each individual Plaintiff dealership. After Voynow completed its work for any specific year and issued its work product, these workpapers were then bound and filed away in a storage cabinet at Voynow' offices.[6] Significantly, the workpapers contained the various financial schedules that Voynow had reviewed along with the final year-end trial balance listing all account balances and were explicitly labeled as "year end" workpapers.[7] Thus, the manner in which Voynow documented, organized and maintained its annual workpapers further support the existence of discrete and separate engagements – not an open-ended, continuous engagement. If it was a continuous, ongoing engagement, "year-ending" workpapers would not even exist, nor would Voynow file them away in a cabinet at the end of each year.

However, in another attempt to create an issue of fact, Plaintiffs have presented this Court with an altered and misleading version of Voynow's workpapers. Specifically, in Plaintiffs' Ex.

---

[6] See Voynow Ex. 36, Deposition of David Kumor 30:1-11; 31:9-16; 33:8-12.
[7] See Voynow Ex. 37-38. Exhibits 37-38 are full sets of Voynow's 2015 Star Chrysler and 2015 Star Toyota workpapers, respectively. Voynow Exhibit 39 is a sampling of the individual cover sheets that accompanied each individual sets of Voynow workpapers.

38-44, they pulled out random pages or random schedules from discrete sets of Voynow's annual workpapers and presented them out of context, as is readily apparent by the non-sequential bates numbering.  Voynow Exhibits 37-38 represent a true and accurate depiction of how its workpapers were assembled, maintained and organized.  Each set had a "year-ending" cover sheet as is apparent by Voynow Ex. 39, and were maintained and organized by the fiscal "year-ending" date for each Plaintiff entity.  The workpapers contained the various financial schedules reviewed during that particular year's engagement along with the final trial balance listing all financial statement accounts, and were then filed away in a cabinet after Voynow's work product was issued for that particular year.  Plaintiffs cannot create an issue of disputed material fact by presenting a distortion of Voynow's workpapers with random pages presented out of context.

In the same manner, Voynow's invoices provide further support as to the existence of discrete and separate engagements and not a continuous, open-ended one.  Each year, beginning in approximately March, Voynow issued "progress" bills to Plaintiffs that reflected work it had completed up to that point that was applied against any retainers paid.  Then in approximately September of each year, Voynow issued a "final" bill after completing its annual work and issuing its work product for Plaintiffs' December 31st fiscal year.[8] This same cycle recurred with "progress" and "final" bills issued throughout each year.  Clearly, if there was any "mutual understanding" of an ongoing, open-ended engagement, there would be no "progress" or "final" bills issued each year.  See _Booth v. Kriegel_, 36 A.D. 3d 312, 825 N.Y.S.2d 193 (2006) (merely because an accountant performed same type of work in successive years does not toll the running of the statute of limitations, even if same error allegedly repeated each year).

---

[8] See Voynow Ex. 8, R. Seibel Dep. 136:16-137:3; Voynow Ex. 25, Sampling of Voynow Bills.

In their Response, Plaintiffs claim that because Voynow bills do not explicitly reference the term "tax" and instead use the term "accounting," there is somehow a disputed issue of material fact as to what Voynow actually did.  This argument can also be dismissed.  For purposes of this Motion, Voynow does not dispute Michael Koufakis' claim that he hired it to perform "audit/review" procedures of all of Plaintiffs' financial statement accounts and to verify all of these financial statement balances that were then reflected on the tax returns.  Thus, to the extent some bills omit the word "tax," that omission does not create an issue of disputed material fact to avoid summary judgment.  Voynow also does not dispute that it periodically handled sales tax or IRS audits which were reflected in invoices designated as "special accounting services."  However, a tax audit is a discrete and finite engagement – not an open-ended, continuous matter.  So it cannot be used to establish the continuous representation exception.  More importantly, there is no alleged malpractice claim arising from Voynow's handling of any sales tax or IRS audit.  For the continuous representation exception to apply, not only must there be a "mutual understanding" between the parties, but it must also arise from the specific subject matter underlying the alleged malpractice.  Hence, any Voynow's invoices that reference "special accounting services" arising from tax audits do not reflect any continuous, open-ended matter, nor relate to the specific alleged thefts at issue and cannot be used to give rise to a fact issue to avoid summary judgment.

## 2.   Mr. Koufakis' May 15, 2024 Declaration Is Insufficient To Establish The Applicability Of The Continuous Representation Exception.

Plaintiffs offer a May 15, 2024 Declaration from Michael Koufakis that contradicts his deposition testimony. See Plaintiffs' Ex. 73.  In this Declaration, Mr. Koufakis now claims that he hired Voynow for a "consulting and controllership" engagement – which is distinctly at odds

with his sworn deposition testimony.  At his deposition, Mr. Koufakis testified that after the difference between a financial statement compilation, review and audit was purportedly explained to him, he hired Voynow to provide services that were "more than a review but less than an audit" of every account balance on the financial statement.  Initially, he wanted Voynow to visits quarterly but then reduced its visits to three times per year.  He did not require that Voynow issue audited or reviewed financial statements, but wanted it to "verify" all account balances on the financial statements, which were reflected in the various income and balance sheet account balance accounts listed on the annual corporate tax returns it prepared and issued. Not once did Mr. Koufakis ever testify that he hired Voynow to be a controller or provide controllership functions, nor did he ever testify that he hired Voynow to be a financial consultant to the dealership businesses.  While Plaintiffs' Response cites to Mr. Koufakis' May 15, 2024 Declaration to try to create a disputed issue of material fact, this Declaration should be disregarded as it cannot be used to avoid summary judgment.  See _Hale v. Mann_, 219 F.3d 61, 74 n.1 (2d Cir. 2000) (a party cannot create a genuine question of material fact by means of a self-serving declaration, affidavit, or affirmation that contradicts prior admissions); _Buttry v. General Signal Corp._, 68 F.3d 1488, 1493 (2d Cir. 1995) (a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.).

Mr. Koufakis' Declaration is also unreliable.  For example, he states that "Voynow was provided with log-in credentials" for the Reynolds system.  That is true.  However, Mr. Koufakis notably does not state in his Declaration that these log in credentials ever allowed for remote access by Voynow – because they did not.  Prior to 2017, Voynow could only access Plaintiffs' Reynolds system through a computer physically located at Plaintiffs' dealership and only when it was physically on site, using these log in credentials.  As stated above, Voynow was only on site

3-4 times per year, and thus could only access the Reynolds system quarterly, at most. Mr. Koufakis is the administrator of Plaintiffs' Reynolds' system and maintains all credentials of anyone who has access to the system and has the ability to track who logs in and when, yet he admitted that he has no evidence of Voynow ever logging in remotely or even being given remote access to do so prior to 2017. Voynow Ex. 40, M. Koufakis Dep., 126:13-21; 129:17-22; 132:24-133:14. Further, it they wanted to, Plaintiffs could produce a summary of any remote logins to their Reynolds system but failed to produce such evidence and cannot show that Voynow ever logged in remotely, which presumably would have occurred frequently if was actually hired as a controller or financial consultant. See Voynow Ex. 35, Sosnowski Dep. 123:21-126:9; 94:22-95;114:2-25. This is the type of evidence Plaintiffs would need to submit to meet their burden of a continuous representation as to any purported "consulting and controllership" engagement and their failure to produce any severely discredits their argument.

At paragraph 11 of his Declaration, Mr. Koufakis states that he spoke on the phone monthly to Voynow and that these conversations included questions he had about accounting operations. See Plaintiff Ex. 73. While this statement is also offered to try to create a material issue of disputed fact as to a continuing representation, it is again insufficient. Not only is it vague as to any particular subject or even any specific dealership, it does not connect any such conversation to any alleged act of employee theft that was undetected, nor to any alleged financial statement account balance that was purportedly erroneous. *Arnold v. KPMG LLP*, 543 F. Supp. 2d 230, 236 (S.D.N.Y. 2008), *aff'd*, 334 F. App'x 349 (2d Cir. 2009) (a plaintiffs' claim that accountant made "repeated assurances" of no wrongdoing or errors did not constitute a "continuous representation" absent any explicit and mutual agreement as to specific scheme underlying alleged loss).

Further, even if Voynow communicated to Plaintiffs' management any notable items or matters observed for them to address while Voynow was physically on site or in a letter, the evidence is clear that it did not follow up the next year on these issue as it was left to Plaintiffs' management to decide how to address it."[9]  In fact, Plaintiffs' owner Steve Koufakis confirmed that if he received any such written reports or communications from Voynow, he discarded them "at the end of the year".  See Voynow Ex. 42, S. Koufakis Dep. 44:5-14.  This testimony suggests that Plaintiffs' owners likewise viewed each year to be separate and discrete engagements and did not look for follow up from Voynow either as to any prior year's issue.  Indeed, each year, Plaintiffs' closed out their annual books and records with a year-end trial balance used to prepare their tax returns.  Annual year-ending entries were made to close out each fiscal year.  Notably, Mr. Koufakis' Declaration does not state that he ever asked Voynow to go back and revisit past financial statement accounts that had been "reviewed or audited" in past years, nor does he state that he asked Voynow to redo any prior tax return it had issued.  Thus, there is no support for any "mutual" agreement to provide continuous representation on any specific subject matter, let alone the specific matter underlying the alleged loss. See _Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C._, 713 F. Supp. 2d 96, 105 (N.D.N.Y. 2010) (rejecting continuous representation doctrine where plaintiff claimed ongoing business relationship to provide periodic audit services but did not establish mutual understanding between parties that a certain service, such as a past audit, was specifically subject to ongoing representation, or any agreement to provide corrective or remedial services by reexamining a prior year's financial statements or redo a prior year's audit).

---

[9] See Voynow Ex. 41, R. Franzen Dep. 185:3-13 ("Voynow does not follow up; they bring it to their attention.  If they want follow up, it's up to the client.  It's not what we do").

**C.** **Plaintiffs Cannot Use Their Expert Douglas Sosnowksi's Reports To Create An Issue Of Fact Where The Reports Are Unsupported, Unreliable And Inconsistent With Actual Testimony.**

Plaintiffs' Exhibit "2" contains the September 15, 2023 and November 20, 2023 reports of Mr. Sosnowski which they cite to extensively in their Response in an attempt to avoid summary judgment.  They seek to use his reports essentially to make the following points: (1) Voynow's invoices were excessive so it therefore follows that it was providing  "controllership" services or an open-ended consulting engagement; (2) Voynow never documented the scope of its services; and (3) Plaintiffs' Reynolds & Reynolds accounting system had no tax-related purpose so Voynow's access of it indicates it provided more than tax preparation services.[10]

At the outset, reliance upon Mr. Sosnowski's unsworn letter reports is an "inappropriate response" to a summary judgment motion, and any factual assertions made therein are "properly disregarded by the court." See e.g., _Brazier v. Hasbro, Inc._, 2004 WL 1497607, at *2 (S.D.N.Y. July 6, 2004) ("The submission of unsworn letters is an 'inappropriate response' to a summary judgment motion, and factual assertions made in such letters are 'properly disregarded by the court.'") (quoting _United States v. All Right, Title and Interest in Real Property and Appurtenances_, 77 F.3d 648, 657–68 (2d Cir.1996); _Raskin v. Wyatt Co._, 125 F.3d 55, 66 (2d Cir.1997) (an expert's report is not a talisman against summary judgment).

Further, the opinions cited in his reports to try to create an issue of fact are inadmissible. Courts can reject inadmissible evidence on summary judgment, including that of expert reports. _Berk v. St. Vincent's Hosp. & Med. Ctr._, 380 F. Supp. 2d 334, 352–53 (S.D.N.Y. 2005) (rejecting inadmissible expert testimony submitted in opposition to a summary judgment motion); _Nimely v. City of New York_, 414 F.3d 381, 395 (2d Cir.2005) (proffered expert testimony must be

---

[10] Voynow reserves the right to challenge other aspects of Mr. Sosnowski's opinions not cited by Plaintiffs at this juncture through a _Daubert_ motion.

admissible and a district court functions as gatekeeper).  Pursuant to Rule 702 of the Rules of Evidence, an expert's opinions must be based upon sufficient facts or data, it must be the product of reliable principles and methods, and the expert must apply the principles and methods reliably to the facts of the case.

### 1.  Mr. Sosnowski's Opinion That Voynow's Annual Fees Were Excessive And Therefore Indicative of Being A Controller or Open-Ended, Ongoing Consultant Is Unsupported, Unreliable And Inadmissible.

Mr. Sosnowski's September 15, 2023 report states that the "customary fee for preparation of a corporate tax return in the New York City metropolitan area in 2015 was approximately $9,700."  He then opines that because Voynow's annual bills exceeded this amount, its services were therefore indicative of being a "controller" for Plaintiffs or providing an open-ended, ongoing consulting service.  See Plaintiffs' Ex. 2, Sept. 15, 2003 at p.7.  His report fails to cite to any journal, study, survey or publication to support what the "customary fee" for a corporate tax engagement in New York City in 2015 would have been.  For that reason alone, it is inadmissible and unreliable.  Further, Mr. Sosnowski admitted that he has not prepared any corporate tax return for an auto dealership since 2001.  Voynow Ex. 35, Sosnowski Dep., 103:3-5.  When asked about his statement as to the purported "customary fee" for a tax return in New York City in 2015, he was unable to identify any taxpayer to support this statement, whether by name, size, revenue, income, type of dealership, inventory, number of accounts, or even type of tax return.  _Id_., 152:13-154:11.  In short, he provided no support whatsoever for this statement.

Not only did Mr. Sosnowski fail to cite to any data to support what "customary" billings were for New York City, he ignored the only evidence in the record on this point and specifically the testimony of Voynow's Managing Partner Hugh Whyte.  Mr. Whyte was questioned extensively about Voynow's annual billings for its clients, and specifically for tax engagements

17

for large auto dealership groups such as Potamkin, Sloane or Plaintiffs.  See Voynow Ex. 43, H. Whyte Dep. 49:19-52:9.  According to Mr. Whyte, Voynow's annual billings for the large Potamkin and Sloane dealership groups were approximately $350,000 each, and the annual billing for the Star dealership group approximated $100,000.  _Id_., Whyte Dep. 52:6-9.  Mr. Whyte explained that Voynow has a "very sophisticated tax practice" and that its clients are large "flow-through entities" and that it's "an enormous task" to get all the "flow-through numbers so that we can prepare the quarterly estimates."  Voynow Ex. 7, Whyte Dep. 40:21-41:13.  Despite Mr. Whyte's testimony being the only evidence in the record as to comparable billings for similar type engagements, it was plainly overlooked by Mr. Sosnowski, who chose to cite to nothing whatsoever to support his opinion.

Mr. Sosnowski also computed purported "average" calculations of Voyow's billings in his report in an attempt to support his opinion that Voynow's billings were indicative of a "controllership" service.  However, when questioned about the "average" calculations he computed, Mr. Sosnowski  conceded that his calculations were misleading.  Despite being aware that Voynow's total annual billings included services it rendered to other Star-related entities such as Star Auto Body or Plaintiffs' real estate companies, he made no attempt to segregate those amounts out when computing Voynow's "average" billings per year, nor could he break down how much of Voynow's total billing applied to these other Star-related entities not party to this case.  See Voynow Ex. 35, Sosnowski Dep. 148:16-152:12.  Likewise, he was also aware that this "average" figure reflected work Voynow had done for tax audits but notably did not attempt to segregate this amount out when making his calculations.  _Id_.  In short, Mr. Sosnowski's opinion that the amount Voynow's bills were indicative of a controllership and consulting engagement is unsupported, unreliable and in admissible.

18

### 2. Mr. Sosnowski's Opinion That Voynow's Engagement Was For A Controllership Or Open-Ended, Ongoing Consultant Is Rendered Unreliable Based Upon His Own Deposition Testimony.

In his attempt to recast Voynow's engagement as a "controllership," Mr. Sosnowski's report stated that "on their invoices for services rendered, Voynow indicated the performance of various controllership functions." Plaintiff Ex. 2, Sept. 15, 2023 Report, p. 6. Again, his report failed to cite to any specific Voynow invoice to support this statement despite his review of all of them. At his deposition, he similarly could not identify any specific invoice that supported this opinion. See Voynow Ex. 35, Sosnowski Dep. 119:8-11; 119:20-120:10. Mr. Sosnowski's inability to offer any support for this opinion renders it unreliable and inadmissible.

Voynow acknowledges that there are invoices it issued in the Fall of 2017 that reference the "controllership function." But these are the only such invoices and were clearly explained by the testimony. Specifically, when Voynow was requested by Plaintiffs in the Spring of 2017 to assist and train Ms. Cutillo, who had been promoted to Controller without any prior experience, the invoices Voynow issued in the Fall of 2017 state "special accounting services as requested related to the controllership function." See Voynow Ex. 31. However, those are the only invoices that even reference the term "controllership." At his deposition, Mr. Sosnowski conceded that this Fall 2017 invoice was the only one he knew of that ever referenced a "controllership" function and he failed to identify any invoices supporting his opinion on this point. Voynow Ex. 35, Sosnowski Dep. 116:7-16; 118:21-119:11; 119:20-120:10. This failure to cite to any invoice in his report nor identify any pre-2017 invoice at his deposition, renders his opinion that Voynow's invoices were indicative of an ongoing controllership functions as unreliable, unsupported and inadmissible. Given that no other Voynow invoice prior to 2017

references the "controllership" function further refutes Plaintiffs' attempt to create an disputed issue of fact on this point.

In his deposition, Mr. Sosnowski also admitted to the lack of evidence in the record to support his statement that Voynow provided controllership services as part of an ongoing consultant arrangement.  He conceded that a controller would typically prepare monthly and annual financial statements but cited to no evidence that Voynow ever did that.  Voynow Ex. 35, Sosnowski Dep. 123:21-124:23.  He admitted that he would expect a controller to have a lot of log entries into the Reynolds system but saw no evidence Voynow ever made any entries in the system. _Id._, 114:2-25.  He testified that "I don't think [Voynow] ever proposed [journal] entries outside of year end for purposes of the tax engagement" and acknowledged that Voynow never even entered these year-end adjusting journal entries or any other journal entries, but that Plaintiffs did. _Id._, 123:3-5; 122:3-10.  He admitted seeing no evidence in either Plaintiffs' or Voynow's records showing that Voynow ever accessed Plaintiffs' Reynolds' accounting system remotely or directly, and was never provided with a total summary of all of Voynow's log ins to the Reynolds' system despite Plaintiffs having the ability to generate it. _Id._, 123:21-125:7; 94:22-95.  He admitted that this meant that Voynow could only access Plaintiffs' records when it was physically on site. _Id._, 96:10-14. Given that it was only on site three times a year, Mr. Sosnowski acknowledged it would be impossible for Voynow to act as a controller for seven large dealerships when it only had access to Plaintiffs' records 7 out of 365 days a year.  Rather, that responsibility would fall to Plaintiffs' accounting staff who were on site with access 365 days a year to perform all such controllership functions. _Id._, 123:21-126:9.  Mr. Sosnowski further admitted that Voynow's annual engagement letters were inconsistent with its being a controller or an open-ended consultant. _Id._, 108:4-12.  He also could not cite to any evidence in

Voynow's billing records that Voynow, who is based in Trevose, PA, supervised Plaintiffs' employees who were working in Long Island. _Id_., 110:14-111:5.

Mr. Sosnowski's own deposition testimony is wholly inconsistent with his reports – which conspicuously fail to cite to any specific evidentiary support in the record.  This testimony renders his opinions unreliable and therefore inadmissible.  See _Berk v. St. Vincent's Hosp. & Med. Ctr_., 380 F. Supp. 2d 334, 352–53 (S.D.N.Y. 2005) (deeming expert testimony submitted in opposition to a summary judgment motion as inadmissible where it was controverted by expert's own testimony and the evidentiary record).

### 3.   Mr. Sosnowski's Opinion That Voynow Never Documented The Scope of Its Services Is Unsupported, Unreliable, And Inadmissible.

Plaintiffs cite to Mr. Sosnowski's report wherein he states that Voynow purportedly never documented the scope of its services in any written engagement letter prior to December 2016.[11]  This opinion is also inadmissible as it is unreliable, unsupported and inconsistent with actual evidence in the record.  At his deposition, Mr. Sosnowski claimed that there was a "lack of actual evidence" of any such documentation by Voynow.  Voynow Ex. 35, Sosnowski Dep., 61:1-5.  Yet, he conceded that actual annual engagement letters do exist and were produced by Voynow in discovery and are therefore part of the evidentiary record.  See Voynow Ex. 20-21. He then stated that "I don't think they were ever issued," but when asked the basis for this opinion, he stated that he relied upon Jackie Cutillo who simply told him so. Voynow Ex. 35, Sosnowski Dep. 53:7-15.  At the outset, Ms. Cutillo would have no way of knowing whether Voynow issued its annual engagement letters each year from 2008-2016.  During that time, she was working as a billing/DMV clerk for Plaintiffs – and not in any managerial capacity – and

---

[11] See Plaintiffs' Counterstatement of Facts, No. 10 and 20

would have no way of knowing what was occurring inside Voynow's offices.  Voynow Ex. 44, J. Cutillo Dep., 21:1-20.  More importantly, in making this statement, Mr. Sosnowski admitted that he either chose to ignore or was unaware of the following key pieces of evidence: (1) meta data produced by Voynow in discovery reflecting that its engagement letters were updated each year from 2008-2016 on its server; (2) internal emails produced by Voynow that confirm the issuance of engagement letters sent to Plaintiffs; (3) time billing entries recorded by Voynow staff documenting the preparation of engagement letters for Plaintiffs; (4) the change in format of the engagement letters after 2009 when all were sent to Michael Koufakis in a single letter at the request of John Koufakis; and (5) testimony from Voynow stating that its engagement letters were issued.  Voynow Ex. 35, Sosnowski Dep. 55:17-20; Voynow Ex. 20-21, Annual Engagement Letters 2008-2016; Voynow Ex. 8, Seibel Dep. 71:22-72:9; Voynow 30(b)(6) Dep., Ex. 16 at 71:8-72:1; J. Koufakis Dep., Ex. 3 at 99:6-18.   The fact that Mr. Sosnowski chose to ignore all of this evidence and actually opine that Voynow never documented the scope of its services, renders his opinion wholly unsupported, unreliable and actually inconsistent with the record.  An expert cannot simply choose to ignore evidence.  Indeed, Mr. Sosnowski conceded that because Plaintiffs' owners admitted to discarding documents they received from Voynow at the end of each year, it was "possible" they also discarded Voynow's annual engagement letters. Voynow Ex. 35, Sosnowski Dep. 65:11-19.  See _Conde v. United States_, 2021 WL 3604701, at *12–13 (S.D.N.Y. Aug. 13, 2021) (excluding expert testimony on summary judgment that was entirely conclusory or based upon an inadequate assessment of the evidence).

**4.  Mr. Sosnowski's Opinion That Voynow's Accessing Of Plaintiffs' Reynolds Accounting System is Indicative of Providing Services Beyond Tax Preparation Is Unreliable, Unsupported And Inadmissible.**

Voynow admits that when it was physically on site approximately three times a year, it would log onto a Star computer and print out certain schedules from Plaintiffs' Reynolds accounting system.  In his report, Mr. Sosnowski states that the Reynolds accounting system has no tax-related purpose.  Plaintiffs' Ex. 2, Sept. 15, 2003 at p.6.  He then opines that because Voynow accessed it while on site and printed out various schedules, it follows that Voynow did more than prepare Plaintiffs' tax returns.

At the outset, for purposes of this Motion, Voynow does not dispute Michael Koufakis' testimony that he hired Voynow to perform procedures that were "more than a review but less than an audit" of all account balances.  So in that regard, Mr. Sosnowski's opinion is plainly irrelevant.  But it is also inadmissible as it is unsupported and unreliable.  Mr. Sosnowski's report does not reference or cite any factual support or to the evidentiary record to support his statement that the Reynolds system has no tax-related functions.  In fact, Mr. Sosnowski has not worked with or used Reynolds for over 20 years, having last accessed it sometime before 2001.  Voynow Ex. 35, Sosnowski Dep. 18:4-16.  Thus, he is clearly unfamiliar with its features and lacks the necessary credentials as an expert to make such a statement.  Further, as reflected in the Reynolds User Manual Table of Contents produced by Plaintiffs, it is apparent that the Reynolds accounting system has tax preparation components and features.  See Voynow Ex. 45.[12]

---

[12] The Table of Contents for the Reynolds User Manual specifically identifies tax-related functions such as generating tax forms (Form 1099, Form 8300 tax reports and sales tax reports), as well as making adjustments for 1099 balances or recording Section 409A deferrals for income tax withholding.  The Reynolds system also has features for maintaining general ledger accounts, generating monthly and year-end schedules, trial balances and recording year-end tax-related adjusting journal entries.  See Voynow Ex. 45.

23

**5.   Mr. Sosnowski's May 15, 2024 Declaration Is Inadmissible.**

Plaintiffs' proffer of Mr. Sosnowski's May 15, 2024 Declaration is improper. This Declaration is inadmissible as it seeks to offer opinions not reflected in his prior reports or deposition in another attempt to create an issue of fact to avoid summary judgment.  It also violates FRCP 26 and 37(c)(1) and this Court's prior orders regarding the deadlines for expert discovery.  In _Looney v. Macy's Inc._, 588 F. Supp. 3d 328, 354–55 (E.D.N.Y. 2021), the court excluded an affidavit from an expert that contained opinions beyond his initial report and was disclosed beyond the disclosure deadline.  In doing so, the court stated that "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions. If that were the case, there would never be any closure to expert discovery, and parties would need to depose the same expert multiple times."  _Id_.   Accordingly, Plaintiffs cannot use Mr. Sosnowski's May 15, 2024 Declaration to try to create a disputed issue of material fact.

**D.  The Cases Cited By Plaintiffs Are Distinguishable And Do Not Support Application of the Continuous Representation Exception To This Case.**

Plaintiffs cite to three cases they deem to be "particularly instructive." Response at 12. Significantly, none involve an analysis of the statute of limitations in the context of a summary judgment motion under Fed.R.Civ.P. 56.  All involve motions to dismiss based upon under the standard in NY CPLR 3211(a), which requires that a court afford a liberal construction to the complaint and accept all facts alleged as true.  At that pleading stage, the plaintiff is accorded every possible favorable inference such that a court determines only whether the facts as alleged fit within any cognizable legal theory. _Leon v. Martinez_, 84 N.Y.2d 83, 87-88 (N.Y. 1994).  The court must also accept as true any factual submissions in opposition papers to the motion.

*Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 (2002).  At this summary judgment stage, Plaintiffs are no longer entitled to blind acceptance of their factual allegations, but instead must adduce actual evidence to support their claims and they have not done so.  Their reliance upon these three cases is misplaced given the entirely different procedural posture and lack of a fully developed record therein, as well as the significant factual differences.

Plaintiffs cite to *Bill Kolb. Jr., Subaru, Inc., v. LJ Rabinowitz, CPA*, 117 A.D.3d 978 (N.Y.2d Dep't. 2014) but omit critical facts underlying the court's decision.  There, an accountant was hired in 1998 by an automobile dealership, allegedly to review all books, schedules, journals, records, receivables and oversee an in-house controller. *Id*., 117 A.D.3d at 978. On March 13, 2009, the in-house controller informed the dealership's owner that there was a $2.3 million shortage as the dealership was "out of trust" such that it now owed Subaru over $2 million.[13]  The owner suspected there were financial discrepancies in the books and specifically contacted the accountant and asked him to come out to the dealership to look into the matter. *See* Complaint, *supra* note 15.  Three days later, on March 16, 2009, the accountant did visit and investigated the "out of trust" issue.  *Id.*. He met with the owner, reviewed the books and records, and discussed the "out of trust" issue with two Subaru representatives. *Id.* After his investigation, he advised the owner on March 16, 2009 that he did not see any issues and that the financial records were fine. *Bill Kolb Jr.*, 117 A.D.3d at 978. The dealership later hired a forensic accountant who, after conducting a forensic audit, found the $2.3 million discrepancy and embezzlement by the in-house controller. *Id*. at 978-79. The dealership sued the accountant on February 28, 2012, alleging that he had failed to detect the $2.3 million discrepancy and was

---

[13] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=ODcDzZ34ae2gPYvbfg8Eig. The Court may take judicial notice of the complaint in *Bill Kolb. Jr., Subaru, Inc., v. LJ Rabinowitz, CPA* which is a matter of public record.

negligent on March 16, 2019 when performing due diligence after being asked to investigate it. *See* Complaint, *supra* note 15.  Because this March 16, 2019 visit specifically related to the "out of trust" issue and was within the 3 year limitation period, the motion to dismiss was denied. The court found that the accountant never even met his burden to establish a statute of limitations defense:

> On a motion to dismiss a cause of action pursuant to CPLR 3211(a)(5) on the ground that it is barred by the statute of limitations, a defendant bears the initial burden of establishing, *prima facie*, that the time in which to sue has expired .... The Rabinowitz defendants failed to meet this burden with respect to any claims arising from services they rendered on March 16, 2009. In considering the motion, a court must take the allegations in the complaint as true and resolve all inferences in favor of the plaintiff ….. The complaint alleges that the Rabinowitz defendants negligently performed work for the dealership on March 16, 2009, a date that falls within three years of the February 28, 2012, commencement of the action.

*Id*., 117 A.D.3d at 979–80.

Plaintiffs assert that the *Bill Kolb Jr*. court "found that the CPA's continuous services for the dealership tolled the statute of limitations with respect to claims accruing more than seven years before the commencement of the action, i.e. before December 31, 2004." Response at 13. That is simply incorrect.  The court made no such finding.  Rather, it noted that the plaintiff had averred a "continuous representation" in its pleadings and this factual averment had to be accepted as true at the pleading stage. *Id*., 117 A.D.3d at 980.  But it did not actually find there was a continuous representation nor make any ruling as to any specific date when the limitations period was even tolled.

In *Lobel Chemical Corp. v. Petitto*, 2016 WL 628101 (N.Y. Sup. Ct. Feb. 16, 2016), a plaintiff alleged that he entered into an oral agreement in 1991 with an accountant to provide "general accounting services" and be its "financial advisor." *Id.,* 2016 WL 628101, at *1. No written engagement letters were ever issued at any point during their 23 year relationship. *Id.* at

*4. The alleged general accounting services included supervising the company bookkeeper and reviewing all monthly financial reports that were specifically generated at his direction and with his guidance in order to regularly monitor the plaintiff's financial condition. *Id.* at *1. The accountant's alleged duties also included oversight of all bookkeeping and accounting, review of all monthly income statements, bank statements, reconciliations prepared by the bookkeeper, onsite monthly visits and preparation of all tax returns. *Id.* In terms of financial advice, the accountant allegedly agreed to render counsel as to all business matters, including shareholder distributions, employee bonuses and hiring, as well as provide advice as to treatment and timing of certain expenditures. *Id.* The accountant also advised the company to switch to a new accounting software and helped to install this new system for the plaintiff. *Id.* When a longtime bookkeeper retired in 2004, the accountant specifically recommended that an existing employee replace her and agreed to train her. *Id.* This new bookkeeper thereafter forged over 400 checks made payable to herself. *Id.* The plaintiff alleged that, in 2011, he specifically questioned certain discrepancies in the records but the accountant told him that they were explainable by simple adjustments. *Id.* at *2. After the bookkeeper's embezzlement was discovered in 2014, a lawsuit against the accountant was filed on October 22, 2014. *Id.* The plaintiff alleged that the accountant was negligent in not detecting the forgeries and that the 2012 tax return he had prepared grossly understated sales and income. *Id.* In response to the accountant's motion to dismiss all claims for alleged negligence in failing to detect theft occurring prior to October 22, 2011, the plaintiff submitted opposition papers, averring that he had entered into an oral mutual agreement with the accountant to provide continuous supervision and oversight of the accounting function on a monthly basis and to advise as to ongoing financial concerns and decisions. *Id.*

There was no written agreement or engagement letter ever in existence. *Id.* at *4. Citing to the standard applicable to a motion to dismiss, the *Lobel Chemical* court stated:

> Since the facts alleged in the complaint are accepted as true on a motion to dismiss and are viewed in a light most favorable to plaintiff, Lobel's pleading is sufficient to establish that the parties mutually contemplated that RSSMC's work would continue on a monthly basis and that Petitto's work was not limited to annual tax preparation and audit review.

*Id*. Essentially, the *Lobel* court was compelled to accept the plaintiff's factual averments at the pleadings stage, and unlike this case, there was no written engagement letter ever issued at any point in the engagement.

Lastly, Plaintiffs cite to *Ghiz v. Schreck & Co.*, 2013 N.Y. Misc. WL 4046710 (N.Y. Sup. Ct. Aug. 9, 2013), but again omit critical facts. Specifically, they neglect to mention that the complaint alleged that accountant had admitted to having "f**ed up" in failing to detect an employee's theft and then thereafter undertook to try to rectify his errors through a continued representation on this precise issue.[14] According to complaint, the accountant was hired pursuant to an oral agreement to prepare all financial statements and certify both their accuracy and fairness, as well as prepare taxes and provide advice as to all expenses.[15] No written engagement letters ever existed at any point over the course of the relationship. *See* Complaint, *supra* note 17. The accountant visited monthly. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, *supra* note 16. He advised the plaintiff to transition from a manual accounting system to a computerized one, despite knowing the plaintiff owner was computer illiterate. *Id.* When the employee theft was discovered in August of 2009, the

---

[14]https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=QL_PLUS_WPq2_PLUS_LRf6V41g mhMOmg==&system=prod. The Court may take judicial notice of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss in *Ghiz v. Schreck & Co.* as it is a matter of public record.

[15] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=Kzg6ICSkchi9/QUN_PLUS_ETfvA. This Court may take judicial notice of the Complaint in *Ghiz v. Schreck & Co.* as it is a matter of public record.

accountant allegedly and repeatedly conceded that he "f**ed up" and specifically undertook to rectify his error by mitigating the losses. *Id*.  He increased his services by engaging with the IRS over the next three years to resolve a tax liability stemming from the theft and generated reports for the district attorney outlining the employee theft and financial loss. *Id*.  The plaintiff alleged that he relied upon the accountant's promise to make good on his error and correct matters before finally opting to end the engagement in September of 2012 and file suit on December 12, 2012. *See* Complaint, *supra* note 17. Noting that the plaintiff had met his burden in a motion to dismiss to set forth sufficient fact allegations to support a "mutual understanding of the need for further representation on a specific subject matter underlying the malpractice claim," the court denied the motion to dismiss. *Ghiz*, 2013 N.Y. Misc. WL 4046710 at *3.  Critically, in *Ghiz*, it was the factual allegations that the accountant had admitted errors in not detecting the theft, offered to fix them, and continued to represent the plaintiff to rectify the errors and financial loss, that were deemed sufficient at the pleading stage to establish a "mutual understanding for further representation" as to the theft loss at issue. *Id*. at *3. No such allegations or facts exist in this case.

## CONCLUSION

For the foregoing reasons, Defendants Voynow, Bayard, Whyte and Company, LLP , Hugh Whyte, Randall Franzen, and Robert Seibel, respectfully request that this Honorable Court enter an award of summary judgment in their favor and against Plaintiffs based upon the statute of limitations.  Defendants seek an order dismissing all negligence and respondeat superior claims in Plaintiffs' Complaint based upon alleged acts of theft or fraud occurring from 2001 through 2014 that were purportedly not detected as such claims are now time-barred.

**MARSHALL DENNEHEY, P.C.**

BY: _____

JOHN L. SLIMM, ESQUIRE
MAUREEN P. FITZGERALD, ESQUIRE
620 Freedom Business Center, Suite 300
King of Prussia, PA 19406
(610) 354-8270 Fax (610) 354-8299
Email:  mpfitzgerald@mdwcg.com
Attorneys for Defendants,
Voynow, Bayard, Whyte and Company, LLC, Hugh
Whyte, Randall Franzen, and Robert Siebel

Dated:  June 5, 2024

**Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property name.**