**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STAR AUTO SALES OF BAYSIDE, INC. (d/b/a STAR TOYOTA OF BAYSIDE), et al. | Civil Action No.: 1:18-cv-05775-ERK-TAM |
| Plaintiffs, | |
| -against- | |
| VOYNOW, BAYARD, WHYTE AND COMPANY, LLP, HUGH WHYTE, RANDALL FRANZEN AND ROBERT SEIBEL, | |
| Defendants. | |

<u>**DEFENDANTS' RESPONSE TO PLAINTIFFS' COUNTER-STATEMENT OF FACTS**</u>

1.    Voynow was recommended to Star by Reynolds & Reynolds because Voynow was considered experts on the Reynolds & Reynolds system, which has no connection to preparation of tax returns. Felsen Decl. Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 2.

**Response:  Disputed.  Exhibit 25 does not support this factual statement.**

2.    Voynow held itself out as an accounting specialist in the auto industry and auto dealerships were its primary client type. Felsen Decl. Exhibit 11, Lombardo Dep. at 23:3-18; Felsen Decl. Exhibit 13, Kumor Dep. at 36:16-20; 42-13-18.

**Response:  Admitted.**

3.    Voynow offers its dealership clients a variety of services including preparation of tax returns, financial statements, and consulting work, and interim visits/management visits. Felsen Decl. Exhibit 11, Lombardo Dep.17:18-18:5; 23:20-24:6; Felsen Decl., Exhibit 35.

**Response:  Disputed as this does not accurately quote Mr. Lombardo's testimony. He stated that "we largely provided tax services, financial statements, and interim reviews**

1

or management visits."  He further stated that the nature of work Voynow performed "would depend on the engagement" and that each engagement was "client specific." Exhibit 35 does not support this factual averment.

4.   When Voynow performed only tax services for auto dealerships, it would only include a maximum of one tax planning visit at the end of the year. Felsen Decl. Exhibit 11, Lombardo Dep. at 25:21-26:14.

**Response:  Disputed.  Mr. Lombardo testified to "tax planning visit_s_" that generally occurred "towards the end of the year."  See Lombardo Dep. 26:2-6.  He did not testify to "only a maximum of one tax planning visit."  Notably, Mr. Lombardo also stated that he was never involved in tax planning visit at Plaintiffs and only went on an interim year visit. He was not part of Voynow's "normal engagement team" for Plaintiffs, stating that Plaintiffs were not one of his "typical" clients, as he visiting "less than three times." Voynow Ex. 46, Lombardo Dep. 74:24-75:1-2; 231:6-20; 235:1-22.**

5.   In the latter half of 1996, Michael Koufakis interviewed Randy Franzen and Hugh Whyte in Mr. Koufakis' office at Star. Mr. Franzen was to the right of Mr. Koufakis and Mr. Whyte was to Mr. Koufakis' left. Mr. Franzen and Mr. Whyte explained the differences between compilation, audit, and review. Mr. Koufakis explained that he wanted the highest level, which was an audit. Mr. Franzen and Mr. Whyte said that an audit was not necessary, it would be very high in cost and typically is only reserved for publicly traded companies. Mr. Franzen explained that there was something in between – "more than review but less than an audit" – and that Voynow would come into the dealerships on a quarterly basis. That is ultimately what Mr. Koufakis agreed to. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 74:14-75:20.

**Response: Admitted.  For purposes of this Motion, Voynow does not dispute Mr. Koufakis' testimony.  Mr. Koufakis also testified that he hired Voynow to verify all account balances on the financial statements that were then reflected on annual corporate tax returns he requested Voynow to prepare and issue.  See Voynow Ex. 2, M. Koufakis Dep. 82:24-83:19; 108:12-14; 109:10-22.  Disputed that Voynow was required to visit quarterly. While Michael Koufakis wanted Voynow to visit quarterly, he later reduced it to three visits a year.  Voynow Ex. 2, M. Koufakis Dep. at 104:7-10; 105:19-24; Voynow Ex. 4 S. Koufakis Dep., 9:16-10:15; Voynow Ex. 8 R. Seibel Dep. 98:4-7.  Mr. Koufakis never testified that there was ever any agreement, let alone request by him, for Voynow to provide controllership services or be a financial consultant to Plaintiffs.**

6.  Franzen was assigned to the Star account because Star wanted an accountant fluent in Reynolds and Reynolds because Star wanted to streamline its accounting system and because Franzen has a very good relationship with Reynolds and Reynolds and he could direct Star in issues related to Reynolds and Reynolds. Felsen Decl. Exhibit 10, Whyte Dep. at 38:8-23.

**Response: Admitted.  When Voynow was hired, Plaintiffs already had the Reynolds system in place. Reynolds affords Plaintiffs with customer service support to respond to questions or generate requested reports, and supplied Plaintiffs with a detailed user manual it published to consult as needed.  Voynow Ex. 5 J. Cutillo Dep. 119:5-13; 121:13-24; 122:15-123:2; Voynow Ex. 45 Reynolds & Reynolds User Manual Table of Contents.**

7.  Reynolds & Reynolds has no connection to, nor is it used in any manner for, the preparation of income tax returns except to generate a trial balance which summarizes assets, liabilities income and expenses; a tax preparer does not require access to the accounting system.

Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 6; November 20, 2023 Sosnowski Report at 6.

**Response:  Disputed.  The citations referenced are insufficient to support this averment. Mr. Sosnowski's expert reports are unsworn, unsupported, unreliable and inadmissible.  He last used or worked with the Reynolds system prior to 2001. Voynow Ex. 35, Sosnowski Dep. 18:4-16. As is apparent from the Reynolds User Manual produced by Plaintiffs, there are numerous tax-related features in the system.  Voynow Ex. 45, Reynolds Manual Table of Contents, pp. __.  However, for purposes of this Motion, Voynow does not dispute Mr. Koufakis' testimony that he hired it to perform "more than a review but less than an audit" of all financial statement account balances and to verify these account balances that were then reflected on annual corporate tax returns it issued.**

8.  Star only recalls seeing one form letter from Voynow – and it was presented in December 2016 right after one of the thefts was first uncovered. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 116:15-119:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 51:14-52:1; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 95:9-12.

**Response:  Admitted as to Mr. Koufakis' "recollection" of having seen only one Voynow engagement letter in approximately December of 2016 when he says it was physically handed to him.  Mr. Koufakis also stated that he never asked his employees if Voynow's engagement letters were received in the mail and has no way of knowing they were not.  Voynow Ex. 2, M. Koufakis Dep. at 119:21-120:23; 165:7-21.  Admitted that while John Koufakis also had no recollection, he conceded that it was "highly probable" that he received something from Voynow that he passed on to another party but did not sign.  Voynow Ex. 47, J. Koufakis Dep. 95:1-7.  Disputed that December of 2016 was the**

4

first occasion Plaintiffs became aware of employee theft. Michael Koufakis knew of "at least two" prior thefts and submitted insurance claims under Plaintiffs' crime coverage insurance policy back in 2014 and again in 2015 for employee thefts of approximately $100,000 and $20,000, respectively.  Voynow Ex. 40, M. Koufakis Dep. 140:8-142:18.

9.   Voynow is unaware of the existence of signed retainer agreements with Star. Felsen Decl. Exhibit 10, Whyte Dep. at 11:21-24.

**Response:  Admitted.**

10. That is because Voynow did not describe in writing the proposed scope of services, including the terms of Voynow's engagement to provide professional accounting and tax services to Star until December 2016 after Star notified Voynow of the theft by Vivian Karouzakis. Felsen Decl. Exhibit 1, September 15, 2023 Sosnowski Report at 5; Felsen Decl. Exhibit 75.

**Response:  Disputed.  The citations referenced are insufficient to support this averment as Mr. Sosnowski's expert report is unsworn, unsupported, unreliable and inadmissible.  Mr. Sosnowski's May 15, 2024 Declaration is also inadmissible for the same reasons as well as violating FRCP 26 and 37(c)(1) and this Court's orders as to deadlines for expert discovery.  Further, once the AICPA recommended engagement letters be issued in approximately 2008, Voynow issued annual letters dated December 30, 2008, December 30, 2009, December 15, 2010, December 15, 2011, December 28, 2012, January 2, 2014, January 30, 2015, January 18, 2016 and January 3, 2017 which describe the professional services.  Voynow Ex. 20, 21 Engagement Letters; Voynow Ex. 8, R. Seibel Dep. 65:20-66:13; 70:7-12; Voynow Ex. 16, Star Toyota Dep. 66:17-68:3; 70:2-16.**

11. Kumor has been tasked with drafting form letters for Voynow, but he never drafted one for Star, and he does not know if form letters include visits. Felsen Decl. Exhibit 13, Kumor Dep. at 115:25-116:6; 142:16-22.

**Response: Disputed as the citations referenced do not support this factual averment. Mr. Kumor did not testify about "form" letters. He stated that while he had drafted engagement letters for other Voynow clients, he was not involved in drafting the annual engagement letters issued to Plaintiffs, but saw them in Voynow's files.  He also stated that it "was beyond his knowledge" whether interim year visits were referenced in Voynow's engagement letters for clients other than Plaintiffs.  See Voynow Ex. 36, D. Kumor Dep., 85: 8-24; 115:25-116:6; 142:12-22.**

12. Voynow was Star's accountant of record from 1996 through 2017 during which time Voynow performed ongoing consulting services and a review and oversight function and assessed and analyzed the internal control systems and performed controllership functions for Star on an ongoing, continuous basis until Star terminated the relationship in 2017. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 5. Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:1122; 295:10-13; 297:6-21; September 15, 2023 Sosnowski Report Ex. 1 ¶¶ 1, 6, 7, pages 5-7.

**Response:  Disputed as the citations referenced are insufficient to support this averment.  Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and inadmissible.  There is no deposition testimony from either Mr. Koufakis or Voynow that Voynow was ever hired to be a controller or a continuous, open-ended financial consultant. Plaintiffs' Controllers Karazoukis and Theocharis managed**

**and supervised Plaintiff's accounting staff, and they in turn were supervised by the three Koufakis owners.  Voynow Ex. 2, M. Koufakis Dep. 26:10-14; 27:3-16; 28:17-21; Voynow Ex. 3, J. Koufakis Dep. 27:7-3; Voynow Ex. 4, S. Koufakis Dep. 21:16-18; Voynow Ex. 5, J. Cutillo Dep. 115:11-117:6. Further, at his deposition, Mr. Sosnowski could not identify anything in Voynow's billing records to indicate it supervised Plaintiffs' employees and he also clarified that his reference to Voynow being Plaintiffs' "accountant of record" pertained only to being on record with the Internal Revenue Service.  Voynow Ex. 35, Sosnowski Dep.  91:2-14; 110:14-111:5.**

13. These controllership functions included inspection of Star Auto's financial schedules, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing continuous basis. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7, 17-18; November 20, 2023 Sosnowski Report at 5; Felsen Decl., Exhibit 25.

**Response:  Disputed as the citations referenced are insufficient to support this averment.  Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and inadmissible.  Ex. 25 does not support this averment.**

14. Voynow's duties also included detecting fraud, overseeing all accounting processes, accounting entries (including reviewing and verifying the propriety of accounting transactions), and internal procedures. See Felsen Decl., Exhibit 25.

**Response:  Disputed.  The citation referenced above does not support this averment.**

15. Voynow also counseled Star on whether to terminate employees in its accounting office. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 214:6-18.

**Response:  Admitted only as to the period after December of 2016.  Specifically, after the theft by Plaintiffs' Controller Karazoukis was discovered in December of 2016, Defendant Hugh Whyte suggested, during a phone call from Michael Koufakis, that he should "clean house" in Plaintiffs' accounting department.  Mr. Koufakis declined to do so, stating that his other Controller Theocharis was "clean as the wind driven snow."  Voynow Ex. 40, M. Koufakis Dep., 214:6-22; Voynow Ex. 43, H. Whyte Dep., 164:22-165:22.**

16. Voynow also recommended that Star hire a specific forensic accountant. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 70:6-21.

**Response:  Admitted that Voynow recommended to Michael Koufakis that he consider hiring Nick Chester following the discovery of the theft by the Controller Karazoukis in December of 2016.  Mr. Koufakis hired Mr. Chester in February of 2017 to verify the alleged theft by Karazoukis and as a "fresh set of eyes to look over the books." Disputed that Mr. Chester is forensic accountant; he is a retired controller from Potamkin. In April of 2017, Mr. Koufakis hired Rosenfield who are forensic accountants. Voynow Ex. 2, M. Koufakis Dep. 64:3-11; 70:6-25; Voynow Ex. 40, M. Koufakis Dep.  72:18-23.**

17. Voynow had, and was given, "free reign" to review everything and anything whenever and however it deemed fit to ensure no fraud or irregularities existed and was expected to do so. See Felsen Decl., Exhibit 25.

**Response:  Disputed as the citation referenced does not support this averment.**

18. Voynow also trained Star's accounting staff. See Felsen Decl., Exhibit 31.

**Response:  Admitted only that Voynow provided training to Plaintiffs' new Controller Jackie Cutillo in the Spring of 2017 after Karakoukis and Theocharis were fired and she was promoted to Controller for all Star dealerships in 2017, despite lacking any**

**prior experience as either a Controller or a manager. Voynow deemed this request to be a special project outside the scope of its regular engagement and billed Plaintiffs separately for it. See Voynow Ex. 31, September 27, 2017 Invoice. Disputed that Voynow provided training to any other accounting staff and the citation referenced does not support this averment. Admitted that Plaintiffs' Ex. 31 is copy of an internal control checklist that Voynow sent to Ms. Cutillo on June 12, 2017 via email to help learn the responsibilities of a Controller. See Voynow Ex. 48, June 12, 2017 Email Enclosing Checklist.**

19. Star usually did not direct Voynow to look at any specific items because they understood that Voynow was an expert in the automotive field and trusted its judgment to review areas most susceptible to fraud. See Felsen Decl., Exhibit 25.

**Response: Disputed as the citation referenced does not support this averment.**

20. Voynow's review and consulting services were continuous in nature and were not segmented by year or project as evinced by the lack of a written accountant's report as required by AICPA standards. Felsen Decl. Exhibit 1, September 15, 2023 Sosnowski Report at 2, 4-7, 1718; November 20, 2023 Sosnowski Report at 1-2.

**Response: Disputed as the citations referenced are insufficient to support this averment. Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and inadmissible. By way of further answer, Mr. Koufakis did not want annual issued financial statement; only an annual tax return that reflected the account balances allegedly review and verified by Voynow each year. See Voynow Ex. 34.**

21. Voynow's expert admitted that a consultative engagement could be ongoing. Felsen Decl. Exhibit 22, Scherf Dep. at 245:10-18; Felsen Decl. Exhibit 75, Sosnowski Decl. ¶ 5.

**Response: Admitted. Voynow's expert Stephen Scherf testified that "theoretically" a consulting engagement could be ongoing but that, in this case, the record did not support that. He referenced the specific matters which were outside the scope of Voynow's regular engagement that could be viewed as a consulting engagement. These were the training Voynow provided to Controller Ms. Cutillo in 2017, assisting with calculations for hours worked for a Department of Labor audit for Star Chrysler, or handling tax audits and he stated that each had a definitive start and end date and were not ongoing engagements. Voynow Ex. 49, Scherf Dep. 244:19-245:18; Voynow 50, Feb. 25, 2016 Email; Voynow Ex. 31, Sept. 2107 Invoice.**

22. A consultative engagement can be oral. November 20, 2023 Sosnowski Report at 5.

**Response: Disputed as the citations referenced are insufficient to support this averment. Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and inadmissible.**

23. On a quarterly basis, Voynow made visits to Star during which time it provided review and controllership services, including inspection of Star's financial schedules, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing basis; there were no annual or final reports provided by Voynow to Star that related to any specific project. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2, 4-7; November 20, 2023 Sosnowski Report at 1-2, 4; Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

**Response: Disputed as the citations referenced are insufficient to support this averment. Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with**

the record, unreliable and inadmissible.  **Further, Mr. Koufakis' May 15, 2024 Declaration is inconsistent with his deposition.  He testified that while initially requesting that Voynow visit quarterly, he later reduced it to only three site visits per year.  He also testified that he hired Voynow to perform services that were "more than a review but less than an audit" of its financial statement account balances and to verify all account balances which were then reflected on annual corporate tax returns Voynow issued.  He never testified that he hired Voynow to be a Controller.  See Voynow Ex. 2, M. Koufakis Dep. 73:12-74:5; 74:10-75:20; 82:2-83:19; 82:24-83:19; 84:11-17; 104:7-10; 105:19-24; 108: 12-14; 109:10-22.  He also admitted that he has no evidence that Voynow was ever given remote access prior to 2017 to Plaintiffs' accounting system or that it ever logged into the system at all remotely – which would be expected for a controller – despite having the ability as the administrator of the system to find such evidence.  Voynow Ex. 40, M. Koufakis Dep. 126:13-21; 129:17-22; 132:24-133:14.  For purposes of this Motion, Voynow admits that its review of financial schedules and records, inquiries of Plaintiffs, and review of internal controls were part of the engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances.**

24. Among the duties Voynow performed under its ongoing consulting engagement were reviews of Star's schedules, financial statement review, controllership services, including reviewing bank statements, developing general journal entries that were not for tax purposes, and overseeing and supervising Star's accounting employees. Felsen Decl. Exhibit 4, J. Koufakis Dep. at 18:21-19:1; Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15; 107:23-108:110:18; 115:2-7; 122:11-22; 295:10-13; 297:6-21; September 15, 2023 Sosnowski Ex. 1 ¶¶ 1, 6 7, pages 5-7; Felsen Decl. Exhibit 22, Scherf Dep. at 100:2-22.

Response:   Disputed as to any purported controllership or ongoing consulting engagement or as to purported oversight and supervision of employees.   The citations referenced are insufficient to support this averment. Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, and unreliable.   Plaintiffs' own Controllers Karazoukis and Theocharis managed and supervised Plaintiffs' accounting staff, and, in turn, were supervised by the Koufakis owners.  Voynow Ex. 2, M. Koufakis Dep. at 26:10-14; 27:3-16; 28:17-21; Voynow Ex. 3, J. Koufakis Dep. at 27:7-3; Voynow Ex. 4, S. Koufakis Dep. at 21:16-18; Voynow Ex. 5, J. Cutillo Dep. at 115:11-117:6.   Plaintiffs fail to cite to any deposition from Michael Koufakis, who hired Voynow, to support the notion that he hired Voynow to supervise Plaintiffs' employees. Voynow is  based in Trevose, PA while Plaintiffs' employees worked in Long Island.  Plaintiffs' expert failed to cite to any specific evidence supporting the notion that Voynow was ever hired to, or ever actually did, supervise Plaintiffs' employees, and when questioned at his deposition, stated that he simply did not remember.  Voynow Ex. 35,  Sosnowski Dep., 137:2-21.

Disputed that the citation to Voynow's expert Mr. Scherf supports this averment. Mr. Scherf identified the specific "special accounting services" provided by Voynow that could be considered consulting services as being limited to the 2017 training of Plaintiffs' new Controller, the 2016 assistance with a Department of Labor audit for Star Chrysler, and handling of various tax audits, all of which were referenced in bills or emails and had "start and end" periods, thus were not indicative of a continuous or open-ended consulting engagement. Voynow Ex. 49, Scherf Dep. 100:2-22; 244:19-245:18; Ex. Voynow Ex. 31 September 27, 2012 Invoice; Voynow Ex. 50, February 25, 2016 Email.

**Admitted for purposes of this Motion that Voynow reviewed financial schedules and records as part of its engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the corporate tax returns it issued annually. These corporate tax returns set forth year end amounts for Plaintiffs' balance sheet and income statement accounts. See Voynow Ex. 34, 2014 Star Nissan Tax Return.[1]**

25. As part of Voynow's consulting engagement with Star, Voynow made visits during the slower months, typically during the summer months and into the fall; visits for tax engagements were not made during this period. Felsen Decl. Exhibit 11, Lombardo Dep. at 28:1-9; 38:24-39:5; 88:3-13; 145:23-146:11; Felsen Decl. Exhibit 12, Breslin 19:3-21:12; 28:11-14; Felsen Decl. Exhibit 18, McCabe 28:8-17; Felsen Decl. Exhibit 19, Bucolo Dep. at 27:8-28:7-30:17.

**Response: Admitted that Voynow visited Plaintiffs' dealerships approximately three times each year, that its visits typically lasted 1 or 2 days, and that they included services provided to other Star entities not party to this litigation.   Admitted that interim year site visits occurred in the summer or fall.  Voynow designated its visits as tax planning, interim year, or year-end tax preparation visits.  Disputed that these visits were ever part of any open-ended "consulting engagement" or unrelated to tax work as the cited references do not support this assertion.  See Voynow Ex. 9, R. Franzen Dep. at 25:19-9;  Voynow Ex. 7, H. Whyte Dep. 119:3-24; Voynow Ex. 2, M. Koufakis Dep. 105:19-22; S. Koufakis Dep., Ex. 4 at 9:16-10:15; R. Seibel Dep., Ex. 8 at 98:4-7; S. McCormack Dep., Ex. 33 at 24:4-22; Voynow Ex. 51, C. McCabe Dep., 32:11-33:3; Voynow Ex. 46, D. Lombardo Dep. 44:11-20.**

---

[1] Voynow has filed the first page only of the redacted Form 1120S as part of this submission but is supplying this Court with the full unredacted tax return that reflects all of the amounts for the income statement and balance sheet accounts.  That document is bates stamped as VOYNOW 004094-0000-004094-0085.

**Admitted for purposes of this Motion that Voynow's three site visits per year were part of the engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and verification of all account balances that were then reflected in the annual corporate tax returns.**

26. Voynow had accountants dedicated to performing visits for Star during which visits the accountants reviewed various schedules and reconciliations to assess internal controls associated with the schedules which could reveal fraud or misstatements. Felsen Decl. Exhibit 11, Lombardo Dep. at 74:13-77:3; 94:9-95:9; 104:24-105:2.

**Response:  Admitted that Voynow reviewed schedules printed out as of the date of their visits and the status of reconciliations.  See Voynow Ex. 2 at 74:10-75:20; 82:24-83:19; 108: 12-14; 109:10-22.  Disputed that Mr. Lombardo was a "dedicated" part of Voynow's team as he stated he was not and that Plaintiffs were not his "typical" client as he visited "less than three times."  Voynow Ex. 46, Lombardo Dep. 74:24-75:1-2; 231:6-20; 235:1-22. Disputed that Voynow was hired to detect fraud as Plaintiffs' expert admits that it was not. Voynow Ex. 35, Sosnowski Dep. 78:20-79:10 ("I don't think it was my opinion that they were required to detect fraud").**

27. Voynow's visits gave clients a level of comfort that their books and records were accurate. Felsen Decl. Exhibit 11, Lombardo Dep. at 44:11-20.

**Response:  Disputed as the citation referenced does not support this factual averment.  Mr. Lombardo was asked about the general purpose of interim year visits and stated that they give clients "a level of comfort that everything's being reconciled and handled appropriately during the year. Even when we do our tax work, ….you want to see**

14

what's being done throughout the year.  Some clients are interested in that." **Voynow Ex. 46, Lombardo Dep., 44:11-20.**

28. In general, Voynow's visits to clients ranged from one to four times a year, depending on the client. Felsen Decl. Exhibit 11, Lombardo Dep. at 35:20-36:8.

**Response:  Admitted that Mr. Lombardo generally referred to the number of interim visits made for unspecified Voynow clients, and that it "would vary per client" as "some wanted more, some less."   His testimony was not applicable to Plaintiffs.**

29. Voynow conducted three to four visits at Star each year. Felsen Decl. Exhibit 4, J. Koufakis Dep. at 75:22-76:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at 91:5-93-2.

**Response:  Admitted only as to three visits per year.  Michael Koufakis stated that while initially he requested four, he later reduced it to three visits. Voynow's visits typically lasted 1-2 days and included other Star entities not party to this case, such as Star Auto Body and Star's real estate entities.  Voynow Ex. 2, M. Koufakis Dep. 104:7-10; 105:19-24; Voynow Ex. 33, S. McCormack Dep. 24:4-22; Voynow Ex. 8, R. Seibel Dep.  98:4-7; 148:25-149:20; 225:20-227:15; 228:17-22; 229:7-21; Voynow Ex. 41, R. Franzen Dep. 25:21-28:9.**

30. Voynow's visits to Star's offices to review its books and records were unrelated to tax preparation services. Felsen Decl. Exhibit 20, Sidor Dep. at 22:4-7; Felsen Decl. Exhibit 21, Corrigan Dep. at 55:13-20; 126:5-9.

**Response:  Admitted for purposes of this Motion, that its site visits three times a year were part of the engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the annual corporate tax returns issued.**

31. Voynow sent approximately six (6) employees to Star's offices during the summer; Voynow's employees conducted audits for Star and referred to these visits as "audits". Felsen Decl. Exhibit 21, Corrigan Dep. at 23:15-18; 55:13-23; 178:13-179:2; Felsen Decl. Exhibit 13, Kumor Dep. at 26:16-17. Voynow never issued Star a certified financial statement which would be required to close out an audit. Felsen Decl. Exhibit 75, D. Sosnowski Decl. ¶ 9.

**Response:  Admitted that Voynow typically sent up to 6 employees for a single interim year visit that was for all seven Plaintiff dealerships (Toyota, Subaru, Nissan, Chrysler, Fiat, Hyundai and Mitsubishi) as well as the related Star Auto Body and real estate entities, and that this interim year visit typically lasted 1-2 days.  Voynow Ex. 8, Seibel Dep. 148:25-149:20.  Admitted that Mr. Corrigan referred to his site visit at his deposition as an "audit" but then stated he did not understand the difference between an audit, compilation or review.  Voynow Ex. 52, Corrigan 135:18-136:12.  Other Voynow employees denied that it ever referred to interim year visits as audits.  Sidor Dep., Ex. 53, 73:25-74:3.  Admitted that Voynow never issued audited financial statements as Michael Koufakis did not hire Voynow to do so, nor were Plaintiffs required to have them.  Voynow Ex. 2, M. Koufakis Dep. 47:10-15; 50:14-19; 60:2-5; 80:8-81:2; 82:2-83:19**.  **He did require Voynow to issue tax returns that reflected financial statement account balances that had been reviewed and verified for both balance sheet and income statement accounts.  Voynow Ex. 2, M. Koufakis Dep. at 109:10-22; Voynow Ex. 19, Letters Issuing Annual Tax Returns; Voynow Ex. 34, 2014 Star Nissan Tax Return.**

32. In accordance with its oral agreement to perform ongoing consulting services, during Voynow's review of Star's books and records, Voynow would review Star's books and records, including all of its schedules, such as accounts receivables, accounts payables, prepaids,

previewed bank reconciliations, reviewed 1099s, reviewed all sales tax payments, asked questions of Star's accounting employees, ensured various reconciliations were completed, reviewed internal controls, and were supposed to notify Star about its findings and any issues they identified. Felsen Decl. Exhibit 17, Lombardo Dep. at 34:6-35:5; Felsen Decl. Exhibit 12, Breslin Dep. at 11:1113:7; 21:13-19; Felsen Decl. Exhibit 20, Sidor Dep. at 133:7-135:12; Felsen Decl. Exhibit 13, Kumor Dep. at 62:23-63:10; 119:3-120-23; 131:5-133:7; 133:10-136:20; Felsen Decl. Exhibit 6, Star Nissan 30(b)(6) Dep. at 120:6-121:9; Felsen Decl. Exhibit 7, Star Chrysler 30(b)(6) Dep. at 43:25-44:13; Felsen Decl. Exhibit 8, Star Subaru 30(b)(6) Dep. at 21:6-14; 113:1-10; Felsen Decl. Exhibit 9, Star Toyota 30(b)(6) Dep. at 40:3-40:19; 53:8-54:5; 61:16-62:1; 94:14-23; 138:12139:1.

**Response:  Admitted that during its three visits per year, Voynow reviewed various schedules printed out as of the visit date, asked questions of employees if warranted, checked the status of bank reconciliations being completed by Plaintiffs' employees, and to the extent notable items were observed or needed to be addressed by Plaintiffs prior to year-end, communicated those either verbally or in writing to Plaintiffs owners and/or Controllers. For purposes of this Motion, it is admitted that these procedures were performed pursuant to an engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and verification of all account balances that were then reflected in annual corporate tax returns issued. Disputed that these tasks were performed as part of any "ongoing oral agreement to perform consulting services" and the cited references do not support this averment.**

33. As part of its consulting services and controllership role at Star, Voynow also looked for anomalies which could identify potential fraud. Felsen Decl. Exhibit 11, Lombardo Dep. at 44:21-45:6; See Felsen Decl., Exhibits 39-43, 62.

**Response:  Disputed.  The citations referenced do not support this averment.  Mr. Lombardo testified as to the general purpose of an interim visit – not as to any consulting engagement or controllership role and not even as applicable to any interim visit to Plaintiffs.  Mr. Lombardo stated that when doing tax work for clients, "you kind of wanted to see what's being done throughout the year." Voynow Ex. 46, Lombardo 44:4-24. Disputed that Exhibits 39-43 and 62 support this averment as they are pages randomly pulled in no particular order from Voynow's annual sets of engagement workpapers.  For an accurate depiction as to how schedules were contained in discrete sets of Voynow workpapers, see Voynow Ex. 37-38.**

34. Voynow would review in excess of sixty (60) schedules per dealership during its visits to Star, including, but not limited to, Accounts Receivable, Employee Advances, Car Deals, Financial Reserves, Service and Parts Receivables, We-Owe Deliveries, Accrued Commissions, Accounts Payable, Rebates and Incentives, Credit card Receivable, Inventory, and New/Used. Felsen Decl. Exhibit 13, Kumor Dep. at 107:3-22; 114:9-17; Felsen Decl. Exhibit 21, Corrigan Dep. at 46:1-47:21; Felsen Decl. Exhibit 11, Lombardo Dep. at 81:13-83:13; 84:6-24; Felsen Decl. Exhibit 12, Breslin Dep. at 51:8-53:9; Felsen Decl., Exhibit 44.

**Response: Admitted.**

35. The purpose of reviewing bank reconciliations and schedules as part of Voynow's ongoing services to Star was to test the internal controls to ensure completeness of accounts and to prevent theft or financial misstatement. Voynow would review this information to confirm

accuracy and identify inaccuracies, anomalies, and irregularities and was supposed to ask questions for items that seemed unusual. Voynow would also look for aged deposits in transit and outstanding checks to determine if there was any unusual activity. Also, as part of its services, if Voynow identified abnormal activity or irregularities, it was supposed to be further investigated by asking questions, asking for support and further documentation, and following up. There was no final report that Voynow issued to Star when it completed these various tasks. Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9; Felsen Decl. Exhibit 11, Lombardo Dep. at 40:13-41:25; 42:1843:20; 52:13-20; 67:17:68:13; 83:15-84:1; 88:14-89:14; 91:15-92:2; 92:25-93:5; Felsen Decl. Exhibit 21, Corrigan Dep. at 35:8-16; 60:7-25; 95:9-96:11; Felsen Decl. Exhibit 12, Breslin Dep. at 11:11-12:7; 13:1-15:8; 89:5-15; Felsen Decl. Exhibit 19, Bucolo Dep. at 27:8-28:7-30:17; 46:425; Felsen Decl. Exhibit 13, Kumor Dep. at 26:18-21; 135:20-136:7; 240:13-249:23; Felsen Decl. Exhibit 14, McCormack Dep. at 110:12-111:24; Felsen Decl. Exhibits 35, 38, 44.

**Response:  Admitted that Voynow reviewed Star's schedules, reconciliations, and aged deposits during three visits per year that, according to Mr. Koufakis, was for an engagement that was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the corporate tax returns.  These annual corporate tax returns contain year-end amounts for Plaintiffs' balance sheet and income statement accounts.  Voynow Ex. 34, 2014 Star Nissan Tax Return.  Admitted that Voynow never issued year-end audited financial statements as Mr. Koufakis did not require them, but wanted all financial statement account balances verified by Voynow to be reflected on the annual corporate tax returns it issued each year. Voynow Ex. 2, M. Koufakis Dep. at 82:2-83:19.**

19

36. Voynow reviewed service open repair orders at Star, and then collected VIN numbers, had the service department look up customers' names, and performed a physical check on Star's service lots to ensure the customers' vehicles were still present to confirm the repair remained in process, and if not, reported such irregularities to Franzen. There was no final report that Voynow issued to Star when it completed these various tasks. Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9; Corrigan Dep. at 21:9-25; 37:10-38:3; 47:24-50:25; Bucolo Dep. at 50:16-24; 55:18-56:7; 99:19-100:17. This was done to make sure no employees were stealing and to identify fraud. Felsen Decl. Exhibit 21, Corrigan Dep. at 37:23-38:3.

**Response: Admitted that Voynow reviewed open repair orders for vehicles during interim year site visits and that this was for the engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the corporate tax returns. Admitted that Voynow never issued year-end audited financial statements as Mr. Koufakis did not require them but wanted all financial statement account balances that were verified by Voynow to be reflected on annual corporate tax returns it issued each year. Voynow Ex. 2, M. Koufakis Dep. 82:2-83:19; Voynow Ex. 34, 2014 Star Nissan Tax Return. Disputed that the purpose of reviewing open repair orders was to identify fraud; to the contrary it was to bring items to the attention of Plaintiffs' management so it could determine if the item could be written off or if it was collectible as either scenario would effect income. Voynow Ex. 51, McCabe 108:12-23; 115:117-116:22.**

37. Voynow performed a review of aged receivables at Star to ensure that employees were not stealing and to identify fraud. Felsen Decl. Exhibit 21, Corrigan Dep. at 75:2-76:17; 36-

37; Felsen Decl. Exhibits 36-37. There was no final report that Voynow issued to Star when it completed these various tasks. Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

**Response:      Admitted that Voynow reviewed aged receivables during interim year site visits as part of its engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the corporate tax returns.  Admitted that Voynow never issued year-end audited financial statements as Mr. Koufakis did not require them but wanted all financial statement account balances that were verified by Voynow to be reflected on annual corporate tax returns it issued each year. Voynow Ex. 2, M. Koufakis Dep. 82:2-83:19;  Voynow Ex. 19, Letters Issuing Annual Tax Returns; Voynow Ex. 34, 2014 Star Nissan Tax Return.  Disputed that Michael Koufakis' Declaration is admissible evidence to support this averment as it conflicts with his deposition testimony.**

38. Voynow was responsible for finding irregularities and determining why there were irregularities. Felsen Decl. Exhibit 21, Corrigan Dep. at 62:1-5. There was no final report that Voynow issued to Star when it completed these various tasks. Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 9.

**Response:  Disputed as Mr. Corrigan never testified that Voynow was responsible for finding irregularities nor does the testimony cited even pertain to Plaintiffs' engagement.  Admitted that Voynow never issued year-end audited financial statements as Mr. Koufakis did not require them, but wanted all financial statement account balances that were verified by Voynow to be reflected on annual corporate tax returns it issued each year. Voynow Ex. 2, M. Koufakis Dep. 82:2-83:19; Voynow Ex. 19, Letters Issuing Annual**

21

**Tax Returns.  Disputed that Michael Koufakis' Declaration is admissible evidence to support this averment as it conflicts with his deposition testimony.**

39. Voynow assigned its accountants to review the schedules at Star. Felsen Decl. Exhibit 11, Lombardo Dep. at 78:16-79:3; Felsen Decl. Exhibit 16, Seibel Dep. 140:23-143:12.

**Response:  Admitted.**

40. The review of Star's schedules conducted by Voynow was not tax work. Felsen Decl. Exhibit 11, Lombardo Dep. at 116:20-25; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7; November 20, 2023 Sosnowski Report at 7.

**Response:  For purposes of this Motion, Voynow admits that its review of schedules was for an engagement that, according to Mr. Koufakis, was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances that were then reflected in the corporate tax returns.  However, Voynow testified that review of schedules was part of tax work as it reviewed schedules before using the numbers on them to prepare tax returns. Voynow Ex. 51, McCabe 112:20-24. Voynow checked schedules to let Plaintiffs know what they needed to focus on or clear from their income statement before year-end and help get them prepared for year end. Voynow Ex., 54, McCormack 120:9-22; 121:7-14.  Even when doing tax work for clients, "you kind of wanted to see what's being done throughout the year." Voynow Ex., 46 Lombardo 44:4-24.**

41. Voynow's review of these schedules establishes that Voynow performed procedures consistent with a financial statement review but without issuing a final accountant's written report. Felsen Decl. Exhibit 1, Sosnowski Dep. at 101:23-102:15.

**Response:  Admitted for purposes of this Motion that Voynow's review of schedules and procedures performed were for an engagement that was "more than a review but less**

22

**than an audit" of all financial statement accounts and to verify all account balances which**

**were then reflected on annual corporate tax returns it was required to issue.  Admitted that**

**Plaintiffs did not require annual audited or reviewed year-end financial statements but did**

**require annual corporate tax returns to be issued that reflected year-end account balances**

**for Plaintiffs' balance sheet and income statement accounts.  Voynow Ex. 2, M. Koufakis**

**Dep. 74:10-75:20; 82:24-83:19; 109:10-22; 108: 12-14; Voynow Ex. 19, Letters Issuing**

**Annual Tax Returns; Voynow Ex. 34, 2014 Star Nissan Tax Return.**

42. Voynow's performance of reviewing the financial statements and audit-type procedures is consistent with a consulting engagement. Felsen Decl. Exhibit 75, Sosnowski Decl. ¶ 7.

**Response:  Disputed. Mr. Sosnowski's May 15, 2024 Declaration is inadmissible as it is unsupported by the record,  inconsistent with the evidence, unreliable and in violation of FRCP 26, Rule 37(c)(1) and this Court's orders as to expert discovery.**

43. During Voynow's review of Star's schedules, Voynow would ask Star's office employees questions regarding the schedules they ran and reviewed, then Voynow would make notes on the schedules which included notes related to unusual activity (such as control numbers on commission schedules with the name "Extra" instead of the names of employees or with Star's office manager's initials), and notes indicating Voynow purportedly inquired with Vivian Karouzakis, one of the employees who stole from Star, about unusual activity, such as by writing on the schedules "OK by Viv" and "OK"; Voynow's employees also raised concerns with Voynow management about lack of internal controls. Felsen Decl. Exhibit 12, Breslin Dep. at 11:11-12:22; 102:1-104:19; 112:1-11; Felsen Decl. Exhibit 11, Lombardo Dep. at 95:10-97:18; Felsen Decl. Exhibit 1, Sosnowski Dep. at 97:16-98:4; Felsen Decl. Exhibit 14, McCormack

Dep. at 166:24167:10; 168:18-181:19; 186:19-189:2; Felsen Decl. Exhibit 33, 39, 70; Felsen Decl. Exhibit 22, Scherf Dep. at 245:19-251:10; Exhibits 39-43, 62.

**Response:  Admitted that Voynow, during three site visits each year, would review certain schedules that were printed out from Plaintiffs' accounting system as of the date of the visit.  Admitted that Voynow would ask questions, if warranted, about some schedules, and that certain questions were posed to Plaintiffs' Controller Karazoukis.  Admitted that Voynow would make notations in its annual workpapers on some schedules. Disputed that Voynow ever "ran" any schedule and the citations referenced do not support this averment.  Disputed that Exhibits 39-43 and 62 are accurate depictions of Voynow's work as they are pages randomly pulled in no particular order from various sets of Voynow's annual engagement workpapers.  An accurate depiction of full sets of Voynow's annual engagement workpapers, with schedules reviewed, is set forth in Voynow Ex. 37 and 38.**

44. After reviewing and extracting all of the data from the documents, Voynow would generate questions to ask employees if Voynow discovered any errors, red flags, anything aged outstanding at time of the visit, and/or any other issues. Felsen Decl. Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 2.

**Response:  Disputed as Ex. 25 does not support this factual averment.**

45. Voynow had complete control of the amounts included in the final trial balances each year for Star; for example, for the year ended December 31, 2014 a general entry was made in the amount of $283,985.56 which entry reduced inventory and net income. Supporting documentation for the general journal entry was contained in the Voynow workpaper file demonstrating Voynow's control. This level of review and analysis would not be required for a tax-only engagement. Reviewing year-end general journal entries is a controllership function.

24

Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7; November 20, 2023 Sosnowski Report at 7.

      **Response:  Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and even inconsistent with his own testimony.  Mr. Sosnowski's conceded at his deposition that "I don't think [Voynow] ever proposed [journal] entries outside of year end for purposes of the tax engagement." Voynow Ex. 35, Sosnowski Dep. 123:3-5.  He conceded that Voynow never entered any journal entries which would be a typical function of a controller. Id., 122:3-10. He admitted to seeing no evidence that Voynow prepare monthly and annual financial statements, that it accessed the Plaintiffs' Reynolds system directly or remotely, and that it would be impossible for Voynow to act as a controller for seven automobile dealership groups when it only on site 7 out of 365 days a year.  Id., 94:22-95:14; 96:10-14; 114:2-25;123:21-126:9.  Further, to the extent Plaintiffs are suggesting the December 31, 2014 year-ending inventory or net income account balances for Star Nissan are erroneous, Voynow issued its work product as to these purportedly "verified" inventory and net income account balances which are reflected on the 2014 Star Nissan Tax Return it issued on September 10, 2015.  Voynow Ex. Ex. 19, Letters Issuing Annual Tax Returns at VOYNOW 021747; Voynow Ex. 34, 2014 Star Nissan Tax Return.  That claim is now time-barred.**

      46. With regard to the shortfall of $283,985.56 in inventory parts for Star Nissan for which Voynow made an enormous accounting adjustment, increasing cost of sales, which in essence, was a write-off of that amount – without having any physical inventory in place to justify the adjustment and without ever apprising the owner of this large and unusual adjustment.

Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 14; November 20, 2023 Sosnowski Report at 14.

**Response:  Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record and unreliable.  To the extent Plaintiffs are suggesting the December 31, 2014 year-ending "cost of sales" account balance for Star Nissan was erroneous, Voynow issued its work product as to this purportedly "verified" "cost of sales" account balance which is reflected on the 2014 Star Nissan Tax Return it issued on September 10, 2015.  Voynow Ex. Ex. 19, Letters Issuing Annual Tax Returns at VOYNOW 021747; Voynow Ex. 34, 2014 Star Nissan Tax Return.  That claim is now time-barred.**

47. Voynow had the adjustment "baked in" with the bottom-line figure, instead of separating it out, so as to hide the basis for the Star Nissan's poor performance that year. See Felsen Decl., Exhibit 68.

**Response:  Disputed.  The citation referenced above does not support this averment. Ex. 68 are pages excerpted from Voynow's 2013-2015 annual workpapers reflecting year-end adjustments for profit tie-ins for year-end tax purposes.  The documents do not reference or support the averment of a "baked in" figure or "poor performance" as averred and Plaintiffs fail to cite to any testimony as to this issue.**

48. Voynow was required to answer all of Star's questions covering the broad scope of Voynow's work. Voynow was on call for and answered practically all of Star's questions. See Felsen Decl., Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 2.

**Response: Disputed. Ex. 25 does not support this averment.**

49. The owners of Star would ask virtually every time at the end of every review of its books and records by Voynow whether there were any issues with the accounting records and Voynow's response always led them to believe that there was never any theft going on. See Felsen Decl., Exhibit 25, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, no. 7.

**Response: Disputed. Ex. 25 does not support this averment.**

50. At Star, Voynow also performed cashier audits, checked the petty cash drawer in the service department of dealerships and performing an accounting of it, and provided recommendations related to internal controls; this is not related to tax preparation work. Felsen Decl. Exhibit 10, Whyte Dep. at 172:18-173:12; Felsen Decl. Exhibit 13, Kumor Dep. at 217:5-218:22; Felsen Decl., Exhibit 34.

**Response: For purposes of this Motion, Voynow does not dispute that it performed procedures relating to cash or petty cash, and that according to Michael Koufakis, these were for an engagement that was "more than a review but less than an audit" of all financial statement account balances and to verify all account balances financial statements. Voynow Ex. 2 at 74:10-75:20; 108: 12-14. As such, these procedures would encompass more than preparation of annual corporate tax returns after the fiscal year-end.**

51. Following some visits to Star, Voynow's accountants provided Star's owners with letters identifying and summarizing their findings, including unusual activity or anomalies, and making recommendations for internal controls. Felsen Decl. Exhibit 11, Lombardo Dep. at 48:2-14; 110:6-12; 114:1-116:19; 117:3-8; Felsen Decl. Exhibit 12, Breslin Dep. at 11:12-17:3; Felsen Decl. Exhibit 4, J. Koufakis Dep. at 182:23-183:20; Felsen Decl. Exhibit 1, Sosnowski Dep. at

27

64:6-11; Felsen Decl. Exhibit 19, Bucolo Dep. at 53:6-16; Felsen Decl. Exhibit 13, Kumor Dep. at 141:19-142:11; Felsen Decl. Exhibit 15, Franzen Dep. at 52:15-18; Felsen Decl. Exhibit 16, Seibel Dep. at 156:4-157:2; 163:10-166:15; Felsen Decl., Exhibits 28-30, 35-37, 57.

**Response:  Admitted only that following its visits, Voynow would communicate notable items to Plaintiffs' Controllers and/or owners, either orally or in writing to address for year-end purposes and that after 2013, all such communications were oral while it was on site.  Voynow admits that a purpose of such interim year reports was to bring items to the attention of Plaintiffs' management so it could determine if an item could be written off or whether it was collectible, and to enable Plaintiffs to focus on clearing their income statement before year-end.  Voynow Ex. 51, McCabe 115:117-116:22; Voynow Ex., 54, McCormack 120:9-22; 121:7-14.  Voynow's interim communications were between two tax periods and helped Plaintiffs figure out what could be written off or adjusted prior to year end.  Voynow Ex. 41, Franzen Dep., 127:6-14.  Admitted only that Plaintiffs' Exhibits 28, 35 and 57 are written letters sent to Plaintiffs.  Disputed that Exhibits 29-30 or 36-37 were letters sent to Plaintiffs and the citations referenced above do not support this averment.**

52. Voynow would discuss its findings, concerns, and recommendations with Star during visits and on future visits. Felsen Decl. Exhibit 13, Kumor Dep. at 220:16-222:5; Felsen Decl. Exhibit 15, Franzen Dep. at 57:5-16; 61:18-62:11; 114:15-115:10; 120:3-135:25; Felsen Decl. Exhibit 21, Corrigan Dep. at 89:1-18. In addition to speaking with Voynow when they came to Star's offices, Michael Koufalkis and Star's accounting personnel spoke with Voynow on the phone on a monthly basis. The conversations on the phone included questions about prior visits and questions about daily accounting operations. Felsen Decl. Exhibits 72-73, Declarations of J. Cutillo ¶ 4 and M. Koufakis ¶ 11.

**Response:  Admitted only that Voynow would communicate notable items for purposes of year-end to Plaintiffs' Controllers and/or owners, if available, while on site three times a year.  To the extent these communications were in writing, Plaintiffs' owners discarded them after the end of each fiscal year. Voynow Ex. 42, S. Koufakis Dep. 44:5-14. Voynow did not follow up on matters raised from prior years, as it was left to Plaintiffs' management to decide how to address.  See Voynow Ex. 41, R. Franzen Dep. 185:3-13 ("Voynow does not follow up; they bring it to their attention.  If they want follow up, it's up to the client.  It's not what we do").  Disputed as to the admissibility of Declarations proffered by Ms. Cutillo or Mr. Koufakis to support purported phone conversations with Voynow.  Ms. Cutillo was never even part of Plaintiffs' management until 2017 as she was a billing/DMV clerk during the period at issue and would have never been involved in any phone conversations with Voynow.   Voynow Ex. 44, Cutillo Dep. 21:1-20. Both Declarations also lack any specificity as to who was involved in alleged conversations, nor describe any particular subject or even the identity of any dealership.  Both fail to connect any such purported conversation to any alleged act of employee theft that was undetected or to any alleged specific account balance that was purportedly erroneous.**

53. Voynow had "various meetings" with Star's owners about the parts department because it was a "serious problem" (which ultimately was not proven to be a problem at all) Felsen Decl. Exhibit 15, Franzen Dep. at 152:13-154:2.

**Response:  Admitted that Voynow met with Michael Koufakis and Plaintiffs' Controllers regarding items noted while on site in Plaintiff Star Nissan's parts department. Disputed as to "ultimately not proven to be a problem" as it not supported by this citation.**

29

54. Voynow prepared analytical review work papers comparing multiple years, including trend analyses. Felsen Decl. Exhibit 1, Sosnowski Dep. at 98:22-99:9.

**Response:  The citation referenced does not support this averment.  Mr. Sosnowski could only identify one analytical review workpaper – not multiple ones.  Voynow Ex. 35, Sosnowski Dep. 98:22-99:12.  For purposes of this Motion, Voynow does not dispute that its engagement was "more than a review and less than an audit."**

55. Voynow counseled Star about fraud. Felsen Decl. Exhibit 15, Franzen Dep. at 246:1517; 250:11-252:9; Felsen Decl., Exhibit 61.

**Response:  Disputed.  The averments cited do not support this averment.  Plaintiffs' Ex. 61 is a published article as to fines assessed against an unrelated dealership.  Mr. Franzen emailed the article to Mr. Koufakis and Controller Karazoukis with a sole comment that it was "interesting."  See Plaintiff Ex. 61.  He testified that he sent it to Mr. Koufakis because Star Toyota had a similar issue in the past as the unrelated dealership.**

56. Voynow billed based on the category of services; the different categories included tax preparation services, review engagement services, interim services and audited financial statement services. Felsen Decl. Exhibit 24, Kaplan Dep. at 55:14-56:11; 59:3-6; 65:6-11; Felsen Decl. Exhibit 13, Kumor Dep. at 150:1-152:24; 210:13; 214:9-11.

**Response:  Admitted. Voynow billed clients based upon the engagement.**

57. On their invoices for services rendered, Voynow indicated the performance of various controllership functions. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 6; November 20, 2023 Sosnowski Report at 6.

**Response:  Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Mr. Sosnowski's expert reports are unsworn, unsupported,**

inconsistent with the record and unreliable. Voynow produced all of its invoices in discovery yet Plaintiffs fail to reference any invoice to support this statement. Mr. Sosnowski's reports also fail to cite to any specific invoice to support this statement. The only Voynow invoices that reference the "controllership function" were issued in the Fall of 2017 and pertain to Plaintiffs' request that Voynow assist and train Ms. Cutillo in the Spring of 2017 when she was promoted to Controller for all dealerships despite lacking any prior experience. No other invoices exist to support this averment and Mr. Sosnowski conceded as much at his deposition. Voynow Ex. 35, Sosnowski Dep. 119:8-11; 119:20-120:10; Voynow Ex. 31 September 27, 2012 Invoice.

58. Voynow would bill visits to Star and the drafting of letters as "INTSER" (interim services) and under "Accounting and Reporting" rather than under preparation of tax returns. Felsen Decl. Exhibit 11, Lombardo Dep. 143:7:144:12; 146:23-147:22; Felsen Decl. Exhibit 12, Breslin Dep. at 45:4-10; Felsen Decl. Exhibit 19, Bucolo Dep. at 112:4-7; 116:15-118:5; 121:7-122:7; Felsen Decl. Exhibit 14, McCormack Dep. at 83:16-85:18; 89:23-93:10; 97:22-98:15.

**Response: Disputed as the citations referenced do not support this averment. These witnesses cited were questioned about their time entries entered into Voynow's time-keeping system and the various pre-programmed codes within that system–not about finalized bills issued to Plaintiffs. They testified that their time entries were entered into the time-keeping system using codes based upon when services were performed, with time entries for interim year services being entered under the "INTSER" time code. Voynow Ex. 25 reflects the finalized bills actually sent to Plaintiffs and Plaintiffs have failed to support this averment with any actual finalized bill issued to them by Voynow.**

31

59. Voynow's time sheets reflect the ongoing consulting services they performed. <u>See</u> Felsen Decl., Exhibits 32, 45-56, 58.

**Response:  Disputed.  The citations referenced above do not support this averment. Plaintiffs' Ex. 32, 45-56 and 58 are excerpts from Voynow's time-keeping system which contained various pre-programmed task codes.  There is no code on these documents for purported "ongoing consulting services" nor do the entries reflect that.**

60. On some occasions, Voynow performed more than one (1) visit to Star in the same month. <u>See</u> Felsen Decl., Exhibit 60.

**Response: Disputed.  The citation referenced above does not support this averment.**

61. The last interim report that Voynow issued to Star was in 2013. Felsen Decl. Exhibit 73, M. Koufakis Decl. ¶ 13.; Felsen Decl. Exhibit 38.

**Response:  The citations referenced do not support this averment.  Exhibit 38 is an excerpted page pulled from Voynow's 2014 workpapers for its 2014 Star Subaru annual engagement and has nothing to do with an interim report.  Mr. Koufakis May 15, 2024 declaration also does not cite to "interim" report and does not support this averment.**

62. Voynow's own expert concedes that, with regard to Star, there are "e-mails or billing records that describe the scope of certain other services that were provided", and those would have been consulting services by definition. Felsen Decl. Exhibit 22, Scherf Dep. at 100:2-22.

**Response:  Admitted that Mr. Scherf stated that outside of Voynow's primary engagement, there were specific other discrete professional services it rendered that could be viewed as consulting services.  He then identified these discrete services as being limited to the 2017 training of Plaintiffs' new Controller, the 2016 assistance with a Department of Labor audit for Star Chrysler, and handling of various tax audits, all of which had specific**

**"start and end" periods and were not indicative of a continuous or open-ended engagement.  Voynow Ex. 49, Scherf Dep. 97:6-25; 100:2-22; 244:19-245:18.  Admitted that Mr. Scherf stated that there were bills or emails referencing these discrete services.  See Voynow Ex. 31, September 27, 2017 Invoice Regarding Training Cutillo; Voynow Ex. 50, February 25, 2016 Email Regarding Department of Labor Audit Assistance for Plaintiff Star Chrysler.  There is no allegation against Voynow in connection with these services and Plaintiffs offer no other evidence to support any other consulting service by Voynow.**

63. Each time Voynow visited Star, the accountants from Voynow sat down all of Star's accounting office employees and the accountants from Voynow looked in detail into what exactly they were doing, going through schedules and the dollar amounts of each of the accounts. Felsen Decl. Exhibit 3, M. Koufakis Dep. at 48:8-12.

**Response: Disputed.   The citation referenced does not support this factual averment.  Mr. Koufakis testified as to his "understanding" as to what accountants from the firm Kera Weiner (Voynow's predecessor) would do when visiting Plaintiffs.  The testimony cited does not apply to Voynow.  Voynow Ex. 40, M. Koufakis Dep., 47:16-48:24.**

64. In total, Voynow charged Star $1,561,300. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 2.

**Response:  Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Mr. Sosnowski's expert reports are unsworn, unsupported, inconsistent with the record, unreliable and inconsistent with his own testimony.  At his deposition, Mr. Sosnowski conceded that the total Voynow billing figure included services provided to non-parties such as Star Auto Body or Star's real estate companies, or to Star Mitsubishi or Star Fiat. He did not attempt to segregate those amounts out when**

33

calculating this "total" figure, nor could he break down how much of the total billed applied to the other Star-related entities not party to this case.  Voynow Ex. 35, Sosnowski Dep. 148:16-152:12.

65. Voynow billed Star annually as follows:

| Year | NISSAN | TOYOTA | CHRYSLER | SUBAR | TOTAL |
|------|--------|--------|----------|-------|-------|
| 1999 | $19,425.00 | $27,290.00 | $14,625.00 | | $63,339.00 |
| 2000 | $26,000.00 | $22,870.00 | $12,860.00 | | $63,730.00 |
| 2001 | $37,525.00 | $22,125.00 | $13,225.00 | | $74,876.00 |
| 2002 | $22,925.00 | $22,175.00 | $11,375.00 | | $58,477.00 |
| 2003 | $23,250.00 | $31,825.00 | $16,250.00 | | $73,328.00 |
| 2004 | $26,850.00 | $22,525.00 | $12,935.00 | | $64,314.00 |
| 2005 | $22,500.00 | $24,200.00 | $20,225.00 | | $68,930.00 |
| 2006 | $27,700.00 | $24,200.00 | $18,700.00 | $960.00 | $73,566.00 |
| 2007 | $24,750.00 | $25,250.00 | $14,000.00 | $5,890.00 | $71,897.00 |
| 2008 | $37,215.00 | $23,500.00 | $23,750.00 | $5,950.00 | $92,423.00 |
| 2009 | $18,000.00 | $20,000.00 | $12,000.00 | $6,000.00 | $58,009.00 |
| 2010 | $19,825.00 | $34,685.00 | $27,750.00 | $15,240.00 | $99,510.00 |
| 2011 | $43,635.00 | $30,950.00 | $26,570.00 | $12,520.00 | $115,686.00 |
| 2012 | $49,440.00 | $34,825.00 | $24,085.00 | $11,325.00 | $121,687.00 |
| 2013 | $29,490.00 | $36,865.00 | $24,360.00 | $16,315.00 | $109,043.00 |
| 2014 | $27,230.00 | $27,380.00 | $26,820.00 | $12,725.00 | $96,169.00 |
| 2015 | $31,475.00 | $35,230.00 | $32,315.00 | $14,270.00 | $115,305.00 |
| 2016 | $38,085.00 | $29,615.00 | $32,985.00 | $12,700.00 | $115,401.00 |
| 2017 | $19,875.00 | $19,875.00 | $20,300.00 | $10,100.00 | $72,167.00 |

See Felsen Decl., Exhibit 71.

**Response:  Admitted that Voynow billed Star Nissan, Star Toyota, Star Chrysler, and Star Subaru the amounts reflected above and for the years cited.**

66. The customary fee charged for preparation of a corporate tax return in the New York Metro area in 2015 was $9,700 in a year. Felsen Decl. Exhibit 1, Sosnowski Dep. at 152:13-17.

**Response:      Disputed.  Mr. Sosnowski could not cite to any journal, study, survey or publication to support this statement and he has not prepared any corporate tax return since 2001.  He was unable to identify any specific corporate taxpayer, whether by name,**

size, revenue, type of dealership, number of accounts, or even type of tax return, to support this statement.  **Voynow Ex. 35, Sosnowski Dep. 152:13-154:11.**

67. During the relevant period, the cost for the preparation of a tax return by Voynow did not exceed $10,000 in a year. Felsen Decl. Exhibit 20, Sidor Dep. at 78:12-25.

**Response:  Disputed.  The citation referenced above does not support this averment. Mr. Sidor testified that he was familiar with Voynow's billing for "clients that [he] worked heavily on at the end of [his] tenure" and speculated that it would not have exceeded $10,000. Voynow Ex. 53, Sidor Dep. 78:6-25.  Mr. Sidor left Voynow in 2021.  When his tenure ended in 2021, Plaintiffs were no longer a Voynow client as the engagement ended in 2017.  Voynow Ex., 53 Sidor Dep. 16:12-20.  Further, Voynow's Managing Partner Hugh Whyte stated that Voynow's annual billings for a tax engagement for large dealership groups such as Potamkin or Sloane was approximately $350,000 each, and was approximately $100,000 for Plaintiffs.  Voynow Ex. 43, Whyte Dep. 49:19-52:9.**

68. Review engagements were double the price of tax-only engagements, *i.e.*, less than $20,000 in a year. Felsen Decl. Exhibit 14, McCormack Dep. at 49:12-17; 50:5-12.

**Response:  Disputed.  The citation referenced above does not support this averment. When asked about the difference in cost between a review and a tax engagement in general, Mr. McCormack testified that "he did not know exactly" and speculated that the cost of a review engagement was "generally about double" as compared to a tax engagement.  There is no reference to "less than $20,000" or any other dollar amount in his cited testimony.**

69. In 2015, Star paid Voynow an average of $28,673 per dealership. Felsen Decl. Exhibit 1, Sosnowski Dep. at 152:9-12.

**Response:  Admitted that this $28,673 amount is an average figure applicable to only five of Plaintiffs' dealerships and only for 2015.  When computing this average, Mr. Sosnowski excluded amounts billed to Plaintiffs Star Mitsubishi and Star Fiat or for Star Auto Body, as that would lower the average.  He was also aware that Voynow's 2015 billings included services for IRS tax audits but also did not segregate this out when making his calculation.  Voynow Ex. 35, Sosnowski Dep. 148:16-152:12.**

70. Thus, the professional fees Star paid Voynow were well in excess of the customary fees charged for the preparation of corporate income tax returns and were in line with (or exceeded) the customary fee for providing financial statement review and controllership functions, along with other ongoing consulting services in addition to tax return preparation. Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7.

**Response: Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Mr. Sosnowski's expert report is unsworn, unsupported, inconsistent with the record, and unreliable.  It fails to cite to any data, journal, study, survey or publication to support what are "the customary fees" for preparation of a corporate tax return, preparation of reviewed financial statements, or the performance of controllership functions. He has not prepared any corporate tax return since 2001.  At his deposition, he was unable to identify any specific corporate taxpayer, whether by name, size, revenue, type of dealership, number of accounts, or even type of tax return, to support his statement.  Voynow Ex. 35, Sosnowski Dep. 152:13-154:11.**

71. In addition to analyzing Star's schedules, the amount of time Voynow spent performing services for Star, the time of year that they billed for services, and their own billing entries (*e.g.*, stating "accounting services" or "special accounting services"), all establish that

36

Voynow performed financial statement review and controllership functions as part of a consulting engagement on an on-going basis. Felsen Decl. Exhibit 1, Sosnowski Dep. at 103:7-105:25; Felsen Decl. Exhibit 2, September 15, 2023 Sosnowski Report at 7 November 20, 2023 Sosnowski Report at 7.

**Response:  Disputed as the citations referenced above do not support this averment or are otherwise inadmissible.  Disputed as to any purported controllership functions or any on-going, open-ended consulting engagement. Mr. Sosnowski's expert report is unsworn, unsupported, inconsistent with the record, unreliable and inconsistent with his own deposition.  He conceded that the only Voynow invoice that references a controllership function was issued in the Fall of 2017 and related to the training of Ms. Cutillo.  Plaintiffs fail to support this averment with any bill issued by Voynow despite receiving all of them.**

**In his deposition, Mr. Sosnowski admitted to the lack of evidence to support his statement that Voynow provided controllership services as part of an ongoing consultant arrangement.  He conceded that a controller typically prepared monthly and annual financial statements but cited to no evidence that Voynow ever did that.  Voynow Ex. 35, Sosnowski Dep. 123:21-124:23.   He would expect a controller to have a lot of log entries in the Reynolds system but saw no evidence Voynow ever made any entries in the system. Id., 114:2-25.  He testified that "I don't think [Voynow] ever proposed [journal] entries outside of year end for purposes of the tax engagement" and it never entered these year-end adjusting journal entries or any other journal entries, but that  Plaintiffs did. Id., 123:3-5; 122:3-10.  He admitted seeing no evidence in either Plaintiffs' or Voynow's records showing that Voynow ever accessed Plaintiffs' Reynolds' accounting system remotely or directly, and was never provided with a total summary of all of Voynow's log ins to the Reynolds'**

system despite Plaintiffs being able to generate it. **Id.**, **123:21-125:7; 94:22-95.  This meant that Voynow could only access Plaintiffs' records when it was physically on site.  Id., 96:10-14.** He acknowledged it would be impossible for Voynow to act as a Controller for seven large dealerships when it only had access to Plaintiffs' records 7 out of 365 days a year. Rather, it would be the responsibility of Plaintiffs' accounting staff who were on site with access 365 days a year to perform all such Controllership functions. **Id.**, **123:21-126:9.  He admitted that Voynow's engagement letters were inconsistent with its being a controller or an open-ended consultant. Id., 108:4-12.  He could not cite to any evidence in billing reocrds that Voynow, based in Trevose, PA, supervised Plaintiffs' employees working in Long Island. Id., 110:14-111:5.**

72. Voynow did not visit clients who had only tax engagements three or four times a year. Felsen Decl. Exhibit 11, Lombardo Dep. at 27:21-25.

**Response:  Admitted that Mr. Lombardo stated that he did not recall having gone to any Voynow client three or four times a year for only tax services.  As to Voynow's engagement with Plaintiffs, he was never involved in tax planning visits and was not part of Voynow's "normal engagement team" for Plaintiffs who were not one of his typical clients. He visited less than three times. Voynow Ex., 46 Lombardo Dep. 74:24-75:1-2; 231:6-20; 235:1-22.**

73. The only required visit for tax purposes is in December. Felsen Decl. Exhibit 10, Whyte Dep. at 122:20-22; Felsen Decl. Exhibit 12, Breslin Dep. at 17:19-23.

**Response:  Disputed as the citations referenced do not support this averment.  Mr. Breslin stated that for tax services, Voynow would visit "near the end of the year and then**

after."  Mr. Whyte was asked if "the only required interim visit is in December" and he responded "Could be."

74. For tax preparation work, some Voynow partners do not meet with clients and merely walk through year end over the phone with the clients. Felsen Decl. Exhibit 10, Whyte Dep. at 90:24-91:21.

**Response:  Admitted.  Voynow submits that interactions of unnamed Voynow partners with other clients is not relevant to Plaintiffs or to this Motion.**

75. At most, two visits per year were made to clients for whom Voynow provided solely tax preparation work; any additional visits were for interim visits. Felsen Decl. Exhibit 13, Kumor Dep. at 119:3-120:23; Felsen Decl. Exhibit 11, Lombardo Dep. at 26:15-27:20.

**Response:  Admitted only that Mr. Kumor testified that Voynow would generally visit dealerships "at least twice" with one visit being for tax planning and one visit at year end, and that to the extent Voynow went more, it was "requested" by the client.  Voynow admits that Michael Koufakis initially requested quarterly site visits but then reduced it to three times a year.  Voynow Ex. 2, M. Koufakis Dep., 104:7-10; 105:19-24; Voynow Ex. 4, S. Koufakis Dep. 9:16-10:15; Voynow Ex. 8, Seibel Dep. 98:4-7.**

76. Tax work does not involve any analysis. Felsen Decl. Exhibit 13, Kumor Dep. at 62:16-18.

**Response:  Admitted that Mr. Kumor responded "not really" when asked if tax work involved any analysis.**

77. Typically, Voynow did not provide separate form letters for interim visits covering consulting and controllership services. Felsen Decl. Exhibit 11, Lombardo Dep. at 57:1-23.

**Response:  Disputed.  The citation referenced does not support this averment.  Mr. Lombardo's testimony does not even refer to controllership or consulting services.  He stated that Voynow issued annual engagement letters for the type of service being provided and there no additional engagement letter was issued specifically for interim visits.  Voynow Ex. 46, Lombardo Dep., 57:1-10; 15-23. Consistent with this testimony, Voynow engagement encompassed professional services performed during tax planning, interim year and tax preparation visits and its engagement letters stated that "it will perform tasks it deemed necessary" for the engagement.  Voynow Ex. 41, R. Franzen Dep. 25:19-28:9; Voynow Ex. 21, Engagement Letters.**

78. Voynow repeatedly, each time it reviewed Star's schedules, saw abnormal entries on schedules and said nothing to Star's owners. Felsen Decl., Exhibits 39-43; 62.

**Response:   Disputed. The referenced citations do not support this averment. Exhibits 39-43, 62 are random pages pulled from Voynow's annual workpapers and presented out of context.  True depictions of Voynow's annual engagement workpapers and how they were maintained are set forth in Voynow Ex. 37 and 38.**

79. At the end of 2014 or early 2015, Voynow was informed by Cutillo, who at the time had just started the job function of posting commissions for Star, that the commission schedules contained unusual information and Voynow told her "that's Vivian's [Karouzakis], don't worry about it." Felsen Decl. Exhibit 6, Star Nissan 30(b)(6) deposition. The commission schedule contained a list of the names of employees but also contained the names of employees beginning with the term "PTSN" and TOY" followed by a series of numbers, which was later revealed as a scheme by Karouzakis to steal money. Felsen Decl., Exhibits 39-40.

**Response:  Admitted that Ms. Cutillo testified to a conversation she purportedly had with Voynow at the end of 2014 or early 2015 regarding an accrued commission schedule. Disputed that the entries on the schedules with the term "PTSN" or "TOY" are indicative of theft. Exhibits 39-40 do not support this averment.  Despite Plaintiffs report of this to the District Attorney, no charges were ever filed as the entries do not reflect any theft.  Voynow Ex. 55, Star Nissan Dep., 263:17-24; Voynow Ex. 23, Criminal Complaints.**

80. Voynow's own employees concede that Voynow did not exercise professional skepticism with respect to work it performed at Star. Felsen Decl. Exhibit 11, Lombardo Dep. at 101:11-103:10.

**Response:  Disputed.  The citation referenced does not support this averment.  Mr. Lombardo was asked about an interaction in 2008 - his first year as a staff accountant at Voynow.   During a visit to Plaintiffs, he spoke with Ms. Karazoukis' husband, a Star employee who had an aged receivable account balance outstanding for over 90 days. Mr. Lombardo then spoke to Voynow partner Randall Franzen about this aged receivable and stated that Mr. Franzen did not think it was a "big deal." Mr. Lombardo agreed that it "wasn't a huge amount of money" and "less than five thousand" dollars and he never became aware that it was theft or fraud. With regard to the concept of professional skepticism, Mr. Lombardo stated that an accountant is entitled to rely upon an explanation given by a client if it makes sense.  Voynow Ex. 46, Lombardo Dep. 230:9-15; 231:21-232:12; 247:21-249:2; 251:5-12; 255:3-13; 259:2-13; 282:21-283:1.**

**MARSHALL DENNEHEY, P.C.**

BY: _____

JOHN L. SLIMM, ESQUIRE
MAUREEN P. FITZGERALD, ESQUIRE
620 Freedom Business Center, Suite 300
King of Prussia, PA 19406
(610) 354-8270 Fax (610) 354-8299
Email:  mpfitzgerald@mdwcg.com
Attorneys for Defendants,
Voynow, Bayard, Whyte and Company, LLC, Hugh
Whyte, Randall Franzen, and Robert Siebel

Date:  June 5, 2024
LEGAL/161605992.v1