EXHIBIT 35

Page 1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    -------------------------------X
     STAR AUTO SALES OF BAYSIDE,
3    INC., ET AL.,
4         Plaintiffs,
5
      Civ. No. 18-CV-5775 (ERK) (CLP)
6
7         -against-
8    VOYNOW, BAYARD, WHYTE AND COMPANY,
     LLP, ET AL.,
9
                  Defendants.
10   -------------------------------X
                November 28, 2023
11              10:00 a.m.
12              Virtual Deposition
13
14

          THE EXAMINATION BEFORE TRIAL of
15
     DOUGLAS SOSNOWSKI, a Witness, held remotely,
16
     before a shorthand reporter and Notary
17
     Public within and for the State of New York.
18
19
20
21
22
23
24
25   Job No. CS6326406

Page 2

1      A P P E A R A N C E S :

2

3      MILLMAN LAW
       3000 Marcus Avenue
4      Lake Success, New York 11042
       BY: JOSEPH LABUDA
5      For the Plaintiff
       Also present:
6      Jeremy Koufakis
       Jacqueline Cutillo

7

8      MARSHALL DENNEHY
       620 Freedom Business Center
9      King of Prussia, PA 19406
       BY: MAUREEN FITGERALD
10     For the Defendants

11                              * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 18

1    A.    In the last ten years.

2    Q.    How many times?

3    A.    Five times.

4    Q.    Have you used or are you familiar with the

5    Reynolds and Reynolds accounting system used by

6    automobile dealerships?

7    A.    Yes.

8    Q.    How did you obtain that familiarity?

9    A.    From my time as an auditor.

10   Q.    That was at some point before 2001; is that

11   correct?

12   A.    Correct.

13   Q.    So is it fair to say that you have not worked

14   with or used Reynolds and Reynolds in over twenty

15   years; is that correct?

16   A.    Correct.

17   Q.    So is it your testimony opinion that a tax

18   accountant who accesses client's accounting system

19   is doing something more than tax work?

20   A.    Yes.

21   Q.    In all cases?

22   A.    In most cases.

23   (Mr. Franzen entered the Zoom.)

24   Q.    You are a forensic accountant?

25   A.    Yes.

Page 53

1          MR. LABUDA: Objection.  You can

2     answer.

3          THE WITNESS:  Not that was

4     provided to Star.

5  EXAMINATION BY

6  MS. FITGERALD:

7  Q.    Well, my question is, though, whether or not

8  there were letters issued by Voynow, you acknowledge

9  based upon what is listed in the appendix, that the

10 evidence shows there were engagement letters issued

11 by Voynow?

12          MR. LABUDA: Objection.

13          You can answer.

14          THE WITNESS:  No I don't think

15     they were ever issued.

16 EXAMINATION BY

17 MS. FITGERALD:

18 Q.    On what basis, based on the facts and documents

19 deposition testimony do you make that statement?

20 A.    Because there are no copies of assigned

21 documents and the clients have told me that they did

22 not receive those engagement letters.

23 Q.    Okay.  So did you review the deposition

24 testimony from the owners of Star, as to whether or

25 not they actually testified that they never received

Page 55

1    A.    I don't think so.

2    Q.    Let me ask you this.  You don't think any

3    engagement letters were sent.  And if I understand

4    your answer, you are relying upon statements by, as

5    told to you by Jackie Cutillo and by Michael

6    Koufakis; is that correct?

7    A.    Correct.

8    Q.    So is it fair to say that you did not consider

9    the evidence and the documents that were produced in

10   the case that suggest otherwise?

11          MR. LABUDA:  Objection.  You can

12      answer.

13          THE WITNESS:  There is no evidence

14      suggesting otherwise.

15   EXAMINATION BY

16   MS. FITGERALD:

17   Q.    Were you provided with the metadata showing

18   that the engagement letters were updated on an

19   annual basis?

20   A.    No.

21   Q.    Would that be something that's important

22   whether or not there is any evidence -- withdrawn.

23          Were you provided with billing records from

24   Voynow?

25   A.    Yes.

1    Q.   What else then, did you rely upon other than

2    the conversations, for your statement in your report

3    that Voynow never documented its service s in an

4    engagement letter prior to December of 2016?

5    A.   I relied on the lack of actual evidence.

6    Q.   Are e-mails evidence?

7    A.   They can be evidence, but they don't prove that

8    there was an engagement letter.

9    Q.   Are billing records evidence?

10          MR. LABUDA:  Objection.  You can

11    answer.

12          THE WITNESS:  Could you be more

13    specific?  They can be evidence, but not

14    for an engagement letter sent to

15    clients.

16          MS. FITGERALD:  Again, sir I am

17    talking about -- withdrawn.

18    Did you see --

19    I will move on.  I will move on.  Forget it.  I

20   will move on now.

21   EXAMINATION BY

22   MS. FITGERALD:

23    Q.   Is it your understanding that Star received an

24   engagement letter from Voynow on or around December

25   of 2016?

Page 65

1      MS. FITGERALD:

2      Q.    To the extent that Star did not produce interim

3      letters that it claims to have received in this

4      case, do you acknowledge the possibility that it

5      discarded those letters?

6              MR. LABUDA:  Objection.  You can

7         answer.

8              THE WITNESS:  Yes.

9      EXAMINATION BY

10     MS. FITGERALD:

11     Q.    Do you recall testimony from some of the owners

12     that they discarded documents they received from

13     Voynow at the end of each year?

14     A.    Yes.

15     Q.    So knowing that, do you acknowledge the

16     possible that Star also received engagement letters

17     from Voynow and discarded those at the end of each

18     year?

19     A.    It's possible.

20     Q.    You stated in your rebuttal affidavit that

21     Mr. Shirk discussed accounting services other firms

22     provided to Star after Voynow was terminated and the

23     Rosenfield company has no relevance to this matter.

24     Do you recall that statement?

25     A.    Yes.

Page 5

Douglas Sosnowski                    78

2    the assistance we do provide is not to be

3    construed as an oversight function in any respect

4    of a company's accounting system.

5                  Therefore, there should be no

6    reliance stated or implied by a company on the

7    accuracy of the assistance we are to provide."

8                  Do you see that?

9         A     I do.

10        Q     So then do you agree that should a

11   jury determine these letters were issued, then to

12   the extent you've offered an opinion stating

13   Voynow was providing an oversight function, that

14   opinion is no longer supported by the record?

15                  MR. LA BUDA:  Objection.

16                  You can answer.

17        A     I would need to give it some more

18   thought.

19        Q     All right.

20                  If we go further down on page 2 of

21   exhibit 4 Voynow's engagement letter states, "we

22   will not honor or otherwise verify the data

23   submitted. Accordingly our engagement cannot be

24   relied upon to disclose error, fraud or other

25   illegal acts that may exist."

1                    Douglas Sosnowski                    79

2                    Again, that disclaimer, to the extent

3    the jury accepts the evidence that Voynow did in

4    fact issue this opinion letter, do you agree that

5    negates your opinion that Voynow was required to

6    detect fraud?

7                    MR. LA BUDA:  Objection.

8                    You can answer.

9         A      I don't think it was my opinion they

10   were required to detect fraud.

11        Q      You do not hold the opinion Voynow

12   was engaged to detect fraud irrespective of any

13   engagement letter, correct?

14        A      I don't know for sure that they

15   weren't.

16        Q      Well, what is your opinion as the

17   expert in this case?  Was Voynow retained to

18   detect fraud?

19        A      There is no written engagement

20   letter.  So it's difficult to say what they were

21   retained to do over a period of twenty-one years

22   and I don't know if at any point during those

23   twenty-one years they were asked to look for

24   fraud.  So I can't answer that.

25        Q      You see no evidence in any of the

Page 18

1                    Douglas Sosnowski              91

2         Q      You made the statement that Voynow is

3    the accountant of record, okay?

4         A      Right.

5         Q      I have to know.  I'm the attorney on

6    record with the court for the purposes of this

7    case.

8         A      Right.

9         Q      I asked you when you referenced

10   accountant of record, who is Voynow on record

11   with?

12               MR. LA BUDA:  Objection.

13               He can answer.

14        A      With the IRS.

15        Q      Was Rosenfield the accountant of

16   record after Voynow's services were terminated?

17        A      I believe so.

18        Q      Is Withum Star's current accountant

19   of record?

20        A      I have no idea.

21        Q      You state on page 2 of your report,

22   number 7, that on an interim\quarterly basis

23   Voynow made periodic visits to Star.  Do you see

24   that?

25        A      Yes.

1              Douglas Sosnowski              94

2                    He can answer.

3        A      I didn't know one way or another.

4        Q      Did you review the deposition

5   testimony of the Voynow accountant?

6        A      I did.

7        Q      Do you recall that they all testified

8   they did not have remote access at Star prior to

9   2017?

10       A      I did not remember that.

11       Q      Did you see any evidence in Voynow's

12  documents or in Star's records that Voynow

13  accessed Star's accounting records remotely?

14       A      No.

15       Q      If you were to assume there is no

16  evidence and that Voynow could not have accessed

17  Star's records prior to 2017 remotely, would you

18  then agree that the only time Voynow could have

19  accessed or reviewed any of Star's records was

20  when it was physically on-site?

21                   MR. LA BUDA:  Objection.

22                   He can answer.

23       A      No.

24       Q      In what way could Voynow have

25  accessed Star's records when it was not on-site?

Page 22

1              Douglas Sosnowski                95

2          A     They could have contacted someone at

3      the dealership and asked them to send over a fax

4      or e-mail.

5          Q     All right.

6                Having someone transmit a document is

7      different than logging in and accessing an

8      accounting system, is that correct?

9          A     Yes.

10         Q     Would you agree if Voynow did not

11     have access prior to 2017 Voynow would not have

12     been able to access Star's accounting system

13     unless it was on-site?

14         A     Yes.

15               MR. LA BUDA:  Objection.

16               He can answer.

17         Q     When you formulated your opinions in

18     this case, did you consider or recall the evidence

19     provided by the Voynow accountant as to what

20     documents they would bring if any when they would

21     go to Star to physically visit?

22         A     Yes.

23         Q     What is your recollection as to what

24     documents Voynow brought?

25         A     I don't recall specifically.

1                    Douglas Sosnowski                96

2          Q        Do you recall Voynow bringing

3    anything other than the prior year's tax return?

4          A        I don't recall what the testimony

5    was.

6          Q        Do you think what Voynow was bringing

7    on-site is pertinent as to what the scope of its

8    engagement was?

9          A        No, not at all.

10         Q        If you were an accountant providing a

11   review or audit, you would be bringing certain

12   things that would be different than a tax

13   engagement?

14         A        No, I would not.

15         Q        Are you familiar with typical things

16   that one might use or see in a accountant's work

17   papers for a review engagement?

18         A        Yes.

19         Q        One of those things would be a

20   preprinted checklist?

21         A        Yes.

22         Q        Are those a checklist that are

23   published by somebody and has preprinted text by

24   one side and the other side is blank with lines,

25   right?

Page 25

Douglas Sosnowski                        98

1

2      where some anomolies were discovered by Voynow and

3      there was a notation on it that they had spoken

4      about it with Vivian, the office manager.

5              Q       You recall the testimony of Bob

6      Seibel as part of your review on this case?

7              A       Yes.

8              Q       He testified that he inquired, for

9      purposes of his tax engagement, about that PTSM

10     entry and was told it was accrual.  Do you recall

11     that?

12             A       Yes.

13             Q       Other than that document is there any

14     other document you are categorizing as an inquiry

15     work paper?

16             A       I know there were more, but none that

17     come to mind specifically.

18             Q       Did you see any documents that were

19     specifically labeled or designated "PBC" or as

20     prepared by client in going out work papers?

21             A       No.

22             Q       Did you see any documents analytical

23     review work papers in Voynow's documents?

24             A       Yes.

25             Q       Which document are you referring to?

1                    Douglas Sosnowski                    99

2          A      I do remember a trend analysis they

3    were performing on inventory where they were

4    comparing inventory trends to statements to prior

5    product statements from the dealer.

6          Q      That's the report you have referenced

7    dated January 19, 2015?

8          A      Yes.

9          Q      Other than that document is there any

10   other analytical review work papers contained in

11   the documents you reviewed?

12         A      No.

13         Q      Did you see any engagement

14   agreements?

15         A      No.  I'm sorry?

16         Q      Did you see any engagement agreement

17   in these work papers for Voynow?

18         A      No.

19         Q      Do you agree that for a review you

20   would expect to see the signed engagement letter

21   in an accountant's work papers?

22         A      Yes.

23         Q      Did you see any management

24   representation letter in Voynow's work papers

25   signed by Star?

Page 30

1                    Douglas Sosnowski                103

2         A      No, that's incorrect.

3         Q      You last prepared a tax return for an

4    automobile dealership in 2001, is that correct?

5         A      Yes.

6                (Discussion off the record.)

7         Q      You stated that the timesheets

8    support your opinion that Voynow performed

9    procedures consistent with the financial statement

10   review?

11        A      Yes.

12        Q      What specifically is it about the

13   time sheets that you are relying upon?

14        A      Well, first of all, just the volume

15   of time that they spent on these engagements and,

16   secondly, the time of the year that they would go

17   out.

18                If you were doing only tax work,

19   there would be no need to go out and perform

20   procedures at interim dates like Voynow did.

21        Q      When you say, "timesheets," you're

22   relying upon the number of hours billed and the

23   timing of the on-site visits by Voynow?

24        A      And the descriptions.

25        Q      What specific description are you

1                    Douglas Sosnowski                    108

2       controllership services."

3            A     Yes.

4            Q     Do you agree there is nothing in

5       writing in any of the engagement letters that I

6       showed you or in the engagement letter that Star

7       acknowledges receiving wherein Voynow states it

8       was providing controllership services?

9                    MR. LA BUDA:  Objection.

10                   He can answer.

11           A     Not in any of the documents you

12      showed me, no.

13           Q     Where in Voynow's records did you see

14      any evidence they provided controllership

15      services?

16           A     Just, again, timesheets, billing

17      records and their work papers.

18           Q     Identify for me any specific work

19      paper you believe is indicative of a

20      controllership service.

21           A     Anything that would show they

22      reviewed bank statements and when they prepared

23      general journal entries or reviewed general

24      journal entries.  Those were all controllership

25      references.

1                   Douglas Sosnowski                110

2          Q       Did you see any evidence where Voynow

3    was actually in a position to supervise Star's

4    employees?

5          A       Yes.

6          Q       In what capacity?  Would it be when

7    they were physically on-site?

8          A       No, they could also do it remotely.

9          Q       Did you see any evidence that Voynow

10   was supervising Star's employees while it was

11   based in Trevose, Pennsylvania and the employees

12   were based in Long Island?

13         A       Just in the billing records.

14         Q       Is there anything in the billing

15   records that suggest that Voynow, based in

16   Pennsylvania, is supervising employees working in

17   Long Island?

18         A       Yes.

19         Q       What?

20         A       I can't remember specifically as

21   we're sitting here.

22         Q       There is nothing that you cite to in

23   your report, either a document or a deposition,

24   that supports your opinion or your statement that

25   Voynow was supervising Star's employees, is that

Page 38

Douglas Sosnowski                    111

2    correct?

3                    MR. LA BUDA:  Objection.

4                    You can answer.

5         A     Yes.

6         Q     Where in Voynow's records did you see

7    evidence that they were reviewing actual bank

8    statements?

9         A     I don't recall specifically.

10        Q     Is it fair to say there is nothing

11   you cited in your report document wise or

12   deposition testimony that supports that statement?

13                   MR. LA BUDA:  Objection.

14                   He can answer.

15        A     No, that's incorrect.

16        Q     Tell me where in your report you

17   cited to a deposition or a document showing that

18   Voynow reviewed bank statements.

19        A     Depositions of Debbie Theochakis and

20   Jackie Cutillo.

21        Q     Where in your report?

22        A     Those are all in Appendix A to the

23   report.

24        Q     Do you understand under the rules

25   you're required to cite specific pages and

1                Douglas Sosnowski                114

2        Q        You would expect if somebody was

3    providing controller services they would have a

4    lot of entries in the Reynolds system under their

5    log-in, correct?

6                    MR. LA BUDA:  Objection.

7                    He can answer.

8        A        There would be entries made by the

9    controller on occasion, yes.

10        Q        Were you provided with any documents

11    or any evidence showing that Voynow ever made any

12    entries or recorded any transactions in Star's

13    Reynolds system?

14                    MR. LA BUDA:  Objection.

15                    He can answer.

16        A        It's my understanding they gave the

17    information to one of the office staff who would

18    actually post the entry, but no, they did not

19    access the computers directly.

20        Q        There is no evidence in the Reynolds

21    system that you are aware of that shows that

22    Voynow ever made any entry in that system,

23    correct?

24        A        Right.  They didn't physically input

25    it into the system, no.

1                    Douglas Sosnowski                116

2    describe as controllership functions, that was a

3    change in the relationship between Star and

4    Voynow?

5           A      It changed how Voynow would be

6    perceived.

7           Q      You don't reference in your report

8    any documents by citation or date as to the

9    specific invoices that reference purportedly

10   controllership functions, correct?

11                 MR. LA BUDA:  Objection.

12                 You can answer.

13          A      Correct, they're in Appendix A.

14          Q      They're not cited by date or by bate

15   number in your report?

16          A      No.

17          Q      Correct?

18          A      Appendix A is part of my report.

19          Q      Do you understand in Federal Court as

20   an expert you can't cite to a whole invoice, to

21   thousands and thousands of documents?  You have

22   the obligation to support the statements in your

23   opinion with specific references to citations, to

24   testimony and documents.  Do you understand that

25   as an expert to Federal Court?

1                Douglas Sosnowski                118

2    to controllership functions?

3         A     Yes.

4         Q     What year did you believe those

5    invoices were issued?

6         A     I think you can find examples in

7    every year.

8         Q     Is it your contention when you make

9    that statement in your report that there are

10   invoices every year that referenced special

11   accounting services as requested related to

12   controllership functions?

13        A     Not that specific phrase, no.  It

14   might just have said accounting services.  It

15   might not have been special accounting services.

16        Q     Well, your report says that Voynow

17   indicated the performance of controllership

18   function, which is the language on exhibit 9,

19   correct?

20        A     A lot of the examples, correct.

21        Q     My question to you, prior to 2017 are

22   you aware of any documents issued by Voynow, any

23   invoices issued by Voynow, that indicated they

24   were providing special accounting services related

25   to controllership functions as reflected in this

Page 46

Douglas Sosnowski                    119

1
2    exhibit?
3              MR. LA BUDA:  Objection.
4              You can answer.
5         A    I don't think that phrase was used,
6    no.
7         Q    All right.
8              So are you aware of "controllership
9    functions" being contained on any Voynow invoice
10   prior to 2017?
11        A    I don't recall.
12        Q    It's your opinion that when Star
13   received an invoice stating "controllership
14   function" its perception changed that's stated in
15   your report?
16        A    No.
17        Q    You said fundamentally changed the
18   relationship in your report.
19        A    But not in 2017.
20        Q    Are you aware, tell me the year,
21   point to me the document, any invoice that said
22   Voynow was providing services related to the
23   controllership function before 2017?
24             MR. LA BUDA:  Objection.
25             He can answer.

1                    Douglas Sosnowski                120

2          A      I believe they did every year during

3     the twenty-one year engagement period.

4          Q      What are you basing that answer on?

5     What document, bate stamp, date, anything?

6          A      I don't have it just off the top of

7     my head.

8          Q      Is it fair to say you don't cite to

9     anything to support that opinion in your report?

10         A      Other than Appendix A, no.

11         Q      In your report you don't cite to

12    anything specifically supporting that statement,

13    correct?

14         A      Correct.

15         Q      Do you recall the testimony from

16    Voynow as to why it was asked to provide the

17    services that were reflected in exhibit 9?

18         A      Yes.

19         Q      Do you recall that Star had decided

20    to appoint Jackie to positions that were held

21    jointly by Vivian and Debbie?

22         A      No, that's incorrect.

23         Q      All right.

24                Who did you understand to be the

25    replacement for Vivian and Debbie?

Page 48

1              Douglas Sosnowski          121

2              MR. LA BUDA:  Objection.

3              He can answer.

4      A      I don't think there were, like,

5  direct one-for-one replacements for those two

6  employees.  I think their duties were spread out

7  among the accounting personnel of the dealerships.

8      Q      As of May 2017 did you understand

9  Jackie was performing a significant component of

10 Vivian and Debbie's duties?

11     A      Yes.

12     Q      Did you also understand that she had

13 no prior experience performing those duties?

14     A      I don't know which duties she had

15 prior experience with and what she didn't.  She

16 did learn new things I'm sure.

17     Q      Did understand that Voynow was

18 providing assistance and training to her?

19     A      Yes.

20     Q      They were doing so at the request of

21 Star on or around May 2017?

22     A      Yes.

23     Q      You agree Voynow never prepared any

24 financial statements for Star?

25     A      They assisted in making journal

Page 49

1                  Douglas Sosnowski                    122

2       entries that went into the financial statements.

3              Q       So the adjusting journal entries that

4       are referenced in Voynow's work papers is what

5       you're referring to, correct?

6              A       Correct.

7              Q       Those entries were in fact recorded

8       by Star personnel to its own books and records,

9       correct?

10             A       Correct.

11             Q       You agree that other than preparing

12      adjusting journal entries, which my client's

13      contend were for tax purposes, Voynow did not do

14      anything in terms of preparing Star's financial

15      statements?

16                     MR. LA BUDA:  Objection.

17                     You can answer.

18             A       I'm unclear what your question is.

19      They made adjusting journal entries I find other

20      than at year end.  So, they weren't for tax

21      purposes.  They were for reconciling the books and

22      records of the company.

23             Q       All right.

24                     On what occasion do you recall Voynow

25      proposing journal entries outside of the year end

1                    Douglas Sosnowski                123

2    for purposes of their tax engagement?

3         A     I don't think they ever proposed

4    entries outside of year end for purposes of the

5    tax engagement.

6         Q     All right.

7               You agree Voynow never did the

8    monthly closings of Star's books and records?

9         A     I didn't know that.

10        Q     Do you recall the testimony from

11   Debbie Theocharis who stated that she and Vivian

12   did the monthly closing statements?

13        A     I recall her saying Voynow did the

14   year end closing, but I don't recall what was done

15   on a monthly basis.

16        Q     Did you see any evidence indicating

17   that Voynow ever did the monthly closings for

18   Star?

19        A     I believe they assisted but not every

20   month.

21        Q     So what evidence, where in your

22   report do you cite to any evidence that Voynow

23   assisted each month with the monthly closings of

24   Star's books and records?  Where is that?

25        A     I didn't say each month.

1                    Douglas Sosnowski              124

2         Q       Where is it?  Where is the evidence?

3         A       I said occasionally in Appendix A.

4         Q       Where in Appendix A?

5         A       I can't tell you as I'm sitting here.

6         Q       You don't identify in your report

7    anything to support your opinion, correct?

8         A       Correct.

9         Q       Would you agree that preparing the

10   monthly and annual financial statements for a

11   dealership is a function of a controller?

12        A       Yes.

13        Q       You are aware that the Reynolds

14   system has the ability to retrieve all of the

15   log-in information that would have been generated

16   by any particular user, correct?

17        A       Yes, correct.

18        Q       Is it fair to say when you make your

19   opinions concerning Voynow in this case you were

20   never provided with the pool of all of the log-ins

21   or the summaries generated by Reynolds and

22   Reynolds with regard to what Voynow may have done?

23        A       That's correct.

24        Q       So you can't point to anything in the

25   Reynolds and Reynolds system that supports your

Page 52

Douglas Sosnowski                    125

2  opinion that Voynow was providing various

3  controllership functions, correct?

4            MR. LA BUDA:  Objection.

5            He can answer.

6       A    No, I don't believe they accessed the

7  Reynolds system directly.

8       Q    Would it be possible for a controller

9  of a combined seven automobile dealership group to

10 do his or her job six days out of the year?

11           MR. LA BUDA:  Objection.

12           You can answer.

13      A    I don't know if I can answer that

14 question.  Could you break it down for me?

15      Q    Is it possible for a controller of a

16 family of automobile dealerships, seven group

17 dealership, to perform the functions of a

18 controller when they only had access to records or

19 only did work seven out of three hundred

20 sixty-five days a year?

21           MR. LA BUDA:  Objection.

22           He can answer.

23      A    They would need assistance.  They

24 wouldn't be able to perform all the functions of

25 the controller, but they would be able to delegate

Page 53

1              Douglas Sosnowski              126

2   to other office staff.

3        Q      It would be the responsibility of

4   other folks within the office staff who were

5   actually working three hundred sixty-five days out

6   of the year to do those functions?

7        A      Correct.

8        Q      Correct?

9        A      Correct.

10       Q      In your rebuttal affidavit at

11  paragraph 21 you referenced Star's prior

12  accountant, the Kera Weiner firm.  Do you recall

13  that?

14       A      I do.

15       Q      You state that the Kera Weiner firm

16  used a checklist demonstrating consulting services

17  provided to Star.  Do you recall that?

18       A      Yes.

19       Q      I will show you what was marked as

20  Exhibit 8, which is one of the very few documents

21  you reference in this case by bates number.  Could

22  you see the document, sir?

23       A      Yes, I can.

24       Q      This is a May 15, 1996 accountant's

25  checklist that is generated on a Kera Weiner form,

Page 64

1                    Douglas Sosnowski              137

2                    (Recess taken.)

3                    (After recess, the following ensued.)

4    EXAMINATION

5    CONT'D BY MS. FITZGERALD:

6        Q      Mr.  Sosnowski, turn to page 7 of

7    your report.

8        A      Twenty-seven?

9        Q      Page 7, under Internal Controls.  You

10   state that, "some of the most important internal

11   controls involve effective safeguarding of cash.

12   Voynow knew or should have known that internal

13   controls for safeguarding cash at Star Auto were

14   inadequate."

15                  What were the internal controls that

16   Star had implemented that you deem to be

17   inadequate?

18       A      After a deposit is made, after a

19   deposit slip is filled out, the cash should not be

20   able to be accessed by the person who filled out

21   the deposit slip.

22                  Star didn't have that control.  So

23   the person who filled out the deposit slip still

24   had access to the cash until it was brought to the

25   bank.

Page 75

1                    Douglas Sosnowski              148

2        A     Yes.

3        Q     Does that mean it's fraudulent?

4        A     I don't understand the question.

5        Q     Is it a fraudulent number because

6  it's a round number?

7        A     I don't understand.

8        Q     Is the number in your report, which

9  is a round number, a fraudulent number?

10       A     I believe that this fee was actually

11 picked.

12       Q     So then you acknowledge a scenario

13 where a round number can be a legitimate number

14 and not a fraudulent number?

15       A     It could be.

16       Q     Is there anything in your report that

17 breaks down the 1.5 mil by year or by dealership?

18       A     No.

19       Q     Is it your understanding that this

20 1.5 mil was the total amount Star paid Voynow?

21       A     Yes.

22       Q     To the extent Voynow provided

23 services for other dealerships besides Toyota,

24 Nissan, Chrysler, Subaru, and Hyundai, those

25 services would be encompassed in the 1.5 million

Page 76

Douglas Sosnowski                    149

1

2    dollars?

3         A       I believe so, yes.

4         Q       Are you aware Voynow provided

5    services for Mitsubishi?

6         A       Yes.

7         Q       And for Fiat?

8         A       Yes.

9         Q       And for Star Auto Body?

10        A       Yes.

11        Q       Are you aware that Voynow provided

12   services for various real estate companies?

13        A       Yes.

14        Q       Your report does not distinguish

15   between what portion of those fees went to

16   services provided by Voynow on behalf of any of

17   those entities I just looked at?

18        A       Correct, it's a total fee.

19        Q       You state that in 2015 the five main

20   Star dealerships paid Voynow approximately

21   $143,365. How did you compute that number?

22        A       I added up the invoices.

23        Q       You added up the invoices issued by

24   Voynow?

25        A       Correct.

Page 77

1          Douglas Sosnowski                 150

2          Q     Were those invoices issued in 2016 or

3     were those invoices issued that related to the

4     2015 calendar year?

5          A     They were invoices that related to

6     the 2015 calendar year.

7          Q     Some of those invoices then would

8     have been issued in 2015 as well as 2016?

9          A     Yes.

10         Q     Let me try that again, because I

11    don't think you understood what I was asking you.

12               When you competed the $143,365 number

13    that's in your report, did that number relate to

14    bills that were issued and dated with the 2015

15    date or does the number relate to work that was

16    performed relating to Star's 2015 fiscal year?

17         A     The latter.

18         Q     All right.

19               To that extent you would have looked

20    at invoices that were issued in both 2015 and

21    2016?

22         A     Yes.

23         Q     When you competed that number, did

24    you make any distinction for any invoices that

25    related to tax audit services?

Page 78

| | | |
|---|---|---|
| 1 | | Douglas Sosnowski 151 |
| 2 | A | I don't remember. |
| 3 | Q | Were you aware that there were tax |
| 4 | audits that took place in 2015? | |
| 5 | A | I am. |
| 6 | Q | Would you agree that when a tax |
| 7 | accountant asked you represent a company in | |
| 8 | connection with a tax audit that's going to | |
| 9 | increase that company's tax bill? | |
| 10 | A | No. |
| 11 | Q | Do you expect that the accountant's |
| 12 | going to provide services related to an audit for | |
| 13 | free? | |
| 14 | A | No, they will charge for their time. |
| 15 | It's a separate consulting engagement. | |
| 16 | Q | When you talleyed the $143,365, are |
| 17 | you able to break down how much of that related to | |
| 18 | tax audit work? | |
| 19 | A | Not as I'm sitting here, no. |
| 20 | Q | But you're aware at least some of it |
| 21 | did? | |
| 22 | A | No, I'm not sure. |
| 23 | Q | You're not sure one way or the other? |
| 24 | A | Right. |
| 25 | Q | You're not able to break down what |

1                Douglas Sosnowski              152

2    portion of that $143,365 related to dealerships

3    other than Toyota, Nissan, Chrysler, Subaru, and

4    Hyundai?

5          A     No, I just get a total.

6          Q     There are facts figures analysis in

7    your report breaking down that total, right?

8          A     Correct.

9          Q     When you state the average per

10   dealership is $28,673, did you just divide

11   $143,365 by 5?

12         A     Yes.

13         Q     You state in your report that the

14   customary fee charged for preparation of a

15   corporate tax return in New York City in 2015 was

16   approximately $9,700, correct?

17         A     Yes.

18         Q     You don't cite to any publication,

19   journal, treatise, or survey in your report that

20   supports that statement, correct?

21         A     No, it's based on my personal

22   knowledge.

23         Q     You don't append anything in your

24   report to support that statement?

25         A     No.

Page 80

1                    Douglas Sosnowski                153

2        Q        All right.

3                 You don't distinguish in your

4    statement as to the specific type of corporate tax

5    return at issue, correct?

6        A        The number that I am giving you is

7    for a tax return of an automobile dealership.

8        Q        That's based on your personal

9    knowledge, correct?

10       A        That is correct.

11       Q        You told me you have not prepared a

12   tax return for a dealership since 2001, correct?

13       A        That's correct, but I own an

14   accounting firm that prepares dealership tax

15   returns.

16       Q        So that statement then is based upon

17   the billing of Brisbane Consulting, correct?

18       A        No, it's Lumsden and McCormick is the

19   firm that we use to prepare the tax returns and

20   perform the audits.

21       Q        It's based on the billing of Lumsden

22   McCormick, correct?

23       A        Lumsden and McCormick.

24       Q        Who are the clients of Lumsden who

25   are based in New York City, the dealership

Page 81

1                    Douglas Sosnowski                154

2     clients?

3          A      I can't disclose that.

4          Q      You can't disclose the identity of

5     your client based on what?

6          A      Based on client confidentiality.

7          Q      So is it fair to say there is no

8     support in your report and you're not willing to

9     provide that support as to the statement on page

10    7?

11         A      Based on my experience.

12         Q      At page 8 of your report you state

13    that Doug Filardo embezzled $1,419,874.83 from

14    Star Subaru through payments to a fictitious

15    vendor for advertising work that was never

16    performed.   Do you see that?

17         A      I do.

18         Q      Do you acknowledge that there is

19    nothing in your report that allowed a reader to

20    determine any specific act of theft that comprises

21    that amount?

22         A      It's in Appendix A.

23         Q      Tell me where in Appendix A I can

24    look at and see a listing of every specific act

25    that comprises the 1.4 million dollars which