# EXHIBIT 36

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\* \* \*

STAR AUTO SALES OF BAYSIDE, INC.,:
d/b/a STAR TOYOTA OF BAYSIDE),    :
STAR AUTO SALES OF QUEENS, LLC,   :
d/b/a STAR SUBARU, STAR HYUNDAI,  : NO:  18-CV-05775
LLC, d/b/a STAR HYUNDAI, STAR     :      (ERK)(TAM)
NISSAN, INC., d/b/a STAR NISSAN,  :
METRO CHRYSLER PLYMOUTH, INC.,    :
d/b/a STAR CHRYSLER JEEP DODGE,   :
STAR AUTO SALES OF QUEENS COUNTY, :
LLC, d/b/a STAR FIAT and STAR     :
AUTO SALES OF QUEENS VILLAGE,     :
d/b/a STAR MITSUBISHI,            :
            Plaintiffs,           :
            - vs -                :
VOYNOW, BAYARD, WHYTE AND         :
COMPANY, LLC, HUGH WHYTE and      :
RANDALL FRANZEN,                  :
            Defendants.           :

\* \* \*

Oral deposition of DAVID KUMOR, taken at U.S. LEGAL SUPPORT, 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, 19103, on Tuesday, October   , 2022, beginning at approximately 11:00 a.m., before Lisa M. Cooper, Court Reporter.

\* \* \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

```
 1   A P P E A R A N C E S :

 2
             MILMAN LABUDA LAW GROUP, PLLC
 3           BY:  MICHAEL C. MULE, ESQUIRE
             BY:  JEREMY M. KOUFAKIS, ESQUIRE
 4           3000 Marcus Avenue, Suite 3W8
             Lake Success, New York  11042
 5           michaelmule@mllaborlaw.com
             -- Representing the Plaintiffs
 6

 7           MARSHALL DENNEHEY WARNER COLEMAN
             & GOGGIN, P.C.
 8           BY:  MAUREEN P. FITZGERALD, ESQUIRE
             620 Freedom Business Center, Suite 300
 9           King of Prussia, Pennsylvania  19406
             mpfitzgerald@mdwcg.com
10           -- Representing the Defendants

11                      *    *    *

12   ALSO PRESENT:
             Robert Seibel
13           Jacqueline Cutillo
             Steve Rambam (via telephone)
14

15

16

17

18

19

20

21

22

23

24

25
```

1  Q.      All right.  How did Voynow store clients'
2  accounting records while you were there?
3  A.      You mean the physical copies we brought back?
4  Q.      Yeah.
5  A.      They would be binded into what we considered
6  tax planning, work papers.  And then we would have year
7  end work papers.  And I believe the year end work
8  papers we started getting scanned into the system.
9  Q.      So you would have, it would be binded in tax
10 planning, work papers.
11 A.      Um-hum.
12 Q.      And year end work papers?
13 A.      Correct.  The tax planning work papers we
14 brought back out to us with the clients, so any
15 questions we had received, they were resolved.
16 Q.      Okay.  And the year end work papers, that
17 would stay at Voynow?
18 A.      That would stay and then it would -- we would
19 bring that out the following year, so that we weren't
20 asking -- or if we forgot, like, what, say, the Subaru
21 incentives were, we sometimes had notes on our paper to
22 say what the Subaru incentives were supposed to be.
23 Q.      Was there any records that were bound with
24 respect to interim visits?
25 A.      What I did with mine is I would print out

```
 1   whatever I wrote, rubber band it, and give it to the
 2   partner in charge.
 3   Q.        And you would physically give it to the
 4   partner in charge?
 5   A.        Yes.
 6   Q.        The hard copy.
 7   A.        If they were in.  I would put it in their
 8   office on their desk if they weren't in the office.
 9   Q.        Okay.  If -- if you were back in the office
10   and you wanted to look for a particular year at the
11   work papers for tax planning, or for year end, you'd be
12   able to go to a particular location in the office and
13   locate them?
14   A.        Yeah, we had -- they were stored in red
15   ropes.  I started doing them by year.  And then they
16   were stored somewhere in a file cabinet.
17   Q.        Okay.  You said they were stored by -- what
18   was the word you used?
19   A.        Year.
20   Q.        Before that.  Red --
21   A.        Red ropes.
22   Q.        Red ropes?
23   A.        The big -- I don't know.
24   Q.        Oh.  Redwelds?
25   A.        Those things.  Are they called Redwelds?
```

```
 1   recall at Voynow?
 2   A.        Like the tax return?
 3   Q.        Yeah, whatever else.
 4   A.        The tax return.
 5   Q.        The tax return.
 6   A.        The tax return was the main hard copy we
 7   kept.  As well as the year end files.
 8   Q.        Okay.  And -- but they also kept the binded
 9   work papers?
10   A.        Yeah.  So it would be the tax return and then
11   the binded year end work papers, which were the
12   clients' produced schedules.
13   Q.        And do you know how long the hard copies
14   would be maintained?
15   A.        By the time I left I believe that we were
16   keeping them for five years.
17   Q.        And you were saying Star had its own cabinet?
18   A.        Its own file cabinet.
19   Q.        When you became manager, did you get involved
20   with basically compiling any interim reports yourself
21   from work --
22             MS. FITZGERALD:  Object to form.
23   BY MR. MULE:
24   Q.        -- that was provided by associates?  Or staff
25   accountants?
```

```
 1   Q.        Would that imply internal controls of the
 2   company?
 3                 MS. FITZGERALD:  Objection.
 4                 THE WITNESS:  That would -- that's what
 5            I'm thinking.  But we would definitely need a
 6            separate engagement letter for that.
 7   BY MR. MULE:
 8   Q.        Okay.  On that point, as far as separate
 9   engagement letters, when you were staff accountant at
10   Voynow, did you see the engagement letters, if they
11   were sent?
12   A.        I know they existed.  And I have seen them.
13   So like for the Paruzzis, because we did a reviewed
14   financial statement, I couldn't do anything until I got
15   that engagement letter back.
16   Q.        Okay.  For Paruzzi.  Now, focusing on Star
17   for a minute.  Did you ever see an engagement letter
18   for Star?
19   A.        I might have seen it in the files.
20   Q.        But as you sit here, do you recall seeing
21   one?
22   A.        Um-hum.  Yeah.
23   Q.        For Star?
24   A.        For Star, yes.
25   Q.        In particular.
```

1  don't know if Reynolds forces you to schedule it,
2  though, so.
3  Q.        Going down to page 7874, Voynow.  There's a
4  couple of entries that looks like there is a highlight.
5  Service and Parts Receivable and Warranty Claims.  Do
6  you see that?
7  A.        Yes.
8  Q.        Do you know why that would be highlighted?
9              MS. FITZGERALD:  Objection.
10             THE WITNESS:  Probably just to tell the
11         employee printing it out that those are full
12         schedules you need to print out.  Because it
13         looks like none of the other -- yeah, so if
14         you look at the next page, only the 3's and
15         -- 2's and 3's are highlighted.  So they're
16         just telling the person printing it out, that
17         this is what you have to print out, a full
18         schedule.
19  BY MR. MULE:
20  Q.        Okay.  And there's handwriting on the right
21  side on that page.  Do you see that?
22  A.        Yep.
23  Q.        Do you know what that is?
24  A.        No idea.
25  Q.        All right.  We can put that aside.  Were you

```
 1  charged at all, while you worked at Voynow, with
 2  drafting engagement letters?
 3  A.        Yes.
 4  Q.        Okay.  Did you ever draft an engagement
 5  letter pertaining to Star?
 6  A.        No.
 7  Q.        Okay.  When -- when you were a staff attorney
 8  were you charged with drafting any engagement letters?
 9  A.        A staff accountant.
10  Q.        Staff accountant, yes.
11  A.        Okay.  I -- I might have written it up, but
12  it always went through review.
13  Q.        Okay.  Do you recall any particular clients
14  that you worked on for which you drafted an engagement
15  letter?
16  A.        Paruzzi, Thompson.  Those are the ones that I
17  definitely did.
18  Q.        Okay.
19  A.        Because the reviewed financial statements
20  were different than the tax return ones.  The tax --
21  different than the tax return ones.
22  Q.        The reviewed are different than the tax
23  return ones?
24  A.        Different than -- they are two different
25  engagement letters.
```

David Kumor
October 18, 2022

| | |
|---|---|
| 1 | A. The ones I worked on, yes. |
| 2 | Q. Okay. And when you say the ones you worked |
| 3 | on, are those the ones that you're responsible for? |
| 4 | Or, to your knowledge, the ones that you participated |
| 5 | in, even if you didn't see the end result? |
| 6 | A. Yeah. Even if I didn't see the end result, I |
| 7 | wrote up whatever I worked on. |
| 8 | Q. Okay. And whether that -- the partner in |
| 9 | charge actually issued an interim report, you don't |
| 10 | know? |
| 11 | A. I do not know. |
| 12 | Q. Okay. But on the ones that you were |
| 13 | responsible for, Paruzzi -- |
| 14 | A. Just Paruzzi had the interim. And then I |
| 15 | made sure, because the owner expected to see it, so. |
| 16 | Q. Okay. And of the ten -- say the ten out of |
| 17 | 30 dealerships that included this type of interim |
| 18 | visit, should that have been included in the engagement |
| 19 | letter? |
| 20 | A. It's beyond my knowledge. |
| 21 | Q. You don't know? |
| 22 | A. I don't know. |
| 23 | Q. Okay. Before starting an engagement with a |
| 24 | client, or going out to a client, would the partner in |
| 25 | charge have a team meeting? |