# EXHIBIT 40

```
                                                           Page 1

 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   1:18-CV-05775-ERK-CLP
     -------------------------------------------x
 4
     STAR AUTO SALES OF BAYSIDE, INC.
 5   (d/b/a STAR TOYOTA OF BAYSIDE), STAR
     AUTO SALES OF QUEENS, LLC (d/b/a STAR
 6   SUBARU), STAR HYUNDAI LLC (d/b/a
     STAR HYUNDAI), STAR NISSAN, INC. (d/b/a
 7   STAR NISSAN), METRO CHRYSLER
     PLYMOUTH INC. (d/b/a STAR CHRYSLER
 8   JEEP DODGE), STAR AUTO SALES OF
     QUEENS COUNTY LLC (d/b/a STAR FIAT)
 9   And STAR AUTO SALES OF QUEENS
     VILLAGE LLC (d/b/a STAR MITSUBISHI),
10
              Plaintiffs,
11
         v.
12
     VOYNOW, BAYARD, WHYTE AND COMPANY, LLP,
13   HUGH WHYTE, RANDALL FRANZEN AND ROBERT
     SEIBEL.
14
              Defendants.
15   -------------------------------------------x
16                    2000 Market Street
                      Philadelphia, Pennsylvania
17
                      August 15, 2022
18                    10:09 a.m.
19
         DEPOSITION of MICHAEL KOUFAKIS, a
20
     Plaintiff, held at the above-entitled time and
21   place, taken before Carolyn Crescio, a
22   Professional Shorthand Reporter and Notary
23   Public of the State of Pennsylvania.
24
25              *       *       *
```

```
 1
 2    A P P E A R A N C E S:
 3
      MILMAN LABUDA LAW GROUP, PLLC
 4    Attorneys for Plaintiffs
          3000 Marcus Avenue
 5        Suite 3W8
          Lake Success, New York 11042
 6    BY: JAMIE FELSEN, ESQ.
 7
 8
      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, ESQS.
 9    Attorneys for Defendants
          620 Freedom Business Center
10        Suite 300
          King of Prussia, Pennsylvania 19406
11    BY: MAUREEN FITZGERALD, ESQ.
12
13    ALSO PRESENT:
14    Hugh Whyte
      Randall Franzen
15    Robert Seibel
      Jeremy Koufakis
16    Steven Rambam (via phone)
17
18
19
20
21
22
23
24
25    Job No. CS5329457
```

Page 3

1  M. KOUFAKIS
2  MIKE KOUFAKIS, the witness herein,
3  after having been first duly sworn by a Notary
4  Public of the State of Pennsylvania, was examined
5  and testified as follows:
6  BY THE COURT REPORTER:
7       Q.    Please state your name for the
8  record.
9       A.    Mike Koufakis.
10              MS. FITZGERALD:  Usual
11          stipulations?
12              MR. FELSEN:  Yes.
13  EXAMINATION
14  BY MS. FITZGERALD:
15       Q.    Good morning, Mr. Koufakis.  My name
16  is Maureen Fitzgerald, and I represent the
17  defendants in this lawsuit that's been brought
18  on behalf of the Star entities.  We are here
19  today to take your deposition.  Before we begin,
20  I would like to go over some ground rules and
21  instructions.  Okay?
22       First off, when I ask a question, I need you
23  to keep your responses verbal, so you can't answer
24  by shaking your head.
25       Okay?  is that understood?

1          M. KOUFAKIS
2  year-end financial statement for each of the
3  dealerships, with an accompanying opinion as to
4  their review; is that your understanding?
5          MR. FELSEN: Objection.
6      A.   Yes.
7      Q.   What, if anything, did Voynow do --
8  I'm sorry. What, if anything, did any of the
9  Star entities -- strike that.
10         During the course of their engagement, were
11 any of the Star entities required to have reviewed
12 financial statements?
13     A.   Every manufacturer requires
14 financial statements to be submitted on a
15 monthly basis.
16     Q.   So did you understand that the
17 reviewed financial statements, that you claimed
18 to have engaged Kera, Weiner to do, were they
19 done on an annual basis, or were they done on a
20 monthly basis?
21     A.   The -- again, every manufacturer
22 requires a monthly financial statement. They
23 would come in quarterly to review the accounts
24 and the accounting procedures that were being
25 done in the office.

M. KOUFAKIS

Q. So do you have -- when you're using the term "review," do you have any understanding as to -- and you're using that in the context of financial statements. Do you have any understanding as to what that means?

MR. FELSEN: Objection.

A. My understanding is they come in. They sit down with everyone in my office, and they look in detail into what exactly they are doing, going through schedules and verifying the dollar amounts of each of the accounts.

Q. And that's what you believe you hired Kera, Weiner to do?

A. That's what I know they were hired to do. And that's what I know they did.

Q. So who hired them?

A. I did.

Q. So you would have hired them around 1987, '86?

A. Let me rephrase that. I think it was closer to '90. I think it was 1990 to 1996.

Q. Who was your point of contact there?

A. Larry Weiner.

Q. Prior to Kera, Weiner, who was the

Page 72

1  M. KOUFAKIS
2  been pursuant to an oral agreement?
3       A.    Yes.
4       Q.    Was there an engagement letter with
5  Mr. Rosen?
6       A.    I believe so.
7       Q.    And did you sign that engagement
8  letter?
9       A.    I believe.
10      Q.    Was there an engagement letter with
11 this other accounting firm, whose name you do
12 not recall?
13      A.    Not sure.
14      Q.    At any point has any of the Star
15 entities ever hired an accountant, to conduct an
16 audit or prepare audited financial statements?
17           MR. FELSEN:  Objection.
18      A.    Can I amend the prior --
19      Q.    Certainly.
20      A.    Okay.  Nick Chester was brought to
21 me as a retired controller of the Potamkin
22 Group, so I did not know whether he was an
23 accountant or not.
24      Q.    Understood.
25      A.    Just to clarify that.

1      M. KOUFAKIS
2  name of Rob Sanka?
3      A.    Doesn't ring a bell.
4      Q.    At any point during Voynow's
5  engagement, did you ever look at their website?
6      A.    During the engagement.
7      Q.    You told me when you hired them in
8  '96, you don't think there was a website in
9  existence. So my question was, at any point
10 from the '96, up until their termination, did
11 you ever look at their website?
12     A.    Not that I can specifically recall.
13     Q.    When Voynow switched to the Era
14 system with the Rentals and Rentals, were you
15 the person designated as the administrator of
16 that system?
17     A.    Yes.
18     Q.    By that, that means that you
19 maintained all of the credentials for anybody
20 who you were going to give access to?
21     A.    Yes.
22     Q.    And did you keep a list of
23 individuals that had access to and, like, update
24 that as new employees were hired?
25     A.    I didn't keep a list. It was just

1  M. KOUFAKIS
2  So if you had a log-in and password and you knew
3  the phone number, you would be able to do it.
4  But I don't believe he did.
5     Q.   Did there come a point where you
6  actually needed a VPM?
7     A.   Yes.
8     Q.   When did that come into fruition?
9     A.   I believe that comes -- I'm going to
10 guess around '14 or '15, around that range.
11 Once the firewall was installed, you needed
12 additional software and another password and
13 log-on to get past it.
14    Q.   And did you have to extend like an
15 invitation for somebody to join through a VPM?
16    A.   No.
17    Q.   You testified that you believe
18 Voynow first used -- when do you think Voynow
19 first used the remote access?
20    A.   I'm not sure if they did.  But
21 they -- I'm not sure if they utilized it.  But
22 they may have had the ability.
23    Q.   You said they may have had the
24 ability?
25    A.   Well, I would say they did have the

Page 132

1  M. KOUFAKIS
2  exist in the system that would show what level
3  of access was provided?
4      A.   If the user ID still exists, the
5  answer would be yes.
6      Q.   But you keep the user IDs?
7      A.   Yes.  I'm not sure if they were
8  deleted, off the top of my head.  But I can
9  check.
10     Q.   Did you delete the user IDs for
11 Vivian or Debbie?
12     A.   So the way the system works -- the
13 answer is I'm not sure.  But the way the system
14 works, is if you don't log in -- for sure once
15 they were terminated, the password was changed.
16 If the system -- if you don't log in with any
17 user for a 30-day period, it locks you out.  It
18 requires you to change it at least after 30
19 days.  As a general rule, when someone is
20 terminated, their password is immediately
21 changed.  If someone is -- if you forget or, you
22 know, it just renders inactive.  It will lock
23 you out.  You have to unlock it.
24     Q.   Do you have a recollection of
25 providing Voynow with remote access for the

Page 133

1          M. KOUFAKIS
2  first time in 2017, in connection with asking
3  them to help Jacque?
4       A.   Possibly, but not specifically.  If
5  there was a need to, and they wanted it, I would
6  have given it to them.  I don't specifically
7  remember if they had it or not.  It gets a
8  little involved.
9       Q.   Is it possible that the first time
10 Voynow was provided remote access was in 2017,
11 in connection with your request to help Jacque?
12          MR. FELSEN:  Objection.
13      A.   I would say it's possible after the
14 firewall had been installed.  It's possible.
15      Q.   I don't understand.  So are you
16 saying that you believe you gave Voynow remote
17 access at some point after 2015?
18      A.   What I'm saying is once the firewall
19 is installed, you need to have this other
20 software installed in order to accomplish it.
21 Prior to that, you didn't.  You could just use
22 your regular user ID and log in.  It didn't
23 matter if you were inside or outside of the
24 dealership, as long as you knew the phone number
25 to dial in this.

Page 140

```
 1                    M. KOUFAKIS
 2   neither Mr. Hughes nor Mr. Gundermann ever
 3   advised you that you should have more crime
 4   coverage than a hundred thousand dollars?
 5            MR. FELSEN:  Objection.
 6       A.   No.  If they did, I probably would
 7   have taken it.
 8       Q.   Has any claim been made under any of
 9   this crime coverage that was available during
10   the period 2010 through 2020?
11       A.   Yes.
12       Q.   Tell me about the claims that have
13   been made.
14       A.   I believe there were at least two in
15   I think 2014 and 2015.
16       Q.   And for what?
17       A.   Theft.
18       Q.   By whom?
19       A.   One was -- she was a service and
20   parts cashier.  I think her name was Elefteria.
21   Last name I believe starts with an A.
22       Q.   Would it be Adikimenakis?
23       A.   Yes.
24       Q.   And she was a Nissan employee?
25       A.   I believe so.
```

Page 141

```
 1                    M. KOUFAKIS
 2         Q.    How much did she steal?
 3         A.    It was about 90 or 100,000.
 4   Somewhere in that range.
 5         Q.    And is your coverage claim-based or
 6   occurrence-based?
 7         A.    Explain the difference.
 8         Q.    So does your policy provide the
 9   amount of coverage that is triggered when the
10   theft occurred, or when you report it to the
11   insurance company?
12         A.    I believe it's -- I believe it's
13   when it occurs.
14         Q.    And has that been the case through
15   the time you've had coverage?
16         A.    I believe so, but I'm not sure.
17         Q.    So when do you think this cashier's
18   theft was discovered?
19         A.    Sometime in 2015.
20         Q.    Who discovered it?
21         A.    Vivian.
22         Q.    What was the second claim that was
23   made?
24         A.    It was a parts driver.  U-R-I-J
25   K-O-L-O -- whatever.
```

Page 142

1       M. KOUFAKIS
2   Q.   And he was a Toyota employee?
3   A.   He may have been on the Toyota
4   payroll, but he was a parts driver, so he could
5   have delivered for either Toyota, Nissan or
6   Subaru.
7   Q.   And how much did he steal?
8   A.   I'm not sure.  Maybe $20,000.
9   Q.   Who discovered that?
10  A.   I'm not sure.
11  Q.   How was it brought to your
12  attention?
13  A.   Somebody told me.
14  Q.   And you don't know who?
15  A.   Probably Vivian or the parts
16  manager.  One of them.
17  Q.   Who was the parts manager?
18  A.   Al Karim, K-A-R-I-M, Parvin.
19  Q.   So for those two claims that were
20  submitted, did Star receive full reimbursement
21  for the amount of the claim?
22  A.   I believe so, unless there's a
23  deductible.
24  Q.   Have there been other employee
25  thefts for which claims have not been submitted?


```
```
Page 214

1  M. KOUFAKIS
2  A.  I think so.
3  Q.  How much?
4  A.  A monetary reward. Maybe a thousand
5  dollars.
6  Q.  Did anyone advise you around this
7  time that you should clean house in your
8  accounting department?
9  A.  Yes.
10 Q.  Who?
11 A.  Hugh Whyte.
12 Q.  And in what context? Was this a
13 phone conversation?
14 A.  Yes.
15 Q.  When did you have a phone call with
16 Mr. Whyte?
17 A.  Shortly after this incident was
18 discovered with Vivian.
19 Q.  And you did not follow that advice;
20 is that fair to say?
21 A.  Not immediately. It was not
22 possible.
23 Q.  Well, did you advise him that you
24 would follow that advice, or did you say, No, I
25 think this is just Vivian?