EXHIBIT 46

David Lombardo
October 03, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
*     *     *

STAR AUTO SALES OF BAYSIDE    :
INC., (d/b/a STAR TOYOTA      :          CASE NO.
OF BAYSIDE), STAR AUTO SALES:    18-cv-05775(ERK)(TAM)
OF QUEENS, LLC, (d/b/a        :
STAR SUBARU) STAR HYUNDAI,    :
LLC, (d/b/a STAR HYUNDAI      :
LLC), STAR NISSAN, INC.,      :
(d/b/a STAR NISSAN)), METRO :
CHRYSLER PLYMOUTH, INC.       :
(d/b/a STAR CHRYSLER JEEP     :
DODGE), STAR AUTO SALES OF    :
QUEENS COUNTY, LLC, (d/b/a    :
STAR FIAT) and STAR AUTO      :
SALES OF QUEENS VILLAGE, LLC:
(d/b/a STAR MITSUBISHI),      :
              Plaintiffs  :
                              :
                              :
          vs.                 :
                              :
VOYNOW, BAYARD, WHYTE AND     :
COMPANY, LLP, HUGH WHYTE      :
and RANDALL FRANZEN,          :
                              :
              Defendants :
                    *     *     *


        Videotape deposition of DAVID LOMBARDO, held

at the offices of U.S. LEGAL SUPPORT, 1818 Market

Street, 14th Floor, Philadelphia, Pennsylvania 19103,

beginning at 10:54 a.m., on Monday, October 3, 2022,

before Alice T. Mattes, Court Reporter and Notary

Public, there being present:

                    *     *     *

                U.S. LEGAL SUPPORT
              Northeast Processing Center
              1818 Market Street, Suite 1400
              Philadelphia, Pennsylvania 19103
                    (877)  479-2484

David Lombardo
October 03, 2022

```
 1     APPEARANCES:

 2


 3

               MILMAN LABUDA LAW GROUP, PLLC
 4             BY: JOSEPH M. LABUDA, ESQUIRE
                        and
 5             JEREMY M. KOUFAKIS, ESQUIRE
               3000 Marcus Avenue
 6             Suite 3W8
               Lake Success, NY 11042
 7             joe@mllaborlaw.com
               jeremy@mmmlaborlaw.com
 8             -- Representing the Plaintiffs

 9

10

11             MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
               BY: MAUREEN P. FITZGERALD, ESQUIRE
12             620 Freedom Business Center
               Suite 300
13             King of Prussia, PA 19406
               mpfitzgerald@mdwcg.com
14             -- Representing the Defendants

15

16


17     ALSO PRESENT: Videographer, Scot Dantzer

18                  Jacqueline Cutillo

19                  Robert Seibel

20                  Steven Rambam (telephonically present)

21

22

23

24

25
```

David Lombardo
October 03, 2022

```
 1              Would that be from a supervisor
 2   saying, hey, look, we're here to do tax work or
 3   we're here to do X, you know, type of work?
 4        A      Yeah.  I mean, it would be talked
 5   about.
 6   Q      Okay.
 7        A      Sometimes I was involved in like
 8   preparing the engagement letter, but not all the
 9   time.
10   Q      Okay.
11              All right.  So let me ask you
12   generally, 'cause I think you kind of talked about
13   three buckets of services; tax services, financial
14   statements, and interim reviews.  Is that accurate?
15              MS. FITZGERALD:  Objection.
16   BY MR. LABUDA:
17   Q      You can answer.  Sorry.
18        A      Interim visits.
19   Q      Interim visits, okay.
20        A      That's what we called them.
21   Q      All right.  So with respect to let's say tax
22   services, and let's talk specifically about
23   dealerships.  What is the scope of work that's
24   involved and the type of work that's done with
25   respect to a client who has engaged Voynow to
```

```
 1    perform tax services?
 2           A      Towards the end of the year, I would
 3    say starting in November and December, we'd go out
 4    for tax planning visits.  And then shortly after the
 5    beginning of the year I guess we'd finish up a lot
 6    of the tax work.
 7    Q      All right.  And what would that -- what
 8    would that entail in terms of the actual work that
 9    you would be performing with respect to tax services
10    for an auto client?
11           A      Just going through the trial balance,
12    reviewing account balances.  Writing off any
13    uncollectible receivables.  Adjusting prepaids.  You
14    kind of primarily focus on the balance sheet.
15    Q      All right.  And approximately how many times
16    would you visit a client who was requesting tax
17    services?  How many times a year would you go?
18           A      Times a year, I would say twice.
19    Q      Okay.  You said --
20           A      Yeah, tax planning before the end of
21    the year and then after the year to wrap up
22    everything.
23    Q      Okay.  So right.  Once before the tax year
24    ends, assuming I guess fiscal year ending on
25    December 31st of the year.
```

David Lombardo
October 03, 2022

```
1           A      Yeah.

2    Q      -- for the client?

3           A      Yeah, the clients with IRS.

4    Q      And what was the purpose behind providing

5    financial statements?  What was the goal there, the

6    reason for providing financial statements?

7           A      You know, sometimes it was required

8    by the bank for floor plan financing or a particular

9    loan.  Occasionally some clients requested it for

10   their own internal purposes.

11   Q      And then what was the purpose for providing

12   interim visits?

13          A      By client request.  Give 'em a level

14   of comfort that everything's being reconciled and

15   handled appropriately during the year.

16                 Even when we do our tax work, you

17   know, that's primarily, yeah, November through

18   March.  You know, you kind of want to see what's

19   being done throughout the year.  Some clients are

20   interested in that.

21   Q      Okay.  As an accountant providing interim

22   visits was one of your jobs to look for anomalies

23   during these interim visits?

24          A      Yeah.

25   Q      And the anomalies could be as innocuous as
```

David Lombardo
October 03, 2022

```
 1                    As part of your -- with respect to
 2      the different services, would those be listed in an
 3      engagement letter that Voynow provided to the
 4      client?
 5            A      Yeah.  Each of those types of
 6      services should have an engagement letter.
 7      Q     Okay.  And to your understanding did the
 8      engagement letters specify what level or what type
 9      of service Voynow was providing to a client?
10            A      Yes.
11      Q     Did you have any internal discussions at
12      Voynow about engagement letters in general?
13            A      We didn't put too much of an emphasis
14      on those.
15      Q     Okay.  Were there any conversations about
16      engagement letters with respect to interim visits?
17            A      I do remember shortly before I had
18      left our quality control person Ken Mann suggested
19      engagement letters for everything, including interim
20      visits.  And, you know, a lot of people -- a lot of
21      the partners just didn't want to do that.  They
22      didn't want to issue a separate engagement letter
23      just for interim visits.
24      Q     Okay.  So if I'm understanding correctly,
25      there would be an engagement letter with respect to
```

David Lombardo
October 03, 2022

```
 1   supervisor or an owner for their review and editing

 2   before it was sent out to the client?

 3           A       I would say it would go to the

 4   partner for review and editing.

 5   Q       Okay.  And with respect to the reports that

 6   you provided and included in your reports, would you

 7   also include recommendations, if necessary?

 8           A       Sometimes, yeah.

 9                        *   *   *

10                      (Pause.)

11                        *   *   *

12   BY MR. LABUDA:

13   Q       All right.  Now, you had mentioned that one

14   of the dealerships that you worked on at Voynow was

15   Star.  Correct?

16           A       Correct.

17   Q       Okay.  And do you have any recollection of

18   when it was that you worked on the -- on the Star

19   dealerships?

20           A       I couldn't give you specifics on

21   that.

22   Q       And do you remember doing any particular

23   work -- well, withdrawn.

24                   What type of engagement did Voynow

25   have with respect to Star?
```

David Lombardo
October 03, 2022

```
1              A       I believe the times I was out there
2    it was only for interim visits.
3    Q       All right.  So...  So and what is it that
4    you did with respect to these interim visits?
5              A       Depending on the accounts I was
6    assigned, I would, you know, look into balances.
7    Q       Okay.  And when you say balances, is that
8    reviewing various schedules?
9              A       Correct.
10   Q       Okay.
11             A       Schedules, reconciliations.
12   Q       Do you have any recollection of any
13   coworkers that worked at the Star dealerships with
14   you at Voynow?
15             A       You mean my coworkers --
16   Q       Yeah, your coworkers --
17             A       -- at Voynow?
18   Q       Yeah, your Voynow coworkers.
19             A       To my knowledge, I didn't think any
20   of them were employees of the Star dealerships.
21   Q       Okay.  Yeah, let me rephrase it.
22                     Were -- do you have any recollection
23   about the names of the -- or the other Voynow
24   employees that worked with you on Star?
25             A       Yes.
```

David Lombardo
October 03, 2022

```
1    you say you spent on those automobile dealerships
2    clients versus other clients?
3              A       80/90 percent.
4    Q       And when you were hired at Voynow you were
5    hired -- that was your first job from graduating
6    Temple?
7              A       I did work at M&B Tax Services.   M&B
8    BIRT Tax Services.
9    Q       Right out of college.
10             A       But -- but I took my first public
11   accounting job with Voynow in February 2008.
12   Q       Okay.  And you were hired as a staff
13   accountant?
14             A       They weren't big on titles there.
15   But it would be entry level, yes.
16   Q       Okay.  And were you a staff accountant for
17   the duration of your employment?  In other words,
18   you were never promoted to senior?
19             A       They don't -- they don't really do
20   titles there.  Can I defer to Bobby on that?
21   Q       Okay.  Well, based on your understanding,
22   did you ever think that you were moved into the role
23   of a senior, or did you stay as a staff accountant?
24             A       They just didn't do titles.
25   Q       So you --
```

David Lombardo
October 03, 2022

```
 1              A      I'm not trying to avoid the question.
 2   Q      Yes.
 3              A      It's just like they just don't do
 4   that.
 5   Q      All right.
 6                     Okay.   And while you were at Voynow
 7   was there a particular partner who you worked with
 8   the most?
 9              A      I would say I worked with Steve White
10   the most.
11   Q      Okay.
12              A      I would say the vast majority of my
13   work was with Steve White.
14   Q      So percentage wise what would that be?
15              A      80/90 percent.
16   Q      Okay.   Now, I believe you testified that --
17   and correct me if I'm wrong.   But I think you said
18   that you recalled going to Star physically three or
19   less occasions.   Is that accurate?
20              A      I believe so.
21   Q      Okay.   And you said you started there in
22   two-thousand -- February 2008 and left in October of
23   2013.   Correct?
24              A      Correct.
25   Q      So are you able to give us any specificity
```

David Lombardo
October 03, 2022

```
1    as far as when you think you would have physically
2    visited any of the Star sites on those three
3    occasions?
4            A      I want to say they were during warmer
5    months.  I don't ever remember being there in the
6    cold.
7    Q      Other than that, is there any particular
8    year that you recall?  Like I remember going up
9    there my first year of employment.  I remember going
10   up there at the end.  Anything that you recall?
11           A      I want to say it was my first year,
12   but I'm not absolutely sure.
13   Q      Okay.
14           A      I was pretty good with entering my
15   time.  I think I would put it in as interim services
16   client visit.
17   Q      So you were shown McCormack Deposition
18   Exhibit 5 -- this is where we get into trouble
19   because they're not -- which is this document.
20               MR. LABUDA:  Or just Exhibit 5.  I
21           don't think they were identified as
22           McCormack 5.  They were just used as a
23           McCormack exhibit.
24               MS. FITZGERALD:  Okay.
25               MR. LABUDA:  Yeah.
```

David Lombardo
October 03, 2022

```
 1              A       Maybe there's a time I went there for

 2    tax planning.  But I wasn't -- I wasn't one of the

 3    normal engagement team members that serviced those

 4    clients.

 5    Q       So Star wasn't one of your regular clients.

 6              A       Correct.

 7    Q       Okay.

 8              A       During the months of January,

 9    February, March I think I would have been too busy

10    going to my other typical clients that they wouldn't

11    have used me for the New York clients.

12    Q       All right.  So when you say you had your

13    typical clients, were your typical clients like

14    largely based in the Pennsylvania area?

15              A       Pennsylvania/Jersey.

16    Q       All right.  And Star would not be one of

17    your typical clients.

18              A       No.  I wasn't on their primary

19    engagement team --

20    Q       Got it.

21              A       -- if that makes sense.

22    Q       Yep.

23                      How did you first hear about this

24    lawsuit?

25              A       I was coming home from a mortgage
```

David Lombardo
October 03, 2022

```
 1              A        One of the Star entities.
 2    Q         Do you know which one?
 3              A        No.
 4    Q         So you said that you were looking at the
 5    parts and service receivable schedule.
 6              A        (Witness nods head.)
 7    Q         Correct?
 8              A        Um-hmm.
 9    Q         For what dealership?
10              A        One of the Star entities.
11    Q         Which one?
12              A        You did them all at the same time, so
13    it was kind of...
14    Q         So --
15              A        I don't recall.
16    Q         -- when you said that you believe you saw a
17    receivable in his name on one of the schedules, for
18    which dealership?
19              A        It was in his name.  I don't recall
20    which dealership.
21    Q         Okay.  What was the amount of the
22    receivable?
23              A        It wasn't a huge amount of money.
24    Q         So --
25              A        Less than ten thousand.
```

David Lombardo
October 03, 2022

```
 1    Q       Okay.

 2           A       I would even venture to say it was

 3    less than five thousand.

 4    Q       Okay.  Can you be any more specific?

 5           A       I don't have the specific dollar

 6    amount.

 7    Q       Okay.  So...  And you mentioned that it had

 8    been listed for in excess of 90 days.  Is that

 9    right?

10           A       Yes.

11    Q       Okay.  And how many days, do you know?

12           A       No.

13    Q       Okay.  So I just want to make sure I

14    understand what your best recollection is, is you

15    remember there being some sort of receivable on the

16    schedule of a dealership, but you don't know --

17           A       It was parts or service, yeah.

18    Q       But you don't know which dealership it was.

19           A       No.  I don't recall which Star entity

20    it was, no.

21    Q       Okay.  And you don't know what the amount

22    was, but you believe it was probably less than five

23    thousand dollars?

24           A       Yes.

25    Q       Okay.  And you don't remember how long it
```

David Lombardo
October 03, 2022

```
 1   was listed as far as aging.
 2           A       Over 90.  That's all I recall.
 3   Q       Okay.  But you don't know how much over 90.
 4           A       No.
 5   Q       All right.
 6                   And you said that you recall meeting
 7   with Vivian's husband.  What's his name?
 8           A       I don't recall.
 9   Q       Okay.
10           A       But I know it was Vivian's husband.
11   Q       And how do you know that?
12           A       Same last name, and I think -- I
13   think Randy confirmed it.
14   Q       Okay.  And you said that you recall meeting
15   him in a room, but you don't remember physically
16   which dealership you were in.  Correct?
17           A       Correct.
18   Q       Okay.  Do you remember what part of the
19   dealership you were in, in other words, like what
20   floor?
21           A       The service parts area.  I think it
22   was the ground floor.
23   Q       Okay.
24           A       You normally don't have service or
25   parts on the second floor.
```

David Lombardo
October 03, 2022

```
 1   Q      Okay.  Did you know who he reported to as
 2   the service manager?
 3          A       Know for certain?  I guess not.  No.
 4   I didn't work there.
 5   Q      Okay.  Do you remember anything that he told
 6   you about the reason why there was an entry listed
 7   in his name?
 8          A       I just remember his response saying
 9   that, you know, he could have written it off.
10   Q      So you remember him specifically saying that
11   he could have written it off?
12          A      Yes.
13   Q      Okay.
14          A       I guess he was justifying, you know,
15   it's okay because he didn't write it off.  Which
16   it's just not a thing to say.  That's why it stuck
17   out in my mind so much.
18   Q      Okay.  And could it have been an open repair
19   that you were asking him about, an open repair
20   order?
21                  MR. LABUDA:  Objection, asked and
22          answered.
23                  THE WITNESS:  I'm pretty sure it was
24          parts.
25                  MS. FITZGERALD:  Okay.
```

David Lombardo
October 03, 2022

```
1              A       I don't recall if anybody else was
2       there.
3       Q       And do you know what Randy did with that
4       information that you provided?
5              A       He kind of talked about it and then
6       he kind of just dismissed it.
7       Q       How do you know --
8              A       He didn't think it was that big of a
9       deal.
10      Q       -- that he dismissed it?  How do you know
11      that he didn't do anything afterwards with that
12      information?  Do you know?
13             A       I guess that's possible, yeah.
14      Q       So you don't know.  Is that fair to say?
15             A       He just didn't seem -- he didn't seem
16      to think it was a big deal.
17      Q       Okay.  But is it fair to say that you don't
18      know what, if anything, Randy did with the
19      information you provided?
20             A       Okay.  I'm agreeable to that.
21      Q       Okay.  Other than talking to Randy, did you
22      note it on the schedule that you were working on?
23             A       I would have definitely noted that
24      item, yes.
25      Q       Okay.
```

David Lombardo
October 03, 2022

```
 1          A       A client problem?
 2     Q        As I understood your testimony, you stated
 3     that you were not aware of any client employees
 4     engaging in theft while you were working on a client
 5     engagement?
 6          A       As a current matter, no.
 7     Q        Okay.  So that would be true for Star.  In
 8     other words, on the occasions when you were
 9     providing services to Star during the course of your
10     engagement you did not become aware of any
11     information to indicate that any Star employee was
12     engaging in theft or fraud.
13          A       No.
14     Q     Okay.
15                        *   *   *
16                        (Pause.)
17                        *   *   *
18     BY MS. FITZGERALD:
19     Q        Is internal control the responsibility of
20     management?
21          A       Yes.
22     Q        And would you agree that accountants can
23     make recommendations, but ultimately it's up to
24     management whether to follow through on those
25     recommendations?
```

David Lombardo
October 03, 2022

```
1              A       I do.

2     Q        And is it fair to say that you don't know

3     what -- you don't know who they spoke to?  Correct?

4              A       That's true.

5     Q        And you don't know what explanation was

6     provided.  Correct?

7              A       I mean, I could tell by the notes

8     like, you know, the first item was on the bank

9     reconciliation.

10    Q        Okay.  And you don't know --

11             A       The schedules need to be cleaned up.

12    Insurance clean.

13    Q        Okay.  So does that indicate to you that

14    that would have been information that likely came

15    from the client?

16             A       Yes.

17    Q        And that would have been an explanation that

18    the client would have given to Voynow for these

19    entries?

20             A       I would believe so, yeah.

21    Q        Okay.  And an accountant's entitled to rely

22    on the explanation given by the client if it makes

23    sense.

24             A       Yeah.

25    Q        Okay.
```

David Lombardo
October 03, 2022

```
 1            A       Professional skepticism.

 2    Q       And looking at the next page of this

 3    exhibit, 8830.  Again, rather than go through all

 4    those questions again, but would you agree that the

 5    same parameters apply in terms of you have no

 6    knowledge of what these entries mean or what -- or

 7    who Voynow may have spoken to as far as getting

 8    these explanations?

 9            A       No.

10    Q       Okay.   'Cause you were gone for over a year

11    at this point.   Correct?

12            A       Correct.

13    Q       And you said that -- I believe you said that

14    in answering questions about this document that you

15    didn't believe it was okay to just rely on Vivian.

16    And maybe I got that wrong.

17            A       What document are you referring to?

18    Q       This exhibit, Exhibit 6.

19            A       As a whole?

20    Q       So I think the question was specifically on

21    the second page of the exhibit where it says All ok

22    per Vivian.

23            A       I think that's poor documentation

24    there.   I mean, you're not really saying anything.

25    Q       But you don't know what Vivian told this
```