UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

STAR AUTO SALES OF BAYSIDE, INC.
d/b/a STAR TOYOTA; STAR AUTO SALES
OF QUEENS, LLC d/b/a STAR SUBARU; STAR
HYUNDAI LLC d/b/a STAR HYUNDAI; STAR
NISSAN, INC. d/b/a STAR NISSAN; METRO
CHRYSLER PLYMOUTH, INC. d/b/a STAR
CHRYSLER JEEP DODGE; STAR AUTO
SALES OF QUEENS COUNTY LLC d/b/a
STAR FIAT; and STAR AUTO SALES OF
QUEENS VILLAGE LLC d/b/a STAR
MITSUBISHI,

**MEMORANDUM & ORDER**

18-CV-05775 (ERK) (TAM)

Plaintiffs,

– against –

VOYNOW, BAYARD, WHYTE AND
COMPANY, LLP; HUGH WHYTE;
RANDALL FRANZEN; and ROBERT
SEIBEL,

Defendants.

Korman, *J*.:

Plaintiffs—seven commonly owned and operated automobile dealerships—
brought this suit against their former accountants alleging that they failed to notice
that dealership employees were embezzling millions of dollars from 2001 to 2017.
In 2019, I dismissed plaintiffs' breach of contract claim but allowed their
professional malpractice and respondeat superior claims to continue.  Defendants
now move for partial summary judgment, contending that the applicable statute of

limitations bars plaintiffs' claims related to the events that occurred from 2001 through 2014.

## BACKGROUND

### I.    Plaintiffs' and Defendants' Business Relationship

The Star Auto Group (hereinafter "plaintiffs" or "Star") is comprised of seven commonly owned and operated automobile dealerships ("the Star Dealerships") located in Queens.  Compl. ¶ 2, ECF No. 1.  John Koufakis, Sr. built the business and passed ownership onto his sons, Michael, John, Jr., and Steve Koufakis, who have each held ownership interests and managerial roles in the Star Dealerships.  Defs.' Statement of Facts ("SOF") ¶¶ 3–5, ECF No. 126-2.  In 1996, Star hired defendant Voynow, Bayard, Whyte, and Company, LLP—an accounting firm specializing in auto dealerships—to "more than review, but less than audit[]" its financial statements and to provide annual corporate tax services.  M. Koufakis Dep. 74:16–75:20, 108:12–24, ECF No. 126-5.

Star sought the "highest level of accuracy" in its financial statements and expected Voynow to "verify" that the financial statements used to prepare the tax returns were "just short of [] audited statement[s]."  *Id.* 82:9–83:13, 109:19–22.  Voynow itself did not issue audited or reviewed financial statements,[1] but instead

---

[1] An audit is the highest level of assurance an accountant can provide; an auditor must follow Generally Accepted Auditing Standards and assess a client's internal controls.  A review engagement is a lesser analysis which consists primarily of

analyzed Star's accounts and the financial statements prepared by its then-office manager Vivian Karouzakis and her supervisee, Despina Theocharis. *Id.* 82:2–83:19; S. Koufakis Dep. 71:14–20, ECF No. 126-7; SOF ¶¶ 30–35, ECF No. 126-2. Karouzakis and Theocharis supervised Star's internal accounting staff, none of which were licensed accountants, in preparing financial statements and accounting schedules under Voynow's intermittent guidance. SOF ¶¶ 6–12, ECF No. 126-2; D. Sosnowski Dep. 101:23–102:15, ECF No. 126-40.

At the outset, the parties did not memorialize their relationship in writing, instead operating under the 1996 oral agreement. SOF ¶¶ 23–30, 57–58, ECF No. 126-2; R. Seibel Dep. 65:16–66:18, ECF No. 126-11. Beginning in 2008[2] and continuing until the parties' relationship ended in 2017, Voynow documented its engagement(s) with Star in yearly engagement letters. SOF ¶¶ 62–65. In pertinent part, the letters indicated that Voynow was to prepare Star's tax returns for the subsequent year, that the "engagement will be satisfied upon delivery of the completed returns," that "any services . . . will be limited to those tasks we deem

---

analyzing financial information provided by a client and provides limited assurances that the client's financial statements are accurate. *Compare In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 479 (S.D.N.Y. 2005) (describing audits), *with Joel v. Weber*, 569 N.Y.S.2d 955, 959 (App. Div. 1991) (describing review procedures).

[2]  According to defendants, they began issuing engagement letters in 2008, after the American Institute of Certified Public Accountants began recommending that accountants issue engagement letters for tax engagements. SOF ¶¶ 61–62.

necessary for the preparation of the returns only," that "the assistance we do provide is not to be construed as an oversight function," and that "our engagement cannot be relied upon to disclose errors, fraud, or other illegal acts that may exist." Engagement Letters, ECF Nos. 126-23, 126-24. Other than the 2016 letter, plaintiffs deny or do not recall receiving any of the other letters. Pls.' Counterstatement of Facts ("COF") ¶¶ 8–10, ECF No. 126-38. The only evidence in the record that Voynow transmitted the letters via hard copy mail and delivered them in person is testimony by Voynow principal Robert Seibel.[3] R. Seibel Dep. 71:2–72:24, ECF No. 126-11.

To conduct its work, Voynow sent teams of accountants to the Star Dealerships multiple times a year, where Star provided Voynow "free reign" to review its operations, including books and records, accounting schedules, bank reconciliations, control procedures, personnel decisions, and more. COF ¶¶ 13, 17, ECF No. 126-38. Each year, Voynow issued plaintiffs' corporate tax returns months after the close of plaintiffs' prior fiscal year and before their September 15 tax deadline. SOF ¶¶ 53–56, ECF No. 126-2; Letters, ECF No. 126-22. Voynow compiled and stored its work for the Star Dealerships on a year-by-year basis, referring to each bundle as

---

[3] Even so, plaintiffs admit to discarding Voynow's communications at each year-end, S. Koufakis Dep. 44:5–14, ECF No. 126-127, and defendants have set forth unopposed evidence that plaintiffs utterly lacked any sort of document retention system prior to 2016, despite defendants' repeated entreaties for them to do so, R. Franzen Dep. 114:2–115:25, ECF No. 126-54.

"year end workpapers."  D. Kumor Dep. 30:1–33:12, ECF. No. 126-121; Voynow Workpapers, ECF Nos. 126-122–24.  Similarly, Voynow issued plaintiffs annual "final" bills in September, as well as several "progress" bills, to be offset by monthly retainers Star already paid in advance, each year starting in March.  R. Seibel Dep. 136:16–137:5, ECF No. 126-11; Voynow Bills, ECF No. 126-28.

Voynow also serviced Star in other ways beyond strictly preparing year-end tax returns.  Voynow handled periodic sales tax and Internal Revenue Service audits, which it designated as "special accounting services."  SOF ¶ 74, ECF No. 126-2; COF ¶ 71, ECF No. 126-38.  Voynow performed cashier audits and recommended internal controls.  COF ¶ 50; Control Checklist, ECF No. 102-8.  Voynow visited the Star Dealerships multiple times yearly in what it called "interim visits" or "year-end visits," during which its accountants performed various oversight and accounting functions resulting in written reports.  SOF ¶¶ 39–46.  Voynow did not document these visits with separate engagement letters, and it billed Star for them under headings distinct from tax preparation services.  COF ¶ 58; D. Lombardo Dep. 48:2–14, ECF No. 126-50.

Additionally, Voynow performed various tasks such as reviewing plaintiffs' physical inventory and its aged receivables.  Voynow Letters, ECF Nos. 126-75, 126-76.  Voynow often documented its findings in writing to Star, yet it also informed the Koufakises of its concerns verbally, speaking with the Koufakises by telephone

somewhat regularly about various issues, including fraud prevention. J. Cutillo Decl. ¶ 4, ECF No. 126-111; R. Franzen Dep. 250:11–252:18, ECF No. 126-54. Voynow also handled personal tax services for the Koufakises and Karouzakis, as well as tax services for various Star-related entities that are not parties to this case, such as Star Auto Body and plaintiffs' real estate companies. R. Seibel Dep. 225:20–229:21, ECF No. 126-11.

## II.    Embezzlement by Plaintiffs' Employees

In 2016, plaintiffs began uncovering various embezzlement schemes perpetrated by its employees starting in 2001, resulting in millions of dollars in losses. Karouzakis and Theocharis were the primary perpetrators of the schemes, along with employees Carmen Jones and Douglas Filardo. The bulk of the theft involved fraudulent checks. In simple terms, only the Koufakises were authorized to sign checks for Star; the embezzlers sent purportedly business-related checks to them to sign; the Koufakises trusted the employees and did not require proper verification for the expenses before signing; and upon receiving the signed checks, the employees would use them for personal gain.[4]  *See* SOF ¶¶ 82–122, ECF No.

---

[4] Jones, for example, used checks intended to purchase office supplies from Staples to purchase personal use items. SOF ¶¶ 89–95, ECF No. 126-2. Filardo, even more egregiously, sent the Koufakises checks to pay an "advertising agency." The Koufakises never questioned the continuous payments. The "advertising agency" turned out to be a bogus shell company owned by Filardo. *Id.* ¶¶ 96–105. Karouzakis often obtained checks to pay back financial institutions that she labeled as Star's creditors but were in fact her own personal creditors. *Id.* ¶¶ 106–15.

126-2.  The embezzlers' control of Star's financial records allowed them to manipulate the records to conceal their malfeasance.  *See generally id.*

When a Star employee brought unusual information in Karouzakis's commission schedules to Voynow's attention in 2015, Voynow it brushed away, stating "[t]hat's Vivian's, don't worry about it."  Voynow 30(b)(6) Dep. (J. Cutillo) 256:6–22, ECF No. 126-45.  In other instances, Voynow accepted the validity of Karouzakis's various schedule entries without questioning them, noting in its workpapers that the entries were "Ok per Vivian."  Voynow Workpaper at 4, 6, ECF No. 126-78.  One of Voynow's junior accountants testified that Voynow did not exercise typical "professional skepticism" with regard to Karouzakis's conduct.  D. Lombardo Dep. 101:6–103:10, ECF No. 126-50.

After a bank alerted Star that Karouzakis used a company check to pay off a personal loan late in 2016, Star fired Karouzakis and engaged Rosenfield & Company to provide forensic accounting services.  SOF ¶¶ 111, 125, ECF No. 126-2.  To date, Jones and Filardo have been indicted, Karouzakis was indicted but died prior to being tried, and Theocharis has pled guilty to a single count of petit larceny.  Pls.' Reply to SOF ¶¶ 97, 107, 116, 121, ECF No. 126-38.  Plaintiffs have also

---

Theocharis received personal cash loans from Star and never repaid them, later adjusting the books to conceal her theft.  *Id.* ¶¶ 118–22.

obtained substantial civil judgments against Jones and Karouzakis's estate. *Id.* ¶¶ 92, 97, 116.

After terminating Karouzakis and Theocharis, Star promoted Jacqueline Cutillo to office manager for the Star Dealerships. *Id.* ¶ 128. Star asked Voynow to train Cutillo in this role, which Voynow deemed a special project and billed Star separately for. *Id.* ¶¶ 128–30; Voynow Invoice, ECF No. 126-34. Voynow was given remote access to Star's Reynolds & Reynolds accounting system for purposes of assisting Cutillo. SOF ¶¶ 128–29, ECF No. 126-2. This was the only time Voynow accessed Star's Reynolds account remotely. *Id.*; D. Sosnowski Dep. 94:7–96:14, 123:21–125:7, ECF No. 126-120. After Voynow completed its work on plaintiffs' 2016 tax returns, plaintiffs terminated their engagement with Voynow in November 2017. SOF ¶ 130. Rosenfield assumed and did Star's tax work until 2020; Star thereafter filed a lawsuit against Rosenfield alleging it committed malpractice for erroneously identifying things as fraudulent that were not. *Id.* ¶¶ 131, 136–37.

## III. Procedural History

Star filed its complaint against Voynow and its principals (collectively, defendants) in October 2018. Compl., ECF No. 1. Defendants moved to dismiss the complaint in 2019, which I granted as to plaintiffs' breach of contract claim but denied as to their professional malpractice and respondeat superior claims. *Star Auto Sales of Bayside, Inc. v. Voynow, Bayard, Whyte & Co., LLP*, No. 18-CV-5775, 2019

8

WL 1333255, at *9, *11 (E.D.N.Y. Mar. 25, 2019).  Defendants then answered the complaint, raising numerous affirmative defenses and bringing several counterclaims against plaintiffs for unpaid bills.  Defs.' Answer, ECF No. 30.

An odyssey of protraction and hostility has since ensued.  Mediation failed. The parties engaged in numerous discovery disputes, often requiring judicial intervention.  Plaintiffs failed to comply with discovery-related court orders.  In toto, the parties produced around 150,000 pages of documents, as well as third-party discovery.  Much of this is not in the record.  Many depositions were taken, yet the transcripts submitted are heavily excerpted, often omitting pages the parties cite to. Eventually, after nearly six years of this case lingering in discovery limbo, Magistrate Judge Merkl ordered discovery closed and established a summary judgment briefing schedule.  Discovery Order, ECF No. 124.  Defendants' motion for partial summary judgment is fully briefed and ready to be resolved.

Defendants seek summary judgment on the remaining claims insofar as they relate to the events that occurred from 2001 to 2014 based on the three-year statute of limitations applicable to professional malpractice claims under New York law. Defs.' Mem. at 3, ECF No. 126-1; *see* N.Y. C.P.L.R. § 214(6).  In opposition, plaintiffs argue that the continuous representation exception applies to extend the statute of limitations back to 2001.  Pls.' Mem. in Opp'n at 11, ECF No. 126-115. They argue that there are disputed material facts as to whether Voynow serviced

them in an open-ended and continuous consulting and controllership engagement rather than in yearly tax-related engagements.  *Id.*

Defendants, on the other hand, argue that they viewed their relationship with Star as that of year-by-year tax engagements with additional tasks performed to "verify" plaintiffs' financial statements, as they agreed to in 1996.  Defs.' Mem. at 6, ECF No. 126-1; Defs.' Reply at 8, ECF No. 126-116.  They also contest the propriety of some of the evidence plaintiffs proffer to establish factual disputes, namely aspects of plaintiffs' expert Douglas Sosnowski's deposition, his unsworn declaration post-dating his deposition, and Michael Koufakis's unsworn affidavit post-dating his deposition.  Defs.' Reply at 8–24.  Moreover, defendants argue that plaintiffs have forfeited the ability to extend the statute of limitations back to 2001 by refusing to provide evidence in discovery pre-dating 2010 and basing their position on the statute of limitations.  Defs.' Mem. at 11, ECF No. 126-1; Defs.' Reply at 5, ECF No. 126-116.

## DISCUSSION

## I.    Summary Judgment Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citation omitted).

The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation and citations omitted). Indeed, when a motion for summary judgment is supported by documentary and testimonial evidence, the nonmoving party may not rest upon mere allegations or denials— rather, they must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 324. If the nonmoving party submits rebuttal evidence that is "merely colorable," or is "not significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

When deciding a summary judgment motion, I must resolve any ambiguities and draw inferences from the facts in the light most favorable to the nonmoving party. *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995). Although "courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments," summary judgment must

be defeated with "evidence on which the jury could reasonably find for the non-moving party." *Saeli v. Chautauqua County*, 36 F.4th 445, 456 (2d Cir. 2022).

## II.    Statute of Limitations

Professional malpractice claims are subject to a three-year statute of limitations. N.Y. C.P.L.R. § 214(6). Time begins to accrue when a client receives an accountant's work product, even if the client is then ignorant of a wrong or injury. *Ackerman v. Price Waterhouse*, 644 N.E.2d 1009, 1011–12 (N.Y. 1994). Each year, plaintiffs received Voynow's work product for a preceding year prior to its September 15 tax deadline, and they filed suit in October 2018. Plaintiffs' claims regarding the 2015 and 2016 fiscal years are timely, while their claims related to 2001 to 2014 are not, unless the continuous representation exception applies.

### A. Continuous Representation Exception

The continuous representation exception derives from the principle that clients cannot be reasonably expected to assess or question the quality of professional services that are ongoing. *Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 872 N.E.2d 842, 846 (N.Y. 2007) (citations omitted). It tolls the statute of limitations where there is "a *mutual understanding* of the need for further representation on the specific subject matter underlying the malpractice claim." *McCoy v. Feinman*, 785 N.E.2d 714, 722 (N.Y. 2002) (emphasis

added).[5]  Stated another way, the doctrine applies only when there was a mutual understanding that a professional would continue advising a client in connection with a "particular transaction [that] is the subject of the action," not "merely during the continuation of a general professional relationship." *Booth v. Kriegel*, 825 N.Y.S.2d 193, 195 (App. Div. 2006).

The plaintiffs in *Williamson*, where the Court of Appeals considered the doctrine for the first time in the accounting context, were two hedge funds who untimely sued their former accountants for inaccurately performing year-end audits. 872 N.E.2d at 843, 845.  Each year, the accountants audited the funds' financial statements by reviewing past audits, examining the evidence supporting the information in the statements, and assessing the funds' accounting principles. *Id.* at 843.  After many years, the funds' management discovered that a former portfolio manager had used an improper valuation method which overstated the value of the funds' holdings, an error that the accountants continuously failed to notice and rectify in their audits. *Id.* at 843–44.

---

[5]  "It has long been established as a matter of federal law that state statutes of limitations govern the timeliness of state law claims under federal diversity jurisdiction[,]" as well as "the related questions of what events serve to commence an action and to toll the statute of limitations in such cases." *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir. 1989) (first citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 112 (1945), then citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752 (1980)).

The Court of Appeals rejected the plaintiffs' invocation of the continuous representation doctrine, explaining that the plaintiffs entered into "annual engagements with defendant for the provision of *separate and discrete* audit services for the [plaintiffs'] year-end financial statements" because the defendants never returned to work from a previous year or corrected previous audits, and the parties never explicitly contemplated further representation as to the audits. *Id.* at 847–48 (emphasis added). In this situation, the plaintiffs had only alleged "failures within a continuing professional relationship, not a course of representation as to the particular problems (conditions) that gave rise to" their claims. *Id.* at 847.

Many courts have rejected the continuous representation doctrine in accounting malpractice cases with similar facts as here. *Booth v. Kriegel*, for example, held that an accountant's yearly preparation of tax returns did not create a continuous representation absent evidence that any tax engagement was explicitly contemplated as continuous and was linked to the malpractice allegations, explaining that "unless services relating to the particular transaction sued upon were rendered within the limitation period, even the defendant's general and unfettered control of [the plaintiff's] financial, tax and investment affairs" could not render the action timely. 825 N.Y.S.2d at 195–96 (cleaned up); *see also Cusimano v. Schnurr*, 27 N.Y.S.3d 135, 139 (App. Div. 2016) (holding that "defendants contin[uing] to provide accounting and tax services for the relevant entities and individuals

amount[s] to nothing more than a series of discrete and severable transactions"); *Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.*, 713 F. Supp. 2d 96, 105 (N.D.N.Y. 2010) (rejecting continuous representation where the plaintiffs could "not indicate the existence of a mutual understanding between the parties that a certain service, such as a past audit, was specifically subject to ongoing representation").

Plaintiffs argue that the relevant continuous transaction was a decades long consulting and controllership engagement with Voynow. Yet, in support of their motion for summary judgment, defendants have set forth concrete evidence indicating that they viewed their relationship with Star as that of yearly and discrete engagements—namely yearly engagement letters, year-by-year workpaper organization, year-by-year billing records, and the nature of the work itself—which undermines any *mutual* understanding of a continuous consulting engagement.

## 1. Yearly Engagement Letters Evince Separate Transactions

Engagement letters are critical in this analysis, as "the nature and scope of the parties' retainer agreement (engagement) play a key role in determining whether 'continuous representation' was contemplated by the parties." *Williamson*, 872 N.E.2d at 847. Voynow supplied engagement letters dated December 30, 2008; December 30, 2009; December 15, 2010; December 15, 2011; December 28, 2012; January 2, 2014; January 30, 2015; January 18, 2016; and January 3, 2017. ECF Nos. 126-23, 126-24. The letters leave little doubt that Voynow viewed each year as

15

a discrete engagement that Star could not rely on as a continuous consulting representation.

Plaintiffs argue that Voynow never transmitted these letters. At his deposition, plaintiffs' expert Douglas Sosnowski repeated that conclusion and stated that he was unaware of metadata showing yearly updates to the letters but noted Voynow's internal emails indicating that the letters were sent and time billing entries by Voynow employees documenting preparing the letters. D. Sosnowski Dep. 55:2–20, 61:1–15, ECF No. 126-120. Defendants maintain that they produced this evidence in discovery, which would have enabled Sosnowski to review it, Defs.' Reply at 22, but neither the metadata nor the internal emails are in the summary judgment record before me. Otherwise, the strongest evidence indicating that the letters were transmitted is Robert Seibel's deposition testimony stating that he remembers Voynow transmitting the letters via mail and personally bringing several of the letters to Star in person. R. Seibel Dep. 71:2–72:24, ECF No. 126-11.

Nonetheless, plaintiffs lacking recollection of receiving the letters is immaterial because plaintiffs must establish a *mutual understanding* of continued representation, *i.e.*, they must at least show a genuine factual dispute as to whether Voynow too understood the engagement(s) to be open-ended. *Williamson*, 872 N.E.2d at 847 (rejecting continuous representation doctrine in part because of the defendants' "lack of awareness of a condition or problem warranting further

16

representation"). In other words, Voynow need not show that it *and* plaintiffs *both* understood the engagement(s) to be yearly and segmented. Merely insisting that the letters were never transmitted fails to establish a genuine factual issue as to *Voynow's understanding* of the engagement, as its principals understand the letters to have been sent.

More importantly, plaintiffs' blanket denial of receiving the letters is insufficient to create a genuine factual dispute because they admitted to discarding Voynow's communications at each year-end and because they lacked a document retention system. *See supra* note 3. Given defendants' proffer of the letters and evidence indicating that they transmitted them, plaintiffs' simple denial of receipt, despite acknowledging tossing Voynow's letters each year and lacking document a retention system, is not probative evidence upon which a jury could conclude that defendants never sent the letters. *See Saeli*, 36 F.4th at 455; *see also Celotex Corp.*, 477 U.S. at 321 n.3 (a party cannot withstand a summary judgment motion supported by documentary or testimonial evidence with mere denials).

There is also no genuine dispute over whether the parties orally agreed to an open-ended consulting engagement at the 1996 meeting. The only evidence supporting this argument is Michael Koufakis's May 15, 2024, Declaration, in which he hardly implies as much. M. Koufakis Decl. ¶ 3, ECF No. 126-112. I will not consider this Declaration. For one, it post-dates Magistrate Judge Merkl's Order

17

closing discovery. *See* Discovery Order, ECF No. 124. It also squarely contradicts Michael Koufakis's deposition testimony, in which he stated that he hired Voynow to "more than review, but less than audit[]" Star's finances and to prepare tax returns. M. Koufakis Dep. 74:16–75:20, ECF No. 126-5. He never stated that Voynow agreed to issue reviewed or audited financial statements, much less serve as a financial consultant or controller on a perpetual basis, but instead that Voynow agreed to "verify" the account balances on the financial statements (which Karouzakis prepared) that would be reflected in Star's yearly tax returns. *Id.* 82:9–83:13, 109:19–22. Because the Koufakis Declaration states that Voynow agreed to a consulting engagement in contradiction of his deposition testimony, it cannot create a genuine factual issue to withstand summary judgment. *Patacca v. CSC Holdings, LLC*, No. 16-CV-0679, 2019 WL 1676001, at *18 (E.D.N.Y. Apr. 17, 2019) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996))).

## 2. Defendants' Workpapers and Billing Records Indicate Separate Transactions

Other tangible evidence further demonstrates Voynow's understanding of a year-by-year relationship. For one, Voynow bundled and stored all of its workpapers for the Star entities on a year-by-year basis, explicitly labeling them as "year-end"

18

workpapers.  ECF Nos. 126-122–24.  Voynow also billed plaintiffs on a yearly basis, sending "progress" bills in March and "final" bills in September, after plaintiffs' tax filing deadline.  R. Seibel Dep. 136:16–137:3, ECF No. 126-11; Voynow Bills, ECF No. 126-28.

Plaintiffs attempt to create a factual dispute regarding defendants' billing practices by arguing that (1) their fees were excessive for a tax engagement, and (2) their invoices reflected consulting services.  *See* COF ¶¶ 62–70.  As to the fees, plaintiffs rely heavily on Sosnowski's testimony indicating that the customary fee for preparing a corporate tax return in New York City in 2015 was $9,700.  *Id.* ¶ 66.  But at summary judgment, "[a] district court properly considers only evidence that would be admissible at trial."  *Nora Beverages, Inc. v. Perrier Grp. of Am. Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  Sosnowski's testimony on the customary fee for a corporate tax return is cut from whole cloth and wholly unsupported by any "facts or data" whatsoever, as Federal Rule of Evidence 702 requires for expert testimony, and it is therefore inadmissible.  Fed. R. Civ. P. 702(b); *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 475 (S.D.N.Y. 2017) (explaining that courts must disregard expert reports that do not comply with Rule 702 at summary judgment).

Plaintiffs also point to a Voynow employee's deposition testimony stating that Voynow typically charged $10,000 for tax preparation and $20,000 for a review engagement to contend that Voynow's yearly billings to the individual dealerships,

which often exceeded $20,000, must be for consulting services.  COF ¶¶ 65–70.  For one, that Voynow's yearly bills to Star may exceed its average bills for other yearly tax engagements does not demonstrate that Voynow viewed any year's engagement as open-ended or subject to continue beyond the year billed.  Second, plaintiffs' argument that the yearly billing amounts are excessive overlooks nuance in that the amounts included the "special accounting services" Voynow rendered for discrete sales tax and IRS audits and the work Voynow performed throughout each year during the interim and year-end visits.  Moreover, the deposition testimony of Hugh Whyte, Voynow's managing partner, clarifies that Voynow's bills to Star were actually commensurate with (or more accurately, much less than) Voynow's bills to other large auto dealers for which it performed tax services, as larger auto dealers present tax complexities justifying a bill that is higher than average.  H. Whyte Dep. 49:19–52:9, ECF No. 126-128.  Put simply, the amount of money Voynow charged plaintiffs does not establish a mutual understanding of continued representation on a particular transaction.

### 3. The Nature of Voynow's Work Does Not Support a Continuous Representation

That brings me to the nature of Voynow's work itself.  Plaintiffs seek to construe Voynow's engagement as an open-ended consulting and controllership agreement by pointing to evidence that Voynow did more than just prepare yearly tax returns.  But this misses the point at this juncture.  Defendants do not contend

that they merely prepared tax returns; they explicitly agree with plaintiffs and concede that plaintiffs hired them to "more than review, but less than audit[]" financial statements. Rather, defendants argue that every aspect of their work for plaintiffs was tied to and done in service of yearly engagements that ended with each year. The evidence supports only that conclusion. Viewed in the proper context, none of plaintiffs' evidence supports a mutual understanding of an open-ended engagement that would enable a jury to find in plaintiffs' favor on this issue.

Nor is this conclusion undermined by one piece of evidence upon which plaintiffs rely: a statement defendants' expert made at his deposition indicating that "[t]here are e-mails or billing records that describe the scope of certain other services that were provided, those would have been consulting services by definition." S. Scherf Dep. 100:6–12, ECF No. 126-61. Plaintiffs' references to this statement omit the immediately subsequent context in which Scherf explained that the additional services were rooted in the tax engagement, that is, based "on an oral understanding as to what you're doing if somebody says to you come up and oversee this sales tax audit, then you do that and then you bill them separately." *Id.* 100:12–16. Moreover, Scherf explained that accountants handling tax work often assess inventory, adjust schedules, and inquire about fraud controls—the work plaintiffs contend is indicative of a consulting engagement—as a matter of "meeting . . . professional responsibilities under the tax standards." *Id.* 245:2–251:25.

Indeed, defendants do not dispute that they handled several sales tax and IRS audits and designated them as "special accounting services." Defs.' Reply at 12, ECF No. 126-116. But these audits were discrete, and they do not transform defendants' services into an open-ended consulting engagement. The underlying malpractice claims also do not arise from these audits. *Cf. Rodeo Family Enters., LLC v. Matte*, 952 N.Y.S.2d 581, 585 (App. Div. 2012) (holding that an accountant's allegedly negligent advice as to a specific, one-off transaction was distinct from the accountant's ongoing audit work and therefore insufficient to establish continuous representation). Similarly, Voynow's only invoice that mentions "controllership" was specifically linked to training Cutillo, who had been promoted to office manager, a role which required her to perform the same controller functions Karouzakis had performed. Voynow Invoice, ECF No. 126-34.

Again, defendants do not dispute that their role in "verifying" the accuracy of plaintiffs' books and records, as the parties agreed to in 1996, required additional services beyond mere tax return preparation. The critical fact, nonetheless, is that the record demonstrates that Voynow viewed these services as part and parcel of yearly engagements. For example, plaintiffs point to Voynow's practice of conducting interim visits and drafting interim reports as services unrelated to taxes and indicative of a controllership. COF ¶¶ 56–61. However, as Voynow partner Randall Franzen explained, defendants conducted interim visits to "understand

where the income is at that period of time," and the reports were to advise the Koufakises of items that could be "write-offs by the end of the year" or things that "might be income by the end of the year for the tax return." R. Franzen Dep. 128:2–129:2, ECF No. 126-54. Franzen further testified that, to his knowledge, Voynow performed at least one interim visit to every dealership client for which Voynow prepared taxes because such visits were necessary to understand the client's finances and to be adequately prepared for year-end tax season. *Id.* 129:17–131:8.

Relatedly, plaintiffs cite to various tasks such as defendants' reviews of their internal controls, aged receivables, schedules, and inventories, as well as defendants' calls to the Koufakises to inform them of operational concerns, as indicative of a controllership engagement. COF ¶¶ 23–24, 32–35, 48–49, 52, 56–61, ECF No. 126-38. The record does not show that Voynow ever viewed those tasks in such a way. As Franzen testified, insufficient internal controls could lead to "violation[s] of the tax code," and his calls to the Koufakises were to inform them of business issues that could impact tax liability. R. Franzen Dep. 246:2–12, 250:11–252:18, ECF No. 126-54. Moreover, the work defendants performed each year was for that year only—an understanding it appears plaintiffs shared. Indeed, plaintiffs admit to discarding all of Voynow's communications for a particular year at the end of that year. S. Koufakis Dep. 44:5–14, ECF No. 126-127. And, while defendants did various tasks and raised issues to the Koufakises, they made clear that they neither

23

followed up nor performed remedial tasks for issues related to a previous year in a subsequent year, instead leaving those decisions to plaintiffs.  R. Franzen Dep. 185:3–13, ECF No. 126-126.

Thus, even if defendants did more than tax work, the evidence does not display a mutual understanding that any work for any particular year was subject to continue to a subsequent year or beyond the filing of the tax return related to which the work was performed.  *See, e.g.*, *Arnold v. KPMG LLP*, 543 F. Supp. 2d 230, 236 (S.D.N.Y. 2008) (rejecting continuous representation where a plaintiff failed to demonstrate that the "requisite agreement existed," *i.e.*, that "the parties had a specific and mutual understanding that their professional relationship continue beyond the purchase of the [tax] schemes and the receipt of [defendant's] opinion letters"); *Apple Bank for Sav. v. PricewaterhouseCoopers LLP*, 895 N.Y.S.2d 361, 362 (App. Div. 2010) (rejecting continuous representation and noting that "[a]lthough defendant audited plaintiff's year-end financial statements, prepared its tax returns and provided ad hoc tax advice to plaintiff, it never had any express, mutual agreement to advise plaintiff on the effect of [a separate transaction] after the original advice.").  *But cf. Symbol Tech., Inc. v. Deloitte & Touche, LLP*, 888 N.Y.S.2d 538, 541 (App. Div. 2009) (holding that the doctrine applied at the motion to dismiss stage based on allegations that "the parties mutually contemplated that

24

[the accountant's] work and representation for each audit year would continue after the issuance of the audit opinion/report").

Plaintiffs attempt to resist the conclusion that each year was a separate transaction in part by alleging that Voynow prepared analytical reviews comparing multiple years. *See* COF ¶ 54, ECF No. 126-38. The only support for this argument comes from Sosnowski's deposition testimony indicating that he "remember[ed] a trend analysis" from 2015 comparing plaintiffs' inventory to product statements from dealers. D. Sosnowski Dep. 99:2–8, ECF No. 126-40. The document he referenced, however, is not in the record. Sosnowski also stated that this was the only analytical workpaper he saw. *Id.* 99:9–12. Merely noting a workpaper from 2015 comparing plaintiffs' inventory to dealers' product statements does not indicate an open-ended, multi-year consulting relationship, as the analysis could have been related to that year's tax preparation, nor does it establish continuous representation dating back to 2001. And regardless, an accountant merely *comparing* a client's current financial situation to its work product from past years does not establish that the representation in the past years was mutually understood to be continuous or subject to further work. *Williamson*, 872 N.E.2d at 843, 847 (defendant "perform[ing] the audits by referring to the worksheets it prepared for the prior year's audits" did not establish course of continuous representation on those audits).

25

Indeed, the evidence would not allow a reasonable juror to conclude that Voynow understood that it signed up for a continuous consulting and controllership engagement. As Sosnowski testified, a financial consultant or controller would likely frequently access a client's Reynolds system and prepare monthly and annual financial statements. D. Sosnowski Dep. 123:3–126:9, 95:10–14, ECF No. 126-120. Voynow did not access Star's Reynolds system before 2017, nor did it prepare any financial statements. Simply, an accountant cannot service a client in an ongoing controllership engagement while only having access to the client's records while on site a few times annually.

Finally, the cases plaintiffs rely on—specifically *Bill Kolb, Jr., Subaru, Inc. v. LJ Rabinowitz, CPA*, 986 N.Y.S.2d 523 (App. Div. 2014); *Lobel Chem. Corp. v. Petitto*, No. 653226/14, 2016 N.Y. Misc. LEXIS 492 (Sup. Ct. Feb. 16, 2016); and *Ghiz v. Schreck & Co.*, No. 158805/12, 2013 N.Y. Misc. LEXIS 3559 (Sup. Ct. Aug. 9, 2013)—are distinguishable and insufficient to withstand summary judgment. Each case was decided at the motion to dismiss stage, requiring the courts to accept the plaintiffs' allegations of continuous representation as true. More specifically, the court in *Bill Kolb* found that the accountant's relevant work product was actually within the statute of limitations and, even if not, that the plaintiff had sufficiently *alleged* a continuous consulting representation, where there were no contrary engagement letters, to withstand a motion to dismiss. 986 N.Y.S.2d at 525. Here,

26

Voynow documented the scope of its services. The *Lobel Chemical* decision, unpublished and lacking precedential value, was also made on a motion to dismiss, and the court properly accepted as true the plaintiff's allegations that the defendant had orally agreed to "advise" the plaintiff on financial matters on an "ongoing" basis. 2016 N.Y. Misc. LEXIS 492 at *9. There is no credible evidence of such an oral agreement in this case. Lastly, the court in *Ghiz* found a continuous representation where the accountant agreed that it erred in a tax filing and sought to rectify the issue over the next several years with the IRS. 2013 N.Y. Misc. LEXIS 3559 at *3–4, *6. In the instant case, Voynow never agreed to perform further work on any year's engagement. These cases do not alter the conclusion, made here with a developed record, that plaintiffs cannot demonstrate any genuine factual dispute that is material to defendants' understanding of their engagement with plaintiffs.

## B. Plaintiffs' Discovery Conduct Contradicts Their Position

Plaintiffs' discovery conduct also undermines their position that they viewed their relationship with defendants as continuous since its inception and offers an additional reason to reject their attempt to extend the statute of limitations back to 2001. Plaintiffs objected wholesale to the temporal scope of defendants' first set of interrogatories seeking information back to 2000, contending that defendants' requests "cover[ed] time periods not relevant to the instant litigation." Pls.' Resp. to Interrogs. 2, ECF No. 126-32. Similarly, in responding to defendants' request for

internal controls and accounting policies Star had in place to prevent employee fraud since 2001, plaintiffs "limit[ed] their response . . . to the relevant time period of 2010 to 2017, based on the statute of limitations in this case." *Id.* at 6. Likewise, plaintiffs responded to defendants' initial document request by stating that the relevant time period for discovery was "from January 1, 2012 forward." Pls.' Resp. to Doc. Reqs. 2, ECF No. 126-33. Consistent with these refusals, plaintiffs have not produced internal documents from pre-2010, and discovery is now closed.

I construe defendants' efforts to use plaintiffs' discovery conduct against them as an invocation of judicial estoppel, an equitable doctrine providing that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Judicial estoppel applies if: "1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *United States v. Swartz Fam. Trust*, 67 F.4th 505, 519 (2d Cir. 2023) (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)). The doctrine is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa*, 595

28

F.3d at 103 (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).

Here, amongst the myriad discovery disputes that took place over the past six years, it does not appear that plaintiffs secured a favorable ruling sanctioning their refusal to provide pre-2010 records. Regardless, in light of my decision that the statute of limitations bars plaintiffs' claims from 2001 through 2014 and that the continuous representation exception is inapplicable on this record, I need not independently or alternatively rule on the impact of the erroneous view of the statute of limitations that plaintiffs took in discovery. I merely note that their continued disavowal of a relevant discovery time period dating back to 2001 seriously undercuts their position that the parties had a "mutual understanding" of a continuous representation dating back to 2001.

## CONCLUSION

Defendants' motion for partial summary judgment is granted as to plaintiffs' professional malpractice and respondeat superior claims based upon alleged acts of theft or fraud occurring from 2001 through 2014.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
March 25, 2025

Edward R. Korman
United States District Judge

29