**MARSHALL DENNEHEY**

620 Freedom Business Center, Suite 300, King of Prussia, PA 19406
(610) 354-8250  Fax (610) 354-8299

Direct Dial:  (610) 354-8270
Email:  mpfitzgerald@mdwcg.com

August 3, 2026

**VIA ECF**

Honorable Edward R. Korman, U.S.D.J.
United States District Court Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York, 11201

> RE:   Star Auto Sales, et al. v. Voynow, et al.
>         Docket No.:   USDC of Eastern NY No. 1:18-cv-05775-ERK-TAM
>         Our File No.:  03127.01373

Dear Judge Korman:

This firm represents the Defendants Voynow, Bayard, Whyte and Co., LLP, Randall Franzen, Hugh Whyte and Robert Seibel in this matter ("Voynow"), and submits this correspondence following the Pretrial Conference held before Your Honor on July 27, 2026.  Voynow sets forth its arguments as to the preclusion of testimony and reports from Plaintiffs' expert Douglas Sosnowski ("Sosnowski").

> **I.      Voynow Has Not Waived Any Challenge To The Admissibility Of Sosnowski's Testimony.**

Plaintiffs argued at the Pretrial Conference that Voynow waived its ability to challenge the admissibility of Sosnowski's reports and testimony because the issue was not raised in conjunction with Voynow's partial summary judgment motion predicated upon the statute of limitations.  This argument is unfounded for several reasons.  First, the Court's most recent case management order never set any deadline to file motions in limine. (See ECF Dkt. No. 12/13/23 Order).  Second, Voynow explicitly stated in its summary judgment briefing that it intended to file a *Daubert* motion through separate briefing.  (See Reply, ECF Dkt. No. 126 at 16 n. 10).  Third, "unlike a summary judgment motions, which are designed to eliminate a trial in cases where there are no genuine issues of fact, motions in limine are designed to narrow the evidentiary issues for trial and eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. Of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) (*quoting Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). As this Court stated at the Pretrial Conference, it has discretion to decide when such in limine motions can be filed, including those pursuant to *Daubert*.  See *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984) ("Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."); *Rivera v. Inc.*

August 3, 2026
Page 2

_____

*Vill. of Farmingdale*, 29 F. Supp. 3d 121, 125 (E.D.N.Y. 2013) ("A motion in limine lies in this Court's inherent authority to manage the course of its trials."). This Court is the ultimate gatekeeper as to the admissibility of Sosnowski's testimony and has discretion to address this issue at the outset.

## II. Expert Testimony Required In Accounting Malpractice Cases.

In diversity actions, the question of whether expert testimony is required is a question of New York State law. *Kranis v. Scott*, 178 F. Supp. 2d 330, 334 (E.D.N.Y. 2002), *citing Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 27 (1st Cir. 2006). In an accounting malpractice claim, a plaintiff must prove that (1) the accountant's conduct fell below the accepted standard of practice; and (2) the accountant's conduct was a proximate cause of the alleged injuries. *Pennington v. D'Ippolito*, 425 F. Supp. 3d 222, 228 (S.D.N.Y. 2019). New York law requires that a plaintiff asserting professional liability claims present expert testimony on the issues of negligence and causation unless a lay jury is competent to evaluate the alleged malpractice. *Dia v. Conrad*, 1988 U.S. Dist. LEXIS 9904 (S.D.N.Y. Sept. 6, 1988); *Pennington v. D'Ippolito*, *supra*, 425 F. Supp. 3d at 228; *Kranis v. Scott, supra*, 178 F. Supp. 2d at 334 (plaintiff must introduce expert testimony to establish standard of care and whether the defendant's acts or omissions negligently deviated from that standard and whether such negligence was the proximate cause of any damages to plaintiff); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) (expert testimony required to establish applicable standard of practice and whether an alleged deviation from that standard was proximate cause of a plaintiff's injuries).

## III. Sosnowski's Expert Reports And Testimony.

Plaintiffs' expert Sosnowski has issued reports dated September 15, 2023 and a Rebuttal Report dated November 10, 2023, copies of which are attached as Exhibits "A" and "B". These reports were issued in conformity with this Court's scheduling order. (See ECF 8/2/23 Order). Plaintiff produced a late report from Sosnowski dated November 20, 2023 in violation of this Order, attached as Exhibit "C". Sosnowski was deposed on November 28, 2023. Pertinent excerpts of his deposition are attached as Exhibit "D". Sosnowski also submitted a May 15, 2024 Declaration in opposition to Voynow's motion for partial summary judgment, attached as Exhibit "E." As a result of this Court's ruling as to the statute of limitations, many of Sosnowski's opinions and reports, as discussed below, have now been rendered moot as they pertain to claims or years now dismissed pursuant to the statute of limitations.

Sosnowski's remaining opinions in his reports and testimony as to liability, causation and damages are inadmissible under Rules 702 and 403 of the Federal Rules of Evidence as (1) he is not qualified to render these opinions; (2) he failed to use any reliable methodology; (3) his opinions are inadmissible as ipse dixit; and (4) his opinions are moot given the statute of limitations ruling or are otherwise contrary to the law of this case.

## IV. Pertinent Factual Background

### A. Allegations As To Employee Purported Theft Or Fraud

Plaintiffs allege that certain former employees committed acts of theft over the course of several years, and seek to hold Voynow responsible for not detecting these alleged thefts. Plaintiffs claim that the purported thefts began in 2001. Pursuant to this Court's ruling granting Voynow's motion for partial summary judgment, all "claims based upon alleged acts of theft or fraud occurring from 2001 through 2014" have been dismissed. (See ECF Dkt. 128 at p. 29). During the remaining 2015-2017 years now at issue, Plaintiffs contend that former

August 3, 2026
Page 3

_____

employees – Carmen Jones, Douglas Filardo, Despina Theocharis, and Vivian Karazoukis --  committed theft through various alleged schemes.  Plaintiffs repeatedly attempted to have these employees criminally charged for all such alleged schemes, but the New York District Attorney's office rejected Plaintiffs' assertions, stating in writing that the "evidence" presented as to many of the alleged schemes was not indicative of theft.  Other than misdemeanor charges for $5,000 filed against Despina Theocharis for an unpaid employee loan, the only criminal charges filed were for schemes that arose from checks legitimately signed by Plaintiffs' authorized check signers.  These checks were signed without backup documentation and the funds were thereafter diverted for the employees' personal use.  Specifically, Carmen Jones purchased gift cards for personal use from Staples and Plaintiffs signed all checks paying these Staples invoices.  Sales Manager Douglas Filardo created an advertising company and submitted fake advertising invoices which were paid by checks signed payable to the advertising company, without ever requiring proof of delivery of actual advertising services.  Controller/Office Manager Vivian Karazoukis prepared checks payable to various banks which were signed by authorized check signers without any backup, and which were then used to pay her mortgage and personal credit card debt.

Below is a chart summarizing the purported theft schemes at issue for the 2015-2017 years, the amounts Plaintiffs allege for each scheme, whether criminal charges were filed, and the outcome of those criminal cases:

| Employee | Alleged Theft Scheme | 2015 | 2016 | 2017 | Total | Charged/Convicted |
|---|---|---|---|---|---|---|
| Carmen Jones | Staples Checks Signed By Owners | 4,050 | 4,050 | 4,050 | $13,100 | Plead guilty to misdemeanor; paid $250 fine |
| Carmen Jones | Alleged Theft of Cash via Reverse Deposit | 109,158 | 83,107 | | 192,265 | Never Charged |
| Doug Filardo | Advertising Checks Signed by Owners | 472,466 | 433,100 | | 905,566 | Plead Guilty to Class C Felony for $300,000 |
| Doug Filardo | Alleged Theft of Cash -Customer Claim | 115,127 | 124,832 | 128,259 | 368,218 | Never Charged |
| Vivian Karazoukis | Checks Signed By Owners - Personal Credit | 198,518 | 263,950 | | 462,468 | Indicted but died shortly thereafter |
| Vivian Karazoukis | Vehicle Theft - Full Amount Unpaid | | 36,000 | | 36,000 | Never Charged |
| Vivian Karazoukis | Alleged Theft of Cash - Interco Checks | 246,650 | 151,600 | | 398,250 | Never Charged |
| Despina Theocharis | Alleged Unpaid Employee Loans | 19,333 | 15,100 | | 34,433 | Charged for $5,000; plead guilty to $2,000 |
| Despina Theocharis | Vehicle Trade-Ins for Higher Appraisal | 1,900 | | | 1,900 | Never Charged |
| | | | | | Total $2,411,250 | |

Of the $2,411,250 alleged to be theft, $1,381,134 pertains to checks signed by authorized check signers who signed without backup documentation and without confirming that the disbursements were actual expenses of the dealerships. The remaining alleged schemes pertain to purported thefts of cash, failure to repay undocumented employee loans, or vehicles released by Plaintiffs' sales managers, allegedly without receipt of full payment or after a sales manager assigned a higher appraisal value through a trade in transaction.

The initial theft was discovered in December of 2016 when Capital One Bank alerted Plaintiffs' owner Michael Koufakis that a check payable to Capital One, signed by an authorized check signer, was being used to pay off a personal credit card debt of Vivian Karazoukis.  She was fired.  In January 2017, Michael Koufakis hired an outside accountant named Nicholas Chester to investigate other possible schemes by Karazoukis but never followed up after receipt of Mr. Chester's findings.  Plaintiffs thereafter hired Rosenfield & Company ("Rosenfield") in April of 2017 to conduct a forensic accounting investigation.  Rosenfield's team of forensic accountants was on site at Plaintiffs' dealerships for several months beginning in late April 2017 to investigate and conduct a forensic analysis.  Rosenfield issued several reports as to its findings and is the forensic accountant referenced in the Complaint as having conducted "a broad investigation of the extent of thefts and the manner in which they were conducted."  (See ECF Dkt. 1, ¶49, 54).  Plaintiffs have since disavowed Rosenfield's reports and never produced any other forensic accounting report in this litigation.

August 3, 2026
Page 4

_____

### B.   Voynow's Scope of Engagement.

Voynow was initially retained by Plaintiffs in 1996.  Its services were terminated on November 4, 2017.  Voynow completed work on Plaintiffs' 2016 tax returns and issued them in 2017.  After several of Plaintiffs' accounting employees were fired or quit in 2017, Plaintiffs promoted Jacqueline Cutillo to the Controller/Office Manager role for all dealerships.  As she had no experience, Koufakis asked Voynow to train her in this new role which it did in the Spring of 2017.  Voynow was last on site at Plaintiff's premises in June of 2017.

For the 1996 through 2016 tax years, Voynow prepared and issued Plaintiffs' tax returns.  Each year, Voynow typically visited Plaintiffs' dealerships three times: an interim visit in the middle of the tax year; a tax planning visit in late Fall; and a visit after year-end in January.  If a tax audit occurred, Voynow would visit to address the audit.  Voynow did not have remote access to Plaintiffs' Reynolds & Reynolds  ("Reynolds") system, which is its accounting and dealer management system.  In the Spring of 2017, in conjunction with training Cutillo, Voynow was given limited remote access.  Thus, throughout 2015-2016 and most of 2017, Voynow was only able to access Plaintiffs' Reynolds system when physically on site.

Voynow issued annual engagement letters to Plaintiffs beginning in 2008.  Certain accounting engagements (such as an audit or review) mandate that engagement letters be signed by a client, but there is no such mandate for tax engagements.  For the 2015-2016 tax years at issue, Voynow issued engagement letters specifically to Michael Koufakis.  He never signed them and does not recall receiving the 2015 engagement letter, but did receive the 2016 engagement letter.  (ECF Dkt. 128 at pp. 4,16) ("Other than the 2016 letter, plaintiffs deny or do not recall receiving any of the other letters").  Voynow never issued an engagement letter for the 2017 tax year as its services were terminated before ever beginning work on the 2017 taxes.

The 2015 and 2016 engagement letters state, in part, the following:

> We will perform our services in accordance with the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants. .... **We will prepare your tax returns based upon information and representations provided to us. We will not audit or otherwise verify the data you submit to us, although we may ask you to clarify some of the information.... .**

> Client Responsibilities: You will provide us with a trial balance and other supporting data needed to prepare your tax returns. It is your obligation to provide us with accurate and complete information, including worldwide income. You are responsible for maintaining an adequate and efficient accounting system for safeguarding assets and authorizing transactions and for maintaining adequate documentation to substantiate the accuracy and completeness of your tax returns. ...

> CPA Firm Responsibilities: Our services will be limited to only those tasks we deem necessary for the preparation of the returns. We may deem it necessary to provide you with accounting and bookkeeping assistance in that regard. ... Please note that we will not validate the completeness or accuracy of the information supplied, and the assistance we do provide is not to be construed as an oversight function, in any respect of your accounting system; therefore there should be no reliance, stated or implied, by management on the accuracy of the assistance we are to provide....

August 3, 2026
Page 5

_____

>    **Our engagement does not include any procedures designed to discover errors, fraud or theft. Therefore, our engagement cannot be relied upon to disclose such matters.**

(See ECF Dkt. Nos. 126-23, 126-24; Dkt. No. 128 at p.4).

Notwithstanding Voynow's engagement letters and his receipt of the 2016 letter, Koufakis has testified that he hired Voynow for an engagement that was "more than a review but less than an audit," whereby Voynow would "verify every account balance on the balance sheet," oversee Star's accounting procedures and staff, review its internal controls, detect fraud through forensic accounting services, and prepare all tax returns.

### V.     Applicable Legal Standard Under FRE 702 And *Daubert* Regarding Expert Testimony.

The legal framework for determining whether an expert's report and testimony is admissible is based upon the application of Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A trial court acts as a gatekeeper with respect to expert testimony to assure that the methodology upon which the expert opinion is founded is reliable, *i.e.*, that the expert's conclusions are based upon good grounds. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 597 (1993). Rule 702 clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. *Id.*, at 589.  Thus, this Court's inquiry into whether an expert meets Rule 702's requirements includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology rather than subjective belief or unsupported speculation; and (3) whether the proposed testimony "fits" or would be relevant to the case and helpful to the trier of fact. See *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 732 (3d Cir. 1994); *Arista Records LLC, et al. v. Lime Grp. LLC, et al.*, 2011 U.S. Dist. LEXIS 47416 at *1 (S.D.N.Y. May 2, 2011).  The "overarching subject" or the Rule 702 inquiry is "the evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

A trial court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys with respect to its ultimate reliability determination." *Kumho Tire v. Carmichael*, 526 U.S. 137, 142, 119

August 3, 2026
Page 6

_____

S.Ct. 1167 (1999); <u>Kogut v. Cnty. of Nassau</u>, 894 F. Supp. 2d 230, 239 (E.D.N.Y. 2012) ("The decision whether to admit or exclude a proposed expert's testimony is committed to the Court's broad discretion."). Expert testimony should be excluded if it is "speculative or conjectural." <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996)). "When an expert's opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." <u>Paguirigan v. Prompt Nursing Empl. Agency LLC</u>, 2019 U.S. Dist. LEXIS 165587 at *9 (E.D.N.Y. Sept. 24, 2019); see also <u>Nimely</u>, <i>supra</i>, 414 F.3d at 396 ("Nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <i>ipse dixit</i> of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." <u>U.S. SBA v. Feinsod</u>, 2025 U.S. Dist. LEXIS 113166, *17-19 (E.D.N.Y. June 13, 2025)  The district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. <u>Id</u>., <i>quoting</i> <u>Kumho Tire Co. v. Carmichael</u>, <i>supra</i>, 526 U.S. at 152).  The burden of showing that expert testimony is admissible, once challenged, lies with the offering party.  <u>United States v. Jones</u>, 965 F.3d 149, 161 (2d Cir. 2020); <u>Kannankeril v. Terminix Int'l</u>, 128 F.3d 802, 807 (3d Cir. 1997).  Notably, even otherwise qualified experts may not simply offer conclusory opinions. <u>Bridgeway Corp. v. Citibank</u>, 201 F.3d 134, 142 (2d Cir. 2000).

Expert testimony is also subject to the requirements of Rule 403, which provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." See Fed. R. Evid. 403. In <i>Daubert</i>, the Supreme Court "noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." See <u>Nimely v. City of New York</u>, <i>supra</i>, 414 F.3d at 397; <u>In re Puda Coal Secs., Inc</u>., 30 F. Supp. 3d 230, 249-250 (S.D.N.Y. June 17, 2014).

## VI. <u>Sosnowski's Reports And Testimony As To Voynow's Alleged Violations Of Professional Accounting Standards Should Be Precluded Pursuant To FRE 702 And 403.</u>

Sosnowski offers the opinion as to liability that Voynow violated professional accounting standards. His opinions on this issue should be precluded because (1) Sosnowski is not qualified to render his opinions; (2) Sosnowski failed to use any reliable methodology supported by any actual analysis or data; and (3) his opinions are nothing more than ipse dixit.  Indeed, Sosnowski admitted that his opinions were not predicated upon what Voynow actually did when rendering services. (See Ex. D at 214:9-11) ("I don't know what [Voynow] looked at on every day they went there.  <b><i>That wasn't part of my analysis</i></b>.").

### A. Sosnowski Is Not Qualified To Render His Opinions As To Liability In This Case.

A party proffering an expert must demonstrate that the expert has specific knowledge and expertise in the area in which he wishes to offer the opinion. <u>D&D Assoc., v. Bd. Of Educ. of N. Plainfield</u>, 411 F.Supp.2d 483, 486 (D.N.J. 2006).  Expert witnesses do not have an unconditional license to opine on all matters at issue in a litigation – an expert may be generally qualified but may lack qualifications to testify outside his area of expertise. See <u>Calhoun v. Yamaha Motor Corp., U.S.A</u>., 350 F.3d 316, 322 (3d Cir. 2003).

August 3, 2026

Page 7

_____

Sosnowski has spent 95% of his practice within the last 10 years as an expert, however only 1% of his practice has pertained to accounting professional liability matters. (Ex. D at 13:5-14). He has never testified in federal court against an accountant, and the vast majority of cases for which he has been qualified as an expert involve matrimonial disputes (over 50%), or patent violations and shareholder disputes. (Ex. D at 14:2-5; 14:17-15:3). He has never been expert in any case involving an auto dealership. (Ex. D at 15:4-7). Aside from his lack of credentials as a qualified expert in comparable matters, Sosnowski lacks actual experience to opine on the issues at hand. Notably, he has not prepared a tax return for an automobile dealership in over 25 years, having last done so in 2001. (Ex. D at 16:12-18; 103:3-5). He was unable to state how many dealership tax returns he had ever prepared. (Ex. D at 16:17-19). He has not worked with the Reynolds accounting system in over 25 years (Ex. D at 18:13-16). He has not conducted any review engagement in over 10 years and never performed one for an auto dealership. (Ex D at 17:6-13). Similarly, Sosnowski has not conducted any audit for any client since 2001. (Ex. D at 17:14-21). This case involves tax engagement letters, yet Sosnowski is not familiar with applicable professional guidelines for such letters and does not know who set guidelines for issuing tax engagement letters, nor when any such mandate took effect. (Ex. D at 50:14-51:2). Plaintiffs bear the burden to establish that Sosnowski is qualified to render his opinions in this case, but they cannot carry that burden.

### B. Sosnowski Failed To Utilize Any Reliable Methodology To Support His Opinions.

In his September 15, 2023 report, Sosnowski sets forth a "Summary of Fraud" schemes and thereafter describes "Voynow's Violation of Accounting Standards" as to each scheme."[1] (See Ex. A at pp. 8-18). At the very outset, this Court should deem his opinions inadmissible because Sosnowski fails to actually cite to any specific accounting standard Voynow purportedly violated for any alleged scheme. He fails to state whether Voynow violated the Statements of Standards for Tax Services, the AICPA's Code of Professional Conduct, the Statement on Standards for Consulting Services, or the Statement on Standards for Accounting and Review Services when it failed to detect any particular alleged scheme. He further fails to specify what provision within any of these body of standards were purportedly violated. While he describes select portions of these professional accounting standards at pp. 3-4 of his Report, he never connects any such specific standard to any specific scheme or to any purported Voynow violation. When asked at his deposition, Sosnowski conceded that his report failed to pinpoint the specific standards supporting his opinions as to Voynow's alleged violations, stating that "there may be instances where one standard was violated but not the other." (Ex. D at 163:12-4-166:4). For this reason alone, his opinions as to Voynow's violation of professional standards are inadmissible. See *Great White Bear, LLC v. Mervyns, LLC*, 2008 U.S. Dist. LEXIS 41977 (S.D.N.Y. May 27, 2008)(excluding expert report for failing to show how and why expert arrived at the conclusions).

Sosnowski's Reports and testimony are also unreliable as he fails to state any date by which Voynow actually should have discovered theft and consequently breached professional standards. Repeatedly, he was asked to provide dates when Voynow's violations allegedly occurred. Other than blanketly stating that Voyow could have only discovered a theft after it occurred, Sosnowski's reports and testimony failed to provide any specific dates of the alleged violations.[2] (See Ex. D at 47:22-48:3; 215:7-17; 228:20-229:2; 241:20-15; 267:25-268:4; 278:21-24). His inability to pinpoint *when* Voynow purportedly violated any professional standard renders his opinions unreliable, as such dates are critical to issues of causation and damages.

_____

[1] In Sosnowski's late report dated November 20, 2023 issued in violation of this Court's order, he reiterates these opinions at pp. 8-19, adding an alleged theft scheme he wholly neglected to even address in his September 15, 2023 report. See Ex. C.

[2] The one exception is Sosnowski's statement in his late report that Voynow should have discovered purported theft of $284,000 by 1/19/15. (See Ex. C at p. 13).

August 3, 2026
Page 8

_____

**1. Sosnowski's Opinions Predicated Upon Alleged "Red Flags" On Accounting Schedules Are Unreliable As He Conducted No Analysis To Connect Any Such Schedules Or "Red Flags" To What Voynow Actually Saw Or Could Have Seen.**

During the approximate three times each year when Voynow visited Plaintiffs' dealerships, it would print out schedules from the Reynolds system that listed balances for certain accounts. Sosnowski's opinions as to Voynow's "violations" are predicated, in large part, upon alleged anomalies on these accounting schedules. However, his methodology in reaching his conclusions is completely flawed as he never conducted any analysis to determine what was actually on the accounting schedules that Voynow reviewed. In other words, he performed no analysis to connect any purported anomaly to the specific schedule Voynow saw in order to support his opinion that Voynow deviated from professional standards by ignoring an alleged red flag. Sosnowski knew that Voynow did not have remote access to Plaintiffs' Reynolds system and thus only accessed these accounting schedules when physically on site. (Ex. D at 93:22-94:14; 95:10-14). He acknowledged that Voynow was typically on site only three times each year. (Ex. D at 92:5-10). Yet, Sosnowski did no analysis whatsoever to even identify the dates of Voynow's site visits even though they are reflected in billing records, nor did he attempt to connect these dates to when any purported red flag referenced in his Report appeared on an accounting schedule.[3] (Ex. D at 211:15-212:24). Sosnowski admits he never reviewed any evidence showing the dates of Voynow's log ins to Reynolds system as part of his methodology. (Ex. D at 170:9-12).

This failure to correlate the dates of Voynow's visits to the dates when any purported anomaly cited in his report appeared on a schedule is fatal to Sosnowski's opinions, as he conceded that these schedules were fluid and changed from day to day. See (Ex. D at 250:21-23) ("Things come on and off schedules."). Sosnowski knows that Voynow would only see what was listed on any particular schedule as of the date it was on site to look at it:

> Q. But you've already said and do you acknowledge that things come on and off schedules, right?
> A. Yes.
> Q. All right. So if something might be on a schedule in January, it might be off in February. Right?
> A. Correct.
> Q. Something might be on a schedule on a Monday and it's off on a Wednesday, right?
> A. Right.
>
> \*    \*    \*    \*    \*
>
> Q. The monthly schedules are only current as of the date they're on site, isn't that true, sir?
> A. The monthly schedules only include transactions up to the date that they're there, yes.
> Q. When they log on, on July 5 or July 6, they're going to see what the schedule looked like on July 6, right?
> A. Correct.
> Q. They're not going to see what it looked like on June 20, correct?
> A. No, you would only have month end that are available other than the date you were there.

_____

[3] The one exception is a reference to a Voynow site visit on January 19, 2015. (See Ex. A at p. 13).

August 3, 2026
Page 9

_____

(Ex. D at 212:8-19; 251:11-25).

Despite knowing that these accounting schedules were fluid and changed daily, Sosnowski failed to conduct any analysis to determine if the alleged red flags were ever on any of the schedules Voynow saw. (See Ex. D ay 214:9-11) ("***I don't know what [Voynow] looked at on every day they went there.  That wasn't part of my analysis.***"). Putting aside his failure to connect whether Voynow was on site when any alleged anomaly appears, his reports and testimony fail to even reference the dates when these alleged anomalies appeared (or even to any document number).  Sosnowski's methodology is deficient as there is no link between any schedule date with purported red flags to any date when Voynow was on site and would have been in position to see it, nor is there any link to the specific schedules contained in Voynow's workpapers.[4]  In other words, it is not enough for a purported red flag to appear on an accounting schedule on a random date.  Accountants are not all-knowing, especially when they only visit three times a year and do not have remote access.  In order for Sosnowki's opinions based upon these schedules to be reliable, his methodology should have reflected an analysis demonstrating that Voynow was actually in position to see the red flag, or that it actually saw it, based upon dates it was on site, or based upon the schedules actually continued in its workpapers.  Since Sosnowski flatly admits that he failed to conduct any such analysis, his opinions and methodology collapse.  See e.g., <u>U.S. SBA v. Feinsod</u>, 2025 U.S. Dist. LEXIS 113166 (E.D.N.Y. June 13, 2025) (excluding expert testimony where expert admitted he did not perform an analysis in his report that was essential to support his opinion); <u>Bank of America, N.A. v. Bear Stearns Asset Mgmt.</u>, 969 F.Supp.2d 339, 358 (S.D.N.Y. 2013 (precluding expert opinions premised upon "unfounded assumptions" as such conclusions are not helpful to the trier of fact); <u>Potter v. United States</u>, 2020 U.S. Dist. LEXIS 95381 *24 (S.D.N.Y. May 30, 2020)(where expert provided no explanation as to how he came to his conclusion and what methodologies or evidence substantiate that conclusion, it must be excluded under Daubert and Rule 702).

For example, for the Filardo advertising scheme, Sosnowski's Report claims that, on some unknown date, a "Schedule 18 Accounts Payable" contained "unusually round amounts" for Motorsports Advertising expenses. (Ex. A at p. 9).  He opines that these "unusually round" numbers should have caused Voynow to discover a fictitious advertising vendor. When asked why a round number would be a red flag for advertising expenses, Sosnowski conceded that he did not rely upon any journal or study to support this opinion and that round numbers could actually be legitimate.  (Ex. D at 148:12-15; 177:25-178:11).  See <u>Potter v. United States</u>, <i>supra</i>, 2020 U.S. Dist. LEXIS 95381 at *24 (expert failure to cite study or literature supporting opinion was deemed to be not based upon sufficient facts or data).  More critically, is Sosnowski's failure to identify, either by date or document number, any specific Schedule 18 that had a round number for Motorsports Advertising, let alone connect any such Schedule 18 to what was either in Voynow's work papers or in existence on a date Voynow visited.  (Ex. D at 178:7-182:3).  Repeatedly at his deposition, Sosnowski was asked to identify any date when such a round number showed up on Schedule 18 that corresponded to a Voynow visit, and he could not do so. <u>Id</u>.  Instead, after being unable to do so, he claimed that Voynow would purportedly print out every monthly schedule, yet acknowledged that his statement was not supported by the actual record. ( "I don't recall if [that] was in anybody's testimony."). See <u>Id</u>.  Eventually, Sosnowski conceded his opinion was baseless:

> Q.  Sir, I'm going to try it one more time.  When you offered that opinion whether or not on the three occasions each year that Voynow went up and looked at Schedule 18, you don't know for a fact that Motor Sports advertising showed up on these schedules, correct?

_____

[4] The one scheme for which Sosnowski did perform limited analysis was the NMAC/AMEX alleged scheme. (See Ex. A at pp. 12-15). However, as this scheme is alleged to have occurred from 2010 through 2014, it has been dismissed as time-barred.

August 3, 2026
Page 10

_____

(Objection.  You can answer).
A.  Voynow didn't have great documentation.  So I wouldn't know.

(Ex. D at 182:7-25; 183:17-22).  See *Tower 570 Co. LP v. Affiliated FM Ins. Co.*, 2022 U.S. Dist. LEXIS 94178 *12 (S.D.N.Y. May 25, 2022) (Expert precluded where "making matters worse, during his deposition, [the expert] was asked many times, in many different ways, to explain the scientific evidence or principle on which his opinion was based.  Yet, he provided no satisfactory answer.").

Similarly, Sosnowski's opinions as to the Staples scheme and Schedule 18 are predicated upon the same flawed methodology. His report states that two separate Staples vendors for Star Nissan were listed on Accounts Payable Schedule 18, which purportedly was a red flag that should have prompted Voynow to inquire about the use of two accounts for the same vendor.  (Ex. A, p. 11).  Sosnowski did not know when a second vendor account for Staples was ever set up and admitted that there can be legitimate business reasons why a company would have two vendor accounts.  (Ex. D at 235:12-20).  He acknowledged that Voynow was never required to review the Staples' invoices.  (Ex. D at 238:22-239:7).  Critically, the fundamental flaw in Sosnowski's methodology persists as he never connected any specific Schedule 18 listing two Staples vendors to any Schedule 18 in Voynow's workpapers, or to any date of a Voynow visit where it could have seen a version of Schedule 18 showing two Staples vendors listed.  Thus, the premise of his entire opinion is unreliable:

> Q.  Are you aware of any Schedule 18 that exists which contained both [Staples] vendors on the same schedule?
> A.  I don't know.
> Q.  You don't cite to any such schedule or document in your report, do you?
> A.  All the documents are in Appendix A.
> Q.  As you sit here today, as part of your review, you never remember seeing Schedule 18 that has two different Staples vendors in the same document?
> A.  I don't recall.
> Q.  It is also true that you don't recall any specific Schedule 18 in any Voynow work papers that has two Staples vendors on the same documents?
> A. No I don't remember.

(Ex. D at 233:16-234:7).

At pages 16-17 of his September 15, 2023 Report, Sosnowski opines as to Voynow's alleged violations in connection with the Vehicle scheme and his opinions are predicated upon the content of Schedule 60 We Owe Account.  His report claims there were five transactions where "fictitious stock numbers" were listed in Schedule 60's general journal entries and that Voynow should have investigated these stock numbers.  (See Ex. A at p. 17).  Again, Sosnowski's methodology underlying this opinion is flawed and unreliable.  He cites to no dates when these purported fictitious stock number showed up on Schedule 60, nor is there any document number referenced in his report.  No analysis was undertaken to ascertain whether Voynow was even on site when the stock numbers at issue appeared on Schedule 60, and he thereafter admitted that Voynow would have never actually seen these stock numbers.

> Q. Do any of the five transactions show up on any specific Voynow work paper that you reviewed on the We Owe schedule?
> A. Voynow may not have copied that and put it in their workpaper, no.

---

> Q. That wasn't my question.  My question was: Did any of those five transactions show up on the We Owe Schedule 60 that is contained in any of the Voynow work papers that you reviewed.
> A. I don't believe so.

(Ex. D at 279:20-280:6).

This same flawed methodology applies to Sosnowski's opinions referencing Schedule 21 Rebates & Incentives in connection with the alleged theft by Karazoukis through a personal creditors scheme.  While opining that Karazoukis purportedly stole $590,481, Sosnowski claims that Schedule 21 Rebates & Incentives contained two "unusual entries" for checks written to Star Toyota in the amount of $3,500.  Aside from the dubious notion that an entry for $3,500 can support an opinion as to $590,481 in theft, Sosnowski contends that Voynow violated accounting standards for not realizing that the $3,500 appearing on Schedule 21 is "an unusually round number" and that a dealership check to Star Toyota should not be on a Star Nissan Schedule 21.  (Ex. A at pp. 9-10).  As noted above, Sosnowski's opinion as to a round number being a red flag is wholly unsupported by any data or study, and he admitted that round numbers can be legitimate. (Ex. D at 148:12-15).  Yet, once again Sosnowski failed to identify any date or document number where a Schedule 21 contained two entries for $3,500 from Star Toyota.  He conducted no analysis to connect the dates when Voynow was on site to this specific version of Schedule 21 and could not provide this information at his deposition, nor link the specific Schedule 21 with two "unusual entries" to anything in Voynow's workpapers. (Ex. D at 242:15-243:9):

> Q.  Did you see anything in your review of Voynow's work papers, any document produced by Voynow, that had Schedule 21, that had the two unusual entries you reference in your report?
> A. I don't remember which Schedule 21 I was looking at when I showed this example.
> Q. So as you sit here today you're not aware of any Schedule 21 about (sic) these two entries ever being in any of Voynow's work papers?
> A. Voynow didn't put everything in its workpapers.

(Ex. D at 244:24-245:10).  Likewise, Sosnowski claims that Schedule 5 Service and Parts Receivable listed customer names and stock numbers which purportedly was a red flag in connection with the Customer Claim scheme. (Ex. A, p. 12).  At his deposition, he admitted that these customer references were not indicative of actual theft as none of the customers whose deposits were allegedly stolen appeared on this Schedule 5. (Ex. D at 268:7-13).

It is obvious that Sosnowski's conclusion based upon purported red flags on certain schedules are not predicated upon any reliable methodology and his resulting opinions as to Voynow's alleged violations of accounting standards are flawed.  His failure to conduct any analysis connecting a purported red flag to a version of the schedule Voynow would have seen or to its workpapers should lead this Court to conclude that his methodology was deficient and his opinions are unreliable.  This Court should not allow Sosnowski to predicate his opinions upon mere speculation that Voynow might not have put everything in its workpapers.  The fact that Sosnowski admitted that he did no analysis as to what Voynow looked at and fell back upon obvious speculation and conjecture as the basis for his methodology should be gravely concerning to this Court.  An expert's methodology cannot be predicated upon such conjecture or speculation under Rule 702. *In re Puda Coal Secs., Inc.*, *supra*, 30 F. Supp. 3d at 251.

_____

### 2. Sosnowski's Opinions Predicated Upon General Journal Entries Are Unreliable Because They Are Based Upon Entries He Admits Voynow Never Saw.

Within the Reynolds system, an accounting schedule can be printed out in either a "full" or "mini" version. The former is hundreds of pages for each account and referred to as the "0355 report," whereas the "mini" schedule is typically one or two pages and is referred to as the "0350 report." (Ex. D at 204:13-205:21; 213:25-214:5). The distinction between the two versions is significant as mini schedules do not contain any detailed general journal entries, whereas a "full" schedule does. *Id*. Sosnowski opines that Voynow violated professional standards based upon the content of certain general journal entries containing purported red flags which appear only on the "full" version of a schedule. His opinions are unreliable as they are unsupported by the factual record and otherwise lacking in any methodological basis.

Specifically, Sosnowski opines that "Voynow personnel should have noticed Vivian Karazoukis' name associated with a general journal entry (Journal 11)" and should have noticed a "general journal entry (Journal 11) for a $26,000 deposit" in his opinions as to the Personal Creditor Scheme. (Ex. A at p. 10). He likewise claims that Voynow should have identified "general journal entries (Journal 11) for loan payments" as being unusual on Schedule 5 Service & Parts Receivable and references "fictitious general journal entries (Journal 11) recorded in the Reynolds system for the alleged Customer Claim scheme as being purported red flags. (Ex. A at p. 11-12). As to the alleged Reverse Deposit and the Employee Advance schemes, Sosnowski predicates his opinions, in part, upon alleged "multiple general journal entries (Journal 11)." (Ex. A at p. 15-16). These opinions are unreliable as Sosnowski admitted that Voynow was never required to review all journal entries as part of its engagement, (Ex. D at 206:12-16), and that he knew Voynow personnel testified that they only printed out mini schedules when on site as opposed to full schedules. (Ex. D at 205:5-15). Indeed, it is only these mini schedules that are contained in Voynow's workpapers. Thus, Voynow would never be in position to even see these alleged general journal entries that were purportedly questionable. Sosnowski's methodology ignores these critical facts, thereby rendering his opinions predicated upon the content of general journal entries as unreliable:

> Q. Did you see any Schedule 7 in Voynow's work papers that contained the detail of any general journal entries?
> A. ***The detail would not be there***. You would have to follow the trail.
> Q. So by looking at Schedule 7 Voynow would not see the detail for any general journal entries associated with this alleged cover-up and scheme, is that correct?
> A. Correct.

(Ex. D at 252:7-16). See *Gyllenhammer v. Am. Nat'l Red Cross*, 2018 U.S.Dist. LEXIS 228437 *20 (N.D.N.Y. January 23, 2018) (expert opinion founded upon findings unsupported by factual record fails to meet Rule 702's reliability standards).

Similarly, Sosnowski's opinions predicated upon purported fictitious journal entries are disconnected from any foundation in the factual record or any analysis. (See Ex. A at pp. 10, 12, 15). He wholly fails to tie any purported fictitious journal entry to either any Voynow workpaper or to the date of a Voynow site visit. In fact, his report does not even identify the dates of such journal entries:

> Q. You state at the bottom of page 10 of your report from 2010 to 2016 Theocharis recorded several fictitious journal entries to incorrectly reflect her loans were being repaid, correct?
> A. That's correct.

August 3, 2026
Page 13

_____

> Q. Your report does not reference any date of these allegedly fictitious journal entries, correct?
> A. Correct.
> Q. There is nothing to indicate the date of any journal entry or the amount, correct?
> A. Correct.
> Your report does not cite to any specific Voynow work paper that indicated it ever saw any of these allegedly fictitious journal entries, correct?
> (Objection)
> A. Correct.

(Ex. D at 189:11-190:5).

Sosnowski's admission that only the "full" version of schedules – which Voynow did not review – contained the allegedly suspicious journal entries, coupled with the fact that he never did any analysis to connect what Voynow looked at to any purported fictitious journal entry, renders his opinions entirely unreliable. (See Ex. D ay 214:9-11) ("***I don't know what [Voynow] looked at on every day they went there. That wasn't part of my analysis.***").

### 3. Sosnowski's Opinions Based Upon Other Purported Red Flags Are Unreliable As They Are Speculative Or Otherwise Undercut By His Deposition Testimony.

To a lesser extent, Sosnowski predicates his opinions as to Voynow's alleged violations of professional standards upon other purported red flags aside from schedules or general journal entries. His opinions are nonetheless unreliable as they are unsupported by any methodology or facts of record, are speculative and even undercut by his own testimony.

For example, as to the Karazoukis Personal Creditor scheme where Plaintiffs knowingly signed checks without backup, Sosnowski states that "valid intercompany transactions must balance with each other" and that a check written to Star Toyota on an unknown date purportedly would have led to the discovery of an imbalance in intercompany accounts. (Ex. A at p. 10). Sosnowski undercuts his own opinion as to these intercompany transactions as he testified that Voynow was never required to balance intercompany transactions. (See Ex. D at 248:23-249:6) ("Q. There was no evidence the owners ever requested Voynow balance inner (sic) company transactions, is there? A. Not to my knowledge."). See *Potter v. United States*, *supra*, 2020 U.S. Dist. LEXIS 95381 at *21-24 (precluding expert where his testimony undercut his own unsupported opinions).

Sosnowski bases his opinions, in part, upon purported suspect control numbers that contained letters as opposed to just numbers. For the Employee Advance scheme involving Karazoukis, Sosnowski states that an Employee Advance Schedule, of an unknown date, contained control reference numbers with "AFRO" and "DEBB" which Voynow purportedly should have viewed as "unusual." (Ex. A at 15-16). For the alleged Personal Creditor scheme, he states that a control number for a factory receivable with "VKFP" was "unusual" and somehow should have led Voynow to discover that Plaintiffs' owners had signed checks without backup. (Ex. A at p. 10). His opinion that these control numbers are somehow "unusual" is undercut by his testimony. He conceded that the mere fact that a control reference included letters does not mean it is "fictitious" and agreed that the Reynolds system actually enables users to create such control numbers, and even explains how to do it in the user manual. (Ex. D at 219:12-220:10). Thus, his testimony undercuts his opinions as to these control number references somehow being a red flag. Further, Soswnoski's report does not connect these control numbers to any specific actual theft. His report is also devoid of any reference to any dates when these purported suspect control numbers appeared on any schedule, nor is there any reference to a document citation.

August 3, 2026
Page 14

_____

At his deposition, he could not provide any date when either a "VKFP" "AFRO" or "DEBB" control number ever appeared in Plaintiffs' accounting records, nor could he link it to any Voynow visit or what was in any Voynow work paper.  Instead, Sosnowski surmised that Voynow purportedly "didn't include every schedule in their workpapers." (See Ex. D, 216:11-217:8; 249:7-250:6) ("Q: My question was: Is there anywhere in Voynow's work papers that you reference in your report that schedules containing these two control numbers were contained in Voynow's workpapers? A. I don't know if they retained copies.").  An expert's methodology cannot be predicated upon such conjecture or speculation under Rule 702. *In re Puda Coal Secs., Inc.*, *supra*, 30 F. Supp. 3d at 251.

As to the alleged theft scheme where Theocharis purportedly failed to repay certain employee loans, Sosnowski actually admitted to ignoring key testimony from Plaintiffs' owner Steve Koufakis (who approved the loan and supervised Theocharis) and from Theocharis.  The two parties to the loan both testified that the loan was repaid. (Ex. D, 186:23-188:5).  Yet, Sosnowski nonetheless opined that there was a theft.  He stated that a 12/31/15 Employee Advance Schedule 6 (which Voynow did see) reflected an outstanding loan balance for Theocharis in the amount of $32,500, and that Voynow should have investigated it. (Ex. A at p. 11).  Yet, at his deposition, he conceded that the mere fact that Plaintiff Star Chrysler extended loans to employees, and these loans appeared on an Employee Advance schedule, was not indicative of theft.  (Ex. D at 199:6-10).  His testimony again undercuts his opinion.  When shown the specific 12/31/15 schedule, Sosnowski conceded that there was nothing on it to suggest that the loan to Theocharis was overdue.  (Ex. D at 199:2-19).  Sosnowski's opinions on this issue are further flawed as they are contradicted by facts of record.  He opined that Voynow "should have noticed there were no payroll deductions recorded on the Theocharis loan during the month of December 2015." (Ex. A at p. 11).  Yet, he testified that he did not even know if the Theocharis loan was even set up for repayment through a payroll deduction. (Ex. D at 202:2-6) ("Q. But with regard to Debbie Theocharis, you're not aware as you testify today of any loans that were set up to be repaid through payroll deduction, correct? A: Correct.").  Thus, there would be no such payroll deduction for Voynow to even look for as to this loan in December 2015.  Other than the 12/31/15 Employee Advance schedule, Sosnowski was not aware of any other schedule listing a loan to Theocharis, thereby rendering his opinions as to Voynow's violations unsupported and unreliable. (Ex. D, 200:7-11).

Sosnowski bases his opinions as to the advertising scheme, in part, upon the notion that there were never any 1099 forms prepared for Motorsports Advertising.  He states that this was a red flag and that Voynow "did not notify Star Subaru of the omission of a 1099 for Motorsports Advertising." (Ex. A at p. 8).  His analysis is flawed in two significant aspects.  First, there were 1099 forms prepared by Plaintiffs for Motorsports Advertising.  Sosnowski admitted he did not know this until receiving rebuttal expert reports from Voynow's experts pointing out his error. In fact, the IRS sent Michael Koufakis a letter in 2015 after receipt of the 1099 for Motorsports Advertising. (See Ex. D at 171:18-23) ("Q: Were you aware that the IRS had issued a letter to Michael Koufakis in 2016 regarding the 1099 involving Motor Sports advertising? A. Not until I reviewed the rebuttal reports."). Thus, his opinion is predicated upon the erroneous notion that there was no 1099 forms for Motorsports Advertising, when in fact there were.  Secondly, Sosnowski's report stated that "according to [Voynow] invoice descriptions" it purportedly inspected Plaintiffs' list of 1099 forms issued to vendors.  There is no reference in his report, either by date or document number, to any such Voynow invoice. When asked if he ever saw a 1099 within Voynow's work papers, Sosnowski stated "I don't track where I received all the documents from…," inappropriately discounting the importance of the source of documents as part of his analysis. (Ex. D at 169:11-170:3).  While he then claimed there must have been a reference in some deposition testimony, he could not identify any witness who ever testified that Voynow reviewed 1099 forms. Ultimately, Sosnowski conceded that he was simply reiterating what he was told by Plaintiffs  -- a methodology

August 3, 2026
Page 15

_____

consistently rejected by courts as being reliable. (Ex. D at 170:4-171:10); See *Lava Trading, Inc. v. Hartford Fire Ins*., 2005 U.S. Dist. LEXIS 4566 *62 (S.D.N.Y. February 14, 2005) (precluding expert opinion where analysis premised upon crucial factual assumptions that were belied by the record); *Gyllenhammer v. Am. Nat'l Red Cross*, *supra*, 2018 U.S. Dist. LEXIS 228437 (reliability of expert opinion undercut by the fact that several findings were either unsupported by factual record or have no basis of methodology, rendering them inadmissible); *S.E.C. v. Tourre*, 950 F.Supp. 2d 666, 675 (S.D.N.Y. 2013) (it is inappropriate for an expert to become a vehicle for a parties' factual narrative).

Lastly, in his November 20, 2023 report submitted in violation of this Court's order, Sosnowski states that Karazoukis purportedly stole $1.2 million in cash over an unspecified time period by cashing intercompany checks and allegedly using the cash for personal use. (Ex. C at pp. 16-17).  At the outset, the mere existence of intercompany checks is not an unusual occurrence. (Ex. D at 262:11-18).  Sosnowski's opinions are unreliable as he does not identify any date as to when any such theft by Karazoukis took place, nor even the years at issue. (Ex. C at pp. 16-17). He never did an analysis to ascertain what was done with the cash and no witness has corroborated his conclusion that Karazoukis was stealing cash as he alleges.  To the extent any intercompany checks were cashed and cash thereafter removed, he did not know if it was Karazoukis who did so, and could not recall the testimony whereby vendors were paid in cash, and that Plaintiffs' owners removed cash from the dealerships.  (Ex. D at 214:14-215:6; 260:21-261:9).  His opinions as to Voynow's violations of professional standards are predicated upon the Accrued Commission Schedule 31, yet not supported by the factual record. Sosnowski erroneously claims that references to control numbers PTSN0116, PTSN0216, Toy316 or Toy0416 on Schedule 31 are to employee names.  He cites to nothing to support this statement.  In reality, Voynow testified that Star Toyota and Star Nissan shared a Parts & Service departments, such that Nissan employees provided services to Toyota customers and vice versa.  These entries on Schedule 31 were how Karazoukis recorded monthly accruals as to commissions owed between Nissan and Toyota and reflected, for example, "Parts Nissan January 2016" or "Toyota March 2016."  Nothing in the record ever indicated that these references were to employee names.  Sosnowski's conclusions belie what is in the factual record – which is why he failed to cite to anything to support his statements. See *U.S. SBA v. Feinsod*, *supra*, 2025 U.S. Dist. LEXIS 113166 at *21-23 (expert's method is unreliable if he fails to draw his opinions form the actual facts in the case at hand); *Gyllenhammer*, *supra*, 2018 U.S.Dist. LEXIS 228437 at *20 (opinion founded upon findings unsupported by factual record fails to meet Rule 702's reliability standards); *Oleg Casini, Inc. v Electrolux Home Prods.*, 2014 U.S. Dist. LEXIS 52085 *22-25 (April 15, 2014) (precluding expert opinion where report did not contain references to sources and material relied upon nor did deposition disclose such information).

#### 4. Sosnowski's Opinions As To Voynow's Violation Of Accounting Standards Are Unreliable As He Lacks Any Consistent Position As To Voynow's Engagement.

Sosnowski's reports and testimony are replete with contradictions as to the scope of Voynow's engagement, revealing his lack of any clear understanding.  Without any such understanding, his opinions as to Voynow's purported violations of professional standards are plainly unreliable.  It is the very scope and nature of an accountant's engagement that dictates what professional standards apply.  Sosnowski's inconsistency and self-contradictions on this issue render his opinions unreliable and inadmissible.

For example, Sosnowski repeatedly stated that "there were no engagement letters" or that Voynow never documented the scope of its services in writing prior to the 2016 engagement letter.  (See Ex. A at p. 2; Ex. D at 51:20-52:3; 258:15) ("I reviewed all documents and I didn't see any engagement letters that were ever provided and I also spoke with Michael Koufakis and Jackie Cutillo who told me they did not exist.").  At the outset,

August 3, 2026
Page 16

_____

there was ample evidence of Voynow's engagement letters in this case, including the actual letters, the billing records and emails referencing them, meta data showing annual updates to the letters, and testimony explaining how they were prepared, why the format changed and how they were issued.  Sosnowski plainly chose to deliberately ignore all of this evidence.  (Ex. D at 52:8-14; 55:2-61:20).  He acknowledged testimony from Plaintiffs' owners who admitted to discarding documents received from Voynow at the end of each year, before begrudgingly admitting "it's possible" that Plaintiffs had received the letters. (Ex. D at 65:11-19). His blatant disregard of such evidence casts significant doubt as to his ability to opine regarding the scope of Voyow's engagement. See <u>United States v. Scop</u>, 846 F.2d 135, 142 (2d Cir. 1988), *modified on reh'g*, 856 F.2d 5 (2d Cir. 1988) (court may preclude an expert from testifying as to the credibility of evidence).

Yet, even more concerning is that Sosnowski did acknowledge that Michael Koufakis received the 2016 tax engagement letter, but never considered it when reaching his opinions.  Initially, he testified to having only seen "just some of it" before contradicting himself and stating that this 2016 engagement letter was never even provided to him as part of his review.  (Ex. D at 61:23-62:5; 62:25-63:5).  Why Sosnowski would not insist on reviewing an accountant's engagement letter received by a client, before rendering an expert opinion as to compliance with professional standards, is confounding and casts serious doubt as to his methodology when formulating his opinions.  Voynow's 2016 engagement letter explicitly identified the professional standards governing its engagement and made clear that its engagement could not be relied upon to detect theft or fraud and did not encompass any procedures designed to do so.  When asked if receipt of Voynow's engagement letter would change his opinions as to Voynow's compliance with professional standards, Sosnowski stated that it would:

> Q. … If a jury looks at all the same evidence and agrees with Voynow that these letters were issued. Does that change any of your opinions in this case?
> (Objection)
> A. Yes.
> Q. How so?
> A. If the engagement letter actually were issued, I would have to consider the language in those engagement letters. …..
> Q. The question was whether it would change your opinion and you said yes, and I asked you how so and that's when it broke.
> A. Yes. ***Well, I would have to read the engagement letter.  It may change but I can't tell you how it would.***

(Ex. D at 68:20-69:9; 76:19-24).  Thus, the fact that Sosnowski never read the 2016 engagement letter applicable to the 2016 tax year and was unable to opine as to whether professional standards were violated for the 2016 tax year, despite Koufakis' admission to having received it, renders his testimony and opinions unreliable.

Sonowski also contradicts himself as to whether Voynow was ever required to detect fraud.  His report states that "Star Auto did not release Voynow from liability for failure to detect fraud at anytime during the engagement period." (Ex. A at p. 17),  Yet, in his deposition, he testified that "I don't think it was my opinion they were required to detect fraud." (Ex. D at 79:2-10).  Indeed, he stated:

> Q. You see no evidence in any documents you reviewed to suggest that Voynow was ever requested or engaged to detect fraud, is that fair?

August 3, 2026
Page 17

_____

> A. Not that I recall.

(Ex. D at 79:25-80:7).

Sosnowski again contradicted himself as to whether Voynow was hired to provide internal audit services.  In his November 10, 2023 report, he stated: "As discussed in the Brisbane Report, Voynow performed consulting, review, *internal audit*, and controllership services during the engagement period." (Ex B at ¶9). Yet, in his deposition, he contradicted this statement.

> Q. Is it your opinion Voynow provided internal audit services?
> A. I don't know if I said that.
> Q. I'm asking you. Do you have that opinion?
> A. No.

(Ex. D at 107:17-22).  When asked about his opinion that Voynow purportedly supervised Plaintiffs' employees in light of 2016 engagement letter explicitly stating that its services were "not to be construed as an oversight function in any respect," Sosnowski simply responded that "I would need to give it more thought." (Ex. D at 77:21-78:18).

Similarly, Sosnowski contention that Voynow purportedly provided controllership services is contradicted by his own testimony. In fact, this Court already discredited Sosnowski's opinions on this issue, stating that "Voynow's only invoice that mentions "controllership" was specifically linked to training Cutillo, who had been promoted to office manager, a role which required her to perform the same controller functions Karazoukis had performed." (See ECF No. 128 at 22).  Sosnowski acknowledged that a controller would be expected to frequently access the Reynolds system and would be required to prepare monthly and annual financial statements. (Ex. D at 123:3-126:9; 95:10-14).  Voynow never did any of these tasks, and as this Court aptly noted, "an accountant cannot service a client in an ongoing controllership engagement while only having access to the client's records while on site a few times annually." (See ECF No. 128 at 26).  Sosnowski's contradictions undercut his opinions as to the scope of Voynow's engagement.

In short, Sosnowski's disregard of evidence in the record, his failure to insist on reviewing the 2016 engagement letter, and his testimony contradicting his reports as to Voynow's engagement reflect his confusion and lack of essential understanding.  Any opinions rendered as to purported violations of professional standards are therefore not predicated upon any reliable methodology and should be inadmissible.

### C.    Sosnowski's Opinions Are Supported By Only By Ipse Dixit And Not Adequate Facts.

When an expert's opinion is not support by adequate data, facts, methodology or analysis, to support the conclusions reached, Daubert and Rule 702 mandate exclusion of such unreliable opinion testimony. *Paquirigan v. Prompt Nursing Empl. Agency LLC*, 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y. Sept. 24, 2019). Nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.  *Nimely, supra*, 414 F.3d at 396.

_____

Sosnowski's reports and testimony are unreliable because he conspicuously failed to cite to any evidence in the record to support his analysis or methodology.[5]  Indeed, his reports do not cite to **any** deposition testimony, nor does he identify documents by date or bates number to support his analysis or methodology.  At his deposition, when asked to reveal the specific facts he relied upon for his conclusions, Sosnowski could not do so.  Repeatedly, he simply fell back on the verbatim response that "its in Appendix A." (See Ex. D at 111:16-112:12; 115:16-117:6; 120:4-14; 123:21-124:8; 154:18-155:12; 166:5-167:5; 194:10-197:13).  Appendix A is a listing of largely the entire universe of discovery produced by both parties along with all deposition transcripts.  Sosnowski's inability to connect his opinions with specific documents or specific testimony or even specific witnesses, and his repeated fallback to "Appendix A" as the source of his findings, demonstrates that there is "simply too great an analytical gap between the data and opinions proffered," rendering his opinions inadmissible as nothing more than ipse dixit. See _General Elect. Co. v. Joiner_, 522 U.S. 136, 146 (1997).

### VII.    Sosnowski's Opinions As To Causation Should Be Precluded Pursuant To FRE 702 and 403.

Sosnowski opines that Voynow's alleged violations of professional standards was the cause of Plaintiffs' alleged theft losses. (See Ex. A at 17, 18) ("Continuing economic losses would have been avoided if Voynow exercised a moderate level of professional skepticism which would have resulted in a more thorough inspection and analysis of Star Auto's financial accounts;" "Because of deficiencies in their accounting and tax services, Voynow failed to detect any of the fraud schemes that resulted in $4,528,600 in economic losses to Star Auto.").

#### A. Sosnowski's Opinions As To Causation Are Unreliable And Undercut By His Own Testimony.

Despite his opinions as to causation, Sosnowski acknowledged that Voynow could have only been able to detect any particular act of theft **after** it occurred.  (Ex. D at 48:4-9; 183:7-10).  However, he testified that not only were Plaintiffs' owners in position all along to actually **prevent** the theft, they had a duty to do so but failed in this duty.  He admitted that had they fulfilled their obligations, then none of the subsequent alleged thefts would have ever occurred.  Thus, Sosnowski's opinions as to causation against Voynow are squarely undercut by his testimony, rendering them unreliable.  See _Pennington v. D'Ippolito_, 425 F. Supp. 3d 222, 230-231 (S.D.N.Y. 2019) (rejecting plaintiffs' expert opinion and finding no causation as matter of law where "in other words, the damage was done before any failure by defendants to properly account for the transactions.")

Sosnowski testified that it was the responsibility of Plaintiffs' management to implement and adhere to internal controls. (Ex. D at 82:2-14).  Having designated check signers is an internal control intended to prevent theft by ensuring that only an appropriate level of management can approve expenditures by signing checks. (Ex. D at 129:11-19).  But in order for this control to be effective, the authorized check signer must ensure that the check signed is for a legitimate expense supported by a review of backup documentation before any check is signed. (Ex. D at 130:8-23; 131:14-23).  If a company owner approved a payment by signing a check, it would be reasonable for an accountant to believe it was for a legitimate business expense.  (Ex. D at 246:18-24).  Sosnowski testified that Plaintiffs' owners failed in their responsibilities as authorized check signers, and that

_____

[5] The lone exception is Sosnowski's opinions as to the alleged NMAC/AMEX scheme at pp. 12-15 of his September 15, 2023 Report. However, this alleged scheme relates to purported theft occurring in 2010 through 2014 – which has been dismissed pursuant to this Court's ruling as to the statute of limitations.  Sosnowski's opinions are inadmissible pursuant to this ruling and the law of the case.

_____

but for these failure, none of the subsequent alleged thefts at issue would have thereafter occurred.  He essentially testified that Plaintiffs' failures directly caused the economic losses at issue.

Specifically, Plaintiffs' owners were first presented with a fraudulent Staples invoice in 2001.  Sosnowski testified that he would have expected Plaintiffs' owners to investigate it at that time, and had they fulfilled their responsibilities as authorized check signers dating back to 2001, they would have terminated Carmen Jones' employment in 2001.  But for the failures of Plaintiffs' owners, Sosnowski stated that none of the subsequent Staples theft from 2001 through May of 2017 would have ever occurred.  (Ex. D at 132:12-133:12).  He further testified that if Plaintiffs' owners had fulfilled their obligations dating back to 2001 and appropriately reviewed backup for Staples purchases, then none of the other alleged subsequent schemes perpetrated by Jones would have ever occurred. (i.e., reverse deposit, NMAC/Amex scheme, vehicle scheme).  (Ex. D at 133:13-23).  Thus, according to Sownowski, it was Plaintiffs' failures in their role as check signers that caused the theft losses at issue.

Sosnowski made similar statements as to the check schemes involving Filardo and Karazoukis.  He testified that if Plaintiffs' owners had done their job as authorized check signers as they should have, and reviewed backup documentation for checks they signed payable to Capital One, M&T Bank or HSBC Bank, they would have realized that the disbursements were unrelated to dealership business and would have fired Karazoukis back in May of 2013.  (Ex. D at 133:24-134:22).  He testified that had Plaintiffs acted appropriately back in May of 2013, then none of the other subsequent fraudulent checks used to pay Karazoukis' personal creditors after May of 2013 would have occurred. (Ex. D at 134:14-135:7).  Similarly, if Plaintiffs had fulfilled their duties in 2013, Sosnowski testified then none of the alleged subsequent thefts attributed to Karazoukis would have ever occurred, (i.e. employee advance, cash via intercompany checks, vehicle schemes, falsified checks).  (Ex. D at 135:8-11).  Likewise, Sosnowski testified that Plaintiffs' authorized check signers failed in their responsibilities when they signed checks beginning in 2008 payable to Motor Sports Advertising (owned by Filardo) without any proof of receipt of advertising. (Ex. D at 135:12-21).  Had Plaintiffs appropriately required such proof before signing any check payable to Motor Sports, Sosnowski testified that Plaintiffs would have realized they were not receiving the advertising reflected in the invoice and would have terminated the relationship with Motor Sports as of November 2008.  Had they done what they should have, he testified that none of the subsequent advertising theft would have occurred, nor the alleged customer claim scheme involving Filardo.  (Ex. D at 135:22-136:23).  Sosnowski's testimony unequivocally points to Plaintiffs as the cause of the losses at issue.

Sosnowski also testified to other failures by Plaintiffs which caused the losses at issue, further discrediting his opinions against Voynow as to causation.  For example, in 2015 the IRS sent Plaintiffs' owner Michael Koufakis a letter advising that there was an issue regarding the 1099s submitted by Plaintiffs which included one for Motor Sports Advertising.  Sosnowski testified that Koufakis was obligated to follow up and investigate what the IRS had highlighted, but failed. (Ex. D at 172:13-173:6; 174:20-24).  Consequently, the advertising scheme continued.  Similarly, as to alleged thefts involving employee loans, Sosnowski testified that Plaintiffs failed in their responsibilities by never documenting any loan at issue, never setting terms for repayment, and not having procedures in place to actually track loan repayments.  (Ex D. 188: 6-189:10). In essence, a company is required to safeguard its assets and management is responsible for implementing and adhering to internal controls, irrespective of the role of any outside accountant.  (Ex. D at 81:3-7; 82:14).

August 3, 2026
Page 20

_____

Sosnowski's opinions in his report as to causation are inadmissible as they fail to even address Plaintiffs' obvious failures in directly causing the losses at issue.  He fails to explain how Plaintiffs' own actions caused the losses at issue and created an environment susceptible to theft.  "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Israel v. Springs Indus.*, 2006 U.S. Dist. LEXIS 80863 at *5 (E.D.N.Y. Nov. 3, 2006); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."); See *Hernandez v. Leichliter*, 2016 U.S. Dist. LEXIS 19728 at *2 (S.D.N.Y. Feb. 18, 2016) ("To the extent [the expert] merely repeats or recasts the testimony of Plaintiff in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion.").

### VIII.   <u>Sosnowski's Damage Opinions Are Not Admissible And Should Be Precluded</u>.

Sosnowski offers the damages opinion that "as a result of [Voynow's] failure to adhere to professional accounting standards, [Voynow] was unable to detect fraudulent schemes that resulted in $4,528,600 of economic loss to Star Auto." (Ex. A at p. 1; 18).  Sosnowski states in both reports that Plaintiffs' former employees "embezzled and misappropriated approximately $4,528,600 during the period of August 2002 through July 10, 2017." (Ex. A at p. 3, 17; Ex. B at ¶16) ("Voynow's violation and departure from accounting standards during the engagement period resulted in economic damages to Star Auto of $4,528,600…).  Sosnowski's reports and testimony as to any specific amount of damages should be precluded.

#### A.  Sosnowski Is Not Qualified To Render An Opinion As To Damages In This Case.

Sosnowski is not qualified to render any damages opinion as the amount of alleged theft.  He was never retained to conduct any forensic analysis of purported theft and did not do so.  (Ex. D at 19:1-4). His report does not contain any analysis of what evidence exists or does not exist to support any alleged act of theft. (Ex. D at 21:20-22:1).  During his deposition, Sosnowski disclosed that he relied upon findings by another professional and initially was unable to even recall his name.  (Ex. D at 27:25-28:10).  Eventually he stated that he relied upon documents prepared by Glen Rosen - whose report and findings were never produced in discovery, nor was Mr. Rosen ever disclosed as an expert in this case.  When asked what type of forensic analysis was done by Mr. Rosen that he relied upon, Sosnowski conceded that he "[doesn't] know what they did, either one of them really did." (Ex. D at 37:3-4).  Sosnowski also never met nor spoke to Mr. Rosen.  (Ex. D at 36:17-37:8). This Court should not allow an alleged expert to rely upon data, calculations and conclusions of undisclosed non-testifying experts who cannot be cross-examined regarding their data, methods or conclusions.  *Leese v. Lockheed Martin Corp.,* 6 F. Supp. 3d 546, 553 (D.NJ. 2014) (Holding that expert could not rely on estimations from an undisclosed non-testifying expert to form his opinions); *In Re: M/V MSC Flaminia,* 2017 U.S. Dist. LEXIS 119146, at * 229 (S.D.N.Y. July 28, 2017) (Excluding portions of a report that discussed calculations performed by undisclosed individuals in areas where the expert was not qualified to opine).

#### B.  Sosnowski Failed To Use Any Reliable Methodology To Compute Damages.

Sosnowski's conclusions as to theft damages are unreliable as they are not based upon ***any*** methodology or forensic analysis and are in total disregard of the investigative findings of the District Attorney as to actual

August 3, 2026

Page 21

_____

evidence indicative of theft.  Sosnowski's reports contain no analysis or computations to support any aspect of this $4.5 million figure.  This alone should raise the Court's suspicions about a lack of reliability.  *Mills v. Atrium Med. Corp*., 2023 U.S. Dist. LEXIS 526551 *5 (D.N.J. March 28, 2023) ("An expert's opinions must be based upon the methods and procedures of science, rather than on subjective belief or speculation.").

His reports reference unsupported ***totals*** of purported theft schemes, with no breakdown as to when any individual act of theft occurred or the amount of each individual alleged theft.  (Ex. D at 44:17-45:5; 45:19-46:6).[6]  Indeed, Sosnowski does not break down this $4.5 million figure by specific date, month or even years, and instead summarily references ranges of years.  For some schemes (alleged theft of cash using intercompany checks or using employee advances) he does not even identify the years when these alleged thefts purportedly occurred. (See Ex. A, pp. 9, 15; Ex. C, p. 16).  His report reflects no interview of witnesses, suspects, current or former employees, or persons who may have knowledge relating to any alleged act of theft.  (Ex. D at 20:21-21:14).  His  report does not contain any analysis of the evidence that exists to support any alleged act of theft. (Ex. D at 21:20-22:1).  He admittedly never traced any paper or digital trail within Plaintiffs' accounting records to investigate any alleged act of theft. (Ex. D at 20:16-21:14; 21:20-22:1).  He never reviewed or analyzed any data contained on backup tapes, nor reviewed bonus funds purportedly stolen that could be tracked through online portals set up with dealership manufacturers.  (Ex. D at 22:4-18).  He never analyzed the impact of documents Plaintiffs are missing or which were destroyed. [7]  (Ex. D at 22:19-23:13).  Sosnowski never communicated with any law enforcement personnel as to whether or not there was actual evidence of theft.  (Ex. D at 23:14-17).

Even where Sosnowki's report did reference a number claimed to be theft, this number is nowhere close to the amounts Sosnowski contends are the totals for any individual scheme.  For example, while opining that Karazoukis purportedly stole $590,481 through a personal creditor scheme, his report references only two "unusual entries" in the amount of  $3,500 and an alleged fictitious journal entry for a deposit of $26,000.  (Ex. A  at p. 9-10).  These amounts can in no way support an opinion for $590,481 in theft.  Likewise, he opined that there was allegedly $98,897 stolen by Theocharis through unpaid loans, but his report only referenced a single loan balance of $32,500 and he admitted that all but $7,000 of this amount was not repaid. (Ex. A at 10-11; Ex. D at 200:12-23).  Yet, he provided no explanation as to how he computed the remainder of the $98,897 figure. He did not even quantify the number of loans comprising this amount, nor state when these loans were issued, nor specify whether the loans were paid by cash or check. (Ex. D at 184:7-10; 185:12-186:9).  He conceded that no one could ascertain from his report what loans were allegedly made to Theocharis between 2010 to 2016.  *Id*. Similarly, for the purported reverse deposit scheme where a second deposit slip was purportedly created to reverse a prior one, Sosnowki's report stated that $127,297 was stolen (Ex. A at p. 15). Yet, at his deposition he

_____

[6] Specifically, Sosnowski opines that Filardo stole a *total* of $1.4 million through an advertising scheme between 2008 and 2016 and a *total* of $378,157 between 2014 through 2017 through a customer claim scheme.  See Ex. A, pp. 8, 12.  He states that Karazoukis stole a *total* of $590,481 between 2013 and 2016 by using signed checks to pay her personal debt and purportedly stole a *total* cash amount of $202,975 during *unspecified time periods* through an employee advance scheme.  He claims she also stole $1.249 million *total* in cash using intercompany checks during another *unspecified time frame*.  See Ex. A, pp. 9, 15; Ex. C, p. 16.  Sosnowski states that Theocharis stole a *total* of $98,897 in unpaid employee loans from 2010 through 2016.  See Ex. A at p. 10. He claims Carmen Jones stole a *total* of $68,852 from 2001 through 2017 using checks signed to pay Staples, and stole cash *totaling* $367,660 from 2010 through 2014 through a purported NMAC/AMEX scheme, and a *total* cash amount of $127,296 from 2013 through 2016 through a reverse deposit scheme. See Ex. A at pp. 8-15. Sosnowski states that employees stole through vehicle schemes whereby the full amount was allegedly not paid or a trade in was assigned a higher appraisal value. See Ex. A at p. 16.

[7] Plaintiffs typically stored paper copies of their accounting records in the basement but they experienced several significant floods whereby the basement had accumulated several feet of water destroying a substantial amount of records.  Plaintiffs also did not have a document scanning system in place and their owners admitted to discarding documents at the end of fiscal years.

August 3, 2026
Page 22

_____

acknowledged that there is only a single deposit ticket that he reviewed that showed a reversal of approximately $2,000 – making clear that there are no deposit tickets to support the remaining $125,000 of theft opined.  (Ex. D at 289: 20-291:22). See _Oleg Casini, Inc. v Electrolux Home Prods._, _supra_, (precluding expert opinion where report did not contain "actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure.").

Not only are Sosnowski's opinions as to damages unreliable because the math "simply doesn't add up," but he conspicuously fails to cite to evidence in the record to support the damage opinions proffered.  He failed to cite to any deposition testimony or any document by bates number to support his damage computations.  When asked for the basis of his damage computations, Sosnowski again responded that "its in Appendix A." (See  Ex. D at 111:16-112:12; 115:16-117:6; 120:4-14; 123:21-124:8; 154:18-155:12; 166:5-167:5). He admitted that he was unable to state whether Vivian Karazoukis stole $100,000 or $10, nor could he pinpoint any total alleged theft loss for any specific year over the course of a 17-year period.  (Ex. D at 45:6-22).  He conceded that if a jury was to determine that Voynow was only responsible for some alleged theft schemes, or only for some alleged dates of theft, that his report does not provide what the number would be, nor would it aid a juror or enable anyone else to figure it out.  (Ex. D at 48:12-49:9).  See _Gen. Elec. Co. v. Joiner_, 522 U.S. 136, 146 (1997) (a court may disqualify an expert if it determines that "there is simply too great an analytical gap between the data and the opinion proffered."); _Lava Trading, Inc. v. Hartford Fire Ins. Co._, _supra_, at *45-47 (_Daubert_ does not permit a purported expert witness to use his credentials to legitimize what amounts a client's wishes; finding that expert's methodology unreliable when he began with client's guesses and ultimately relied on them while avoiding any meaningful inquiry into whether they had a basis in fact).

Sosnowski's methodology as to his damage opinions are unreliable as he admittedly ignored critical findings and the criminal investigation by the District Attorney's office as to whether there was actual evidence of theft, as well as the outcome of those criminal proceedings.  He never communicated with any law enforcement personnel as to whether there was actual evidence of theft, and ignored communications to Plaintiffs from with law enforcement, explicitly stating there was a lack of proof of actual theft, despite being aware of them. (Ex. D at 23:14-17; 37:25-38:13; 31:22-32:14).  Sosnowski deemed the criminal investigation as to actual evidence of theft to be "not relevant."  (Ex. D at 41:21-42:12).

Sosnowski's methodology underlying his damage opinions reveals that he also failed to consider the impact of a double recovery.  (Ex D at 141:14-142:9).  For example, he was aware of evidence that Plaintiffs' owners were actually removing cash from deposits, but did not consider it when opining as to the alleged cash amount claimed to be theft.  (Ex. D at 138:17-20).  For vehicles released allegedly without full payment, Sosnowski admitted that it was possible that full payment was actually received, but removed by Plaintiffs' owners. (Ex. D at 277:15-278:9).  Such scenarios give rise to a double recovery.  Sosnowski also failed to consider offsets in connection with damages for the alleged advertising scheme.  Plaintiffs filed pleadings filed in another court case, swearing that they had actually received some of these advertising services and produced documents showing receipt of some services.  Sosnowski was aware of this evidence but failed to acknowledge it when opining as to damages. (See Ex. D at 156:21-161:4).  Similarly, Plaintiff Star Subaru was part of a co-op program whereby Subaru of America reimbursed it for $300,000 to offset the advertising procured by Plaintiffs. Sosnowski was aware of this reimbursement through the co-op program, but failed to offset these amounts when computing damages. (Ex. D at 161:5-163:8).  When confronted, Sosnowski then claimed that his damages opinion as to the advertising scheme now encompassed "a loss of future sales." (Ex. D at 161:20-162:18).  Yet, he  never undertook any analysis as to alleged loss of future sales or profits stemming from undelivered advertising, and his report is devoid of any data or study to support any loss of future sales through lack of advertising and is therefor unreliable.

August 3, 2026
Page 23

_____

In essence, this is not a scenarios where an expert used an unreliable methodology.  What is clear here, is that **Sosnowski used no methodology whatsoever**, let alone any methodology "reliably applied" to the facts of the case. See *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 792 (3d Cir. 2017).  He simply adopted the number Plaintiffs put in front of him, without performing any investigation, computation or detailed analysis as to whether there was actual acts of theft to support that amount.  Sosnowski's mere review of the universe of documents listed in Appendix A, without any forensic accounting analysis or computations to establish actual theft damages, is insufficient to constitute a reliable methodology under *Daubert*.  If it was, then all experts would pass the reliability test merely by reading case documents. See *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, *supra*, at *45-47 (precluding damage expert who sought to "use his credentials to legitimize what amounts to a client's wishes" where the expert's analysis avoided meaningful inquiry into whether they had a basis in fact; concluding that "there is simply no methodology to support his opinion as to damages."); *G.E. v. Joiner,* 522 U.S. 136, 146 (1977) ("nothing in either *Daubert* or the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (upholding district court's exclusion of expert who conducted no tests and used little if any methodology beyond his own belief).

### IX.    Sosnowski's Opinions Contrary To The Law Of The Case Should Be Precluded.

#### A. Sosnowski's Damage Opinion At Odds With The Law Of The Case Should Be Precluded.

Sosnowski's opinions as to the alleged $4.5 million in purported employee theft encompass the period of 2001 through 2017.  Since the issuance of his reports, this Court dismissed all claims relating to purported employee theft from the period of 2001 through 2014.  (See ECF Dkt. 128).  This ruling constitutes the law of the case. See *Bedrosian v. IRS*, 42 F.4th 174, 181 (3d Cir. 2022) (The law of the case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case.").  All opinions and testimony pertaining to alleged violations by Voynow arising from damages alleged to have occurred between 2001-2014, as well as damage claims tied to alleged theft schemes falling in this time frame (i.e., Ex. A at p. 12-16)) should be precluded.  These opinions and testimony would only confuse the jury and no longer meet the fit requirements of  FRE 702.

#### B. Sosnowski's Opinions As To Voynow's Fees Have Already Been Stricken.

Sosnowski offers the opinion that the fees charged by Voynow were "in excess of the customary fee charged for the preparation of corporate income tax returns." (Ex. A at p. 7, 18); ("Based on the …. amount of fees charged… there is no evidence to support a tax-only engagement."  He claims that the "customary fee charged for preparation of a corporate tax return in the New York City metropolitan area in 2015 was approximately $9,700" and then opines that because Voynow's average charge per dealership was $28,673 in 2015, it necessarily follows that Voynow provided "financial statement review and controllership and other consulting services in addition to tax return preparation." *Id*.  No data, study, or report is cited to support this statement.  Further, Sosnowski admitted that he did not offset the fees Voynow charged for services rendered to affiliated entities not party to this litigation, such as Fiat, Mitsubishi, the auto body shop or the various real estate companies, nor did he exclude Voynow's fees related to tax audits handled in 2015. (Ex. D at 148:16-151:22).

Plaintiffs cited to Sosnowski's opinion regarding Voynow's fees in its opposition to summary judgment. This Court appropriately rejected it and ruled it inadmissible pursuant to FRE 702, stating as follows:

August 3, 2026
Page 24

_____

> Sosnowski's testimony on the customary fee for a corporate tax return is cut from the whole cloth and wholly unsupported by any "facts or data" whatsoever, as Federal Rule of Evidence 702 requires for expert testimony, and it is therefore inadmissible.

See ECF Dkt. 128 at p. 19.

**X.      Conclusion**

For the forgoing reasons, Voynow requests leave to file its motion seeking to preclude the testimony and opinions of Sosnowski.

Thank you for your consideration of this matter.

Very truly yours,

Maureen P. Fitzgerald

MPF:ls
cc:      All counsel of record

LEGAL/139253376.v1