# AFFIDAVIT OF DOUGLAS P. SOSNOWSKI
## REBUTTAL TO DEFENDANTS' EXPERT REPORTS

Douglas P. Sosnowski, being duly sworn, states:

1. I am a partner with Brisbane Consulting Group, LLC.

2. I was retained by Milman Labuda Law Group, PLLC on November 1, 2022 as an expert in the areas of Economic Damages and Certified Public Accountancy.

3. My firm is being compensated at an hourly rate range of $210 to $410 for the preparation of this report. I am being paid an hourly rate of $410 for work on this report. My expected hourly rate for any trial work is $500.

4. On September 15, 2023, I issued a written report summarizing the methodologies and procedures applied in arriving at my conclusions (the "Brisbane Report") which is incorporated herein by reference.

5. Subsequent to September 15, 2023, I received a report prepared by Stephen J. Scherf, CPA/CFF, CFE which was issued at/around September 15, 2023 (the "Scherf Report") and a report prepared by Vincent P. Petruzziello which was issued at/around September 15, 2023 (The "Petruzziello Report").

6. My review and analysis of the Scherf Report and the Petruzziello Report is set forth herein.

7. I may acquire additional information and/or attain further insights that result in modification or supplementation of the opinions set forth in the Brisbane Report. I thus reserve the right to further supplement my report and to rely on or rebut additional documents, written opinions, or discovery or testimony that may come to my attention between now and the time of the trial in this

CONFIDENTIAL

case. Moreover, I may make additions, deletions, or modifications to the Brisbane Report and my opinions in the future that would be reflected in my testimony at the trial. I also reserve the right to rely on or rebut all other expert reports submitted in this case.

**REVIEW AND ANALYSIS OF SCHERF REPORT**

8.      Scherf does not accurately describe the scope of services performed for Star Auto[1] by Voynow, Bayard, Whyte and Company, LLP (the "Voynow" or the "Firm") during the 21-year engagement period. Factual inaccuracies include the statement that "it's [Voynow's] engagement...was limited to the preparation and filing of tax returns." [2] and "I note that Voynow was not engaged to perform a review."[3]

9.      As discussed in the Brisbane Report, Voynow performed consulting, review, internal audit and controllership services during the engagement period.

10.      Scherf's reliance on the mere existence of professional standards is misplaced because it does not constitute proof that Voynow actually adhered to those standards. A proper analysis would include knowledge of procedures actually performed by Voynow.  The statement that "Since Voynow is a member of the AICPA, they must comply with the standards" begs the question regarding Voynow's actual compliance with professional standards.[4] This presumption at the beginning of the Scherf analysis renders the entire report unreliable.

11.      Applicable professional standards discussed in the Scherf Report omit the AICPA Statement  on Standards for Consulting Services.

---

[1] Star Auto Sales of Bayside, Inc., Star Auto Sales of Queens, LLC, Star Hyundai, LLC, Star Nissan, Inc., Metro Chrysler Plymouth, Inc., and Star Auto Sales of Queens Village, LLC
[2] Scherf Report, Page 2
[3] Ibid.
[4] Scherf Report, Page 4

12.     Scherf relies on the erroneous assumption that "Voynow issued annual engagement letters."[5] As discussed in the Brisbane Report, the scope of accounting and tax work performed for Star Auto by Voynow was not defined in a written document prior to December 2016, after Star Auto notified Voynow of employee theft.  The only engagement letter produced by Voynow that Star Auto actually received was unsigned by Star Auto.

13.     The Scherf Report is replete with extreme exaggeration regarding his knowledge of the accounting profession.  For example, he states that "In my professional experience members of the accounting profession in the United States continuously ensure that they remain objective, discharge their service with integrity, assess the possibility of conflicts of interest, and are careful not to misrepresent facts or subordinate their judgement to others."[6] This is obviously false because of the number of accountants in the United States and the incontrovertible fact that malpractice does occur in the accounting profession (E.g. Enron/Arthur Andersen).

14.     Nonetheless, Scherf indicates that annual engagement letters were issued starting with the tax year ended December 31, 2008.[7] This is incorrect as no engagement letter was ever issued by Voynow to Star Auto. In addition, the Scherf Report does not address Voynow's failure to detect fraud between 1996 and 2007. Note the first fraud scheme used by Vivian Karouzakis commenced in 2003. Termination of Karouzakis at that time would have prevented this and at least three additional fraud schemes.

15.     Scherf relies on the erroneous assumption that "Voynow noted (in its alleged engagement letters) that it would inform the company of any material errors, fraud, or other illegal acts

---

[5] Scherf Report, Page 8
[6] Scherf Report, Page 4
[7] Scherf Report, Page 8

CONFIDENTIAL                                                                                                          3

that would come to their attention." [8] Because no engagement letters were sent to Star Auto, this information was never communicated to the owners. However, even if this information was actually communicated to Star Auto it would confirm that Voynow failed to exercise due professional care because multiple instances of fraud were present at Star Auto but not communicated to the owners.

16.    As discussed in the Brisbane Report, Star employees embezzled and misappropriated approximately $4,528,600 during the period from August 2001 through July 10, 2017 through various fraud schemes which would have been detected if Voynow personnel exercised a moderate level of professional skepticism.

17.    Scherf appears to have limited experience in the accounting and auditing profession. For example, he states that "In all of my professional experience, I have never heard of any accountant performing such an engagement (i.e. in between a review and audit)." [9] Based on my 34 years of public accounting experience, the most common type of service performed by certified public accountants for privately-held mid-sized businesses in the United States is a financial statement review with additional consulting services. [10]

18.    The inclusion of language from a "sample engagement letter" as support for Voynow's engagement is improper. [11] Scherf states that "The sample engagement agreement above, makes it clear that the work performed by Voynow was not an audit…." [12] This statement has no basis in reality for this engagement.

19.    Scherf is dismissive of services Voynow agreed to provide because they are "inconsistent

---

[8] Scherf Report, Page 10
[9] Scherf Report, Page 10
[10] See Rosenberg National Survey of CPA Firm Statistics 2020-2023
[11] Scherf Report, Page 10
[12] Ibid.

CONFIDENTIAL                                                                                    4

with the types of engagements accountants perform." [13] This statement is irrelevant and does not justify ignoring both the services Voynow agreed to perform and the services that Voynow actually performed. It appears that Scherf did not review all of Voynow's workpapers, emails, correspondence, bills and related work product because he does not understand all the services provided to Star Auto by Voynow.

20.    The extent of consulting , income tax and other accounting services performed by Voynow was evident through review of Voynow's workpapers including interim reports, timesheets and invoices prepared and issued by Voynow. Thus, Scherf's statement to the contrary is incorrect. [14] Voynow's scope of services actually performed included consulting services including journal entry review and review of bank reconciliations. Additionally, Voynow provided journal entries for Star Auto to record. Scherf erroneously states that these procedures were not performed. [15]

21.    Contrary to the statement in Scherf's report, Star Auto's previous accountants, Kera Weiner & Company used a checklist demonstrating the consulting services provided to Star Auto in addition to tax services. [16] This checklist was included in Star Auto's document production. [17]

22.    Scherf states that Voynow would prepare adjusting journal entries and review those entries with "management". [18] Scherf does not define "management" in his report and appears to group the owners with Vivian Karouzakis and Despina Theocharis (a/k/a Debbie Theocharis) as equal and/or one in the same. In fact, **Voynow never reviewed adjusting journal entries with owners** and only reviewed them with Vivian Karouzakis and Despina Theocharis, the same employees who committed the fraud. The inference that owners ignored issues is incorrect because the owners were never

---

[13] Scherf Report, Page 1
[14] Scherf Report, Page 11
[15] Scherf Report, Page 13
[16] Scherf Report, Page 11
[17] STAR00066598-STAR00066605
[18] Scherf Report, Page 12

CONFIDENTIAL                                                                                    5

informed.

23.    During the 21-year engagement period, the owners of the Star Auto dealerships made quarterly estimated tax payments to the Internal Revenue Service and New York State Department of Taxation and Finance using the "safe harbor" method of 110% of the previous year's tax. Therefore, contrary to the Scherf Report, it was **not** necessary to review financial information prior to year end to ensure proper estimated tax payment were prepared.[19] The memos to the client prepared by Voynow [20] did not discuss estimated taxable income or payment of quarterly tax payments.

24.    The professional malpractice of Voynow was due to its failure to discover the coverup of the various fraud schemes through its review of the Star Auto's financial schedules and follow-up inquiries. Voynow's inability to discover a fraud scheme through inspection of a legitimately signed check is not relevant.[21]

25.    No documents have been produced by Voynow to justify the workpaper notations that indicate an irregularity was "ok" pursuant to a statement by an employee.[22] Proper documentation would include the details of the discussion including the irregularity, the question asked and why the explanation was sufficient to justify foregoing further inquiry and investigation.

26.    Scherf excuses Voynow's failure to detect fraud because it would not have reviewed certain schedules for purposes of detecting fraud. [23] Scherf acknowledges that Voynow's workpapers confirm that the schedules that would have revealed the fraud were in fact reviewed.  When the schedules were viewed by Voynow, the obligation under professional standards is to make reasonable

[19] Scherf Report, Page 12
[20] Scherf Report, Page 13
[21] Scherf Report, Page 14
[22] Scherf Report, Page 15
[23] Scherf Report, Page 16

CONFIDENTIAL                                                                                           6

inquiries if the information furnished by the taxpayer appears to be incorrect incomplete or inconsistent. Under professional accounting standards, this obligation is not conditioned by how the information was obtained by the CPA. I disagree with Scherf's implication that fraud can be ignored because Voynow was not looking for it while reviewing Star Auto's schedules or other workpapers.

27. Voynow's standard practice was to perform professional accounting services to Star Auto without issuing an engagement letter. As noted in the Scherf report, Voynow provided assistance in 2017 to the new Controller, Jacqueline Cutillo. [24] This clearly represents Voynow providing consulting services which were not documented in an engagement letter. This example illustrates how Voynow continued to provide non-tax consulting services to Star Auto and invoiced for those services but failed to document those services in an engagement letter.

28. Scherf confirms that when Voynow "stumbled across" the alleged fraud after the fact, it should be reported to management. [25] However, when Voynow stumbled across the fraud it was not reported to management. If Voynow reported the fraud to management at any point during the 21-year engagement, it would have prevented future theft.

29. Scherf uses a logical fallacy to dismiss the employee theft at Star Auto. Scherf implies that there are no damages because "no one has admitted to any of the allege frauds/thefts and there have been no convictions." [26] The evidence supporting $4,528,600 of fraud were produced in connection with this matter and presumably reviewed by Scherf.

30. Similarly, the lack of claims under an employee theft policy does not prove the absence of fraud. The denial by Scherf of the very existence of fraud, with the benefit of 20/20 hindsight, demonstrates Scherf's lack of professional competence and credibility. Scherf does not appear to be an

---

[24] Ibid.
[25] Scherf Report, Page 19
[26] Ibid.

CONFIDENTIAL                                                                                                7

expert in risk management or insurance. Accordingly, his opinions in this regard are outside his area of expertise.

31.     Scherf fails to acknowledge that the oversight function provided by Voynow to Star Auto would hold them to a higher standard. Voynow provided controllership services and review and assessment of internal control systems.

32.     Scherf's discussion about the accounting services other firms provided to Star Auto after Voynow was terminated (i.e. Rosenfield & Co.) has no relevance to this matter. [27]

33.     As set forth herein, the conclusions expressed in the Scherf Report are wholly unreliable because no foundation was established.

34.     The conclusions expressed in the Scherf Report are wholly unreliable because of the multiple misstatement of facts and/or its failure to consider the facts.

35.     The conclusions expressed in the Scherf Report are wholly unreliable because of the logical fallacies that serve to mislead rather than to assist the trier of fact to understand the professional accounting services performed for Star Auto by Voynow.

**REVIEW AND ANALYSIS OF PETRUZZIELLO REPORT**

36.     The stated scope of the Petruzziello Report is to "offer an opinion regarding the policies and procedures in place at the [Plaintiff's] dealerships." [28] However, there is no indication that he visited the dealerships or interviewed ownership either now or during the time of the fraudulent activity. Accordingly, he has insufficient basis for opining on this issue.

37.     The Petruzziello Report appears irrelevant because Petruzziello is opining on the policies

---

[27] Rosenfield000001-Rosenfield000572
[28] Petruzziello Report, Page 1

CONFIDENTIAL                                                                                                   8

and procedures of the Plaintiff. However, the relevant analysis is the policies and procedures of the Defendant which is the subject of the professional malpractice claims.

38.     At no time does the Petruzziello Report indicate that Voynow was competent or delivered adequate accounting, consulting, or income tax services. The Petruzziello Report does not acknowledge that Voynow is a CPA firm and its owners are Certified Public Accountants.

39.     The author of the Petruzziello Report is not a certified public accountant and does not appear qualified to opine on the adequacy of Voynow's procedures. Accordingly, it is not surprising that this analysis is omitted from the Petruzziello Report.  Mr. Petruzziello is also not an attorney and therefore his legal conclusions are irrelevant. For example, multiple statements that the "Plaintiffs cannot prove actual theft" are outside his area of expertise. Petruzziello's actual area of expertise is unclear.

40.     Petruzziello is not employed by the National Automobile Dealers Association (NADA) or the New York State Automotive Dealers Association (NYSADA) and has not been designated as a representative of either organization. In addition, neither organization is affiliated with the AICPA and have no authority with respect to accounting industry standards.

41.     The implication that Voynow cannot be guilty of malpractice because the Plaintiff cannot prove actual theft is a logical fallacy.

42.     The Petruzziello Report appears to be an indictment of Voynow stating that the methods used by the Star Auto Group employees to allegedly defraud the dealerships are not original or unique and are common in many businesses. [29] If true, this fact supports the conclusion that Voynow committed professional malpractice by not detecting the fraud and not advising the owners of internal

---

[29] Petruzziello Report, Page 3

CONFIDENTIAL                                                                                                    9

control weaknesses.

43.     The fact that Voynow performed management functions is supported in the Petruzziello Report which acknowledges that the owners relied on Voynow to supervise [the] controller, Vivian Karouzakis. [30]

44.     Voynow did not issue engagement letters at any time during the 21-year engagement period. Accordingly, the statement in the Petruzziello Report indicating that "Voynow's engagement letters reflect that it was not specifically engaged for the purposes of detecting fraud" is obviously false.[31]

45.     The statement that "Voynow was never engaged to perform the type of forensic accounting or level of service needed to uncover fraud" appears to contradict the previous statement that the fraud schemes were not "unique" or "original" and in fact are "common in many businesses." [32]

46.     Voynow's workpapers confirm that they had access to all the information needed to discover fraud and actually obtained and analyzed the information. The Petruzziello Report's statement that "The scope of the Voynow engagement would not have given Voynow the type of access and/or information necessary to discover the fraud within the Star Auto Group" is patently false. [33]

47.     The Douglas Filardo customer claim scheme should have been identified by Voynow when a Star Auto employee, Gladys, informed Voynow that some new car deals (customer CODs) were incorrectly treated as a service and parts receivable.  In addition, Voynow's procedures included review

---

[30] Petruzziello Report, Page 10
[31] Petruzziello Report, Page 21
[32] Ibid.
[33] Ibid.

CONFIDENTIAL                                                                          10

of the Service and Parts Receivables schedule during every interim visit . As noted in the Petruzziello

Report, a review of this schedule would have resulted in the investigation of the aged account and large

dollar amount would have resulted in the discovery of the fraud. [34]

48.     The Douglas Filardo Motorsports advertising scheme involved payments to a fictitious

vendor. Although Voynow inspected the 1099 list each year, they failed to identify a large vendor

(Motorsports Advertising) that was not issued a Form 1099 at any time from 2008 through 2015.

49.     The Petruzziello Report notes that every check written to Motorsports was signed by an

authorized check signer. However, Voynow's violation of professional accounting standards occurred at

the 1099 review stage and not the check signing part of the fraudulent transaction.

50.     Motorsports Advertising hired New Vision Advertising who only made sample mailers

and never actually mailed any direct mail pieces for Star Auto. Filardo's payments to New Vision

Advertising does not mitigate the theft. Filardo's use of stolen money is irrelevant.

51.     The Carmen Jones Staples scheme should have been identified by Voynow during its

review of the Accounts Payable schedule. The Petruzziello Report notes that gift card purchases may

have company business-related purposes. However, Voynow's violation of professional accounting

standards occurred when they did not inquire about the existence of two separate Staples vendors in

the Reynolds & Reynolds accounting application. The only gift cards Star Auto ever purchased were the

gift cards Carmen Jones purchased without authorization.  The fact that this occurs at other companies

is irrelevant.

52.     The Carmen Jones NMAC AMEX scheme should have been discovered by Voynow in its

review of the credit card receivables schedule and subsequent investigation of fictitious general journal

---

[34] Petruzziello Report, Page 12.

CONFIDENTIAL                                                                                                    11

entries.  The Petruzziello Report notes a lack of internal controls over the petty cash fund which has no

connection to this scheme. Voynow's violation of professional accounting standards occurred when they

did not investigate the cover up of the theft.

53.    The Carmen Jones Reverse deposits scheme should have been detected by Voynow

during its review of bank reconciliations and credit card receivable schedules. The Petruzziello Report

notes the lack of evidence to support the theft.  However, Voynow's violation of professional accounting

standards occurred when they did not investigate the cover up of the theft.

54.    The Carmen Jones Highlander scheme was discovered and investigated by Michael

Koufakis. Although a payment was ultimately paid on May 19, 2017, the fraud actually occurred in 2016

and was not discovered by Voynow.

55.    The Despina Theocharis loan scheme should have been detected by Voynow during its

review of the employee advance schedule. Voynow would have known that Star Auto's standard

procedure was  for employee loans to be repaid through payroll deductions. Voynow's violation of

professional accounting standards occurred when they did not investigate the aged employee advance

with no repayment schedule. In addition, Voynow's inspection of monthly bank reconciliations would

have revealed that the fictitious deposit recorded through an adjusting journal entry did not appear on

the bank statement indicating that the funds were not actually received.

56.    The Despina Theocharis vehicles scheme is supported by entries in the Reynolds &

Reynolds accounting application. The Petruzziello Report notes the lack of deal jackets. However,

inspection of deal jackets is not required to uncover or quantify the fraud.

57.    The Tundra and Avalon scheme was brought to the attention of Randy Franzen, CPA on

CONFIDENTIAL                                                                                                  12

December 16, 2016. [35] The Petruzziello Report again notes the lack of deal jackets. However, inspection of deal jackets is not required to uncover or quantify the fraud. Voynow's violation of professional accounting standards occurred when they did not investigate the alleged fraud which would have been discovered through the review of the We-Owe schedule and/or the customer deposit schedule.

58. The Vivian Karouzakis employee advance scheme would have been discovered through the monthly bank statements, as noted in the Petruzziello Report, which Voynow also reviewed. [36] In addition, Voynow's review of the rebate & incentive schedule should have revealed the scheme. The fact the checks were signed by authorized check signers is irrelevant. Voynow's violation of professional accounting standards occurred when they did not investigate the cover up of the theft.

59. The Vivian Karouzakis employee advance scheme should have been discovered by Voynow during its review of the employee advance schedule. Petruzziello's Report incorrectly states that checks were involved in this scheme. Voynow's violation of professional accounting standards occurred when they did not investigate the cover up of the theft.

60. The Vivian Karouzakis personal creditors scheme would have been discovered through the monthly bank statements, as noted in the Petruzziello Report, which Voynow also reviewed. [37] In addition, Voynow's review of the rebate & incentive schedule should have revealed the scheme. The fact the checks were signed by authorized check signers is irrelevant. Voynow's violation of professional accounting standards occurred when they did not investigate the cover up of the theft.

61. The Vivian Karouzakis drawing falsified checks (PTSN/TOY) and cash withdrawal scheme should have been discovered by Voynow during its review of intercompany receivables and commission schedules. Although the existence of intercompany checks is not an indication of fraud, an imbalance in

---

[35] STAR00015994.
[36] Petruzziello Report, Page 19
[37] Ibid.

CONFIDENTIAL                                                                                              13

the related party accounts receivable/accounts payable accounts is obviously incorrect. Voynow's violation of professional accounting standards occurred when they did not investigate the imbalance.

62.    The Vitaliano/Vivian Avalon scheme involves an unpaid deposit of $20,000. The Petruzziello Report notes that "Ms. Vitaliano maintains that she paid in full for the car." [38] However, the alleged payment was in the form of cash given to Vivian Karouzakis.  The theft occurred when the funds received by Karouzakis were not subsequently deposited into the bank account of Star Auto and Voynow should have uncovered this scheme when reviewing the customer deposit schedule.

63.    The Petruzziello Report is contradictory by claiming that Star Auto failed to prevent and detect fraud while also claiming that the fraudulent schemes did not occur.[39]

64.    The conclusions in the Petruzziello Report are not supported by the body of the report. The inaccurate statement in the conclusion section that "Voynow's services to the Star Group were primarily for a tax engagement" represents the first time this issue is mentioned in the Petruzziello Report.[40]

65.    The conclusions expressed in the Petruzziello Report are wholly unreliable because of the multiple factual inaccuracies.

**SUMMARY OF RESULTS**

66.    Based on my review of the Scherf Report and the Petruzziello Report and subsequent analysis, my expert opinions remain as follows:

> I.    Voynow provided accounting, consulting and tax services for Star Auto. Voynow also performed procedures consistent with a financial statement review but without issuing an accountant's report.

---

[38] Petruzziello Report, Page 20
[39] Petruzziello Report, Pages 10-11
[40] Petruzziello Report, Page 22

CONFIDENTIAL                                                                                            14

II.   Voynow violated the accounting profession's technical standards and failed to discharge its professional responsibilities with competence.

III.   Voynow failed to ensure that accounting and tax services provided to Star Auto were competently delivered and adequately supervised.

IV.   As a result of its failure to adhere to professional accounting standards, Voynow was unable to detect fraudulent schemes that resulted in $4,528,600 of economic losses to Star Auto.

67.   I declare under penalty of perjury that the foregoing is true and correct.

Dated:   November 10, 2023

_____
Douglas P. Sosnowski, CPA/ABV, ASA, CFF

CONFIDENTIAL