**Supplemental Expert Report Re:**

**Star Auto Sales of Bayside, Inc., et al.**

**v.**

**Voynow, Bayard, Whyte and Company, LLP, et al.**



**CONFIDENTIAL**

**Supplemental Expert Report Re:**

**Star Auto Sales of Bayside, Inc., et al.**

**v.**

**Voynow, Bayard, Whyte and Company, LLP, et al.**


**Table of Contents**

| Section | Description | Page |
|---|---|---|
| I. | Expert Opinions | 1 |
| II. | Summary of Relevant Facts | 2-3 |
| III. | Professional Standards | 3-4 |
| | AICPA Code of Professional Conduct | 3 |
| | AICPA Statements on Standards for Tax Services | 3 |
| | Code of Federal Regulations / IRS Code of 1986 | 3-4 |
| | AICPA Statement on Standards for Consulting Services | 4 |
| | AICPA Statement on Standards for Accounting and Review Services | 4 |
| IV. | Scope of Services | 5-7 |
| | Description of Services | 5 |
| | Voynow's Automobile Dealership Industry Experience | 5 |
| | Accounting Software | 6 |
| | Voynow's Review/Controllership Functions at Star Auto | 6-7 |
| | Internal Controls | 7 |
| | Professional Fees | 7 |

**CONFIDENTIAL**

**V.  Summary of Fraud Schemes** ...................................................................................... 8-17

    A.  Motorsports Advertising Scheme ....................................................................... 8-9

    B.  Payment of Personal Creditors Scheme ............................................................. 9-10

    C.  Loan Payments Not Repaid Scheme .................................................................. 10-11

    D.  Staples Scheme.................................................................................................11

    E.  Customer Claim Scheme ...................................................................................12

    F.  NMAC AMEX Scheme  ...................................................................................... 12--15

    G.  Reverse Deposit Scheme  .................................................................................15

    H.  Employee Advance Scheme ............................................................................. 15-16

    I.  Drawing Falsified Checks (PTSN/TOY) and Cash Withdrawal Scheme ..................... 16-17

    J.  Vehicle Schemes .............................................................................................. 17-18

        Carmen Jones Highlander Scheme ...................................................................... 17-18

        Ange Raptis Highlander Scheme  ........................................................................ 17-18

        Tundra and Avalon Scheme ................................................................................ 17-18

        Vitaliano/Vivian Stolen Avalon Scheme.............................................................. 17-18

        Theocharis Vehicles Scheme ............................................................................. 17-18

**VI. Summary of Results** ................................................................................................ 17-18

    Damages .........................................................................................................18

    Analysis and Conclusion  ................................................................................... 18-19

**APPENDIX A: Primary Sources of Information and Additional Documents Provided by Counsel (See Attached Spreadsheet)**

**APPENDIX B: Statement of Qualifications**

**APPENDIX C: Statement of Professional Fees**

**CONFIDENTIAL**

November 20, 2023

Jospeh M. Labuda, Esq.
Milman Labuda Law Group, PLLC
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042

      **Re:  Star Auto Sales of Bayside, Inc. et al. v. Voynow, Bayard,**
          **Whyte and Company, LLP, et al.**
        **Case No.: 1-18-cv-5775 (ERK)  (TAM)**
        **Our File No.: A0-991291**

Dear Mr. Labuda:

Pursuant to your request, we reviewed various documents describing the professional accounting and tax services provided by Voynow, Bayard, Whyte and Company, LLC ("Voynow" or the "Firm") to Star Auto Sales of Bayside, Inc. and affiliated companies ("Star Auto" or the "Dealership") in order to evaluate the scope of work performed by Voynow for Star Auto and if the quality of work was performed in accordance with professional standards and if the level of due care was consistent with the level of care that would have been exercised by a reasonable person under the same circumstances.

## I.  EXPERT OPINIONS

Based on the facts and procedures outlined in this report, the following represent the expert opinions of the undersigned:

1.  The Firm provided accounting, consulting and tax services for Star Auto. The Firm also performed procedures consistent with a financial statement review but without issuing an accountant's report.

2.  The Firm violated the accounting profession's technical standards and failed to discharge its professional responsibilities with competence.

3.  The Firm failed to ensure that accounting and tax services provided to Star Auto were competently delivered and adequately supervised.

4.  As a result of its failure to adhere to professional accounting standards, the Firm was unable to detect fraudulent schemes that resulted in $4,528,600 of economic losses to Star Auto.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 2

## II.    SUMMARY OF RELEVANT FACTS

1.  Voynow Bayard Whyte and Company, LLP Certified Public Accountants is a public accounting firm that can trace its origins back to 1954.

2.  Voynow Bayard Whyte and Company, LLP is a member of the American Institute of Certified Public Accountants (AICPA) and ascribes to the Peer Review Program of the AICPA.

3.  During the relevant time period, automobile dealerships represented the largest industry serviced by Voynow Bayard Whyte and Company, LLP and accounted for an estimated 60% to 70% of its clients.

4.  In the latter half of 1996, Voynow Bayard Whyte and Company became the accountant of record for Star Auto.

5.  Tax services provided by Voynow to Star Auto included the preparation of corporate income tax returns for Star Chrysler, Star Nissan, Star Toyota, Star Mitsubishi, Star Hyundai and Star Subaru. Voynow also prepared returns of partnership income for Star Auto Body and related-party real estate holding companies.

6.  Non-tax accounting services provided to Star Auto on an interim/quarterly basis were described as "more than review, but not quite fully audited."

7.  On an interim/quarterly basis, Voynow made periodic visits to Star Auto during which time it provided review and controllership services including inspection of Star Auto's financial schedules, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing basis.

8.  Voynow continued to perform these professional accounting and tax services for Star Auto through November 3, 2017.

9.  During the 21-year engagement period, Star Auto did not have any certified public accountants on their payroll, a fact known by Voynow.

10. Voynow did not describe in writing the proposed scope of services, including terms of Voynow's engagement to provide professional accounting and tax services to Star Auto until December 2016 after Star Auto notified Voynow of the theft by Vivian Karouzakis. Star Auto did not agree with the proposed scope of services and did not signed the December 2016 engagement letter.

11. Fees paid by Star Auto to Voynow totaled $1,561,300 during the engagement period.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 3

12. Several accounting employees of Star Auto, including Vivian Karouzakis, Despina Theocharis, Carmen Jones, and a sales manager, Douglas Filardo, engaged in improper conduct during their employment with Star Auto. These employees embezzled and misappropriated approximately $4,528,600 during the period from August 2001 through July 10, 2017.

13. Voynow failed to discover the employee theft which occurred over a 16-year period and resulted in economic losses to Star Auto.

## III. PROFESSIONAL STANDARDS

### AICPA Code of Professional Conduct

The American Institute of Certified Public Accountants adopted the AICPA Code of Professional Conduct on January 12, 1988. The AICPA Code of Professional Conduct is applicable for all members in public practice and includes guidance and rules for the performance of professional accounting services.

In discharging their professional responsibilities, certified public accountants are expected to adhere to the principles of *Integrity*, *Objectivity and Independence*, *Due care*, and *Scope and nature of services*.

### AICPA Statements on Standards for Tax Services

The AICPA issued its Statements on Standards for Tax Services in August 2000 (the "Statements"). The Statements apply to all certified public accountants providing tax services.

When preparing or signing an income tax return, a certified public accountant should make reasonable inquiries if the information furnished by the taxpayer appears to be incorrect, incomplete or inconsistent.

### Code of Federal Regulations for Tax Services

The Internal Revenue Code of 1986 (IRC) is codified in the Code of Federal Regulations (CFR), Title 26. Rules and regulations regarding money and finance are contained in CFR Title 31. According to *Standards with respect to tax returns and documents, affidavits and other papers,* a tax practitioner generally may rely without verification upon information furnished by the client.[1] However, a tax practitioner cannot ignore the implications of information furnished to

---

[1] 31 CFR §10.34 (d)

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 4

him or her. If any information furnished, or otherwise known, appears to be incorrect, incomplete or inconsistent, the tax practitioner must make reasonable inquiries.[2]

### AICPA Statement on Standards for Consulting Services

The AICPA issued its Statements on Standards for Consulting Services which is effective for engagements accepted on or after January 1, 1992 (the "Consulting Standards"). The Consulting Standards apply to all members of the AICPA holding out as a CPA while providing consulting services.

All CPA practitioners engaged in the performance of a consulting service are subject to the standards of *professional competence*, *due professional care*, *adequate planning and supervision* and *obtaining sufficient relevant data*.

Regular services performed by Voynow during the engagement period included review and controllership services including inspection of Star Auto's financial schedules, assessment and analysis of internal controls, inquires of accounting and operational personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and issuance of written reports to Star Auto. By definition, the activities performed by Voynow constitute consulting services.

### AICPA Statement on Standards for Accounting and Review Services

Through its Accounting and Review Services Committee, the AICPA first issued its Statement on Standards for Accounting and Review Services (SSARS) in December 1978. Since then, the SSARS have been revised several times including November 1992 and November 2002 and most recently in December 2014.

In accordance with SSARS, an accountant should issue a report that is appropriate for the highest level of service rendered. A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. A review does not provide assurance that the accountant will become aware of all significant matters. However, if the accountant becomes aware that information coming to his attention is incorrect, incomplete, or otherwise unsatisfactory, he should perform additional procedures deemed necessary.

---

[2] Ibid.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 5

IV.    SCOPE OF SERVICES

The AICPA requires a signed engagement agreement for review services. Additionally, the AICPA recommends a signed engagement agreement for tax services and consulting/controllership services provided by a CPA firm to a client.

Despite the obligation to obtain a signed engagement agreement for its review services and the recommendation to obtain signed engagement agreements for its tax services and consulting/controllership services, the scope of accounting and tax work performed for Star Auto by Voynow was not defined in a written document prior to December 2016.[3] During the engagement period, Star Auto perceived the scope of services based on verbal representations from Voynow and through observation of services actually performed by Voynow and interim reports issued to Star Auto by Voynow. The reasonable expectation of Star Auto was that Voynow was its accountant of record from 1996 through 2017 during which time Voynow performed a review and oversight function and assessed and analyzed the internal control systems of Star Auto on an ongoing, continuous basis that continued until Star Auto terminated the relationship in 2017. Voynow's review and consulting services were continuous in nature and were not segmented by year or project as evinced by the lack of a written accountant's report as required by AICPA standards.

It is common practice for accounting firms to receive a signed contract which includes a clause that limits the firm's liability for matters beyond the scope of services. However, Voynow did not attempt to limit their scope of services or their liability for negligence or failure to detect fraud at any time prior to December 2016.

***Voynow's Automobile Dealership Industry Experience***

Automobile dealerships are an industry specialty of Voynow. With over 60% of clients in the industry, Voynow has special knowledge of the automotive industry and should have been aware of incentives offered by Toyota, Nissan and other manufacturers. In addition, they would have knowledge of gross margins on sales of new cars and repairs.[4] Many of the fraud schemes were concealed through transactions in service and parts, sales and through dealer incentives received from the manufacturers.

---

[3] The only engagement letter produced by Voynow was unsigned by Star Auto.
[4] Used car sales can vary between dealerships based on the types of trade-ins at each location.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 6

### *Accounting Software*

At all relevant times, Reynolds & Reynolds was a leading provider of software to the automobile dealership industry. Computer applications include customer relationship management, retail sales, and accounting software. When Voynow was initially retained by Star Auto, the Dealership used the Reynolds & Reynolds accounting application for transaction recording and general ledger functions. The owners of Star Auto prioritized hiring an accounting firm that had experience with the Reynolds & Reynolds system. In fact, Voynow was initially recommended to the Dealership by Star Auto's sales representative from Reynolds & Reynolds. According to the sales representative, Voynow's partners and staff were experts with Reynolds & Reynolds.

Reynolds & Reynolds has no connection to, nor is it used in any manner for the preparation of income tax returns accept to generate a trial balance which summarizes assets, liabilities income and expenses. A tax preparer does not require access to the accounting system.

Despite their proficiency with Reynolds & Reynolds, Voynow failed to detect multiple abnormalities in the books and records of Star Auto which occurred over many years. Further investigation of these abnormalities by Voynow likely would have resulted in the detection of the employee theft.

### *Voynow's Review/Controllership Functions at Star Auto*

A controller is typically the department head of a company's accounting department. The controller has primary responsibility for internal controls, transaction reporting, and financial statement preparation. According to the AICPA, controller-type activities performed by a CPA involve management responsibilities. On their invoices for services rendered, Voynow indicated the performance of various controllership functions. This fundamentally changed the relationship between the Dealership and Voynow. The owners of the Dealership had a reasonable expectation that Voynow would oversee transaction reporting and internal controls. The employee theft likely would have been prevented through proper internal controls. In addition, the employee theft likely would have been discovered through proper oversight of accounting personnel and transaction reporting.

A CPA who performs review or controllership functions has a greater responsibility for the accuracy of the financial information than a CPA retained merely to prepare income tax returns. For a tax-only engagement, unless the CPA receives information that appears to be incorrect, incomplete or inconsistent, the CPA generally would not be responsible for detecting fraud because they would accept the company's financial information, as presented in the trial balance. Nevertheless, a tax preparer must make reasonable inquiries if the information furnished by the taxpayer appears to be incorrect, incomplete or inconsistent.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 7

According to former Star Auto employee Despina "Debbie" Theocharis, Voynow would close the books for Star Auto and oversaw the accounting in the office. In addition, Voynow would review various schedules during their interim visits. These activities constitute controllership functions and would not be performed on a tax-only engagement.

Voynow appeared to have substantial input into the amounts included in the final trial balances of the Star Auto dealerships. For example, for the year ended December 31, 2014 a general journal entry was made in the amount of $283,985.56. The entry reduced inventory and net income. Supporting documentation for the general journal entry was contained in the Voynow workpaper file demonstrating substantial input by Voynow. This level of review and analysis would not be required for a tax-only engagement. Reviewing year-end general journal entries is a controllership function.

### Internal Controls

Proper internal controls are necessary to reduce the risk of fraud. Although Star Auto had established internal controls, Voynow was aware that the Dealership did not employ any certified public accountants. Voynow also knew that the Dealership maintained a significant level of cash at its multiple facilities. Some of the most important internal controls involve effective safeguarding of cash. Voynow knew or should have known that internal controls for safeguarding cash at Star Auto were inadequate. In connection with its controllership/consulting services, Voynow should have created policies to ensure cash was adequately safeguarded.

### Professional Fees

During the engagement period, Voynow invoiced and collected approximately $1,561,300 of fees for professional accounting services rendered to the five (5) main Star Auto dealerships (Star Toyota, Star Nissan, Star Chrysler, Star Subaru, and Star Hyundai). The amount charged is in excess of the customary fee charged for the preparation of corporate income tax returns. For example, in 2015, the five (5) main Star Auto dealerships paid Voynow approximately $143,365, an average of $28,673 per dealership while the customary fee charged for preparation of a corporate tax return in the New York City metropolitan area in 2015 was approximately $9,700. The professional fees Star Auto paid Voynow were well in excess of the customary fees charged for the preparation of corporate income tax returns and were in line with the customary fee for providing financial statement review and controllership and other consulting services in addition to tax return preparation.

CONFIDENTIAL

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 8

## V.  SUMMARY OF FRAUD SCHEMES

**A.  MOTORSPORTS ADVERTISING SCHEME -** Douglas Filardo ("Filardo") embezzled $1,419,874.83 from Star Subaru through payments to a fictitious vendor for advertising work that was never performed. This fraud scheme occurred from November 25, 2008 to November 1, 2016.

1) **FACTUAL SUMMARY:** Filardo was a sales manager at Star Subaru and  responsible for advertising. This fraud scheme involved Filardo forming a fictitious vendor, Subaru Motorsports DBA Motorsports Advertising which was his sole proprietorship. From November 25, 2008 through November 1, 2016, Star Auto believed they were receiving advertising services from Motorsports Advertising. However, Motorsports Advertising provided no advertising or other services despite payments from Star Auto totaling $1,419,874.83. Filardo listed Motorsports Advertising as a vendor in Reynolds & Reynolds and used the Florida address and Taxpayer Identification Number ("TIN") of another company involved in the scheme. During Filardo's employment, Motorsports Advertising was excluded from Star Auto's Form 1096 and Copy A of Form 1099 was not transmitted to the IRS, as required.

2) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

   a) **Review of 1099s**: According to invoice descriptions, Voynow prepared Star Subaru's income tax returns and inspected the list of 1099s issued to vendors each year. In accordance with IRS regulations, the issuance of a 1099 is required for non-corporation taxpayers who receive at least $600 in a fiscal year. The Reynolds & Reynolds accounting application generates a list of all vendors paid at least $600 during the year to aid in 1099 reporting.

   Payments made to Motorsports Advertising exceeded $600 in 8 years during the engagement period.[5] Despite their inspection of the 1099 list, Voynow did not notify Star Subaru of the omission of a 1099 for Subaru Motorsports DBA Motorsports Advertising.

   The fraud scheme was ultimately discovered when a 1099 was issued to Motorsports Advertising in 2017. Voynow should have identified that a large vendor (Motorsports Advertising) was not issued a Form 1099. The issuance of a Form 1099 for each tax year from 2008 through 2015 would have resulted in the

---

[5] Average annual payments were in excess of $175,000.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 9

generation of an IRS letter much sooner - notifying Star Auto that the TIN did not match the vendor name - triggering an investigation.

b) ***Accounts Payable Invoices, Schedule 18***: The accounts payable invoices schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 18." Accounts payable entries in unusually round amounts, as occurred here, are considered unusual. It is very common for fraud schemes to involve payments to a fictitious vendor such as Motorsports Advertising and should have been discovered by Voynow.

**B. PAYMENT OF PERSONAL CREDITORS SCHEME -** Vivian Karouzakis ("Karouzakis"), an Office Manager for Star Auto, embezzled $590,481.56 from Star Auto: Star Nissan -$517,033.86, Star Toyota of Bayside - $9,147.70, Star Hyundai - $56,500 and Star Subaru - $7,800. This fraud scheme occurred from May 14, 2013 to November 18, 2016 and involved the generation of Star Auto dealership checks to pay Ms. Karouzakis' personal credit cards and mortgage. To conceal her theft, Karouzakis recorded numerous general journal entries (Journal: 11) using fictitious names and fictious control numbers instead of vehicle identification numbers ("VINs"). This scheme also involved the generation of Star Nissan checks written to Star Toyota. The checks were exchanged for cash which was removed from the daily deposit. However, the checks were also deposited in the bank and therefore were "cashed" twice. In addition, fictitious deposits from Karouzakis were recorded through general journal entries (Journal: 11).

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

a) **Rebate & Incentives, Schedule 21:** The rebate and incentive schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 21." This schedule is also known as factory receivables. During their interim visits, Voynow personnel inspected the monthly rebate and incentive schedule. Rebates and incentives represent accounts receivable from a manufacturer, such as Nissan. All proper transaction entries on this schedule contain VINs to match each vehicle with the specific rebate or incentive offered by the manufacturer. No dealership checks should be recorded in this account because it represents a receivable.

Voynow should have noticed two unusual entries (as an example). Both entries represented dealership checks written to Star Toyota for $3,500. This is unusual because Star Toyota has no connection with Star Nissan's receivable for Nissan's manufacturer rebates and incentives. Additionally, no dealership checks (Journal

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 10

:06) should be recorded as a dealer incentive. Finally, an entry for $3,500 is an unusually round amount not typically included in a rebate or incentive.

b) **Intercompany Transactions**: Valid intercompany transactions must balance with each other. The amount of a related party accounts receivable recorded by Star Nissan would be equal to a related party accounts payable recorded by Star Toyota. Voynow's investigation of an improper dealership  check written to Star Toyota would result in the discovery of the imbalance in the related party accounts.

c) **Factory Receivables:** Voynow should have identified fictitious control numbers as unusual. For example, one transaction used the fictitious control number "VKFP." Voynow's investigation into the fictitious control numbers would have resulted in the discovery of dealership checks recorded as Rebate & Incentives receivable.

d) **Customer *Deposits, Schedule 7***: The customer deposits schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 7." Voynow personnel should have noticed Vivian Karouzakis' name associated with a general journal entry (Journal: 11). Customer deposit transactions are identified by Journal: 05.  Voynow should have identified general journal entries as unusual for a customer deposit. Further inquiry and investigation would have resulted in the discovery of the general journal entry for the fictitious deposit credited to the controller.

e) **Monthly Bank Reconciliations:** Voynow inspected monthly bank reconciliations of Star Auto. This fraud scheme involved a fictitious $26,000 deposit from Vivian Karouzakis recorded through a general journal entry (Journal: 11). However, there was no corresponding deposit on the actual bank statement. The fraudulent transaction was hidden through the manipulation of stale checks that had not been cashed.

**C. LOAN PAYMENTS NOT REPAID SCHEME:** Despina Theocharis ("Theocharis"), an Office Manager for Star Auto, failed to repay loans from Metro Chrysler Plymouth Inc. d/b/a Star Chrysler Jeep Dodge in the amount of $98,897.98.  From 2010 until 2016, Theocharis recorded several fictitious general journal entries (Journal: 11) to incorrectly reflect that her loans were being repaid.

    1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 11

a) **Monthly Bank Reconciliations:** Voynow's inspection of monthly bank reconciliations would have revealed that the fictitious deposit recorded through an adjusting journal entry did not appear on the bank statement indicating that the funds were not actually received.

b) **Service & Parts Receivables, Schedule 5***:* The service & parts receivables schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 5." Voynow should have identified general journal entries (Journal: 11) for loan repayments as unusual.

c) **Employee Advances, Schedule 6**: The employee advance schedule for December 31, 2015 lists $58,264 of loans outstanding. The balance due from Despina Theocharis was $32,500 and another manager, Nicholas Guadango had an outstanding balance of $11,793.39. The aggregate amount due from all other employees totaled $13,969.65. Voynow created a spreadsheet for its workpapers indicating awareness of the large outstanding amounts from two employees. However, there was no indication of follow-up investigation for loan repayments.

d) Employee advances are repaid through payroll deductions (Journal: 30). Voynow should have noticed there were no payroll deductions recorded on the Theocharis loan during the month of December 2015.

**D. STAPLES SCHEME:** Carmen Jones ("Jones"), an Accounts Payable Clerk for Star Auto, used Star Nissan's Staples credit card to purchase personal items totaling approximately $68,852.67 from August 2001 through May 2017. Star Nissan paid the Staples credit card based on information provided by Jones which did not include itemized invoices.

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

a) **Accounts Payable, Schedule 18**. The accounts payable schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 18." The accounts payable schedule for Star Nissan listed two separate Staples vendors. Voynow Should have inquired regarding the use of two accounts with the same vendor. This inquiry would have resulted in the discovery of the personal items paid using the Staples credit card.

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 12

**E. CUSTOMER CLAIM SCHEME:** Filardo embezzled $378,157.08 from Star Subaru through the retention of customer deposits from 2014 through 2017. Customers made cash deposits toward vehicle purchases which should have been deposited in the bank by Star Subaru. The theft was concealed using an annual advance payment from Subaru of America, Inc. ("Subaru of America"). Additionally, Filardo instructed clerks to issue credits to customers for vehicle damages, verbally or by using fictitious claim forms. Next, fictitious general journal entries (Journal: 11) were recorded in the Reynolds & Reynolds accounting application.

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

   a) **Service and Parts Receivables, Schedule 5.** Customers who purchase vehicles should never appear on a service & parts receivables schedule. Therefore, Voynow should have investigated the notations of customer names with corresponding stock numbers for vehicle purchases.

   b) Voynow represents other Subaru dealerships and should have knowledge of the amount and purpose of annual advance dealer payments to Star Subaru.

   c) Gladys, a Star Auto employee informed Voynow that new car deals were incorrectly treated as factory rebates. However, no follow-up was performed by Voynow.

   d) On one interim memo, Voynow identified minor service and parts receivables. However, they omitted the large amounts relating to vendor Subaru of America. Voynow's investigation of the vendor's outstanding debt likely would have resulted in the discovery of the theft.

**F. NMAC/AMEX SCHEME:** Jones embezzled approximately $367,660.04 through the retention of cash payments from customers during the period from October 16, 2010 to September 25, 2014. The theft was concealed by replacing customer payments with American Express (AMEX) merchant check payments and incorrectly recording Nissan Motor Acceptance Corp. (NMAC) bonuses. Fictitious general journal entries (Journal: 11) were made in the Reynolds & Reynolds accounting application.

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

   a) **Credit Card Receivables, Schedule 26**: Credit Card Receivables is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 26." Voynow should have identified general journal entries (Journal:

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 13

11) as unusual. Credit Card receivable transactions are identified by (Journal: 05). Voynow's inquiry and investigation would have resulted in the discovery of the general journal entry for the fictitious deposit credited to Jones.

b) *Service & Parts Report*: Cash receipts for service and parts is reported daily on the service & parts report. This fraud scheme involved reversing daily deposit transactions and recording a general journal entry (Journal: 11) to create a fictious deposit. Voynow should have noticed two unusual entries. The deposit reversal and the journal entry are both unusual transactions that should have been investigated.

c) Because the fictious general journal entries (Journal: 11) were recorded in several accounts, Voynow had greater opportunity to discover the fraud. Cash sales, parts payable and inventory were all misstated through the general journal entries (Journal: 11). Actual transactions for parts are through general purchases (Journal :09) or Warranty Claims Payable (Journal :16).

d) **American Express Accounts Receivables, Schedule 26**. The American Express accounts receivable schedule reflects Star Auto receivables for customer purchases. Deposits are received from American Express. A general journal entry (Journal: 11) is an unusual transaction which should have been investigated by Voynow.

e) Voynow represents other Nissan dealers and should have been aware of bonus payments due to the Dealership. Further investigation would have resulted in the discovery of missing amounts resulting in misstatements on the monthly financial statements.

f) **Monthly parts statements.** Voynow should have noticed that the monthly parts statement included multiple general journal entries (Journal: 11). The proper transactions on the monthly parts statements are general purchases (Journal: 9) and warranty claims payable (Journal :16).

   i) Voynow's workpapers confirm that monthly parts statements were inspected and the general journal entries (Journal: 11) were identified because they were circled. However, the fictitious general journal entries (Journal: 11) were not investigated.

   ii) A Trend Analysis Report for Parts Inventory (Account 2420) was generated on 1/19/2015. Voynow made notations of unusually round dollar amounts: $50,000 OCT2014, $35,000 NOV2014, $119,000 APR-

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 14

MAY2013. However, no follow-up investigation was performed. Ownership was not informed of theses significant abnormalities in parts inventory.

iii) Voynow's workpapers confirm the inspection of a general journal entry (Journal ID ADJ1114) generated on 11/30/2014 in the amount of $35,000.00 by USER Vivian. The general journal entry increases parts inventory (account 2420) and accounts payable (account 3000) for Vendor# 150 Nissan Motor Corp. This is unusual because inventory purchases are recorded through Journal: 9. The fictitious general journal entry was identified on the Trend Analysis Report (see above). However, Voynow did not perform any follow-up investigation.

iv) Voynow's workpapers confirm the inspection of a Year-End Journal Entry (Journal ID YENIS2014) generated on 01/20/2015 by USER Vivian. The journal entry modifies several accounts including a $283,985.56 increase in cost of sales (C/S-COUNTER WHOLESALE, Account 6670) with a corresponding adjustment to inventory (PARTS INVENTORY, Account 2420). This journal entry resulted in a significant reduction in the 2014 net income of the Dealership. Entries of this magnitude to inventory are unusual and are typically the result of a physical inventory. However, Voynow was aware that no physical inventory was performed at the Dealership as of December 31, 2014. The owners should have been notified of the severity of this issue and the possibility of fraud.

v) Voynow's workpapers confirm the analysis of a general journal entry (Journal ID ADJ1013A) generated on 11/01/2013 in the amount of $119,000.74 by USER Carmen. The general journal entry increases inventory (PARTS INVENTORY, Account 2420) with a corresponding adjustment to accounts payable (ACCOUNTS PAYABLE, Account 3000) for Vendor # 81365 Nissan Motor Acceptance Corporation. Inventory purchases are recorded through Journal: 9. Voynow should have investigated this entry because it was an unusually round amount and was recorded as a general journal entry (Journal: 11)

vi) Voynow's workpapers confirm the inspection of a general journal entry (Journal ID 803019168A) generated on 10/01/2014 in the amount of $50,000 by USER Vivian. The general journal entry increases inventory (PARTS INVENTORY, Account 2420) with a corresponding adjustment to accounts payable (ACCOUNTS PAYABLE, Account 3000) for Vendor #150 Nissan Motor Corp. Voynow should have investigated this general journal entry because it was an unusually round amount and was recorded as a

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 15

general journal entry (Journal: 11)

**vii)** Star Auto's financial records indicate three vendor numbers for Nissan Motors Acceptance Corp.: 150, 81365 and 56856. Voynow should have investigated the use of multiple vendor numbers for the same vendor.

**G. REVERSE DEPOSIT SCHEME:** Jones removed bank deposits (cash and checks) totaling $127,296.88 from Star Auto's safe from February 20, 2013 to April 19, 2016. The theft was concealed through a reversal of the deposit entry in the Reynolds & Reynolds accounting application. Jones then created fraudulent general journal entries which applied credits to Star Nissan's Parts & Service Cash Sales Account with a corresponding entry to parts inventory.

A valid deposit received by Star Auto is recorded in the general ledger prior to submission to the bank. Therefore, Voynow should have detected the reversed deposit through the bank reconciliation process. To conceal the theft, fictitious general journal entries (Journal: 11) were recorded in the cash sales account. Any general journal entry (Journal: 11) recorded in the cash sales account is unusual. Voynow's investigation of these transactions would have resulted in the detection of fraud.

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

   a) **Journal Entries**: The aforementioned NMAC-AMEX Scheme was concealed by reversing deposit entries and using multiple general journal entries (Journal: 11) to manipulate cash sales and inventory.

   b) Voynow represented other Nissan automobile dealers and should have noticed the discrepancy in bonus payments.

   c) Deposits reversed by Jones were associated with credit cards receivable. Voynow's inspection of the credit cards receivable schedule likely would have resulted in the detection of the fraud.

**H. EMPLOYEE ADVANCE SCHEME:** Karouzakis embezzled $202,975.69 through employee loans which were never repaid. The theft was concealed by removing cash from Star Toyota deposits and creating fraudulent general journal entries (Journal: 11). However, no actual repayments were received from Karouzakis.

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

   a) *Employee Advances, Schedule 6:* The employee advances schedule is a standard report generated by the Reynolds & Reynolds accounting application. A

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 16

practitioner familiar with the system would recognize this document as "Schedule 6." Payments against employee advances are identified by a control number (last 4 digits of social security.) Voynow should have identified fictitious control numbers as unusual. For example, transactions used fictitious control numbers "AFRO" and "DEBB." Entering letters on this schedule requires an override in the system.

b) *Journal Entries.* Voynow should have identified general journal entries (Journal: 11) as unusual because employee advances are typically repaid through payroll (Journal: 30).

**I. DRAWING FALSIFIED CHECKS (PTSN/TOY) AND CASH WITHDRAWAL SCHEME:** Karouzakis, an Office Manager for Star Auto, embezzled $1,249,400 from Star Auto: Star Nissan -$786,400 and Star Toyota - $463,000. This fraud scheme involved the generation of Star Nissan checks written to Star Toyota and vice versa. The checks were exchanged for cash which was removed from the daily deposit. The fraudulent transactions were hidden by general journal entries (Journal: 11).

1) **VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS**

a) *Accrued Commissions, Schedule 31:* The accrued commissions schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 31." During their interim visits, Voynow reviewed the monthly accrued commissions schedule. All proper transaction entries on this schedule contain compensation paid to employees through payroll on a weekly basis (Journal:30). No intercompany dealership checks should be recorded in this account.

b) Voynow should have identified fictitious employees as unusual. Each item on Schedule 31 always contains an employee's full name, along with a control number, which is always the last four digits of the employee's social security number. The entries on Schedule 31 that Vivian Karouzakis used to carry out her theft did not contain an employee's full name or the last four digits of an employee's social security number. As an example, social security numbers such as Toy0116, Toy0216, Toy0316 and Toy0416 were used and the associated employee name was "blank". Similarly, Star Toyota transactions used obviously fictitious social security numbers such as PTSN0116, PTSN0216, PTSN0316 and PTSN0416 with "blank" employee names. Further investigation into the fictitious social security numbers and "blank" employee names would have resulted in the discovery of dealership checks recorded as Accrued Commissions.

c) An item on Schedule 31 with no employee name clearly appears to be incorrect, incomplete or inconsistent with the other entries on its face and therefore

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 17

should have been investigated further. Moreover, the use of letters "TOY" or "PTSN" required a forced override in the Reynolds & Reynolds accounting application because social security numbers do not contain letters. Employee overrides are suspicious and should have been investigated by Voynow. An investigation by Voynow likely would have resulted in the discovery of the theft.

d) During one interim visit in 2014, a Star employee, Jacquie Cutillo identified a fictitious PTSN transaction associated with no employee name or social security number and informed Voynow (Randy) of the abnormality. Instead of investigating the transaction, Randy told Ms. Cutillo: "not to worry." Ownership was not informed by Voynow of these multiple abnormalities.

e) After Vivian Karouzakis was terminated, Ms. Cutillo noticed that PTSN entries were no longer recorded by Star Toyota. Voynow (Seibel) was informed by Ms. Cutillo that the reporting changed after the termination of Ms. Karouzakis. However, Seibel did not investigate the change in reporting or inform ownership of the change in reporting after the termination of accounting personnel.

## J. VEHICLE SCHEMES

1) **FACTUAL SUMMARY – CARMEN JONES HIGHLANDER SCHEME:** Jones failed to remit at least $3,000 due at the purchase or delivery of a 2016 Toyota Highlander from Star Toyota of Bayside. A general journal entry (Journal: 11) was generated on September 2, 2016 by Vivian Karouzakis which reflected a fictitious receipt of $3,000. However, no deposits were received from Carmen Jones.

2) **FACTUAL SUMMARY – ANGE RAPTIS HIGHLANDER SCHEME:** Ange Raptis failed to remit $3,000 due at the lease signing or delivery of a 2016 Toyota Highlander from Star Toyota of Bayside in September 2016. Vivian Karouzakis generated a fraudulent general journal entry (Journal: 11) which reflected a fictitious receipt of $3,000. However, no deposit was received from Ange Raptis.

3) **FACTUAL SUMMARY – TUNDRA AND AVALON SCHEME:** Michael Karouzakis, Vivan Karouzakis' husband, purchased a Toyota Tundra in March 2016 with an outstanding $10,000 cash COD ("Cash On Delivery") which was never paid. In addition, Michael Karouzakis purchased a new Toyota Avalon in May 2013 from Star Toyota with an outstanding $30,000 cash COD. Vivian Karouzakis created a fraudulent general journal entry (Journal: 11) which reflects a fictitious receipt of $30,000. However, no deposit was received by Michael Karouzakis.

4) **FACTUAL SUMMARY – VITALIANO/VIVIAN STOLEN AVALON SCHEME:** Vitaliano purchased a Toyota Avalon. The transaction reflected a $20,000 deposit applied

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 18

against the purchase price. Vivian Karouzakis created a fraudulent general journal entry (Journal: 11) which reflects a fictitious receipt of $20,000.

5) **FACTUAL SUMMARY – THEOCHARIS VEHICLES SCHEME:** Despina Theocharis purchased an unusual number of used vehicles from Star Chrysler at low costs and subsequently traded them in for future purchases. The trade-in values were higher than the initial cost. Despina Theocharis embezzled approximately $9,500 from Star Chrysler through this scheme.

### VOYNOW'S VIOLATION OF ACCOUNTING STANDARDS

a) **We Owe, Schedule 60:** The accrued we owe schedule is a standard report generated by the Reynolds & Reynolds accounting application. A practitioner familiar with the system would recognize this document as "Schedule 60." General Journal Entries (Journal: 11) were recorded using fictitious stock numbers. Voynow should have identified the fictitious stock numbers as unusual. For example, transactions used the fictitious stock numbers "100139" Bank0715" "Clean" and Extra." Voynow's Investigation into the fictitious stock numbers would have resulted in the discovery of dealership checks recorded as We Owes which reduced the profitability on vehicle sales.

### Damages

Voynow's violation and departure from accounting standards during the engagement period resulted in economic damages to Star Auto of $4,528,600 due its failure to properly investigate incorrect, incomplete and inconsistent data which likely would have resulted in the discovery of the aforementioned fraud schemes.

### Analysis and Conclusion

The fraud schemes used by former Star Auto employees should have been detected through inquiry and investigation of unusual, abnormal or incorrect entries in Star Auto's financial accounts. Continuing economic losses would have been avoided if Voynow personnel exercised a moderate level of professional skepticism which would have resulted in a more thorough inspection and analysis of Star Auto's financial accounts.

Voynow knew or should have known the requirements for tax practitioners as outlined by the CFR/IRS Code, the AICPA and other industry associations. Those requirements would permit Voynow to rely on information furnished by Star Auto without verification. However, the scope of Voynow's services included services consistent with consulting, controller-type functions, internal auditing procedures and review services. In fact, Voynow's workpapers confirm that

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 19

the Firm actually obtained information that contained evidence of fraud. Accordingly, Voynow had the obligation under professional standards to make inquiries and obtain additional information which likely would have resulted in the detection of fraud. Star Auto did not release Voynow from liability for failure to detect fraud at any time during the engagement period.

During the 21-year engagement period, Voynow failed to exercise due professional care while performing professional accounting and tax services. This failure represents a violation of accounting industry standards. If the proper standard of care were exercised, Voynow likely would have detected the fraud.

Alternatively, the logical conclusion would be that Voynow personnel detected fraud but knowingly ignored the illegal acts or was complicit in one or more of the fraud schemes. This would also constitute improper professional conduct for a CPA firm.

Based on the absence of a written contract for accounting and tax services, the number of professional hours devoted, the amount of fees charged, the extensive evidence demonstrating the types of services and procedures actually performed by Voynow, and the verbal representations from Voynow to the owners and employees of Star Auto, there is no evidence to support the limited scope of a tax-only engagement.

In my professional opinion, within a reasonable degree of professional certainty, Voynow, Bayard, Whyte, and Company, LLP Certified Public Accountants violated the due care and professional skepticism standards of the accounting profession, did not ensure proper supervision of employees and failed to provide accounting and tax services at the level of care that would have been exercised by a reasonable accountant under the same circumstances.

Because of deficiencies in their accounting and tax services, Voynow failed to detect any of the fraud schemes that resulted in $4,528,600 of economic losses to Star Auto.

I reserve the right to amend, supplement, alter, or modify my opinions based on new information that may become available. Such information may result in modification or supplementation of the opinions set forth in this report. Thus, I reserve the right to further supplement this report and to rely on or rebut additional documents, written opinions, discovery, or testimony that may come to my attention between now and the time of the trial in this case. Moreover, I may make additions, deletions, or modifications to this report and our opinions in the future that would be reflected in testimony at the trial. I also reserve the right to rely on or rebut all other expert reports submitted in this case.

Respectfully submitted,

**CONFIDENTIAL**

Star Auto Sales v. Voynow, Bayard, Whyte and Co.
November 20, 2023
Page 20

**BRISBANE CONSULTING GROUP, LLC**

Douglas P. Sosnowski, CPA/ABV, ASA, CFF

**CONFIDENTIAL**

**APPENDIX A**

**PRIMARY SOURCES OF INFORMATION AND
ADDITIONAL DOCUMENTS PROVIDED BY COUNSEL
(SEE ATTACHED SPREADSHEET)**

**CONFIDENTIAL**

**APPENDIX B**

**STATEMENT OF QUALIFICATIONS**

**DOUGLAS P. SOSNOWSKI, CPA/ABV, ASA, CFF**
**Managing Director/Partner**

**PRESENT POSITION**

Mr. Sosnowski is the Managing Director and Partner with Brisbane Consulting Group, LLC providing Business Valuation, Forensic Accounting, and Litigation Support Services. He has extensive accounting, income tax, investment advisory and valuation experience and has served as a financial consultant and expert to attorneys in financial analysis, business judgment and the economic aspects of commercial litigation and matrimonial dissolution. Mr. Sosnowski has experience consulting with publicly traded entities and valuing a variety of closely held companies in connection with mergers, acquisition and divestitures, business combinations, estate and gift tax planning, ESOPs and purchase price allocations.

**PROFESSIONAL DESIGNATIONS AND ACHIEVEMENTS**

- CPA - Certified Public Accountant: New York State

- ABV - Accredited in Business Valuations; American Institute of Certified Public Accountants

- ASA - Accredited Senior Appraiser: American Society of Appraisers

- CFF - Certified in Financial Forensics, AICPA

- Certificate of Educational Achievement - Business Valuation (AICPA)

- Securities Licenses – Series 7 and 66

**EDUCATION**

Mr. Sosnowski graduated with honors from the State University of New York at Buffalo in June 1989. He earned his Bachelor of Science Degree in Business Administration with concentrations in Accounting and Finance.

**CONTINUING EDUCATION**

The New York State Board of Accountancy requires CPAs to complete 40 hours per year in continuing professional education (CPE). Mr. Sosnowski concentrates his professional education in business valuations, forensic accounting, and related tax issues.  Also, to maintain his designation as Certified in Financial Forensics, Mr. Sosnowski is required to obtain 20 hours of CPE in related courses each year.

**SPEAKING ENGAGEMENTS**

Mr. Sosnowski has extensive speaking experience on forensic accounting, investments, and business valuation issues before matrimonial attorneys, estate attorneys, and judges in Erie, Monroe, Kings, Nassau, Suffolk, New York, Westchester and Rockland Counties of New York

State, and for various industry associations. No publications have been authored in the previous 10 years.

**EXPERT TESTIMONY**

Expert witness testimony was given by Mr. Sosnowski at trial or by deposition during the previous four years in the following cases:

| | Index No. | Court |
|---|---|---|
| Shahira Eltahawy v. Sherif Eltahawy, et. al. | 2015/002341 | NYS Supreme Court |
| Gil H. Elbaz v. Meital Elbaz | 2016/14107 | NYS Supreme Court |
| Novick, Steven v. Novick, Adrienne | 2017/200169 | NYS Supreme Court |
| Kahan, Kimberly v. Kahan, Steven | 2019/303 | NYS Supreme Court |
| Colaberry, Inc. et.al. v. Anand Dasari | 2020-0291 PAF | Delaware Chancery |
| Novedea Systems, Inc. et al. v. Colaberry, Inc., et. al. | 6:20-CV-180-JDK | U.S. District Court – Eastern District of Texas |
| Michael Izzo v. Camille Izzo | 2020/200254 | NYS Supreme Court |
| Trade Links, LLC v. Bi-Qem, Inc. and Bi-Qem S.A. de C.V. | 3:19-CV-00308(KAD)(SALM) | U.S. District Court – Western District of CT |

**APPENDIX C**

**STATEMENT OF PROFESSIONAL FEES**

Douglas P. Sosnowski of Brisbane Consulting Group, LLC was retained by Milman Labuda Law Group, PLLC on November 1, 2022 as an expert in the areas of Economic Damages and Certified Public Accountancy. Professional fees through September 15, 2023, including unbilled time, total $51,000. Expert testimony will be billed at a daily rate of $4,000.

**CONFIDENTIAL**