Case 1:18-cv-05775-ERK-TAM    Document 137-4    Filed 08/03/26    Page 1 of 163 PageID #: 4749
Exhibit D

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

STAR AUTO SALES OF BAYSIDE,
INC., ET AL.,

     Plaintiffs,

 Civ. No. 18-CV-5775 (ERK) (CLP)

    -against-

VOYNOW, BAYARD, WHYTE AND COMPANY,
LLP, ET AL.,

              Defendants.

--------------------------------X

        November 28, 2023
        10:00 a.m.
        Virtual Deposition

     THE EXAMINATION BEFORE TRIAL of

  DOUGLAS SOSNOWSKI, a Witness, held remotely,

  before a shorthand reporter and Notary

  Public within and for the State of New York.

Job No. CS6326406

A P P E A R A N C E S:


MILLMAN LAW

3000 Marcus Avenue

Lake Success, New York 11042

BY: JOSEPH LABUDA

For the Plaintiff

Also present:

Jeremy Koufakis

Jacqueline Cutillo


MARSHALL DENNEHY

620 Freedom Business Center

King of Prussia, PA 19406

BY: MAUREEN FITGERALD

For the Defendants

* * *

A.    Yes.

Q.    Have you served in the past as an expert in areas other than accounting malpractice?

A.    Yes.

Q.    What percentage of your practice in the last ten years involved serving as an expert?

A.    95 percent.

Q.    Of that 95 percent how many of those cases involved accounting malpractice where one of the parties, the plaintiff or defendant was an accountant?

A.    It is very few.

Q.    Give me a percentage.

A.    One percent.

Q.    How many cases would that be, where one of the parties, the plaintiff or defendant was an accountant?

A.    Maybe 20.

Q.    What?

A.    20.

Q.    Of the 20, how many cases was the accountant named as an defendant?

A.    All of them.

Q.    Of those 20, how many cases involved federal court proceedings?

Page 14

A.    None of them.

Q.    So this is the first time that you authored a report against an accountant in a federal court case; is that correct?

A.    Correct.

Q.    Have you authored a report as an expert in a federal court case in any other case as an expert?

A.    Yes.

Q.    Are you familiar with the requirements for experts under the federal rules with respect to the contents of a report?

MR. LABUDA:  Objection.

You can answer.

THE WITNESS: Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    What does the 99 percent of other cases as an expert generally speaking, what does that involve?

A.    (No verbal response.)

Q.    What type of cases?

A.    A whole variety of cases involving economic damages, violation of patents, shareholder disputes, and probably the majority of the litigation that happens is in the matrimonial realm.  I don't know if I can give percentage on any one area.

Q.    So the majority the 99 percent is matrimonial matters?

A.    Over 50 percent, yes.

Q.    Other than this case, have you served as an expert in any case involving an automobile dealership?

A.    Not that went to trial, no.

Q.    Have you written a report in a case involving an automobile dealership?

A.    Yes.

Q.    How many?

A.    Five.

Q.    In all of those five cases were those cases where an accountant was a defendant or cases involving matters other than the accounting malpractice?

A.    Cases that were not considered accounting malpractice.

Q.    Have you ever had any part of your opinions excluded by a Judge?

A.    No.

Q.    On cases where you issued reports involving automobile dealerships, were you retained by the dealership or by the law firm representing the dealership?

A.    Sometimes, yes; sometimes, no.

Q.    Did any of those cases involve trial testimony?

A.    No.

Q.    Or deposition testimony?

A.    No.

Q.    Other than in your capacity as an expert, authoring reports, have you provided any services to automobile dealership clients?

A.    Yes.

Q.    What?

A.    Yes.

Q.    Have you prepared tax returns for an automobile dealership?

A.    Yes.

Q.    When was the last time you did that?

A.    2001.

Q.    How many tax returns have you prepared for an automobile dealership?

A.    I don't know.  It would be a complete guess.

Q.    The return you prepared in 2001, was it for a single dealership or a group of dealerships?

A.    A group.

Q.    What was the name of the group?

A.    Doreso, in Rochester, New York.

Q.    Spell it?

A.    D-O-R-S-E-S-O.

Q.    Were they a client of the firm?

A.    Yes.

Q.    A prior firm?

A.    Prior firm.

Q.    How many review engagements have you participated in, involving automobile dealerships?

A.    Maybe 50 to 100.

Q.    In the last ten years, how many?

A.    None.

Q.    How many of those were involving automobile dealerships?

A.    None.

Q.    Have you ever participated in an audit engagement for any client?

A.    Yes.

Q.    In the last ten years?

A.    No.

Q.    When was the last time that you participated in one?

A.    2001.

Q.    Have you ever provided forensic accounting work for an automobile dealership?

A.    Yes.

Q.    When?

Q.    For purposes of this case, you did not conduct a forensic accounting of the plaintiff's records; is that correct?

A.    Correct.

Q.    So you did not analyze or trace any paper or digital trail of evidence of any suspected act of theft within Star's accounting system; is that correct?

A.    I saw paper documents, but did not access their computer directly.

Q.    You did not do an analysis or trace any specific trail of evidence with respect to any alleged act of theft, correct?

A.    Incorrect.

     MR. LABUDA:  Objection.

Q.    Tell me where in your report can I find that analysis?

A.    Well, there is analysis throughout the entire report.

Q.    Looking now at exhibit 1, tell me, in your September 15th report, where in your report can I find the analysis where you traced the trail of evidence with respect to any specific act of theft alleged in this case, and point to a page number for us now.

Page 20

A.    It is not described in the report.

Q.    Okay.  It is not in the report; is that correct?

A.    That's incorrect.

Q.    Where is it in the report where you did an analysis of any evidence showing any specific act of theft alleged in this case?

A.    If look at appendix A, documents reviewed, items 2012 to 2024.

Q.    So that spread sheet shows a forensic analysis of theft supported by evidence?

A.    It is not in the Excel spreadsheet.  It's thousands of documents.

Q.    Appendix A is an Excel spreadsheet.

A.    It refers to the document.

Q.    I am asking, in your report, is there anything in your report that shows where you did any analysis that traced the evidence, either for or against, any alleged acts of theft in this case?

A.    No.

Q.    Is there anything in your report showing that you interviewed any witnesses or suspects, or current or former employees, who might have had knowledge one way or the other relating to any alleged act of theft?

Page 21

A.    Yes.

Q.    Tell me the page in your report where you interviewed any such individual.

MR. LABUDA:  You want him to review his report?

THE WITNESS:  Appendix A.

EXAMINATION BY

MS. FITGERALD:

Q.    Where?  What line number shows the results of your interview of any specific individual?

A.    I didn't put a transcript of any interview in my report.

Q.    So it's not in there, sir, right?

A.    (No verbal response.)

Q.    Is it also fair to say that your report does not contain any analysis as far as what evidence exists or doesn't exit to support the occurrence of any specific act of alleged theft in this case?

A.    Repeat it.

Q.    Your report does not contain any analysis of what evidence exists or does not exist to support any alleged act of theft, any specific act of theft in this case?

MR. LABUDA:  Objection.

You can answer.

Page 22

THE WITNESS:  Correct.

EXAMINATION BY

MS. FITGERALD:

Q.    And is it fair to say that you also did not review or analyze any data that was contained on any backup tapes in your report?

A.    Correct.

Q.    And would it be fair to say that you did not trace any monies coming into any dealership that was reflected in any portal setup with any manufacturer?

A.    I don't understand.

Q.    As part of your services in this case, you did not analyze any evidence or documents reflecting monies paid into the dealership, reflected on portal that is set up between the Star dealerships and any manufacturer?

A.    I did not.

Q.    You did not conduct any analysis of documents that are missing in connection with the ability to prove the occurrence of any actual theft, correct?

A.    No, I could not analyze documents that were missing.

Q.    You did no analysis of what it required and what was no longer existing.

Page 23

A.    (No verbal response.)

Q.    You read the testimony showing documents no longer existing, correct?

A.    Yes.

Q.    You didn't do any analysis as to what that extent of missing documents does with respect to the obligation to establish actual theft, correct?

A.    No.

Q.    You did not do any record reconstruction of evidence due to documents damaged or lost or otherwise missing, with respect to any specific alleged act of theft?

A.    No.

Q.    You did not talk or communicate to law enforcement in any regard as to whether or not there was actual evidence of theft?

A.    No.

Q.    And that is a service that you can provide as an forensic accountant, correct?

A.    Define that.

Q.    Tracing and analyzing documents, trying to establish whether or not there is actual theft, that is something a forensic accountant can do; is that correct?

A.    Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    In your answer, you referred to items 212 through 225.  So I was asking you, can you pinpoint for me --

A.    The --

Q.    Where is that forensic account review or report or analysis you relied upon?

        MR. LABUDA:  Objection.  Stop interrupting him.  He is answering.  Wait for him to finish.  He waits for you to ask in fully, so give the witness the same opportunity and let him finish.  Don't cut him off.  You asked him a question.  Now let him finish without cutting him off.

        THE WITNESS:  The documents I reviewed encompass everything that is listed in appendix A.

        MS. FITGERALD:  I understand, you say it is in appendix A.

        THE WITNESS:  Right.

EXAMINATION BY

MS. FITGERALD:

Q.    Was there forensic analysis or forensic

accounting that was done by another forensic accountant that you reviewed or relied upon for purposes of your opinions in this case?

A.    I can't pinpoint it.

Q.    Because it is not there, is it?

A.    It is there.

Q.    What is the name of the forensic accountant that did this analysis or review you relied upon actually?

A.    I don't remember.

Q.    What does it looks like?

A.    Be more specific.

Q.    Well, I don't see one.  What it is you believe you looked at?

A.    I reviewed list of transactions which added up the $4.5 million in fraudulent transactions that I list in my expert opinion on page 1.

Q.    You believe you reviewed lists that total up to those numbers?

A.    Yes.

Q.    Is that your opinion that, that was forensic analysis?

A.    No.

Q.    Okay.  Other than those lists is there any other forensic analysis done by a forensic

Q.    Were you provided with the documents produced in this case with respect to Rosenfield's work and forensic investigation and forensic accounting?

A.    Yes.

Q.    Did you review them?

A.    Yes.

Q.    So even though they are not listed on appendix A, you looked at and considered those records; is that correct?

A.    I don't know that they are not listed.

Q.    You understood that the forensic accounting investigation conducted by Rosenfield was the investigation that prompted the filing of plaintiff's complaint?

A.    No, I was unaware of that.

Q.    Do you know any other forensic accounting firm hired prior to October of 2018?

A.    (No verbal response.)

Q.    Hired to investigate suspected theft by Plaintiffs?

A.    I have no idea.

Q.    Did you review the Rosenfield e-mails and documents produced as part of your analysis and review in this case?

A.    I don't know which documents you are referring

to.

Q.    Rosenfield's communication with law enforcement with respect to alleged acts of theft?

A.    I don't know.  If you can show me the documents I will tell you.

Q.    Are you aware of communications between Rosenfield and the district attorney with respect to whether or not there was actual proof of theft for certain alleged schemes?

A.    Yes.

Q.    Did you consider those communications as part of your opinions in this case?

A.    No, I wasn't involved in any of the criminal complaints.

Q.    In your rebuttal affidavit you state that defendant's expert discussion about the accounting services provided to Star Auto Rosenfield has no relevance to this matter.  Do you recall that comment?

A.    Yes.

Q.    Knowing that the forensic accounting firm referred to in paragraph 49 of Plaintiff's complaint, is Rosenfield, do you now acknowledge that the services and the investigation provided by Rosenfield are in fact relevant to this case?

Page 36

along with any work or forensic accountant analysis

they may or not perform have performed?

A.    I didn't receive anything from him.  I received

provided to him.

Q.    Did you receive or review any work papers that

went along with any work that the Glenn Rosen firm

may or may not done in this case?

A.    Other than the sources of documents provided to

me, no.

Q.    Source documents are not work papers, do you

agree?

A.    For an accountant, if we save source documents

in a file, then we will consider it work papers.

Q.    So meaning, as generated by the forensic

accountant?

A.    Correct.

Q.    You did not review any bills generated by the

Glenn Rosen firm with respect to the work he did in

this case; is that correct?

A.    That's correct.

Q.    Did you review the bills produced by Rosenfield

in this case?

A.    I don't remember.  Maybe.

Q.    If you didn't review the bills from Rosen, you

would not be able to compare the extent of work

undertaken by Rosenfield in its bills based upon the extent of work conducted by the Glenn Rosen firm ?

A.    I have no idea.  I don't know what they did, either one of them really did.

Q.    Prior to -- have you ever met Glenn Rosen?

A.    No.

Q.    Or ever spoken to him?

A.    No.

Q.    Since you reviewed the Rosenfield reports at least as of the time of rebuttal is it fair to say you are aware that the alleged theft related losses by Rosenfield's forensic investigation is significantly different from what is set forth in your report?

A.    I did not rely on analysis by them.

Q.    Did you acknowledge numbers in your report are significantly different from the numbers in the Rosenfield forensic accounting reports?

A.    I think they were different.  I don't recall the magnitude of difference.

Q.    Did you consider or review any of the analysis conducted Rosenfield with respect to any of your opinions in this case?

A.    No.

Q.    You said you were not involved in criminal

Page 38

matters here; is that correct?

A.    That is correct.

Q.    You were not involved in any discussions with law enforcement regarding whether or not charges should be filed?

A.    Correct.

Q.    You are aware that Rosenfield was involved in those discussions?

A.    Yes.

Q.    And you did not consider the substance of those communications when you formulated your opinions; is that correct?

A.    That's correct.

Q.    And on page 3, September 15, report, you stated that the Star employees listed, paragraph 12 of your report, page 3, those employees embezzled and misappropriated approximately 4.5 million from August 2001 to July 10, 2007; is that correct?

A.    Yes.

Q.    Do you understand that prior this amount 4.528 million dollars is the damage claimed by plaintiffs in this case?

A.    Yes.

Q.    Do you understand that these damage claims are losses are alleged to be acts of theft committed by

that --

MS. FITGERALD:  And you are an expert, so answer it --

THE WITNESS:  I --

MS. FITGERALD:  That's why --

THE WITNESS:  Because I have seen the evidence.  So if there were no evidence, then yes.

EXAMINATION BY

MS. FITGERALD:

Q.   In other words, if the plaintiff is unable to prove actual theft related losses of 4.528 million, then you agree then that plaintiff is not entitled to that amount at damages in this case.

MR. LABUDA:  Objection.

You can answer?

THE WITNESS: Right.  Maybe a separate amount.

EXAMINATION BY

MS. FITGERALD:

Q.   Right.  You are aware nobody has been convicted of any crime that is related to the alleged thefts; is that correct?

A.   I have no idea.  I wasn't involved in any criminal aspect.

Page 42

Q.    Does the existence or nonexistence of criminal conviction play any importance in your mind as to the plaintiff's abilities to prove actual theft?

A.    No.  It's not relevant.

Q.    Okay.  Were you provided with criminal complaints filed in this case?

A.    No.

Q.    Are you aware that charges have never been filed in a number of the alleged theft schemes that the plaintiffs are pursuing in this case?

A.    No, but I read that in a rebuttal report somewhere.

Q.    Did you consider the fact that the district attorney did not see fit to even bring charges for some of this schemes, important, when you formulated your opinions in this case

        MR. LABUDA:  Objection.

        You can answer.

        THE WITNESS: No.

EXAMINATION BY

MS. FITGERALD:

Q.    Does the district attorney's decision to not even pursue charges for many of these schemes call into question whether or not there was ever any act of theft for some of the schemes?

Page 44

MS. FITGERALD:

Q.    But it is important as to who got that money, would you agree?

A.    No.

Q.    So it does not matter whether Jonathan or Jones took the money, the money is gone and it means it's gone.  Is that accurate?

MR. LABUDA: Objection.  You can answer.

THE WITNESS: Yeah, it would matter on a different level.  To me, fraud is fraud, whether or not it is an employee or an owner, and that's not my job to assign blame.

EXAMINATION BY

MS. FITGERALD:

Q.    With respect to the 4.5 million dollars in your report can we agree your report does not break down by date any listing of alleged acts of theft that comprise that amount?

A.    No, I give date ranges for each scheme in the report only.

Q.    Okay.  I am asking whether or not your report breaks down this 4.5 million dollars by dates of when the theft occurred?

Page 45

A.    No.

Q.    Is there any breakdown in your report as to the amount of each individual act of theft that comprises this 4.5 million dollars?

A.    No.

Q.    So you are not able to tell me whether or not Vivian stole $100,000 or ten dollars.

A.    That's correct.  I can find out.

Q.    It is not your report.

A.    That's correct.

Q.    It is not in your report?

A.    That's correct.

Q.    Your report does not even break down by year the total loss.

A.    I gave the range.

Q.    For the alleged theft over the 17 year period of time; is that correct?

A.    Correct.

Q.    Is there any reference in your report as to how much alleged theft occurred in each of those 17 years?

A.    No.

Q.    Is there any breakdown with respect to any specific scheme as to the alleged amount of theft that occurred in any particular year?

A.    Not in year, no.

Q.    Is there any breakdown in your report with respect to each specific scheme as to dates of any individual act of theft that comprises the amounts you attributed for each scheme?

A.    No.

Q.    Since your report does not cite to any specific date or any alleged individual acts of theft occurred that comprises the 4.5 million dollars isn't it also true your report does not set forth any specific date on which any particular act of theft should have been detected by Voynow?

A.    That's untrue.  There are some dates.

Q.    Show me a page number and dates on that.

MR. LABUDA: Well, give him a second.  In exhibit 1.

THE WITNESS:  I can look at my report.

MR. LABUDA:  Yes.

MS. FITGERALD:  Right.

THE WITNESS: Okay.  So I have my November 20th report here.

MS. FITGERALD:  Okay.

THE WITNESS:  The page numbers are different.

MS. FITGERALD: Is that report going to be disputed and raised with the Judge?

THE WITNESS: Can I print another copy right now of my report?

(Unintelligible crosstalk in colloquy.)

(Reporter admonition.)

THE WITNESS: Page 13 my report , there is listed under Nissan Corp. and American --

MS. FITGERALD: Okay.

THE WITNESS: So here it is listed, approximately 284 thousand dollars of fraud discovered, or should have been discovered by Voynow on January 19, 2015, because that is the day they generated reports and did field work that they did at that time.

EXAMINATION BY

MS. FITGERALD:

Q. Okay. Other than that date on page 13 with respect to alleged fraud of 284 thousand dollars, is there anywhere else in your report where you provide a specific date on which Voynow should have

discovered a specific act of alleged theft in this case?

A.   No.  I don't think so.

Q.   Do you agree that for each individual act of alleged theft Voynow would have only been able to detect it after it occurred?

MR. LABUDA:  Objection.

You can answer.

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.   If a jury determined that Voynow should only be responsible for damages for a few schemes or for only certain dates, do you agree that your report would not be able to provide what that number is?

MR. LABUDA: Objection.

You can answer.

THE WITNESS: No, not from my report.

EXAMINATION BY

MS. FITGERALD:

Q.   And so there is nothing in your report that would enable somebody to figure that out; is that correct?

MR. LABUDA:  Objection.

MS. FITGERALD:

Q.    Show me where I can find the analysis in your report?

A.    It is discussed within each scheme.  I have a subsection from each scheme.

Q.    Okay.  All right.  And so you believe that, that analysis is set forth in your September 15th report?

A.    Yes.

Q.    In your report?

A.    Yes.

Q.    Of September 15th?

A.    Yes.

Q.    Moving on now.Do you agree that there is no requirement under any known standard or governing body that there actually be an engagement letter for tax engagement?

A.    As I sit here today I believe that there are requirements for tax engagements.

Q.    And who has issued a requirement or mandate that there be engagement letters issued for tax engagements?

A.    I'm not sure.

Q.    When did that mandate begin?

A.    (No verbal response.)

Page 51

Q.    When did they do that?

A.    I don't remember.

Q.    Do you acknowledge that as of the time Voynow provided services to the plaintiffs, there was no mandate by any accounting standard or governing body that there would be engagement letters for tax engagements?

A.    Yes.

Q.    Do you also agree that there is no requirement in scenarios where an engagement letter is issued for a tax engagement that the letter actually be signed before the tax return can be issued?

A.    That's correct.

Q.    Now, page 2, September 15th of your report now. Page 10, you stated scope of accounting and tax work performed for Star Auto by Voynow was not defined in a written document prior to December of 2016.  Do you see that?

A.    Yes.

Q.    What facts, testimony, or documents did you rely upon when you made that statement in your report?

A.    I reviewed all documents and I didn't see any engagement letters that were ever provided, and I also spoke with Michael Koufakis and Jackie Cutillo

Page 52

who told me that they did not exit.

Q.    Anything else?

A.    No.

Q.    So let's look now at your appendix, number 11 and engagement letters not signed by Star.  Do you see that?

A.    Yes.

Q.    There is a whole slew of documents that are Bates stamped by Voynow you listed and you have reviewed; is that correct?

A.    Correct.

Q.    And those documents, are in fact, engagement letters; is that correct?

A.    Yes, unsigned.

        MS. FITGERALD:  Sorry, what was his answer?

        (Whereupon, the answer was read back by the stenographer.)

EXAMINATION BY

MS. FITGERALD:

Q.    And your statement states that there is no documentation of the services that Voynow was providing, and you acknowledge that there is, in fact, engagement letters that are issued by Voynow and you reviewed them in your appendix?

Page 55

A.    I don't think so.

Q.    Let me ask you this.  You don't think any engagement letters were sent.  And if I understand your answer, you are relying upon statements by, as told to you by Jackie Cutillo and by Michael Koufakis; is that correct?

A.    Correct.

Q.    So is it fair to say that you did not consider the evidence and the documents that were produced in the case that suggest otherwise?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  There is no evidence suggesting otherwise.

EXAMINATION BY

MS. FITGERALD:

Q.    Were you provided with the metadata showing that the engagement letters were updated on an annual basis?

A.    No.

Q.    Would that be something that's important whether or not there is any evidence -- withdrawn.

Were you provided with billing records from Voynow?

A.    Yes.

Q.    Did you review them?

A.    Yes.

Q.    Do you recall entries regarding editing and reviewing and mailing engagement letters?

MR. LABUDA: Objection.  You can answer.

THE WITNESS:  I remember seeing some reference to engagement letters.  I don't remember the actual term "mailing."

EXAMINATION BY

MS. FITGERALD:

Q.    Okay.  Did you consider those entries on billing records when you made that statement in your report, that Voynow never documented or issued engagement letters?

A.    I considered them, yes.

Q.    Did you consider the e-mails that explicitly reference engagement letters having been sent?

MR. LABUDA:  Objection.  You can answer?

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    Did you consider the deposition testimony of

the Voynow employees who stated that engagement letters were sent?

MR. LABUDA:  Objection.  You can answer?

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    Did you consider the fact that in 2008 and 2009 engagement letters were sent to each of the individual owners, and then the format was changed at the request of John Koufakis, junior?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    Did you consider that evidence?

A.    Yes.

Q.    Your report does not reference any of this evidence when you make the statement that Voynow never documented services in engagement letters, correct?

A.    Correct.

Q.    So would it be fair to say that you accepted the information that was provided verbally to you by

Jackie Cutillo and by Michael Koufakis outside of sworn depositions when you made that statement in your report that Voynow never documented its services in engagement letters?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  The fact that I never saw engagement letters was confirmed by discussions.

MS. FITGERALD:  I am not asking signed, about signed engagement letters. And your report says Voynow never documented its services in an engagement letter prior to December of 2016; is that correct?

THE WITNESS:  That's correct.

EXAMINATION BY

MS. FITGERALD:

Q.   So, other than the unsworn conversation that you had with Jackie Cutillo and Michael Koufakis, is it fair to say that you did not consider any of the sworn deposition testimony, or any of the meta data or documents or e-mails or billing records that suggest otherwise?

MR. LABUDA:  Objection.

You can answer.

THE WITNESS:  No, I considered all the information.

EXAMINATION BY

MS. FITGERALD:

Q.    And you chose to disregard all of that and accept your conversation that you had with Michael Koufakis and Jackie Cutillo.  Is that correct?

MR. LABUDA:  Objection.  You can answer?

THE WITNESS:  I was looking for a signed engagement letter, and I didn't find one --

MS. FITGERALD:  -- okay --

THE WITNESS:  And asked for one --

MS. FITGERALD:  And --

THE WITNESS:  And I was told no --

MS. FITGERALD:  Okay, sir.  Sir --

MR. LABUDA:  Let him finish and stop interrupting his answers.

EXAMINATION BY

MS. FITGERALD:

Q.    I did not about signed or not signed.  I asked you about the statement in your report that Voynow never documented the scope of its services in any

Page 60

engagement letter prior to December of 2016.

Do you understand that?

A.    Yes.

Q.    Okay.  Is it fair to say that you disregarded all of other evidence in the form of sworn deposition testimony, documents, metadata, e-mails, and billing records when you chose to accept the unsworn conversation you had with Michael Koufakis and Jackie Cutillo?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  No.

EXAMINATION BY

MS. FITGERALD:

Q.    Okay.  So it was only your conversation with Jackie Cutillo and Michael Koufakis, those conversations you relied upon when you made a statement in your report that Voynow never documented its services kin a engagement letter.  Is that correct?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS: Incorrect.

EXAMINATION BY

MS. FITGERALD:

Q.    What else then, did you rely upon other than the conversations, for your statement in your report that Voynow never documented its service s in an engagement letter prior to December of 2016?

A.    I relied on the lack of actual evidence.

Q.    Are e-mails evidence?

A.    They can be evidence, but they don't prove that there was an engagement letter.

Q.    Are billing records evidence?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  Could you be more specific?  They can be evidence, but not for an engagement letter sent to clients.

MS. FITGERALD:  Again, sir I am talking about -- withdrawn.

Did you see --

I will move on.  I will move on.  Forget it.  I will move on now.

EXAMINATION BY

MS. FITGERALD:

Q.    Is it your understanding that Star received an engagement letter from Voynow on or around December of 2016?

Page 62

A.    Yes.

Q.    Did you see a copy of that engagement letter having been produced by Star when you reviewed the documents in this case?

A.    Just some of it.

Q.    Do you have an understanding that documents are Bates stamped by the party that provides them?

        MR. LABUDA:  Objection.

        THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    Were documents that were produced by Star had Bates numbers and were understand produced by plaintiffs in this case?

A.    Correct.

Q.    Do you understand that?

A.    Yes.

Q.    So are you aware of any documents provided to you as part of your review, that is the December of 2016 engagement letter that Star claims to have received by Voynow?

        MR. LABUDA:  Objection.  You can answer.

        THE WITNESS:  I don't understand still.

MR. LABUDA:  If you turn to your appendix.

THE WITNESS:  Okay.

MS. FITGERALD:  Number 11, and you reference engagement letters.

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    And you list documents you reviewed, all of them are produced by Voynow; is that correct?

A.    Correct.

Q.    Were you provided with the version of the engagement letter that Star contends and acknowledges it received, were you provided with that as produced by Star in this case?

A.    Yes.

Q.    And so why did you not reference in what you reviewed?

MR. LABUDA: Objection.  You can answer.

THE WITNESS:  I don't know.  It wasn't relevant.

EXAMINATION BY

MS. FITGERALD:

Q.    So is it your belief that the engagement letter

Page 65

MS. FITGERALD:

Q.    To the extent that Star did not produce interim letters that it claims to have received in this case, do you acknowledge the possibility that it discarded those letters?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    Do you recall testimony from some of the owners that they discarded documents they received from Voynow at the end of each year?

A.    Yes.

Q.    So knowing that, do you acknowledge the possible that Star also received engagement letters from Voynow and discarded those at the end of each year?

A.    It's possible.

Q.    You stated in your rebuttal affidavit that Mr. Shirk discussed accounting services other firms provided to Star after Voynow was terminated and the Rosenfield company has no relevance to this matter. Do you recall that statement?

A.    Yes.

MS. FITGERALD:  It is engagement letters that Voynow contends were issued from 2008 to 2017.

MR. LABUDA:  Did you use these before?

MS. FITGERALD:  I don't know.

(Whereupon, an off the record discussion was held.)

EXAMINATION BY

MS. FITGERALD:

Q.    This is based on your appendix, that you looked at these documents.  Do you agree?

A.    Yes.

Q.    And you are aware that Star never signed any of these letters; is that correct?

A.    Correct.

Q.    It is stated in your report that you believed these letters were never issued; is that correct?

A.    Except for this one of January 3, 2017.

Q.    I asked you about all of the testimony and facts that you considered when you made that statement.  If a jury looks at all the same evidence and agrees with Voynow that these letters were issued, does that change any of your opinions in this case?

MR. LABUDA:  Objection.  You can answer.

THE WITNESS:  Yes.

EXAMINATION BY

MS. FITGERALD:

Q.    How so?

A.    If engagement letter actually were issued, I would I have to consider the language in those engagement letters.

(Technical difficulties.)

(The reporter exited, and was relieved by another reporter.)

(Time noted: 11:51 a.m.)

* * *

I have read the foregoing the time and place noted in the above heading hereof, and I do hereby acknowledge it to be a true and correct transcript of the same record of my testimony taken at that time.

_____

DOUGLAS SOSNOWSKI

Signed and subscribed to before me on:_____, 20__

Page 3

Douglas Sosnowski                          76

(Whereupon at this time, the

reporters changed.)

EXAMINATION

CONT'D BY MS. FITZGERALD:

Q       Mr Sosnowski, before we had the interruption I had asked you that if, as the trier of fact the jury were to determine that Voynow did issue the annual engagement letters that are reflected in exhibit 4, whether or not that would change your opinion that are stated in your report, exhibits 1 and 2 and you said yes, and then I asked you how so and I believe that's when we lost the connection.  So, please respond how so it would change your opinion.

A       I don't remember if I said it would change my opinion, but I said it may change my report.

Q       The question was whether it would change your opinion and you said yes, and I asked you how so and that's when it broke.

A       Yes.  Well, I would have to read the engagement letter.  It may change, but I can't tell you how it would.

Q       So looking at exhibit 4 --

Page 4

Douglas Sosnowski                              77

MS. FITZGERALD: You can show the witness.

Q       - - could you see the exhibit now, sir?

A       Yes.

Q       And you recall I had these up before we were interrupted?

A       Yes, I do.

Q       All right.

So you reviewed these engagement letters as indicated in the appendix to your report, correct?

A       Yes, these appear to be the ones I reviewed.

Q       Do you agree there is disclaimer language in each of these engagement letters as far as what Voynow was retained to do and what it was not retained to do?

A       Yes.

Q       For example, if we look at the second page of exhibit 4, the top paragraph, according to this engagement letter Voynow is stating, "please note we will not determine the completeness or accuracy of the information supplied and

Page 5

Douglas Sosnowski                    78

the assistance we do provide is not to be

construed as an oversight function in any respect

of a company's accounting system.

Therefore, there should be no

reliance stated or implied by a company on the

accuracy of the assistance we are to provide."

Do you see that?

A       I do.

Q       So then do you agree that should a

jury determine these letters were issued, then to

the extent you've offered an opinion stating

Voynow was providing an oversight function, that

opinion is no longer supported by the record?

MR. LA BUDA:  Objection.

You can answer.

A       I would need to give it some more

thought.

Q       All right.

If we go further down on page 2 of

exhibit 4 Voynow's engagement letter states, "we

will not honor or otherwise verify the data

submitted. Accordingly our engagement cannot be

relied upon to disclose error, fraud or other

illegal acts that may exist."

Page 6

Douglas Sosnowski                              79

Again, that disclaimer, to the extent the jury accepts the evidence that Voynow did in fact issue this opinion letter, do you agree that negates your opinion that Voynow was required to detect fraud?

MR. LA BUDA:  Objection.

You can answer.

A       I don't think it was my opinion they were required to detect fraud.

Q       You do not hold the opinion Voynow was engaged to detect fraud irrespective of any engagement letter, correct?

A       I don't know for sure that they weren't.

Q       Well, what is your opinion as the expert in this case?  Was Voynow retained to detect fraud?

A       There is no written engagement letter.  So it's difficult to say what they were retained to do over a period of twenty-one years and I don't know if at any point during those twenty-one years they were asked to look for fraud.  So I can't answer that.

Q       You see no evidence in any of the

Page 7

Douglas Sosnowski                    80

documents you reviewed to suggest that Voynow was

ever requested or engaged to detect fraud, is that

fair?

MR. LA BUDA:  Objection.

You can answer.

A      Not that I can recall.

Q      If the jury was to accept that the

engagement letters by Voynow were issued and

contain the explicit language that it was not

auditing or verifying the data and its engagement

could not be relied upon to disclose errors, fraud

or other illegal acts, do you then acknowledge

that Voynow was entitled to accept the

representations from Star in response to questions

answered about its books and records?

MR. LA BUDA: Objection.

You can answer.

A      Yes.

Q      Further down on page 2 of exhibit 4

it states that you, meaning Star, "are responsible

for maintaining an adequate and sufficient

accounting system, for safeguarding assets, for

authorizing transactions, and for retaining

supporting documentation for those transactions,

Page 8

Douglas Sosnowski                    81

all of which will, among other things, help assure
the preparation of proper returns."

Q       Do you agree that, irrespective of
what's in this engagement letter, that a company
is responsible for safeguarding its assets?

A       Yes.

Q       Do you agree, irrespective of what's
in the engagement letter that a company has the
responsibility to keep adequate books and records?

A       Yes.

Q       Do you agree, irrespective of what's
in the engagement letter, that a company has the
responsibility to maintain and implement internal
controls?

MR. LA BUDA:  Objection.

A       No.

Q       So it's your opinion as an expert
that a company has no responsibility for
maintaining and implementing internal controls?

A       Correct.

Q       That's irrespective of whatever
nature of the engagement by the accountant?

A       Correct.

Q       Let me follow up on that point, sir.

Page 9

Douglas Sosnowski                    82

Do you agree that management of a company is responsible for the implementation of internal controls of a business?

A       Yes.

Q       That would be the case irrespective as to the nature of any accountant's engagement?

A       Yes.

Q       Do you also agree that the management of the company is not only responsible for the implementation of the internal controls, but to follow up, to make sure they are actually being adhered to?

A       Yes.

Q       Going back to exhibit 4, page 2, do you think that management of a company is responsible for retaining supporting documentation that reflects the positions taken in its tax return?

A       Yes.

Q       What is your understanding as to how long that documentation is required to be maintained?

A       It's typically seven years.

Q       Now at page 5 of your report you

Page 19

Douglas Sosnowski                    92

Q        Quarterly we can agree is four times a year?

A        Yes.

Q        Is it your opinion that Voynow visited Star four times a year during the course of its engagement?

A        I believe I previously answered this question that it was three or four times a year. It may not have always been four times.

Q        You used the word "interim".

A        Yes.

Q        What does interim versus quarterly mean?

A        Well, interim is a more broad term. So, interim would refer to any time you went out prior to year end.  It doesn't necessarily mean it's done at a specific calendar quarter.

If it were quarterly and under normal circumstances, you would go out in April, because that would be the month after the first quarter and you would go out in July, the month after the second quarter.

I don't think Voynow did that.  They would show up in June or August.  They were before

Page 20

Douglas Sosnowski                    93

year end, but not necessarily on the quarter.

Q       You don't cite any date in the documents or report that showed you tabulated the specific dates when Voynow was actually on-site, is that correct?

MR. LA BUDA:  Objection.

He can answer.

A       Well, the time sheets I reviewed on Appendix A.

Q       Nothing in your report lists a specific date that Voynow was on-site, correct?

A       Well, accept for the one that one year.

Q       To be clear, that is the January 19, 2015 date you reference in page 13 of your report?

A       Yes.

Q       Other than that date there is nothing in your report showing when Voynow was actually on-site?

A       Correct.

Q       Did you understand that Voynow did not have remote access to Star's records prior to 2017?

MR. LA BUDA:  Objection.

Page 21

Douglas Sosnowski                    94

He can answer.

A        I didn't know one way or another.

Q        Did you review the deposition testimony of the Voynow accountant?

A        I did.

Q        Do you recall that they all testified they did not have remote access at Star prior to 2017?

A        I did not remember that.

Q        Did you see any evidence in Voynow's documents or in Star's records that Voynow accessed Star's accounting records remotely?

A        No.

Q        If you were to assume there is no evidence and that Voynow could not have accessed Star's records prior to 2017 remotely, would you then agree that the only time Voynow could have accessed or reviewed any of Star's records was when it was physically on-site?

MR. LA BUDA:  Objection.

He can answer.

A        No.

Q        In what way could Voynow have accessed Star's records when it was not on-site?

Page 22

Douglas Sosnowski                    95

A        They could have contacted someone at the dealership and asked them to send over a fax or e-mail.

Q        All right.

Having someone transmit a document is different than logging in and accessing an accounting system, is that correct?

A        Yes.

Q        Would you agree if Voynow did not have access prior to 2017 Voynow would not have been able to access Star's accounting system unless it was on-site?

A        Yes.

MR. LA BUDA:  Objection.

He can answer.

Q        When you formulated your opinions in this case, did you consider or recall the evidence provided by the Voynow accountant as to what documents they would bring if any when they would go to Star to physically visit?

A        Yes.

Q        What is your recollection as to what documents Voynow brought?

A        I don't recall specifically.

Douglas Sosnowski                    103

A       No, that's incorrect.

Q       You last prepared a tax return for an automobile dealership in 2001, is that correct?

A       Yes.

(Discussion off the record.)

Q       You stated that the timesheets support your opinion that Voynow performed procedures consistent with the financial statement review?

A       Yes.

Q       What specifically is it about the time sheets that you are relying upon?

A       Well, first of all, just the volume of time that they spent on these engagements and, secondly, the time of the year that they would go out.

If you were doing only tax work, there would be no need to go out and perform procedures at interim dates like Voynow did.

Q       When you say, "timesheets," you're relying upon the number of hours billed and the timing of the on-site visits by Voynow?

A       And the descriptions.

Q       What specific description are you

Page 34

Douglas Sosnowski                    107

A        No.

Q        Were there any Schedules that you believe support the statement that Voynow performed procedures consistent with the financial statement review?  Did you see any accompanying analytical review work papers?

A        Yes.

Q        For which schedule?

A        I can't recall sitting here.

Q        Where do you recall seeing an analytical review work paper other than the trend analysis report?

A        The trend analysis for sure, yes.

Q        Anything else beyond that?

A        Not that I can recall.

Q        Is it your opinion Voynow provided internal audit services?

A        I don't know if I said that.

Q        I'm asking you.  Do you have that opinion?

A        No.

Q        So page 26 of your report, number 7, you state that, "Voynow made periodic visits to Star during which time it provided review and

Page 38

Douglas Sosnowski                              111

correct?

MR. LA BUDA:  Objection.

You can answer.

A       Yes.

Q       Where in Voynow's records did you see evidence that they were reviewing actual bank statements?

A       I don't recall specifically.

Q       Is it fair to say there is nothing you cited in your report document wise or deposition testimony that supports that statement?

MR. LA BUDA:  Objection.

He can answer.

A       No, that's incorrect.

Q       Tell me where in your report you cited to a deposition or a document showing that Voynow reviewed bank statements.

A       Depositions of Debbie Theochakis and Jackie Cutillo.

Q       Where in your report?

A       Those are all in Appendix A to the report.

Q       Do you understand under the rules you're required to cite specific pages and

Page 39

Douglas Sosnowski                    112

documents that support your opinion rather than

here's the universe of documents that exist?

MR. LA BUDA:  Objection.

You can answer.

A        I included all the documents I

reviewed in Appendix A.

Q        You agree you did not cite to any

specific document or specific deposition that

supports your statement that Voynow reviewed bank

statements?

A        I did not know.

Q        Do you think that for a tax

engagement it is appropriate for an accountant to

propose adjusting journal entries?

A        Yes.

Q        Did you see Voynow proposed adjusting

journal entries in this statement?

A        Yes.

Q        Did you see in the engagement letters

that you reviewed that Voynow indicated it is up

to Star's management to accept these proposed

adjusting journal entries?

A        Voynow did not issue any engagement

letters.

Page 42

Douglas Sosnowski                    115

Q    So when you made the statement they were making general journal entries, that's not accurate, correct?  They did not do that?

MR. LA BUDA:  Objection.

A    No, they developed the general entries and had somebody else input that.

Q    When you say, "general journal entries," you're referring to adjusting general journal entries, correct?

A    Adjusting journal entries, correct.

(Recess taken.)

(After recess, the following ensued.)

EXAMINATION

CONT'D BY MS. FITZGERALD:

Q    Sir, at page 6 of your report you state, under the section entitled "controllership function" that in Voynow's invoices for services rendered Voynow indicated the performance of various controllership functions.  This fundamentally changed the relationship between dealership and Voynow." Do you see that?

A    Yes.

Q    If I understand your statement, when Voynow issued invoices referencing what you

Page 43

Douglas Sosnowski                    116

describe as controllership functions, that was a change in the relationship between Star and Voynow?

A    It changed how Voynow would be perceived.

Q    You don't reference in your report any documents by citation or date as to the specific invoices that reference purportedly controllership functions, correct?

MR. LA BUDA:  Objection.

You can answer.

A    Correct, they're in Appendix A.

Q    They're not cited by date or by bate number in your report?

A    No.

Q    Correct?

A    Appendix A is part of my report.

Q    Do you understand in Federal Court as an expert you can't cite to a whole invoice, to thousands and thousands of documents?  You have the obligation to support the statements in your opinion with specific references to citations, to testimony and documents.  Do you understand that as an expert to Federal Court?

Page 44

Douglas Sosnowski                          117

MR. LA BUDA:  Objection.

You can answer.

A      I was unaware of that specific requirement.

Q      Well, you know it now.

Let's pull up what we've marked as exhibit 9.  Could you see that, sir?

A      Yes, I can see it.

Q      When your report references invoices that indicate performance of controllership functions, is this the document that you're referring to?

A      This is one of them, yes.

MR. LA BUDA:   Just because we're doing this on the fly could you, like, identify what this document is?

I know you're going to send it to us later.  How many pages is it?

MS. FITZGERALD:  This is a September 27, 2017 invoice, a two-page exhibit.  Bate stamped Voynow 25348 and 25349.

Q      Prior to September 2017 did you see any invoices issued by Voynow that referenced special accounting services as requested related

Douglas Sosnowski                    120

A       I believe they did every year during the twenty-one year engagement period.

Q       What are you basing that answer on? What document, bate stamp, date, anything?

A       I don't have it just off the top of my head.

Q       Is it fair to say you don't cite to anything to support that opinion in your report?

A       Other than Appendix A, no.

Q       In your report you don't cite to anything specifically supporting that statement, correct?

A       Correct.

Q       Do you recall the testimony from Voynow as to why it was asked to provide the services that were reflected in exhibit 9?

A       Yes.

Q       Do you recall that Star had decided to appoint Jackie to positions that were held jointly by Vivian and Debbie?

A       No, that's incorrect.

Q       All right.

Who did you understand to be the replacement for Vivian and Debbie?

Page 50

Douglas Sosnowski                    123

for purposes of their tax engagement?

          A      I don't think they ever proposed

entries outside of year end for purposes of the

tax engagement.

          Q      All right.

                 You agree Voynow never did the

monthly closings of Star's books and records?

          A      I didn't know that.

          Q      Do you recall the testimony from

Debbie Theocharis who stated that she and Vivian

did the monthly closing statements?

          A      I recall her saying Voynow did the

year end closing, but I don't recall what was done

on a monthly basis.

          Q      Did you see any evidence indicating

that Voynow ever did the monthly closings for

Star?

          A      I believe they assisted but not every

month.

          Q      So what evidence, where in your

report do you cite to any evidence that Voynow

assisted each month with the monthly closings of

Star's books and records?  Where is that?

          A      I didn't say each month.

Douglas Sosnowski                    124

Q       Where is it?  Where is the evidence?

A       I said occasionally in Appendix A.

Q       Where in Appendix A?

A       I can't tell you as I'm sitting here.

Q       You don't identify in your report anything to support your opinion, correct?

A       Correct.

Q       Would you agree that preparing the monthly and annual financial statements for a dealership is a function of a controller?

A       Yes.

Q       You are aware that the Reynolds system has the ability to retrieve all of the log-in information that would have been generated by any particular user, correct?

A       Yes, correct.

Q       Is it fair to say when you make your opinions concerning Voynow in this case you were never provided with the pool of all of the log-ins or the summaries generated by Reynolds and Reynolds with regard to what Voynow may have done?

A       That's correct.

Q       So you can't point to anything in the Reynolds and Reynolds system that supports your

Page 52

Douglas Sosnowski                    125

opinion that Voynow was providing various controllership functions, correct?

MR. LA BUDA:  Objection.

He can answer.

A      No, I don't believe they accessed the Reynolds system directly.

Q      Would it be possible for a controller of a combined seven automobile dealership group to do his or her job six days out of the year?

MR. LA BUDA:  Objection.

You can answer.

A      I don't know if I can answer that question.  Could you break it down for me?

Q      Is it possible for a controller of a family of automobile dealerships, seven group dealership, to perform the functions of a controller when they only had access to records or only did work seven out of three hundred sixty-five days a year?

MR. LA BUDA:  Objection.

He can answer.

A      They would need assistance.  They wouldn't be able to perform all the functions of the controller, but they would be able to delegate

Page 53

Douglas Sosnowski                     126

to other office staff.

Q    It would be the responsibility of other folks within the office staff who were actually working three hundred sixty-five days out of the year to do those functions?

A    Correct.

Q    Correct?

A    Correct.

Q    In your rebuttal affidavit at paragraph 21 you referenced Star's prior accountant, the Kera Weiner firm.  Do you recall that?

A    I do.

Q    You state that the Kera Weiner firm used a checklist demonstrating consulting services provided to Star.  Do you recall that?

A    Yes.

Q    I will show you what was marked as Exhibit 8, which is one of the very few documents you reference in this case by bates number.  Could you see the document, sir?

A    Yes, I can.

Q    This is a May 15, 1996 accountant's checklist that is generated on a Kera Weiner form,

Page 56

Douglas Sosnowski                    129

an internal control it would be easier for fraud to occur?

A     Yes.

Q     Do you agree it would be easier for fraud to remain undetected?

A     Yes and no.

Q     In some cases it would be easier for fraud to remain undetected?

A     Yes in some cases.

Q     Is having designated check signers on behalf of a company an internal control?

A     Yes.

Q     Is the reason why a company has designated check signers to ensure that the appropriate level of management is authorized to approve expenditures and disbursments on behalf of the company?

A     Yes.

Q     And is it a control design to ensure that people with the relevent level of knowledge and expertise and trustworthiness are the ones who are assigned the responsibility for signing checks?

A     Yes.

Douglas Sosnowski                    130

Q       Do you think that check signers, authorized check signers of a company are authorizing and approving the disbursement of funds reflected in the check when they sign that check?

A       Yes.

Q       You agree that an authorized check signer has the responsibility to make sure that what they are signing is a legitimate expense on behalf of the company?

A       Yes.

Q       Is it an effective internal control for the check signer to require back-up documentation supporting a check before he or she signs it?

A       Yes.

Q       The reason why that's an effective internal control is because, if there was insufficient information to support the check, then the person signing the check would be able to see it before he or she signed it?

A       That's correct.

Q       If there was questionable information in the back-up documentation, then the authorized

Page 58

Douglas Sosnowski                    131

check signer would be in a position to spot that
before he or she signed that check?

A       Yes.

Q       Do you agree it's the responsibility
of the check signer to ask questions about any
payment that might appear to be unusual or suspect
to them?

A       Yes.

Q       One of the reasons why only certain
people are authorized to sign checks is to prevent
the occurrence of theft, correct?

A       Yes.

Q       In order for internal control to work
properly you need check signers to do their job,
correct?

A       Yes.

Q       Would you agree that if an authorized
check signer did not look at the back-up and did
not satisfy themselves of the appropriateness of
the invoice before signing the check then that
internal control is rendered ineffective?

A       Yes.

Q       When you provided your opinions in
this case, did you consider the testimony from

Douglas Sosnowski                    132

Star's owner wherein they acknowledged that they signed checks without looking at back-up?

A        Yes.

Q        Did you address that and that is a failure on Star's part with regard to internal control?

A        Correct.

Q        Did you address that failure on Star's part in any part of your report?

A        No.

Q        If Star's owners had reviewed the back-up supporting checks payable to Staples back in 2001 when they were first presented with a Staples invoice and if they had acknowledged or realized that the purchase reflected in the invoice was not a legitimate purchase on behalf of the company, would you have expected the owners to then have investigated it at that time?

                MR. LA BUDA: Objection.

                He can answer.

A        Yes.

Q        Would have expected if the owners had determined back 2001 purchase on the Staples invoice was made by Carmen Jones for her personal

Page 60

Douglas Sosnowski                    133

use, that the owners would have taken steps to terminate her employment at that time?

A       Yes.

Q       If the owners had taken steps back in 2001 to review the back-up and terminate Ms. Jones at that time, then do you think that all of the subsequent Staples purchases she made from 2001 up through May 2017 would not have occurred?

MR. LA BUDA:  Objection.

He can answer.

A       Yes.

Q       Do you also acknowledge if the owners had taken steps back in 2001 with regards to reviewing the back-ups for the Staples purchases then the alleged theft by Carmen Jones with regards to the reverse deposits scheme, the NMAC scheme, the AMEX scheme, and the Highlander scheme would never have occurred because she never would have been employed?

MR. LA BUDA:  Objection.

He can answer.

A       Correct.

Q       In the same regard, to the extent that Vivian Karouzakis presented a check that was

Douglas Sosnowski                    134

signed by one of the owners without back-up to pay

either Capital One or M & T Bank or HSBC Bank or

any of her personal creditors, do you think if the

owners had reviewed the back-up at that time they

would have realized that it was not a legitimate

business expense?

        A       If they reviewed the appropriate

back-up, yes.

        Q       As a check signer you would expect

they would require the appropriate back-up before

they approved the disbursement?

        A       Yes.

        Q       If they had done that back in May

2013 when first presented with the check regarding

Vivian's alleged personal creditor scheme, would

you have expected the owners would have taken

action to investigate or terminate her employment

at that time?

                MR. LA BUDA:  Objection.

                He can answer.

        A       Yes.

        Q       If the owners had taken steps to

terminate her employment when presented with a

check that did not have proper back-up, would you

Page 62

Douglas Sosnowski                       135

agree that all of the subsequent components of the personal creditors scheme after May 2013 would not have occurred?

MR. LA BUDA:  Objection.

He can answer.

A      Yes.

Q      Would you likewise agree that the employee advance scheme alleged to be $203,000 likewise would also have never occurred?

A      Yes.

Q      With regards to the checks that the owner signed regarding the Motor Sport advertising scheme, you're aware they were presented with checks with an advertising invoice, correct?

A      I don't know that to be true for everyone.

Q      Are you aware that they were never presented with any proof of actual mailings of the advertising brochures?

A      Yes.

Q      So do you agree that when first presented with a check payable to Motor Sports in November 2008, if the owners had required proof of actual mailing at that time, then they would have

Page 63

Douglas Sosnowski                    136

realized that they were not receiving the advertising services reflected in the invoice?

MR. LA BUDA: Objection.

You can answer.

A      Yes.

Q      Would you expect that if the owners were presented with an invoice for which they were being asked to pay, despite everything not received, the advertising services, they would have terminated their relationship with Motor Sports advertising at that time?

A      Yes.

Q      So you would agree then if the owners had required the back-up showing actual proof of advertising services when they signed the first check on November 28, 2008 and terminated that relationship after none of the other expenditures reflected the total 1.4 million dollars wouldn't have occurred?

MR. LA BUDA: Objection.

He can answer.

A      Correct.

MR. LA BUDA:  Let's take a break for a second.

Page 65

Douglas Sosnowski                    138

Q       Is that statement made with regard to any specific dealership?

A       I believe Toyota was the main dealership.

Q       Is that statement made with regard to parts, service, sales?

A       I think all the cash went to the same place.  So it would be all of the above.

Q       Is that the extent of your answer?

A       Yes.

Q       Does an owner's removal of cash from the deposit circumvent internal control related to that deposit?

A       It depends on the specific internal controls of the company.

Q       Are you aware that there is evidence indicating that the owners removed cash from the deposits?

A       Yes.

Q       Knowing that evidence, does that compromise the internal controls surrounding the handling of the cash at the dealership?

A       No, not necessarily.

Q       So in your view it's appropriate or

Page 68

Douglas Sosnowski                    141

this case did you consider evidence or did you review any of the documents showing the extent of cash that the owners had removed from the business?

A        I considered all the evidence that was available to me.

Q        Did you reference that evidence in your report?

A        Yes.

Q        Where did you reference the owner's removing cash in your report?

A        I don't reference it.

Q        Now when you authored your opinion as to economic damage in this case or in any case, do you agree that a proper methodology for a damage calculation would exclude numbers that would reflect a windfall or double recovery?

MR. LA BUDA:  Objection.

He can answer.

A        I don't understand the question.

Q        You have given testimony in written reports as an expert in the past, right?

A        Yes.

Q        You follow a methodology when you

Page 69

Douglas Sosnowski                            142

compute damages in your capacity as an expert, correct?

A    Yes.

Q    As part of that methodology it is appropriate to exclude amounts that would provide a windfall or double recovery, correct?

A    I think that's the job of the judge to decide.

Q    So then is it fair to say when you provided your opinion as to the damages of 4.5 million in this case you did not, as part of your methodology, consider any component that would provide a windfall or double recovery to the plaintiff?

A    I did not see any that would constitute a windfall or double recovery.

Q    All right.

As part of your role in computing damages would you agree a proper methodology would apportion fault if there were two or more people who contribute to a loss?

MR. LA BUDA:  Objection.

He can answer.

A    No.

Page 75

Douglas Sosnowski                          148

A        Yes.

Q        Does that mean it's fraudulent?

A        I don't understand the question.

Q        Is it a fraudulent number because it's a round number?

A        I don't understand.

Q        Is the number in your report, which is a round number, a fraudulent number?

A        I believe that this fee was actually picked.

Q        So then you acknowledge a scenario where a round number can be a legitimate number and not a fraudulent number?

A        It could be.

Q        Is there anything in your report that breaks down the 1.5 mil by year or by dealership?

A        No.

Q        Is it your understanding that this 1.5 mil was the total amount Star paid Voynow?

A        Yes.

Q        To the extent Voynow provided services for other dealerships besides Toyota, Nissan, Chrysler, Subaru, and Hyundai, those services would be encompassed in the 1.5 million

Page 76

Douglas Sosnowski                    149

dollars?

A    I believe so, yes.

Q    Are you aware Voynow provided services for Mitsubishi?

A    Yes.

Q    And for Fiat?

A    Yes.

Q    And for Star Auto Body?

A    Yes.

Q    Are you aware that Voynow provided services for various real estate companies?

A    Yes.

Q    Your report does not distinguish between what portion of those fees went to services provided by Voynow on behalf of any of those entities I just looked at?

A    Correct, it's a total fee.

Q    You state that in 2015 the five main Star dealerships paid Voynow approximately $143,365. How did you compute that number?

A    I added up the invoices.

Q    You added up the invoices issued by Voynow?

A    Correct.

Page 77

Douglas Sosnowski                    150

Q       Were those invoices issued in 2016 or were those invoices issued that related to the 2015 calendar year?

A       They were invoices that related to the 2015 calendar year.

Q       Some of those invoices then would have been issued in 2015 as well as 2016?

A       Yes.

Q       Let me try that again, because I don't think you understood what I was asking you.

When you competed the $143,365 number that's in your report, did that number relate to bills that were issued and dated with the 2015 date or does the number relate to work that was performed relating to Star's 2015 fiscal year?

A       The latter.

Q       All right.

To that extent you would have looked at invoices that were issued in both 2015 and 2016?

A       Yes.

Q       When you competed that number, did you make any distinction for any invoices that related to tax audit services?

Page 78

Douglas Sosnowski                      151

A        I don't remember.

Q        Were you aware that there were tax audits that took place in 2015?

A        I am.

Q        Would you agree that when a tax accountant asked you represent a company in connection with a tax audit that's going to increase that company's tax bill?

A        No.

Q        Do you expect that the accountant's going to provide services related to an audit for free?

A        No, they will charge for their time. It's a separate consulting engagement.

Q        When you talleyed the $143,365, are you able to break down how much of that related to tax audit work?

A        Not as I'm sitting here, no.

Q        But you're aware at least some of it did?

A        No, I'm not sure.

Q        You're not sure one way or the other?

A        Right.

Q        You're not able to break down what

Page 81

Douglas Sosnowski                    154

clients?

A        I can't disclose that.

Q        You can't disclose the identity of your client based on what?

A        Based on client confidentiality.

Q        So is it fair to say there is no support in your report and you're not willing to provide that support as to the statement on page 7?

A        Based on my experience.

Q        At page 8 of your report you state that Doug Filardo embezzled $1,419,874.83 from Star Subaru through payments to a fictitious vendor for advertising work that was never performed.   Do you see that?

A        I do.

Q        Do you acknowledge that there is nothing in your report that allowed a reader to determine any specific act of theft that comprises that amount?

A        It's in Appendix A.

Q        Tell me where in Appendix A I can look at and see a listing of every specific act that comprises the 1.4 million dollars which

Page 82

Douglas Sosnowski                              155

you're offering your opinion on?

A       I can't provide that as I'm sitting
here.

Q       You agree there is nothing in your
report that cites to the date on which any alleged
acts of theft comprising this amount occurred?

A       That is true.

Q       There is nothing in your report that
sets forth the number of alleged acts of theft
that comprises this number?

A       Yes, that's true.

Q       You're aware that Mr. Filardo was
never charged with 18.4 million dollars of theft?

A       I don't know one way or the other.

Q       You told me you were not provided
with a criminal complaint that was actually filed,
is that correct?

A       I wasn't involved in those
complaints.  There was no need for me to look at
anything.

Q       Some of the criminal complaints have
been produced in this case.  Were you provided
with those complaints as part of the discovery?

A       I would have looked at them if they

Page 83

Douglas Sosnowski                    156

were produced.

Q        Did you look at the complaint against Mr. Filardo?

A        I may have seen it.

Q        Does the fact that he was only charged in connection with this advertising scheme with $634,228 impact your opinion in this case?

A        Absolutely not.

Q        Did you see evidence in your review of the document that Mr. Filardo had paid sums to a company called New Vision for advertising expenses?

MR. LA BUDA:  Objection.

He can answer.

A        Yes.

Q        Did you see that evidence in the form of bank statements produced by or on behalf of Mr. Filardo?

A        Yes.

Q        You reviewed the civil complaint that Star Subaru filed against Doug Filardo?

A        Yes.

Q        So you're aware of the allegation that Star Subaru made in that court filing that it

Page 84

Douglas Sosnowski                    157

had in fact received advertising services, but did not know they were being provided by New Vision?

A        Is there a question?

Q        Yes.  Did you see that allegation?

A        Yes.

Q        What is your understanding as to where that 1.4 million dollars figure comes from?

A        It's based on the amount of money that was paid to the fictitious vendor.

Q        It was the money Star paid to Motor Sports?

A        Correct.

Q        If the documents were to show that Star received advertising services, whether from Motor Sports or whether from Motor Sports paid New Vision and New Vision providing those services, do you agree that your figure of 1.4 million dollars is overstated?

                    MR. LA BUDA:  Objection.

                    He can answer.

A        No.

Q        If Star received advertising services through New Vision based upon the documents that have been produced in this case and Star is going

Douglas Sosnowski                    158

to, under your view, obtain the benefit of damages reflecting the 1.4 million dollars, which is the extent of what it paid, that would constitute double recovery, would it not?

MR. LA BUDA:  Over objection he can answer.

A        No, that's the amount that was stolen from the dealerships.

Q        So is the District Attorney of New York wrong when, under its methodology, it discounted the amount that Mr. Filardo's company paid New Vision for advertising services that were provided to Star?

MR. LA BUDA:  Objection.

You can answer.

A        I don't know what the district attorney is doing.  He has a different objective than me.

Q        His objective is to charge the theft, correct?

MR. LA BUDA:  Objection.

He can answer.

A        Yes.

Q        The damages claimed in this case are

                    Douglas Sosnowski                    159

based on theft, correct?

        A       That is correct.

        Q       If the district attorney is
acknowledging that Star received advertising
services for some of the funds that it paid, then
you would acknowledge that there was not a
complete theft of 1.4 million dollars?

                MR. LA BUDA:  Objection.

                He can answer.

        A       No, the 1.4  million dollars was
removed from the dealerships.

        Q       In your mind the mere payment to
Motor Sports without any consideration of the
benefit that may have been received for that
payment is the basis for the damage?

                MR. LA BUDA:  Objection.

                He can answer.

        A       There was no benefit for that
payment.  It went to Doug Filardo and a company he
controlled.

                He controlled both companies as I
understand.

        Q       Did you follow the paper trail of
evidence showing the payments from Filardo's

Page 87

Douglas Sosnowski                    160

company to New Vision?

A       Yes.

Q       So you saw there were payments there
and you saw in Star's records there were
advertising brochures that were produced?

A       Yes, but there was no evidence they
were mailed.

Q       All right.

One way or the other, right?

MR. LA BUDA: Objection.

You can answer.

A       What's the question?

Q       There was no evidence that it was
mailed?  There was no evidence it wasn't mailed?

A       Well, the documents I reviewed did
not show that it was mailed.

Q       Do you recall seeing e-mails between
Mr. Filardo and the owner of New Vision
referencing mailing of advertising?

A       Yes.

Q       You're aware that Star in its court
filing represented that it had received
advertising services?

A       Yes.

Page 88

Douglas Sosnowski                    161

Q      But you discount all of that evidence when you make your opinion as to this scheme?

A      Yes.

Q      Were you aware that Star Subaru participated in a co-op program with Subaru of America?

A      Yes.

Q      Did you understand as part of that co-op program Star Subaru submitted proof of advertising and received a portion of that payment as a reimbursement?

A      Yes.

Q      So to the extent Star Subaru was reimbursed by Subaru of America for any portion of that 1.4 million dollars then that would be an offset to its damage claim in this case, correct?

MR. LA BUDA: Objection.

A      No.

Q      Explain for me why that would not be a double recovery.

A      Star Subaru was paying for advertising services.  They thought they were paying for advertising services of 1.4 million dollars.  The 1.4  is the minimum that they were

Page 89

Douglas Sosnowski                    162

damaged, because they would have paid for advertising that then would have resulted in profits for them.

They never got any of that advertising. Whether or not it got reimbursed with the defrauding of the dealership by Douglas Filardo prevented them from receiving 1.4 million dollars in services.

Whether or not it's a cash loss or a loss of future sales, they still lost the benefit of the entire amount that was fraudulently removed from the company.

Q       Is there any analysis in your report where you undertake to review or calculate what the potential or alleged loss of profits or loss of future sales is in connection with this case?

A       No, I used a conservative amount.

Q       So, under your methodology as a damage expert, if Star paid out 1.4 million to Motor Sports and got $300,000 back from Subaru of America, you don't count that $3000,000 as part of your methodology?

MR. LA BUDA:  Objection.

He can answer.

Page 90

Douglas Sosnowski                    163

A       Correct, because it's offset by services not received.

Q       Despite the fact that Star Subaru alleged in a court filing that it did in fact receive those, correct?

MR. LA BUDA: Objection.

He can answer.

A       Correct, I don't know the methodology or the thinking behind what the district attorney may or may not have been doing.

Q       In your report you have a category called Voynow's violation of the county standards. I'm looking specifically at page 8.

A       Yes.

Q       Now that heading is contained under each of the specific schemes.

A       Yes.

Q       You don't identify or cite to any specific standard in your report for any of these schemes, is that correct?

A       They're on page 3 and 4.

Q       So with regard to the Motor Sports, to the extent you're claiming that Voynow violated certain provisions of the AITPA code of

Page 91

Douglas Sosnowski                    164

professional conduct or statements on standards

for tax services or the code of federal

regulations for tax services or the statement on

standards for consultant services or the statement

for accountant and review services, do we agree

that nowhere in your report under any of these

schemes do you specify which provision or which

standard you claim that Voynow violated for any

particular scheme?

MR. LA BUDA:  Objection.

He can answer.

A    That's true.

Q    When you claim that Voynow violated

accounting standards, you don't pinpoint or

specify which of any of those various standards I

just articulated as part of any particular scheme?

MR. LA BUDA:  Objection.

He can answer.

A    Most if not all the standards were

violated in every single scheme.  It would be

redundant to list them all.

Q    You don't list any.

A    They're listed on page 3 and 4,

because they apply to all the schemes.

Page 92

Douglas Sosnowski                    165

Q      So I just want to be clear, that is your opinion for every statement where you have a category that says, "Voynow violated accounting standards," it's your opinion that every single professional standard set forth under Roman numeral III of your report has been violated?

A      I said most if not all of them. There may be instances where one standard was violated but not the other.

A      One standard was violated in each of these schemes.

Q      As the reader of this document you agree that there is no way I can pinpoint which of these standards you are opining that Voynow violated for any of these individual schemes, isn't that true?

A      They're described on page 3 and 4.

Q      You just told me that not all of those standards apply to each scheme. So I'm saying to you don't acknowledge that your report does not specifY which if any of these standards are violated for any individual scheme?

A      Right, I did not exclude any standards.

Page 93

Douglas Sosnowski                              166

Q       Or identify, correct?

A       I didn't identify anything that was excluded, no.

Q       At page 8 of your report you state that, according to, and this is under Section 2a, according to invoice description Voynow prepared Star Subaru's income tax returns and inspected the list of 1099's issued to vendors each year.

You don't cite to any specific document, testimony that supports that statement, correct?

A       Correct.

Q       Is it your belief that there are Voynow's billing issued to Star Subaru that reflects invoice descriptions regarding inspection of a list of 1099's?

A       It may be in the billing records and not the invoice or just in the billing records.

Q       It may be.  Are you sure?

A       It was in the documents produced by Voynow that they performed the service.

Q       For Star Subaru?

A       For Star Subaru.

Q       That is your testimony?

Page 94

Douglas Sosnowski                                    167

A        That is.

Q        You don't identify anything to support that position, correct?

A        It's in Appendix A.

Q        If there are no such invoice descriptions indicating that Voynow prepared or inspected the list of 1099's, you would agree your opinions set forth on page 8 is undercut?

MR. LA BUDA:  Objection.

He can answer.

A        No, because if it was in the billing records, but we know that they did it.

Q        If it is not in the billing records, then you would acknowledge that your opinion under this specific scheme are undercut?

MR. LA BUDA:  Objection.

He can answer.

A        I don't know if I understand your question.

Q        If the evidence showed that there are no Voynow billing invoices to Star Subaru revealing or indicating that it inspected the list of 1099's, would you agree your opinion with regard to this scheme are flawed?

Page 96

Douglas Sosnowski                    169

Q      Your report references invoice description.  Okay, that's all I'm asking about what you state here.

If the record doesn't support that, you acknowledge that your opinion is flawed.

MR. LA BUDA:  Objection; asked and answered.  He can answer.

A      No.

Q      All right.

You said that the records show Voynow inspected Star Subaru's 1099 did you see any 1099 for a Star Subaru vendor in any of Voynow's work papers for Star Subaru?

A      I've seen them.  I don't recall if they were in Voynow's papers or not.

Q      You may have seen them produced by Star, but you don't know if they were produced as part of Voynow's work papers?

A      I don't track where I received all the documents from, but I have seen the 1099.

Q      That's kind of important in a professional malpractice case, wouldn't you agree?

MR. LA BUDA:  Objection.

He can answer.

Douglas Sosnowski                    170

A       No, I'm just concerned about what was and wasn't done.

Q       Is it fair to say you don't cite to any risk list generated by Reynolds showing Star Subaru's vendors that's contained in Voynow's work papers?

A       That's correct.

Q       You've already told me you did not provide or not receive any evidence in terms of Voynow's log-ins to the Reynolds system, correct?

A       Correct.

Q       So there is no evidence based upon any list that Voynow would have generated for Star Subaru with regard to its 1099 vendors correct?

A       The buttons would have been pressed by an employee of Star.

Q       There is no evidence those buttons that were pressed by Star employees ever resulted in a list of vendors being reviewed by Voynow is there?

A       I believe that's part of the testimony in the depositions.

Q       Whose deposition because you don't cite to anything in your report?

Page 98

Douglas Sosnowski                        171

A       But I know it's been told to me.

Q       It's been told to you, okay.  Who told you?

A       Jackie Cutillo.

Q       Jackie.

Did you see that in Jackie's sworn deposition testimony?

A       I don't recall if it was in there or not.

Q       I state at the bottom of page 8 the fraud scheme was ultimately discovered when a 1099 was issued to Motor Sports advertising in 2017. Do you see that?

A       Yes.

Q       You cite to that document, correct?

A       Correct.

Q       Were you aware that the IRS had issued a letter to Michael Koufakis in 2016 regarding the 1099 involving Motor Sports advertising?

A       Not until I reviewed the rebuttal reports.

Q       Is it your opinion that the IRS issuance of a letter in 2017 was the first

Douglas Sosnowski                    172

occasion by which Star could have known that Motor Sports advertising was not a legitimate vendor?

MR. LA BUDA: Objection.

A    No.

Q    So do you agree that Star could have realized that Motor Sports was not a legitimate vendor when it did not provide proof of actual [deliver|delivery] of advertising services?

MR. LA BUDA: Objection. He can answer.

A    Yes.

Q    With regards to the IRS letter send to Michael Koufakis in 2015 am I correct there is no evidence in any depositions or documents that letter was [ever|every|of] sent or shared to Voynow?

A    I do not know either way.

Q    You didn't see anything indicating that it was correct because you told me you didn't know about it [throughout|through the] rebuttal?

A    Correct.

Q    Did Michael Koufakis have a responsibility to follow up and look into a letter he received from the IRS suggesting that there may

Page 100

Douglas Sosnowski                              173

have been a problem with the mother supports

advertising 1099?

          MR. LA BUDA:  Objection.  He can

     answer.  ?

     A     Yes.

     Q     Does the fact that the IRS issued

this letter in 2015 to Michael Koufakis impact in

anyway your determination as to the length of

damages in this case?

     A     No.

     Q     Why not?

     A     Because this has been going on for a

long time.  So it happened for, like, eight years

before this letter was issued.

     Q     After the letter was issued in 2015 I

believe it's February 2015, to the extent that

Star Subaru continued to pay invoices to Motor

Sports advertising despite being on notice from

the IRS, does that impact your view of the damages

as to this scheme?

     A     No, the money was still not there.

It was still paid and left the company.

     Q     Despite being on notice from the IRS

and despite not receiving proof of actual

Page 101

Douglas Sosnowski                    174

services, it's your view that Star Subaru is entitled to the damages despite its own action or interaction?

MR. LA BUDA:  Objection.

He can answer.

A     I don't know if that's what I said.

Q     Is that your view?

A     My view is that Star Subaru does not have the money and they would have the money had this scheme been uncovered by Voynow ten years ago.

Q     Does Star Subaru's owner have the obligation, after being put on notice from the IRS to look into whether or not Motor Sports was a legitimate vendor?

MR. LA BUDA:  Objection.

He can answer.

A     Yes.

Q     To the extent they failed to do so do you apportion any blame to them?

MR. LA BUDA:  Objection.

He can answer.

A     Yes, there was no follow-up.

Q     All right.

Page 104

Douglas Sosnowski                    177

dealership to also purchase advertising to the extent your opinion is that a round number is unusual that they also would have been attune to that?

MR. LA BUDA:  Objection.

He can answer.

A        No business owners sometimes delegate responsibilities to accountants because they're better at that.

They're not always attune to different things that require additional investigation.

Q        You're saying the Star owners did not delegate their check signing responsibilities they signed the checks?

A        They signed the checks, yes.

Q        They were the ones presented with the invoices and they were the ones who decided whether or not the invoices were legitimate, correct?

A        They signed the check. I don't know what support they actually looked at.

Q        All right.

Other than your own experience you

Page 105

Douglas Sosnowski                178

don't cite to any journal or study or standards or publications supporting your statement that advertising invoices in a round number are unusual for an automobile dealership.

A        No, I don't.

Q        You also don't cite to any specific Schedule 18 that was produced by any party in this case in support of your opinion in this section, correct?

A        That's correct.

Q        You don't cite to any specific Schedule 18 that was contained in Voynow's work papers that referenced Motor Sports advertising, correct?

A        Well, they didn't always print out the Schedules.  Sometimes they viewed them on the screen when they were out there.

Q        All right.

         Are you aware of any Schedule in Voynow's work papers that contained or any reference to Motor Sports advertising?

A        I don't recall.

Q        You don't cite to any in your report, do you?

Page 106

Douglas Sosnowski                    179

A      No.

Q      So you also aren't aware as to whether or not any schedule that was in Voynow's work papers or that Voynow looked at?  You don't even know whether Motor Sports was on it and if it was, whether there was a round number next to its name, is that true?

MR. LA BUDA:  Objection.

He can answer.

A      I know they looked at every schedule every time I went out there.

Q      You don't know on the three dates each year that they went out there.  You don't know whether or not Motor Sports was listed on any of those Schedules at any time, do you?

MR. LA BUDA:  Objection.

You can answer.

A      They would have reviewed the transactions to date when they went out there.

Q      What you say in your opinion is that Schedule 18 was unusually round numbers for Motor Sports advertising where Voynow purportedly violated accounting standards that's what you say in your report, correct?

Douglas Sosnowski                    180

A        Correct.

Q        Am I correct on the three occasions each year that Voynow went out to Star and looked at Schedule 18, you don't know whether Motor Sports was on any schedule and number 2, if it was, whether or not the entry next to it was a round number, is that true?

MR. LA BUDA:  Objection.

He can answer.

A        It happened over a period of ten years.

Q        You're the expert in this case and you're offering an opinion against my client.  I'm asking you whether or not you have facts to back up that, number 1, Voynow would have seen on the three occasions each year the Schedule 18 it looked at Motor Sports advertising on it and whether or not the entry next to it was a round number?

MR. LA BUDA:  Same objection.

You can answer.

Q        You don't know, sir, do you?

A        Had they looked at Schedule 18 and it was a round amount, they should have questioned

Page 108

Douglas Sosnowski                                    181

it.  To the extent they didn't, then they were derelict in their duties.

Q     But you don't know if the schedule they looked at on the three dates they were there each year had Motor Sports advertising on it, do you?

MR. LA BUDA:  Objection.

You can answer.

A     I do, because they looked at every Schedule Motor Sports advertising was always there every month.

Q     That's not the truth.  Vendors come on and off schedule if bills are paid, you're moved on and off schedule isn't that true?

A     They looked at the monthly ones in the binder.  When they got there, they would look on the screen and say what's current every month. They would print out the schedule so Voynow could look at them.

They were looked at in the office at Star Auto so they could see the history.

Q     Who testified that occurred?

MR. LA BUDA: Objection.

You can answer.

Douglas Sosnowski                    182

A        I don't recall if it was in anybody's testimony.

Q        That was something Jackie told you, right?

MR. LA BUDA:  Objection.

Q        Sir, I'm going to try it one more time.

When you offered that opinion whether or not on the three occasions each year that Voynow went up and looked at Schedule 18, you don't know for a fact that Motor Sports advertising showed up on those Schedules, correct?

MR. LA BUDA:  Objection.  Same objection.

You can answer.

A        Voynow didn't have great documentation.  So, I wouldn't know.

Q        You wouldn't know, okay.

We would agree nowhere in this report under your section do you tie any specific entry that may or may or may not have shown up on Schedule 18 to any specific acts of theft by Mr. Filardo?

A        That's correct.

Douglas Sosnowski                    183

Q       Nowhere in your report under this section do you identify a point in time as to when Voynow should have discovered any specific acts of theft by Mr. Filardo?

A       At any point during the ten years.

Q       You agree that Voynow could have only discovered any act of theft after it occurred, correct?

A       That's correct.

Q       All right.

You're aware of Star Subaru's testimony in this case that the theft occurred at or around the time that the owner's son signed the check approving the disbursement?

A       Correct.

Q       There is nothing in your report that ties any visit by Voynow to any specific check that was signed by the owners with regard to any alleged acts of theft in this scheme, correct?

A       I don't know what checks Voynow looked at.

Q       If you could turn to page 10 of your report, sir.

Under Section C at the bottom.  You

Douglas Sosnowski                      184

state that Despina Theocharis, an office manager for Star Auto failed to repay loans for Metro Chrysler Plymouth in the amount of $98,897.98, correct?

A       Correct.

Q       Could we agree that your report does not quantify the number of loans that comprised this $98,000?

A       Yes.

Q       Could we agree your report does not specify the amount of any particular loan that relates to this scheme?

A       You can find it by looking at the documents in Appendix A.

Q       Well, there is nothing in Appendix A that references the amount of any specific loan and there is nothing in your report that does so, isn't that true, sir?

A       No, that's not true.

Q       Where in your report, show me, does it break down the amount of any specific loans that were made from 2010 to 2016 relates to this scheme?

A       The amounts are all in Appendix A.

Page 112

Douglas Sosnowski                          185

Q        I'm looking at Appendix A.  I don't see a breakdown of any loans that comprise the $98,000 that occurred between 2010 to 2016.

A        You have to add up the amounts.

Q        You don't see any amounts?

A        You're just looking at the summary.

Q        You don't provide any reference to any documents to support this statement, do you?

A        I do.  I thought you had all the documents that are listed in Appendix A.

Q        Where in your report are you referencing there were loans that were made supporting this $98,000?

A        It's not in the body of the report.

Q        Is it fair to say your report doesn't state when any of these loans were issued?

A        It does not, no.

Q        Your report doesn't state whether any of these loans were paid by cash or check?

A        It does not say that.

Q        To the extent it was by check, your report doesn't identify the bates number of any check, correct?

A        Correct.

Page 113

Douglas Sosnowski                    186

Q        So somebody reading this report would have no idea as to the extent of loans that were made to Ms. Theocharis at any time between 2010 to 2016?

MR. LA BUDA:  Objection.

He can answer.

A        Not without looking at the documents in Appendix A.

Q        Is it your contention that this $98,000 represents the full balance of loans made to Ms. Theocharis or is it a component of the loans or don't you know?

A        It's the loans that were not repaid.

Q        But my question is:  Are those full loans that were not repaid or were they only partial payments made or don't you know?

A        There were partial payments made on loans.  This is the net amount.

Q        Are you aware that you did review the testimony regarding these loans?

A        Yes.

Q        Did you review the testimony of Steve Koufakis?

A        I did.

Page 114

Douglas Sosnowski                    187

Q        You are aware that he was the one who authorized loans to Debbie Theocharis, correct?

A        Correct.

Q        You are aware that he testified he believes she repaid all the loans, correct?

A        Correct.

Q        You reviewed the testimony of Debbie Theocharis, correct?

A        Correct.

Q        She testified that she repaid all of the loans, correct?

A        Correct.

Q        So the two parties to the loans have both testified consistently the loans are repaid, correct?

MR. LA BUDA:  Objection.

He can answer.

A        I don't know if she provided a definitive answer.

Q        Well, you read the deposition, correct?

A        Yes.

Q        He testified he believes she repaid the loans.  Several times he made that statement,

Page 115

Douglas Sosnowski                    188

correct?

MR. LA BUDA:  Objection.

Q    He is management of Star Chrysler?

A    Yes.

Q    Did Star Chrysler have any responsibility to document the loans it was extending to its employees?

A    Responsibility to who?  I don't understand the question.

Q    Responsibility to itself to document the loans it would issue to its employees as part of a proper internal control.

A    It's good business practice.

Q    Is it also good business practice to have a repayment scale set forth for loans?

A    Yes.

Q    Is it also good business practice to have the terms and the amounts of the loans and how it was issued documented?

A    Yes.

Q    Is it also good business practice to actually track the repayment of these loans by employees?

A    Yes.

Page 116

Douglas Sosnowski                                    189

Q        Do you agree or do you acknowledge that Star Chrysler did not in fact follow any of those good business practices with regards to employee loans to Debbie Theocharis?

MR. LA BUDA:  Objection.

He can answer.

A        Yes.

Q        You agree?

A        I agree.

Q        You state at the bottom of page 10 of your report from 2010 to 2016 Theocharis recorded several fictitious journal entries to incorrectly reflect her loans were being repaid, correct?

A        That's correct.

Q        Your report does not reference any of these allegedly fictitious journal entries, correct?

A        Correct.

Q        There is nothing to indicate the date of any journal entry or the amount, correct?

A        Correct.

Q        Your report does not cite to any specific Voynow work paper that indicated it ever saw any of these allegedly fictitious journal

Page 117

Douglas Sosnowski                              190

entries, correct?

MR. LA BUDA:  Objection.

You can answer.

A        Correct.

Q        Is it your opinion that any journal entry made by anyone using journal 11 is fictitious?

A        No, only if it was supposed to be a cash transaction.  There are different journal entries.

There is entries that would be to record payroll, to record accounts payable, sales, everything.

There is journal entries to record everything, but the ones that are important to look at are the ones that are cash based transaction entries, that involve cash, cash receipts, cash disbursements.

So, to the extent that there is a journal entry where there should have been a cash transaction it should be investigated.

Q        Did you review Debbie's testimony as to how she performed her job on a daily basis?

A        Yes.

Page 121

Douglas Sosnowski                    194

MR. LA BUDA:  Objection.

You can answer.

A       No, because I know the entire $98,000 wasn't repaid.

Q       You know that because you spoke to Jackie, correct?

A       Because I reviewed the documents.

Q       All right.

You don't cite to any of these allegedly fictitious journal entries in your report, do you?

MR. LA BUDA:  Objection.

You can answer.

A       They're all in Appendix A in my report.

Q       There is nowhere in your report where you set forth the date, the amount or anything for any of these journal entries, correct?

MR. LA BUDA:  Objection.

A       They're all in the schedule in Appendix A.

Q       I'm looking at Appendix A and I don't see a list of fictitious journal entries, is that correct?

Page 122

Douglas Sosnowski                    195

A       Appendix A includes all the documents listed.

Q       Appendix A includes the universe of documents produced in this case, okay?

MR. LA BUDA:  Objection.

Q       Where in your report do you identify the date or amount of any fictitious journal entry you believe supports this $98,000?

MR. LA BUDA:  Objection.

He can answer.

A       It's in Appendix A.

Q       It's not in your report, is it?

A       Appendix A is part of my report.

Q       Where in Appendix A is it set forth the date and the amount of each and every fictitious journal entry that you are offering an opinion on based against my client?

MR. LA BUDA:  I'm going to look at the witness to look at Appendix A.

A       Item 219.

Q       I'm sorry?

A       Item 219.  I'm sorry 14, sorry.

Q       Could we agree there is nothing in item 214 that connects any of these alleged

Douglas Sosnowski                     196

fictitious journal entries to any Voynow work paper or to any on-site visit by Voynow that's not fair, is it?

MR. LA BUDA:  Objection.

He can answer the question.

A       I don't know specifically, but I know they looked at every schedule every time they went out there.

Q       If we look at 214, those are all Star based documents, correct?

A       Yes.

Q       There is nothing in there that reflects a Voynow work paper?

MR. LA BUDA:  Could you show him that document that are referenced in 214, please?

MR. LA BUDA:  He's looking at the spreadsheet himself.

MR. LA BUDA:  Show him the documents, themselves.

MR. LA BUDA:  If you look at the bates numbers of all these documents, they all say, "Star reflect," correct?

THE WITNESS:  Correct.

Q       They don't reflect Voynow's work

Page 124

Douglas Sosnowski                              197

papers, correct?

MR. LA BUDA:  Objection.

He can answer the question.

Q    Are you aware, sir, that the Voynow work papers that were produced by my office in this case had the designation of Voynow and the document number?

A    Yes.

Q    So could we agree under 214, none of the Voynow documents are referenced as part of your review?

A    Not in 214, no.

Q    Your report doesn't set forth the date as to when Voynow should have discovered any alleged acts of theft by Debbie with regard to any specific loan?

MR. LA BUDA:  Objection.

You can answer.

Q    Correct?

A    Can I review my report?

Q    Sure.

A    The one schedule listed is the employee advance schedule, Schedule 6, for December 31, 2016 which would have been looked at

Douglas Sosnowski                    199

marked as exhibit 6.  Is this the 12-31-2015

schedule you are referencing in subparagraph C of

your report at page 11?

A        Yes, it is.

Q        The fact that Star Chrysler's

management decided to extend loans to its

employees is not indicative of employee theft,

correct?

A        Correct.

MR. LA BUDA:  What is the bates

number on this document?

MR. LA BUDA:  Voynow 19598.

It's how many pages, two pages?

MS. FITZGERALD:  One.

Q        There is nothing in the schedule

we're looking at that indicates any of the loans

to any of these employees are overdue, correct?

A        Correct.

Q        You agree its management's

responsibility to collect on any loans extended to

its employees?

A        Yes.

Q        If management advised Voynow that the

loans to any of the employees listed on this

Page 127

Douglas Sosnowski                      200

document were in fact valid and expected to be collected, was Voynow entitled to rely on that?

A    If a relevent inquiry were made to ownership and they received a satisfactory answer, then yes.

Q    Other than this particular Voynow schedule, you don't identify any other Schedule 6 that contains loans regarding Debbie Theocharis, correct?

A    Not in this -- not on page 11, no.

Q    You don't identify any fictitious journal entry that relates to this $32,500 loan in your report, do you?

A    No.

Q    You don't cite to any fact testimony or any document indicating that this loan was never repaid?

A    No, I used fictitious entries that made it go away.

Q    How much of this loan do you believe went away?

A    7,000 -- $7,500 was the amount.

Q    Looking at this schedule given that it's dated 12-31-15, when if you recall was the

Page 129

Douglas Sosnowski                    202

Q    But with regard to Debbie Theocharis you're not aware as you testify here today of any loans that were set up to be repaid through payroll deduction, correct?

A    Correct.

Q    Did you consider the testimony of Steve Koufakis who said on behalf of Star Chrysler that New York City law precluded loans being paid back through payroll deduction?

MR. LA BUDA:  Objection.

He can answer.

A    No, because that's not how it's done at the Star Auto dealers.

Q    So it's your understanding that, irregardless of what New York City law mandated, Star set up employee loans to be paid back through payroll deductions?

MR. LA BUDA:  Objection.

You can answer.

A    I don't know what the law says.  All I know is they made the loans at the Star Auto dealers.

Q    Just to be clear, you never saw any loans with regards to Debbie specifically that

Page 131

Douglas Sosnowski                    204

alleged theft by Debbie as part of this scheme, do you?

    A       There wouldn't be a bank statement if there was no repayment made.

    Q       You don't make that connection saying this is where it should have shown up and it didn't, correct?

            MR. LA BUDA:  Objection.

            You can answer.

    A       Well, the journal entries reflect a payment didn't happen.

    Q       Are you aware there is a difference in the Reynolds and Reynolds system between a full and a mini schedule?

    A       Yes.

    Q       Do you agree that a mini schedule does not show the detail of general journal entries or any journal entries?

    A       What do you mean by mini schedule Which schedule are you referring to?

    Q       You told me you understood the difference.  What is your understanding of a mini schedule?

    A       Well, I don't know what you call a

Page 132

Douglas Sosnowski                    205

mini schedule, but if you're using the report 0350 and it doesn't have the summary of the journal entries, if you are using 0355, it does.

Q      You've seen testimony Voynow would print out the mini schedule of 0350?

MR. LA BUDA:  Objection.

You can answer.

A      Yes.

Q      Do you recall that testimony?

A      Yes.

Q      You acknowledge that on the mini schedule there is no detail of specific journal entries, whereas, there would be on a full schedule?

A      Journal entries in summary, not specific.

Q      There is no detail, correct?

A      There is no detail of the journal entries on any schedule.  You have to look further.

Q      Is it your view an accountant who is engaged to conduct more than a review but less than an audit is required to review every journal entry recorded in the client's book?

Page 133

Douglas Sosnowski                    206

A       No, it would be what's defined in the arrangement between the firm and the client.

Q       You would acknowledge an accountant who is performing an audit is not required to review every journal entry recorded in the client's books and records?

A       That wouldn't be part of an audit if somebody would review every journal entry.  It would be a consulting service requested specifically by the client.

Q       There is no testimony in this case by anyone that Voynow was ever requested to review every journal entry in Star's books and records, is there?

A       Not that I saw, no.

Q       We could turn to page 15 of your report, under Paragraph H.  You state Vivian embezzeled $202,975.69 through employee loans which were never repaid.

A       That is correct.

Q       Is it your understanding that this alleged theft consisted of cash that was stolen purportedly from Star Toyota deposits?

A       Yes.

Page 138

Douglas Sosnowski                              211

MR. LA BUDA:  Objection.

Q      That's not in your report, is it, sir?

A      Just because they didn't copy it doesn't mean they didn't look at it.

Q      So now we're basing it on the hypothetical.  On the three days per year that Voynow was on-site it would have seen a specific schedule that had a purportedly fake employee loan, is that your testimony?

MR. LA BUDA:  Objection.

He can answer.

A      Yes.

Q      Anywhere in your report or analysis you don't connect any specific visit by Voynow to the existence of any loan that shows up on the books and records of Star, right?

A      I did not list the visit of Voynow.

Q      You didn't do an analysis to even connect them as part of your opinions in this case, right?

A      No, because they looked at every schedule every time they went out.

Q      All right.

Page 139

Douglas Sosnowski                    212

Did you have any facts that you can point to that indicate any of the allegedly fake loans were on the specific Schedules Voynow looked at when they were on-site three times a year?

A      They were listed on the Schedules. Voynow looked at the Schedules.

Q      But you've already said and do you acknowledge that things come on and off Schedules, right?

A      Yes.

Q      All right.

So if something might be on a schedule in January, it might be off in February, right?

A      Correct.

Q      Something might be on schedule on a Monday and it's off on a Wednesday, right?

A      Right.

Q      So there is nothing that you did as part of your analysis that's either in your report or in the appendix which shows on the three occasions each year when Voynow was on-site and looked at the schedule that any of these purported fake loans were actually on the Schedules they

Douglas Sosnowski                    213

looked at, correct?

A        It's not the schedule with the loans. It's the schedule with the loans being removed through journal entries.  That's the part the accountant would look at and think unusual and follow the trail to find out the loan went away without cash actually being received.

Q        So the fact that an employee allegedly with a fake loan shows up on Schedule 6 is not the basis for your opinion against Voynow, correct?

A        Unless it's an unusual amount.

Q        You haven't identified any particular loan or any particular unusual amount in your report, right?

A        Well, not in this scheme, no.

Q        To the extent you're saying that when Voynow would have looked at the journal entries associated with Schedule 6, that's when you're saying that Voynow should have been able to see a purported fictitious journal entry?

A        Yes.

Q        All right.
         You've already told me that journal

Page 141

Douglas Sosnowski                              214

entries, the details do not show up on mini

schedules, correct?

        A        Correct.

                And do you agree there is nothing in

your report that connects the date of any specific

journal entry that you contend is fictitious to

the date of any specific visit by Voynow?

        A        I don't know what they looked at on

every day they went there.  That wasn't part of my

analysis.

                I know they looked at every schedule

when they came up.

        Q        All right.

                To the extent this scheme involved

alleged theft of cash by Vivian, your report does

not reference any testimony from any fact witness

suggesting or supporting Vivian's alleged theft of

cash in this matter, is that correct?

                MR. LA BUDA:  Objection.

                He can answer.

        A        I don't know if I understand the

question.

        Q        When you reviewed the deposition

testimony in this case, do you agree there is no

Page 142

Douglas Sosnowski                    215

witness who testified that they were aware or

observed or knew that Vivian stole cash from 2013

to 2016 in the manner in which you allege in your

report as part of the employee advance scheme?

        A       No, I don't believe so.

        Q       Nowhere in this section of your

report do you cite to any specific date on which

Voynow purportedly should have discovered this

scheme, is that correct?

                MR. LA BUDA:  Objection.

                He can answer.

        A       It would be any time after the date

of the fictitious journal entry.

        Q       So, which again there is no date in

this section of your report, correct?

        A       Correct.

        Q       There is no date of any fictitious

journal entry.  So there is no date on which you

are saying in any section in your report Voynow

should have discovered this scheme?

        A       No, it's in Appendix A.

        Q       Since this scheme involved an alleged

theft of cash by Vivian she purportedly used for

her personal matters, do you agree that Voynow

Douglas Sosnowski                    216

could have only discovered this alleged or any alleged act of theft after it had occurred?

A        Yes, unless they were standing right there when it happened.

Q        You're not aware of any evidence indicating that Voynow was ever standing next to Vivian when any alleged acts of theft as part of this scheme occurred?

A        No.

Q        At page 16 of your report do you suggest that the numbers or the letters that say AFRO or DEBB are fictitious control numbers?

A        Correct.

Q        Your report does not identify either by bates number or by date or by amounts any entry associated with any of these purportedly fictitious control numbers, is that correct?

MR. LA BUDA:  Objection.

A        They're in Appendix A.

Q        Nowhere in your report do you identify any Voynow work paper that reflected these two purportedly fictitious control numbers, correct?

MR. LA BUDA:  Objection.

Page 144

Douglas Sosnowski                            217

A        They were in the schedules.

Q        My question was:  Is there anywhere in Voynow's work papers that you reference in your report that schedules containing those two control numbers were contained in Voynow's work papers?

A        I don't know if they retained copies for that date.

Q        Do you know whether or not any schedules they saw would have had those two control numbers, correct?

A        No, the schedules they would have saw did have those control numbers.

Q        Could you tell me the date on which those control numbers showed up on Schedule 6?

A        Yes, I could.

Q        Where is that in your report?

A        It would be in Appendix A.

Q        Where is that connection to the date of Schedule 6 with those control entries to the specific visit where Voynow was actually on-site that connection doesn't exist, does it?

MR. LA BUDA:  Objection.

A        When you're performing an interim visit, you don't just look at what's going on that

Douglas Sosnowski                    219

AFRO or DEB?

MR. LA BUDA:  Objection.

He can answer.

A     No, we can't agree on that.

Q     You don't cite to it in your report, right?  You don't reference that connection or do that analysis anywhere in this report, do you, sir?

A     I don't list the dates that Voynow went out there, no.

Q     Is it your testimony that any control number which has letters in it such as AFRO or DEB or Extra, that is a fictitious control number?

A     No, but it would lead you to question it.  It's an indication it may be fictitious.

Q     Does the Reynolds system allow users to create known standard control numbers?

A     If you override the system, yes.

Q     That's a function that's actually permitted and described in their user manual, isn't it?

A     Yes.

Q     All right.

The fact that a dealership chose to

Douglas Sosnowski                    220

use known standard control numbers does not

indicate that those transactions associated with

the known standard control number is false?

        A        No, you have to follow the trail.

        Q        Based upon your review of the

documents in this case was ownership aware that

Star was using these known standard control

numbers?

        A        Yes.

        Q        Did you review the similar complaint

against Vivian?

        A        Yes.

        Q        You're aware she has never or was

never charged with this scheme?

        A        I understand she passed away.

        Q        Are you aware that Star attempted to

have her charged with alleged acts of theft prior

to her death and beyond what she was charged with?

        A        Yes.

        Q        Were you provided with the

documentation regarding those efforts?

        A        Documentation regarding what efforts?

        Q        The efforts to have Vivian charged

beyond what she was actually charged with.

Page 155

Douglas Sosnowski                                 228

Q       How many meetings did you have with Michael Koufakis?

A       Two.

Q       Were attorneys present during those meetings?

A       Yes.

Q       You have notes from those meetings as well?

A       I believe I do.

Q       Did you meet with any other Star employees other than Jackie Cutillo and Michael Koufakis?

A       No.

MR. LA BUDA:  If there were any conversations, any comments the witness made involving any conversations where attorneys were present, we'd object on the attorney-client communication privilege.

Q       Is there any date specified in section D of your report as to when Voynow should have discovered any alleged theft by Ms. Jones as part of this scheme?

A       It would have been any time during 2001 to 2017.  This was the oldest scheme, one

Douglas Sosnowski                    229

that goes all the way back to 2001.

Q     You're aware of Star Nissan's testimony the theft occurred at the time Carmen Jones acquired possession of an item using the Staples credit card for her personal use?  Are you aware of that?

A     Yes.

Q     So then you acknowledge that Voynow would have only been in a position to detect any alleged acts of theft after it occurred?

MR. LA BUDA:  Objection.

He can answer.

A     Yes, they can only claim theft after it occurred.

Q     Voynow would have only been in a position to detect any specific acts of alleged theft after the check signers had approved the payment of the Staples invoice, correct?

MR. LA BUDA:  Objection.

A     Correct.

Q     While you state that the range of the theft occurred from 2001 to 2017, do you acknowledge that your report does not specify any date on which any specific act of theft should

Page 160

Douglas Sosnowski                    233

dealerships and that's what I am totaling.

(Time noted: 5:30 p.m.)

Q    All right.

Are you aware as part of this case that Star must prove acts of actual theft to the extent it is claiming theft related damages?

A    I don't know the law specifically, no.

Q    You state at the bottom of page 11 that the accounts payable schedule for Star Nissan listed two separate vendors, correct?

A    It says there were two accounts with the same vendor.

Q    All right.

Are you aware of any Schedule 18 that exists which contained both vendors on the same schedule?

A    I don't know.

Q    You don't cite to any such schedule or document in your report, do you?

A    All the documents are in Appendix A.

Q    As you sit here today, as part of your review, you never remember seeing Schedule 18 that has two different Staples vendors on the same

Douglas Sosnowski                        234

document?

A        I don't recall.

Q        It also is true you don't recall any specific Schedule 18 in any Voynow work paper that had two Staples vendors on the same document?

A        No, I don't remember.

Q        Did you do any analysis as part of your opinions in this case as to which of the two Staples vendors the $68,000 was paid to?

A        Yes.

Q        Who was it paid to?

A        It was paid to Staples.

Q        Under which?  You said there were two vendors set up in the Star system for Staples, correct?

A        Correct.

Q        Does your analysis look at which of those two vendors reflected the payments in Star's accounting system?

A        Yes.

Q        Where is that analysis in your report?

A        It's in Appendix A.

Q        Could you break down that $68,000 and

Page 162

Douglas Sosnowski                    235

tell me how much went to one Staples vendor versus another Staples vendor?

    A     I can't as I sit here.

    Q     It's not in your report, is it?

    A     Appendix A.

    Q     You don't provide any analysis in your report as to how any specific entries on Schedule 18 would reflect personal items purportedly purchased by Carmen Jones, do you?

    A     No, that wouldn't be on Schedule 18.

    Q     Your report doesn't state when a second vendor account for Staples was set up, does it?

    A     No, it does not.

    Q     Do you acknowledge there may be legitimate business reasons why a company might set up two vendor accounts?

    A     It's unusual, but there may be circumstances, yes.

    Q     Would one of those circumstances be if the vendors have different mailing addresses?

    A     No.

    Q     Would one of those circumstances be in the case of the bank, if you were sending loan

Douglas Sosnowski                    238

legitimate supply and, hey, that's not?

A       Not at all.

Q       Owners should be able to do that, don't you agree?

A       But an owner who is managing an automobile dealership wouldn't necessarily get down to that level of detail while they're signing checks.

Q       All right.

But it's your opinion that an accountant based in Pennsylvania is required to get down to that level of detail to determine what supply purchase by one of the clients is legitimate or not?  Is that your opinion, sir?

A       I don't care where they're based out of.  If an accountant is there and notices something that's either obviously incorrect or inconsistent or unusual, then they have a duty to ask questions and obtain additional information to find out if there is a reasonable explanation.

Q       As part of what you describe as more than a review and less than an audit, does that obligate an accountant to actually inspect and review every invoice that is issued to a company?

Page 166

Douglas Sosnowski                    239

A       Not unless that was specifically asked for by the owners.

Q       There is no evidence of that ever being asked for by the owners in this case, isn't that correct, sir?

A       That's correct.

Q       If the Staples bill showed the purchase of a gift card, and based on your testimony Star Nissan had no legitimate reason to purchase a gift card, do you agree the owners would have then been in a position to actually detect an alleged theft when they were presented with the invoice and signed checks?

A       If that's the document that they looked at, then yes, they would be in a better position, because the document showing the theft was right in front of them.

Q       All right.

Let's turn to page 9 of your report. Under subcategory B, "payment of personal creditors."

You state that Vivian embezzeled $590,481.56 from Star Auto and then you break that down between four dealerships, correct?

Douglas Sosnowski                    241

A      That is correct.

Q      So there is no analysis set forth in either the appendix or in your report, correct?

A      The amounts are there.  You need to add them up, yes.

Q      You haven't done that.  You haven't broken that down as part of your analysis and your opinion in this case in your report?

A      I did.  I total it by dealership in my report.

Q      Other than breaking it down by the four dealerships, you don't break it down by specific alleged acts of theft?

A      No.

Q      So there is nothing in this report that tells us how many alleged acts of theft comprised this scheme, right?

A      That's correct.

Q      And there is nothing in this report that indicates a date on which Voynow purportedly should have known or detected any individual acts of theft?  That's not in your report either?

A      As we discussed it would be after it occurred.

Page 169

Douglas Sosnowski                    242

Q        You don't pinpoint any specific theft to any specific date on which Voynow was actually on-site and actually looked at Schedule 21.

A        I did not list the dates that Voynow visited the Star dealerships.

Q        You would agree that Voynow would only have been able to detect this theft after it occurred, correct?

A        Correct.

Q        So that would have been after the owners approved the payment allowing the disbursement of these funds, correct?

A        Correct.

Q        For section 1 A of this part of your report you reference Schedule 21 for rebate and incentive?

A        Yes.

Q        At the bottom paragraph you state that Voynow should have noticed two unusual entries.  Both entries represent checks written to Star Toyota for $3,500, correct?

A        Correct.

Q        Your report doesn't provide any reference or citation either to deposition

Douglas Sosnowski                    243

testimony or to a document that reflects those two

purported entries, correct?

        A       No, the document does not specify

that.

        Q       As you sit here today do you know the

dates of those entries?

        A       No, I would have to look at the

documents.

        Q       Did you know the date that those

entries showed up on Schedule 21?

        A       No, not as I sit here.

        Q       Do you know if those dates coincided

with the dates of Schedule 21 that purportedly

contains these entries?  Do you know if those

dates coincided with any visit that Voynow was

actually on-site?

        A       Yes.

        Q       Where do I see that in your report?

Where did you make that connection in that

analysis?

        A       It's not specifically stated.

        Q       As you sit here today it's not in the

report.  You can't tell me the date of the

entries, the date of the schedule or the date of

Page 171

Douglas Sosnowski                          244

any Voynow visit that purportedly connects all

three of those pieces, right?

        A       That's not how I organized my report,

no.

        Q       Is there any analysis in your report

that connects any of these two entries for $3,500

to any checks issued to either Capital One, M & T

or HSBC?

        A       No.  What I am describing here is the

cover up, because the accountant would be in a

better position to uncover fraud by reviewing the

cover up of the fraud, not necessarily when the

fraud occurred.

                So it's not unusual to see a check

written to Capital One for example.  That wouldn't

be something that would require additional

investigation, but when you're looking at a rebate

and incentive schedule which is a receivable and

you see a check written, so cash is going out

instead of coming in, it is unusual.  It looks

incorrect.  You would want to inquire and

investigate further.

        Q       Did you see anything in your review

of Voynow's work papers, any document produced by

Page 172

Douglas Sosnowski                        245

Voynow, that had Schedule 21, that had the two unusual entries you reference in your report?

A    I don't remember which Schedule 21 I was looking at when I showed this example.

Q    So as you sit here today you're not aware of any Schedule 21 about those two entries ever being in any of Voynow's work papers?

A    Voynow didn't put everything in their work papers.

Q    You're not able to tie any Schedule 21 by date to any specific Voynow visit when it was on-site, are you, sir?

A    Yes, I am.

Q    Where is that in your report?  Show me.

A    It would be the first visit after the entry was made.

Q    When was the entry made and when was that visit?

A    You would have to look at the documents in Appendix A to figure that out.

Q    You're the expert and making an opinion critical of my client.  When did you make that connection?  When did it show up on the

Page 173

Douglas Sosnowski                    246

schedule and when was the Voynow visit?

MR. LA BUDA:  Are you asking him to look at Appendix A, the document inside Appendix A?

MS. FITZGERALD:  I'm asking where he made that connection.  It's not in the report.

MR. LA BUDA:  He said he'd have to look at the papers.

I'm just asking do you want him to look at those papers?

MS. FITZGERALD:  I'm asking where in Appendix A is that connection made.  Either way, where is the connection?

A       I don't understand the question. That's not how I organized my report.

Q       If an owner of a company approved a payment by signing a check, would it be reasonable for an accountant to believe that, that disbursement was a legitimate business expense?

MR. LA BUDA:  Objection.

He can answer.

A       Yes.

Q       With regards to the two unusual

Page 175

Douglas Sosnowski                                  248

"unusual entries" that make up the balance to get the $590,000?

A        That's not how the $590,000 was determined, because there is two pieces.  There is the stealing of the money and the cover-up.

Q        All right.

A        You look at the money going out. That's the 590.

Q        Other than the cover-up for the $3,500 is there anything else that you reference in your report that is indicative of cover-up as part of this scheme?

A        Yes.

Q        Where in Section D of this scheme do I see cover-up for anything other than $3,500?

MR. LA BUDA:  Objection.

He can answer.

A        Well, specific dollar amounts I've referenced in Section B except for that and the $26,000 deposit that's in those are the only two actual amounts that are shown.

Q        Is it your opinion that Voynow was required to balance inner company transactions?

A        Not unless it was specifically

Page 176

Douglas Sosnowski                          249

requested by the owners.

Q        There is no evidence that the owners ever requested Voynow balance inner company transactions, is there?

A        Not to my knowledge.

Q        You reference in subparagraph C on page 10 a purportedly fictitious control number with the "VKFP".  Do you see that?

A        Yes.

Q        Your report doesn't cite to any bates number of any document that contains that control number, does it?

MR. LA BUDA:: Objection.

He can answer.

A        Not in C, no.

Q        Your report doesn't cite to any Voynow work papers that contained or referenced having seen a document with that control number, does it?

A        It would have been seen on the Schedule A rebate and incentive schedule that would have been reviewed by Voynow.

Q        Since you don't include the date of when this control number showed up, is it fair to

Douglas Sosnowski                    250

say you aren't able to identify any date for any specific Voynow work paper that contained a schedule with that entry?

A    No, because they didn't include every schedule in their work papers.

Q    You did not include or conduct any analysis in this report as to the existence of that control number on the schedule coinciding with a specific date where Voynow was actually on-site?

A    I don't understand the question.

Q    There's no analysis in your report connecting any schedule that has that control number VKFP to the date on which Voynow was ever physically on-site.  In other words, there is no analysis showing this schedule on this date and Voynow being on-site to see that entry?

A    Right, it would have been the interim visit after the entry was made.

Q    As we stated, things come on and off schedule, right?

A    Yes.

Q    You don't know, because the dates of the interim visits varied, correct?

Page 178

Douglas Sosnowski                    251

A        Yes.

Q        You don't know whether or not and there is nothing in your report indicating you've done an analysis showing that entry was on the schedule at the time of any Voynow interim visit?

MR. LA BUDA:  Objection.

You can answer.

A        But they had all the monthly schedules at their disposal.

Q        The monthly schedules are only current as of the date they're on-site, isn't that true, sir?

A        The monthly schedules only include transactions up to the date that they're there, yes.

Q        When they log on, on July 5 or July 6, they're going to see what the schedule looked like on July 6, right?

A        Correct.

Q        They're not going to see what it looked like on June 20, correct?

A        No, you would only have month end that are available other than the date you were there.

Page 179

Douglas Sosnowski                    252

Q        Under Subparagraph E for Schedule 7 you state that, "Voynow should have identified general journal entries as unusual for a customer deposit."

A        Yes.

Q        Did you see any Schedule 7 in Voynow's work papers that contained the detail of any general journal entries?

A        The detail would not be there.  You would have to follow the trail.

Q        So by looking at Schedule 7 Voynow would not see the detail for any general journal entries associated with this alleged cover-up and scheme, is that correct?

A        Correct.

Q        Under Section E, monthly bank reconciliations, you state that, "Voynow inspected a monthly bank reconciliation that purportedly involved a fictitious $26,000 deposit from Vivian reported to a general journal entry."

What is the date of that monthly bank reconciliation you're referring to?

A        I don't remember.

Q        You don't reference either by date or

Page 185

Douglas Sosnowski                    258

outside accountant to record a company's

employee's compensation, is it?

A       If the outside accountant is asked to

look at it, then yes.

Q       There is no evidence in this case

suggesting that Voynow was ever asked to look at

compensation being paid to Star's employees, is

there?

MR. LA BUDA:  Objection.

You can answer.

A       There were many services that were

provided during the course of its twenty-one

years, many consulting services, none of them were

documented.  There were no engagement letters.

No, I cannot tell you what was

requested and why Voynow did what they did and why

they spent so much time at these dealerships.

There is no documentation to show that.

Q       There is no documentation or

testimony by anyone in this case to show that Star

ever asked Voynow to review its employee

compensation payments, is there, sir?

MR. LA BUDA:  Objection.

You can answer.

Page 187

Douglas Sosnowski                         260

also involved the generations of checks written by
Star Nissan payable to Star Toyota, correct?

        A       Correct.

        Q       And you don't break down the amount
or date or the number of those checks that
comprised the number that you set forth in this
scheme, do you, sir?

        A       I did not add them up for you, no.

        Q       Do you know who signed those checks?

        A       I believe the owners signed all the
checks.

        Q       Assuming that a check payable to Star
Toyota was cashed, how do you know who actually
received that cash?

                MR. LA BUDA:  Objection.

                You can answer.

        A       I don't know who received it, but I
know that it was removed from the deposit by
looking at the deposit slip.

        Q       You don't know that it was Vivian who
removed that cash, is that fair to say, sir?

        A       No, I could only tell you who
recorded the entry to cover it up.  I couldn't
necessarily pinpoint who took the cash, just that

Page 188

Douglas Sosnowski                    261

it was missing.

Q      Do you recall testimony from various employees indicating that Star paid vendors or other people in cash?

A      No.

Q      You don't recall that testimony?

A      No, I don't recall that testimony. No.

Q      Assume that there is testimony to support that.  Is there anything in your report or your analysis that considers or discounts the fact that a check payable to Star Toyota was cashed and the cash was used for legitimate business purposes?

A      No, because that's not how it would have been done.

Q      But you don't recall reviewing the testimony that showed or supported the fact that cash was being used to pay individuals, vendors or other entities for legitimate business reasons?

A      If that was done, it wouldn't show up on the books and records like it did.  There wouldn't be deposits being changed and reversed. There would be an entry that showed the cash came

Page 189

Douglas Sosnowski                    262

out and who it went to.  That would all be documented.

Q       If it was cashed and used by one of the owners for their personal use, then it wouldn't be documented in the manner you just stated, would it?

A       No, if it was removed by the owners, it wouldn't be any different if it was removed by the employee.

Q       Prior to your review in this case have you ever seen inner company checks issued as part of another case review that was done?

A       Yes.

Q       That's not an unusual occurrence, correct?

A       Not unusual, but it's always a high risk area.

Q       Explain for me how a check can be cashed twice.

A       A check was written and the office manager would take the check and bring it over to another employee who was in charge of the cash and say I need you to cash this check for me.  So they would give them the check and that person who was

Page 194

Douglas Sosnowski                    267

else?

        A       Correct.

        Q       And you're not aware of any evidence that Voynow had access to the Subaru of America portal between Star Subaru and Subaru of America?

        A       I don't know if they had direct access, but they could ask an employee to access the portal if it was necessary.

        Q       Did you see any evidence that anyone at Star ever requested Voynow to access the Subaru of America portal?

        A       No.

        Q       You're aware that Star Subaru contends that any individual acts of theft as part of this scheme occurred at the time the cash was purportedly removed from the deposit by Mr. Filardo?

        A       Yes.

        Q       So do you agree Voynow would have only been in a position to detect any individual act of theft comprising this scheme after it had already occurred?

        A       Yes.

        Q       Your report does not set forth any

Douglas Sosnowski                    268

specific date on which Voynow could have discovered or detected any individual acts of theft that comprises the $378,000, does it, sir?

A        No, because they looked at every schedule every time they went out there.

Q        With regard to the service and parts receivable Schedule 5 that you cite on page 12 of your report, you don't cite to any documents or testimony linking any alleged acts of theft to any customers who may have appeared on Schedule 5, correct?

A        Correct.

Q        You're not aware of any customers whose deposits were allegedly stolen that actually appeared on Schedule 5, are you?

A        Not as I sit here today, no.

Q        Was Star's Subaru's management, including its general manager, obligated to be aware of the incentive program such as this advance program through Subaru of America?

A        I don't know about obligated.  They would certainly be aware of it if they were the general manager.

Q        Are you aware that Subaru of America

Page 204

Douglas Sosnowski                          277

You can answer.

A       I don't know.  An obligation from who?

Q       Would you expect --

A       Who is imposing this obligation?

Q       Would you expect Star to pursue claims against employees, individuals who are alleged to have stolen from them directly?

MR. LA BUDA:  Objection.

You can answer.

A       It's a business decision and the owners would have to make a risk assessment on whether or not they want to pursue that.

Q       When you formulated your opinions in this case, you never interviewed any of the Star employees who were involved in the sale or lease of any of these vehicles, is that correct?

A       That's correct.

Q       So you don't know from them whether or not they actually received payment in connection with any of these transactions?

MR. LA BUDA:  Objection.

You can answer.

A       No, I did not speak with any of them.

Page 205

Douglas Sosnowski                    278

Q      So you don't know whether or not they actually received payment and then it was removed by one of the owners?  You don't know whether or not that happened, right?

MR. LA BUDA: Objection.

You can answer.

A      I can speculate on a number of things.

Q      Is it your opinion that Voynow was required to review every vehicle sale or lease as part of its services to Star?

A      No, not at all.

Q      Would you agree that the theft occurred at the time the vehicle was removed from the premises without full payment?

A      Yes.

Q      Voynow would have only been in a position to discover this theft after the fact?

A      Yes.

Q      Your report does not identify any specific date on which Voynow could have discovered any alleged acts of theft, does it?

A      No, that wasn't part of my report.

Q      To the extent you referenced Schedule

Page 206

Douglas Sosnowski                    279

60, which is the We Owe on page 17 in your

report --

A      Yes.

Q      - - do any of the thefts that are

listed on page 16 in your report show up on any We

Owe Schedule 60?

A      Yes, all of them.

Can we amend that?  Only the first

four.  The last one was different.  It was used

cars.  It wouldn't have been on the We Owe.

Q      So the $9,500 is not on any We Owe

schedule?

A      Correct.

Q      Any of the other four transactions,

do they appear on a specific Schedule 60 that is

contained in Voynow's work papers?

A      They are on a specific Schedule 60.

There is five transactions.  One of them has 2.

Q      Do any of the five transactions show

up on any specific Voynow work paper that you

reviewed on the We Owe schedule?

A      Voynow may not have copied that and

put it their work paper, no.

Q      That wasn't my question.

Page 207

Douglas Sosnowski                    280

My question was:  Did any of those five transactions show up on the We Owe Schedule 60 that is contained in any of the Voynow work papers that you reviewed?

A       I don't believe so.

Q       There is no analysis in your report tying or linking the dates of any Voynow on-site visit to the entries contained on any specific We Owe schedule that reflects any of the five transactions we're talking about?

A       No, it would be the next visit after the transactions were recorded.

Q       You don't have any analysis indicating that at the next time Voynow was on-site any of these five transactions showed up on a work schedule You didn't do that analysis, did you?

A       No.

Q       If you turn to page 12 of your report, so under Section F you've offered an opinion that Carmen Jones purportedly embezzled $367,060 under what you describe as a NMAC\AMEX scheme and you state that scheme occurred from October of 2010 through September 20 14, correct?

Page 216

Douglas Sosnowski                    289

slips to show a reversal of a deposit?

A       Yes.

Q       All right.

So is there any analysis in your report as to what documents exist showing a reversal of deposit and what doesn't exist?

A       So once a pattern is identified you can trace it without actually looking at the documents, because they're following the same pattern.

Q       All right.

A       So, once we know how the fraud was perpetrated, we can replicate it and look for the other side without deposit slips, because that's how it was done.

Q       That would involve assumptions and presumptions on your part, would it not, sir?

A       Yes, there were some assumptions.

Q       How many actual deposit tickets did you see as part of your review to support the reverse deposit scheme?

A       I don't remember.  At least one.

Q       At least one.  That one was less than $2,000, wasn't it, sir?

Page 217

Douglas Sosnowski                    290

A       I don't remember the amount.

Q       All right.

But that would be something that you could have put in your report to actually show how many reversal of deposit documents you actually reviewed, right?

MR. LA BUDA: Objection.

You can answer.

A       Yes, I could have put that in my report.

Q       Other than the fact that there is one document showing a reverse deposit of approximately $2,000, do you agree that there are no other documents in the form of deposit tickets showing reversals that total up to the $127,000 that you have listed in your report?

A       No, it's in the Reynolds and Reynolds system, but we don't have deposit tickets for everything.

Q       All right.

You don't have proof that Ms. Jones reversed the deposit through a deposit ticket, correct?

MR. LA BUDA:  Objection.

Page 218

Douglas Sosnowski                          291

You can answer.

A       We only know that the entry was made in the Reynolds and Reynolds system.

Q       You don't have proof that Ms. Jones -- answer my question.  You don't have proof Ms. Jones made a deposit ticket and reversed it?  That documentation does not exist?

MR. LA BUDA:  Objection.

You can answer.

A       No, but it follows the pattern.

Q       All right.

That pattern is based on one single deposit ticket that exists that you reviewed, right?

A       At least one.  I don't recall how many there were.

Q       You don't cite to even the one that you did review in your report, do you?

MR. LA BUDA::  Objection.

You can answer.

A       No.

Q       To the extent you claim that Voynow should have detected either of these schemes through journal entries, could we agree that your