**MILMAN LABUDA LAW GROUP PLLC**
**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

September 23, 2026

**VIA ECF**
Honorable Edward R. Korman, U.S.D.J.
United States District Court Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

***Re:*** **Star Auto Sales of Bayside, Inc., *et al.* v. Voynow, Bayard, Whyte and Co., LLP, *et al.***
**Case No.: 1:18-cv-5775 (ERK) (TAM)**
**Defendants File No.: 03127-1373**
**MLLG File No.: 76-2018**

Dear Judge Korman:

We represent Plaintiffs (hereinafter, "Star") in the above-referenced accounting malpractice action. We submit this in accordance with this Court's order on August 3, 2026 (Dkt. 136) in opposition to Voynow's August 3, 2026 motion to preclude the testimony of Star's accounting liability expert, Mr. Douglas P. Sosnowski, CPA/ABV, ASA, CFF ("Sosnowski").

For the reasons set forth below, Voynow's proposed motion is baseless and should be denied. After a review of the papers, if the Court still has any unresolved issues with Sosnowski's testimony (which Star respectfully asserts there are none prohibiting his testimony), the Court should address at trial or at a pre-trial Daubert hearing.

## Preliminary Statement

Voynow was Star's accountant for decades, from 1996 through 2017. As set forth in this Court's March 25, 2025 decision, "plaintiffs hired them to [do] 'more than review, but less than audit[]' financial statements." (Dkt. 128, p. 21). Voynow came to Star's facilities for "interim visits" multiple times per year reviewing all of Star's books and records for their accuracy and stayed for multiple days on each occasion. "Star provided Voynow 'free reign' to review its operations, including books and records, accounting schedules, bank reconciliations, control procedures, personnel decisions, and more." (Dkt. 128, p. 4). Voynow printed out each schedule and had access to all of Star's hard-copy monthly schedules every time they visited, and also could (and in fact, did) run similar month-end reports on the Reynolds & Reynolds ("R&R") system. Those monthly schedules were reliable, and the end of each such full schedule would have a recap page with all the sources that are affecting that schedule, for example, adjusting general journal entries (Schedule 11).

In around December 2016, Star discovered that an employee Vivian Karouzakis was embezzling from Star using fraudulent accounting entries to cover up her theft. Thereafter, Star discovered additional embezzlement by other employees again using fraudulent accounting entries to cover up their theft.

On October 16, 2018, Star filed the instant lawsuit against Voynow alleging, inter alia, accounting malpractice.

In support of its claim, Star's expert, Douglas Sosnowski stated, based on evidence in the record, that Voynow's scope of work was "more than review, but less than audited" and opined that Voynow failed to adhere to professional standards because they failed to make reasonable inquiries when in possession of information that was incorrect, incomplete or inconsistent, and that had they done so, the fraudulent schemes identified would have been uncovered in the ordinary course during Voynow's engagement.

In the present motion, Voynow's principal argument is that Voynow could only be liable for malpractice on documents that they actually reviewed and that there is no evidence that Sosnowski could rely on that they reviewed documents that contained any incorrect, incomplete or inconsistent information that would have required further inquiry by Voynow.

Voynow misses the mark in two (2) significant ways. First, based on Voynow's "more than review, but less than audited" scope of engagement, Sosnowski describes the accounting standards needed to complete that scope of work pursuant to AICPA guidelines and in applying that standard correctly opines that Voynow was required to look at every schedule, report, bank reconciliation, adjusting journal entries, and other accounting documents every time it visited Star and review prior months schedules to get a complete picture of the accuracy of those records. Indeed, Voynow drove up from Philadelphia PA to Star's location in Queens NY and conducted 3 to 4 interim visits per year (1-3 days per visit) with a team of generally three (3) accountants where they reviewed Star's books and records for all day long.[1] He further opines that if Voynow had performed their scope of work of "more than review, but less than audited", they should have reviewed documents that were incorrect, incomplete or inconsistent requiring further inquiry which would have uncovered the fraudulent accounting entries, informed Star who would have terminated the employees (which they did) and stop any subsequent embezzlement from occurring. Sosnowski also states that "[t]o the extent Voynow didn't [review the necessary books and records required under their scope of work], then they were derelict in their duties." As this Court recognized in its March 25, 2025 summary judgment decision, the opinion of Star's expert, Sosnowski, is, thus, explicitly grounded in the assumption that the scope of Voynow's engagement required it to take certain steps every time they visited that included reviewing monthly schedules, reviewing bank information, preparing or reviewing adjusting journal entries, responding to accounting questions, and providing accounting assistance to Star personnel. (Dkt. 137-1, p. 2; Dkt. 137-3,[2] p. 2), and he ties that in to the standard of care needed to accomplish that scope of work. This Court referred to the various tasks performed by Voynow, including "reviews of [Star's] internal controls, aged receivables, schedules, and inventories, as well as defendants' calls to the Koufakises to inform them of operational concerns …." (Dkt. 128, p. 23). Sosnowski's opinions in his report are expressly grounded on the assumption that Voynow performed these services (or were required to do so) based on accounting standards set forth by the AICPA.

---

[1] *See e.g.*, Voynow's own billing records for these interim visits. VOYNOW 024810, 024523, 024700, 024523; 024700, 024712, 024668; 024689, 024929, 024667; 024929, 022985; 024797, 024670, 024220, 024669, 024656; 024657). Due to the volume, and in accordance with the directions of the Court's Clerk, other than references to the Court's docket, *e.g.*, "Dkt.," all documents referenced herein, such as Voynow Bates-stamped documents, will be sent to the Court tomorrow and included on a flash drive, with a copy to opposing counsel.

[2] As set forth below, Defendants' objection to Sosnowski's supplemental expert report, dated November 20, 2023, is baseless. *See* Point VIII, *infra*.

Second, Sosnowski further states that under these accounting standards, Voynow had a duty to make reasonable inquiries when it received information that was incorrect, incomplete or inconsistent, and breached that standard of care when it reviewed such documents or information failed to make any further inquiries. Sosnowski repeatedly references documents and other information that Voynow, unquestionably reviewed but did not act on.

Voynow's remaining arguments concerning Sosnowski's qualifications, causation, and damages are equally unavailing.

Lastly, Voynow's motion is also procedurally defective. The issues raised in their motion generally revolve around competing facts (*e.g.*, unsigned engagement letters and scope of engagement, *etc*.) that are for the jury to decide and in any event should be addressed after Star has had an opportunity to present its facts in their entirety to the jury. As such, the Court should hold Voynow's motion in abeyance until the trial and allow Voynow to renew its motion, or alternatively, the Court may hold a Daubert hearing prior to the trial to allow Star to fully present its proofs as opposed to limiting Star to the instant papers. In addition, Voynow raised these arguments in its summary judgment papers (which the Court ruled in Voynow's favor on several fronts) and should not now be raising again for a second time.

## PROCEDURAL ARGUMENTS

### I. VOYNOW'S MOTION SHOULD BE HELD IN ABEYANCE AND RESOLVED EITHER AFTER STAR PRESENTS ITS EVIDENCE AT TRIAL ON WHICH SOSNOWSKI'S OPINIONS REST OR AFTER A DAUBERT HEARING

Voynow never address this Court's inquiry: "whether a Daubert motion to exclude Star's expert is appropriate at this stage or whether it should be addressed at trial instead." In disregard of the Court's direction, Voynow just filed their motion which should be denied on two procedural grounds.

#### A. The Court Should Resolve the Challenged Opinions After Development of Their Factual Foundation at Trial

The Court should reserve determination of Voynow's motion to exclude Sosnowski's challenged opinions until the relevant factual testimony and documentary evidence have been presented and the Court has heard his explanation of their foundation. Voynow could then conduct focused voir dire and renew their objections, permitting the Court to determine which opinions may be presented to the jury. This procedure would enable an informed assessment of the particular factual and methodological issues Voynow raises while preserving the Court's gatekeeping responsibility.

Second Circuit authority permits the necessary reliability inquiry to occur through foundational testimony at trial. In *United States v. Williams*, 506 F.3d 151, 160–62 (2d Cir. 2007), the court upheld admission of expert testimony without a separate *Daubert* hearing, emphasizing the foundation established through examination of the witness. The governing requirement is a sufficient basis for admission when the expert opinions are presented to the jury; a separate pretrial hearing is not indispensable. *Id.* at 161.

Particularly instructive is *United States v. Santiago*, 199 F. Supp. 2d 101, 111–12 (S.D.N.Y. 2002), discussed approvingly in *Williams*. Judge Marrero determined that reliability

could be assessed through the foundation established before accepting the witness as an expert. The contemplated examination addressed the witness's experience, qualifications, methods, and the reliability of those methods. Defendants were permitted to challenge that foundation through voir dire, which the court anticipated conducting before the jury, subject to continuing outside its presence if necessary. *Id.* at 112. That procedure provides a practical model here.

Judge Cogan's reasoning in *Joseph S. v. Hogan*, 2011 U.S. Dist. LEXIS 76762 (E.D.N.Y. July 15, 2011), further illustrates the value of live examination where the challenge concerns the data underlying an expert's opinion. In denying pretrial exclusion, the court explained that testimony and cross-examination would permit a fuller assessment of the expert's reasoning and contemplated revisiting the testimony's reliability after that examination. Although *Joseph S.* involved a bench trial, and its willingness to receive testimony subject to later exclusion reflected that setting, its practical concern applies here: examination of the expert may clarify disputed aspects of the foundation that the written submissions leave unresolved. The jury-trial safeguard is the procedure contemplated in *Santiago*—focused foundational examination, with the jury excused as necessary, followed by a ruling before the challenged opinions are admitted.

The issues raised here warrant that approach. Sosnowski's original report identifies bank-reconciliation review among Voynow's interim services and explains that examination of the reconciliations would have revealed a recorded deposit unsupported by the corresponding bank statement. (Dkt. 137-1, p. 2, § II ¶ 7; p. 11, § V.C.1(a); Dkt. 137-3, pp. 2 and 11). His rebuttal likewise identifies the failure to investigate an aged employee advance and explains how comparison with actual bank activity would have exposed the purported repayment. (Dkt. 137-2, ¶ 55). These passages distinguish an opinion concerning information actually examined from an opinion concerning examination or follow-up that competent performance required. The absence of actual review does not, standing alone, defeat the latter opinion.

After the relevant witnesses and records establish the factual context, Sosnowski can explain the services underlying each challenged opinion, the accounting procedures he considers applicable, the specific records supporting his analysis, and the reasoning connecting those records to his conclusions. Voynow can test those matters through focused examination. The Court can then assess each opinion against the developed foundation, rather than treating every dispute about what Voynow actually examined as necessarily fatal to an opinion concerning what it should have examined.

This request preserves Star's burden under Rule 702. The 2023 Advisory Committee Note expressly states that the amendment imposes no new, specific procedures; it requires the Court to determine whether the admissibility requirements are satisfied. Star therefore requests a trial-stage determination following the pertinent factual proofs and foundational examination of Sosnowski, with examination outside the jury's presence whenever appropriate and a ruling before the challenged conclusions are presented. That sequence permits meaningful gatekeeping while addressing Voynow's concern about exposing the jury to opinions ultimately found inadmissible. Rule 702 and 2023 Advisory Committee Note.[3]

[3] Voynow's challenge, in part, rests on matters not fully explored in its deposition questioning. However, the absence of an elicited explanation should not be equated with the absence of a factual or methodological foundation, without consideration of Sosnowski's reports and supporting materials, which explicitly included, for example, conversations with client, which formed the basis of some of Sosnowski's assumptions (Dkt. 137-1, App. A). Further explanation within the scope of a disclosed opinion is distinguishable from an untimely new opinion. See *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*, 769 F Supp 2d 269, 279 (S.D.N.Y. 2011) (finding "Mr. Minton's report is more explicit about the chemistry upon which he based his initial conclusions, but he 'did not alter this position' and

**B. Alternatively, the Court Should Hold the Motion in Abeyance Pending a Focused Daubert Hearing**

Before determining the admissibility of Sosnowski's testimony on papers, Star respectfully requests that the Court hold Voynow's motion in abeyance and conduct a focused evidentiary hearing addressing the challenged opinions and their foundations. Such a hearing would permit the Court to examine the relationship among the extensive underlying records, the factual assumptions concerning Voynow's engagement, and the accounting principles Sosnowski applied.

Courts within this Circuit have recognized the value of live testimony and cross-examination in assessing evidentiary reliability. In *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995), the Second Circuit described a pretrial evidentiary hearing as "highly desirable" to permit the presentation of expert evidence and testing through cross-examination. Although *Borawick* concerned hypnotically refreshed recollections rather than accounting testimony, its reasoning supports a hearing where reliability requires a developed factual inquiry. The court observed that a hearing would have been more appropriate before the ruling, although it ultimately affirmed exclusion on the record presented. *Id*. Similarly, in *In re Ephedra Products Liability Litigation,* 393 F. Supp. 2d 181 (S.D.N.Y. 2005), Judge Rakoff addressed expert challenges through an evidentiary hearing involving expert testimony, cross-examination, and hundreds of documentary exhibits before determining which opinions could be admitted. That procedure illustrates the utility of a hearing when expert opinions rest on extensive documentary material. *Id.*

A focused hearing would serve that purpose here. Sosnowski's report and Appendix A identify an extensive body of underlying materials. (Dkt. 137-1). Their significance cannot adequately be assessed merely by counting documents or isolating deposition answers; the pertinent inquiry requires examining how particular records support particular opinions. For example, Sosnowski explains that inspection of monthly bank reconciliations would have revealed that a purported deposit recorded through an adjusting journal entry did not appear on the bank statement. (Dkt. 137-1, p. 11, § C.1(a); Dkt. 137-3, p.11). A hearing would permit him to identify the relevant records, explain why the engagement as he understood it required that comparison, and demonstrate the reasoning connecting the discrepancy to his disclosed opinion. Voynow could cross-examine him on each step, and the Court could directly explore any perceived analytical gap.

**II. VOYNOW IS SEEKS TO RETREAD ARGUMENTS ALREADY MADE IN ITS PRIOR SUMMARY JUDGMENT MOTION**

In addition, Voynow's motion in limine is a thinly-disguised repeat of its summary judgment motion that lacks the procedural safeguards of a summary judgment motion, which is untimely and raises issues that are more appropriately raised at trial. Thus, Voynow's motion in limine should be denied on that basis alone.

---

'did not include a new opinion which had not been previously disclosed'"), *adopted and obj. overruled*, *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 2011 US Dist LEXIS 110715, at *3 (S.D.N.Y. Sep. 28, 2011). Accordingly, if the Court were to find that any assumptions needed to be explored, Star requests that the Court reserve decision pending a hearing directed to the disclosed opinions and their existing foundations, so as to provide Star with an opportunity to demonstrate those connections through a focused hearing, including examination of the pertinent records and cross-examination of Sosnowski and other witnesses, with advance identification of the specific testimony and exhibits Star would propose to present.

In its summary judgment motion, Voynow argued that Sosnowski's expert reports are unsupported, unreliable, inconsistent with testimony, and inadmissible. (Dkt. 126-116, pp.16-24) (arguing, customary-fee opinion lacks sufficient support; his claimed controllership services opinion lack a factual foundation (*id*. at 17-18); his opinion that Voynow did not document its engagement disregards contrary evidence (*id*. at 21-22); his opinion about Reynolds & Reynolds having no tax-related purpose is unreliable or irrelevant (*id*. at 23); and that the May 15, 2024 expert declaration contains untimely new opinions (*id*. at 24)). In its summary judgment Order dated March 25, 2025, this Court specifically agreed with several of Voynow's arguments, for example, rejecting Sosnowski's opinion that the fees charged by Voynow were in line with Voynow's scope of work as described by Star. (*See* Dkt. 128, pp. 20-29). Voynow is now impermissibly seeking relief it requested but did not receive in its Summary Judgment motion.

Voynow received Sosnowski's initial September 15, 2023 report, his November 10, 2023 rebuttal report, and his November 20, 2023 supplemental report before taking his deposition on November 28, 2023 (Dkt. 137-1 through 137-4). If Voynow wanted to make a dispositive motion based on a claim that Plaintiff did not have admissible evidence sufficient to establish Voynow's breach of the standard of care and/or causation for a viable accounting malpractice cause of action, they had all evidence necessary for such a motion nearly three years ago. The deadline to make a dispositive motion was February 12, 2024 – more than a year and a half ago. *See* December 13, 2023 Minute Entry Order.

Here, Voynow claims that expert testimony is required to establish the standard of care and causation in this accounting-malpractice case, and, based on its view of what the evidence establishes, that Sosnowski's report is deficient, requiring Sosnowski's preclusion. Although Voynow does not expressly say so, it is clear that Voynow seeks summary judgment by preclusion.[4]

Voynow, thus, seeks not merely to regulate trial evidence, but to eliminate the evidence necessary to present Star's remaining claims. *See Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (holding, generally, that a motion in limine ordinarily serves to narrow trial evidence, not to obtain dismissal of remaining claims after the time for dispositive motions has passed); *Altruis Group, LLC v Prosight Specialty Mgt. Co.*, 2023 U.S. Dist. LEXIS 130070, *13-14 (S.D.N.Y. July 26, 2023) ("[a] motion in limine is generally not the appropriate vehicle for effecting dismissal of entire claims" and "not … the appropriate vehicle to resolve [a] factual dispute" or "weigh the sufficiency of the evidence to support a particular claim or defense") (*citing Pavone v. Puglisi*, 2013 U.S. Dist. LEXIS 9140, at *3 (S.D.N.Y. Jan. 23, 2013)); *Dial Corp. v. News Corp.*, 2016 U.S. Dist. LEXIS 20427, at *14 (S.D.N.Y. Feb. 17, 2016) (same). As stated in *Pavone*, it is well-established that "a motion in limine 'is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because "[t]hat is the

[4] Defendants note that "New York law requires that a plaintiff asserting professional liability claims present expert testimony on the issues of negligence and causation unless a lay jury is competent to evaluate the alleged malpractice." (Dkt. 137, p. 2) (citing *Pennington v. D'Ippolito*, 425 F. Supp. 3d 222, 229 (S.D.N.Y. 2019)). So, the purpose of Defendants' motion is clear. They seek to have the Court weigh the sufficiency of the evidence on which Sosnowski's opinions are based for purposes of seeking judgment without a trial. While Plaintiffs agree that expert testimony is required and will assist the jury, that principle supports admission rather than exclusion. The jury cannot evaluate, without expert assistance, the professional significance of dealership accounting schedules, adjusting journal entries, factory-receivable accounts, employee-advance schedules, reconciliations, vendor-reporting obligations, and the standards governing a CPA's response to inconsistent or anomalous information. As set forth below, Defendants want Plaintiffs' expert excluded because they disagree with his factual conclusions and application of the accounting standards. The Court should instead permit the parties' qualified experts to explain their competing views, subject to an appropriate foundation for each opinion.

function of a motion for summary judgment, with its accompanying and crucial procedural safeguards.''" *Id.*, 2013 U.S. Dist. LEXIS 9140, at *3 (*quoting Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 532 (D.N.J. 2008) (*quoting C & E Services, Inc., v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008)). *See also, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 U.S. Dist. LEXIS 149561, at *10 (S.D.N.Y. Aug. 15, 2022) (stating, "I sometimes cannot believe the things that lawyers do. This is not a motion in limine. It is a thinly - and not at all cleverly - disguised motion for summary judgment on the central issue in this case."); *Douglas v. Smith*, 2008 U.S. Dist. LEXIS 50378, *2 (N.D.N.Y. July 1, 2008) (holding that a "motion in limine is a tool by which to challenge the admissibility of evidence prior to trial" on the grounds that its admission or reference "would be overly prejudicial," that "[i]t is appropriately used only for this relatively narrow purpose" and "is not properly used as a vehicle for a different motion, such a dismissal of an entire claim or complaint"); *Uzhca v. Wal-Mart Stores, Inc.*, 2023 U.S. Dist. LEXIS 43896 (S.D.N.Y. Mar. 15, 2023) (discussed below).

*Pavone* is instructive. In *Pavone*, the Court determined to resolve the issue at trial and explained its reasoning:

> As an initial matter, we will not convert this motion in limine into a summary judgment motion without requiring additional briefing, including Rule 56.1 statements of undisputed facts and memoranda of law. The "crucial procedural safeguards" that accompany summary judgment motions … are not mere formalities; they help ensure the accurate resolution of claims as a matter of law. Defendants cannot evade the procedural requirements of Rule 56 by offering arguments for summary judgment in a motion in limine. … Therefore, the question becomes whether it is more efficient at this stage for the parties to fully brief another summary judgment motion, or to resolve the issue at trial.

*Id.* at *5-6 (citations omitted); *see also*, *Chepilko v. City of NY*, 2024 U.S. Dist. LEXIS 20637, at *3 (S.D.N.Y. Feb. 6, 2024) (same, noting that motion in limine is "tantamount to a second summary judgment motion and, although the Court could consider such a motion, doing so would require additional submissions for the parties to ensure compliance with the 'crucial procedural safeguards' that accompanying motions for summary judgment"); *Funk v. Belneftekhim*, 2019 U.S. Dist. LEXIS 115819, at *10 (E.D.N.Y. July 11, 2019) (same, finding that considering such a motion outside the context of a summary judgment motion would be "unfair to plaintiffs"). All of these cases found, as the Court should here, that it would be more efficient to resolve the issue at trial.

*Uzhca* is also instructive. In that case, the Court denied a motion in limine "to preclude evidence and testimony by [two doctors] that Uzcha's cervical fusion was causally related to the May 29, 2015 accident" on the grounds that "the purpose of a motion in limine is not to function as a belated motion for summary judgment" and because the basis of the motion concerned "a disputed issue of fact, namely, the scope of Uzcha's injury" which was to be determined by the trier of fact. *Id.*, 2023 U.S. Dist. LEXIS 43896 at *21, n. 7. Although *Uzhca* involved personal injury claims, in that case, as here, the defendants sought to preclude evidence and testimony of an expert based on disputed issues of fact. In *Uzhca*, the issue was the scope of plaintiff's injury. Here, it is the scope of Voynow's services, including what Voynow had access to and what Voynow saw on its visits, will be determined by the trier of fact. Thus, here, as in *Uzhca*, it is more appropriate for the Court to resolve the issues raised by Voynow at trial.

Based on the foregoing, the Court should decline to permit Voynow to file the functional equivalent of a late-filed summary judgment motion disguised as a motion in limine, particularly in these circumstances where Voynow's motion concerns disputed issues of fact, which are more appropriately to be resolved at trial.

## MERITS ARGUMENTS

### III. SOSNOWSKI'S OPINIONS ARE RELIABLE

"The Rules of Evidence provide a liberal standard for the admissibility of expert testimony." *United States v. Dukagjini*, 326 F3d 45, 52 (2d Cir. 2002); *United States v. Mustafa*, 406 F App'x 526, 529 (2d Cir. 2011) (same); *Noriega v. Abbott Labs.*, 2026 U.S. Dist. LEXIS 123829, at *9 (S.D.N.Y. June 4, 2026) (noting that courts assess the requirements that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact … in light of the 'liberal standard for the admissibility of expert testimony'") (*quoting Dukagjini*, 326 F.3d at 52).

Under Rule 702, there are two steps in determining the admissibility of expert testimony. *See, e.g.*, *Thomas v. YRC Inc.*, 2018 U.S. Dist. LEXIS 24384, at *9 (S.D.N.Y. Feb. 14, 2018). The "first step" is to determine "whether the expert is qualified to testify." *Id.* (*quoting Artista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (Katz, M.J.) (*quoting Zaremba v. General Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004)). The second step is to "look to the expert's particular opinion itself and permit the expert to testify only if the opinion is both relevant and reliable." *Thomas v. YRC Inc.*, 2018 U.S. Dist. LEXIS 24384 (S.D.N.Y. Feb. 14, 2018) (*citing Feinberg v. Katz*, 2007 U.S. Dist. LEXIS 94967, 2007 WL 4562930 at *6 (S.D.N.Y. Dec. 21, 2007) (Haight, D.J.) (*citing Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

"'[T]he rejection of expert testimony is the exception rather than the rule.' Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702; *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 185 (S.D.N.Y. 2008) (Leisure, D.J.)." *Thomas v. YRC Inc.*, 2018 U.S. Dist. LEXIS 24384, at *9 (S.D.N.Y. Feb. 14, 2018). Preclusion should be denied except in "rare situations," not present here. *JT Cleary, Inc. v. Narragansett Elec. Co.*, 2024 U.S. Dist. LEXIS 197926, at *13 (S.D.N.Y. Oct. 30, 2024) (denying motion to preclude supplemental expert report); *see also, e.g.*, *Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC*, 571 F.3d 206, 213 (2d Cir. 2009) (finding that district court abused its discretion by excluding expert testimony for noncompliance with a pretrial order); *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005).

The Court must act as a gatekeeper, not a factfinder. Therefore, so long as the expert is qualified, his testimony should be admitted "[u]nless the information or assumptions that plaintiff's expert[] relied on were 'so unrealistic and contradictory as to suggest bad faith ….'" *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (*citing R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (*quoting Zerega Ave. Realty*, 571 F.3d at 214). *Washington* continued, "inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *Id.* As explained in *Zerega Ave*, "'other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *Id.* at 214 (*quoting Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). *Zerega Ave.* gave the example of an assumption being, "in essence, 'an apples and oranges comparison.'" *Id.* (*quoting Boucher*, 73 F.3d at 21).

While the parties agree that an expert in accounting would be help the jury, and indeed, is necessary in this action (Dkt. 137, p. 2; fn. 4 above), Voynow's disagreement is not with the usefulness of expert testimony, but with the conclusions Sosnowski reached after applying recognized accounting standards to the evidence he reviewed. That disagreement presents a classic battle of competing expert opinions for resolution by the jury, not a basis for wholesale exclusion under Rule 702.

As an initial matter, experts in disciplines that require the use of professional judgment, such as accountants, *e.g.*, non-scientific disciplines, are less likely candidates for exclusion. *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2022 U.S. Dist. LEXIS 195087, at *177-178 (E.D.N.Y. Oct. 8, 2022) ("'[e]xperts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation'") (*quoting In re Masella*, 2007 Bankr. LEXIS 2719, at *7-8 (Bankr. D. Conn. Aug. 7, 2007) (*quoting In re Comm. Fin. Servs., Inc.*, 350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005)).

As explained in *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54 (Bankr. N.D. Ill. 2002) (*quoted in Masella*): "Accounting is not an exact science. Accountants are therefore required to make judgments about how to communicate financial information. A *Daubert* hearing is not the time to fully test the validity of those assumptions." *Id.* at 70. *See also, e.g.*, *Boyd v Amica Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 191475, at *27 (N.D. Ga. Aug. 20, 2013) (recognizing "that accounting or financial analysis is not an exact science" and denying summary judgment based on alleged unreliability of expert accountant's opinions). *See also, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 2000 U.S. Dist. LEXIS 10271, at *8-9 and 12-13 (S.D.N.Y. July 24, 2000) (denying motion to preclude experts in bankruptcy law opining on the standard of conduct that the defendant bank's officers owed the plaintiff, whether the officers failed to meet that standard and if so, what damages are attributable to that failure and observing that the concerns expressed in *Daubert* "do not arise in connection with the opinions of these [malpractice] experts in bankruptcy law"); *Tokio Marine v. Calabrese*, 2011 U.S. Dist. LEXIS 135987, at *37 (E.D.N.Y. Nov. 28, 2011) (observing that "expert testimony in a legal malpractice action does not lend itself to the scientific and 'technical concerns expressed by *Daubert*'")(*quoting LNC Invs.*). Thus, any rulings on admissibility would turn on factual issues which should be determined at trial. *See, e.g., Louis Vuitton Malletier v Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) (*citing Padillas v Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)).

"The test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016); see also Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"). "In cases where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method is the application of experience to facts." *Scott*, 315 F.R.D. at 50 (citation and quotation marks omitted). As explained in *In re Vitamin C Antitrust Litigation*, 2012 U.S. Dist. LEXIS 181158 (E.D.N.Y. Dec. 21, 2012):

> In non-scientific disciplines … where the use of professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized

> in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion.

*Id.*, 2012 U.S. Dist. LEXIS 181158, at *20-21 (*quoting In re Commercial Fin. Servs., Inc.*, 350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005)) (rejecting motion in limine to preclude economist's opinion as unreliable); *Masella*, 2007 Bankr. LEXIS 2719, at *8-9 (same, forensic accountant). *See also, e.g.*, *Middle Mkt. Fin. Corp. v. D'Orazio*, 2002 U.S. Dist. LEXIS 17817, at *23, 26 (S.D.N.Y. Sep. 18, 2002) (denying motion in limine to preclude attorney's expert testimony in legal malpractice action because an "expert is permitted to testify concerning the law applicable to the underlying action, at least to the extent necessary to explain the expert's conclusion concerning the attorney's standard of conduct"); *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 577 (S.D.N.Y. 2017) (Expert's "experience together with the evidence of past behavior of the credit rating agencies and regulators qualifies them to testify about what credit rating agencies and regulators would have done in a hypothetical scenario" and satisfies reliability requirement); *Singleton v. Fifth Generation, Inc.*, 2017 U.S. Dist. LEXIS 170415, at *13 (N.D.N.Y. Sep. 27, 2017) (rejecting motion to exclude opinion of expert in food science, Donald Coffey, who opined on composition, ingredients and production of vodka and noting that "Coffey's non-scientific testimony calls for a flexible Daubert inquiry").

It is fundamental that an expert should not be excluded merely because the opponent disputes his factual assumptions or conclusions. Unless the assumptions are so unrealistic or contradictory as to render the opinion speculative, disputes over the underlying facts are properly explored through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *Rutledge v. Walgreen Co.*, 182 F.4th 168, 194 (2d Cir. 2026). Moreover, it is entirely appropriate for an expert to base his opinion on assumed facts – that are disputed – because "expert witnesses are not fact witnesses …." *Goetz v. Hershman*, 2010 U.S. Dist. LEXIS 70983, at *53 (S.D.N.Y. July 15, 2010), vacated in part on other grounds, 423 F. App'x 2 (2d Cir. 2011). In *Goetz*, the Court observed that "Defendants' challenge to Plaintiff's experts' testimony is based on the misapprehension that there is something inherently wrong about an expert testifying to his or her opinion based on a set of assumed facts, as Plaintiff's experts did at trial." *Id. Goetz* rejected Defendants' challenge. An expert has "wide latitude to offer opinions based on assumed facts, and it is inappropriate to exclude an expert's opinions "at this stage" when plaintiff "may offer evidence to establish facts upon which" the expert's opinions are based. *Phelps v. CBS Corp.*, 2020 U.S. Dist. LEXIS 223300, at *24 (S.D.N.Y. Nov. 30, 2020) (observing, "Because Plaintiff may offer evidence to establish facts upon which Mr. Paskal relies, including video testimony from Grimes and general testimony from the Plaintiff's Naval Expert, Mr. Paskal's opinions cannot be excluded at this stage") (*citing Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)); *Israel v. Springs Indus.*, 2006 U.S. Dist. LEXIS 80863, at *48 (E.D.N.Y. Nov. 3, 2006) ("An expert may incorporate assumptions into his or her opinion, but those assumptions must be ones that a reasonable juror could find correct based on admissible evidence"); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (affidavit "provide[d] evidentiary details for the [expert's] conclusions").

*Phelps* notes: "It is commonplace to have expert witnesses testify to his or her opinion 'based on a set of assumed facts'—facts elicited elsewhere in the record." *Id.* at *29. As held in *Phelps*, if Defendants "dispute[] these facts, it may attack the factual accuracy of the assumed facts

on which [the expert's] testimony would be premised." *Id.* at *30. Of course, during cross-examination, Voynow is free to ask Sosnowski "if his opinion would change if other facts were assumed." *Id. See also*, *e.g.*, *Allstate Ins. Co. v. Gonyo*, 2009 U.S. Dist. LEXIS 36597, at *21 (N.D.N.Y. Apr. 29, 2009) (noting "wide latitude" accorded to experts and holding, "Expert testimony should not be precluded just because the expert assumed facts not in evidence or did not interview a witness"); *Kalyna v. City of NY*, 2018 U.S. Dist. LEXIS 244718, at *29-30 (E.D.N.Y. Sep. 11, 2018) (noting that the jury is entitled to know an expert's factual assumptions and makes determinations as to facts).

Based on these standards, as set forth below, Sosnowski's opinions are reliable.

**A. Sosnowski Identifies The "More Than Review, But Less Than Audited" Undertaking To Verify Financial Information From Evidence And Explains Why Proper Performance Required Examination Of Relevant Accounting Records Under Applicable Accounting Standards**

Star's principal, Michael Koufakis, testified as to the agreement reached with Voynow in 1996 as follows:

> … They told me that compilation was just basically a cursory check of the numbers. They had explained to me that reviewed was much more in-depth, and that the highest level was audited accounting work. I indicated to them that I wanted the highest level, which was the audited. They said that that was -- that was really not necessary, that it was very high in cost, and typically only reserved for publicly-traded companies. But what we ultimately settled on was something -- and Randy specifically told me at that meeting that there was something in between, more than review, but less than audited. And he said when they would come into the dealerships on a quarterly basis, they would send someone, let's say, to the Toyota parts department and do random VIN checks. Then on another meeting, they might go to Chrysler used cars and check -- do a physical of the used car inventory. So it was more than review, but not quite fully audited. That was discussed. That's what they promised. That's what I agreed to, and that's what they did.

(*See* Michael Koufakis dep. 74:22-75:20) (emphasis added). Koufakis expressly distinguished Voynow's agreed-upon undertaking from a unilateral expectation: "That was discussed [with Franzen and Whyte]. That's what they promised. That's what I agreed to, and that's what they did." *Id*. 75:17–20. He further explained that Voynow "reviewed the accounts that were used to prepare the financial statements" and that, although the work did not rise to a full audit, "it was their job to verify" the information. *Id*. 83:4–6, 109:10–22. This testimony supplies a concrete factual foundation for Sosnowski's assumption that Voynow undertook verification work beyond merely accepting client-supplied figures for tax-return preparation.

During Sosnowski's deposition, Voynow's counsel asked him why he attributed responsibility to Voynow for the schemes addressed in his report but not for other alleged thefts at Star. He answered: "it's based on the evidence that I found in the work papers that Voynow looked at that would have indicated there was some sort of irregularity or abnormality that would require further investigation and inquiry that would uncover that fraud." Sosnowski Dep., 146:13–18. Further, Star's interrogatory responses also state, among other things:

> …Voynow's duties also included overseeing all accounting processes, accounting entries (including reviewing and verifying the propriety of accounting transactions), and internal procedures. Voynow had, and was given, free reign to review everything whenever and however it deemed fit to ensure no fraud or irregularities were found, and was expected to do so. Plaintiffs usually did not direct Voynow to look at any specific items because they understood that Voynow was an expert in the automotive field and trusted its judgment to review areas most susceptible to fraud…. Plaintiffs, Koufakis, and Defendants agreed that, as part of the scope of Voynow's engagement, that after reviewing and extracting all of the data during each quarterly visit, Voynow would generate questions to ask employees if Voynow discovered any errors, red flags, anything aged outstanding at time of the visit, and/or any other issues. Plaintiffs and Voynow agreed that Voynow would notify Koufakis about each and every such issue. Plaintiffs' office employees were told by Vivian Karouzakis ("Karouzakis) and Despina Theocharis ("Theocharis") that any issues brought to Voynow's attention by the employees to Voynow or by Vownow to the employees would be relayed to Koufakis. Under Voynow's engagement, Voynow was required to answer all of Plaintiffs' questions covering the broad scope of their work.

(Plaintiff's Interrogatory Responses, #2).

In its summary judgment motion, Voynow also directly acknowledged Star's position – that "plaintiffs hired them to 'more than review, but less than audit[]' financial statements." (Dkt. 128, p. 21). "To conduct its work, Voynow sent teams of accountants to the Star Dealerships multiple times a year, where Star provided Voynow 'free reign' to review its operations, including books and records, accounting schedules, bank reconciliations, control procedures, personnel decisions, and more." (Dkt. 128, p. 4). Thus, when Voynow moved for summary judgment, "[D]efendants [did] not dispute that their role in 'verifying' the accuracy of plaintiffs' books and records, as the parties agreed to in 1996, required additional services beyond mere tax return preparation." (Dkt. 128, p. 22). This Court referred to the various tasks performed by Voynow, including "reviews of [Star's] internal controls, aged receivables, schedules, and inventories, as well as defendants' calls to the Koufakises to inform them of operational concerns …." (Dkt. 128, p. 23).

Substantively, Voynow ignores the purpose of Sosnowski's opinion. Sosnowski is a liability expert in this case who was expressly retained to present non-scientific, expert testimony, "to evaluate the scope of work performed by Voynow … and if the quality of work was performed in accordance with professional standards" and "due care." Dkt. 137-1, p. 1; Dkt. 137-3, p. 1). Sosnowski's opinion is grounded on well-established accounting principles and accounting standards that are not even disputed by Voynow's own accounting expert, Mr. Stephen J. Scherf, CPA/CFF, CFE ("Scherf"), who cites to the same exact standards. (Sosnowski Dep., at pp. 301-02; Scherf Report, pp. 6-7).

As to accounting principles, Sosnowski explained that "all CPAs are expected to" exercise "professional skepticism," which means that "a certified public accountant should make reasonable inquiries if the information furnished by the taxpayer appears to be incorrect, incomplete or inconsistent." (Sosnowski Dep., 301-02; Dkt. 137-1, pp. 3-4, 17-18; Dkt. 137-3, pp. 3-4, 18-19). Sosnowski testified, consistent with his report, that a CPA is required to exercise professional skepticism in both attestation engagements and tax engagements. *Id.* Thus, regardless

of scope of the engagement, if a CPA has reason to believe that information it has received is "incorrect, incomplete or inconsistent," they have an obligation to dig further. *Id.*[5]

Sosnowski's report notes that "a tax practitioner cannot ignore the implications of information furnished to him or her. If any information furnished, or otherwise know, appears to be incorrect, incomplete or inconsistent, the tax practitioner must make reasonable inquiries." Sosnowski cited the Code of Federal Regulations (CFR), 31 CFR §10.34(d).

Sosnowski's expert report also explains AICPA standards for a CPA's Consulting Services and for Accounting and Review Services. (Dkt. 137-1, p. 4; Dkt. 137-3, p. 4). As to Consulting Services, CPA practitioners "are subject to the standards of professional competence, due professional care, adequate planning and supervision and obtaining sufficient relevant data." *Id.* (*citing* AICPA Consulting Standards). In a review engagement, "if the accountant becomes aware that information coming to his attention is incorrect, incomplete, or otherwise unsatisfactory, he should perform additional procedures deemed necessary." *Id.* (*citing* AICPA's Statement on Standards for Accounting and Review Services (SSARS)).

These standards, among others, are explicitly stated in Sosnowski's reports. (Dkt. 137-1, pp. 3-4, 17-18; Dkt. 137-3, pp. 3-4, 18-19). And, Scherf cites to the same exact standards. (Scherf Report, pp. 6-7). Thus, Voynow's statement – that "Sosnowski fails to actually cite to any specific accounting standard Voynow purportedly violated for any alleged scheme" and failed "to state whether Voynow violated" tax standards, Consulting Standards or SSARS – is demonstrably false. (Dkt. 137, p. 7). He clearly did.

Sosnowski's reports specifically identify the professional standards governing the services Voynow performed. (Dkt. 137-1, pp. 3-7; Dkt. 137-3, pp. 3-7). Sosnowski's expert opinion covers all potentially applicable standards. (*Infra*., Point III.A.5). For example, his opinion notes:

> A CPA who performs review or controllership functions has a greater responsibility for the accuracy of the financial information than a CPA retained merely to prepare income tax returns. For a tax-only engagement, unless the CPA receives information that appears to be incorrect, incomplete or inconsistent, the CPA generally would not be responsible for detecting fraud because they would accept the company's financial information, as presented in the trial balance. Nevertheless, a tax preparer must make reasonable inquiries if the information furnished by the taxpayer appears to be incorrect, incomplete or inconsistent.

(Dkt. 137-1, p. 6; Dkt. 137-3, p. 6).[6] More importantly, Sosnowski's expert opinion is not dependent on the jury finding that Voynow's scope of services went well beyond a tax engagement. This is so because, as Sosnowski opines, under the CFR, even a tax practitioner must make

---

[5] As to the principle of professional skepticism, Scherf, at his deposition, agreed: "Voynow does in the preparation of tax returns need to identify items that appear on their face to be inaccurate and then follow up with appropriate inquiries. So I agree that that's the case …." (December 14, 2023 Scherf Dep., at 77-78, 90-91). However, Scherf also testified that if Voynow received a response, "okay," such as, "Ok per Viv," to an inquiry, they have "satisfied their professional obligations" because "professional judgment is subjective …." *Id.* at 80 and 91. Thus, Scherf appears to hold the view that a CPA satisfies professional standards so long as he asks a question and that he may accept the response to that question even if the response is only a conclusion that provides no additional facts to resolve the issue raised or receives an answer that makes no or little sense.

[6] Under the consulting and review standards, a CPA may be held to a higher standard of care. The Consulting Standards require the CPA to have "sufficient relevant data." Under SSARS, the CPA must "perform additional procedures deemed necessary" when in receipt of incorrect, incomplete or inconsistent data.

reasonable inquiries when in receipt of information that appears to be incorrect, incomplete or inconsistent.

Sosnowski explained that the governing standards require competence, due professional care, adequate planning and supervision, and sufficient relevant data. *Supra.* He further explained that even in a tax engagement, while a tax practitioner may ordinarily rely upon information furnished by the client, he may not ignore information that appears incorrect, incomplete, or inconsistent and must make reasonable inquiries when such information comes to the practitioner's attention. *Supra.*[7]

In his Appendix A, Sosnowski identified the sources that that he considered in forming his opinions, Appendix A cites 225 sources. (Dkt. 137-1, pp. 26-29). The very first source category identified is "Discussions with Client (Star Auto)." (*Id.*, p. 27). Also referenced are professional standards, pleadings, interrogatories and responses, tens of thousands of pages of document discovery, 184 deposition exhibits, plus 45 deposition transcripts. (*Id.*, pp. 27-29). In Appendix A, thousands of pages of exhibits explicitly identified by bate numbers, and Sosnowski keyed specific evidence to the specific schemes as set forth on Appendix A (*id.*).

From the sources identified, Sosnowski's opinion assumes, among other facts:

- There is no signed writing defining Voynow's scope of services. "Voynow did not describe in writing the proposed scope of services, including terms of Voynow's engagement to provide professional accounting and tax services to Star Auto until December 2016 after Star Auto notified Voynow of the theft by Vivian Karouzakis. Star Auto did not agree with the proposed scope of services and did not signed the December 2016 engagement letter." (Dkt. 137-1, pp. 1, 2 at #10, 5; Dkt. 137-3, pp. 1, 2 at #10, 5; *see also*, Michael Koufakis Dep., dep. 74:22-75:20).

- "Non-tax accounting services provided to Star Auto on an interim/quarterly basis were described as '<u>more than review, but not quite fully audited</u>.'" (Dkt. 137-1, p. 2 at #6; Dkt. 137-3, p. 2 at #6) (emphasis added).

- "On an interim/quarterly basis, Voynow made periodic visits to Star Auto during which time it provided review and controllership services including <u>inspection of Star Auto's financial schedules</u>, assessment and analysis of internal controls, inquiries of personnel, review of bank reconciliations, review of sales tax filings, recommendation of general journal entries and reporting to Star Auto through written and oral reports on an ongoing basis." (Dkt. 137-1, p. 2 at #7; Dkt. 137-3, p. 2 at #7) (emphasis added).

As set forth in the second bullet above, Sosnowski's report describes the interim services as "more than review, but not quite fully audited." When asked who supplied that description, Sosnowski answered: "That quote was from Michael Koufakis." (Sosnowski Dep., 87:5–12). More

[7] Although not relevant to Voynow's "more than review, but not quite audited" scope of work, when asked at his deposition whether professional skepticism applies in a tax engagement, Sosnowski explained: "If information looks incomplete or incorrect, then you have an obligation to make further inquiries." Sosnowski Dep., 301:25–302:8. He characterized that obligation as the practical application of professional skepticism to tax services. As set forth above, Sosnowski's opinion that Voynow failed to act in accordance with professional accounting standards apply regardless of the type of engagement, *e.g.*, review, consulting or tax.

significantly, he identified the objective of the services: "To verify the numbers that flowed into the financial statements and income tax returns of the company." *Id*., 296:19–21. He explained that Voynow examined schedules during the year for adjustments, and described verification in connection with monthly dealer financial statements and tax returns. *Id*., 295:21–296:4, 297:11–14.

Defense counsel then asked where he found evidence that Star engaged Voynow to verify the numbers on its financial statements. Sosnowski answered: "It's in Michael Koufakis' deposition. There were no restrictions. He wanted Voynow to do whatever was necessary." *Id*. 297:25–298:7. He further described participation in closing the books and ensuring accurate numbers. *Id*. 298:15–19. Read in context, these passages support a defined objective—verification of financial information—and professional discretion to perform procedures necessary to accomplish it. They need not be expanded into an undertaking to guarantee every transaction or assume every management function.

Contrary to Voynow's suggestion, Sosnowski testified, particularly as to schedules, that based on their scope of work of "more than review, but not quite audited" and the applicable accounting standard that Voynow "looked at every schedule every time" it visited Star. (Sosnowski Dep., 105, 179, 196, 211, 214, 268, 294). Indeed, as to this, it is telling that Voynow selectively quote part of Sosnowski's testimony where he states: "I don't know what [Voynow] looked at on every day they went there. That wasn't part of my analysis." (Sosnowski Dep., 214:9-11). But, Voynow conveniently omitted Sosnowski's very next sentence where he testified: "I know they looked at every schedule when they came up." (Sosnowski Dep., 196:7-9; 214:12-13) (emphasis added).

Sosnowski also explained that if Voynow performed an interim visit, it did not just look at what was going on that particular day. *Id.* at 217-18. So, for example, if Voynow visited Star in March, it would look at records for January and February. *Id.* at 218. If Voynow visited again in July, it would look at "everything from March to July." *Id.*

Thus, Sosnowski testified that, although a schedule on the R&R system may look different from one day to the next, Voynow would "have the month end that are available other than the date you were there." (Dkt. 137, p. 8; Sosnowski Dep., 251:21-25). As Sosnowski explained, his understanding was that Voynow "had all the monthly schedules at their disposal" (Sosnowski Dep., 251) and those were contained in hard copy "binders" (Sosnowski Dep., 181; *see also*, Feb. 1, 2023 30(b)(6) Cutillo Dep. hereto, at 165-66, noting that her review of all journal entries that affect the cash sales account going back to 1998; the February 28, 2023 deposition of Jacqueline Cutillo, Ex. "G" hereto, at 229, explaining that journals with each month end schedule were kept as "actual books"). Voynow could also run an R&R schedule for any month-end. Whether Voynow reviewed hard-copy month-end schedules or reviewed month-end schedules on R&R, those schedules would contain every transaction that occurred within the particular month that affected that particular schedule.

So, contrary to Voynow's premise, if Voynow failed to review schedules, it still failed to act in accordance with professional standards. For example, Sosnowski was asked about the facts supporting his opinion that "Voynow would have seen on the three occasions each year the Schedule 18 it looked at Motor Sports advertising on it and whether or not the entry to it was a round number?" (Sosnowski Dep., 180:13-20). In response, Sosnowski testified: "Had they looked at Schedule 18 and it was a round amount, they should have questioned it. To the extent they

didn't, then they were derelict in their duties." (Sosnowski Dep., 180:21-181:3).[8] Thus, whether Voynow failed to look at the schedule or failed to question the anomalous entry after inspection, either way, it was "derelict" in its duties.

Sosnowski's testimony was fully supported by the factual assumptions expressly stated in his expert report as well as the evidence cited therein. (Dkt. 137-1, p. 2 at #7; Dkt. 137-3, p. 2 at #7). For example, among the evidence Sosnowski relied upon was the February 1, 2023 30(b)(6) deposition of Jacqueline Cutillo on behalf of Star Nissan, where she explained what Voynow looked at every time they visited and explains numerous "red flags" that Voynow missed.[9] *See, e.g.*, Feb. 1, 2023 30(b)(6) Cutillo Dep. at 115-21 (as to AMEX and Reverse Deposit Schemes, testifying that "Voynow would have been able to identify [the scheme] based off of the accounts receivable to the credit cards, as well as being responsible to look at and review parts statement every time they came"); at 141-42 and 171-73 (as to Reverse Deposit Scheme, noting that Carmen Jones offset cash sales to Nissan parts statement and to credit card receivables, *i.e.*, showing the company paying money, instead of getting paid, within a receivable account, and noting credits on the parts statement and "evidence in a journal entry showing that the credit card receivable schedule is being affected, as well as the cash sales account being affected. And the parts statement that they're reconciling and they're identifying on the accounts payable schedule"); at 208-09 (as to the Vehicle Scheme, "<u>Voynow would look at the customer deposit schedule every time they came" and that would show a "recap page with all the sources that are affecting that schedule</u>"); at 243-44 (as to Payment of Personal Creditors Scheme, noting that Voynow "should have caught this based off of the account these checks were being written out of, which is the Star Nissan Incentives Account," because there is a "cash disbursement entry" where Vivian Karouzakas utilized "an incentive and rebate schedule. That's a receivable, not a payable."). In addition, Voynow's own records establish that it reviewed bank reconciliations. (*See, e.g.*, Voynow_0006805; Voynow_0006829; Voynow_0006990; Voynow_0010918-32; Voynow_011008-14; Voynow_0011159-61; Kumor Dep, 265:18-20; Lombardo Dep., 35:2-4, 40:21; Kravets Dep., 101:19-21).

Indeed, Voynow also dismissed explicit and legitimate questions from Star's staff which would have exposed the PTSN Scheme had Voynow acted in accordance with its duties. *See* Feb. 1, 2023 30(b)(6) Cutillo Dep. at 255-59 (as to PTSN Scheme, Vivian stole cash and covered it up by creating fraudulent journal entries with an improper control number disguising the missing cash as bogus expenses on commission schedules, meant to compensate employees, each with a specific control number, and Cutillo specifically "questioned Randy about that entry" and he said "it's

---

[8] Evidence of Schedule 18s from Voynow's own work papers include, but are not limited to, Exhibit 8 p. 1 (VOYNOW_010014); p. 2 (VOYNOW_012388); Exhibit 25 p. 1 (VOYNOW_010014); p. 2 (VOYNOW_009410); Exhibit 133 p. 4 (VOYNOW_022477); p. 7 (VOYNOW_022480); p. 8 (VOYNOW_022481); Exhibit 141 p. 148 (VOYNOW_022477); p. 150 (VOYNOW_022479); p. 151 (VOYNOW_022480); p. 152 (VOYNOW_022481); p. 177; Exhibit 148 p. 11 (VOYNOW_009410); p. 14 (VOYNOW_010014); p. 15 (VOYNOW_012388); Exhibit 163 p. 89 (VOYNOW_020695); p. 90 (VOYNOW_020696); p. 91 (VOYNOW_020697); Exhibit 164 - REVISED - Voynow 30b6 Dep. 33 (VOYNOW_012388); p. 61 (VOYNOW_012388); Exhibit 188 p. 35 (VOYNOW_009410); p. 35 (VOYNOW_020695). See also VOYNOW 005654, 006452, 006578, 008342, 010237, 010335, 010614, 012389, 012390, 013020, 013021, 013256, 019947, 019948, 020140, 020142.

[9] It is telling that Cutillo, who is not a CPA, was able to unfold how some of the fraudulent schemes were done from her review of hard-copy monthly schedules (Feb. 1, 2023 30(b)(6) Cutillo Dep. at 103:23-104:20; 255:8-256:22; 257:17-259:13), but Defendants, who were CPAs with industry-specific expertise, charged to review Star's schedules and other documents, failed to even raise questions about those very same records.

Vivian's, don't worry about it"). *See also*, Voynow_010861; Voynow_008783; Voynow_008401; Voynow_008826; Voynow_021089; Voynow_019786; Voynow_021625.

Moreover, the fact that Voynow would have reviewed Star's accounting schedules on R&R and in hard-copy monthly schedules, among other things, is corroborated by Voynow's own records. For example, Sosnowski's report and testimony as to his opinion regarding Voynow's scope of services was based upon the timing and volume of Voynow's work, its billing descriptions, its workpapers, and the procedures reflected in those records. (Dkt. 137-1, pp. 5-7; Dkt. 137-3, pp. 5-7). At his deposition, he explained that Voynow performed work at interim dates when a tax-only accountant ordinarily would have no need to be onsite and that Voynow's time and billing records described "accounting services" and "special accounting services." (Sosnowski Dep., 101:23–105:25).

Since Voynow, unquestionably, was onsite and performed work at interim dates, and that work was unnecessary for a tax engagement, under the circumstances, it would be a reasonable inference that the work that Voynow performed served a purpose other than for the preparation of tax returns. So, for example Voynow's claim that "Voynow personnel testified that they only printed out mini schedules when on site as opposed to full schedules" (Dkt. 137, pp. 12), is not only demonstrably false, but it also is a stunning admission of Voynow's failure, competently, to perform its duties.

In fact, contrary to Voynow's argument, there are numerous, over 250 full reports (0355), including over 200 with recap pages, <u>produced by Voynow</u>, in the record. (*See, e.g.*, VOYNOW_006315-18; VOYNOW_013068-107; and VOYNOW_021010-53). Also, a former Voynow Manager, David Kumor expressly testified that, for some schedules, "<u>we always printed them out as full</u>." (*See*, Kumor Dep., 108:22-23; *id.*, 107:3-111:4) Of course, even if Voynow only "printed" a mini schedules, that does not mean they did not review the full schedule. Sosnowski was specifically asked about Voynow's claim that it only reviewed "mini" schedules, and he testified: "Well, there is no reason why they would have done that, because that <u>wouldn't give them the picture they need</u>…. It doesn't make sense if you're a CPA to not do the investigation like that …. [T]hey were looking at the schedules to try to verify numbers and the most efficient way to do that would be to look at the summary. They would know that. They're familiar with the Reynolds and Reynolds system." (Sosnowski Dep., 294-95)(emphasis added). Sosnowski's testimony is corroborated by Kumor's testimony that all schedules are "all important. Because, I mean, otherwise you would have to do a reconciliation monthly for each account. The schedules just usually make it easier for the user to read." (Kumor Dep., 109:24-110:8). Thus, if Voynow's document review was limited to "mini" schedules (it was not), it would have been departure from the standard of care needed to perform its "more than review, but not quite audited" scope of work constituting malpractice.

In other words, reviewing only the mini reports and not looking at general journal details would be in dereliction of Voynow's duties because it would be a meaningless exercise that would serve no purpose. Sosnowski testified in several instances that the information visible on the schedule required the accountant to "follow the trail" and request the underlying detail, and since they "had all the monthly schedules at their disposal," they had all the necessary information to do so. *Id.* As Cutillo testified, the end of each schedule has a recap page with all the sources that are affecting that schedule. (Feb. 1, 2023 30(b)(6) Cutillo Dep. at 209). Thus, Voynow's argument

that there is no evidence that Voynow reviewed schedules containing accounting anomalies is contrary to the evidence.[10]

Also, contrary to Voynow's mischaracterization (Dkt. 137, pp. 8-9), it is immaterial whether there is evidence contained in Voynow's workpapers or production that Voynow actually reviewed a particular schedule with a particular anomaly. Voynow was required to "inspect[] … Star Auto's financial schedules, assess[] and analy[ze] … internal controls, inquir[e] of personnel, review … bank reconciliations, review … sales tax filings, recommend[] … general journal entries and report[] to Star Auto through written and oral reports on an ongoing basis." (Dkt. 137-1, p. 2 at #7; Dkt. 137-3, p. 2 at #7). Sosnowski's opinion is based on evidence that, based on the scope of its work, at all times, Voynow had all the necessary information to see anomalies reflected on Star's accounting schedules on R&R and in hard-copy monthly schedules, among other things. (Sosnowski Dep., 105, 179, 196, 211, 214, 268, 294). If Voynow failed to perform these tasks, it was derelict in its duties. If performed these tasks but failed to make reasonable inquiries upon seeing anomalies, it was derelict in performing its duties. Voynow, of course, is free to offer conflicting factual evidence at trial. However, if the jury accepts Star's version of the facts, then, contrary to Voynow's spin of fact, a jury reasonably can conclude that accounting irregularities contained on "accounting schedule[s] that Voynow reviewed." (Dkt. 137, pp. 7-9).

Voynow appears to argue that it cannot be proven that Voynow saw the red flag if Voynow, itself, did not maintain records of particular transactions in its file. (Dkt. 137, pp. 7-9). They suggest that Sosnowski's opinion is lacking if Sosnowski cannot explicitly tie each "red flag" regarding each scheme to a particular document bearing a Voynow bates number. *Id.* Voynow's argument is meritless and based on a distortion of Voynow's scope of work of "more than a review, but not quite audited" and the *actual* evidence which debunks Voynow's claim and establishes that Voynow had full access to schedules every time they visited and, in addition, had access to hard-copy month end schedules which would show all transactions affecting that schedule for that particular month, and in addition, were aware of other anomalies, but inexplicably failed to notify Star's owners, or were in a position to identify anomalies, but inexplicably failed to.

So, while Sosnowski does, in fact, tie Voynow's malpractice to Voynow's own documents and testimony that Voynow was expressly alerted to certain accounting irregularities, Sosnowski's opinion is not dependent upon whether each red flag is found in Voynow's own workpapers and interim memos or was explicitly brought to Voynow's attention by a Star employee. Thus, Voynow's claim that "Sosnowski admitted that his opinions were not predicated upon what Voynow actually did when rendering services" (Dkt. 137, p.6) is false and a gross distortion of his testimony and the bases of his opinion.

Voynow's proposed exclusion rests in substantial part on the premise that Sosnowski cannot criticize its failure to discover an irregularity without proving that its personnel actually examined the particular record revealing it. That premise does not answer Star's first theory of departure: Voynow failed to perform the examination required by the services it undertook. Star's evidence of actual examination provides an additional basis for liability, addressed separately. The present argument concerns the antecedent obligation to obtain and examine records necessary to perform the agreed work competently.

[10] As Sosnowski explained on numerous occasions during his deposition, "just because" Voynow "didn't copy" a particular schedule to place in its work papers, that "doesn't mean they didn't look at it." (*See, e.g.*, Sosnowski Dep., 211, 245, 250, 279). Indeed, as Voynow's corporate representative, Defendant Robert Seibel, acknowledged, Voynow also discarded interim printouts. (*See* Ex. "H" for Voynow 30b6 deposition transcript of Robert Seibel, 241). So, it was, apparently, Voynow's practice to discard contemporaneous records.

This theory appears in the disclosed report and testimony. Sosnowski identifies an undertaking to verify financial information, attributes that understanding to Michael Koufakis's testimony, specifies interim procedures, and explains how examination of identified accounting records would have revealed discrepancies. (Sosnowski Dep., 295:21–298:19; Dkt. 137-1, p. 2, ##6–7, p. 11, §V.C.1(a)–(d); Dkt. 137-3, p. 2, ##6–7, p. 11, §V.C.1(a)–(d)). An accountant's decision to examine only an abbreviated report cannot itself establish that the examination satisfied an undertaking requiring more. The disputed question is what competent performance required, not merely what Voynow elected to do.

**1. The Court Should Evaluate Sosnowski's Report Under The Governing Reliability Standard**

With the above evidentiary backdrop, Star has met its burden of demonstrating that the opinions offered satisfy Rule 702, including sufficient factual support and reliable application of professional methodology. Fed. R. Evid. 702(b)–(d). Star does not ask the Court to accept every asserted premise merely because counsel identifies a factual dispute. The distinction is between a materially unsupported assumption and an adequately supported factual premise that the opposing party contests. The Court's gatekeeping determination concerns reliability of the expert's opinions based on the evidence; the jury's determination concerns acting as the finder of the facts based on the evidence and ultimately the merits of those facts to the law as instructed by the Court.

The Second Circuit recently reaffirmed that distinction in *Rutledge v. Walgreen Co.*, 182 F.4th 168 (2d Cir. 2026). Applying amended Rule 702, the court explained that competing factual premises need not compel exclusion and that reliability differs from correctness. It also emphasized meaningful judicial scrutiny of the expert's factual basis and application of methodology. Although Rutledge concerns epidemiology, its discussion of the Rule 702 standard applies here; Star does not equate the scientific methodology there with accounting practice.

*Amorgianos v. Amtrak*, 303 F.3d 256, 267–68 (2d Cir. 2002), likewise requires examination of the facts, method, and connection between them. It distinguishes minor imperfections from defects undermining the grounds for the conclusion, while affirming exclusion where the analysis was fundamentally deficient. Star therefore identifies the actual sequence of Sosnowski's reasoning: the undertaking to verify financial information; the procedures needed to carry out that undertaking; the records necessary for those procedures; and the discrepancies the examination would disclose. The Court should test that sequence rather than assume that actual review is an indispensable premise of every challenged opinion.

**2. New York Accounting Decisions Distinguish The Undertaking From The Adequacy Of Performance**

The two decisions in *1136 Tenants' Corp. v. Max Rothenberg & Co.* provide a useful substantive analogy. In the first, the First Department affirmed denial of summary judgment because the parties presented materially different accounts of an oral accounting retainer and disputed performance under it. The majority separately recognized an alternative theory based on suspicious circumstances that came to the accountants' attention. *Id.*, 27 A.D.2d 830, 830 (1st Dep't 1967). Thus, scope and deficient performance were not collapsed into the separate question of actual notice.

After trial, the First Department affirmed liability, finding support for an audit undertaking and inadequate procedures; it also reasoned that, even under the accountants' narrower description of the engagement, their awareness of missing invoices required a response. *1136 Tenants' Corp. v. Max Rothenberg & Co.*, 36 A.D.2d 804, 804 (1st Dep't 1971). The latter decision involved an audit and does not impose audit duties on Star's accountants. The analogy is the separation between deficient execution of the proven undertaking and inadequate response to information encountered.

These First Department decisions supply persuasive New York authority on the substantive distinction; they do not decide federal expert admissibility. Star must independently satisfy Rule 702. Their significance here is that the scope-based theory asks a recognizable professional-negligence question. Once an undertaking and its required procedures are supported, a failure to perform those procedures cannot be answered solely by pointing to the absence of records showing that the procedures were performed. That would substitute the alleged omission for the standard against which the omission must be measured.

### 3. The Report Identifies Procedures And Records Necessary To Carry Out The Scope of Engagement

Sosnowski does not stop at the word "consulting." Paragraph 7 of his factual summary identifies inspection of financial schedules, inquiries of personnel, review of bank reconciliations and sales-tax filings, recommended general journal entries, and written and oral reporting during interim visits. (Dkt. 137-1, p. 2 at #7; Dkt. 137-3, p. 2 at #7). His standards discussion identifies professional competence, due care, adequate planning and supervision, and sufficient relevant data as governing consulting work. *Id*. p. 4. These are his disclosed professional premises, to be connected to the particular tasks and records rather than treated as a universal command to inspect everything.

The analytical distinction is between the information needed to perform the initial procedure and additional information needed after that procedure reveals an irregularity. An undertaken verification may require obtaining a reconciliation or account detail before the accountant notices any discrepancy. Once the initial examination reveals an unexplained balance or entry, further inquiry becomes necessary.

Bank reconciliations provide the clearest example. The report states that examination of monthly bank reconciliations would have revealed that a fictitious deposit recorded by adjusting journal entry did not appear on the bank statement, showing that the funds had not actually been received. (Dkt. 137-1, p. 11, §V.C.1(a); Dkt. 137-3, p. 11). That opinion describes an intelligible comparison between recorded accounting information and independent Filardobank activity. Star's application of the opinion is that the relevant reconciliation and bank statement necessarily must be consulted to perform that comparison. It does not depend on asserting that Voynow actually saw both documents.

The employee-advance analysis supplies another concrete application. The report identifies a December 31, 2015 schedule with $58,264 in outstanding advances, including $32,500 attributed to Theocharis, and a Voynow spreadsheet reflecting the balances. (Dkt. 137-1, p. 11, §V.C.1(c); Dkt. 137-3, p. 11).[11] It also identifies the absence of December 2015 payroll deductions on that

[11] The December 31, 2015 employee advance schedule is VOYNOW_019598 - it shows the $32,500 Theocharis advance, the $11,793.39 Guadagno advance and a total of $58,263.04, which is the $58,264 the report states - and the same page answers the payroll-deduction point, because the advance stood at $30,000 five weeks earlier

loan. *Id*. §V.C.1(d). The rebuttal expressly locates the departure in failing to investigate an aged advance without a repayment schedule. (Dkt. 137-2, ¶55). The relevance goes to the need to test the outstanding balance and repayment explanation against supporting information, rather than accept an accounting balance without the examination the task required.

Evidence that Voynow created the spreadsheet supports actual awareness. The scope-based opinion concerns what examination was required to verify the balance and any purported repayment, including the pertinent payroll or bank information.

The testimony also explains the accounting significance of journal entries used where cash transactions should have appeared. Sosnowski distinguished ordinary journal entries from entries substituting for cash-based transactions and stated that the latter circumstance warranted investigation. (Sosnowski Dep., 190:6–22). This supplies a professional reason for consulting supporting detail.

### 4. The Court Should Reject Voynow's Argument That Sosnowski's Opinion Is Unreliable Unless He Can Reference A Document That Voynow Produced

The Court should reject Voynow's argument that there must be direct proof that Voynow examined a particular document as a categorical prerequisite to Sosnowski's opinion that Voynow negligently failed to make a required examination. Rather, the Court should evaluate the disclosed opinions against the actual evidence supporting each required procedure, including circumstantial evidence. Where a particular opinion needs a more specific foundation, Star requests an opportunity to identify that foundation through the existing reports, testimony, and records, with any further proffer addressed under the governing disclosure requirements and the Court's directions.

This argument preserves both components of Star's case. Voynow's obligation to examine records necessary to perform its undertaking is the first. Its alleged failure to respond competently to records actually examined is the second. The proposed exclusion should be denied insofar as it assumes that a failure to examine a necessary record defeats, rather than supplies the subject of, a properly supported professional-departure opinion.

As noted above, Voynow repeatedly conflates the underlying theft with the cover-up. Its suggestion – that Sosnowski's opines that Voynow should have found the fraud – mischaracterizes both the reports and the role expert testimony will play at trial. The principal issues in this case

---

(VOYNOW_005888) and rose over December instead of falling. Voynow's own workpaper reflecting the balances is VOYNOW_019445, Voynow's own trial balance for the same store and month, carrying 58,263.04 at account 151. VOYNOW 019598 (Star Chrysler Jeep Dodge, Schedule (6) EMPLOYEE ADVANCES as of 12/31/2015, printed 01/19/2016 by VOYNOW: DESPINA THEOCHARIS 32,500.00, NICHOLAS GUADAGNO 11,793.39, total 58,263.04, with a manuscript note against the balances); VOYNOW 005888 (The same schedule as of 11/23/2015, printed by VOYNOW: the Theocharis advance stands at 30,000.00 and the total at 61,114.98 See also, STAR00157760 (Investors Bank statement for Star Chrysler Jeep Dodge); STAR00157781 (Investors Bank check register); STAR00157790 (Marathon deposit / check-written record, Star Chrysler Jeep Dodge, printed 01/21/2020); STAR00157793 (Bank deposit report, Star Chrysler Jeep Dodge, printed 06/24/2020 on the JACKIEG log-in); STAR00157794 (Cash receipts inquiry by account, Store 02); STAR00159455 (Rosenfield scheme exhibit P: the general ledger history audit report for the month); STAR00159471 (Rosenfield scheme exhibit L: the $3,000.00 check written against the scheme); STAR00159487 (Rosenfield scheme exhibit T: the September 2020 account of the entries).

involve specialized accounting matters beyond the knowledge of an ordinary juror, including dealership accounting schedules, R&R reports, adjusting journal entries, manufacturer-receivable accounts, employee-advance schedules, vendor-reporting obligations, intercompany accounting, reconciliations, and the professional standards governing the accounting services Voynow performed. Whether those accounting records contained information requiring additional inquiry by a reasonably prudent CPA is not a matter of common knowledge. Expert testimony therefore will assist the jury in understanding both the accounting records themselves and the professional obligations arising from them. *See* Fed. R. Evid. 702(a).

Contrary to Voynow's suggestion, Voynow was not charged with "finding the fraud," but as Sosnowski opines, Voynow had a professional obligation to make reasonable inquiries, and if they had done so, the fraudulent schemes would have unraveled. Accordingly, Sosnowski opines that Voynow failed to perform its accounting duties in accordance with professional standards.

Moreover, as set forth above, Sosnowski's reports analyze the specific accounting mechanisms through which the alleged schemes were recorded or concealed and explain why, in his opinion, the accounting information reflected in dealership accounting schedules that Voynow saw "every time they visited," in Voynow's workpapers and related records should have prompted further inquiry. Depending upon the particular scheme, those opinions involve, among other things vendor-reporting obligations and Forms 1099; manufacturer-receivable schedules and factory-rebate accounting; employee-advance accounts and purported loan repayments; adjusting journal entries; bank reconciliations; credit-card receivable schedules; intercompany accounting; account classifications and control references; and dealership-specific accounting procedures reflected in the R&R system.

Sosnowski further explains why those accounting circumstances, viewed individually or in combination, would have required a competent accountant performing the services Voynow undertook to make further inquiry. Whether the jury ultimately agrees that the underlying accounting information existed, whether Voynow actually reviewed it, whether the explanations offered were reasonable, and whether additional inquiry would have uncovered continuing misconduct remain factual questions for the jury.

As he explained during his deposition, Sosnowski limited his opinions to those schemes for which he found evidence that accounting information reviewed by Voynow contained irregularities requiring additional inquiry. He expressly distinguished those schemes from other alleged misconduct for which he found no comparable accounting predicate in Voynow's workpapers. That limiting principle demonstrates that his opinions are based upon an identified accounting methodology rather than hindsight or speculation.

Voynow claims that Sosnowski "never connects any such specific standard to any specific scheme or to any purported Voynow violation" (Dkt. 137, pp. 7-11). Voynow's entire argument is based on its own, self-serving "spin" of the facts completely ignoring Sosnowski's description of what Voynow needed to review in a "more than review, but not quite audited" scope of work and his opinion that if Voynow failed to perform such work, it failed in its duty of care to Star.

Voynow's argument is exemplified with regard to the Vehicle Scheme and Staples Scheme. (Dkt. 137, p. 10). As to the Vehicle scheme, Sosnowski opined that "Voynow should have identified the fictitious stock numbers [on journal entries] as unusual. For example, transactions used the fictitious stock numbers "100139" Bank0715" "Clean" and Extra." (Dkt. 137-1, pp. 16-17; Dkt. 137-3, pp. 17-18). In its motion, Voynow takes issue with Sosnowski's opinion because

they claim that there was no analysis as to "whether Voynow was even on site" when the fictitious stock numbers "appeared on Schedule 60" and further that the five vehicle transactions at issue do not appear in Voynow's work papers (Dkt. 137, p. 10). Similarly, with respect to the Staples Scheme, Voynow argue that Sosnowski's opinion does not have a reliable basis because it is "never connected any specific Schedule 18 listing two Staples vendors to any Schedule 18 in Voynow's workpapers, or to any date of a Voynow visit where it could have seen a version of Schedule 18 showing two Staples vendors listed." (Dkt. 137, p. 10). These examples are typical of Voynow's entire argument, which misses the point.

As set forth above, Sosnowski's report refers to accounting conditions that existed over extended periods, such as recurring balances, year-end account conditions, aged receivables, outstanding employee advances, vendor-reporting information, reconciliations, or other accounting conditions that existed over extended periods, rather than transactions appearing on a single day. (Dkt. 137-1 *passim*; Dkt. 137-3 *passim*). Sosnowski testified that he limited his opinions to schemes for which he found evidence in the materials Voynow reviewed indicating an irregularity that required additional inquiry (Sosnowski Dep., 146:13–18).

Sosnowski's opinion also assumes, based on evidence, that Voynow reviewed and printed out every schedule from R&R <u>every time it visited Star and had all the hard-copy monthly schedules at its disposal for review</u>.[12] (*Supra.*) The evidence upon which Sosnowski relied establishes that Voynow had all the necessary information, at all times, to see anomalies reflected on the accounting records that they reviewed. (*Supra.*) In addition, as to all schemes concerning anomalies apparent on schedules, which occurred on a recurring basis, at his deposition, Sosnowski explained exactly <u>when</u> Voynow should have discovered this scheme: on "the next visit after" the questionable "transactions were recorded." (Sosnowski Dep., 245, 280, 292-93). Thus, Voynow's argument – that R&Rs schedules changed over time, that Voynow visited only periodically, and that Sosnowski did not match every allegedly irregular entry to the exact day of a Voynow visit – fails to address assumption on which Sosnowski's opinion is based.

Voynow's references to isolated deposition answers and evidence, that Sosnowski did not identify the precise date when a particular accounting entry was created or the exact date on which Voynow reviewed a specific schedule (Dkt. 137, pp. 8-11), do not help Voynow. This is so because the relevant question is whether the evidence establishes that the pertinent accounting condition existed during a period when Voynow performed the accounting procedures at issue and that the information was reflected in records Voynow reviewed or was required to review. Sosnowski's ability to memorize a particular date for each accounting anomaly is not the issue. The one-to-one matching exercise Voynow demand misses the point and overlooks the evidence that some opinions concern recurring balances, aged items, account classifications, or year-end reporting obligations rather than a transaction appearing for only a single day.

Therefore, based on the established precedent above, it is a question of fact for the jury whether the evidence establishes, by a preponderance of the evidence, that Voynow saw, for example, Schedule 60 pertaining to the five vehicle transactions in the Vehicle Scheme.[13] (See

[12] Plaintiffs do not contend that Voynow must be charged with knowledge of every entry ever recorded in R&R.

[13] The five purchases at issue are: 1. Carmen Jones Highlander 2016 Toyota Highlander, at least $3,000, general journal entry (Journal: 11) generated 2 September 2016 VOYNOW_005804 Ex. 163 p. 95 (VOYNOW_020701) is a Schedule 60; 2. Ange Raptis Highlander 2016 Toyota Highlander, $3,000, September 2016 VOYNOW_005804 Ex. 23 pp. 3-4 (VOYNOW_008828, VOYNOW_008830); 3. Tundra and Avalon Tundra March 2016, $10,000 COD unpaid; Avalon May 2013, $30,000 COD; a Journal 11 entry reflecting a fictitious $30,000 receipt; VOYNOW_005804 Ex. 6 p. 7 (VOYNOW_008828); 4. Vitaliano / Vivian stolen Avalon $20,000 deposit applied

insert schedule 60s), or saw Schedule 18 listing two duplicate vendors with respect to the Staples Scheme (See Schedule 18s – VOYNOW 009410, 019947, 019948, 012388, 010014), are not grounds for preclusion of Star's expert.

Likewise, it is also a question of fact for the jury whether Voynow reviewed and/or had access to the necessary information upon which Sosnowski's opinions are based. So, as to Voynow claim, in connection with the Payment of Personal Creditors Scheme, Customer Claim Scheme, Vehicle Schemes, Reverse Deposit Scheme, Employee Advance Scheme and Loan Payments Not Repaid Scheme, that they did not review full schedules, only mini schedules (Dkt. 137, pp. 11-14), this is a contested fact. As set forth above, there is evidence that Voynow, in fact, printed, reviewed and had access to every schedule; that "all schedules" were "important," that, for certain schedules, Voynow, in fact, "always printed" full schedules, that if they did not have a full schedule, they would have to do a monthly reconciliation; and that a mini schedule "wouldn't give them the picture they need." (*Supra*.) Based on this, it would be utterly inconsistent for Voynow to review schedules in a format that lacked the necessary information. (*Supra*.) In any event, since a CPA is required to make additional inquiries ("follow the trail") if in possession of incorrect, incomplete or inconsistent information, an accountant need not already possess the full evidentiary trail before a duty to inquire may arise. (*Supra*.) The purpose of the inquiry is to obtain and evaluate the additional supporting detail acquired when the information initially presented appeared to be incorrect, incomplete or inconsistent. (*Supra*). Here, Voynow had access to all monthly schedules. Therefore, Voynow's argument about mini-schedules is meritless because it seeks preclusion of Star's expert merely because his opinion is based on contested facts. Its argument is contrary to the law.

Contrary to Voynow's arguments, "Voynow was … in position to see the red flag[s]." (Dkt. 137, p. 9). The evidence upon which Sosnowski's opinion is based establishes a clear link between the accounting anomalies on Star's books and what Voynow saw. While Voynow may contest the facts upon which Sosnowski's opinion is based, that is not grounds to preclude an expert's opinion. The recent case, *Rutledge*, *supra*, although it concerns scientific evidence, is helpful on the issue of an expert's reliance on contested facts.

In *Rutledge*, plaintiffs claimed that prenatal ingestion of acetaminophen caused them or their children to develop ADHD and/or autism spectrum disorder. Voynow moved to exclude the expert testimony of plaintiff's experts on causation based on reliability. *Rutledge* held:

> As the Rules Committee has explained, "[i]t will often occur that experts come to different conclusions <u>based on contested sets of facts</u>. Where that is so the [rule] does not necessarily require exclusion of either side's experts." Fed. R. Civ. P. 702 committee note to 2023 amendment. That is because a party "do[es] not have to

---

against the purchase price; a Journal 11 entry reflecting a fictitious $20,000 receipt VOYNOW_005804 Ex. 148 p. 10 (VOYNOW_008830); 5. Theocharis vehicles used vehicles bought from Star Chrysler at low cost and traded in higher; approximately $9,500 STAR00019434 (Reynolds F&I deal recall).And the Schedule 60s include VOYNOW 005804 (Star Toyota of Bayside, Schedule (60) WE OWES as of 11/23/2015, printed by VOYNOW: the page carries the control numbers 100139, CLEAN and EXTRA that the report names); VOYNOW 008830 (Star Toyota, Schedule (60) WE OWES as of 11/24/2014, printed by VOYNOW, page 4: the control number VK is circled and annotated in manuscript); VOYNOW 008828 (The unannotated page of the same 11/24/2014 print); VOYNOW 020701 (A Schedule 60 page inside Exhibit 163); STAR00207728 (The Star-side We-Owe record carrying the BANK0715 entry); VOYNOW 006433 (Star Hyundai Schedule 60 as of 11/23/2015, annotated, carrying EXTRA); VOYNOW 007865 (Star Subaru Schedule 60 as of 12/31/2013, annotated, carrying EXTRA); VOYNOW 009950 (Star Nissan Schedule 60 as of 11/24/2014, carrying EXTRA).

demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Id*. (internal quotation marks omitted). "The evidentiary standard of reliability is lower than the merits standard of correctness." *Id*. (internal quotation marks omitted). *Id.*, 182 F.4th at 184-85.

Contrary to Voynow's argument, Sosnowski was not required to "conduct[ an] analysis to determine what was actually on the accounting schedules that Voynow reviewed" (Dkt. 137, p. 8), was not required to adopt Voynow's claim that they only reviewed "mini" schedules (Dkt. 137, pp. 12-13), and was not required to weigh contested facts in Voynow's favor (Dkt. 137, pp. 13-15) – because, among other things, Voynow saw every schedule every time they visited, had access to hard copies of monthly schedules and reviewed bank reconciliations. As an expert, Sosnowski clearly could prefer to rely on Star's version of the facts and come to a conclusion "based on a contested set of facts." *Rutledge*, *Id.*, 182 F.4th at 184.

As *Rutledge* explained in the context of an expert's reliance on competing studies: "Cherry-picking occurs when an expert points to data that support a particular position while ignoring or discrediting data that contradict it. <u>It is not cherry-picking for an expert to prefer one study to another</u> when he offers a coherent, scientifically plausible reason for the preference." *Rutledge*, 182 F.4th at 191 (emphasis added). Likewise, Sosnowski was free to "come to different conclusions" than Voynow's expert "based on contested sets of facts." *Id.* at 184. As *Rutledge* concluded, "[t]he gatekeeping role of the district court is to shield the jury from testimony by even qualified experts that is outside the boundaries of ordinary scientific discourse and thus constitutes 'junk science.' It is not to adjudicate which points in the debate are more persuasive; that is the role of the jury." *Id.* at 193. "[T]he district court should [take] a hard look at the expert's opinions to ensure that they are reliable without necessarily addressing whether they are correct." *Id.*, fn. 25.

Contrary to Voynow's argument – that Sosnowski failed to connect any specific accounting standard to any specific scheme or to any purported Voynow violation, Sosnowski testified, consistent with this report, as follows: "Most if not all the standards were violated in every single scheme. It would be redundant to list them all. … They're listed on page 3 and 4, because they apply to all the schemes." (Sosnowski Dep., 164:20-25). Star's theory is that, even if the jury were to find that Voynow's engagement was a tax engagement, which has the most-deferential standard for accountants, Voynow failed to satisfy its professional standards because they failed to make reasonable inquiries in the face of incorrect, incomplete, inconsistent, or anomalous information it encountered while performing services. Thus, Sosnowski's opinion is based on a "methodology recognized in the profession or by the courts," and the parties "can identify the source of the facts and data underlying the opinion." *Vitamin C Antitrust Litigation*, 2012 U.S. Dist. LEXIS 181158, at *20-21; *Masella*, 2007 Bankr. LEXIS 2719, at *8-9.[14] In light of the fact that Sosnowski's opinion is based on extensive evidence, and he has applied well-established accounting principles and standards in rendering his opinion based on those facts, Voynow's suggestion that Sosnowski's opinion is mere *ipse dixit* is meritless.

Finally, the cases cited by Voynow do not help them and are easily distinguishable. Dkt. 137, pp. 7 and 9. *See, e.g.*, *Great White Bear, LLC v. Mervyns, LLC*, 2008 U.S. Dist. LEXIS 41977 (S.D.N.Y. May 27, 2008) (concerned a damages expert, not a liability expert, so it is not applicable

[14] Contrary to any suggestion by Voynow, Plaintiffs do not contend that every tax accountant must conduct a forensic investigation or guarantee the discovery of fraud.

to Sosnowski's liability opinion, and, in any event, the expert was excluded because he provided a conclusory damages figure without calculations or methodology, whereas here, liability goes through particular examples for every single scheme of accounting records on schedules and other documents seen by Voynow "every time they visited" from which Voynow should have made reasonable inquiries); *U.S. SBA V. Feinsod*, 2025 U.S. Dist. LEXIS 113166 (E.D.N.Y. June 13, 2025) (unlike here, concerning scientific expert testimony, not expert testimony by an accountant concerning professional judgment, so it is not applicable, and in any event, expert was precluded because he failed to perform an analysis essential to supporting his ultimate opinion, creating a fundamental analytical gap between the data and his conclusion, whereas, here, there is no gap in Sosnowski's reasoning); *Potter v. United States*, 2020 U.S. Dist. LEXIS 95381, at *24 (S.D.N.Y. May 30, 2020) (concerning preclusion of neurological expert who offered medical causation opinions without a reliable scientific methodology connecting the alleged cause to the plaintiff's injury, but rather concluded, in essence, medication caused the injury based on the fact that the adverse episodes occurred while the plaintiff was taking the medication, whereas here, Sosnowski identified evidence, including accounting records on schedules seen by Voynow "every time they visited," as well as and other documents, such as 1099s, showing, for example, payments to a fictitious vendor that provided no services). None of those cases are applicable to Sosnowski's opinion.

Sosnowski's methodology was crystal clear, simple and reliable: First, he relied on the AICPA Code of Professional Conduct; the AICPA Statements on Standards for Tax Services; Treasury Department regulations applicable to tax practitioners; the AICPA Statements on Standards for Consulting Services; and the AICPA Statements on Standards for Accounting and Review Services. (Dkt. 137-1, pp. 3-7; Dkt. 137-3, pp. 3-7). Then, he applied those principles and standards to the facts.

All of Voynow's objections as to Sosnowski's methodology pertaining to what Voynow saw and when they saw it are, in reality, objections that go to foundation issues and weight of evidence, not the admissibility. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206 (2d Cir. 2009); *Boucher*, 73 F.3d at 21. Voynow ignore the bases of Sosnowski's opinion as set forth above.[15] Therefore, Voynow's motion is fatally flawed and must be denied.

**5. Sosnowski's Correct Acknowledgement That The Scope Of Engagement Is A Fact Question Is Not Grounds For Preclusion**

Next, Voynow criticize Sosnowski's opinion – apparently because he bases his opinions on all, potentially-applicable, accounting standards (Dkt. 137, pp. 15-17). Voynow's suggestion – that Sosnowski's acknowledgement that the jury will determine the scope of Voynow's engagement is, somehow, grounds for preclusion – is preposterous. Indeed, Voynow's expert, Sherf, conceded the scope of Voynow's engagement is for the jury to determine, and "they have to weigh the evidence and figure that out." Scherf Dep., 144-45. Sosnowski's acknowledgement (like Scherf's) does not render Sosnowski's opinion unreliable.

Voynow make misleading statements based on language contained in the unsigned, disputed engagement letters that they contend were issued to Star in 2015 and 2016. They quote

[15] Obviously, at trial, as with any expert opinion, Plaintiffs will have to establish at trial the factual predicate supporting each scheme-specific opinion. Thus, before Sosnowski offers a scheme-specific opinion, Plaintiffs will provide testimony and other evidence identifying the pertinent Voynow workpaper, schedule, report, inquiry, reconciliation, or other evidence demonstrating that the relevant information was before Voynow or was generated through a procedure Voynow performed.

selective portions of those engagement letters and present them as if (i) there is no question of fact as to the scope of Voynow's services; (ii) those letters contain the full embodiment of the terms of Voynow's engagement; and (iii) those letters make Sosnowski's opinion unreliable (apparently suggesting that Voynow had no obligation to make reasonable inquiries). (Dkt. 137, pp. 4-5). Also, Voynow distort both this Court's March 2025 Order and Sosnowski's testimony as to the scope of Voynow's services.

The fatal flaws in Voynow's argument on these points is that the unsigned engagement letters and the scope of Voynow's engagement are disputed facts and Sosnowski's opinion stands regardless of the scope of Voynow's engagement because, as he opined, Voynow failed to make reasonable inquiry when information they encountered during the engagement was incorrect, incomplete, inconsistent, or otherwise unsatisfactory – and that is the standard applicable even if the jury ultimately finds that the scope of Voynow's engagement was limited to tax preparation services.

Voynow's statements about the 2015 and 2016 engagement letters are false on multiple levels. This Court's March 23, 2025 Order did not determine that those letters contain the full embodiment of the terms governing the parties' relationship. In the summary judgment motion, Star's position was that Voynow were hired "to 'more than review, but less than audit[]' [Star's] financial statements and to provide annual corporate tax services." (Dkt. 128, p. 2). The March 2025 Order did not determine that there were no questions of fact as to the scope of Voynow's services. To the contrary, that Order states: "Other than the 2016 letter, Plaintiffs deny or do not recall receiving any of the other letters.… The only evidence in the record that Voynow transmitted the letters via hard copy mail and delivered them in person is testimony by Voynow principal Robert Seibel." (Dkt. 128, p. 4). Thus, the record contains a factual dispute over whether the earlier letters were ever transmitted to Star. The letters were unsigned, Star denies or does not recall receiving them, and the only letter Star acknowledges receiving was the December 2016 letter sent after the initial Karouzakis misconduct had been discovered. (Koufakis Dep., 118:9-24 and 120:6-11).

Even the language of those engagement letters contradict Voynow's premise – that those engagement letters somehow absolve Voynow. For example, those letters expressly state: "Please date and sign the enclosed copy of this engagement letter and return it to us to acknowledge your agreement with its terms. We can complete our engagement once we have received the signed copy of this letter from you." (Dkt. 126-24 at p.81 of 104) (emphasis added). This language indicates an express intent by Voynow that absent a signature by Star, there is no acknowledgement of Star's "agreement with its terms." *Id.* Further, although these unsigned engagements letters have a merger clause and a clause requiring a signed writing for a modification, nothing in those letters prohibits waiver of those clauses by conduct which may operate as a matter of law even if the parties had executed those engagement letters, and they did not. (Dkt. 126-24 at p.81 of 104).

In this regard, it is fundamental that parties may waive a no-oral modification clause, and an oral modification may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement. *See, e.g.*, *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 (2d Cir. 1998); *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 89 (2d Cir 2025) ("Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel") (citation and internal quotation marks omitted). Three, the 2015 and 2016 engagement letters lack a "no-waiver" provision. *See, e.g.*, *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 230 (S.D.N.Y. 2000); *Van-Go Transp. Co. v. NY City Bd.*

*of Educ.*, 53 F. Supp. 2d 278, 297 (E.D.N.Y. 1999). Based on the parties' conduct, there may be "an oral modification of the Agreement and a waiver of the Agreement's no-oral-modification provision." *Simerman v. MVMT Labs, Inc.*, 2025 U.S. Dist. LEXIS 120827, at *8 (S.D.N.Y. June 25, 2025). (Notably, 2015 is the first time that any merger clause is contained in any of the Voynow engagement letters that Voynow has submitted (Dkt. 126-23 and Dkt. 126-24)). Here, the scope of Voynow's engagement is a material issue of fact for resolution at trial.

Further, Voynow omits the underlined language that is contained in the "CPA Firm Responsibilities" section: "Our services will be limited to only those tasks we deem necessary for the preparation of the returns. We may deem it necessary to provide you with accounting and bookkeeping assistance in that regard. We will request your approval before rendering these services, if they look to be significant, since additional charges would apply…." Dkt. 126-24 at p.76 of 104. The omitted language, itself, clearly contemplates that there may be services in addition to tax return preparation services. *Id.*

Beyond this, even the language emphasized by Voynow – "We will not audit or otherwise verify the data you submit to us …" – does not absolve Voynow from its obligation to make reasonable inquiries if the information furnished by the taxpayer appears to be incorrect, incomplete or inconsistent." (Sosnowski Dep., 301-02; Dkt. 137-1, pp. 3-4, 17-18; Dkt. 137-3, pp. 3-4, 18-19).

Next, Voynow falsely asserts that "Sosnowski plainly chose to deliberately ignore" supposed evidence of "actual letters, the billing records and emails referenced them, meta data showing annual updates to the letters, and testimony explaining" preparation, changes and issuance. (Dkt. 137, p. 16). Not surprisingly, Voynow does not cite any evidence. It remains undisputed that there is no signed copy of any Voynow engagement letter. Sosnowski expressly testified that the engagement letters were "unsigned" and that "[t]here is no written engagement letter." (Sosnowski Dep., 52:12-14; 79:16-24). In addition, he expressly testified that he was not provided with metadata showing annual updates to engagement letters. *Id.*, 55:17-20.

Sosnowski acknowledged that the letters contain provisions assigning responsibility for safeguarding assets and internal controls to management and disclaiming an engagement designed to discover fraud. (Sosnowski Dep., 80:8-85:25). He also acknowledged that, if the jury determines the letters were transmitted and governed the relationship, their terms must be considered. *Id.*

His testimony was not, however, that the letters automatically eliminate every professional obligation or erase the services Voynow actually performed. When asked whether the letters would defeat his opinion that Voynow performed an oversight function, he testified that he "would need to give it some more thought," rather than accepting counsel's proposed conclusion. (Sosnowski Dep., 78:10-17).

Critically, Sosnowski's reports also explain that the scope of a professional engagement may be evaluated through the services actually performed, the parties' course of conduct, the accountant's workpapers, its invoices, and its communications – not solely through the language of a disputed, unsigned document. (Dkt. 137-1, p.5; Dkt. 137-3, p.5).

Moreover, Star does not contend that Voynow was expressly retained to conduct a forensic audit or that Star could rely on Voynow to guarantee the detection of all fraud. (Sosnowski Dep., 78:20-79:24). As set forth above, Star contends that Voynow had an obligation to make reasonable

inquiry when it encountered anomalous or inconsistent information while performing the work it undertook. (*Supra.*)

Finally, Voynow distorts both this Court's March 2025 order and Sosnowski's opinion as to controllership functions. In this regard, Voynow, first, attempts to confuse the Court as to Sosnowski's opinion and testimony. Star does not contend that Voynow served as Star's full-time, continuous controller or assumed responsibility for every accounting function performed by an in-house controller. And, Sosnowski has not and will not offer any such opinion at trial.[16]

Rather, contrary to Voynow's suggestion (Dkt. 137, pp. 16-17), Sosnowski's opinions are limited to the accounting, consulting, and review functions that the evidence demonstrates Voynow actually performed, including reviewing financial schedules, developing adjusting journal entries, analyzing account balances, making inquiries of accounting personnel, and providing accounting advice during interim visits. (Dkt. 137-1; Dkt. 137-3; Ex. "A"). Particularly, as to controllership functions, Sosnowski was asked what specific work he believed indicated that Voynow provided such services, he testified: "Anything that would show they reviewed bank statements and when they prepared general journal entries or reviewed general journal entries. Those were all controllership references." (Sosnowski Dep., 108:18-25). The scope of Voynow's engagement is a factual issue for the jury.

Sosnowski will not, therefore, characterize Voynow as Star's full-time controller, but he may testify regarding the professional obligations arising from the specific accounting services reflected in Voynow's workpapers, billing records, and course of performance for the years at issue.

After distorting Sosnowski's opinion and testimony, Voynow overstates this Court's March 2025 order, suggesting that this Court's statements as to "controllership engagement," somehow, "undercut[s]" Sosnowski's opinion. It does not. The Court's prior ruling addressed whether the record established that "Voynow's engagement" was "an open-ended consulting and controllership agreement …." (Dkt. 128 at 18, 20-21). It did not hold that Voynow's services were limited to the mechanical preparation of annual tax returns, nor did it determine the applicable standard of care governing the accounting services Voynow actually performed. Those issues remain for trial.

Voynow asks the Court to accept, as an undisputed fact, that Voynow performed nothing more than annual tax-return preparation. That is contrary to the evidence Sosnowski reviewed and presents a central factual dispute for trial. The Second Circuit has cautioned that a court should exclude an expert only where the flaw is sufficiently serious to render the opinion fundamentally unreliable, rather than where the expert's analysis is merely subject to criticism. *Amorgianos*, 303

[16] Likewise, while Sosnowski's November 10, 2023 rebuttal report used the phrase "internal audit," Sosnowski testified that he was not offering an opinion that Voynow performed internal-audit services. (Dkt. 137-2, ¶9; Sosnowski Dep., 107:17-22). Thus, Plaintiffs will not offer that characterization at trial. This eliminates the asserted inconsistency and has no bearing on his separate opinions concerning tax, consulting, accounting, and review-type procedures. A withdrawn or narrowed characterization does not require exclusion of otherwise distinct and adequately supported opinions. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (the trial court must evaluate each opinion rather than treat the expert's testimony as an indivisible whole). Amended Rule 702 emphasizes that "each expert opinion" must remain within the bounds supported by the expert's reliable methodology. *See Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, U.S. Dist. LEXIS 128786, at 7 n.2 (E.D.N.Y. July 10, 2025). (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). Accordingly, even if the Court finds a deficiency in one of the Expert's conclusions, that deficiency does not warrant exclusion of his otherwise independently supported opinions.

F.3d at 267. Any disagreement over which standard applied to a particular procedure is properly tested through cross-examination and testimony from Voynow's expert. *Daubert*, 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Amorgianos*, 303 F.3d at 267 (same). Such a disagreement does not render Sosnowski's entire opinion inadmissible.

Moreover, the unsigned engagement letters referenced by Voynow does not establish that an accountant may ignore irregularities actually encountered during the engagement, and, contrary to Voynow's claim, Sosnowski did not ignore or disregard facts. Rather, since Sosnowski is not a fact witness, his opinion is simply based on factual assumptions which, as explained above, is typical for an expert opinion and completely appropriate. *Daubert*, 509 U.S. at 596; *Rutledge*, 182 F.4th at 194; *Goetz*, 2010 U.S. Dist. LEXIS 70983, at *53; *Phelps*, 2020 U.S. Dist. LEXIS 223300, at *24; *Israel*, 2006 U.S. Dist. LEXIS 80863, at *48. The jury will determine the scope of Voynow's services.

Like Voynow's arguments as to what Voynow saw and when they saw it, Voynow's arguments as to the scope of Voynow's engagement also go to the weight, not the admissibility.

### B. Even If Based On Information Admittedly In Voynow's Possession, Voynow Was Derelict In Its Duties

As set forth above, it is Star's position that Voynow was charged with reviewing Star's schedules, assessment and analysis of internal controls, inquiring of personnel, reviewing bank reconciliations, reviewing sales tax filings, recommending and developing general journal entries and reporting to Star Auto through written and oral reports on an ongoing basis. This is vastly different from Voynow's position and is the primary factual issue in this case.

Voynow, in contrast, claims that its engagement was solely for tax purposes, and that it was not charged with reviewing this information, and that suspicious or anomalous items are not matched to dated schedules that Voynow actually saw, could have seen or retained in its workpapers or that was, otherwise, in its possession. (Dkt. 137, pp. 7-17). As set forth above, this claim makes little sense in light of the work that Voynow actually performed and the documents that it actually reviewed. Nevertheless, based on well-established accounting principles and standards as set forth in Sosnowski's report, even if Voynow's obligations were limited to information that Voynow possessed, there is extensive evidence in the record that Voynow was in possession of information that appeared to be incorrect, incomplete or inconsistent, for example, that displayed an unusual balance, aged item, control account, account classification, or unexplained entry, and obligated Voynow to make reasonable additional inquiries, but it failed to do so. (*See*, *e.g.*, Dkt. 137-1, p. 6; Dkt. 137-3, p. 6; Sosnowski Dep., 219-20, 251-52, 311). This is reflected in Sosnowski's report and testimony.

For example, according to invoice descriptions, Voynow prepared Star Subaru's income tax returns and inspected the list of 1099s issued to vendors each year. By way of example, this is expressly contained in Voynow's own memo to "Mike, John and Steven Koufakis," dated November 25, 2015 (Voynow_025163-64; Voynow_027434, December 19, 2016), which states under "Star Subaru," "Make sure all 1099's are issued." *Id.* Voynow also billed for its review of 1099. (*See*, *e.g.*, Voynow_024900 ("Go through 1099's from Carmen"). As explained in Sosnowski's report with respect to the Motorsports Scheme, there were documented irregularities in Voynow's process, such as its failure to identify the non-issuance of a 1099 to a large vendor,

Motorsports, despite the fact that Voynow inspected the list of 1099s issued. (Dkt. 137-1, pp. 8-9; Dkt. 137-3, pp. 8-9). Thus, if the jury accepts Star's version of the facts, then, a jury reasonably can conclude that Voynow's failure to identify Motorsports was not reasonable.

As to the Payment of Personal Creditors Scheme, Sosnowski's report notes that Voynow personnel inspected the monthly rebate and incentive schedule (Schedule 21), known as factory receivables. (Dkt. 137-1, p. 9; Dkt. 137-3, p. 9). In addition, Sosnowski notes that "All proper transaction entries on … schedule [21] contain VINs to match each vehicle with the specific rebate or incentive offered by the manufacturer." *Id.* However, contrary to the typical usage of VINs, Schedule 21 used a fictitious control number, "VKFP." (Voynow_007862-64). In fact, in a Schedule 21 printed by Voynow in January 2014 for the month-ending "12/31/2013," in mini (0350) format, Voynow apparently inquired about the entry with the fictitious control number which indicated a negative $74,693, *i.e.*, a significant sum of money going out of a receivable account. *Id.* Voynow actually handwrote, "Extra money waiting for chargeback." Similarly, as noted in Sosnowski's report, there were "two unusual entries" that "represented dealership check written to Star Toyota for $3,500." (Dkt. 137-1, p. 9; Dkt. 137-3, p. 9). As Sosnowski observed: "This is unusual because Star Toyota has no connection with Star Nissan's receivable for Nissan's manufacturer rebates and incentives." (Dkt. 137-1, p. 9; (Dkt. 137-3, p. 9). In addition, the fact that these were "round numbers" which is "not typical[]" for a factory receivable. *Id.* at 10.

Beyond this, Star's records reflected a fictitious $26,000 deposit from Vivian Karouzakis recorded through a general journal entry on May 14, 2013.[17] (*Id.*; Star00133248-53). Voynow, however, reviewed Star's bank reconciliations. It should have noticed that there was no deposit in the actual bank statements. (Dkt. 137-1, p. 10; Dkt. 137-3, p. 10). Indeed, Voynow's own expert, Vincent Petruzziello, noted that this scheme would have been discovered through the monthly bank statements. (Dkt. 137-2, p.13 at ¶60).

As to the Loan Payments Not Repaid Scheme, Sosnowski's report notes that Despina Theocharis ("Theocharis"), an office manager, failed to repay loans of $98,897.98, but she recorded fictitious general journal entries to reflect payment. (Dkt. 137-1, p. 10-11; Dkt. 137-3, p.

---

[17] It should be noted that the fact that certain documents considered by Sosnowski predate the actionable period does not render those documents categorically irrelevant or disqualify his reliance upon them. The Second Circuit has expressly distinguished the temporal limits on liability from the admissibility of evidence supporting a timely claim. *In Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1037–38 (2d Cir. 1992), a commercial dispute, the court held that a statute of limitations does not prohibit using documents predating the limitations period where those documents are relevant to events within that period. Id. Similarly, after limiting the plaintiffs' actionable claims on summary judgment, the Southern District permitted otherwise relevant historical evidence and rejected exclusion based solely on its pre-limitations date. *Busher v Barry, 2019 US Dist. LEXIS 220082 [SDNY Dec. 18, 2019]*. These authorities support considering earlier records for their bearing on the surviving claims, while preserving the Court's ruling barring recovery on the dismissed claims.

Here, the earlier records are relevant to the extent they establish warning signs presented to Voynow and explain the professional significance of similar irregularities encountered during the 2015–2016 engagements. For example, a 2013 schedule demonstrably reviewed by Voynow may establish its exposure to an anomalous entry or accounting practice; Sosnowski may then explain why that information bears on the inquiry, verification, or supporting-document examination required when the same or a materially related irregularity appeared during the actionable period. The proposed inference is that the earlier warning signs inform the assessment of Voynow's later performance—not that the earlier omission itself supplies an independent basis for recovery. Star must still establish a departure during the surviving engagements and its causal connection to recoverable losses. Subject to that foundation and ordinary evidentiary requirements, the documents should not be excluded merely because they bear an earlier date. Any concern that the jury might impose liability for the dismissed claims can be addressed through a limiting instruction confining its consideration of the historical evidence to the surviving claims.

10-11). Sosnowski opines that "Voynow's inspection of monthly bank reconciliations would have revealed that the fictitious deposit recorded through an adjusting journal entry did not appear on the bank statement indicating that the funds were not actually received." *Id.* at 11. As noted above, it is unquestionable that Voynow reviewed bank reconciliations. (*See, e.g.*, Voynow_0006805; Voynow_0006829; Voynow_0006990; Voynow_0010918-32; Voynow_011008-14; Voynow_0011159-61; Kumor Dep, 265:18-20; Lombardo Dep., 35:2-4, 40:21; Kravets Dep., 101:19-21). In addition, Voynow should have identified general journal entries (Journal: 11) for loan repayment in the service & parts receivable schedule, Schedule 5, for a loan repayment, as usual. Voynow's own records also show that it reviewed the employee advances schedule and the payroll deduction schedule. (*See, e.g.*, Voynow_005888; Voynow_006180; Voynow_019598). The evidence showed that all loans would be repaid by payroll deduction. (Feb. 3, 2023 J. Cutillo 30(b)(6) Dep., 15:20-16:1).

As to the Staples Scheme, Carmen Jones ("Jones"), an accounts payable clerk, used Star Nissan's Staples credit card to purchase personal items, including gift cards, totaling approximately $68,852.67. Here, if Voynow "followed the trail" based on the two (2) Staples vendor accounts, Voynow would have reviewed, *inter alia*, Staples credit card receipts and invoices. (Dkt. 137-1, p. 11; Dkt. 137-3, p. 11). These documents show further anomalies: First, there are multiple payments by Star on each monthly statement which is highly unusual inasmuch as vendors generally get paid one time per month; and second, they show the non-business purchases. (*See* Feb. 3, 2021 Michael Koufakis Dep. in Carmen Jones lawsuit, pp. 123:9-13 ("Q- Were gift cards ever used by any of the dealerships in any department? A- No gift cards at any dealership in any department at any time ever were used for any reason."); p.132:18-25 ("Q- Just with that, would there be any time that a gift card of that amount for something like Starbucks would be used like any kind of incentive for anybody? A- As I said in my previous statement, I thought I was quite clear, never in any location in any department at any time ever was there a need for a gift card. So the answer is no."); Exs. 2 and 4 in Michael Koufakis Dep. in Carmen Jones). Moreover, there is evidence that Star does not use gift cards for any business reason. (*Id.*). Sosnowski testified that Voynow would have been in a position to detect Jones' fraud because if they made reasonable inquiries and "followed the trail." (*See, e.g.*, Sosnowski Dep., 229-30, 234-39). Thus, Voynow fell short of its standard of care owed to Star based on its scope of work.

As to the Customer Claim Scheme, sales manager Douglas Filardo ("Filardo") embezzled $378,157.08 from Star Subaru by retaining customer deposits from 2014-2017, concealing his retention by using annual advance payments from Subaru of America and instructing clerks, verbally and with fictitious claim forms, to issue credits to customers for vehicle damage. (Dkt. 137-1, p. 12; Dkt. 137-3, p. 12). Filardo would by tell employee Gladys Galarza that the customers had not fully paid because their vehicles had been damaged and that Subaru of America would later reimburse Star Subaru for the purported damage. (May 10, 2022 Cutillo Aff. submitted in Filardo case, "Cutillo Aff."). When Star Subaru later received unrelated annual Subaru bonus money, he directed Galarza to apply that money against the fabricated customer receivables, thereby eliminating the shortages from the books. *Id.* Sosnowski observed that customers who purchase vehicles "should never appear on a service & parts receivables schedule." *Id.* Voynow's own records reveal that Voynow reviewed Star's service and parts receivables schedule, Schedule 5, which "we always printed … out as full." (Kumor Dep., 108:19-23; Voynow_011159-61; Voynow_021153-54; Star Dep. Exs. 19 and 19A). This was another example where Voynow had information from which it should have "followed the trail." Here, although Voynow should have investigated the notations of customer names with the corresponding stock numbers for vehicle purchases, it did not. In addition, based on Voynow's own printout of Schedule 5 and its own interim memo, "they omitted the large amounts [of receivables] relating to vendor Subaru of

America" but included much smaller receivables, and "Voynow's investigation of the vendor's outstanding debt likely would have resulted in the discovery of the theft." (Dkt. 137-1, p. 12; Dkt. 137-3, p. 12; Voynow_011159-61; Voynow_021153-54; Star Dep. Exs. 19 and 19A). This would have revealed that Star's books reflected that Subaru of America had a huge receivable when, in reality, the monies that Subaru of America paid to relieve a fictitious customer receivable (because Filardo pocketed the money). Thus, Sosnowski's opinion that Voynow breached the standard of care in this instance is supportable by Voynow's own papers and other documents that it should have reviewed if it followed the trail.

As to the NMAC/AMEX Scheme, there were documented irregularities on Voynow's own work product, such as workpapers and interim memos, where Voynow made inquiries about accounting anomalies. (Dkt. 137-1, pp. 8-17; Dkt. 137-3, pp. 8-18). By way of example, Sosnowski's report provides a concrete example in Voynow's workpaper file, with time records showing who was present, of a huge red flag that Voynow saw, and then ignored, with respect to the January 19, 2015 trend analysis, and related 2014 adjusting journal entry of approximately $283,985 that reduced inventory and net income. (Dkt. 137-1, pp. 13-14; Dkt. 137-3, pp. 13-14; Feb. 25, 2023 Franzen Dep., pp.141:7-169:2; Seibel June 22, 2023 30(b)(6) dep., pp.121:13-198:12; Voynow_022471-73; Voynow_022474-83; Voynow_022484-93; Voynow_024569-76; *see also*, Star00162434-37). With respect to that, Sosnowski's report stated: "This journal entry resulted in a significant reduction in the 2014 net income of the Dealership. Entries of this magnitude to inventory are unusual and are typically the result of a physical inventory. However, Voynow was aware that no physical inventory was performed at the Dealership as of December 31, 2014. The owners should have been notified of the severity of this issue and the possibility of fraud." (Dkt. 137-1, p. 14; Dkt. 137-3, p. 14). His testimony was even more explicit: "So here it is listed, approximately 284 thousand dollars of fraud discovered, or should have been discovered by Voynow on January 19, 2015, because that is the day they generated reports and did field work that they did at that time." (Sosnowski Dep., 47:13-19). This is inexplicable. Yet, Voynow attempts to explain this by referring to something completely different – an issue they highlighted in 2011 as to "open parts invoices," which would refer to receivables, not a write-down of physical inventory, reducing net income by nearly $300,000. (Star00024913-31; *compare* with Feb. 25, 2023 Franzen Dep., pp.141:7-169:2). If the jury accepts Star's version of the facts, then, a jury reasonably can conclude that Voynow's failure to alert Star's owners as to the magnitude of this loss and its significance was contrary to professional standards.

As to the Reverse Deposit Scheme, Jones removed bank deposits (cash and checks) totaling $127,296.88 from Star Auto's safe from February 20, 2013 to April 19, 2016. She concealed the theft by reversing the deposit entry in R&R and creating fraudulent general journal entries (Journal: 11) applying credits to Star Nissan's Parts & Service Cash Sales Account. (Dkt. 137-1, p. 15; Dkt. 137-3, p. 15). Sosnowski opines that "Voynow should have detected the reversed deposit through the bank reconciliation process." *Id.* Sosnowski observed that there were "multiple general journal entries" and that "[a]ny general journal entry (Journal: 11) recorded in the cash sales account is unusual." *Id.* As above, Voynow admittedly reviewed bank reconciliations (*Supra*; Voynow_011008-13 for admission regarding Star Nissan). Moreover, the deposits reversed were associated with credit card receivables, which Voynow also reviewed, and thus, had they reviewed the credit card receivable schedule and made reasonable inquiries, Voynow should have uncovered this scheme. (Dkt. 137-1, p. 15; Dkt. 137-3, p. 15; Voynow_006540; Voynow_012912).

As to the Employee Advance Scheme, Sosnowski testified that, based on the evidence, Voynow's work included reviewing bank information, developing or reviewing adjusting journal entries, responding to accounting questions, and providing accounting assistance to Star personnel.

(Sosnowski Dep., 108:13-25; *supra*). In his report, Sosnowski observed that Voynow's own workpapers expressly noted large outstanding loans. (Dkt. 137-1, p. 11; Dkt. 137-3, p. 11). Voynow's own papers show that they reviewed the employee advance schedule. (*See, e.g.*, Voynow_005888; Voynow_006180; Voynow_019598). Sosnowski's opinion is not merely that an employee advance existed. *Id.* It is that an aged advance, lacking documented repayment terms and accompanied by a purported repayment that was not reflected in bank activity. *Id.* According to Sosnowski, this required reasonable inquiry, particularly as Voynow not only saw the entry in schedules but reviewed bank reconciliations. *Supra*. Thus, if the jury accepts Star's version of the facts, then, a jury reasonably can conclude that accounting irregularities contained on Plaintiff's bank reconciliations and adjusting journal entries were seen by Voynow, and that they provided the responses and assistance as testified.

As to the Drawing Falsified Checks (PTSN/TOY) and Cash Withdrawal Scheme, this Court has already noted:

> When a Star employee brought unusual information in Karouzakis's commission schedules to Voynow's attention in 2015, Voynow it brushed away, stating "[t]hat's Vivian's, don't worry about it." Voynow 30(b)(6) Dep. (J. Cutillo) 256:6–22, ECF No. 126-45. In other instances, Voynow accepted the validity of Karouzakis's various schedule entries without questioning them, noting in its workpapers that the entries were "Ok per Vivian." Voynow Workpaper at 4, 6, ECF No. 126-78. One of Voynow's junior accountants testified that Voynow did not exercise typical "professional skepticism" with regard to Karouzakis's conduct. D. Lombardo Dep. 101:6–103:10, ECF No. 126-50.

(Dkt. 128, p. 7). As noted above, Voynow dismissed explicit and legitimate questions from Star's staff which would have exposed the PTSN Scheme had Voynow acted in accordance with its duties. *See* Feb. 1, 2023 30(b)(6) Cutillo Dep. at 255-59 (as to PTSN Scheme, Vivian stole cash and covered it up by creating fraudulent journal entries with an improper control number disguising the missing cash as bogus expenses on commission schedules, meant to compensate employees, each with a specific control number, and Cutillo specifically "questioned Randy about that entry" and he said "it's Vivian's, don't worry about it"). Thus, as pointed out in Sosnowski's report, this is a prime example of information in Voynow's possession, workpapers and interim memos (*see*, *e.g.*, Dkt. 137-1, pp. 11, 12, 13, 14; Dkt. 137-3, p. 11, 12, 13, 14). Sosnowski referred to specific instances when Voynow was alerted to accounting irregularities occurring prior to particular interim visits, such as when Cutillo brought a fictitious transaction on an Accrued Commission Schedule to the attention of Defendant Randy Franzen during a 2014 interim visit, and Franzen told her "not to worry", that "it's Vivian's", and never told Star's owners (Dkt. 137-3, pp. 17; Feb. 1, 2023 30(b)(6) Cutillo Dep. at 255-59). As another example, Sosnowski identified documentation concerning the PTSN entries showing that Voynow noticed an anomaly and discussed it with Ms. Vivian Karouzakis, the office manager. He also considered Defendant Bob Seibel's testimony that Voynow asked about the entry and accepted the explanation that it was an accrual. (Sosnowski Dep., 97:16-98:12; Feb. 8, 2023 Seibel Dep., 183:15-188:2). These specific instances should have prompted Voynow "to make reasonable inquiries" in accordance with its professional obligations.

As to the vehicle theft schemes, Voynow's own papers show that it reviewed We Owe Schedules (Schedule 60) containing fictitious stock numbers, like "VK," "Extra," (Voynow_008827-30). (*See also*, Star00207728-30 with ficititious control names, "Extra," "Theft10," and "Stolen"). As Sosnowski opined, had Voynow investigated the fictitious stock

numbers, it "would have resulted in the discovery of dealership checks recorded as We Owes which reduced the profitability on vehicle sales." (Dkt. 137-1, p. 17; Dkt. 137-3, p. 18). This is another example of Voynow's failure to "follow the trail" which comes from its own papers.

In addition, as to all these schemes, Voynow's suggestion that Sosnowski failed to identify when Voynow breached the standard of care is also contrary to the evidence. (Dkt. 137, p. 8). As an initial matter, the vast majority of the documents referenced in Appendix A to Sosnowski's report are dated. In addition, to the extent that Voynow refers to isolated deposition answers and states that Sosnowski did not always identify the precise date on which a particular accounting entry was created or the exact date on which Voynow reviewed a specific schedule (Dkt. 137, pp. 7-11), Voynow mischaracterizes the grounds of Sosnowski's opinion.

Many of Sosnowski's opinions concern recurring balances, year-end account conditions, aged receivables, outstanding employee advances, vendor-reporting information, reconciliations, or other accounting conditions that existed over extended periods rather than transactions appearing on a single day. (Dkt. 137-1 *passim*; Dkt. 137-3 *passim*). In addition, at his deposition, Sosnowski explained, particularly as to Payment of Personal Creditors Scheme, Vehicle Schemes, and NMAC/AMEX and Reverse Deposit Schemes, for example, that Voynow should have discovered those schemes on "the next visit after" the questionable "transactions were recorded." (Sosnowski Dep., 245, 280, 292-93). Sosnowski explained numerous times during his deposition, when being questioned as to several particular schemes, that specific accounting entries contained in actual Schedules raised questions, and because of that, Voynow had a professional obligation "to follow the trail." (*See*, *e.g.*, Sosnowski Dep., 219-20, 252, 311).

Based on the foregoing, although it is Star's position that Voynow was charged, among other things, to review Star's schedules, assess and analyze internal controls, inquire of personnel, and review bank reconciliations, even if this Court were to look only at the information that was clearly within Voynow's possession based on Voynow's production or testimony, it is clear that Sosnowski's opinion that Voynow was derelict in its duties is well-grounded in the evidence.

## IV. SOSNOWSKI IS WELL QUALIFIED AS AN ACCOUNTING EXPERT

In determining whether the expert is qualified, "a court must ascertain whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background" (*SEC v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (internal quotation marks omitted)), and then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" (*United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). *Long Is. Hous. Servs. v. NPS Holiday Sq. LLC*, 2021 U.S. Dist. LEXIS 171345, at *8 (E.D.N.Y. Sep. 9, 2021) (same).

"Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *SEC v. Revelation Capital Mgmt.*, 215 F. Supp. 3d 267 (S.D.N.Y. 2016) (internal quotation marks omitted) (collecting cases). "[Q]uibbles" with an expert's qualifications "are properly explored on cross-examination" and "go to the weight, not admissibility" of an expert's testimony. *Id.* at 274; *see also*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043–44 (2d Cir. 1995) ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings …, were properly explored on cross-examination and went to his testimony's weight and credibility -- not its admissibility"); *Long Is. Hous. Servs.*, 2021 U.S. Dist. LEXIS 171345, at

*9 (same); *Lane v. Am. Airlines, Inc.*, 2024 U.S. Dist. LEXIS 50021, at *57 (E.D.N.Y. Feb. 27, 2024) (holding that court will not exclude testimony on ground that expert "lacks expertise in the specialized areas that are directly pertinent" where expert has "educational and experiential qualifications in a general field closely related to the subject matter" because those assertions "go to the weight, not the admissibility").

Here, Sosnowski is a highly credentialed certified public accountant and a managing director and partner of Brisbane Consulting Group, LLC. with 37 years of accounting, forensic-accounting, valuation, and litigation-support experience. (Dkt. 137-1, App. B, pp. 23-25). His resume speaks for itself. *Id.* He has the following professional designations and achievements: CPA - Certified Public Accountant: New York State, ABV - Accredited in Business Valuations; American Institute of Certified Public Accountants ("AICPA"), ASA - Accredited Senior Appraiser: American Society of Appraisers, CFF - Certified in Financial Forensics, AICPA, Certificate of Educational Achievement - Business Valuation (AICPA), and Securities Licenses – Series 7 and 66. *Id.* He has testified in Court on numerous occasions. *Id.* His practice includes forensic accounting, business valuation, economic-damages analysis, and litigation support. The fact that he has not frequently been engaged in accounting malpractice matters does not disqualify him from opining as to the professional standards applicable to accountants and Voynow's failure to adhere to those standards.

His deposition further established that he has decades of public-accounting experience; he participated in approximately 50 to 100 review engagements involving automobile dealerships; he prepared tax returns for an automobile-dealership group; he performed forensic-accounting services involving automobile dealerships approximately five times during the preceding ten years; he had experience with R&R through his prior dealership accounting work; he had served as an expert in approximately twenty accounting-malpractice matters; and no court had ever excluded any portion of his expert opinions. Sosnowski Dep., 13:2–18:7.

Voynow emphasizes that Sosnowski's most recent automobile-dealership tax work and R&R experience were not recent, and that much of his expert practice involves economic-damages, shareholder, patent, and matrimonial matters. Those points may be used on cross-examination. They do not disqualify a CPA with substantial accounting, dealership, review-engagement, and forensic-accounting experience from explaining the governing standards of care. In *McCullock*, the Second Circuit rejected precisely this type of overly narrow attack on an expert's qualifications, holding that alleged gaps in the expert's particular experience affected the testimony's weight rather than its admissibility. The same result is warranted here.

Voynow incorrectly states that Sosnowski had never acted as an expert in a matter involving an automobile dealership. His testimony was that he had prepared expert reports in approximately five dealership matters, although those matters did not proceed to trial and were not characterized as accounting-malpractice cases. Sosnowski Dep., 15:4-12. He also testified that he had performed forensic-accounting work for automobile dealerships approximately five times within the preceding ten years and had participated in approximately 50 to 100 dealership review engagements during his public-accounting career. Sosnowski Dep., 17:6-8; 17:22-18:3.

Voynow likewise emphasizes that only approximately one percent of his recent expert practice involved accounting-malpractice claims. That percentage nevertheless represented approximately twenty matters in which an accountant was a defendant. Sosnowski Dep., 13:2-20. His qualifications therefore do not rest solely upon generalized damages or matrimonial work.

Rule 702 does not require that an expert previously have testified in an identical federal action. The qualification inquiry is functional: whether the witness possesses specialized knowledge that will assist the jury on the opinions actually offered. See Rule 702; *McCullock*, 61 F.3d at 1043–44. Sosnowski's CPA credentials, public-accounting experience, dealership review experience, forensic-accounting work, and familiarity with R&R satisfy that standard.

## V. VOYNOW'S OTHER OBJECTIONS TO SOSNOWSKI'S LIABILITY OPINIONS ARE ALSO MERITLESS

As an initial matter, Voynow's criticism of the format of Sosnowski's reports, in discussing the generally applicable standards in one section rather than repeating the text of each standard beneath every scheme, is meritless. (DKt. 137, pp. 7, 17-18). The reports identify the governing standards and then explain, scheme by scheme, the accounting irregularity that should have prompted inquiry. Rule 26 and Rule 702 impose no such formatting requirement. *See, e.g.*, *Ravikant v. Rohde*, 2025 U.S. Dist. LEXIS 190664, at *23 (S.D.N.Y. Aug. 21, 2025) (observing "Plaintiff fails to explain how a complete list of materials relied on by Dr. Honig falls short of complying with the requirements of F.R.E. 702 or F.R.C.P. 26(a)(2) and thus appears to take issue with the fact that Dr. Honig did not provide in-line citations in his expert report," and rejecting argument that "lack of in-line citations is sufficient to preclude expert testimony"). Sosnowski identified the standards governing each type of service. He then identified the common professional obligation implicated by the schemes – that a CPA may generally rely on client-supplied information but must make reasonable inquiry when information encountered during the engagement appears incorrect, incomplete, inconsistent, or otherwise unsatisfactory. His report applies that obligation to the specific information identified in each scheme.

Next, although Voynow's faulty premise is based on what appears in Voynow's workpapers and a one-to-one matching exercise, even based on its faulty reasoning, Voynow failed to consider the evidence in Sosnowski's report that provides specific examples as to each scheme, including specific examples of accounting anomalies based on Voynow's own records. (Dkt. 137-1, pp. 8-17; Dkt. 137-3, pp. 8-18).

For example, as to the NMAC/AMEX Scheme, as observed by Sosnowski in his report, Voynow acknowledges that the January 19 and 20, 2015 Star Nissan year-end directly place Voynow at Star's dealership. (Dkt. 137, p.7, fn. 2; Dkt. 137-1, pp. 13-14; Dkt. 137-3, pp. 13-14). In particular, Voynow's time record puts Franzen at the dealership on January 19, 2015, shows the trial balance was printed that morning, a second trial balance was printed two days later on Voynow's own log-in, and Voynow's expert, Scherf, agrees the trial balance shows a $284,000 parts adjustment (*See* Voynow 30(b)(6) Robert Seibel Dep., 128-29 and 134; Scherf Dep., 228). As noted above, Sosnowski testified that this $284,000 "of fraud … should have been discovered by Voynow on January 19, 2015, because that is the day they generated reports and did field work that they did at that time." (Sosnowski Dep., 47:13-19).

That evidence is particularly significant. It demonstrates both that Voynow examined information beyond a final trial balance and that it encountered and questioned an accounting irregularity. It identifies the scheme, directly places Voynow at the Dealership at a particular date and time, reviewing the very records that show that, without a reasonable explanation, it was likely that a fraud took place. In this particular instance, Voynow should have discovered the cover-up of that fraudulent scheme. It was right in its face in the accounting records it reviewed.

The adequacy of Voynow's follow-up – and whether accepting an undocumented explanation from an employee allegedly involved in the misconduct satisfied professional standards – is a quintessential issue for the competing accounting experts and the jury.

As to the Drawing Falsified Checks (PTSN/TOY) and Cash Withdrawal Scheme, Voynow argues: (i) that "intercompany checks is not an unusual occurrence"; (ii) that Sosnowski does not state when the theft took place (even though the Damage Calculations Chart identifying the date range from "9/9/2003-11/18/2016" was expressly identified as Item #14 in App. A to his report) ; and (iii) that he "never did an analysis" to corroborate "that Karouzakis was stealing cash." All of these arguments go to weight, not admissibility (*Zerega Ave. Realty*, 571 F.3d at 214; *Boucher*, 73 F.3d at 21), and are matters for cross-examination, not exclusion (*Daubert*, 509 U.S. at 596; *Amorgianos*, 303 F.3d at 267).

As to the Staples Scheme, Voynow's remaining argument (in addition to its faulty argument addressed above regarding review of schedules, *supra*) that there may be legitimate reasons for maintaining two vendor accounts for Staples (Dkt. 137, p. 10) is also not grounds for Sosnowski's preclusion. This is so because Sosnowski's opinion is not that every duplicate vendor account is fraudulent. It is that two Staples accounts, considered with the gift-card purchases, account activity, and other evidence, required clarification. Assuming Star establishes that both Staples accounts appeared on schedules Voynow reviewed, Voynow's suggestion that there is a possibility of an innocent explanation for a duplicate vendor account is a matter for cross-examination, not exclusion. *Daubert*, 509 U.S. at 596; *Amorgianos*, 303 F.3d at 267.

With respect to the Motorsports Advertising Scheme which ran from November 25, 2008 through November 1, 2016, Voynow contend that Sosnowski, "in part," relied on the erroneous assumed no Form 1099 was ever prepared for Motorsports Advertising, when, in fact, the IRS later sent Mr. Michael Koufakis a mismatch notice in 2015 (Dkt. 137, pp. 14-15). That evidence, however, does make Sosnowski's opinion inadmissible. Sosnowski's report states: "According to invoice descriptions, Voynow prepared Star Subaru's income tax returns and inspected the list of 1099s issued to vendors each year." (Dkt. 137-1, p. 8; Dkt. 137-3, p. 8). This is consistent with evidence directly from Voynow, which Sosnowski reviewed. (*See e.g.*, Voynow_003431, Dep. Ex. 52, Franzen internal March 11, 2013 email inquiring: "Were 1099 send out/" [sic]; Dkt. 137-1, App. A), and Sosnowski's testimony that he assumed that Voynow reviewed the list of 1099 vendors based on what he was told by "Jackie Cutillo" (Sosnowski Dep., 170:4-171:10).

Here, the significant facts are that Motorsports received substantial payments over multiple years, that the vendor name and taxpayer-identification information allegedly did not match, that Voynow reviewed Schedule 18 which contained payable entries with usually round numbers,[18] and that Voynow reviewed 1099s but never noticed that there was no 1099 issued for this vendor. The later IRS notice tends to confirm, rather than eliminate, the significance of the mismatch. The factual questions include when a 1099 was first transmitted, whether Forms 1099 were properly transmitted in each prior year, whether Voynow reviewed the vendor-reporting information, and whether a competent inquiry should have occurred earlier. Although Sosnowski acknowledged

[18] Defendants repeatedly argue that a round-dollar transaction may be legitimate. (Dkt. 137, pp. 9, 11). Plaintiffs agree. Sosnowski does not propose to testify that a round-dollar amount, standing alone, establishes theft. Round-dollar amounts are one contextual feature among others, including the account in which the entry appeared, the size and recurrence of the payments, the identity or apparent duplication of the vendor, missing tax reporting, unexplained aging, and inconsistent control information. (Sosnowski Dep., 147:24-148:15, 175:15-177:13) The jury should evaluate the combination of circumstances rather than isolate one descriptive characteristic from the remainder of the analysis. Sosnowski must be able to explain why, when combined with the other identified facts, round-dollar transaction was one feature warranting inquiry.

learning from Voynow's rebuttal reports that the IRS had issued a mismatch notice, he nevertheless maintained his opinion after reviewing those reports. Sosnowski Dep., 171:18-173:7. Voynow may use the timing of the 1099 and the notice on cross-examination, but a factual correction concerning whether a form was issued in one year does not require exclusion of the broader opinion concerning repeated vendor-reporting irregularities. Sosnowski's opinion concerns the alleged vendor-reporting irregularities reflected during the relevant periods and the professional significance of those irregularities, not the assertion that no Form 1099 was ever issued.

In addition, for the reasons set forth above, Voynow has no basis to complain that Sosnowski assumes that Voynow reviewed the list of 1099 vendors based on what he was told by "Jackie Cutillo" (Sosnowski Dep., 170:4-171:10) because, as set forth above, since Sosnowski is not a fact witness, it is both typical and completely appropriate that his expert opinion is based on factual assumptions. *Daubert*, 509 U.S. at 596; *Rutledge*, 182 F.4th at 194; *Goetz*, 2010 U.S. Dist. LEXIS 70983, at *53; *Phelps*, 2020 U.S. Dist. LEXIS 223300, at *24; *Israel*, 2006 U.S. Dist. LEXIS 80863, at *48. The jury will determine the scope of Voynow's services, including whether Voynow reviewed 1099s.

As to the Payment of Personal Creditors Scheme, Voynow's remaining arguments (in addition to its faulty argument addressed above regarding review of schedules, *supra*) – that (i) inquiry into relatively small dollar transactions, *e.g.*, $3,500, cannot support $590,000 in theft, (ii) round numbers in schedules may be legitimate; and (iii) Voynow was not required to "balance" intercompany transactions – all go to weight, not admissibility (*Zerega Ave. Realty*, 571 F.3d at 214; *Boucher*, 73 F.3d at 21), and is a matter for cross-examination, not exclusion (*Daubert*, 509 U.S. at 596; *Amorgianos*, 303 F.3d at 267).

The suggestion that investigation into relatively small dollar transactions, *e.g.*, $3,500, cannot support damages conflates the theft with the cover-up. (Sosnowski Dep., 246:25-248:22. 272:14). Star's theory is that had Voynow made reasonable inquiries, the underlying fraudulent schemes would have been uncovered. That could turn on a small transaction. Star has never argued that Voynow should have been able to detect the fraud, dollar-for-dollar as it occurred. As noted above, Sosnowski testified that round numbers may be legitimate, but "[i]t depends" and in certain contexts, such as a category like advertising where round numbers are not common, it warrants an inquiry. (*See* fn. 18, *supra*; Sosnowski Dep., 147:24-148:15, 175:15-177:13). Finally with respect to this scheme, even though Voynow was not required to balance intercompany transactions, that does not absolve Voynow of its duty to make reasonable inquiries when in possession of anomalies.

As to the Loan Payments Not Repaid Scheme, Voynow remaining arguments (in addition to its faulty argument addressed above regarding review of schedules, *supra*), Voynow contends that Steve Koufakis and Theocharis testified that a loan to Theocharis was repaid and that the December 31, 2015 employee-advance schedule did not expressly state that the balance was overdue. (Dkt. 137, p. 14). That evidence conflicts with the accounting record reflecting an outstanding balance. Certainly, an expert may rely upon an accounting record even though witnesses offer a different explanation. Sosnowski's opinion is that an outstanding employee advance of substantial size, without written terms or an identifiable repayment schedule, warranted inquiry. (Dkt. 137-1, pp. 10-11; Dkt. 137-3, pp. 10-11). Whether the loan actually was repaid, whether repayment was properly documented, and whether Voynow reasonably relied on any explanation are questions for the jury that go to weight, not admissibility, and are matters for cross-examination, not exclusion (*Zerega Ave. Realty*, 571 F.3d at 214; *Boucher*, 73 F.3d at 21; *Daubert*, 509 U.S. at 596; *Amorgianos*, 303 F.3d at 267).

## VI. THERE IS NO BASIS TO PRECLUDE SOSNOWSKI'S CAUSATION OPINION

Voynow's argument to preclude Sosnowski's causation opinion is baseless. First, as to the Employee Advance Scheme, Payment of Personal Creditors Scheme, and Motorsports Advertising Scheme, Voynow makes another straw man argument (in addition to its faulty argument addressed above regarding review of schedules, *supra*). They suggest that Star argues that fictitious control numbers in the schedules "somehow should have led Voynow to discover that Star's owners had signed checks without backup" (Dkt. 137, p. 13). Star has never made that argument. Voynow repeated reference to checks that were "legitimately signed by Star's authorized check signers" (*see, e.g.*, Dkt. 137, pp. 3, 13, 18, 19) conflates the theft with the cover-up.

As an initial matter, it is fundamental in accounting malpractice cases that "'[q]uestions of causation are ordinarily reserved for a finder of fact ….'" *Pennington v. D'Ippolito*, 425 F. Supp 3d 222, 229 (S.D.N.Y. 2019) (*quoting MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 841 (S.D.N.Y. 2016))(collecting cases). *See also, e.g.*, *Badilla v. Midwest Air Traffic Control Serv.*, 8 F.4th 105, 135 (2d Cir 2021) (causation "is ordinarily a question of fact for a jury"). This is particularly so where causation is based on circumstantial evidence or competing inferences. *Estate of Gustafson v. Target Corp.*, 819 F.3d 673, 675-78 (2d Cir. 2016). As stated in *Estate of Gustafson*, "today, circumstantial connections between a defendant's negligence and the harm that occurred have been deemed enough to raise a question for the jury, not only when the defendant has greater knowledge of what in fact occurred, but even when neither side can tell us what happened." *Id.* at 677. Thus, a court may not take causation away from the jury if doing so would involve choosing among competing reasonable causal inferences. *See, e.g.*, *id.*; *see also*, *Liriano v. Hobart Corp.*, 170 F.3d 264, 272 (2d Cir. 1999) (Plaintiff's "prima facie case arose from the strong causal linkage between [defendant's] negligence and the harm that occurred"); *Turturro v. City of New York*, 28 N.Y.3d 469, 483–84 (2016) ("Given the unique nature of the inquiry in each case, proximate cause is generally an issue for the trier of fact, so long as the court has been satisfied that a prima facie case has been established and the evidence could support various reasonable inferences") (internal quotation marks and citations omitted); *Hain v. Jamison*, 28 N.Y.3d 524, 529–30 (2016) (noting that proximate cause as a "uniquely fact-specific determination" and explaining that where the evidence permits the requisite causal inference, the determination "is best left for the factfinder"). As *Pennington* observed:

> Many accounting malpractice cases bring up thorny causation issues because, as is the case here, the accountant is alleged to have failed to notice an issue caused by someone other than the accountant himself, and the accountant argues that the underlying issue, not the accountant's conduct, was the proximate cause of the plaintiff's damages. … Judge Preska laid out two ways that a plaintiff can establish causation where damages were initially brought about by another party's actions …. First, plaintiff can establish proximate cause if he "affirmatively acted on the defendant's alleged erroneous [accounting documents] and assurances." Id. Second, a plaintiff can establish proximate cause if he can show that had the documents been correctly prepared, the plaintiff would have been able to mitigate his damages.

*Pennington*, 425 F. Supp 3d at 229-230.

Voynow's argument that Star's internal controls somehow make Sosnowski's causation opinion unreliable is meritless. Certainly, Voynow is free to make comparative fault arguments about the failure to undercover the fraudulent schemes. However, unless Star were found by the

jury to be 100% at fault, any comparative fault attributable to Star would not provide Voynow with a "get out of jail free" card. *See, e.g., Philius v. City of New York*, 161 A.D.3d 787, 790 (2d Dep't 2018) (concurring op.) (explaining that New York uses a "pure" system of comparative fault. So, "a plaintiff who is 99% at fault can still recover 1% of his or her damages from a negligent defendant").

In support of its argument, Voynow relies on cases excluding experts who entirely failed to consider an obvious alternative cause. Dkt. 137, pp. 19-20). That is not what occurred here. Sosnowski considered Star's internal controls and expressly acknowledged at deposition that management was responsible for implementing and following internal controls; authorized signers should review supporting documentation; failure to require backup rendered the check-signing control ineffective; and proper review by Star could have prevented later transactions. His testimony therefore did not ignore the alternative cause identified by Voynow. It accepted it. The dispute is whether Star's conduct was the sole cause of the losses or whether Voynow's later professional departures were also a substantial factor in permitting the schemes to continue. New York law does not require a defendant's negligence to be the sole cause of an injury; it is sufficient if the negligence was a substantial factor in producing the loss. See *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016); *Brown v. State*, 31 N.Y.3d 514, 519–20 (2018). Sosnowski did not disregard Star's internal-control failures. He expressly considered and acknowledged them. Voynow's disagreement with his conclusion that Voynow's conduct constituted an additional contributing cause therefore concerns the weight of his causation opinion, not a failure to consider an obvious alternative explanation under Rule 702. Sosnowski's opinion is that Star could have prevented the schemes at the authorization stage and Voynow could have prevented their continuation at later points when accounting anomalies came before it. Those positions are not inconsistent. They describe multiple opportunities to prevent recurring loss.

Ultimately, Voynow's causation argument depends on persuading the jury that Star's internal-control failures entirely superseded any professional shortcomings by Voynow. That is a classic factual dispute between competing experts and fact witnesses. It is not a basis for excluding Sosnowski's testimony under Rule 702.Simply put, any comparative fault by Star would not absolve Voynow from its obligation to make "reasonable inquiries" when furnished with accounting records or information that is "incorrect, incomplete or inconsistent." Star contend that if Voynow had made reasonable inquiries, Star (and Voynow) would have detected the cover-up after the theft for each scheme first occurred.

## VII. THERE IS NO BASIS TO PRECLUDE SOSNOWSKI'S DAMAGES OPINION

### A. Sosnowski Is Qualified to Render an Opinion as to Damages in This Case

Sosnowski's liability opinion concerns Voynow's compliance with professional accounting standards, and his damages opinion concerns the financial consequences of the accounting deficiencies he identified.

As an initial matter, based on his experience, Sosnowski is clearly qualified to quantify Star's damages based on information provided Star and relied upon by Sosnowski.

In its motion, Voynow improperly equates Sosnowski's qualifications with whether he personally conducted a forensic investigation of each alleged theft. That is not the standard. Rule 702 does not require an expert to possess the precise specialization urged by an opposing party; rather, the relevant inquiry is whether the expert possesses specialized knowledge, skill,

experience, training, or education concerning the subject matter of the opinions offered. *See Suffolk Cnty. Water Auth. v. Dow Chem. Co*, 2025 U.S. Dist. LEXIS 152456, at *5–6.

Moreover, Voynow attacks Sosnowski's opinion because he did not personally conduct interviews, personally investigate or independently trace transactions is meritless. It is fundamental that an expert need not personally interview witnesses, conduct a criminal investigation, or independently trace every transaction to opine on resulting economic loss. *See* Fed. R. Evid. 703; *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (holding that experts may rely upon facts and data supplied by third parties, including other experts, where experts in the particular field would reasonably rely on such information). Similarly, Sosnowski's reliance on information developed by Mr. Glen Rosen is not grounds for exclusion.

As explained in *Louis Vuitton Malletier*, "an expert may rely on the opinions of other experts, [but] he must 'in the end be giving his own opinion. He cannot simply be a conduit for the opinion of an unproduced expert.'" *Id.*, 525 F. Supp. 2d at 664. *Louis Vuitton Malletier* distinguishes impermissibly serving as a conduit for another expert's opinions from permissibly relying upon facts, findings, and data generated by others in reaching an independent expert opinion. The relevant inquiry is not whether Sosnowski personally generated every underlying datum or communicated with Rosen, but whether Sosnowski independently applied his accounting expertise to the information and records upon which he relied. Clearly, he did.

Voynow's reliance on *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) and *In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *229 (S.D.N.Y. July 28, 2017) is misplaced. *Leese*, a District of New Jersey decision, did not hold that an expert's reliance on information developed by another professional is, standing alone, grounds for exclusion; rather, the court identified deficiencies in the reliability of the expert's own valuation methodologies. *Id.* at 553–55. Likewise, in *Flaminia*, the Southern District excluded particular opinions involving calculations performed by undisclosed individuals *where those calculations concerned matters outside the testifying expert's own expertise*. *Id.* at *229. Neither circumstance is present here, where Sosnowski applied his own accounting expertise to the information and records before him in reaching his opinions. In any event, any challenge to the extent of Sosnowski's independent judgment in reaching those opinions should be addressed through cross-examination and the development of a full trial record, rather than wholesale exclusion of his testimony.[19]

In fact, there is significant evidence of damages. Indeed, Star's claims against the employee perpetrators for the underlying fraud and embezzlement, which has been proven with judgments in excess of $22 million. Star obtained a judgment, entered on February 9, 2024, in the amount of approximately $16,588,928.87 against Michael Karouzakis as Executor of the Estate of Vivian Karouzakis in *Star Auto Sales of Bayside, Inc. d/b/a Star Toyota of Bayside et al v. Michael Karouzakis as Executor of the Estate of Vivian Karouzakis*, was, in the Supreme Court of the State of New York, County of Queens, Index No. 717443/2017, NYSCEF Doc. No. 65; judgment, entered on February 6, 2025, in the amount of $219,525.16 against Despina Theocharis in *Metro Chrysler Plymouth Inc. v. Despina Theocharis et al.*, in the Supreme Court of the State of New York, County of Nassau, Index No. 613475/2017, NYSCEF Doc. No. 120; judgment entered on February 28, 2025, in the amount of $5,277,300.73 against Carmen Jones and Demetrius Jones in

[19] To the extent Defendants establish that particular information supplied by Rosen was insufficiently supported, the Court should assess the particular opinion dependent upon that information rather than exclude Sosnowski's independently supported opinions. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016).

*Star Nissan, Inc. et al v. Carmen Jones et al.*, in the Supreme Court of the State of New York, County of Nassau, Index No. 610541/2018, NYSCEF Doc. No. 404.[20]

### B. Sosnowski Used a Sufficiently Reliable Basis and Methodology in Rendering His Damages Opinions

Voynow characterizes Sosnowski as having employed "no methodology whatsoever." (Dkt. 137, p. 23). This claim is baseless.

Sosnowski's reports identify the alleged schemes, the individuals involved, the relevant periods, accounting irregularities associated with those schemes, and the financial losses attributed to them based upon the records identified in Appendix A. Therefore, Sosnowski did not simply offer an unexplained conclusion that Star Auto suffered $4,528,600 in damages.

In its motion, Voynow identifies additional investigative steps it believes he should have performed and competing evidence it believes he should have credited, but that is simply Voynow's own belief which goes to weight, not admissibility. *Zerega Ave. Realty*, 571 F.3d at 214; *Boucher*, 73 F.3d at 21. Rule 702 does not require an expert with an otherwise sufficient factual basis to exhaust every conceivable source of evidence or perform every additional analysis proposed by an adversary. *See Suffolk Cnty. Water Auth.*, 2025 U.S. Dist. LEXIS 128786, at *19–21 (rejecting arguments premised upon an expert's failure to examine additional records or conduct additional testing where those criticisms were appropriately explored through cross-examination).

The same is true of Voynow's complaints that Sosnowski did not interview witnesses, examine every backup tape, communicate with law enforcement, trace every transaction, or conduct additional analyses concerning missing records. These criticisms identify additional investigative work Voynow contends would have produced a more complete analysis; they do not, without more, demonstrate that the accounting analysis Sosnowski actually performed was unreliable. Voynow remains free to explore those asserted deficiencies through cross-examination and contrary evidence at trial. *See, Suffolk Cnty. Water Auth.*, 2025 U.S. Dist. LEXIS 128786, at *19–21.

Voynow likewise challenges Sosnowski for failing to adopt the conclusions of the District Attorney's investigation and for allegedly failing to account for alternative explanations, offsets, reimbursements, and possible owner withdrawals. But disagreement concerning which evidence should be credited does not, itself, establish the absence of a reliable methodology. Voynow remains free to attempt to present the District Attorney's findings, alleged owner withdrawals, advertising reimbursements, and other contrary evidence and argue that such evidence undermines the weight of Sosnowski's conclusions.

Voynow's reliance on *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005, and similar cases also overstates the appropriate remedy. *Joiner* involved an impermissible analytical gap between the underlying scientific studies and the expert's causation opinion, while *Lava Trading* involved a damages expert who substantially adopted client-supplied estimates without meaningfully testing their factual basis. Here, by

[20] The claims against Douglas Filardo remain pending in *Star Auto Sales of Queens LLC d/b/a Star Subaru v. Douglas Filardo et al.*, in the Supreme Court of the State of New York, County of Queens-- Commercial Division, Index No. 717443/2017, NYSCEF Doc. No. 1, and seeks damages of at least $455,000.00.

contrast, Sosnowski's opinions are tied to identified accounting records, transactions, alleged schemes, and resulting losses.

In any event, even if Voynow could identify an analytical deficiency in a particular component of Sosnowski's damages calculation, neither *Joiner* nor *Lava Trading* supports wholesale exclusion of his independently supported opinions. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 665 (explaining that a flaw affecting one aspect of an expert's methodology does not necessarily require exclusion of the expert's entire testimony). Moreover, as the court recognized in *Suffolk County Water Authority*, amended Rule 702 requires that "each expert opinion" remain within the bounds supported by the reliable application of the expert's basis and methodology. *Id.* at *7 n.2 (*quoting* Fed. R. Evid. 702 advisory committee's note to 2023 amendment). Accordingly, any asserted deficiency should be evaluated as to the particular opinion or damages component it affects rather than used to justify wholesale exclusion of Sosnowski's testimony. Once again, this type of analysis would be better suited for determination at trial.

Indeed, certain components of Sosnowski's analysis rest upon independently identified facts and records. With respect to the advertising scheme, for example, Sosnowski identified the employee involved, the allegedly fictitious vendor, the relevant period of the scheme, the absence of corresponding advertising services, accounting and tax-reporting irregularities, and payments totaling approximately $1.419+ million. This is materially different from an expert merely repeating an unexplained, client-supplied damages figure. Voynow's evidence that some advertising services may have been received or that certain amounts should have been offset may affect the amount ultimately recoverable, but it does not establish that Sosnowski's entire damages analysis is inadmissible.

At most, Voynow has identified matters for cross-examination and, as to any particular component for which the Court finds an insufficient analytical basis, potential grounds to limit that specific opinion. They have not established that Sosnowski employed "no methodology whatsoever" or that the asserted deficiencies warrant wholesale exclusion of his damages testimony. Voynow's motion must be denied.

## VIII. IF VOYNOW SEEK TO PRECLUDE THE NOVEMBER 20, 2023 SUPPLEMENTAL REPORT, ITS MOTION SHOULD BE DENIED BECAUSE THEY CANNOT ESTABLISH PREJUDICE

Voynow's objection to Sosnowski's supplemental expert report, dated November 20, 2023, is baseless. Sosnowski timely submitted his September 15, 2023 report. He explained at his November 28, 2023 deposition: "There is a section on one of the fraud schemes omitted from the original report inadvertently … and that is why I submitted [th]is second report." November 28, 2023 deposition transcript of Douglas Sosnowski, Ex. "A" hereto, at p. 8). The inadvertently-omitted scheme, itself, was identified in the underlying documents that Sosnowski relied upon in Appendix A, Item #14.

Voynow was never prejudiced and had a full and fair opportunity to ask Sosnowski questions about the inadvertently omitted section, which was included in the supplemental report before his deposition and before the close of expert discovery, but they refused to do so. (Sosnowski Dep., pp. 8-10, 300-01). Voynow received the November 20, 2023 supplemental report before Sosnowski's November 28 deposition. Star expressly offered to make Sosnowski available to answer questions concerning the supplemental report. Counsel placed that offer on the deposition record, and Sosnowski was ready, willing and able to answer those questions. Defense

counsel elected not to examine him concerning the report because Voynow intended to seek preclusion. Sosnowski Dep., 300:10-301:5.

As noted above, preclusion should be denied except in rare circumstances, and with respect to Sosnowski's supplemental report, those circumstances are not present here. *See, e.g.*, *Thomas*, 2018 U.S. Dist. LEXIS 24384, at *9; *JT Cleary, Inc.*, 2024 U.S. Dist. LEXIS 197926, at *13 and 19) (denying motion to preclude supplemental report based on factors set forth in *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997), under similar facts, where situations expert realized he omitted an explanation in his report, and noting that "preclusion of evidence is a harsh remedy" that "should be imposed only in rare situations") (*citing Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)); *see also*, *Sitts v. Dairy Farmers of Am., Inc.*, 2019 U.S. Dist. LEXIS 122446, at *20 (D. Vt. July 23, 2019) (same, rejecting "drastic sanction of exclusion"); *Zerega Avenue Realty*, 571 F.3d at 213 (2d Cir. 2009)(finding that district court abused its discretion by excluding expert testimony for noncompliance with a pretrial order). In deciding whether exclusion is warranted for an untimely expert disclosure, courts consider the explanation for the delay, the importance of the testimony, prejudice to the opposing party, and the possibility of a continuance or lesser remedy. *Softel, Inc.*, 118 F.3d at 961.

Here, Voynow cannot establish meaningful prejudice. Voynow had the report before the deposition, was offered a full opportunity to question Sosnowski, retained its own experts, and has possessed the report for nearly three years. The report addressed an inadvertently omitted scheme, was produced before the deposition, and caused no identifiable inability to conduct discovery. Exclusion would be disproportionate.

## IX. SOSNOWSKI'S OPINIONS ARE NOT MERE *IPSE DIXIT*, BUT ARE WELL-SUPPORTED BY THE RECORD

Voynow characterizes Appendix A as an indiscriminate listing of the entire discovery record. That misstates both the reports and the testimony.

Sosnowski's reports identify the accounting account, schedule, transaction type, or procedure implicated in each scheme. They discuss, among other things, Schedule 18 accounts payable, Schedule 21 manufacturer rebates and incentives, employee-advance schedules, credit-card receivable schedules, bank reconciliations, adjusting journal entries, vendor-reporting information, and intercompany accounts.

Appendix A disclosed the materials considered, while the narrative portions of the reports explained why particular accounting information was significant. His inability at deposition to recall every Bates number does not transform the analysis into ipse dixit. Voynow likewise repeatedly emphasizes isolated deposition answers in which Sosnowski stated that he did not recall a particular Bates number, schedule, or exhibit during several hours of questioning. Rule 702 does not require an expert to memorize years of discovery or recite document citations from memory. The relevant inquiry is whether the opinions expressed in the reports are supported by the materials considered and whether the expert can explain the reasoning connecting those materials to his conclusions.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), permits exclusion where there is no demonstrated connection between data and conclusion. Here, the connection is straightforward. The reports explain that Voynow performed an identified accounting procedure or reviewed an identified account; that the information contained a particular anomaly; that applicable

professional standards required additional inquiry; and that such inquiry would likely have revealed the underlying explanation or prevented continuation of the scheme.

Voynow also overlooks that Rule 702 expressly recognizes that reliable expert testimony may be based on specialized professional experience, provided the expert explains how that experience leads to the conclusions reached, why that experience provides a sufficient basis for the opinions, and how it is reliably applied to the facts of the case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150–52 (1999). That is precisely what Sosnowski did. His opinions are not based on an unsupported assertion that Voynow should have found the fraud. Rather, he explained, based on decades of accounting, dealership, and forensic experience, how a competent CPA reviewing the particular schedules, reconciliations, adjusting journal entries, vendor-reporting information, and account classifications reflected in Voynow's workpapers would recognize anomalies requiring further inquiry under the applicable AICPA standards. Voynow may dispute that professional judgment, but Kumho Tire makes clear that such disputes ordinarily go to the weight of experience-based expert testimony rather than its admissibility.

## X. SOSNOWSKI WAS NOT REQUIRED TO DUPLICATE THE UNDERLYING FORENSIC INVESTIGATION OR RECONSTRUCT THE THEFT

Voynow argues that Sosnowski did not independently reconstruct and prove every underlying theft. Sosnowski acknowledged that he did not access Star's entire computer system, analyze backup tapes, reconstruct every missing document, or communicate with law enforcement. That does not render his professional-malpractice opinions inadmissible. Sosnowski's principal assignment was to determine what services Voynow performed; what accounting information came before Voynow; whether that information contained anomalies; what professional standards applied; and whether competent inquiry would have exposed or prevented continuing losses.

Star expects to establish the underlying transactions through fact witnesses, accounting records, transaction summaries, third-party records, admissions, and other evidence. Sosnowski may rely on those facts in evaluating Voynow's professional conduct. Experts routinely rely upon facts established by other witnesses and business records admitted at trial, which Rule 703 permits. *See* Fed. R. Evid. 703; *United States v. Locascio*, 6 F.3d 924, 937–38 (2d Cir. 1993). Rule 703 does not require the accounting-malpractice expert personally to recreate every underlying transaction before explaining the accounting significance of those facts.

Similarly, Voynow devotes considerable attention to the prior forensic investigation conducted by Rosenfield & Company ("Rosenfield") and argue that Sosnowski improperly relied upon the work of Glenn Rosen ("Rosen"), who has not been disclosed as an expert and will not testify at trial. They also emphasize that Rosenfield's conclusions, the amounts identified during the underlying investigation, and the prosecutors' charging decisions differ in certain respects from Sosnowski's opinions. None of those arguments warrants exclusion under Rule 702.

Star does not intend to prove the underlying fraud schemes through Rosen's expert opinions, nor will Star asks Sosnowski to serve as a conduit for Rosen's conclusions. The existence of the underlying transactions will be established through witnesses with personal knowledge – including Star employees and principals – and through admissible documentary evidence, including Star's business records, R&R accounting records, Voynow's workpapers, bank records, canceled checks, vendor records, accounting schedules, and other records introduced at trial. Those witnesses and records will establish how the alleged schemes operated, what accounting entries

were made, and what information was available during the relevant period. The jury will determine whether Star has established those predicate facts.

Sosnowski was not retained to reconstruct every alleged theft. Rather, he was retained to evaluate the accounting services Voynow performed, determine what accounting information came before Voynow in the course of those services, identify accounting anomalies reflected in the records Voynow reviewed, and evaluate whether the applicable professional standards required further inquiry. Assuming the jury finds the underlying accounting records and transactions established through admissible evidence, Sosnowski will explain whether a reasonably prudent CPA performing the services reflected in Voynow's workpapers should have recognized those anomalies and pursued additional inquiry.

The deposition testimony confirms that Sosnowski did not simply adopt Rosen's opinions as his own. He acknowledged that he did not know the precise methodology Rosen employed, did not independently verify every calculation Rosen performed, and was not offering Rosen's opinions to establish the underlying fraud. Instead, his reports identify the materials he personally reviewed – including Voynow's workpapers, billing records, R&R schedules, adjusting journal entries, accounting records, deposition testimony, bank records, and other discovery – and apply recognized accounting standards to those materials. The fact that another forensic accountant previously investigated some of the same transactions does not transform Sosnowski's independent professional opinions into inadmissible hearsay.

The existence of criminal charges or convictions is not a prerequisite to proving civil loss. Sosnowski correctly explained that law enforcement applies different standards and that the absence of a prosecution does not determine whether money left the dealerships or whether accounting information should have prompted professional inquiry. Star will not ask Sosnowski to determine that a criminal theft occurred merely because he says so. He may, however, assume facts supported by the trial evidence and explain the accounting significance of those facts.

Rule 702 does not require an accounting-malpractice expert personally to reconstruct every alleged theft before offering opinions concerning another accountant's professional conduct. Experts routinely rely upon facts established through admissible testimony and documentary evidence presented at trial. *See* Fed. R. Evid. 703. Rule 703 expressly permits an expert to base opinions on facts or data that experts in the field would reasonably rely upon. Sosnowski's opinions ultimately rest on the underlying accounting records and other evidence introduced at trial, not on Rosen's opinions. If Star establishes through fact witnesses and business records that particular accounting information came before Voynow, Sosnowski may explain the accounting significance of that information and whether it required additional professional inquiry. Conversely, if Star fails to establish the factual predicate for a particular scheme, the corresponding opinion may be limited or rejected by the jury. Those are issues of evidentiary foundation and weight—not grounds for wholesale exclusion under Rule 702.

Finally, Voynow argues that Sosnowski did not independently analyze every alleged scheme identified during the underlying investigation. Star does not intend to elicit opinions from Sosnowski beyond those disclosed in his reports. To the extent a particular scheme is proved through admissible fact testimony and documentary evidence, Sosnowski may testify regarding the accounting significance of the information available to Voynow and the professional obligations arising from that information. To the extent Star does not offer an expert opinion concerning a particular scheme, no Rule 702 issue is presented. Voynow’s criticism therefore concerns the permissible scope of Sosnowski's testimony – not its admissibility.

## XI. THE STATUTE-OF-LIMITATIONS RULING NARROWS DAMAGES, NOT ADMISSIBILITY

Voynow devote considerable attention to the fact that Sosnowski's reports calculate approximately $4.528 million in alleged losses, while the Court has since dismissed claims arising from transactions occurring through 2014. From that premise, Voynow argues that Sosnowski's damages opinions – and, by extension, his testimony as a whole – should be excluded. That argument conflates the scope of recoverable damages with the admissibility of expert testimony concerning the applicable standard of care, alleged departures from that standard, and causation. (*See* fn. 17, above).

The Court's statute-of-limitations ruling necessarily narrows the damages Star may recover at trial. Consistent with the Court's ruling, Star will seek recovery only for timely claims and will present damages supported by admissible evidence relating to the surviving period. To the extent evidence predating 2015 is offered, it will be offered only for permissible purposes, including explaining the development of recurring accounting irregularities, the information available to Voynow during the surviving period, and the accounting context in which the alleged departures from professional standards occurred. Star will not seek in this trial to recover damages the Court has held to be time-barred.

Voynow likewise relies upon a chart they prepared purporting to identify approximately $2,411,250 in surviving losses while simultaneously characterizing numerous transactions as unsupported, repaid, non-criminal, or otherwise non-recoverable. That chart is not evidence and does not establish the proper measure of damages. Rather, it reflects Voynow's interpretation of disputed facts and legal issues that remain for trial. Star does not concede Voynow's characterization of the underlying transactions, the legal significance of those transactions, or Voynow's allocation of recoverable damages. The Court's statute-of-limitations ruling likewise did not adopt Voynow's calculations.

Nor does the fact that Sosnowski's original reports predated the Court's limitations ruling render those reports unreliable under Rule 702. Expert reports necessarily reflect the claims and issues existing when they are prepared. Where subsequent rulings narrow the issues for trial, the ordinary remedy is to limit the expert's testimony to the surviving claims – not to exclude otherwise reliable opinions concerning liability. Here, Sosnowski's opinions regarding the professional accounting standards applicable to Voynow, the accounting information allegedly reviewed by Voynow, the anomalies identified in that information, and the professional significance of those anomalies remain relevant irrespective of the ultimate amount of recoverable damages.

To the extent the Court concludes that the original aggregate damages figure should not be presented to the jury in light of its statute-of-limitations ruling, that issue can readily be addressed through an appropriate limitation on the damages presentation, revised demonstrative summaries, or other trial-management measures. It does not justify excluding Sosnowski's opinions concerning the applicable standard of care, departures from professional standards, or whether timely inquiry could have prevented continuing losses during the surviving limitations period.[21]

---

[21] Rule 403 permits exclusion only where the danger of unfair prejudice, confusion, or misleading the jury substantially outweighs the testimony's probative value. Fed. R. Evid. 403. "Because Rule 403 permits the exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990). Defendants assert that Sosnowski's testimony may mislead the jury concerning criminal theft, the scope of the engagement, responsibility for internal controls, and time-barred damages. Each concern can be addressed by

Ultimately, Voynow's own competing damages chart demonstrates that the dispute concerns the amount and allocation of damages – not the reliability of Sosnowski's accounting methodology. Those issues are properly resolved through the presentation of competing evidence and expert testimony at trial rather than wholesale exclusion under Rule 702.

**CONCLUSION**

Voynow's submission identifies factual disputes and legitimate subjects for cross-examination. It does not establish that Sosnowski is unqualified, that he applied an invented accounting standard, or that his core professional opinions are fundamentally unreliable. Sosnowski's reports and deposition establish that he possesses substantial accounting and automobile-dealership experience; reviewed Voynow's workpapers, time records, billing records, schedules, journal-entry work, interim materials, and deposition testimony; identified recognized professional standards requiring reasonable inquiry into incorrect, incomplete, inconsistent, or anomalous information; distinguished the schemes at issue based on irregularities reflected in materials Voynow actually reviewed; identified specific accounting schedules and procedures through which the irregularities could have been discovered; and acknowledged Star's independent internal-control responsibilities rather than presenting Voynow as the sole possible cause of every loss.

Voynow has identified numerous subjects for cross-examination. It has not demonstrated that Sosnowski employed an unreliable methodology or that his opinions are so fundamentally unsupported as to require wholesale exclusion. Voynow's motion identifies factual disputes, competing interpretations of the evidence, and subjects for cross-examination. It does not identify a defect in methodology warranting exclusion. The Court need only determine whether his opinions satisfy Rule 702. They plainly do.

Star respectfully requests that the Court deny Voynow's request for wholesale preclusion. To the extent the Court concludes that any individual opinion requires limitation under Rule 702, the Court should address those opinions individually rather than permitting Voynow to obtain the functional equivalent of dispositive relief through wholesale exclusion of Star's accounting expert.

At bottom, Voynow asks the Court to resolve factual disputes concerning what Voynow reviewed, what services it performed, what professional standards governed those services, and whether additional inquiry would have uncovered continuing fraud. Those are precisely the types of issues Rule 702 entrusts to competing experts and the adversarial process rather than wholesale exclusion. The Court should deny Voynow's request.

Dated: Lake Success, New York
September 23, 2026

Respectfully submitted,
MILMAN LABUDA LAW GROUP PLLC
/s/ Joseph M. Labuda
/s/ Michael C. Mulè

cc: All counsel of record

---

jury instructions, *e.g.*, that Sosnowski does not determine whether any person committed a crime; Plaintiffs must establish the underlying transactions through other admissible evidence; the jury must determine the scope of Voynow's engagement; and limitation as to recoverable damages. With those limitations, the probative value of professional testimony concerning dealership accounting practices and CPA standards is not substantially outweighed by a danger of unfair prejudice or confusion.